## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Damon Chappelle** | | |
| **Plaintiff,** | **:** | **Civil Action - Law** |
| | **:** | **No. 11-0304** |
| **v.** | **:** | |
| | **:** | **(Judge Conner)** |
| **David Varano, John Dunn, Deborah** | **:** | |
| **Herbst, Michelle Kodack, Renee** | **:** | **Electronically Filed** |
| **Foulds,** | **:** | |
| **Defendants,** | **:** | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION

## FOR SUMMARY JUDGMENT

**Respectfully submitted,**

**LINDA L. KELLY**
**Attorney General**

**By:** *s/ Timothy P. Keating_____*
**TIMOTHY P. KEATING**
**Senior Deputy Attorney General**
**Attorney I.D. No. 44874**

**GREGORY R. NEUHAUSER**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

**Office of Attorney General**
**Litigation Section**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**Phone: (717) 705-8580**
**Fax: (717) 772-4526**
**tkeating@attorneygeneral.gov**
**Date:  September 24, 2012**

## <u>TABLE OF CONTENTS</u>

I.    STATEMENT OF THE CASE .................................................................... 1

II.   RELEVANT PROCEDURAL HISTORY .................................................. 2

III.  STATEMENT OF FACTS ......................................................................... 2

IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT ........................... 15

V.    QUESTIONS PRESENTED ..................................................................... 17

     1.  Were the Defendants deliberately indifferent to Plaintiff's
        complaints that he was being held past his maximum
        incarceration date? ................................................................. 17

     2.  Should the Defendants be granted qualified immunity? ...................... 17

     3.  Is Plaintiff barred from attacking the length of his sentence
        via a § 1983 action? ................................................................. 17

     4.  Does Plaintiff's claim for false imprisonment fail because the
        Defendants released him one day after learning Plaintiff's correct
        recalculated maximum date from the Parole Board? ........................... 17

VI.   LEGAL ARGUMENT ............................................................................. 17

     1.  None of the Defendants were deliberately indifferent to Plaintiff's
        claims that he was being held past his maximum date, they simply
        could not help him because it was an issue solely to be determined
        and addressed by the Parole Board. ...................................................... 17

     2.  Defendants have qualified immunity. .................................................. 24

     3.  Plaintiff cannot attack the length of his confinement via a § 1983
        action because it is barred under the principles established in
        *Heck v.Humphrey.* .................................................................... 27

4. Plaintiff was released within a reasonable amount of time after DOC was notified by PBPP of Plaintiff's newly calculated maximum date and therefore there is no basis for a claim based on false imprisonment. ........................................................29

VII.   CONCLUSION...........................................................................30

# TABLE OF AUTHORITIES

## CASES

*Alston v. Diguglielmo*
  2009 WL 2096214 (E.D. Pa.) ........................................................ 20
*Anderson v. Creighton*
  483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)...................... 24
*Anderson v. Liberty Lobby, Inc.*
  577 U.S. 242 (1986)................................................................. 15, 16
*Arthurs v. Beard*
  623 F.Supp.2d 669 (W.D.Pa. 2009).................................................. 24
*Atwell v. Lavan*
  557 F.Supp.2d 532 (M.D.Pa. 2008) ............................... 18, 22, 23, 27
*Beers-Capitol v. Whetzel*
  256 F.3d 120 (3d Cir. 2001)........................................................... 19
*Benson v. New Jersey State Parole Board*
  947 F.Supp. 827 (D.N.J. 1996) ...................................................... 28
*Brenner v. Local 514, United Brotherhood of Carpenters and*
  *Joiners of America,* 927 F.2d 1283 (3d Cir. 1991).......................... 16
*Burgess v. Roth*
  387 F. Supp. 1155 (E.D.Pa. 1975) .................................................. 29
*Celotex Corporation v. Catrett*
  477 U.S. 317 (1986).................................................................. 16, 17
*Clement v. Consolidated Rail Corporation*
  963 F.2d 599 (3d Cir. 1992)........................................................... 16
*Davage v. United States*
  1997 WL 180336 (E.D.Pa.) ........................................................... 23
*Davis v. Hall*
  375 F.3d 703 (8th Cir. 2004) ......................................................... 25
*DeLauri v. New Jersey Division of State Police*
  2009 WL 222983 (D.N.J. Jan.27, 2009).......................................... 25
*Douglas v. Murphy*
  6 F.Supp.2d 430 (E.D.Pa. 1998) ............................................... 18, 19
*Fitzpatrick v. Algarin*
  2008 WL 3174983 (E.D. Pa.) ......................................................... 27
*Gray v. York Newspapers, Inc.*
  95 F.2d 1070 (3d Cir. 1992)........................................................... 16
*Harter v. G.A.F. Corp.*
  967 F.2d 846 (3d Cir. 1992)........................................................... 17

