**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **Damon Chappelle,** | | : | |
| | **Plaintiff** | : | **Civil Action - Law** |
| | | : | **No. 11-0304** |
| **v.** | | : | |
| | | : | **(Judge Conner)** |
| **David Varano, Michelle Kodack,** | | : | |
| **Deborah Herbst, Renee Foulds, John** | | : | **Electronically Filed** |
| **Dunn,** | | : | |
| | **Defendants** | : | |

## DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Testimony of Superintendent David Varano of June 22, 2012

1.      Dave Varano has been Superintendent at State Correctional Institute Coal Township ("Coal Township") since 2008 and has been with the Department of Corrections ("DOC") nearly thirty years (Exhibit A, p.8-9).

2.      Varano is responsible for, *inter alia*, the budget, the safe housing of between 2,200-2,300 inmates, and ensuring that there is a safe working environment for a staff of over five hundred personnel who work at Coal Township (Exhibit A, p.14, 51).

3.     Varano has two superintendent deputies (deputy for facility management and the deputy of centralized services), a superintendent's assistant, a secretary that is directly underneath him, as well as a clerk (Exhibit A, p.15).

4.     The facility deputy is involved with the actual security of the facility and the deputy of centralized services takes care of the ancillary programs of inmate treatment, the medical and food departments, the food service department, and the education and activity programs (Exhibit A, p.46).

5.     Varano believes that back time relates to parole violators and therefore it is the Pennsylvania Board of Probation and Parole ("PBPP") determines the time to be calculated (Exhibit A, p.78).

6.     Because of the complex nature of dealing with inmate records, Varano will call the records staff about specific inmate cases (Exhibit A, p.27).

7.     The inmate grievance system is handled by Varano's assistant, who also handles many other tasks for him (Exhibit A, p.16).

8.     If an inmate is not happy to the response of the grievance, they can appeal it to Superintendent Varano, and then further appeal it to the central office, which is the final appeal (Exhibit A, p.16).

9.    Varano reviews ten to fifteen inmate request slips a week, looks at the issue involved, reviews the first level response, and ensures the right staff were contacted to look into the matter (Exhibit A, p.18, 51-52).

10.    When Plaintiff wrote a request slip about his max date calculation Varano referred it to the parole officer at the facility and the records supervisor to look into the Plaintiff's grievance (Exhibit A, p.57-58).

11.    When Varano responded to Plaintiff that Plaintiff's issue would be resolved with both parole and the records office Varano wrote, in part, "Obviously, we would not be keeping you past your max date" (Exhibit A, p.59).

12.    If an inmate writes to Varano saying he is not being helped by the staff Varano does not schedule a personal interview with the inmate given that there are over twenty-two hundred inmates and it is up to his staff to handle most of the issues raised by the inmates either at the unit level or the department head (Exhibit A, p.104).

13.    There are memos relative to the manner in which to accommodate the parole board and security to be provided when they are at the institution, but the parole board is separate from the Department of Corrections and must work jointly (Exhibit A, p.33).

14.     Varano does not know of any authority whereby the DOC can modify or change a recalculated maximum sentence of a parole violator made by PBPP (Exhibit A, p.105).

### Testimony of Michelle Kodack of June 20, 2012

15.     Kodack started as a records specialist at SCI-Coal Township in 2000, was promoted to a Records Specialist 2 in 2001 and became the Records Supervisor in 2007 (Exhibit B, p.10, 11).

16.     Kodack is the only Records Supervisor at Coal Township (Exhibit B, p.11).

17.     In 2009, there were approximately 2,000 inmates, which were split among five records specialists (Exhibit B, p.18, 19).

18.     When parole violators come back to Coal Township they are put on "parole violator pending" ("PVP") status until a recommitment order is received by PBPP (Exhibit B, p.25, 26).

19.     Inmates, who are out on parole and returned as a parole violators waiting to be recommitted by the Parole Board, are accompanied by a PBPP warrant and they are put on PVP status (Exhibit B, p.38).