*Hawkins v. Pa. Bd. of Probation and Parole*
    No. 07-0552-LDD, 2007 WL 1852822 (E.D.Pa. June 26, 2007) ...................... 20
*Heck v. Humphrey*
    512 U.S. 477, 114 S.Ct. 2346 (1994) ................................................................ 27
*Jones v. North Carolina Prisoners' Labor Union, Inc*.
    433 U.S. 119, 97 S.Ct. 2532 (1977) ................................................................ 22
*McSpadden v. Wolfe*
    2008 WL 910010 (E.D.PA.) ..................................................................... 25, 29
*Maciariello v. Sumner*
    973 F.2d 295 (4th Cir. 1992) .......................................................................... 25
*Mann v. Adams*
    855 F.2d 639 (9th Cir. 1988), *cert denied*, 488 U.S. 898,
    109 S.Ct. 242 (1988) ...................................................................................... 23
*Matsushita Electric Industrial Co. v. Zenith Radio*
    475 U.S. 574 (1986) ....................................................................................... 16
*Moore v. Tartler*
    986 F.2d 682 (3d Cir. 1993) ..................................................................... 16, 19
*Mosch v. Brown*
    No. 06-4067 (JLL), 2006 WL 2711637 (D.N.J. Sept. 20, 2006) ...................... 28
*Owens v. Ortiz*
    No. 05-2351 (WGB), 2005 WL 1199066 (D.N.J. May 19, 2005) ................... 28
*Pearson v. Callahan*
    129 A.Ct. 808 (2009) ...................................................................................... 25
*Regan v. Upper Darby Tp.*
    2009 WL 650384 (E.D.Pa. 2009) ................................................................... 29
*Robinson v. Love*
    155 F.R.D. 535 (E.D.Pa. 1994) ...................................................................... 23
*Royal v. Durison*
    254 F. App'x 163 (3d Cir.2007) ..................................................................... 27
*Sample v. Dieck*
    885 F.2d 1099 (3d Cir. 1989) ................................................................... 18, 19
*Stewart v. City of Phila.*
    2008 WL 564681 (3d Cir. Mar.3, 2008) ......................................................... 29
*Timmons v. Diguglielmo*
    No. 05-3801, 2006 WL 2934827 (E.D.Pa. Oct.12, 2006) ........................... 20, 21
*U.S. ex rel. Lawson v. Cavell*
    425 F.2d 1350 (3d Cir.1970) ........................................................................... 20
*White v. Westinghouse Electric Company*
    862 F.2d 56 (3d Cir. 1988) ............................................................................. 16

*Wilkinson v. Dotson*
  544 U.S. 74, 125 S.Ct. 1242 (2005)................................................................. 28
*Wilson v. Horn*
  971 F.Supp. 943 (E.D.Pa. 1997) ....................................................................... 22

## STATE STATUTES

61 P.S. § 331.21a(a) ................................................................................................21

## FEDERAL STATUTES

28 U.S.C §2254 ..................................................................................................... 27

## FEDERAL RULES

Fed.R.Civ.P. 56(c)............................................................................................15, 16
Fed.R.Civ.P. 56(e)................................................................................................16

# I.   STATEMENT OF THE CASE

Plaintiff was serving a six to twelve years state sentence for armed robbery at State Correctional Institute Coal Township ("Coal Township") when he was released on parole.  While on parole he was charged and convicted of federal gun and drug charges for which he received a 13 ½ year sentence.  After serving federal time he was sent back to Coal Township in April 2009 pending the Parole Board calculating how much time he had left on his state sentence.  Plaintiff believed that he should have maxed out on his state sentence because he thought that some of his federal time should have been applied to his state sentence.

When Plaintiff complained to the Department of Corrections ("DOC") Defendants they told him that it was an issue that had to be addressed by the Parole Board not by the DOC.  When a convicted parole violator is returned to state prison he is under the authority of the Pennsylvania Board of Probation and Parole ("PBPP") who has the exclusive authority to recalculate an inmate's maximum time remaining on their sentence.  Ultimately, on July 30, 2009, the Parole Board recalculated his state max time to be July 14, 2009.  DOC released Plaintiff from Coal Township the next day.

Plaintiff settled his claims with PBPP and brought this action against the DOC Defendants claiming they were deliberately indifferent to his claims of over detention.

Defendants were not deliberately indifferent to Plaintiff's claims – they simply could not help him.  They repeatedly directed Plaintiff to the Parole Board to correct any mistakes that the Parole Board may have made in recalculating his maximum sentence as a parole violator

## II.    RELEVANT PROCEDURAL HISTORY

Plaintiff filed this action on February 18, 2011.  Defendants filed a Motion for Summary Judgment on September 24, 2012 along with a Statement of Material Facts in support thereof.  This brief is in support of Defendants' motion.

## III.    STATEMENT OF FACTS

Dave Varano has been Superintendent at State Correctional Institute Coal Township ("Coal Township") since 2008 and has been with the Department of Corrections ("DOC") nearly thirty years (SMF 1).  He is responsible for, *inter alia*, the budget, the safe housing of over 2,200 inmates, and ensuring the safe working environment for a staff of over five hundred people (SMF 2).

The inmate grievance system is handled by Varano's assistant, who also handles many other tasks for him (SMF 7).  If an inmate is not happy to the response of the grievance, they can appeal it to Superintendent Varano, and then further appeal it to the central office, which is the final appeal (SMF 8).  Varano

reviews ten to fifteen inmate request slips a week, looks at the issue involved, reviews the first level response, and ensures the right staff were contacted to look into the matter (SMF 9).  If an inmate writes to Varano saying he is not being helped by the staff Varano does not schedule a personal interview with the inmate given that there are over twenty-two hundred inmates and it is up to his staff to handle most of the issues raised by the inmates either at the unit level or the department head (SMF 12). Because of the complex nature of dealing with inmate records, Varano will call the records staff about specific inmate cases (SMF 6).

Coal Township accommodates the Pennsylvania Board of Probation and Parole ("PBPP") when they are at the institution, but PBPP is separate from the DOC and they work jointly (SMf 13).  Varano does not know of any authority whereby the DOC can modify or change a recalculated maximum sentence of a parole violator made by PBPP (SMF 14). Varano believes that back time relates to parole violators and therefore it is the PBPP determines the time to be calculated (SMF 5). Because of the complex nature of dealing with inmate records, Varano will call the records staff about specific inmate cases (SMF 6).