20.     After being recommitted by PBPP, the new maximum sentence of the parole violator inmate is calculated by PBPP (Exhibit B, p.40).

4

21.     The amount of time it takes for the new PBPP calculated by PBPP to Coal Township varies (Exhibit B, p.41).

22.     The records department generally gets twenty five to thirty request slips for information from inmates a week (Exhibit B, p.46, 47).

23.     When an inmate is being returned to the institution as a parole violator, they are returned by a parole agent who must have a warrant to commit and detain with them for the inmate at the time and a letter stating whether they are going to be held past their max (Exhibit B, p.78-80).

24.     PBPP tracks the time parolees are out of prison and determines what time should be credited towards which sentence they are arrested on new charges (Exhibit B, p.111).

25.     Plaintiff was sentenced on September 26, 2002, to 162 months on his federal charges which was vacated on September 23, 2002, and he was resentenced to 95 months plus 48 months federal parole (Exhibit B, p. 133, 134).

26.     Although Plaintiff believed that his thirteen and a half year federal sentence was changed to two years on November 24, 2008, it was not – the remaining time on Plaintiff's on his federal sentence was "reduced" to twenty four months on November 24, 2008 (Exhibit B, p. 138, 139, Ex. #19).

27.     After an inmate is paroled, any change in his original sentence is done by the PBPP, it is no longer done by the DOC (Exhibit B, p.149, 150).

28.     The calculation of a new max date for parole violators is done by PBPP who determines what time is applied where (Exhibit B, p.200).

29.     The amount of delinquent time ascribed to a parole violator is decided by PBPP (Exhibit B, p.206).

30.     The return of Plaintiff to Coal Township in 2009 was valid because Plaintiff was unavailable to serve his parole violation while he was serving his federal sentence (Exhibit B, p.207).

31.     The amount of time Plaintiff spent serving his parole violation and the amount of time accredited towards serving his federal sentence is a calculation solely determined by the PBPP (Exhibit B, p.207, 208).

32.     Kodack is not aware of how the PBPP credits back time (Exhibit B, p.216).

33.     On July 29, 2009, at 2:43 p.m., PBPP modified Plaintiff's max time to be July 14, 2009 (Exhibit B, p.218).

## Testimony of Michelle Kodack of June 21, 2012

34.     Once an inmate is released on parole and comes back on parole violations, the DOC is no longer responsible for the inmate's sentence calculation, the DOC records the information provided by the Parole Board (Exhibit C, p.51).

35.     On July 30, 2009 at 2:36 p.m. Plaintiff was released from Coal Township (Exhibit C, p.66, 67).

36.     If Plaintiff's attorney had contacted Kodack about Plaintiff's recalculation date Kodack would have referred him to the Parole Board (Exhibit C, p.90).

37.     Kodack never interviewed Plaintiff about his complaints concerning his max recalculation date by PBPP (Exhibit C, p.93).

38.     Once PBPP makes a decision about an inmate's max date Kodack cannot change it without PBPP's permission (Exhibit C, p.94).

39.     During the twelve years that Kodack has been working at Coal Township only three inmates have been held past their max date, with Plaintiff being one of them (Exhibit C, p.95).

40.     Plaintiff was released from Coal Township on July 30, 2009 one day after PBPP had recalculated his max to be July 14, 2009 (Exhibit C, p.95).

41.     The DOC does not file detainers on inmates to keep them longer, and does not have the ability to lift detainers filed by other administrative agencies (Exhibit C, p.96).

42.     Whenever anyone contacts the records office asking about an inmate being held past their maximum sentence Kodack will always check the records of that inmate (Exhibit C, p.97).

43.     Just like Kodack cannot change a court order just because she thinks it is wrong, she cannot change a Parole Board action just because she thinks it is wrong (Exhibit C, p.98).