When Plaintiff wrote a request slip about his max date calculation Varano referred it to the parole officer at the facility and the records supervisor to look into the Plaintiff's grievance (SMF 10).  When Varano responded to Plaintiff that Plaintiff's issue would be resolved with both parole and the records office Varano

wrote, in part, "Obviously, we would not be keeping you past your max date" (SMF 11).

Michelle Kodack started as a records specialist at SCI-Coal Township in 2000, was promoted to a Records Specialist 2 in 2001 and became the Records Supervisor in 2007 (SMF 15).  In 2009, there were approximately 2,000 inmates, which were split among five records specialists (SMF 17).  When parole violators come back to Coal Township they are put on "parole violator pending" ("PVP") status until a recommitment order is received by PBPP (SMF 18).

Inmates, who are out on parole and returned as a parole violators waiting to be recommitted by the Parole Board, are accompanied by a PBPP warrant and they are put on PVP status (SMF 19).  After being recommitted by PBPP, the new maximum sentence of the parole violator inmate is calculated by PBPP (SMF 20).  The amount of time it takes for the new PBPP calculated by PBPP to Coal Township varies (SMF 21).

PBPP tracks the time parolees are out of prison and determines what time should be credited towards which sentence they are arrested on new charges (SMF 24). After an inmate is paroled, any change in his original sentence is done by the PBPP, it is no longer done by the DOC (SMF 27).  The calculation of a new max date for parole violators is done by PBPP who determines what time is applied where (SMF 28). The amount of delinquent time ascribed to a parole violator is

4

decided by PBPP (SMF 29).  Kodack is not aware of how the PBPP credits back time (SMF 32).  Once an inmate is released on parole and comes back on parole violations, the DOC is no longer responsible for the inmate's sentence calculation, the DOC records the information provided by the Parole Board (SMF 34).  Once PBPP makes a decision about an inmate's max date Kodack cannot change it without PBPP's permission (SMF 38).  During the twelve years that Kodack has been working at Coal Township only three inmates have been held past their max date, with Plaintiff being one of them (SMF 39).

Whenever anyone contacts the records office asking about an inmate being held past their maximum sentence Kodack will always check the records of that inmate (SMF 42). The records department generally gets twenty five to thirty request slips for information from inmates a week (SMF 22).  Just like Kodack cannot change a court order just because she thinks it is wrong, she cannot change a Parole Board action just because she thinks it is wrong (SMF 43). The amount of time Plaintiff spent serving his parole violation and the amount of time accredited towards serving his federal sentence is a calculation solely determined by the PBPP (SMF 31).

On July 29, 2009, at 2:43 p.m., PBPP modified Plaintiff's max time to be July 14, 2009 (SMF 33).  On July 30, 2009 at 2:36 p.m. Plaintiff was released from

Coal Township one day after PBPP had recalculated his max to be July 14, 2009 (SMF 40).

Deborah Herbst was a records specialist at Coal Township from 2006 until she retired in 2009 (SMF 44).   Herbst monitored minimum and maximum sentencing dates of inmates through the use of a computer at the institution, and computed new state and county sentences imposed by the court system (SMF 45). When a parole violator was returned to the institution, the records office would put in how much back time the inmate owed on their original sentence based on the information received by PBPP (SMF 46). When an inmate came back on a parole violation, he would be put in the computer as "PVP" ("parole violator pending"), meaning his status was until pending (SMF 47).

The amount of back time credit given to an inmate returning as a parole violator comes from PBPP (SMF 48).   When DOC gets an order from PBPP to recommit a parole violator, DOC receive the inmate's back time numbers from PBPP (SMF 49).   If the Parole Board errs in calculating an inmate's back time DOC cannot change it unless the Parole Board changes it (SMF 52).   If a parolee commits a new crime while on parole and is in prison waiting on the new charges, the DOC does not decide where that time is credited (SMF 53).

When Herbst got an inmate request from Plaintiff concerning his parole time, he was told that he would have to talk to parole (SMF 50).   The maximum

time of a parole violator reflected in the inmate's file is generated by a computer based on information received by PBPP (SMF 51).  When Herbst got a request slip from Plaintiff about his max time Herbst checked the computer, saw that Plaintiff had not maxed out yet and responded to Plaintiff's request slip (SMF 54).  Herbst had no interest in keeping Plaintiff, or any other inmate, past their maximum date (SMF 55).

In 2004, Renee Foulds was a Corrections Officer 1 when she started at Coal Township and in 2012 she was promoted to a Corrections Unit Manager, a position she currently holds (SMF 56).  Foulds is Unit Manager for all of A-Unit and half of B-Unit with a caseload of upwards to 250 inmates (SMF 57).  Foulds main responsibility is to review inmate files and treatment recommendation to help them plan for their release (SMF 58).  Inmates are scheduled for programs based on their minimum release and recommendations are made about the programs they should take to become parole eligible (SMF 59).

Inmates coming back as parole violators are put on hold because the counselor must learn first what the new minimum parole date is from PBPP (SMF 60).  When a parole violator is returned to prison, there is a window of time where they are pending a Parole Board action to determine the inmate's status (SMF 61).  It is very common for inmates who are parole violators to come back and dispute their maximum date (SMF 62).

Inmates will tell Foulds they should not have been brought back because they finished their sentence, but fail to include information about whether they absconded while on parole (SMF 63).   There is no real way to know the circumstances of a parole violator's recommitment until the actual documents arrive from PBPP (SMF 64).   PBPP gives information to the DOC and tells the DOC what changes should be made to an inmate's maximum sentence, which information Foulds takes as a direction (SMF 67).