**Testimony of Deborah Herbst of July 6, 2012**

44.     Deborah Herbst was a records specialist at Coal Township from 2006 until she retired in 2009 (Exhibit D, p.7-8).

45.     Herbst monitored minimum and maximum sentencing dates of inmates through the use of a computer at the institution, and computed new state and county sentences imposed by the court system (Exhibit D, p.15, 20-21).

46.     When a parole violator was returned to the institution, the records office would put in how much back time the inmate owed on their original sentence based on the information received by PBPP (Exhibit D, pp.53-54).

8

47.     When an inmate came back on a parole violation, he would be put in the computer as "PVP" ("parole violator pending"), meaning his status was until pending (Exhibit D, p.60).

48.     The amount of back time credit given to an inmate returning as a parole violator comes from PBPP (Exhibit D, p.69).

49.     When DOC gets an order from PBPP to recommit a parole violator, DOC receive the inmate's back time numbers from PBPP (Exhibit D, p.100).

50.     When Herbst got an inmate request from Plaintiff concerning his parole time, he was told that he would have to talk to parole (Exhibit D, p.109).

51.     The maximum time of a parole violator reflected in the inmate's file is generated by a computer based on information received by PBPP (Exhibit D, pp.120-121).

52.     If the Parole Board errs in calculating an inmate's back time DOC cannot change it unless the Parole Board changes it (Exhibit D, p.124).

53.     If a parolee commits a new crime while on parole and is in prison waiting on the new charges, the DOC does not decide where that time is credited (Exhibit D, p.124).

54.    When Herbst got a request slip from Plaintiff about his max time Herbst checked the computer, saw that Plaintiff had not maxed out yet and responded to Plaintiff's request slip (Exhibit D, p.125-126).

55.    Herbst had no interest in keeping Plaintiff, or any other inmate, past their maximum date (Exhibit D, p.126).

## Testimony of Renee Foulds of June 21, 2012

56.    In 2004, Foulds was a Corrections Officer 1 when she started at Coal Township and in 2012 she was promoted to a Corrections Unit Manager, a position she currently holds (Exhibit E, p.9, 10)

57.    Foulds is Unit Manager for all of A-Unit and half of B-Unit with a caseload of upwards to 250 inmates (Exhibit D, p.10, 13).

58.    Foulds main responsibility is to review inmate files and treatment recommendation to help them plan for their release (Exhibit D, p.13).

59.    Inmates are scheduled for programs based on their minimum release and recommendations are made about the programs they should take to become parole eligible (Exhibit D, p.15).

60.    Inmates coming back as parole violators are put on hold because the counselor must learn first what the new minimum parole date is from PBPP (Exhibit D, p.16).

61.    When a parole violator is returned to prison, there is a window of time where they are pending a Parole Board action to determine the inmate's status (Exhibit D, p.31).

62.    It is very common for inmates who are parole violators to come back and dispute their maximum date (Exhibit D, p.51, 52).

63.    Inmates will tell Foulds they should not have been brought back because they finished their sentence, but fail to include information about whether they absconded while on parole (Exhibit D, p.36, 37).

64.    There is no real way to know the circumstances of a parole violator's recommitment until the actual documents arrive from PBPP (Exhibit D, p.36).

65.    Foulds remembers that Plaintiff complained that he was not supposed to be there because he was not a parole violator, and that he had served his time (Exhibit D, p.24).

66.    Foulds told Plaintiff that he had to express his concerns to the records department and to his parole agent, because they would have the answers (Exhibit D, p.32).

67.     PBPP gives information to the DOC and tells the DOC what changes should be made to an inmate's maximum sentence, which information Foulds takes as a direction (Exhibit D, p.49, 51).

68.     Foulds did not ignore Plaintiff's claims, but spoke with him and could not understand what the discrepancy was so when she received PBPP's Board action, she took that to be accurate (Exhibit D, p.52).

## John Dunn testimony of June 21, 2012

69.     John Dunn has been a Unit Manager at Coal Township for six years, and was a Corrections Counselor for twelve years at Coal Township before that (Exhibit E, p.9).