Foulds remembers that Plaintiff complained that he was not supposed to be there because he was not a parole violator, and that he had served his time (SMF 65).   Foulds told Plaintiff that he had to express his concerns to the records department and to his parole agent, because they would have the answers (SMF 66).   Foulds did not ignore Plaintiff's claims, but spoke with him and could not understand what the discrepancy was so when she received PBPP's Board action, she took that to be accurate (SMF 68).

John Dunn has been a Unit Manager at Coal Township for six years, and was a Corrections Counselor for twelve years at Coal Township before that (SMF 69).   Correction counselors meet with inmates within so many days after they arrive and go over the program plan with the inmate in order to prepare them for parole release (SMF 70).   There are ten housing units at Coal Township with 240-250 inmates per unit and the Unit Managers supervise the Correctional Counselors

for the inmates in a particular unit (SMF 71). Inmates have access to the unit manager every day as the Unit Manager walks up and down the tiers talking to inmates addressing problems and concerns inmates may have (SMF 72).

The Institutional Parole Office notifies the counselors of potential inmates coming up for parole release (SMF 73). Unit Managers are not trained on how to calculate an inmate's back time credit (SMF 74). Inmates asking the Unit Manager about sentencing issues or back time would be referred to the records office or the Institutional Parole Office (SMF 75). There are over 2,000 inmates at SCI Coal Township and Unit Managers frequently talk to inmates about a variety of issues (SMF 76). Dunn does not ignore inmates who want to discuss any problems they may have, even if the inmate is being belligerent or disrespectful (SMF 77).

Jennifer Shurock (*nee* Jennifer Pijar) started working for PBPP in 1992 and became a Parole Agent at SCI Coal Township in 2003, after completing six months of training to be a parole agent and a six week course from DOC training academy (SMF 78). As an Institutional Parole Agent Shurock works inside the institution in a building shared with DOC staff (SMF 79). Institutional Parole Agents assist inmates who are becoming parole eligible to get parole (SMF 80).

All of the institutional parole agents, assistants and supervisors interact with the inmates at Coal Township on a daily basis (SMF 81). About eight months before an inmate's minimum (as determined by the DOC), they attend a parole

education class and are then assigned a parole agent (SMF 82).  The Institutional

Parole Office reviews between 100-130 cases of inmates a month Exhibit F, (SMF

83).  The Institutional Parole Office helps inmates with information concerning

their parole eligibility and sentencing and respond to request slips to the pointing

inmate in the right direction concerning any questions they may have (SMF 84).

If a parole violator absconds supervision and is declared delinquent, or is a

convicted parole violator, his original max date can change (SMF 85).  While an

inmate's initial maximum date is determined by the DOC, an inmate who is

returned as a parole violator has their new maximum date determined by PBPP

(SMF 86).  The DOC does not have the ability to change the newly recalculated

max date made by PBPP of a parole violator (SMF 87).  Inmates who contact the

Institutional Parole Office at Coal Township concerning their recalculated max by

the PBPP are directed to contact the Parole Board because parole violators have

thirty days to administratively appeal an action taken by the Parole Board (SMF

88).

Shurock does not assist inmates in sorting out their parole violator

calculations because she is not trained to do such calculations, there is a specific

unit trained to do such calculations, the Case Analysis Unit, under John Janis (SMF

89).

Shurock responded to at least four request slips from the Plaintiff and had received paperwork from Plaintiff's attorney about his complaints concerning his recalculated max date by PBPP (SMF 90).The only steps Shurock would take concerning Plaintiff's complaint is to tell him to contact the Parole Board in Harrisburg because during the twenty years that Shurock worked for PBPP it is the Central Office that calculates back time of a parole violator which provides that information to DOC (SMF 91).  Shurock is not aware of the basis for any of Plaintiff's parole violation max dates recalculated by the Parole Board (SMF 92).

PBPP's Central Office has a Case Analysis Division which is under John Janis that calculates the maximum dates of parole violators (SMF 93).  John Janis, the director of PBPP's Case Analysis Division, has an Associate's Degree and a B.S. in Criminal Justice (SMF 94).  Janis was a county probation officer for twelve years who managed and supervised the violators, unit, issued recommitment actions and recalculated maximum sentences (SMF 95).

It is the responsibility and authority of the DOC to calculate an inmate's sentence when they are initially sentenced (SMF 96).  PBPP have institutional parole offices which are PBPP offices located inside the state prisons which reviews inmate cases three months before their minimum release date (SMF 97).  It is the sole responsibility of the Parole Board to recalculate the max date for any Parole Board action, which then notifies the offender and everyone else privy to

the Parole Board's action of the recalculated max date (SMF 98).   Upon recalculating the max date of an inmate who is a parole violator, the inmate is notified that they have the right to appeal the decision within thirty days (SMF 99). The PBPP "recommitment action" is on a form PBPP-13, which states the recalculated max date and is used by DOC to update the inmate's inmate file (SMF 100).

DOC staff cannot change the PBPP recalculated max date even if they think the PBPP miscalculated the inmate's max date it can only change it if PBPP modifies the Parole Board's official recommitment order (SMF 101).   The DOC does not have the authority to release a parole violator inmate prior to PBPP recalculating his max without PBPP's approval (SMF 102).