70.     Correction counselors meet with inmates within so many days after they arrive and go over the program plan with the inmate in order to prepare them for parole release (Exhibit E, p.13, 23).

71.     There are ten housing units at Coal Township with 240-250 inmates per unit and the Unit Managers supervise the Correctional Counselors for the inmates in a particular unit (Exhibit E, p.26, 64-66).

72.     Inmates have access to the unit manager every day as the Unit Manager walks up and down the tiers talking to inmates addressing problems and concerns inmates may have (Exhibit E, p.65-66).

73.     The Institutional Parole Office notified the counselors monthly of potential inmates coming up for parole release (Exhibit E, p.29-30).

74.     Unit Managers are not trained on how to calculate an inmate's back time credit (Exhibit E, p.36).

75.     Inmates asking the Unit Manager about sentencing issues or back time would be referred to the records office or the Institutional Parole Office (Exhibit E, p.34).

76.     There are over 2,000 inmates at SCI Coal Township and Unit Managers frequently talk to inmates about a variety of issues (Exhibit E, p.66).

77.     Dunn does not ignore inmates who want to discuss any problems they may have, even if the inmate is being belligerent or disrespectful (Exhibit E, p.67).

**Testimony of Jennifer Shurock on August 16, 2012**

78.     Jennifer Shurock (*nee* Jennifer Pijar) started working for PBPP in 1992 and became a Parole Agent at SCI Coal Township in 2003, after completing

six months of training to be a parole agent and a six week course from DOC training academy (p. Exhibit F, 12, 15, 20, 40).

79.    As an Institutional Parole Agent Shurock works inside the institution in a building shared with DOC staff (Exhibit F, p.22, 24).

80.    Institutional Parole Agents assist inmates who are becoming parole eligible to get parole (Exhibit F, p.24, 25, 26).

81.    All of the institutional parole agents, assistants and supervisors interact with the inmates at Coal Township on a daily basis (Exhibit F, p.26).

82.    About eight months before an inmate's minimum (as determined by the DOC), they attend a parole education class and are then assigned a parole agent (Exhibit F, p.27-28).

83.    The Institutional Parole Office reviews between 100-130 cases of inmates a month Exhibit F, p.29).

84.    The Institutional Parole Office helps inmates with information concerning their parole eligibility and sentencing and respond to request slips to the pointing inmate in the right direction concerning any questions they may have (Exhibit F, p.29-30).

85.     If a parole violator absconds supervision and is declared delinquent, or is a convicted parole violator, his original max date can change (Exhibit F, p.37).

86.     While an inmate's initial maximum date is determined by the DOC, an inmate who is returned as a parole violator has their new maximum date determined by PBPP (Exhibit F, p. 36, 37).

87.     The DOC does not have the ability to change the newly recalculated max date made by PBPP of a parole violator (Exhibit F, p.37, 38).

88.     Inmates who contact the Institutional Parole Office at Coal Township concerning their recalculated max by the PBPP are directed to contact the Parole Board because parole violators have thirty days to administratively appeal an action taken by the Parole Board (Exhibit F, p.39, 42).

89.     Shurock does not assist inmates in sorting out their parole violator calculations because she is not trained to do such calculations, there is a specific unit trained to do such calculations, the Case Analysis Unit, under John Janis (Exhibit F, p.47, 48, 61).

90.     Shurock responded to at least four request slips from the Plaintiff and had received paperwork from Plaintiff's attorney about his complaints concerning his recalculated max date by PBPP (Exhibit F, p.49-52).

91.     The only steps Shurock would take concerning Plaintiff's complaint is to tell him to contact the Parole Board in Harrisburg because during the twenty years that Shurock worked for PBPP it is the Central Office that calculates back time of a parole violator which provides that information to DOC (Exhibit F, p.52, 54).

92.     Shurock is not aware of the basis for any of Plaintiff's parole violation max dates recalculated by the Parole Board (Exhibit F, p.57).