Plaintiff was released on parole on April 9, 2001, absconded parole supervision on June 15, 2001, arrested on September 16, 2001, PBPP issued a warrant for him on September 26, 2001, and put a detainer on him on October 24, 2001 (SMF 103).   On September 23, 2002, Plaintiff was sentenced on federal charges to thirteen and one half years (SMF 104).   Plaintiff's federal term of imprisonment was reduced to two years effective July 18, 2007 per court order

(SMF 105).[1]   Plaintiff's incarceration from February 20, 2002 to February 20, 2006, was considered by PBPP to go towards his federal sentence (SMF 106).

If an inmate disagrees with PBPP's decision they can file an administrative appeal within thirty days of PBPP's order (SMF 107).   Plaintiff filed several appeals from PBPP commitment orders by PBPP including one on April 22, 2009 (SMF 108).   On July 29, 2009, at 2:43 p.m., PBPP, in applying the two year federal sentence reduction, determined that Plaintiff's final correct calculated state maximum sentence was July 14, 2009 (SMF 110).

Plaintiff, Damon Chappelle (who also goes by Kevin Jessup, Damon Morrison and Damon Jessup), was sentenced to six to twelve years on a state convictions under the name "Kevin Jessup" (SMF 111).   PBPP had a parole office at Coal Township and if Plaintiff had questions about parole he could get information from the office (SMF 112).   Plaintiff was released from Coal Township on parole in April 2001, went to a Community Corrections Center for three months and then absconded (SMF 113).

Plaintiff was arrested in September 2001 on drug and gun charges, which the state dropped after he was charged by federal agents on the charges resulting in PBPP placing a detainer on him (SMF 114).   Plaintiff was convicted of the gun and

---

[1] It is unclear whether this means the remainder of his sentence was to be two years (which, in context of the order seems correct) or whether his original 13.5 sentence was voided and a 2 year sentence was to be retroactively applied.

drug charges and received a thirteen and a half year federal sentence in September 2002 (SMF 115).  After Plaintiff served time in federal he was sent back to Coal Township April 16, 2009 (SMF 116).  Plaintiff believes that even though he was in a federal prison, he was serving state time (SMF 117).

When Plaintiff returned to Coal Township his Foulds told him to wait for his green sheet concerning his time (SMF 118).  Plaintiff asked Foulds about his situation who told him to contact the Parole Board (SMF 119).

Plaintiff had no trouble contacting Ms. Pijar/Shurock at Coal Township's PBPP office concerning PBPP problems (SMF 34).  Plaintiff outlined to Shurock why he believed he was past his max date in a written statement, and put down all the dates he was incarcerated and Shurock wrote Plaintiff telling him to address his issued to the Parole Board (SMF 121).  Plaintiff does not recall whether he sent documents to Shurock he believed substantiated his claims (SMF 122).

Foulds was accessible to Plaintiff to talk to without a request slip; Plaintiff could just knock on Foulds' door and discuss with her whatever he wanted (SMF 123).  Plaintiff knew in May 2009 from a PBPP green sheet he received that PBPP recalculated his max date to be September 2014, which Plaintiff thought was wrong (SMF 124).  Plaintiff wanted DOC to change the recalculation of his max date made by PBPP (SMF 125).  Plaintiff wanted to talk to Superintendent Varano about his max date and show him documents but does not remember whether he

14

sent Varano the documents he had (SMF 126).  Plaintiff spoke with Superintendent Varano who told Plaintiff to send him a request slip (SMF 127).

Plaintiff wanted Kodack to tell PBPP that PBPP miscalculated his max date, although Plaintiff had already told PBPP he thought the recalculation was wrong (SMF 128).  Plaintiff has been paid by PBPP by way of a settlement for the time that he spent imprisoned past his maximum date (SMF 129).   Plaintiff was due to be released from federal parole on July 30, 2012 (130).

## IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "…forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 577 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  *Anderson*, 577

U.S. at 248; *Gray v. York Newspapers, Inc.*, 95 F.2d 1070, 1078 (3d Cir. 1992).

An issue of material fact is "genuine" if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party. *Anderson*, 577 U.S. at 257;

*Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*,

927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court

must view the facts and all reasonable inference in favor of the nonmoving party.

*Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consolidated Rail*

*Corporation*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric*

*Company*, 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment,

however, the nonmoving party may not rest on the unsubstantiated allegations of

his or her pleadings.  When the party seeking summary judgment satisfies its

burden under Rule 56(c) of identifying evidence which demonstrates the absence

of a genuine issue of material fact, the nonmoving party is required by Rule 56(e)

to go beyond the pleadings with affidavits, depositions, answers to interrogatories

or the like in order to demonstrate specific material facts which give rise to a

genuine issue.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986).  The

party opposing the motion "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v.*

*Zenith Radio*, 475 U.S. 574, 585 (1986).  When Rule 56(e) shifts the burden of

production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.,* 967 F.2d 846, 851 (3d Cir. 1992).


## V. QUESTIONS PRESENTED

1. **Were the Defendants deliberately indifferent to Plaintiff's complaints that he was being held past his maximum incarceration date?**
   **Answer: No.**

2. **Should the Defendants be granted qualified immunity?**
   **Answer: Yes.**

3. **Is Plaintiff barred from attacking the length of his sentence via a § 1983 action?**
   **Answer: Yes.**

4. **Does Plaintiff's claim for false imprisonment fail because the Defendants released him one day after learning Plaintiff's correct recalculated maximum date from the Parole Board?**
   **Answer: Yes.**


## VI. LEGAL ARGUMENT

1. **None of the Defendants were deliberately indifferent to Plaintiff's claims that he was being held past his maximum date, they simply could not help him because it was an issue solely to be determined and addressed by the Parole Board.**

The detention of a prison beyond the termination of his sentence can state an Eighth Amendment violation if that detention occurs without penological justification. *Atwell v. Lavan*, 557 F.Supp.2d 532, 561 (M.D.Pa. 2008) *citing Douglas v. Murphy*, 6 F.Supp.2d 430, 431-432 (E.D.Pa. 1998). In order to establish §1983 liability in such a case a plaintiff must demonstrate three elements. First a plaintiff must demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. Second, the plaintiff must show that the official either failed to act or took only ineffectual action under the circumstance, indicating that his/her response to the problem was a product of deliberate indifference to the prisoner's plight. Third, the plaintiff must show a causal connection between the official's response to the problem and the unjustified detention. *Atwell* at 561, citing *Douglas*, at 686, *citing Sample v. Dieck*, 885 F.2d 1099, 1110 (3d Cir. 1989).