93.     PBPP's Central Office has a Case Analysis Division which is under John Janis that T calculates the maximum dates of parole violators (Exhibit F, p.61).

**Testimony of John Janis on August 8, 2012**

94.     John Janis, the director of PBPP's Case Analysis Division, has an Associate's Degree and a B.S. in Criminal Justice (Exhibit G, p.10, 11).

95.     Janis was a county probation officer for twelve years who managed and supervised the violators, unit, issued recommitment actions and recalculated maximum sentences (Exhibit G, p.10, 11).

96.     It is the responsibility and authority of the DOC to calculate an inmate's sentence when they are initially sentenced (Exhibit G, p.13).

97.     PBPP have institutional parole offices which are PBPP offices located inside the state prisons which reviews inmate cases three months before their minimum release date (Exhibit G, p.14, 16).

98.     It is the sole responsibility of the Parole Board to recalculate the max date for any Parole Board action, which then notifies the offender and everyone else privy to the Parole Board's action of the recalculated max date (Exhibit G, p.21)

99.     Upon recalculating the max date of an inmate who is a parole violator, the inmate is notified that they have the right to appeal the decision within thirty days (Exhibit G, p.20, 21).

100.    The PBPP "recommitment action" is on a form PBPP-13, which states the recalculated max date and is used by DOC to update the inmate's inmate file (Exhibit G, p.21, 23)

101.    DOC staff cannot change the PBPP recalculated max date even if they think the PBPP miscalculated the inmate's max date it can only change it if PBPP modifies the Parole Board's official recommitment order (Exhibit G, p.23).

102.    The DOC does not have the authority to release a parole violator inmate prior to PBPP recalculating his max without PBPP's approval (Exhibit G, p.26, 27).

17

103.   Plaintiff was released on parole on April 9, 2001, absconded parole supervision on June 15, 2001, arrested on September 16, 2001, PBPP issued a warrant for him on September 26, 2001, and put a detainer on him on October 24, 2001 (Exhibit G, p.34).

104.   On September 23, 2002, Plaintiff was sentenced on his federal charges to thirteen and one half years (Exhibit G, p.120).

105.   Plaintiff's federal term of imprisonment was reduced to two years effective July 18, 2007 per court order (Exhibit G, p.90, 91).

106.   Plaintiff's incarceration from February 20, 2002 to February 20, 2006, was considered by PBPP to go towards his federal sentence (Exhibit G, p.75, 122, 123).

107.   If an inmate disagrees with PBPP's decision they can file an administrative appeal within thirty days of PBPP's order (Exhibit G, p.43, 44)

108.   Plaintiff filed several appeals from PBPP commitment orders by PBPP including one on April 22, 2009 (Exhibit G, p.46).

109.   PBPP has an inmate helpline, called "inmate inquiry" for inmates and others to call and bring to PBPP's attention sentence calculation questions (Exhibit G, p.114, 115).

110.  On July 29, 2009, at 2:43 p.m., PBPP applied the two year resentencing of Plaintiff's on his federal sentence and determined that Plaintiff's final correct recalculated max date was July 14, 2009 (Exhibit G, p.41, 83, 144, 145).


**Testimony of Damon Chappelle on July 24, 2012**

111.  Plaintiff, Damon Chappelle (who also goes by Kevin Jessup, Damon Morrison and Damon Jessup), was sentenced to six to twelve years on a state convictions under the name "Kevin Jessup" (Exhibit H, p.11-13, 17)

112.  PBPP had a parole office at Coal Township and if Plaintiff had questions about parole he could get information from the office (Exhibit H, p.24).

113.  Plaintiff was released from Coal Township on parole in April 2001, went to a Community Corrections Center for three months and then absconded (Exhibit H, p. 22, 27, 28).

114.  Plaintiff was arrested in September 2001 on drug and gun charges, which the state dropped after he was charged by federal agents on the charges resulting in PBPP placing a detainer on him (Exhibit H, p. 28-30, 33).