In evaluating a plaintiff's case, among the circumstances relevant to a determination of whether the requisite attitude (deliberate indifference) is present are the scope of the official's duties and the role the official played in the everyday workings of the prison. Id, citing Douglas at 686. Moreover, not every official who is aware of a problem will be found to exhibit deliberate indifference by failing to resolve it. *Id*., at 562; *Douglas* at 686-687.

In order to recover under the Eighth Amendment against an official the plaintiff must demonstrate that the official was "deliberately indifferent" to the fact that the inmate was being held unlawfully beyond his release date from prison. "Deliberate indifference" is a subjective standard in that the official-defendant must actually have known or been aware of the excessive risk to inmate safety. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).

Relevant circumstances in assessing these factors are the scope of the official's duties and the rule the official played in the life of the prison.  Id.  For example, in *Sample* the Court found an Eighth Amendment violation when it was demonstrated that the prison official (1) believed Sample's inquiry might well have merit, (2) knew that the matter needed to be clarified, (3) believed Sample had to rely on his efforts alone to rectify the problem, (4) did not follow the relevant procedure mandated by the Pennsylvania Bureau of Correction, (5) took no other remedial action, and (6) did not inform Sample of any other action he (Sample) might take to resolve his problem.  *Sample*, at 885 F.2d 1099.

The *Sample* articulation of this legal standard was reaffirmed in *Moore v. Tartler*, 986 F.2d 682, 686 (3dCir. 1993) wherein parole officials initially misinterpreted a judge's sentencing order resulting in a six month delay of Moore's release.  Id. at 683-684.  The officials denied Moore's initial requests for release, but did launch an investigation of his claims that lasted over five months and

eventually resulted in his release.  Id.  The Court noted that deliberate indifference is more typically shown in those cases where prison official were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation. Id. at 686.

In the case at bar however, the issue raised is PBPP's recalculation of Plaintiff's maximum state sentence based Plaintiff being a convicted parole violator, it does not concern the calculation of Plaintiff's original sentence by a sentencing Court.   The recalculation of Plaintiff's maximum sentence as a convicted parole violator is solely a function of PBPP and not by DOC employees.

Pennsylvania's parole statute authorizes PBPP to revoke parole and recalculate an individual's maximum release date.  *Alston v. Diguglielmo*, 2009 WL 2096214, at *4 (E.D. Pa.), citing *Hawkins v. Pa. Bd. of Probation and Parole,* No. 07–0552–LDD, 2007 WL 1852822, at *4 (E.D.Pa. June 26, 2007) (Davis, J.) (citing 61 Pa. Cons.Stat. Ann. § 331.21a(a) (West 1999)) (no due process violation because Pennsylvania's parole statute is constitutional); *Timmons v. Diguglielmo,* No. 05–3801, 2006 WL 2934827, at *6 (E.D.Pa. Oct.12, 2006).   Pennsylvania's parole statute, which governs the recalculation of sentences, does not violate the Eighth Amendment. *U.S. ex rel. Lawson v. Cavell,* 425 F.2d 1350, 1352 (3d Cir.1970); *Timmons* , at *6 ("loss of parole credits ... does not implicate a federal constitutional question"). When an inmate violates his parole, PBPP is required

under the parole statute to recompute his maximum term of imprisonment under Title 61 § 331.21a(a) of the Parole Act.

In the case at bar there was no "deliberate indifference" by the Defendants to Plaintiff's complaints that according to his calculations he should have maxed out in April 2009.  Defendants did not ignore Plaintiff's complaints, they simply could do nothing to help him fix the situation, it was up to PBPP.  Nor can it be said that any of the Defendants knew of a risk that unwarranted punishment was being inflicted.  Inmates who are parole violators commonly claim that the Parole Board miscalculated their max and they should not be in prison.  In over twelve years with over 2,000 inmates only three times has an inmate actually been held past their max date, with the current case being one of them.  The risk that Plaintiff's calculations of his max date as opposed to that by the Parole Board was not substantial.  Furthermore, evidence demonstrates that Plaintiff's calculation *was in fact wrong!*  Plaintiff thought his max date was April 2009, when, once it was finally recalculated by PBPP it was July 14, 2009.

The responses by the Defendants to Plaintiff's complaints were clearly not a product of deliberate indifference to Plaintiff's plight.  All of the Defendants responded to Plaintiff's inquiries and pointed him in the right direction – they simply could not help him.  Plaintiff wanted the Defendants to be an advocate on his behalf to PBPP to change his max date – that is not their role within the prison

system, and they all (correctly) pointed him towards the source of his alleged problem with any calculation problems – the Parole Board.