115.  Plaintiff was convicted of the gun and drug charges and received a thirteen and a half year federal sentence in September 2002 (Exhibit H, p.33).

116.   After Plaintiff served time in federal he was sent back to Coal Township April 16, 2009 (Exhibit H, p.38).

117.   Plaintiff believes that even though he was in a federal prison, he was serving state time (Exhibit H, p.91).

118.   When Plaintiff returned to Coal Township his Foulds told him to wait for his green sheet concerning his time (Exhibit H, p.41).

119.   Plaintiff asked Foulds about his situation who told him to contact the parole board (Exhibit H, p.44, 45).

120.   Plaintiff had no trouble contacting Ms. Pijar/Shurock at Coal Township's PBPP office concerning PBPP problems (Exhibit H, p.45, 46).

121.   Plaintiff outlined to Pijar/Shurock why he believed he was past his max date in a written statement, and put down all the dates he was incarcerated and Pijar/Shurock wrote Plaintiff telling him to address his issued to the Parole Board (Exhibit H, p.47).

122.   Plaintiff does not recall whether he sent documents to Pijar/Shurock he believed substantiated his claims (Exhibit H, p.48, 49).

123.   Foulds was accessible to Plaintiff to talk to without a request slip; Plaintiff could just knock on Foulds' door and discuss with her whatever he wanted (Exhibit H, p.51, 52).

124.   Plaintiff knew in May 2009 from a PBPP green sheet he received that PBPP recalculated his max date to be September 2014, which Plaintiff thought was wrong (Exhibit H, p.54, 58).

125.   Plaintiff wanted DOC to change the recalculation of his max date made by PBPP (Exhibit H, p.58).

126.   Plaintiff wanted to talk to Superintendent Varano about his max date and show him documents but does not remember whether he sent Varano the documents he had (Exhibit H, p.59, 60).

127.   Plaintiff spoke with Superintendent Varano who told Plaintiff to send him a request slip (Exhibit H, p.61).

128.   Plaintiff wanted Michelle Kodack to tell PBPP that PBPP miscalculated his max date, although Plaintiff had already told PBPP he thought the recalculation was wrong (Exhibit H, p.64, 65, 67).

129.   Plaintiff has been paid by PBPP by way of a settlement for the time that he spent imprisoned past his maximum date (Exhibit H, p.86, 87, 88).

130.   Plaintiff was due to be released from federal parole on July 30, 2012 (Exhibit H, p.15).

Respectfully submitted,


LINDA L. KELLY
Attorney General


By:    ____*s/Timothy P. Keating*_____
       TIMOTHY P. KEATING
       Senior Deputy Attorney General
       Attorney I.D. No. 44874

       GREGORY R. NEUHAUSER
Office of Attorney General            Chief Deputy Attorney General
Litigation Section                    Chief, Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 705-8580
Fax: (717) 772-4526
tkeating@attorneygeneral.gov
Date:  September 24, 2012

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **Damon Chappelle,** | | : | |
| | **Plaintiff** | : | **Civil Action - Law** |
| | | : | **No. 11-0304** |
| **v.** | | : | |
| | | : | **(Judge Conner)** |
| **David Varano, Michelle Kodack,** | | : | |
| **Deborah Herbst, Renee Foulds, John** | | : | **Electronically Filed** |
| **Dunn,** | | : | |
| | **Defendants** | : | |

## CERTIFICATE OF SERVICE

I, Timothy P. Keating, Senior Deputy Attorney General for the Commonwealth of Pennsylvania, hereby certify that on September 24, 2012, I caused to be electronically filed and served the foregoing document titled Defendants' Statement of Material Facts in Support of Summary Judgment, upon the following:

**Jennifer J. Tobin, Esq.**
**Pennsylvania Institute Law Project**
**718 Arch Street, Suite 304 South**
**Philadelphia, PA 19106**
*Attorney for Plaintiff*

/s/ Timothy P. Keating
**TIMOTHY P. KEATING**
**Senior Deputy Attorney General**