Finally, there is no causal connection between the Defendants' response and Plaintiff's unjustified detention. Plaintiff's maximum date was July 14, 2009, which was determined by PBPP on July 29, 2009. All of the grievances and responses to and from the Defendants occurred prior to his July 14, 2009 max date and therefore Plaintiff being held from July 14-July 30, 2009, is not casually connected to any of the actions of the Defendants. PBPP's untimely recalculation of Plaintiff's max date is the connective causal link between Plaintiff's plight and his two week over detention – not anything done by the Defendants.

Plaintiff also seems to complain that some of the Defendants did not even respond to his grievances (Dunn in particular). There is no constitutional right to a grievance procedure and an inmate has no Constitutional right to a grievance process. *Atwell v. Lavan*, 557 F.Supp.2d 532, 547, citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 137-138, 97 S.Ct. 2532 (1977). A claim that an official ignored an inmate's request or that he did not take action to address a grievance is not sufficient to hold that official for the violation. *Atwell v. Lavan*, 557 F.Supp.2d 532, 547, citing *Wilson v. Horn*, 971 F.Supp. 943, 947 (E.D.Pa. 1997). There is also no constitutional right to require prison officials to investigate an inmate's grievance. *Atwell* at 548 citing *Davage v. United States*,

1997 WL 180336, *3 (E.D.Pa.), also *Robinson v. Love*, 155 F.R.D. 535, 536 n. 3 (E.D.Pa. 1994) (citing cases).   As the *Atwell* Court noted, "Even if the prison provides for a grievance procedure, as the DOC does, violations of those procedures do not amount to a civil rights cause of action."   *Atwell* at 547, *citing Mann v. Adams*, 855 F.2d 639 (9th Cir. 1988), *cert denied*, 488 U.S. 898, 109 S.Ct. 242 (1988).

During depositions Plaintiff's counsel questioned several Defendants about the job descriptions for their positions.   First, while it is clear that some of the job descriptions included calculating inmates' sentences, it is obvious from all of the evidence adduced through discovery that such calculations relate only to original sentences imposed by the sentencing Court, not to recalculations of an inmate's maximum sentence by PBPP as a convicted parole violator.   Secondly, a violation of internal policies does not necessarily give rise to constitutional violations.   *See Atwell,* at 556-557. Third, even if such calculation had been made (and the DOC Defendants erroneously calculated it in such a fashion that they agreed with Plaintiff's erroneous calculation) DOC has absolutely no authority to change PBPP's recalculated max date or to release him even if PBPP was wrong.

Finally, the most obvious demonstration that the DOC Defendants were not "deliberately indifferent" to Plaintiff's complaints is the written response to Plaintiff's grievance by Superintendent Verano when he wrote to Plaintiff

"Obviously, we would not be keeping you past your max date." It is unfortunate that Plaintiff was kept two weeks past his max time at Coal Township, but the source of his over detention was not DOC, it was PBPP, who have already compensated Plaintiff for any mistakes they may have made concerning the situation.

### 2. Defendants have qualified immunity.

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Arthurs v. Beard*, 623 F.Supp.2d 669, 673 (W.D.Pa. 2009) *cites omitted*. What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken. *Id., citing Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Clearly established" for purposes of qualified immunity means that "[the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (citations omitted). Additionally, qualified immunity permits officers to make reasonable

mistakes about what is lawful.  *Id.* at 677, *citing DeLauri v. New Jersey Division of State Police,* 2009 WL 222983, at * 6 (D.N.J. Jan.27, 2009).  *See Pearson v. Callahan,* 129 S.Ct. 808, 815, ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.").

Furthermore, the Supreme Court has generously construed qualified immunity protection to shield all but the plainly incompetent or those who knowingly violate the law.  *McSpadden v. Wolfe*, 2008 WL 910010 (E.D.Pa.) at *9, *citing Davis v. Hall*, 375 F.3d 703, 711-12 (8th Cir. 2004).  Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

In the case at bar Plaintiff is claiming that when he filed his grievances complaining that he was being held past his maximum sentence the Defendants were deliberately indifferent to his complaints.  However, the Defendants did review Plaintiff's complaints, repeatedly responded to his queries, and told him that his detention was based on (1) the fact that a detainer had been lodged by PBPP which would remain until PBPP could recalculate his maximum date, and (2) the recalculated maximum date by PBPP which the Defendants could not change.  Not only was there nothing Defendants could have done other then tell Plaintiff to have PBPP to fix whatever error he perceived they committed

concerning his recalculated maximum date, the final recomputed maximum date arrived at by PBPP (July 14, 2009) was *after* Plaintiff had filed his grievances with the Defendants and the Defendants responded thereto.  As such, at the time that Plaintiff filed his grievances to the Defendants, and at the time the Defendants had responded thereto, Plaintiff had not yet maxed out on his state sentence.

This is not a case where the Defendants knew that Plaintiff's sentence had expired and had refused to release him.  When Plaintiff returned to SCI Coal Township he could not be released because of the PBPP detainer and could not be released until PBPP recalculated his maximum release date. Once PBPP provided a recalculated max date the Defendants were not unreasonable in relying on PBPP's recalculated date – inmates routinely claim that their maximum sentences are incorrectly calculated by PBPP and rarely are they correct.  The Defendants should not be held liable for believing the PBPP's calculation over that of the Plaintiff, especially given that it has been shown through discovery that *Plaintiff's calculation was wrong and that his maximum date was not April 2009 (as Plaintiff claimed), but July 14, 2009.*

There is no evidence that any of the Defendants acted in knowing violation of any law or regulation when they repeatedly told the Plaintiff that they could not help him with his sentence calculation problem and that his concerns would have

to be addressed to, and solved by, PBPP.   Defendants motion for summary judgment should be granted based on the doctrine of governmental immunity.

### 3.  Plaintiff cannot attack the length of his confinement via a § 1983 action because it is barred under the principles established in *Heck v. Humphrey*.

In order to recover damages for allegedly unconstitutional imprisonment, a §1983 plaintiff must prove that the sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.  *Fitzpatrick v. Algarin*, 2008 WL 3174983 (E.D. Pa.) at *3, *citing Heck v. Humphrey*, 512 U.S. 477, 489-90 114 S.Ct. 2346 (1994), *citing* 28 U.S.C §2254.   A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.   *Id.* *referencing Royal v. Durison*, 254 F. App'x 163, 165 (3dCir.2007) (barring under *Heck* a prisoner's § 1983 claim that his due process rights were violated when defendants failed to properly investigate his allegation that his time served had been improperly calculated).   As the Court explained in *Atwell v. Lavan*, 557 F.Supp.2d 532, 563 (M.D.Pa. 2008) a state prisoner's § 1983 action is "barred (absent prior invalidation) *no matter the relief sought* (damages or equitable relief) no matter the target of the prisoner's suit if success in that action would necessarily

demonstrate the invalidity of the confinement or its duration" (*emphasis in original*), *quoting Wilkinson v. Dotson*, 544 U.S. 74, 81-82, 125 S.Ct. 1242 (2005). *Heck's* favorable termination rules applies in situations where a plaintiff calls into question the correctness of the DOC's calculation of credit ordered by a sentencing court and in turn the correct duration of his confinement. *Id. referencing Benson v. New Jersey State Parole Board*, 947 F.Supp. 827, 833 (D.N.J. 1996). The favorable termination rule applies to Eighth Amendment claims baring such claims until the plaintiff's purported confinement beyond his maximum sentence has been invalidated by state authorities, the state courts or by issuance of a writ of habeas corpus. *Id. citing Owens v. Ortiz*, No. 05-2351 (WGB), 2005 WL 1199066, at *3 (D.N.J. May 19, 2005); *Mosch v. Brown*, No. 06-4067 (JLL), 2006 WL 2711637, at *3-4 (D.N.J. Sept. 20, 2006) (damages claim for confinement in excess of plaintiff's maximum term not cognizable under *Heck* when plaintiff failed to aver that the confinement had been deemed excessive by a state court of by a successful habeas petition). The *Heck* "favorable termination" rule (or, as it is sometimes called, the deferred accrual rule) applies to cases where the success of the § 1983 action would necessarily imply the invalidity of the plaintiff's confinement. *McSpadden v. Wolfe*, 2008 WL 910010 (E.D.Pa) at *6, *citing Stewart v. City of Phila.*, 2008 WL 564681 at *1 (3d Cir. Mar.3, 2008).

In the case at bar, Plaintiff's sentence was not reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.   Plaintiff cannot now challenge the length of his confinement through this § 1983 action and therefore summary judgment in favor of the Defendants is proper.

**4. Plaintiff was released within a reasonable amount of time after DOC was notified by PBPP of Plaintiff's newly calculated maximum date and therefore there is no basis for a claim based on false imprisonment.**

An unreasonable delay in a prisoner's release can result in a claim based on false imprisonment.   *Regan v. Upper Darby Tp.*, 2009 WL 650384 (E.D.Pa. 2009) *12, *citing Burgess v. Roth*, 387 F. Supp. 1155, 1161 (E.D.Pa. 1975).   In *Burgess,* the parole board ordered a prison to release the plaintiff, an inmate. *Id.* The parole board's policy was to hand-deliver release orders to the prison. *Burgess* at 1160. The hand-delivery policy occasioned a six-day delay in the plaintiff's release. *Id.* at 1161. Burgess brought a claim that sounded in tort, specifically the tort of false imprisonment.  *Id.* In granting summary judgment the court held that "[o]nly an unreasonable delay in a prisoner's release will result in

the tort of false imprisonment." *Id.* The court found that the six-day delay was not unreasonable since "the board promptly set the release machinery in motion." *Id.*

In the case at bar the Parole Board notified the Department of Corrections on July 29, 2009 that Plaintiff's maximum date had been recalculated to July 14, 2009.  On July 30, 2009, the Plaintiff was released from custody.  Such short amount of time between when DOC was notified of Plaintiff's recalculated maximum date and when he was released is insufficient to support a cause of action based on a false imprisonment claim.

## VII.   CONCLUSION

For the reasons stated above, this Court should grant summary judgment in favor of the Defendants and enter judgment in their favor.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Damon Chappelle** | : | |
| **Plaintiff,** | : | **Civil Action - Law** |
| | : | **No. 11-0304** |
| **v.** | : | |
| | : | **(Judge Conner)** |
| **David Varano, John Dunn, Deborah** | : | |
| **Herbst, Michelle Kodack, Renee** | : | **Electronically Filed** |
| **Foulds,** | : | |
| **Defendants,** | : | |

## CERTIFICATE OF SERVICE

I, **TIMOTHY P. KEATING,** Senior Deputy Attorney General for the Commonwealth of Pennsylvania, hereby certify that on September, 24, 2012, I caused to be electronically filed and served via first class mail the foregoing document titled Brief in Support of Defendants' Motion for Summary Judgment, upon the following:

**VIA ECF:**

**Jennifer J. Tobin, Esq.
Pennsylvania Institute Law Project
718 Arch Street, Suite 304 South
Philadelphia, PA 19106**
*Attorney for Plaintiff*

 *s/Timothy P. Keating* 
**TIMOTHY P. KEATING**
Senior Deputy Attorney General