# EXHIBIT B

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
   DAMON CHAPPELLE,                  :
 3                      Plaintiff
                                     :
 4
                                     :
        vs.                              (C-C P Y
 5                                   :

 6                                   :
   DAVID VARANO, SUPERINTENDENT,
   SCI-COAL TOWNSHIP; MICHELLE   :   NO. 11-0304
 7 KODACK, RECORDS SUPERVISOR,
   SCI-COAL TOWNSHIP; DEBORAH    :
 8 HERBST, RECORDS SPECIALIST,
   SCI-COAL TOWNSHIP; MR. DUNN, :
 9 UNIT MANAGER, SCI-COAL
   TOWNSHIP; MS. FOULDS,         :
10 COUNSELOR, SCI-COAL TOWNSHIP,
                        Defendants:
11

12

13
                Deposition of: MICHELLE KODACK
14
                Taken by     : Plaintiff
15
                Before       : Faith A. Culp
16                             Reporter-Notary Public

17              Beginning    : June 20, 2012; 9:26 a.m.

18              Place        : SCI-Coal Township
                               1 Kelley Drive
19                             Shamokin, Pennsylvania

20     .

21
   COUNSEL PRESENT:
22
        JENNIFER J. TOBIN, ESQUIRE
23      718 Arch Street, Suite 304 South
        Philadelphia, Pennsylvania   19106
24          For - Plaintiff

25
```

ERVIN BLANK ASSOCIATES, INC.

**RECEIVED**

JUL 0 9 2012

**Office of Attorney General**
**Litigation Section**

2

1    COUNSEL PRESENT (continued):

2        TIMOTHY P. KEATING, ESQUIRE
         Senior Deputy Attorney General
3        Pennsylvania Office of Attorney General
         Litigation Section
4        15th Floor, Strawberry Square
         Harrisburg, Pennsylvania  17120
5            For - Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    INDEX TO WITNESSES

2  FOR - PLAINTIFF         DIRECT  CROSS  REDIRECT  RECROSS

3  Michelle Kodack           5      --      --        --

4

5

6

7

8

9

10

11

12

13                    INDEX TO EXHIBITS

14  FOR - PLAINTIFF                    MARKED  ADMITTED

15  Kodack Exhibit No. 1                 15      --

16  Kodack Exhibit No. 2                 67      --

17  Kodack Exhibit No. 3                108      --

18  Kodack Exhibit No. 4                109      --

19  Kodack Exhibit No. 5                110      --

20  Kodack Exhibit No. 6                113      --

21  Kodack Exhibit No. 7                116      --

22  Kodack Exhibit No. 8                119      --

23  Kodack Exhibit No. 9                122      --

24  Kodack Exhibit No. 10               123      --

25  Kodack Exhibit No. 11               124      --

4

INDEX TO EXHIBITS

| FOR - PLAINTIFF | MARKED | ADMITTED |
|---|---|---|
| Kodack Exhibit No. 12 | 126 | -- |
| Kodack Exhibit No. 13 | 128 | -- |
| Kodack Exhibit No. 14 | 130 | -- |
| Kodack Exhibit No. 15 | 131 | -- |
| Kodack Exhibit No. 16 | 133 | -- |
| Kodack Exhibit No. 17 | 134 | -- |
| Kodack Exhibit No. 18 | 136 | -- |
| Kodack Exhibit No. 19 | 138 | -- |
| Kodack Exhibit No. 20 | 144 | -- |
| Kodack Exhibit No. 21 | 173 | -- |
| Kodack Exhibit No. 22 | 180 | -- |
| Kodack Exhibit No. 23 | 184 | -- |
| Kodack Exhibit No. 24 | 188 | -- |
| Kodack Exhibit No. 25 | 204 | -- |
| Kodack Exhibit No. 26 | 212 | -- |
| Kodack Exhibit No. 27 | 212 | -- |

5

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

*       *       *

MICHELLE KODACK, called as a witness, having been duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MS. TOBIN:

Q    Good morning.

A    Good morning.

Q    Could you please state and then spell your full name for the record?

A    Sure.  It is Michelle Kodack.  Michelle, M-i-c-h-e-l-l-e, Kodack, K-o-d-a-c-k.

Q    Thank you.  Ms. Kodack, as you know from meeting me earlier before the deposition started my name's Jennifer Tobin, and I'm the lawyer for the Plaintiff in this case, Damon Chappelle.  Have you ever had a deposition taken before?

A    Yes.

6

1    Q    And when did that happen?

2    A    About three years ago.

3    Q    And was that -- what was that for?

4    A    It was personal.

5    Q    So it wasn't related to your job at Coal

6    Township?

7    A    No.

8         MR. KEATING:   You have to let her finish the

9    question before you answer.   I know you already know

10   what she's going to ask but for the record we have to

11   keep sort of separate.   It's just a tendency that

12   people have.

13   BY MS. TOBIN:

14   Q    That's a good point.   I'm going to just go

15   over some real quick ground rules echoing what Mr.

16   Keating just said.

17        So the main rule of depositions is that you

18   need to wait until I'm done with the question before

19   you give your answer.   I will try to do the same and

20   wait until you're done with your answer before I ask

21   another question or ask a follow-up.

22        It's normal for conversations -- for the

23   deposition to take on a conversational tone but

24   because the court reporter's writing down everything I

25   say as I say it and then writing down everything you

7

1  say, it's good for the record to have a clear record

2  to have us complete each of our parts.

3       The other main rule of a deposition is that

4  if you don't understand one of my questions, I need

5  you to ask me or tell me that you don't understand it,

6  and then I will rephrase it and hopefully that will

7  make it clear.  And if not, I'll need you to tell me

8  again, I still don't understand your question.  I want

9  to make sure that if you're answering a question, that

10  you did understand it.  Does that make sense?

11     A   Yes, it does.

12     Q   Okay.  If you need to take a break, let me

13  know.  We can do that.  I do anticipate this will be a

14  relatively long deposition because you're the person

15  who I think has the most information about this case.

16  So we might have to take a break.  And if you need one

17  before we have that planned, just let me know.

18     A   Okay.

19     Q   One thing I'll ask you to do if you do ask

20  for a break, is to finish whatever question is pending

21  before you take the break.

22     A   Sure.

23     Q   And then we'll take a break.  If you're

24  approximating an answer, let me know.

25     A   Okay.

8

1     Q    And are you taking any medicines or

2  medications today that would affect your ability to

3  answer my questions completely and truthfully?

4     A    No, I am not.

5     Q    Okay.  Any other reason you can think of that

6  would impact your ability to answer questions?

7     A    No.

8     Q    Okay.  Did you review any documents before

9  coming to the deposition today?

10    A    Briefly I reviewed some policies and

11 procedures and just a few portions of his file.

12    Q    Okay.  Which portions of the file did you

13 review?

14    A    The legal section.

15    Q    Okay.  And do you remember which documents in

16 particular?

17    A    I went through and tabbed his warrant, his

18 parole board warrant and a letter from the parole

19 board.

20    Q    Okay.  And then --

21    A    And also -- I'm sorry.  I'm sorry.  I also

22 reviewed his federal detainer.

23    Q    Okay.  We will be talking about those so it's

24 probably good.  And then you said you reviewed some

25 policies and procedures.  Which policies and

9

1  procedures?

2      A    Our release policy and our reception policy.

3      Q    Okay.  If you could just give me a brief

4  description, listing of your educational background

5  after high school.

6      A    I attended Bloomsburg University.  I didn't

7  finish.  I completed three years towards criminal

8  justice.

9      Q    Okay.  And then do you have any other

10  education besides that?

11      A    No.

12      Q    Okay.  And you did graduate high school?

13      A    Yes.

14      Q    Okay.  Do you have any legal training?

15      A    No.

16      Q    When you -- did you go straight to Bloomsburg

17  after graduating high school?

18      A    Yes.

19      Q    And then after the three years at Bloomsburg,

20  what was your first job after that?

21      A    I was at North Central Secure Treatment Unit

22  in Danville.

23      Q    What is that?

24      A    It's a juvenile facility for boys.

25      Q    What was your position there?

10

1      A    I was a youth development aide.

2      Q    And what did you do in that capacity?

3      A    Basically I worked -- I actually worked night

4   shift and we monitored the boys, did bed checks,

5   safety checks, that sort of thing.

6      Q    Was that similar to -- was it a detention

7   center?

8      A    Yes.

9      Q    So it was a lockdown at night?

10     A    Yes.

11     Q    Okay.  How long were you there?

12     A    I was there a year.

13     Q    And then what was your next job after that?

14     A    I was a records specialist.  I started here.

15     Q    Did you start as a records specialist one?

16     A    Yes.

17     Q    And what year was that, if you recall?

18     A    2000.

19     Q    And for how long were you in that job?

20     A    A year.  And then I was promoted to a records

21   specialist two.

22     Q    How many levels of records specialists are

23   there?

24     A    Just two.

25     Q    And how long were you in the number two

1  position?

2      A    I'm trying to think.   January of 2007 is when

3  I became supervisor.  So six years.

4      Q    Okay.   When you were a records specialist

5  one, who was the records supervisor?

6      A    Ray Reeder.

7      Q    Was he your direct supervisor?

8      A    Yes.

9      Q    And how do you spell his last name?

10     A    R-e-e-d-e-r.

11     Q    And when you were a records specialist two,

12  was he still your supervisor?

13     A    For a very brief time.

14     Q    And then who succeeded him?

15     A    Don Young.

16     Q    And was he your supervisor for the six years

17  you were in the number two position?

18     A    Yes.  Yes.

19     Q    And so in 2007, you became the records

20  supervisor?

21     A    Yes.

22     Q    How many of those positions are there at Coal

23  Township?

24     A    Just one.

25     Q    And does each institution have one of those?

12

1      A    Yes.

2      Q    Okay.  You mentioned in your interrogatory

3  responses which I have somewhere who your supervisor

4  was currently.  But could you just tell me again?

5      A    Her name is Linda Chismar.

6      Q    Okay.  And where is she located?

7      A    She's in our program services building.

8      Q    So she's on-site?

9      A    Yes.  She was actually the woman in front of

10  me walking up the hallway.

11     Q    Okay.  So she's not at the central office?

12     A    No.

13          MR. KEATING:  She works here?

14          THE WITNESS:  Yes.

15  BY MS. TOBIN:

16     Q    Could you tell me again what her title is?

17     A    She's the corrections classification program

18  manager.

19     Q    And that sounds like a very broad job.  Does

20  she supervise other people or just you?

21     A    Other people as well.

22     Q    So just to get a sense of what your

23  relationship is with her, what kinds of issues would

24  you go to her with and how does she perform her

25  supervisory function with regard to your job?

1    A    She's more so there for issues that I would

2  have with staff more than anything.  It's tough to

3  explain.  The records department -- in my experience

4  the records department, the program manager that

5  oversees the records department typically didn't work

6  in the records department so doesn't know everything

7  that we do.

8         Typically I go to her with issues I have with

9  staff or if I do have something that is pressing with,

10  you know, a situation with inmates.  It's more so

11  though policy and procedure that I go to her with than

12  actual individual cases.

13    Q    So not something, a specific problem for one

14  inmate.  But can you give me an example of policy and

15  procedure that you might go to her?

16    A    If a new policy is put out and I have a

17  question regarding it, I would go to her for it for

18  guidance.

19    Q    Is there someone who serves that function --

20  or do you have any supervisors in the central office

21  of the DOC?

22    A    They're not considered in my chain of command

23  but there are -- we have a records administrator and

24  we also have an assistant records administrator that

25  we go to with specific questions regarding cases.

14

1    Q    And have you gone to them before?

2    A    Yes.

3    Q    And do you also -- is there anyone else you

4    can go to with specific questions besides the records

5    administrator and the assistant records administrator?

6    A    Officially do you mean?

7    Q    In any capacity?

8    A    I mean I can contact another records

9    supervisor which I've done already at another

10   institution if I have questions or want to see what

11   they think which I've done.

12   Q    And anybody else if you have questions about

13   a particular issue?

14   A    If we have legal questions, we can also go to

15   our chief counsel's office.

16   Q    In Mechanicsburg?

17   A    Yes.

18   Q    Is there somebody at the chief counsel's

19   office in particular that you deal with or is it just

20   you call the receptionist and say I have a question?

21   A    Typically I deal with Randy Sears.

22   Q    And have you gone to them for legal

23   questions?

24   A    Yes.

25   Q    Okay.  Have you had other employment besides

15

1    the youth development aide job and then your DOC

2    employment?

3         A    Just as a teenager.

4         Q    Okay.  Not since you graduated high school?

5         A    No.  No.

6         Q    Okay.  I want to just go over what your job

7    is now.  What your job as a records supervisor is now.

8    And I'm showing you what we will mark as Exhibit

9    Kodack 1.

10             (Whereupon, a document was produced and

11   marked as Kodack Exhibit No. 1 for identification.)

12   BY MS. TOBIN:

13        Q    If you could take a look at that.  Do you

14   recognize what that document is?

15        A    Yes.

16        Q    What is it?

17        A    That is my job description.

18        Q    Before we get into the details of all of the

19   printed items on the job description, can you tell me

20   what you consider your main functions as a records

21   supervisor?

22        A    Well, my main function is to -- I oversee

23   basically the staff in my office and they are all

24   assigned a caseload.  And my main function is to I

25   sign off on any work that they do.  Any sentence

1   computations that are done in our office, any outside

2   clearance requests that we have, they also go through

3   our office, releases.

4       Q    You mean releases of inmates?

5       A    Yes.  Yes.

6       Q    Okay.  Do you sign off, also, on reception

7   issues, classifications and just processing

8   receptions?

9       A    Classification is done at Camp Hill.  We

10   don't classify inmates here.  The inmates' files are

11   already put together when they come to us.  And there

12   are sometimes issues but for the most part the

13   specialists themselves just go through the file and

14   make sure all documentation is there.  If they have

15   issues, then they come to me.

16       Q    Okay.  So I misspoke.  So classifications

17   that happens when the inmate is first sent to?

18       A    Camp Hill.

19       Q    Camp Hill?

20       A    Yes.

21       Q    And then there used to be some other

22   classification areas in the --

23       A    Yes.

24       MR. KEATING:  You have to let her finish the

25   question before you start agreeing with everything she

1  says.

2          THE WITNESS:  Sorry.

3          MS. TOBIN:  Thank you for the reminder.

4          MR. KEATING:  Make it go a little slower but

5  that's okay.

6  BY MS. TOBIN:

7      Q    So you would sign off on your staff's work

8  with regard to reception?

9      A    No.

10     Q    Maybe I'm misusing that term.  When I say

11 reception, does that mean anything to you, inmate

12 reception?

13     A    Yes.  Yes.  That means when we get inmates in

14 from another institution.

15     Q    And does the records department have anything

16 to do with that --

17     A    Yes.

18     Q    -- process?  What does the records department

19 do?

20     A    When the inmates come in, we identify them

21 through the use of a body receipt.  A specialist is

22 always present for that.  And then we also receive

23 their files.

24         And when they come in, the specialist

25 assigned to that particular caseload -- our office

18

1  does caseload by inmate numbers.  The last digit of

2  the inmate's number belongs to a certain specialist in

3  my office.  And they are -- they're responsible for

4  those inmates with the numbers ending in whatever

5  digits they're assigned to.

6       But part of the process is when they come in,

7  we have a checklist that we go through just to ensure

8  that commitment orders are in the file, sentence

9  computation, make sure DNA samples are taken, see if

10  they need to register for Megan's.  Also, to see if

11  they qualify for Act 143.

12       Q    What is that?

13       A    Act 143 it's a victim awareness class.

14       Q    So backing up just a minute.  How many -- I

15  should have asked this earlier.  How many records

16  specialists do you supervise currently at Coal

17  Township?

18       A    Five.

19       Q    Okay.  And back in 2009 which is when the

20  incident underlying this case happened, how many

21  records specialists?

22       A    There were five.

23       Q    And how big -- how large are their caseloads?

24       A    Well, currently or then?

25       Q    Back in 2009.

19

1      A    We had approximately 2,000 inmates split

2  among five people.

3      Q    So 400?

4      A    Approximately 400.

5      Q    And then currently has that changed?

6      A    Yes.  We have approximately 2,300 inmates.

7      Q    So a few more?

8      A    Yes.

9      Q    Okay.  Back in 2009, one of the records

10 specialists that you supervised was Deborah Herbst?

11     A    Yes.

12     Q    Okay.  Who were the others?  Do you remember?

13     A    Chris Phobia.  I'm trying to remember who all

14 was there.  Heather Yoder, Tim Hummel.

15     Q    If you don't remember, it's okay.

16     A    And I'm trying to remember.  We had somebody

17 leave and somebody else come in, and I'm not sure when

18 that was.

19     Q    And how -- what was your procedure, what was

20 your practice of supervising the records specialists?

21 How did you do that?

22          MR. KEATING:  You mean in 2009 or currently?

23          MS. TOBIN:  In 2009.

24          MR. KEATING:  Or if there's any difference.

25 I don't know.

ERVIN BLANK ASSOCIATES, INC.

20

BY MS. TOBIN:

    Q    In 2009.

    A    Do you mean in regards to their caseload?

    Q    In regards to how you oversaw their work.
Did you have meetings every week?  Did you make them
come to you before they finalized any piece of paper?
How much oversight?

    A    Anytime they as you put it finalize anything,
it always gets signed off on by myself.  Again, I sign
off on all the sentence calculations.  I sign off on
all the releases, all the outside clearance screenings
that are done in our office.

    Q    And if you noticed an issue or a problem with
something, what would your next step be after noticing
the issue or problem that was handed to you by your
records specialist?

    A    It all depends what the problem is.  There's
different procedures for different issues.

    Q    Did you have office hours where they could
come to you with a problem or ask you to help them
sort something out?

    A    Anytime I'm there.  They know they're free to
come in and ask me any questions at any time.

    Q    So they didn't have to finalize a document
and turn it in and find out from you that there was a

21

1 mistake and then talk with them?

2     A    No.   No.

3     Q    Okay.  Would you fix the problem yourself or

4 would you have them fix it if there was something that

5 you noticed that they hadn't directly brought to your

6 attention?

7     A    Again, it all depends on what the problem is.

8 For the most part I would have them correct it.

9 Because I have to sign off on things, it's better to

10 have them correct it and then me review it and to sign

11 off on it.

12     Q    Okay.  But you would make them aware that

13 there had been a mistake?

14     A    Correct.

15         MR. KEATING:  I'm going to object to that

16 question.  You're talking about problems and now

17 you're talking about mistakes.

18 BY MS. TOBIN:

19     Q    Okay.  So you'd make them aware that there

20 was an issue with or a problem with something that

21 they turned in to you?

22         MR. KEATING:  Well, the question was if

23 someone had a problem, did they come to her and she

24 was saying what she would do if they came to her with

25 a problem.

22

1      MS. TOBIN:  Let me rephrase it.

2      MR. KEATING:  I don't want her to be

3  confused.  That's all.

4      MS. TOBIN:  Sure.

5  BY MS. TOBIN:

6      Q   If someone turned a document in to you that

7  was incorrect, that there was a mistake on it and they

8  turned it in for you to review it and you went through

9  and found the mistake which they hadn't previously

10  discussed anything with you, an issue or a problem,

11  would your process be to correct it and talk with them

12  about it, about the mistake or would you just correct

13  it and move on?

14      A   Well, it all depends.  Again, it all depends

15  on what the mistake was.  Sometimes with our system

16  the way our computer systems are it is easier for me

17  to correct it.  But whenever there is a mistake, I

18  would always show them what they did.  I would show

19  them what -- that there was a mistake and just let

20  them know that I corrected it and what it was.

21      Q   Okay.  So you mentioned two major functions

22  that you see and there may be more and I wanted to

23  find out about that.  Overseeing staff in the office,

24  signing off on any work that they do including

25  releases and reception?

ERVIN BLANK ASSOCIATES, INC.

23

1    A    Reception, no.

2    Q    Not reception.  Okay.  Does anyone review the

3 reception process?

4    A    Yes.  The specialists who are assigned to a

5 particular caseload, yes.  The specialists assigned to

6 that number is responsible for reviewing the files as

7 they come in.

8    Q    And you don't sign off on that?

9    A    No.

10    Q    Does anyone besides the specialist sign off

11 on that?

12    A    No.

13    Q    And does that also -- is that same procedure

14 used in cases where the person's coming back after

15 violating parole?  Is that considered reception as

16 well?

17    A    Yes.

18    Q    It's not an initial reception but is it

19 something else?

20    A    We just call it a parole violator.

21    Q    So when somebody comes back after violating

22 parole, who handles the documents that -- who handles

23 that process at the very beginning?

24    A    The specialist assigned to that case.

25    Q    And does anyone review that specialist's

24

1   work?

2       A    We have what we complete -- we have what we

3   call a status sheet that we complete when the inmate's

4   returned as a parole violator.   We call it a PVP-16E

5   is how we refer to it.   It's a parole violator

6   pending.   That's what the PVP stands for.   And that's

7   completed.

8           That's what we show as -- that's where we

9   show the minimum and maximum dates and that's what we

10  use as a guide basically for their min and max dates

11  until the parole board recommits them.

12      Q    And who completes that form?

13      A    The specialist and then I sign off on it.

14      Q    And where does the records specialist get the

15  information that goes on that form?

16      A    The PVP?

17      Q    Whatever piece of paper, this PVP-16E I think

18  you called it.

19      A    Yes.   The PVP-16E it typically just brings

20  forward his prior min and maximum dates.

21      Q    How does it bring it forward?

22      A    The system holds all of that information.

23  Our system holds all of that information and then we

24  just go ahead and we open up a new document and

25  basically we just show the computation is pending.

1    Q    So a computer system generates a form, the

2    specialist pushes a button to get the form to print

3    out?

4    A    No.  No.  It's not that simple.  We still do

5    have to go through the computation just to ensure that

6    credit was applied.  If there's multiple sentences,

7    that it's applied concurrently or consecutively.

8    Q    You have to do that even if it's someone

9    who's returning --

10   A    Yes.

11   Q    -- for violating a parole?

12   A    Yes.

13        MR. KEATING:  You have to let her finish her

14   question.

15        THE WITNESS:  Sorry.

16        MR. KEATING:  That's okay.

17   BY MS. TOBIN:

18   Q    When you say you still have to go through the

19   computation, who does that computation?  Is that the

20   records specialist?

21   A    Yes.

22   Q    And is that computation for someone coming

23   back from violating parole, is that adding their

24   street time to their previous controlling max date to

25   get a new max date?

26

 1      A    Not under the parole violator pending 16E.

 2 No.

 3      Q    What kind of computation do you do under the

 4 PVP-16E?

 5      A    That is just -- again, we're just bringing

 6 his prior min and maximum dates forward and reflecting

 7 that it's currently pending.  It's pending recommit by

 8 the parole board.

 9      Q    Okay.  So you're not doing any math?

10      A    Right.  At that point, no.

11      Q    You're just bringing the old information up

12 and then the parole board gives you later some kind of

13 new information that you input into the system?

14      A    Yes.

15      Q    Okay.  I'm jumping ahead of myself.  I'll ask

16 you some more questions about that later.

17      A    Okay.

18      Q    Other than those two main categories;

19 overseeing staff in the office and signing off on

20 their work, what other main functions do you see for

21 yourself or do you consider to be your main functions

22 as a records supervisor?

23      A    My job is to make sure my staff are following

24 policy and procedure in regards to their job duties.

25      Q    And how do you do that?

27

1      A     By reviewing their work, by signing off on

2  all the things that we just discussed, the releases,

3  the status changes.

4      Q     Okay.  Do you -- is part of your job as a

5  records supervisor to make sure that the file is in

6  order?

7      A     Yes.

8      Q     And is that the DC-15?

9      A     Yes.

10     Q     Okay.  Do you perform any audits of the DC-15

11 to make sure that all of the documents that should be

12 in there are in there?

13     A     I wouldn't necessarily call it an audit.

14 When I'm signing off on a 16E or a release, I make

15 sure all the documents are in there.  That's basically

16 what I'm doing when I sign a release checklist is

17 saying that everything's there that needs to be and

18 everything's in order.

19     Q     Are there other checklists besides the

20 release checklist or is that pretty much it?

21     A     We have checklists that we use upon

22 reception.  We do use one; although, I don't think at

23 the time it was the same.

24     Q     Any other major functions for the records

25 supervisor job?

28

1      A     No.  I think the main function is signing off

2  on their work.  There's other things that I'm

3  responsible for.  I'm also a CLEAN coordinator.

4      Q     What's a CLEAN coordinator?

5      A     The state police criminal history system.

6  Like to run a rap sheet.  I oversee that.

7      Q     So you have access to every inmate's criminal

8  history?

9      A     Yes.

10     Q     Does that include federal criminal history?

11     A     Yes.

12     Q     And also county?

13     A     Yes.

14     Q     So you can find out what their charges are

15  and their convictions?

16     A     Yes.

17     Q     And their sentences?

18     A     Yes.

19     Q     Okay.  So if you want to take a look now at

20  the Exhibit Kodack 1.  You touched on some of this.

21  Processing inmate population movement in and out of

22  the SCI-Coal Township.  The first item.  What does

23  that^-- what does that mean?

24     A     Any inmate who comes into the facility or out

25  does not do so without basically my knowledge or

29

1    anybody else in my office knowing about it.   Any

2    movement within the inmate population has to go

3    through our office.

4         Q    And why does your office have to do that?

5         A    Our office puts out the official count

6    records for the institution.   We track how many

7    inmates we have.   It's broken down by race.   And we

8    track both physical and committed inmates.   And that's

9    our office's -- one of our office's responsibilities.

10        Q    And the next item preparing the DC-15 inmate

11   record jacket for all commitments and maintaining the

12   security of the DC-15.   What is a record jacket?

13        A    Basically just this.   It's just a folder --

14        Q    Okay.

15        A    -- that it's in.

16        Q    So you maintain the file?

17        A    Yes.

18        Q    Does the DC-15 include -- I've heard -- in

19   the documents I've seen references to other DC files

20   such as the DC-16 and the DC-14.   Can you explain the

21   difference?

22        A    The DC-14 is the counselor file.   Basically

23   it's just a mini version of the DC-15 that the

24   counselors keep.

25        Q    Do you maintain that file as well?

ERVIN BLANK ASSOCIATES, INC.

30

1    A   No.

2    Q   Do you have access to it?

3    A   If I requested it, yes.

4    Q   Okay.  And then the DC-16 what is that?

5    A   The DC-16 that's just the DC-16E.  That's the

6  sentence status sheet.

7    Q   And is that incorporated into the DC-15

8  record jacket?

9    A   Yes, it is.

10    Q   There's no separate jacket for that?

11    A   No.

12    Q   Okay.  The third item, complete a record

13  check on all inmates prior to prerelease, release or

14  transfer.  Is that the release checklist you were

15  talking about?

16    A   Yes, it is.

17    Q   And so what are you looking for when you

18  complete a record check?

19    A   I review their rap sheet, make sure there's

20  no outstanding arrests or warrants.  I review their

21  sentence structure, make sure all credit has been

22  applied that was ordered by the judge, make sure that

23  the sentences are structured appropriately whether

24  they were ordered concurrent or consecutive.  I review

25  that.

ERVIN BLANK ASSOCIATES, INC.

31

1          Make sure, again, like DNA samples were taken

2     if they're required to.  Also Megan's Law.  And,

3     again, Act 143.  Make sure that was completed if they

4     were required to take it.

5          And if they're paroling, we would also review

6     their parole orders to make sure the parole orders are

7     in order with what they were serving to make sure that

8     all the appropriate sentences that they're being

9     paroled from, parole's paroling them from are listed

10    on their parole orders.

11         Q    Do you make sure that they've met their

12    minimum before they go out?

13         A    Yes.

14         Q    What does it mean certify sentences for

15    inmates being released using the audit tool?

16         A    Within our DC-16E system, there's what we

17    call an audit tool.  It just -- basically you're going

18    through and entering all the information from the

19    sentences and the system double-checks it to make sure

20    that there were no errors.  Make sure there was no

21    double credit given, to make sure that the sentences

22    were applied correctly.

23         Q    So all of the inmates' sentences are in the

24    system and you can look at them and do that check?

25         A    Yes.

32

1    Q    Can you do that at any time or do you have to
2   wait until there's a release checklist?

3    A    It can be done at any time.

4    Q    And who else has access to the audit tool?

5    A    There's two other specialists in my office
6   that have access.

7    Q    And back in 2009, was the audit tool in
8   effect?

9    A    Yes.

10        MR. KEATING:  If you remember.

11        THE WITNESS:  I believe so.

12   BY MS. TOBIN:

13    Q    In 2009, did Ms. Herbst have access to the
14   audit tool?

15    A    No, she did not.

16    Q    And apart from the audit tool, were there
17   other ways you could go into the system and find the
18   sentences and the convictions manually or just review
19   them without some specific computer program?

20    A    Could you be --

21    Q    If someone didn't have access to the audit
22   tool, for example, if another employee wanted to check
23   in the system for the inmate's sentences and
24   convictions, was that possible?

25    A    You mean within the records office or other

33

1    staff?

2        Q    Within the records office.

3        A    Yes.

4        Q    Okay.  And then the next one, work closely

5    with DOC Central Office Records Chief and Chief

6    Counsel's Office to receive guidance on questions

7    related to commitment orders, sentence structures,

8    release orders, and other matters.

9            Is that what you were talking about

10   previously where if you had a question or an issue,

11   you could call someone?

12       A    Yes.

13       Q    Who would you speak with at the central

14   office records -- central office records department?

15       A    Chuck Roberts is the assistant records

16   administrator.

17       Q    In 2009, was he in that position?

18       A    I believe so, yes.

19       Q    And who was the records administrator in

20   2009?

21       A    Denise Wood.

22       Q    And you could talk to both of them if you had

23   a question?

24       A    Yes.

25       Q    How would you communicate with them if you

34

1    did have a question?

2         A    All depends on the importance and if it was

3    something that I needed an immediate answer on.  If I

4    needed an immediate answer, I would typically call.

5         Q    Did you use e-mail, also?

6         A    Yes.

7         Q    Did you also use memos?

8         A    To them?

9         Q    Interoffice memoranda?

10        A    Within the records office, no, not typically.

11   We just usually use e-mail.

12        Q    And then to Chuck Roberts and Denise Wood or

13   anyone outside the records office, would you

14   communicate by phone, e-mail; and then for those

15   communications would they also be in paper or no?

16        A    Phone calls?

17        Q    Would you communicate with Roberts and Wood,

18   for example, at the central office through paper with

19   a memo?

20        A    No.

21        Q    Just e-mail and phone?

22        A    Yes.

23        Q    Okay.  And after the issue or problem was

24   resolved, would a copy of whatever e-mail go into the

25   file for the inmate that it was related to?

35

1      A    Yes.

2      Q    To document that you solved the problem?

3      A    Yes.

4      Q    If you had a phone call with them, would you

5  put a note in the file that you had a phone call with

6  someone outside the office?

7      A    It all depends.  If it's something that

8  affects their sentence or if it's something that would

9  affect that somebody may question down the road and

10  need to look back and see what was done, yes.

11      Q    Would there be any other place other than the

12  inmate's DC-15 where those communications would be

13  documented?

14      A    No.

15      Q    So if it was documented, it would be in the

16  jacket?

17      A    Correct.

18      Q    Okay.  The next one is communicate with other

19  criminal justice agencies and the courts as necessary

20  to inquire into the status of the inmate's sentence

21  related matters.

22           Who would you contact -- who is a criminal

23  justice agency that you had dealings with?

24      A    When you say criminal justice agency, that's

25  a pretty -- are you referring to the courts as well?

36

1  Q For now just asking about the criminal

2 justice agencies.

3  A We've been in contact with numerous police

4 departments, the US Marshals, Bureau of Prisons.  I

5 could go on.

6    MR. KEATING:  State, local, federal?

7    THE WITNESS:  Yes.  At pretty much every

8 level.

9 BY MS. TOBIN:

10  Q So if you had a question that involved them,

11 you had freedom to contact someone and discuss the

12 inmate's issue or the question with them?

13  A We had freedom to do it.  Just because we

14 could, doesn't mean that we always get a response from

15 them, let's put it that way.

16  Q And then the courts.  Would you contact state

17 and federal courts as well?

18  A Yes.

19  Q Regarding what matters?

20  A If there's ever -- a lot of the time we get

21 commitment orders that there's conflicting information

22 on that we will call or fax them requesting

23 clarification.

24    Sometimes we may find out from -- you know,

25 we may get a letter from someone saying that an

ERVIN BLANK ASSOCIATES, INC.

37

```
 1    inmate's sentence was changed whether it be from the
 2    inmate or a phone call from the inmate's family, and
 3    we have to request the documentation because the
 4    courts don't always send it to us.
 5        Q    And if you made a request to a court, that
 6    would be in the file as well?
 7        A    Yes, it would.
 8        Q    And same thing with the criminal justice
 9    agency?
10        A    Correct.
11        Q    So any outgoing communication where you were
12    trying to get information from another entity, that
13    would be in the DC-15?
14        A    Yes, it would.
15        Q    You mentioned the daily population reports
16    earlier and that's -- am I understanding that
17    correctly that that's who's here, who's leaving, who's
18    coming?  All the inmate movement?
19        A    Yes.
20        Q    The next one, review the computation data
21    involving inmate sentence status to ensure accuracy in
22    sentence structure.  What does that mean?
23        A    The sentence status that's the inmate's
24    minimum and maximum dates basically.  And, again, that
25    goes with the sentencing orders, the commitment
```

38

1  orders, any credit memos that there may be, recommits

2  by the parole board.

3      Q    Let me ask you about that.  The parole board

4  has -- you said recommit.  What does that mean,

5  recommit by the parole board?

6      A    The parole board has -- like I said, we

7  complete a PVP-16E.  If an inmate's been released on

8  parole and he violates and they bring him back, they

9  bring us a parole board warrant and at that time we

10  put him in what we call PVP status.  That's a parole

11  violator pending.  At that time they're awaiting to be

12  recommitted by the parole board.

13          They can either be recommitted on technical

14  violations or if they have a new conviction, they can

15  be recommitted on a new conviction.  That's what we

16  call a CPV or TPV.

17      Q    Can they be recommitted on both, a TPV and a

18  CPV?

19      A    Yes, they can.

20      Q    So if they violate a parole rule but that's

21  not a conviction or even a crime, that's one way.  And

22  then after they're convicted of whatever new charge,

23  that's the CPV?

24      A    Yes.

25      Q    Can the parole board do that -- is the

ERVIN BLANK ASSOCIATES, INC.

39

1    purpose of the parole board doing that so that they

2    let you know that this person had a shot, they were

3    out, they're coming back, and now they have to serve

4    their original sentence?

5            MR. KEATING:   I'm going to object if you're

6    asking her what the parole board's intent is when they

7    do that.

8    BY MS. TOBIN:

9        Q    What's your understanding of what it means

10   that the parole board is recommitting someone?

11       A    They committed a violation of their parole.

12   They're bringing them back and ordering them to serve

13   either the remainder of their sentence or if they were

14   unavailable to serve -- I don't know how to put it.

15           If they were delinquent at any point during

16   their parole, they also are required to serve that as

17   well.

18       Q    What does delinquent mean?

19       A    If they weren't reporting to their parole

20   agent and their parole agent was unaware of where they

21   were.

22       Q    So is that considered a technical -- do you

23   know if that's considered a technical parole

24   violation, being delinquent?

25       A    That I do not know.

40

1      Q    So that's a chunk -- that could be a chunk of

2 time that the parole board says they have to serve now

3 incarcerated?

4      A    Correct.

5      Q    Do you know if that's the same thing as what

6 I've heard referred to as street time?  Is delinquent

7 time the same thing as street time?

8      A    No.

9      Q    What's the difference?

10      A    My understanding?

11      Q    Yes.

12      A    The delinquent time again, like I said, is

13 when he wasn't -- if he wasn't reporting to his parole

14 agent.  And the street time is just basically the time

15 from the time that he left the institution to the time

16 that he was out on parole.

17      Q    Okay.  So if somebody comes back after

18 violating parole and the parole board recommits them,

19 who does the calculation of what their new max date

20 is?

21           If they had time left to serve on their

22 original sentence at the point they were paroled, who

23 does that?

24      A    The parole board.

25      Q    And what's your understanding of what -- how

41

1   that calculation is done?

2        A    All I know is they have their own system.

3   Kind of like we have our 16E system that they run

4   dates through and basically get a calculation of how

5   much whether it be delinquent time or backtime or

6   whatever that they're to serve.

7        Q    But the parole board can't issue a new

8   sentence?

9        A    No.

10       Q    So you're really -- is my understanding

11  correct that you're dealing with the original sentence

12  plus delinquent time or street time, something when

13  they were not incarcerated and then any new sentence

14  after they've been convicted of another crime?

15       A    Correct.

16       Q    And when would the parole board contact you

17  to tell you what this new calculation was?

18       A    It varies to be honest with you.  It can

19  be -- we have guys that will be here for two weeks and

20  we'll get a new calculation on them.  We have other

21  guys that have sat for over a year until we get a new

22  calculation.

23            If they're sitting and they have cases

24  pending and the parole board does not have technical

25  violations to recommit them on, they will be sitting

42

1  in parole violator pending status until those new

2  charges are either disposed of or they're convicted on

3  them.

4      Q    And does the records department track that

5  process?

6      A    Yes, we do.

7      Q    How do you track it?

8      A    We use -- we use a couple different things.

9  We have a paper tracking system.  We call it time

10  files.  And then we also have just -- we have a

11  mainframe that we can print out a report on a monthly

12  basis or whenever we want and it shows us min and max

13  dates basically.

14      Q    And if someone's been sitting for a year, you

15  said monthly you track it?

16      A    Yes.

17      Q    And you notice that they're sitting, they're

18  still PVP, can you call up the parole board and say

19  what's going on with this person?  What are you doing?

20      A    Typically we don't do that, no.  Just because

21  an inmate's sitting for a year, again, like I said, he

22  may have new charges that are pending.  And if I see

23  he's going back and forth to court, there's -- I know

24  that's what they're waiting on.  They're waiting on

25  his new charges for him to either be convicted or for

ERVIN BLANK ASSOCIATES, INC.

43

1    those to be disposed of.

2        Q    And is that charges either in the state

3    system or the federal system?  Do you track both court

4    activities?

5        A    Yes.

6        Q    So if somebody has new federal charges but no

7    new state charges, then you keep track of that as

8    well?

9        A    Yes.

10       Q    Have there been times when you've called the

11   parole board and said let's talk about this person,

12   he's sitting here, when you don't understand what's

13   going on with him?  For example, if there are no new

14   charges pending and there's some status that you don't

15   understand?

16       A    Yes.

17       Q    And who do you contact when you do that?

18       A    I contact someone from our institutional

19   parole office.

20       Q    Here at Coal Township?

21       A    Yes.

22       Q    And how many people work at that office?

23       A    Currently?

24       Q    In '09.

25       A    I can't be sure.  I think in '09 there was

44

1   approximately four.

2       Q    And if you reached out to them to find out

3   what was happening with someone, how would you -- what

4   method of communication would you use?

5       A    Either by e-mail or I would pick up the phone

6   and call.

7       Q    And similar to the inquiries that you made

8   outside of the system, would those be documented, the

9   communications to the institutional parole office

10  would those be in the DC-15?

11          MR. KEATING:  I'm going to object to that

12  question.  What do you mean outside the system?

13  BY MS. TOBIN:

14      Q    Earlier you testified that if you were going

15  to contact either --

16          MR. KEATING:  You mean central office?

17  Someone outside this institution?

18          MS. TOBIN:  Yes.

19          MR. KEATING:  Okay.

20  BY MS. TOBIN:

21      Q    Those communications would be in the inmate's

22  file and wouldn't be anywhere else, that's the right

23  place for them?

24      A    Yes.

25      Q    Is it the same thing for talking with the

45

1   institutional parole office, would those

2   communications be in the inmate's file?

3      A   Yes.

4      Q   Okay.  Would they be anywhere else?

5      A   No.

6      Q   Okay.  So processing requests for criminal

7   history information in accordance with Criminal

8   History Information Act.  What is that?

9      A   The Criminal History Information Act is we

10  also refer to it as CRHIA.  It's basically an act that

11  dictates to us how we are to log criminal history

12  information and if it's disseminated.

13      Q   And process inactive records in accordance

14  with applicable provisions of the records retention

15  schedule.  What does that mean?

16      A   When an inmate leaves, we're required to keep

17  their DC-15 on-site for two years and then we purge

18  certain information.

19      Q   Is that in accordance with the Section 3 of

20  the Policy 11.5.1, the filing procedures or is that a

21  different one?

22      A   No.  That's different.

23      Q   What's the -- what tells you what to purge

24  and what to keep?

25      A   The records retention schedule.

46

```
 1      Q    Okay.  Is there another name for that or is
 2  that --
 3      A    That's pretty much it.
 4      Q    Okay.  Coordinate release processing with the
 5  PBPP.  Is that the parole board?
 6      A    Yes.
 7      Q    And I'm reading the rest of this.  Signature
 8  of both the records specialist and records supervisor
 9  is required.  This is to be completed within six
10  working days.  Is that the process you were talking
11  about earlier where you have a release checklist?
12      A    Yes.
13      Q    Respond to inmate request slips and interview
14  inmates to explain responses when necessary.  And how
15  would you respond to the request slips typically?  How
16  does that -- let me start with a broad question.  How
17  many request slips do you get?
18      A    On a weekly basis we get --
19           MR. KEATING:  No.  Do you get?
20           THE WITNESS:  Do I get?
21           MS. TOBIN:  No.  No.  The records department.
22           MR. KEATING:  Okay.  You said you.
23  BY MS. TOBIN:
24      Q    How many records department request slips do
25  you get?
```

ERVIN BLANK ASSOCIATES, INC.

47

1    MR. KEATING:  Does the records department

2  usually get?

3    MS. TOBIN:  Yes.

4    THE WITNESS:  Anywhere from 25 to 30 a week.

5  BY MS. TOBIN:

6    Q    And who handles those?

7    A    It all depends.  Sometimes the specialists

8  will handle them.  Sometimes I handle them.  It

9  depends on the issue.

10    Q    And similar to your other duties of

11  overseeing and signing off on your specialists' work,

12  do you review the specialist's responses to those

13  before the specialist responds?

14    A    Not all of them.

15    Q    And how is it determined whether you review

16  it or not?  Is it up to the specialist whether he or

17  she wants you to?

18    A    They use their own discretion.  They know

19  what -- if they have a question about something that

20  an inmate's asking, they'll come to me and ask.

21    Q    And then interviewing inmates.  When do you

22  do that?

23    A    If we have sentencing issues with an inmate

24  or we register them for Megan's law, our office does

25  that as well.  I'll see them for the Megan's law.

48

1    Also, if an inmate has a question regarding his

2    sentence, I can meet with them and discuss any issues

3    that they have.

4         Q    And that includes issues related to credit,

5    sentence credit?

6         A    Yes.

7         Q    How often do you meet with the inmates, you

8    in particular?

9         A    Not that often.  Typically I don't get many

10   requests to meet with them and go over sentence

11   structure.  If it's something ongoing that I see that

12   an inmate is continuously writing requests saying he

13   doesn't understand something, I will contact his

14   counselor to meet with him.

15        Q    So you'll meet with him and his counselor or

16   just him?

17        A    I try to meet with him and the counselor that

18   way the counselor's there and, you know, maybe they

19   may understand something that the inmate doesn't and

20   the inmate can go to him.

21        Q    Can the counselor request that kind of

22   meeting?  If the counselor knows that the inmate has a

23   sentence issue, can the counselor approach you and say

24   hey, I think you should talk to this person?

25        A    Yes.

49

1      Q     Has that happened in the past?

2      A     Yes.

3      Q     What about the unit manager?  Can the unit

4  manager also request a meeting with you?

5      A     Yes.

6      Q     And the superintendent can ask to meet with

7  you as well?

8      A     Yes.

9      Q     Where do you have those meetings?

10     A     It all depends.  A lot of the time we'll do

11  them in our reception area.  If the reception area is

12  busy, I'll go up to the counselor's office and we'll

13  sit in the counselor's office.

14     Q     Can the inmate come to -- actually, is the

15  records office the office right outside where we're

16  sitting?

17     A     No.  The records office is down front.  It's

18  right -- it's in the lobby.  It's right off of the

19  lobby.

20     Q     Can an inmate come knock on your door and say

21  hey, I've got a problem.  I need to talk to you?

22     A     Absolutely not.

23     Q     How does an inmate get to talk to you?

24     A     Either by writing me a request or again,

25  approaching their counselor and their counselor can

1  call me.

2      Q    So the inmate can't just make a spontaneous

3  appearance at your door?

4      A    No.

5      Q    The next one is attending and testifying at

6  judicial hearings as required.  What does that -- what

7  judicial hearings do you go to?

8      A    A lot of times we have extradition hearings.

9  We may have an inmate with an out-of-state detainer

10 that they're being released to and they have to waive

11 extradition.  So those are typically the ones that we

12 have to testify at.

13     Q    Maintaining time files and alpha indexes.

14 You mentioned time files briefly earlier.  But if you

15 could just explain what that is in comparison to a

16 DC-16 file.

17     A    Basically it is the DC-16.  It's another copy

18 of a DC-16E kept in a separate area according to month

19 and year.

20     Q    Where's it kept?

21     A    Just in a filing cabinet in the office.

22     Q    So in addition to the DC-15 containing that

23 information, there's another place?

24     A    Correct.

25     Q    And then what's an alpha index?

51

1    A    The alpha index is -- it's hard to explain.
2   It's just index cards basically and we track inmates
3   that are out to court.

4    Q    So if they leave the institution, you have a
5   card file?

6    A    Yes.

7    Q    Do you have -- does the alpha index include
8   inmates who have been released or who are coming up
9   for parole or any other reason?

10   A    No.

11   Q    What's the purpose of tracking inmates who
12  are out to court?

13   A    That affects our count.  We track -- like I
14  said before, we track inmates that are physically here
15  and inmates that are committed here.  If they're not
16  physically here, we still track them on our committed
17  count.

18   Q    So they're either physically here or they're
19  supposed to be here?

20   A    But they may be out to a county for court.

21   Q    So if the inmate were going out to any court,
22  even federal court, you would use the alpha index?

23   A    Correct.

24   Q    Would the -- would there be a duplicate of
25  the alpha index information in the DC-15?

52

1    A    No, there's not.

2    Q    So you know if they're coming and going?

3    A    Yes.

4    Q    What monthly reports do you prepare?

5    A    I prepare -- I have a pending release report.

6    It's basically a report that I print out from our

7    system.  It gives us the min, max, and recomputed max

8    dates.  I do nine months out.

9    Q    And those are people who are pending release

10   for what purpose?

11   A    Parole, max out.

12   Q    And how do you use that?  How are those

13   reports used either by you or by anyone in the

14   institution?

15   A    They're used by our parole office.  They use

16   that to prepare their parole staffing memos to see

17   who's coming up for parole to start preparing their

18   documentation and the same for the counselors as well.

19   Q    And what information is contained in -- you

20   said it's the min and max date and the recomputed max

21   date?

22   A    Yes.

23   Q    Any other information in that monthly report?

24   A    Just identifiers for the inmate; name, date

25   of birth, inmate number.

53

1      Q    And you said you do nine months out.  What's
2  the reason behind that?
3      A    That gives them ample time to prepare reports
4  and to see them.  I believe they do judge's letters
5  and DA letters, that sort of thing.
6      Q    So the institutional parole office gets a
7  copy of the monthly report?
8      A    Yes.
9      Q    And then does the unit team get a copy as
10 well?
11     A    The unit managers get it.
12     Q    Okay.  And why does the unit manager get it?
13     A    It's their job to oversee basically I guess
14 what their counselors are doing and just gives them
15 kind of a heads up.
16     Q    So that everyone who has -- every unit
17 manager person or unit team person who has contact
18 with this inmate who's on the report knows what's
19 going on with him?
20     A    Yes.
21     Q    Coming up in nine months this is -- he's
22 going to go for parole.  How is a max out report
23 different, if at all?
24     A    They're on the same report.  Everything's
25 printed on the same report.  Max out report is just

54

1   basically, again, it just shows you who's maxing out.

2   Who's going to be completing their sentence.

3       Q    In nine months?

4       A    Right.

5       Q    And is there some kind of tickler system so

6   that you make sure that that actually happens or you

7   do the report nine months out and then what do you do

8   in the intervening nine months?

9       A    There's also other reports that are done as

10  well.  We also do max out reports.  Those are done

11  three months out.  Those are completely separate from

12  this report.  And then also the specialists run

13  reports on their caseloads on a monthly basis to see

14  if anybody's been added to those reports.

15      Q    And this is the -- the max out report is

16  based on what date?  The controlling max date?

17      A    Yes.  And also if there is a recomputed max

18  date, they're also on there as well.

19      Q    Are these reports archived?

20      A    Yes.

21      Q    So would you be able to pull the reports for

22  Mr. Chappelle?

23      A    No.  They're only kept for two years.

24      Q    And then what happens to them?

25      A    They're destroyed.  They're basically

55

1    shredded.

2        Q    Okay.  And they're just circulated to these

3    various staff people so that they know what's coming

4    up?

5        A    Yes.

6        Q    Any other monthly reports?

7        A    No.

8        Q    Just the pending and then the max out which

9    is three months?

10       A    Yes.

11       Q    Supervise and train records specialists.  Is

12   there a special training curriculum for them?

13       A    No.

14       Q    How do you train them?

15       A    As they start I basically give them -- I

16   guess I ease them into certain things.  I'll go

17   through a file with them and show them what's

18   contained in a file.

19            Filing is one of the first main things that

20   they get to do that way they can become familiar with

21   the file and see where the documents go.  Then it's

22   typically I'll review incoming files with them, show

23   them what we're looking for when inmates are coming

24   into the system.  And then we'll start on status

25   changes, the 16E's as they come in.

56

1          And after -- the only other training that we
2     get really is the CLEAN training because you have to
3     become certified in order to run the rap sheets.
4          Q    And not every records specialist gets that?
5          A    Yes.  Yes, they do.  It's a job requirement.
6          Q    Okay.  So the records specialists can also
7     use CLEAN to -- is CLEAN a computer system?
8          A    Yes.  It's the state police system.
9          Q    Okay.  So records specialists can go into
10    that to get information about sentences, charges,
11    convictions?
12         A    As long as it's there, yes.
13         Q    Okay.  Skipping down to researching
14    unreported dispositions.  What does that mean?
15         A    A lot of the time on a rap sheet you'll have
16    an inmate that was arrested and it'll just say
17    disposition unreported.  So basically the agency that
18    arrested him never entered what happened with the
19    case.  So we would have to contact either the
20    arresting agency or the courts or now we have access
21    to JNet.  We can pull up JNet and see what happened
22    with that case.
23         Q    What's JNet?
24         A    It's basically a court system.  It's a system
25    that all the courts enter their information and we can

57

1  go in and look and see what happened with a particular

2  case.

3       Q    Is that state court or federal court?

4       A    State court.

5       Q    Do you have access to a similar system for

6  federal courts?

7       A    No, I do not.

8       Q    How do you track -- keep track of if an

9  inmate has a federal sentence in addition to a state

10 sentence?

11      A    Typically federal sentences are always

12 applied as detainers and we really don't track them.

13 The only time that an inmate would be serving a

14 federal sentence at the same time they're serving a

15 state sentence is if the Bureau of Prisons actually

16 provided us with a calculation.

17           MR. KEATING:  Is the Bureau of Prisons

18 federal?

19           THE WITNESS:  Yes.

20           MR. KEATING:  As opposed to Department of

21 Corrections?

22           THE WITNESS:  Correct.

23 BY MS. TOBIN:

24      Q    So they're always applied as a detainer.

25 Does that mean that if an inmate's in your institution

58

1   and he has a federal sentence, that means he's going

2   to go do his federal sentence after he finishes his

3   state sentence?

4        A    Yes.

5        Q    So the detainer is so you all don't release

6   him to the street?

7        A    Correct.

8        Q    So if an inmate's in your institution serving

9   a state sentence and has the detainer, you would be as

10  a records person in the records office you could look

11  at that detainer and see what it's for?

12       A    Correct.

13       Q    So his time in the institution would be

14  credited to his state time?

15       A    Correct.

16       Q    Not -- you don't have any authority to credit

17  it to his federal?

18       A    No, I do not.

19       Q    Okay.  And who does the actual research of

20  the unreported dispositions?  Is that the records

21  specialist?

22       A    For the most part, yes.  I do some as well.

23       Q    And is the purpose for doing that to make

24  sure that you've actually got somebody who is

25  sentenced, who actually has a conviction?

59

1     A    No.

2     Q    What's the purpose for doing that?

3     A    The purpose of that is to make sure there's

4 no additional sentences out there that we're missing.

5 As far as I'm concerned as long as I have a commitment

6 order for that inmate, he's here.  He's here legally.

7     Q    Is that the DC-300B?

8     A    Yes.

9     Q    So that's to make sure that you have

10 everything, all of the sentences?

11    A    Yes.

12    Q    Actually, it would be all of the state

13 sentences?

14    A    Correct.

15    Q    So if someone has a federal sentence that you

16 don't know about and there's no federal detainer, you

17 don't have another process by which you look for that?

18    A    Yes.  When we run his rap sheet, it also

19 brings up federal arrests.  If we do see that he was

20 sentenced maybe in the time that he was here or prior

21 to him being here and there's a lengthy sentence that

22 exceeds the time that he spent here, we would contact

23 the Feds for that information.

24        MR. KEATING:  See if they still want him?

25        THE WITNESS:  Yes.

60

BY MS. TOBIN:

Q   And that would be in the case where -- just so I'm understanding correctly.   A lengthy sentence that you said exceeds the time that he's been in the state DOC?

A   Yes.

Q   So can somebody get federal sentence credit time for time that they're here in the state system?

A   I don't know.

Q   So that would be something that the federal court would determine?

A   Correct.

Q   So you all wouldn't --

MR. KEATING:   I'm going to object to that. That's really a legal question that gets very involved about how concurrent and consecutive federal and state sentences work.   And it does get very complicated.

MS. TOBIN:   Sure.   Let me just ask it a different way in terms of how you deal with people who have both.

MR. KEATING:   Go ahead.

BY MS. TOBIN:

Q   In terms of your involvement and your tracking for how long they have to stay here, is it accurate to say that once they're done with their

61

1    state sentences, they either have a detainer and they

2    go to the Feds or go somewhere else to maybe another

3    state or they get released?  You don't try to manage

4    another legal system's sentences for them, do you?

5         A    No.

6         Q    Okay.  Thank you.  That helps me understand.

7    Because I know it does get complicated.

8              MR. KEATING:  They max out, you don't have a

9    detainer.  You don't have a problem getting rid of

10   them?

11             THE WITNESS:  Correct.

12   BY MS. TOBIN:

13        Q    Okay.  So the decision making section of the

14   job description says responsible for making all

15   decisions regarding the supervision of the records

16   office.  That seems pretty self-explanatory.

17             If anyone has like questions, your decision

18   and you have to rethink it, where would -- who can

19   question or bring an issue to you about a decision

20   that you've made?  Who has the authority?

21        A    Within my office or out?

22        Q    Within the whole DOC.

23        A    Anybody for that matter.  Anybody really.

24   Anybody can question a decision I make.

25        Q    But you're the person that makes the

ERVIN BLANK ASSOCIATES, INC.

62

1   decision.  The buck stops with you in terms of the

2   records office?

3       A    Again, it would all depend on what that

4   decision was and how involved it is.  You know, there

5   are certain things that -- I don't know exactly what

6   you're referring to.

7       Q    I'm just trying to get --

8       A    Decisions based on what?

9       Q    On sentences, sentence computation, dealing

10  with inmates, complicated issues.

11      A    I'm very open.

12           MR. KEATING:  I'm not sure that's an actual

13  question.  Could you put that in a question form?

14  BY MS. TOBIN:

15      Q    Is there any point at which -- well, I'll

16  withdraw that question because it is kind of unwieldy,

17  and I may have a better question later down the line.

18           So the essential functions section touches on

19  a lot of what you've just explained.  The first item

20  is verify legality and accuracy of court orders.  How

21  do you do that?

22      A    Again, like I said, a lot of the time we

23  verify the court orders, make sure there's a seal,

24  make sure it's original.  Accuracy.  We are putting

25  our faith basically in the court system that they

ERVIN BLANK ASSOCIATES, INC.

63

1    provided us with the correct information.

2            Again, if there's no conflicting information,

3    I don't question it.  If I have say two different

4    orders for the same inmate and -- I will question it

5    if there's a difference.  A lot of times we'll get

6    multiple orders for the same case sometimes for an

7    inmate.  And if there's a difference on the orders, I

8    will question it.

9        Q    And then the court orders, again going back

10   to the distinction between federal and state, is that

11   just for state court orders or do you also check on

12   the legality and accuracy of federal court orders?

13       A    Again, that goes back to it all depends if I

14   have conflicting information.  Legality or to verify

15   whether it's an original.  The Feds always sign their

16   orders and they're always on pink paper.  It's hard to

17   explain.

18       Q    But you have the tools available to you and

19   you have the authority and the responsibility of

20   making sure that the court orders are accurate and

21   true?

22       A    Yes.

23       Q    If someone's here?

24       A    Yes.

25            MR. KEATING:  You mean if the order itself is

64

1    a valid order?

2         MS. TOBIN:  Yes.

3         THE WITNESS:  Yes.  Accuracy, that's a very

4    broad term and it's kind of difficult to --

5    BY MS. TOBIN:

6    Q    But you can call up the court if you need to?

7    A    Again, if I have a question.  If there's --

8    if I think that there's something conflicting, yes.

9    Q    And have you done that in the past?

10   A    Yes.

11   Q    Access the inmate records system.  Is this

12   the computer system you were referring to earlier?

13   A    Yes.

14   Q    Is that called anything else other than

15   inmate records system?

16   A    Sometimes we refer to it -- it's in our

17   mainframe.  We have what we call a mainframe and

18   that's within our mainframe.

19   Q    Is there any part of the inmate record system

20   that you don't have access to as a records office

21   supervisor?

22   A    No.

23   Q    What about a records office specialist?  Is

24   there a part that he or she does not have access to?

25   A    No.

65

1    Q    The CLEAN terminal you've explained.

2  Fingerprints and photographs inmates.  Is that when

3  they first come in?

4    A    We don't fingerprint.  If they're coming from

5  another institution, we don't fingerprint them.  But

6  if they're paroled, if they're coming in off of the

7  street as a parole violator, we will.

8    Q    Interviews inmates.  We discussed that

9  earlier.  Computes and recomputes sentence structure.

10  What's the difference between a sentence calculation

11  and a sentence structure?  I've read those two terms

12  in the documents that were produced in discovery.

13    A    The sentence structure is the actual -- it

14  gives you the sentence date, the effective date which

15  the effective date is typically the sentencing date

16  less any credit.  It gives you the minimum date and

17  the maximum date.  It shows you the actual sentence

18  itself.  When he started the sentence, when he was

19  sentenced.  His min date and his maximum date.  The

20  sentence computation is that what you were asking

21  about?

22    Q    I've seen sentence calculation and I've seen

23  computation as well.

24    A    The sentence calculation basically refers to

25  the same thing.  Different people use different

1    terminology.

2         Q    You change the data on the DC-16E.  You

3    mentioned that before.  We'll look at some of those.

4    Access the PC terminal and control.  Is that to get

5    access to the inmate record system?

6         A    No.  Basically our control center has a CLEAN

7    terminal right in their control center in their area.

8    And because I'm the CLEAN coordinator, I have to check

9    on it once in a while.

10        Q    Supervise and instruct records specialists.

11   Anything else that's not in this job description that

12   you do on a regular basis as a records supervisor?

13        A    No.

14        Q    If you think of anything in the course of the

15   deposition, let me know.

16        A    Okay.

17        Q    And actually, that's one of my normal

18   instructions.  If you ever have need to supplement or

19   amend an answer as we go down, oh, I remember this,

20   that's perfectly fine.  We can do that.

21        A    Okay.

22        Q    Sometimes you don't remember everything at

23   the time the question is asked.  So in terms of the

24   other job duties, I'm going to show you what I'll mark

25   as Exhibit Kodack 2.

67

1          (Whereupon, a document was produced and
2   marked as Kodack Exhibit No. 2 for identification.)
3   BY MS. TOBIN:
4       Q    I'm showing you Kodack 2.  Do you recognize
5   what that document is?
6       A    Yes.  That's our policy.
7       Q    This is the --
8       A    Reception policy.
9       Q    Reception policy.  And this is a pretty
10  lengthy document.  Is this what you have to go by in
11  terms of what you do when an inmate comes into the
12  institution?
13      A    Yes.
14      Q    And is there another -- is there any other
15  policy that deals with that or is this it?
16      A    That's it.
17      Q    On the first page there's an -- under Section
18  A for initial receptions, item 1.C., reviewing the
19  sentencing order and commitment form to ensure
20  authenticity.  Where do you actually get the
21  sentencing order or commitment form from?
22      A    Let me just say if you actually look at this
23  document, this is actually referring to the entire
24  diagnostic and classification procedures.  This isn't
25  referring to after he's been classified.  These first

1  few pages are all regarding his classification

2  process.

3      Q   I see.  At the top?

4      A   Yes.

5      Q   Shall be received at the Diagnostic and

6  Classification Center.

7      A   Yes.

8          MR. KEATING:  Is that at Camp Hill?

9          THE WITNESS:  Yes.

10         MR. KEATING:  Everyone who does a state

11 sentence has to go through Camp Hill first; is that a

12 correct statement, to be classified if they're not a

13 parole violator being returned?

14         THE WITNESS:  Graterford and Pittsburgh can

15 also receive them.

16         MR. KEATING:  What about Coal Township?

17         THE WITNESS:  No.  We cannot.

18 BY MS. TOBIN:

19     Q   Okay.  So I see this section one, processing

20 of receptions.  The top paragraph refers to the DCC

21 and under item one it says when an inmate is delivered

22 to the department, the records office.  Is that a

23 different records office than the Coal Township

24 records office then?

25     A   Yes.

ERVIN BLANK ASSOCIATES, INC.

69

1      Q    That's the DCC records office?

2      A    Yes.

3      Q    Okay.

4           MR. KEATING:  Where are the DCC's?  What

5  institutions?  Camp Hill?

6           THE WITNESS:  Yes.  Camp Hill, Pittsburgh,

7  Graterford, and for females Muncy.

8           MR. KEATING:  They're the only ones who have

9  DCC's?

10          THE WITNESS:  Correct.

11  BY MS. TOBIN:

12     Q    So this first part under A.1. on page -- at

13  the bottom 1-1, this first part is not done by you?

14     A    Correct.

15     Q    This is done before they get to Coal

16  Township?

17     A    Correct.

18     Q    Okay.  And also item number three, the

19  records office shall check for prior commitments.

20  That's done by the DCC records office?

21     A    Correct.

22     Q    Okay.  I'm flipping over.  Item five is it

23  the same situation, the records office at the DCC

24  conducts a reception interview?

25     A    Correct.

70

1    Q    Okay.  So at the bottom of page 1-3, item
2  eight, within five working days of an inmate's
3  reception -- and I'm reading that to mean at the
4  DCC^-- the records office shall -- and then the next
5  page -- organize the DC-15 according to the procedures
6  outlined in Section 3 which are the filing procedures.
7  Notify the inmate's assigned counselor about being a
8  registered sex offender and review the commitment
9  papers.  That's all done at the DCC records office?
10   A    Yes.
11   Q    And so that assigned counselor is just a
12  temporary counselor at the DCC, it's not the ultimate
13  institutional counselor?
14   A    Correct.
15   Q    Okay.  And then item nine, all initial
16  reception inmates' commitment orders will be sent to
17  the Central Sentence Computation Unit.  Where is that?
18   A    That is -- currently it's in Mechanicsburg.
19   Q    And when did that start happening?  Has that
20  always been the case that it went to the Central
21  Sentence Computation Unit?
22   A    No, it has not.
23   Q    When did that change?
24   A    This is my best guess.  I'm going to say it
25  was around 2005.

1    Q    So prior to 2005 -- and counsel's indicating

2    the date on the policy.

3         MR. KEATING:  It says revised November 2008

4    and that's in bold.  I would assume that the bold

5    parts are the revised parts but that doesn't mean the

6    CSCU wasn't in existence.  So if it's 2005, that

7    sounds about right.

8    BY MS. TOBIN:

9    Q    So starting in 2005, the commitment orders

10   and is that the DC-300B form?

11   A    Yes.

12   Q    That would go to the central place and they

13   would do the -- they would double-check that,

14   double-check the commitment order?

15   A    Yes.

16   Q    Okay.  Did that eliminate the need for you at

17   the institutional level to double-check the commitment

18   order or did you also have to still check the DC-300B?

19   A    They did change policy to say that we're not

20   required to check it, correct.

21   Q    Okay.  And then on number ten, upon

22   notification that the DC-16E has been completed and

23   receipt of the original orders, the institutions will

24   prepare and distribute appropriate documents to

25   necessary departments for the classification process.

1   What institutions is that referring to?

2       A    That's for diagnostic because it is referring

3   to the classification process.

4       Q    So that means the DCC will prepare and

5   distribute the documents?

6       A    Correct.

7       Q    So all of this is happening, you haven't even

8   seen the inmate yet?

9       A    Correct.

10      Q    You don't have his file?

11      A    Nope.

12      Q    His file is being made there?

13      A    Yes.

14      Q    Okay.   Item B, parole violators, at the

15  bottom of 1-4.   The Pennsylvania Board of Probation

16  and Parole District Office will contact the facility

17  to notify staff that they will be returning a parole

18  violator.   And is that facility does that refer to the

19  actual DOC institution such as Coal Township?

20      A    Yes.

21      Q    So they're not calling the DCC at this point.

22  The parole department will call Coal Township?

23      A    Correct.   Each institution has a district

24  which they accept parole violators for.   Ours is

25  Williamsport.

73

1      Q     Okay.  And that's referring to the parole

2  district?

3      A     Correct.

4      Q     Who do they notify?  It says notify staff.

5      A     The records office.

6      Q     Okay.  They will be returning a parole

7  violator including community parole center program and

8  out-of-state parole violators.

9           And then on page 1-5, item one says the

10  records office shall.  Now, that's referring to the

11  institution records office?

12     A     Yes.

13     Q     Okay.  And it goes through a list of parole

14  documents that you are required to collect relating to

15  the reception?

16     A     Yes.

17     Q     Now, all of these -- do you collect all of

18  these for the inmates or do you collect some of them?

19  Which ones?

20     A     Typically the one that we require that we're

21  most interested in is the warrant to commit and

22  detain.  If they don't have one, they're not bringing

23  the inmate in.

24     Q     And at what point do you collect these?

25     A     When they bring the inmate in.

74

1    Q    Okay.  And if they show up with someone and

2  they don't have it, what do you do?

3    A    I'll turn them away.  They need to go get me

4  one.

5    Q    Have you done that before?

6    A    Yes.

7    Q    And why is that?

8    A    I can't accept one.  If they don't have

9  paperwork to show me that they're violating him, I

10 can't accept him because as far as I'm concerned I

11 don't have reason to detain him then.

12   Q    What about the notice of charges and hearing.

13 Do you collect that at that time?

14   A    Yes.  They don't always have it, but yes.

15   Q    And if they don't have that, is that a reason

16 to rebuff someone?

17   A    No.

18   Q    But you do have to have it in the file?

19   A    Yes.  Yes.  We will get that at some point.

20   Q    Is it your responsibility to follow-up with

21 them to make sure that you get that?

22   A    Yes.  And actually, since 2009, that's

23 actually available that we can print it out.

24   Q    And you have access to the computer system to

25 print that out?

1    A    Yes.   The parole board made it available that

2    the DOC can print that out.

3         MR. KEATING:   Which one are we talking about?

4         THE WITNESS:   This one.   The 257N.

5    BY MS. TOBIN:

6    Q    But in 2009, for this case we're talking

7    about the time period in roughly April of 2009, did

8    you have computer access at that point?

9    A    No.

10   Q    Okay.   And then the technical violation

11   arrest report.   The 257T.   Is that something that you

12   need?

13   A    We don't require it, no.

14        MR. KEATING:   When they first come in?

15        THE WITNESS:   Correct.

16   BY MS. TOBIN:

17   Q    Do you have to get it at some point or is

18   it^--

19   A    It's only if they're being brought in only on

20   technical violations.

21   Q    If no new charges at all?

22   A    Correct.

23   Q    And in the criminal arrest and disposition

24   report, the PBPP-257C, is that required?

25   A    It's not -- we don't require them to have it

76

1    when they bring them in, no.

2         Q    Are you required to follow-up later and get

3    it?

4         A    No.  No.

5         Q    And then the return of parole violator

6    report, the PBPP-227, is that required at the time?

7         A    No.

8         Q    So when you're following up and getting

9    whatever documents you get, where do you get those

10   from?  Who gives those to you?

11        A    We typically contact the institutional parole

12   office.

13        Q    Do you know where they get the documents

14   from?

15        A    They get them from their district office.

16   Whatever district that inmate was in, they'll get them

17   from that office.

18        Q    And then the summary of adjustment, the 257H.

19   It says it is forwarded to the facility record office

20   prior to the first level hearing and within 14

21   calendar days of the PV return for cases detained for

22   new criminal charges when the first level hearing is

23   conducted at the magisterial district justice level.

24   What's a first level hearing?

25        A    I'm not sure.  Honestly I'm not sure if

1   they're referring to the parole board hearing or if

2   they're referring to a hearing if they have new

3   charges because this is also saying -- this has me a

4   little confused because they're referring to the

5   magistrate district justice level, but I'm not sure.

6   They may also be referring to the parole board.   I

7   think they're referring to the first level parole

8   board hearing.

9       Q    So there's two different first level

10  hearings?

11          MR. KEATING:   It says in parenthesis and

12  within 14 calendar detained for new criminal charges.

13  So the magisterial district justice level is when they

14  have new criminal charges for like a preliminary

15  hearing type thing.

16  BY MS. TOBIN:

17      Q    Okay.   Just more generally what is a summary

18  of adjustment?

19      A    We honestly don't get those documents very

20  often.   The documents we mostly get are the 257N and

21  the warrant.   The other reports we don't always get.

22  But the summary of adjustment it gives us a synopsis

23  basically of their parole hearing and their behavior

24  while on parole.

25      Q    If you're missing one of these and you have a

78

1  question about something that happened in connection

2  with someone's parole, would you contact the

3  institutional parole office to find the answer?

4      A    Yes.

5      Q    That would be where you'd go?

6      A    Yes.

7      Q    Okay.  Item B, review the confinement

8  documents to verify their authenticity and that the

9  inmate is properly being returned to the department.

10  If it appears that the parole violator is being

11  returned to the department improperly, the facility

12  shall advise the records coordinator administrator or

13  assistant records coordinator administrator central

14  office records supervisor by telephone before

15  declining the commitment.

16          Here it refers to confinement documents.  Is

17  that the same thing as commitment documents?

18      A    No.

19      Q    What's the difference?

20      A    Well, in this instance they're referring

21  to -- we're referring to parole violators so when they

22  say commitment documents, they're referring to the

23  warrant to commitment and detain.

24      Q    So for item B what are you reviewing when you

25  review the confinement documents?

79

1      A     The warrant to commit and detain.

2      Q     And when you review it -- and that's from the

3  parole board?

4      A     Correct.

5      Q     When you review it, what things do you check

6  for?

7      A     We check to make sure the inmate's name and

8  number are correct and the date of the warrant.  And

9  we also prior to -- we get notification when they come

10  in.  Prior to them coming in, if they are beyond their

11  maximum date, they're also required additional

12  documentation.

13      Q     And what additional documentation?

14      A     They're required to provide us with a letter

15  stating why they're going to be held beyond their max.

16  Whether it's a period of delinquency or a new

17  conviction.

18      Q     And who issues that letter?

19      A     The parole board.

20      Q     So when you get someone who comes in after

21  violating parole or who comes in with -- would it

22  be^--

23      A     It's a parole agent.

24      Q     Parole agent would bring the person in.  And

25  you look at the warrant to commit and detain.  You

80

1  then check their max date to make sure that they're

2  not being brought back after their max date?

3      A    Correct.  It's not saying that they can't.

4  They can but they just need the proper documentation

5  for us to hold them.

6      Q    And that documentation comes from the parole

7  board?

8      A    Yes.

9      Q    And it's directed to the records office, the

10 letter?

11     A    The letter's actually written to the

12 superintendent.

13     Q    And if you don't have that letter, then you

14 can't accept them if they're beyond their max date?

15     A    Correct.

16     Q    Would that letter also be in the file?

17     A    Yes.

18     Q    The inmate's file?

19     A    Yes.

20         MR. KEATING:  You have to let her finish her

21 question.

22         THE WITNESS:  I'm sorry.  I caught myself.

23         MR. KEATING:  That's okay.  You're doing very

24 well.

25 BY MS. TOBIN:

81

1    Q    If that letter's not -- at what point do you

2    get that letter?

3    A    If they're beyond their maximum date and

4    they're bringing them in, they need to bring it with

5    them when they bring him in.

6    Q    And if they don't have it, they just have the

7    warrant to commit and detain?

8    A    I would follow the procedures as outlined in

9    Section B and I would contact the records

10   administrator.

11   Q    Would any communications from you to the

12   records administrator be in the DC-15 then about this?

13   A    Yes.

14   Q    Okay.  What reasons have you seen in these

15   letters from the parole board for keeping somebody

16   past their max date, for returning them beyond their

17   max date?

18   A    There's typically on the letters there's only

19   two selections.  It gives you two reasons underneath

20   the body portion of the letter and it's either due to

21   a new conviction or due to delinquency.  Sometimes

22   they will provide us with a new maximum date, a

23   tentative new maximum date and sometimes they do not.

24   Q    And then if you see that and you have a

25   question about it and it doesn't seem right to you,

82

1  what do you do?

2       A    I have no way of knowing whether or not it's

3  right, especially with delinquency time.  We don't

4  have a record of that.  That's all on the parole

5  board.

6       Q    And then if they indicate it's because of a

7  new conviction, do you check to see if there was a new

8  conviction?

9       A    Yes.

10      Q    And is that when you go to the CLEAN?

11      A    Yes.

12      Q    And if there isn't a new conviction but the

13 parole board says we're returning him beyond his max

14 date because he has a new conviction, what do you do

15 then?

16      A    If there was not a new conviction?

17      Q    Um-hum.

18      A    I would contact them and find out where the

19 new conviction occurred and where they got their

20 information.

21      Q    So you'd follow-up at that point?

22      A    Correct.

23      Q    And for delinquency if they check delinquency

24 as the reason we're returning him beyond max date, do

25 you follow-up with the parole board and find out what

83

1  the delinquent time was?

2      A    They provide that when they -- when they

3  recommit him, that's provided to us.

4      Q    Is that when they issue an order for

5  recommitment?

6      A    Yes.

7      Q    And that comes later?

8      A    Correct.

9      Q    It comes after the warrant?

10      A    Yes.

11      Q    Okay.

12      MR. KEATING:  It could come with the warrant

13  but doesn't necessarily have to; is that correct?

14      THE WITNESS:  A recommit?

15      MR. KEATING:  Yeah.

16      THE WITNESS:  99.9 percent of the time it

17  does not come with the warrant.

18      MR. KEATING:  Okay.

19  BY MS. TOBIN:

20      Q    If you did do the follow-up, let's say that

21  you found that there were no new convictions that you

22  could find and yet their paperwork says we're

23  returning him because of a new conviction, who would

24  you contact at that point?

25      A    I would contact our parole office and they

1    would in turn contact the inmate's field agent because
2    they're the ones that track all of that information
3    and track the inmates while they're out.
4        Q    And that would be in the file as well, that
5    chain of communication?
6        A    Yes.
7            MR. KEATING:   The parole file or your file?
8    BY MS. TOBIN:
9        Q    The DC-15?
10       A    It would be in our file as long as it came
11    from me.
12       Q    Okay.  Item C, upon verifying commitment
13    documents, a DC-151A shall be issued to the delivering
14    authority.  What is a DC-151A?
15           MR. KEATING:   Is that a body receipt?
16           THE WITNESS:   Yeah.  That's the body receipt.
17    BY MS. TOBIN:
18       Q    And then the delivering authority.  Is that
19    the parole board?
20       A    Yes.
21       Q    And would you just give that to the
22    institutional parole office?
23       A    No.  The parole agent bringing him in gets a
24    copy.
25       Q    Okay.  And that's to say yes, we have this

85

1    person's body?

2         A    Yes.

3         Q    We've got him.  We are taking him?

4         A    Well, no.  They're dropping him off at this

5    point.

6              MR. KEATING:  As a receipt?

7              THE WITNESS:  Yes.  Yes.  We're giving it to

8    them saying you delivered him, we received him.

9    BY MS. TOBIN:

10        Q    Okay.  And the reception interview in item D

11   it refers back to I believe -- it refers to Subsection

12   A.5, 1 through 6 which I think refers to the DCC

13   reception's process?

14        A    Yes.

15        Q    So you conduct your own reception interview

16   even though they've already -- when they were

17   initially classified, they had had this because

18   they're coming into your institution?

19        A    Yes.

20        Q    Who does the reception interview here?

21        A    We do a very limited part but for the most

22   part our reception officer does that.

23        Q    Is that part of the records office?

24        A    No.

25        Q    Is there any reception interview or reception

86

1   process where you meet with the inmate as a records

2   office person?

3       A    No.

4       Q    And item E, obtain the letter from the PBPP.

5   That's the letter you were referring to?

6       A    Yes.

7       Q    And that has to happen simultaneous to

8   getting the person?

9       A    Correct.

10      Q    Complete and update all associated screens in

11  accordance with Section 6 of the procedures manual.

12  Those are computer screens?

13      A    Yes.

14      Q    And does a records specialist do that?

15      A    Yes.

16      Q    Okay.  Does the records specialist who had

17  the inmate before he was paroled have him now if

18  they're still there or do they get reassigned?

19      A    If that person was still there and the

20  caseloads didn't change, they'll go back to that same

21  person.

22      Q    Okay.

23          MR. KEATING:  Still have the same inmate

24  number, right?

25          THE WITNESS:  Yes.  Yes.

BY MS. TOBIN:

    Q   So item I on page 1-6, notify the records administrator, assistant records administrator.  And those are people at the DCC, the district central?

    A   Diagnostic.

    Q   Diagnostic Classification Center.  That's who those are, the records administrator and the assistant records administrator?

    A   No.

    Q   Okay.

    A   They're at our central office.

    Q   Okay.  And you notify them when an inmate is a PV who has a federal detainer and sentence?

    A   Yes.

    Q   How do you notify them?

    A   Typically via e-mail.

    Q   Do you have a retention policy for keeping and archiving your e-mails?

    MR. KEATING:  If you know.

    THE WITNESS:  Honestly I'm not sure.

BY MS. TOBIN:

    Q   Do you have your e-mails going back to 2009?

    A   Not all of them, no.

    Q   Were you asked to check for your e-mail as part of this case?

88

1     A    Yes.

2     Q    And did you do that?

3     A    Yes, I did.

4     Q    Did you find any e-mails that related to the

5  case or related to the subject matter?

6     A    Nothing that was not in the file, no.

7     Q    So anything related on a piece of paper is in

8  the file?

9     A    Correct.

10    Q    Okay.  Item two, if a parole violator is

11 received from the PBPP at his or her paroling

12 facility, then his or her DC-15 is reactivated.  What

13 does reactivated mean?

14    A    Basically it's pulled from our inactive

15 shelves.

16    Q    The file is physically moved?

17    A    Yeah.  Just physically moved and put back

18 together.

19    Q    And in Mr. Chappelle's case he came back to

20 his paroling facility so he was not -- there was no

21 temporary file created I presume?

22    A    No, there was not.

23    Q    Item three, if the parole violator is being

24 returned from another state, the inmate may arrive via

25 a transportation service.  Does that mean returned

89

1  physically from another state or returned after

2  serving another state's sentence?

3      A   It could be either or.

4      Q   Just coming from someplace outside of

5  Pennsylvania?

6      A   Yes.

7      Q   I'll represent to you that in Mr. Chappelle's

8  case, he was returned from New York.  He was in a

9  federal facility in New York.  Would this have applied

10  to him then, he came through a transportation service?

11  Do you know?

12     A   I don't know off the top of my head.  I don't

13  believe so.  I'm pretty sure that our parole agents

14  brought him in.

15     Q   Okay.  But regardless of how he came in, you

16  still need the warrant, the 141.  What's a PBPP-61?  I

17  don't see that on this earlier list.  It's saying on

18  item three the records office shall be provided with a

19  copy of the parole board's PBPP-141 warrant to commit

20  and detain or PBPP-61, warrant for arrest of paroled

21  prisoner prior to the arrival.

22         So if the person comes in outside of office

23  hours or through a transportation service, who gets --

24  who does the checking?  Let's say somebody arrives at

25  midnight.

90

1     A    Typically the shift commander oversees that.

2     Q    So you still -- they still have to provide

3 the proper documents, it just isn't you who's checking

4 it?

5     A    Correct.  Correct.  And I've already gotten

6 phone calls at midnight asking if it was okay.

7     Q    Okay.  And then if there is a problem, do you

8 have to come in and take care of it or can you give

9 direction?

10    A    I typically give direction.

11    Q    Okay.  Do you review all of the incoming

12 receptions that happened when you weren't here?  Let's

13 say there was one that happened at two a.m.  The next

14 day would you review that person's documentation?

15    A    Yes.

16    Q    And how would you -- how would you do that?

17 Would you get it from the shift commander?

18    A    It's a matter of finding it.  Sometimes it

19 all depends who's up there.  Sometimes they'll unlock

20 our door and they'll bring it in and lay it directly

21 on my desk.  Sometimes they'll let it in the mail slot

22 up in the control area.  It all depends who's up

23 there.

24    Q    And so you would somehow be notified we've

25 got a new person?

ERVIN BLANK ASSOCIATES, INC.

91

1      A    They typically send me an e-mail.  If we get

2    a parole violator in overnight, they'll send me an

3    e-mail letting me know somebody came in.  Sometimes

4    they'll tell me where they put the documentation,

5    sometimes they don't.

6      Q    But then you follow-up and make sure

7    everything's in order?

8      A    Correct.

9      Q    Item C at the bottom, out-of-state parole

10   violators.  Skip that.  Skip D, community parole

11   center program.  Item E, county prison transfers.

12   Let's skip that.

13          On page 1-8, item F, return from authorized

14   temporary absence.  Is that what you were speaking

15   about before when they go for court?

16     A    Yes.

17     Q    Is there -- are there other categories of

18   temporary absences?

19     A    Yes.  We have -- sometimes we'll have an

20   inmate that will go out to an outside hospital for

21   medical reasons or also to another institution.

22          MR. KEATING:  Temporarily?

23          THE WITNESS:  Temporarily, yes.  We call that

24   a temporary transfer but our control center also

25   refers to that as an ATA.

92

BY MS. TOBIN:

Q    So you go through these processes every time somebody has a court date and has to be taken out of the institution?

A    Yes.

Q    So you are tracking people in a sense because you have to keep track of population, you know who's actively got court?

A    Yes.  Can I rephrase that?

Q    Sure.

A    Who's actively out to court.  Just because they have something pending, doesn't necessarily mean that they're out.  I want to be clear on that.  I don't always know if somebody has something pending. I have the available means to review it if they're currently out.

Q    If their body is out of the institution, you need to know where they are?

A    Right.  Yes.

Q    Inter-facility transfer.  Same thing.  You need to know who's coming, who's going.  On page 1-9 under Section H.  A detentioner is an inmate who is in the department's custody in one of the following situations:  The inmate has satisfied his or her state sentence and is being held on another jurisdiction's

93

1    detainer pending transfer to the other jurisdiction.

2           And that would be if they finished their

3    state sentence and are being held on a detainer, how

4    do you keep track of how much of that time that

5    they're in, that time in custody goes to their

6    detainer?  Do you start counting the days for the new

7    sentence?

8        A    If they have a detainer from another agency,

9    that's up to them to contact us to find out.  We

10   don't -- say they max out from us.  A lot of the times

11   it's on a weekend.  They may complete their sentence

12   on a weekend and have to -- the county can't get them

13   until say Monday or Tuesday.  We will hold them for

14   that time period for that county and they pick them

15   up.  What they do with that time, that's up to them.

16       Q    They can contact you and say how long -- how

17   many days was this person in your building?

18       A    Correct.

19       Q    And you can pull up a number?

20       A    Correct.

21       Q    This person's body was in this building for

22   this amount of time?

23       A    Correct.

24       Q    Skip page 1-10.  On page 1-11 under item K,

25   bail returns.  Part one or item one, a bail return is

94

1    the result of resentencing and may return directly to

2    the releasing facility.  I don't understand that.

3    What does bail return being the result of resentencing

4    mean?

5        A    You may have an inmate who appealed their

6    sentence and the judge may have granted him bail

7    pending resentencing and he may have been out on bail

8    and then was brought back to the county and now he's

9    resentenced; however, it's for the same case so

10   they're able to bring them back to the facility that

11   basically they were taken from.

12       Q    If his appeal fails?  If he has to serve the

13   rest of his sentence?

14       A    Well, he may have been resentenced but it's

15   still to a state term so they have to come back.  It's

16   not necessarily that their appeal failed but they may

17   have been resentenced to something else.

18       Q    Okay.

19       MR. KEATING:  You can ask the judge after

20   you're convicted and sentenced to reconsider the

21   sentence of the original judge.  Sometimes the judge

22   will do that and bring them back in and resentence

23   them to usually they're asking for a lesser amount of

24   time.

25   BY MS. TOBIN:

1      Q    But you need to keep track of the time they

2  were out on bail.  They don't get credit for that?

3      A    That's correct.

4      Q    So that doesn't get added to their

5  computation?

6      A    That's correct.

7      Q    Okay.  Item L, return of inmate following

8  retrial or resentence.  A retried or resentenced case

9  is not to be treated as a new commitment and is not

10 entered under a new department number.  He or she is

11 processed the same as an initial reception except for

12 the following:

13      The appropriate records shall be restored in

14 the inmate records system.  What does that mean,

15 restored?

16      A    Basically reactivated or if they're out -- it

17 all depends on how -- if they're coming back from

18 court, we just reactivate them in the system and the

19 computer will show that they're back at Coal Township.

20     Q    Okay.  And a resentenced case for that does

21 that refer to state court cases?

22     A    Yes.

23     Q    So if someone's resentenced for a federal

24 case, does it have any impact on your processing for

25 them in terms of reception?

Case 4:11-cv-00304-CCC   Document 46-3   Filed 09/24/12   Page 98 of 365

A    No.  In terms of reception, no.

    Q    Okay.  If someone's resentenced for a federal

case, does it have any impact on you at all?

    A    No.  We're just required to have that

documentation so that we can contact the federal

authorities when he's finished with our sentence.

    Q    It doesn't play any role in your computations

because it's a federal sentence?

    A    Correct.

    Q    And I believe you said earlier that you

can't -- that if somebody has a federal sentence,

they're going to serve their state sentence first and

the federal sentence will be lodged as a detainer and

they won't -- you don't know if they'll get federal

credit for their time in the state system?

    A    That's correct.

    Q    Because it's not your affair?

    A    That's correct.

        MR. KEATING:  I can tell you legally that's

not correct.  If you're out on parole and you do a

federal crime and get sentenced for federal on your

federal crime, you do -- they put a state detainer on

you, you do your federal sentence first and then you

go back and do your state.

        THE WITNESS:  At the time that's not how

ERVIN BLANK ASSOCIATES, INC.

```
1    things were done though.  In 2009 that isn't -- they
2    have since changed it.
3    BY MS. TOBIN:
4        Q    So in 2009 -- this is what happened in Mr.
5    Chappelle's case.  He was released and committed a
6    federal crime, got a federal sentence, had a federal
7    detainer for that.  How did you handle that -- all
8    that information in 2009 when he came back, when he
9    came back in April -- or excuse me, in July of --
10   September of 2001.
11            MR. KEATING:  But he did his federal time
12   first, right?
13            MS. TOBIN:  I don't believe so.
14            MR. KEATING:  And then he got resentenced.
15   Well, anyway.  I'm sorry.  Go ahead.
16   BY MS. TOBIN:
17       Q    Can you tell me what happened --
18       A    He did do his federal time first.
19            MR. KEATING:  Okay.  Would you just tell us
20   what your recollection is.
21            MS. TOBIN:  Let me ask you a question.
22            MR. KEATING:  I'm sorry.  I'm sorry.
23   BY MS. TOBIN:
24       Q    Let me ask you a question.  What happened --
25   and I'm getting a little off target.  I wanted to just
```

1  find out generally what you do but since we're talking

2  about it.  What's your memory or what do your records

3  show happened with Mr. Chappelle and his timeline?

4      A    At that time -- I'm going to refer to my

5  movement report if that's okay.

6           MR. KEATING:  Do you want to make a copy of

7  that and make that as part of the deposition here?

8           MS. TOBIN:  I have it.  I just want to hear

9  it from you.  I just want to get it from you.

10          MR. KEATING:  But if she's making reference

11 to it sitting here.

12          MS. TOBIN:  That's okay.

13          THE WITNESS:  Where would you like me to

14 start, first of all?

15 BY MS. TOBIN:

16     Q    You know, I actually have -- I'd like you to

17 just tell me Mr. -- let me ask you this.  Is it your

18 understanding that he was released on parole in April

19 of 2001?

20     A    Yes.

21     Q    Okay.  And then how long was he out on

22 parole?

23     A    He was out for six months at that time until

24 October 22nd, 2001.

25     Q    So that would be considered street time?

99

1    A    Yes.

2    Q    Okay.  And then what happened?

3    A    We received him.  It looks like he did go out

4   for court to Philadelphia County in December of 2001.

5   And then we received him at Coal Township in January

6   of 2002 at which time he was pretty much going back

7   and forth it looks like to the Feds.

8    Q    To federal court?

9    A    Federal court, yes.  In Philadelphia.

10    Q    I am going to look at -- you're looking at

11   the moves report?

12    A    Yes.

13    Q    So one thing that stands out without looking

14   at it you said he came back to Coal Township in

15   October of 2001; is that what you're --

16    A    January of 2002.

17    Q    January 2002.  So when he was received in

18   January of 2002 at Coal Township, you said he was

19   going back and forth to federal court?

20    A    Correct.

21    Q    Okay.  And during that time, he was still

22   housed here; is that correct?  You said he was going

23   back and forth?

24    A    He actually was going back and forth it looks

25   like to Graterford and then the federal authorities

100

1    would pick him up at Graterford.

2        Q    Okay.  So he was still in the DOC system?

3        A    Correct.

4        Q    Okay.  And then did he get any state charges,

5    state convictions resulting from that incident as far

6    as you can tell?

7        A    No.  It doesn't look like he did.

8        Q    Okay.  So even if he wasn't at Coal Township,

9    he was in the DOC system starting after his arrest in

10   October of 2001?

11       A    Yes.

12       Q    Okay.  And then --

13           MR. KEATING:  I think she said January 2002.

14           THE WITNESS:  Well, that's when he came to

15   Coal Township.

16           MR. KEATING:  Okay.  So he wasn't held in

17   county, he was held at state down in Graterford or do

18   you know?

19           THE WITNESS:  Yes.  He was held in Graterford

20   from October to January.

21           MR. KEATING:  Okay.

22   BY MS. TOBIN:

23       Q    Okay.  And then at what point did he leave

24   Coal Township to go serve his federal sentence?

25       A    July 19th, 2007.

1      Q     And so from the time he was rearrested when
2  he was on parole to July 19th of '07, he was in DOC
3  custody?
4      A     Correct.
5      Q     And then he went to serve his federal
6  sentence.  And then when did he come back?
7      A     April 15th of '09.
8      Q     And he came back directly to Coal Township?
9      A     That's correct.
10      Q     So his federal sentence did you have a way of
11  keeping track of his time on his federal sentence or
12  what his federal sentence was?  Did you do that or is
13  that -- my understanding is that that's completely
14  separate from what the records office does?
15      A     That's correct.
16      Q     You just track his state sentence?
17      A     Correct.
18      Q     What was happening with his state sentence
19  during this time period from 2001 to 2007?  What was
20  happening to that state sentence?
21      A     He was here serving his parole violation.
22      Q     So he was in Coal Township?
23      A     Like I said, he was back and forth between
24  here and Graterford during that time.
25      Q     But he was in DOC?

102

1      A    Yes, he was within the DOC.

2      Q    And so when you say serving his parole

3   violation, what does that mean, serving his parole

4   violation?

5      A    I'm going to refer to my moves here.  On

6   12/19/03, the parole board recommitted him and

7   recalculated his sentence due to a technical parole

8   violation and also due to a new conviction, and they

9   recalculated his sentence and he was here serving that

10  time.

11     Q    Okay.  So he was arrested in 2001 and it took

12  them until 2003 to recalculate his sentence?

13     A    That's correct.

14     Q    But from that 2001 to 2003, he was still in

15  DOC custody?

16     A    Correct.

17     Q    So whatever that sentence was that time goes

18  to that sentence?

19     A    Correct.  Yes.

20     Q    And what was that new sentence that the

21  parole board -- you said they recalculated it based on

22  a technical?

23     A    Technical violation and a new conviction.

24     Q    And the new conviction was the federal

25  conviction?

103

1      A    I would have to refer to his file.  I mean if
2  you want me to, I can.  Like I said, I don't think
3  there was any new state or county charges.  I don't
4  recall.
5           MR. KEATING:  If you don't recall, that's
6  fine.
7  BY MS. TOBIN:
8      Q    So the parole board conveyed that to you,
9  here's his new max date?
10     A    Correct.
11     Q    And is that called a parole violator max
12 date?
13     A    Yes.
14     Q    Okay.  Does it -- does that document show
15 what the max date was, the one you're looking at?
16     A    This one, no.
17     Q    Okay.  And the parole violator max date -- so
18 he had two years approximately that were going towards
19 that because it took them two years to give you that
20 information; is that accurate?
21     A    Yes.
22     Q    Okay.  So then from 2003, December 19th of
23 '03 to when he went to his federal sentence on July
24 19th of '07, that was also serving his state sentence,
25 correct, his parole violator sentence?

A    Yes.

Q    So that credit went to his state sentence?

A    Correct.

Q    Okay.  And then he went to the Feds, served his sentence there, and then he came back?

A    Correct.

Q    And when did he come back?  You said April?

A    April 15th of 2009.

Q    And when he came back, what's your understanding of the sentence he was serving when he came back?

A    State.  Is that what you're referring to?

Q    Why did he come back?

A    He came back because he still had a parole violation to serve.

Q    And what was that parole violation based on?

A    His new federal conviction.

Q    Is that the same conviction that generated the recalculated sentence in '03?

A    I believe so, yes.

Q    Okay.  So there was one -- I mean I have his whole file and so do you.  But my understanding is and tell me if yours is different and we can go to the documents.  I'm not trying to trip you up here.  But my understanding is there was one federal conviction

that resulted from the incident while he was out on

parole?

     A     Yes.

     Q     And that there were no state convictions?

     A     Again, I said I don't believe there was.

From my recollection, no, there wasn't.

     Q     Okay.  So when he came back, your

understanding is that he was coming back to serve more

of his state sentence?

     A     The remainder of his parole violation, yes.

     Q     Okay.  So we're gonna -- is there anything

else that -- I'm going to ask you more about that.

But is there anything else about that whole series of

events that comes to mind now that you want to --

          MR. KEATING:  You want to ask specific

questions?

          MS. TOBIN:  I will.

BY MS. TOBIN:

     Q     I want to jump back to the processing in

general.  But that's the general timeline?

     A     That's the general timeline, yes.

     Q     Okay.  And I do have the moves report.  We

will look at it in the next part.  Going back to the

Section 1 of the processing of receptions of the

Policy 11.5.1.

1          MR. KEATING:  What page is that?

2          MS. TOBIN:   Page 1-11.

3     BY MS. TOBIN:

4          Q    So just to confirm, item L.1 refers to a

5     retried or resentenced case.  And that's a state

6     sentence, not a federal sentence?

7          A    That's correct.

8          Q    Okay.  And then you can skip Section M,

9     escape returns.  Mr. Chappelle was not an escape

10    return, was he?

11         A    No, he was not.

12         Q    And then page 1-13, escape time scenarios.

13    You can skip that.  CCC returns.  He wasn't a CCC

14    return, was he?

15         A    No, he was not.

16         Q    Page 1-14, proclamation counties.  Skip that.

17    Section P on page 1-14, inmates who regularly use

18    names different from the name on the commitment form.

19    In this case Mr. Chappelle was using the name Kevin

20    Jessup while he was in DOC custody and his inmate

21    number was under Kevin Jessup.

22         Did that cause any confusion in your

23    recordkeeping for his DC-15 that he had two names or

24    did you know that Chappelle and Jessup were the same

25    person?

1      A    We knew they were the same person.

2      Q    So there was no multiple -- there's only one

3  DOC number for him?

4      A    Correct.  Correct.

5      Q    Okay.  So that didn't create any problems

6  with recordkeeping?

7      A    No.

8      Q    On page 1-15, more name change issues so we

9  can skip that.  And page 1-16 also has to do with name

10  changes which isn't an issue, so we'll skip that.

11          So when Mr. Chappelle came back, did you then

12  use the procedure for receptions that's outlined in

13  this section, parole receptions?  Is this what you

14  followed under page 1-4?

15      A    Well, because we weren't the initial

16  receiving -- which time are you referring to?  I'm

17  sorry.

18      Q    When he came back after violating parole in

19  2001, were you the receiving institution?

20      A    No, we were not.  Graterford was.

21      Q    Graterford was.  So for that return they

22  handled all of the processing?

23      A    Correct.

24      Q    When he came back in April of '09, were you

25  the receiving institution?

1     A    Yes, we were.

2     Q    So you followed the procedures that we just

3  went over?

4     A    Yes.

5     Q    Okay.  So you reviewed the confinement

6  documents and the commitment documents?

7     A    Yes.

8     Q    Okay.  And then I guess what I'd like to do

9  is take a look at his -- at the documents from his

10  file.  These particular documents that are referred to

11  in the policy.  And just if you could walk me

12  through^--

13     A    Sure.

14     Q    -- what was done.  Just because I had

15  questions about these and you may have already

16  answered them.  I want to make sure.  We'll call it

17  Kodack 3.

18        (Whereupon, a document was produced and

19  marked as Kodack Exhibit No. 3 for identification.)

20  BY MS. TOBIN:

21     Q    If you could take a look at that.  Do you

22  recognize that document?

23     A    Yes.

24     Q    Okay.  What is this?

25     A    That's a body receipt.

1      Q    Is this the body receipt you were talking

2  about earlier?

3      A    Yes.

4      Q    And it exists to just notify the delivering

5  authority that you are -- you did indeed receive Mr.

6  Chappelle's body?

7      A    Yes.

8      Q    Who is Larry Spain?

9      A    That name isn't familiar with me.  Just says

10  officer.

11      Q    Okay.  And it says on this body receipt

12  receipt time 9:15 p.m.  So is this one of those

13  outside office hours receipts that we talked about?

14      A    Yes.

15      Q    Okay.  Do you recall reviewing this in Mr.

16  Chappelle's case?

17      A    This one, no, I don't.

18      Q    And then this will be -- I'm showing you

19  Kodack 4.

20          (Whereupon, a document was produced and

21  marked as Kodack Exhibit No. 4 for identification.)

22  BY MS. TOBIN:

23      Q    If you could take a look at that.  What is

24  this document?

25      A    This is us receiving him from Graterford in

110

1    January.

2         Q     So this is another body receipt?

3         A     Yes.

4         Q     What's the reason it looks different than the

5    first one?

6         A     Just updated systems.

7         Q     So this one is dated January 22nd, 2002?

8         A     Yes.

9         Q     And this is what you referred to earlier as

10   when he came back from being out on parole and

11   Graterford initially received him?

12        A     Correct.

13        Q     Okay.

14              (Whereupon, a document was produced and

15   marked as Kodack Exhibit No. 5 for identification.)

16   BY MS. TOBIN:

17        Q     And this will be Kodack 5.  If you could take

18   a look at that.  What is this document?

19        A     This is when Graterford received him from

20   parole agents.

21        Q     Is there a way to tell from this document

22   whether -- so the date on this is 10/22/01.  Is there

23   a way to tell whether that is his arrest date or is

24   that just -- what date is that?

25        A     That's just the date that the parole agents

111

1   brought him in to Graterford.

2        Q    So he may have been arrested before?

3        A    Correct.

4        Q    And the time between his arrest and 10/22/01,

5   that chunk of time, would that time also go to his

6   state sentence?

7        A    That's up to the parole board to track.   DOC

8   does not track that.   The parole board tracks that

9   information.

10       Q    And how would you be notified of the result

11  of that tracking?

12       A    We don't necessarily get notified

13  specifically of that.   That's figured in when they

14  recompute his max date.   Any time that he spent if he

15  did spend time at the county, that's figured in when

16  they recompute his max date.

17       Q    Do you double-check those calculations?

18       A    No.

19       Q    So if he has -- if he says I was in the

20  county in the Philadelphia prison system for seven

21  months, where's that -- before I went to Graterford,

22  where's that seven months and he comes to you, what

23  would your procedure be for that?

24       A    I would contact parole.

25       Q    So if there's a presentence commitment credit

112

1  issue, you would look into that?

2      A    It all depends.  Again, if you're referring

3  to a new conviction.  I don't know if you're referring

4  to a new conviction or are you referring to time

5  towards his current state sentence, towards his parole

6  violation?  That depends on what you're referring to.

7      Q    I guess just generally speaking if there's a

8  dispute between the inmate and the state about whether

9  his time is being credited and it's like county jail

10 time that he's serving before he's -- I guess you guys

11 call that precommitment time?

12      I guess you would be able to go and talk to

13 the parole board about that time if there was a

14 dispute is my question?

15      A    Could I, yes.  However, if you're talking

16 about precommitment, to me precommitment is anything

17 prior to sentencing.  Not necessarily if he's already

18 a parole violator.  To me precommitment credit is a

19 moot point.

20      Q    So he's already a parole violator so this

21 document, Kodack 5, any time between his arrest and

22 this date, the parole board would figure that in?

23      A    Yes.  Correct.

24      Q    And if he had a question about that and asked

25 you about that, you could contact the parole board

ERVIN BLANK ASSOCIATES, INC.

113

1    about that?

2        A    Yes.

3        Q    Would you contact the institutional parole

4    office for that?

5        A    Yes.  Because they then correspond.  They're

6    basically our liaison with other parole departments,

7    like their parole central office or their district

8    offices.

9        Q    Okay.

10            (Whereupon, a document was produced and

11   marked as Kodack Exhibit No. 6 for identification.)

12   BY MS. TOBIN:

13       Q    This will be Kodack 6.  Take a look at that.

14   And what is that document?

15       A    This is also a body receipt.  This would be

16   when he initially came into the DOC.

17       Q    Okay.  And down at the bottom of Kodack 6

18   there's several boxes.  The one that says confinement

19   papers is marked.  Are those the confinement papers

20   you talked about earlier?

21       A    Yes.

22       Q    And that's the DC-300B?

23       A    Yes.

24       Q    And then under Kodack 5 there's the same

25   series of boxes and confinement papers is checked.

114

1   Are those confinement papers the ones you talked about

2   earlier with regard to parole issues?

3        A    Yes.

4        Q    Okay.  So, again, what would those consist of

5   for a parole violator coming back?

6        A    Like I said before, the most important is the

7   parole board warrant and sometimes the 257N and the

8   additional documents that we discussed.

9        Q    Okay.  And the checkmark means that these

10  were received with the person as they came in?

11       A    Yes.

12       Q    Under Kodack 4, the receipt date is January

13  22nd, 2002 and the confinement papers box isn't

14  checked.  So what does that tell you, if anything?

15       A    Doesn't necessarily mean anything.  When we

16  have inmates that are inter-facility transfers, these

17  boxes aren't always checked because we're not -- we're

18  not always checking at the time we're signing these if

19  we have the documents.

20            MR. KEATING:  He's already in the system?

21            THE WITNESS:  Right.  He's already in the

22  system.  Sometimes the file will be here.  Sometimes

23  we'll get the documents.  We don't review.

24  BY MS. TOBIN:

25       Q    You're trusting that Graterford was just

ERVIN BLANK ASSOCIATES, INC.

115

1   transferring him?

2       A    Right.  Right.  They're supposed to forward

3   documents pertaining to him with him but we don't

4   check them when we're signing these.

5       Q    Okay.  And then on Kodack 3 which is the body

6   receipt dated April 15th of '09, confinement papers is

7   also not checked.  So what, if anything, does that

8   tell you?

9       A    Again, because this occurred after hours and

10  it was an officer that completed this, they don't

11  always let's say think to fill that section out.  So

12  it doesn't mean anything as far as I'm concerned.

13      Q    And so this person who filled it out what

14  title -- what does that mean?  Can you read that

15  writing?

16      A    It looks like he was acting lieutenant at the

17  time.

18      Q    Okay.  And do you know who this person is?

19      A    Yes.

20      Q    Who is that?

21      A    He's currently a lieutenant now.  It's

22  Lieutenant Dale Williams.

23      Q    Okay.  So he was on duty at 9:15 when Mr.

24  Chappelle was brought back?

25      A    Yes.

1    Q    Is this a document that you would normally

2  receive the -- review the next day, the body receipt?

3    A    Typically, yes.

4       MR. KEATING:  She's making reference to

5  Kodack 3 when she asked the question.  She said

6  typically, yes.

7  BY MS. TOBIN:

8    Q    Okay.  And then these are probably somewhat

9  related.  I'm going to show you Kodack 7.

10       (Whereupon, a document was produced and

11  marked as Kodack Exhibit No. 7 for identification.)

12  BY MS. TOBIN:

13    Q    Can you please review that and let me know if

14  you recognize that?

15    A    This is a transfer petition.

16    Q    And I believe you've talked about it a little

17  bit before.  But what is a transfer petition?

18    A    Basically it's entered into our system to

19  initiate the transfer of an inmate from one

20  institution to another.

21    Q    Are transfer petitions also done when the

22  inmate goes to court?

23    A    No.

24    Q    How do you track that?  What's the form for

25  that?

1      A    There really isn't.  Typically if an inmate's

2  going out, it all depends.  If it's federal court, the

3  inmate will be transferred to the institution closest

4  to the federal district.  And yes, that's what will

5  happen is a transfer petition will occur at that time.

6          County court the sheriffs usually contact us

7  directly, and we put out a notification within the

8  institution that they'll be picked up.

9      Q    Okay.  So for this one, Kodack 7, the

10  petition information section at the top of the first

11  page says transfer from Graterford to Coal Township.

12  The petition date is 12/6/2008.  And then on the

13  second page of this exhibit, the last section, inmate

14  is finished with federal court and can be returned to

15  his home institution.

16          Who fills these out?  Is this a records

17  department, a records specialist who fills this out?

18      A    That's who filled it out in this case, yes.

19      Q    Okay.

20      A    It's not always a records specialist.

21      Q    So the reason that somebody is being

22  transferred between institutions is always listed on

23  the transfer petition or should be?

24      A    Should be.  And can I just say the date on

25  this looks like it's 2006 not 2008.

ERVIN BLANK ASSOCIATES, INC.

118

1     Q   Okay.  The copy's pretty small.

2     A   Yeah.

3     Q   And then these are kept -- do you keep track

4 in your monthly reporting about who's being

5 temporarily transferred to other institutions as well?

6 You mentioned an alpha file that keeps track of people

7 who are going to court.

8     A   Yes, they are.  We have one for inmates that

9 are out at court and we have another listing for

10 inmates that are out to other institutions.

11    Q   Okay.  On the first page of Kodack 7, there's

12 a section for sentence information?

13    A   Yes.

14    Q   Where does that data come from?  Is that

15 automatically pulled from the computer system or is

16 that manually typed in?

17    A   That's automatically pulled.

18    Q   So in this case on the first page, it says

19 minimum sentence it looks like 6, max sentence 12?

20    A   Yes.

21    Q   Why is that information on a transfer

22 petition?

23    A   If an inmate is beyond his minimum or beyond

24 his maximum date, you sometimes -- temporary petitions

25 it does ask for it but for permanent petitions if

119

1   you're entering a permanent petition and he's beyond

2   his min or beyond his max, it'll ask you to enter a

3   reason why you're transferring him and a

4   justification.

5      Q    Okay.  So that's to trigger some review on

6   the part of the records staff?

7      A    Yes.  Or the counselor.  Records staff don't

8   enter permanent petitions.  Like I said, it'll only

9   ask you for a permanent petition.  This is a temporary

10  transfer petition.

11     Q    Okay.

12     A    Records office staff don't have the authority

13  to request permanent petitions.

14     Q    And then this will be Kodack 8 I believe.

15          (Whereupon, a document was produced and

16  marked as Kodack Exhibit No. 8 for identification.)

17  BY MS. TOBIN:

18     Q    If you could take a look at that and let me

19  know what that is, if you know what it is.

20     A    That's just a record of his petitions and

21  whether or not he was transferred.

22     Q    So up in the upper left corner of this

23  document there's an imprint that says M. Kodack,

24  2/8/2012 and it gives a time.  Is that your name?

25     A    Yes.

120

1    Q    Your log-in.  So is it accurate that as of

2  that date these were all of his transfers that are

3  recorded in the system?

4    A    Since this system was in effect.

5    Q    When did this system come into effect?

6    A    You know what, I don't know.  But I mean as

7  you can see if you go back, if I would refer to his

8  moves, he was in the system since '96 and these

9  petitions are only going back to 2002.  So I want to

10  say it was 2000 since they're recorded in this system.

11    Q    Okay.  So this is a summary of all of the

12  temporary transfers?

13    A    And permanent.

14    Q    And permanent?

15    A    Yes.

16    Q    Can you tell me is there anything on this

17  document that shows a permanent?

18    A    Yes.  The very first one from January 22nd,

19  2002.

20    Q    And it says type P?

21    A    Yes.

22    Q    And it's a PV return?

23    A    Yes.

24    Q    Okay.  So the petitions are requested by

25  staff person.  And in the far right column, are those

1  people listed records specialists or who --

2      A   No.  Not all of them.

3          MR. KEATING:  Who are they?

4  BY MS. TOBIN:

5      Q   Who would request a transfer?

6      A   A counselor, central office staff, records

7  staff can.

8      Q   And then who grants or denies the request?

9      A   Central office.  It would actually be the

10 office of population management.

11     Q   So this document, Kodack 7, would be --

12 that's the transfer petition?

13     A   Yes.

14     Q   Would be transmitted to the central office?

15     A   Yes.

16     Q   And then approved or denied?

17     A   Correct.

18     Q   Is there an approval or denial section on^--

19 oh.

20     A   Yes.  This one -- most temporary petitions

21 are automatically approved, but then our central

22 office, the office of population management, they're

23 responsible for adding them to the trips to come back.

24     Q   So this one was approved by gen sys?

25     A   It was system generated.

122

1     Q    Okay.  So getting back to Mr. Chappelle

2 coming back to Coal Township.  Well, I have Mr.

3 Chappelle's court documents that I got from the file

4 in discovery.  So rather than picking through them, I

5 just would like to go over them and we'll see.  We

6 will eventually get to the point where he comes back.

7 So this will be Kodack 9.

8          (Whereupon, a document was produced and

9 marked as Kodack Exhibit No. 9 for identification.)

10 BY MS. TOBIN:

11    Q    If you could take a look at that, and let me

12 know what that is.

13    A    This is his DC-300B for his initial

14 commitment in '96.

15    Q    Okay.  And this is a document that you would

16 review when he comes to your institution?

17    A    Correct.

18    Q    So this document has two pages?

19    A    Yes.

20    Q    Are all of his state sentences at that time

21 in 1996 are they all accounted for on this document?

22    A    I would have to refer back to his file to

23 make sure.  I would have to refer to his status sheet

24 to see.

25    Q    And are you referring to the DC-16E?

ERVIN BLANK ASSOCIATES, INC.

123

1      A    Yes.

2      Q    Okay.  This document reflects -- well, can

3  you just tell me from this what his sentences are on

4  this document?

5      A    On January 25th of '96, he was sentenced to

6  five to ten years for the offense of robbery and on

7  that same date he was sentenced to one to two years

8  for a violation of the Uniform Firearms Act and that

9  was to be consecutive to the robbery charge.  So he

10  received a 6 to 12-year sentence.

11      Q    Okay.  And you would take -- how is that

12  information input into the DOC's system?  Who does

13  that input?

14      A    At that time?

15      Q    In 1996.

16      A    In 1996, that information would have been

17  input into the system by Camp Hill records staff and

18  they would enter that into our mainframe.  The

19  sentence would then be calculated by the Camp Hill

20  records staff.

21      Q    Okay.  And if you had a question about his

22  sentence, you could look on the computer or you could

23  look in the file?

24      A    Correct.

25           (Whereupon, a document was produced and

124

1    marked as Kodack Exhibit No. 10 for identification.)

2    BY MS. TOBIN:

3        Q    The next document I want to talk about is

4    Kodack 10.  Can you identify that document?

5        A    Yes.  That's a credit memo that we received

6    from the Philadelphia County Prison.

7        Q    And what information does this show?

8        A    That he received credit on CP033 from 1995

9    from January 26th, '95 to January 29th, 1996.

10       Q    And going back to the DC-300B, Kodack 9.  If

11   there were other state sentences, there would be

12   separate DC-300B forms for them?

13       A    That's correct.

14           (Whereupon, a document was produced and

15   marked as Kodack Exhibit No. 11 for identification.)

16   BY MS. TOBIN:

17       Q    And then this is Kodack 11.  Can you identify

18   that document?

19       A    This is a printout from the Philadelphia

20   County Court system.  Looks like Mr. Chappelle filed

21   an appeal and on January -- or I'm sorry.  On October

22   22nd, '97, his judgment of sentence was affirmed and

23   his appeal was denied.

24       Q    How did this document come to be in Mr.

25   Chappelle's DC-15 file?

125

1      A    Philadelphia County at that time -- they no

2  longer do this anymore.  When an inmate would file an

3  appeal, they would send us this documentation to show

4  us what happened, what the decision was of the courts.

5      Q    So how did you use this information once you

6  got it?  Or actually, I presume you didn't get it?

7      A    No.

8      Q    Because you were not here at that time?

9      A    No.

10     Q    But how did the records office use this

11  information, if you know?

12     A    I can see by the initials down here those

13  were initials from Ray Reeder.  And at that time he

14  probably -- that's him saying that he reviewed this

15  and basically his sentence was affirmed.  So there was

16  no change in his status.

17     Q    And do you still -- do you get documents like

18  this either from Philadelphia County Court or any

19  other court now?

20     A    No.

21     Q    How do you get the information if anyone's

22  sentence changes or is vacated?  How does that come to

23  you?

24     A    If an inmate is resentenced, there's a lot of

25  different ways that we find out about it.  Sometimes

126

1  they will -- sometimes the inmates will contact us and

2  tell us that they were out for court and they were

3  resentenced.  Sometimes the documents will come back

4  when the sheriffs bring them back.  Sometimes we'll

5  get a phone call from a family member.  Sometimes the

6  inmate will go to his counselor.  It really varies,

7  and we have to request the documents for the most

8  part.

9     Q    So if an inmate does say hey, I was

10  resentenced, then do you call the court to confirm

11  that?

12    A    What we typically do is we'll check JNet

13  first which is that court system I told you about

14  where the courts enter the information.  We'll check

15  there to see if they were resentenced and then we will

16  contact the courts to send us the updated

17  documentation.

18        (Whereupon, a document was produced and

19  marked as Kodack Exhibit No. 12 for identification.)

20  BY MS. TOBIN:

21    Q    So this is Kodack 12.  Can you identify what

22  this is?

23    A    This is a parole board warrant to commit and

24  detain.

25    Q    And is this the document, the PBPP-141, that

127

1  you testified earlier you're required to have when a

2  parole agent brings somebody back?

3      A    Yes.  That's correct.

4      Q    What is the information at the top, the

5  handwritten note, bail 10/4/01.  Does that mean

6  anything to you?

7      A    That I don't know because that wouldn't have

8  been written by somebody in our office.

9      Q    So the date in the middle of the document,

10 9/27/2001, what is that date?

11     A    That's the date the warrant was issued.

12     Q    Is there any way to -- how do you know when

13 you received this warrant to commit and detain?  Is

14 there any date on here for having received it?

15     A    I am going to refer to -- I'm going to refer

16 to Kodack 5.  It looks like the warrant was issued on

17 9/27/01 and they received it on 10/22/01 when they

18 brought him, Mr. Jessup, back.

19     Q    So the warrant is issued obviously before he

20 is brought.  The warrant's issued and that's the legal

21 authority that you have to keep him?

22     A    Yes.  That's correct.

23     Q    Is there any form that's used to -- you

24 referred to Kodack 5.  There's no form for you to sign

25 off and say I got the warrant to commit and detain?

1    Is there a checklist or some kind of procedure where

2    you're going down and saying do I have this, do I have

3    this?

4        A    No.

5        Q    Okay.

6            MR. KEATING:  I thought you testified you

7    wouldn't even take the body unless they had paper?

8            THE WITNESS:  Yes.

9            MS. TOBIN:  So you look for this?

10           THE WITNESS:  Yes.

11           MR. KEATING:  If they don't have that, it's

12   like I don't carry a body receipt, you can't come in?

13           THE WITNESS:  Yes.

14           MR. KEATING:  Is that the 141 thing under the

15   rules or whatever?

16           THE WITNESS:  Yes.  Yes.

17           (Whereupon, a document was produced and

18   marked as Kodack Exhibit No. 13 for identification.)

19   BY MS. TOBIN:

20       Q    Okay.  So this is Kodack 13.  Do you

21   recognize this document?

22       A    I don't recognize it, no.  But it looks like

23   a federal -- something from the federal system.

24       Q    Is this -- so at the top mentions it's from

25   the United States District Court for the Eastern

129

1  District of Pennsylvania.  It is signed by the clerk

2  of court in the Eastern District of Pennsylvania on

3  1/22/02.

4         Do you do anything with this kind of warrant

5  for arrest, the federal warrants?  Would you process

6  this in any way?

7      A    Yes.  We would -- what we would do is this is

8  something that would be lodged as a detainer.

9      Q    And who does that process of lodging it as a

10 detainer?

11     A    The records office.

12     Q    Your records office or the central -- or the

13 diagnostic and classification?

14     A    Our records office.

15     Q    And how do you lodge something as a detainer?

16 Is that a field in a computer screen?

17     A    Yes.

18     Q    What would you put -- what would you do?

19 What steps would you take?

20     A    The first thing would be to verify that this

21 is -- make sure that it's an original and it would get

22 entered.  There's a screen in our mainframe that we go

23 in and we enter the detainer information, the agency

24 lodging it, the detainer number, the offense, and

25 whether or not they were -- he was sentenced on it.

130

1    And then we would at that time also issue a new

2    DC-16E.

3         Q    To change his sentence status?

4         A    Right.  To reflect the addition of the

5    detainer.

6         Q    Okay.

7              MR. KEATING:  What number is this?

8              THE WITNESS:  Thirteen.  Kodack 13.

9              (Whereupon, a document was produced and

10   marked as Kodack Exhibit No. 14 for identification.)

11   BY MS. TOBIN:

12        Q    This is Kodack 14.  Do you recognize this

13   document?

14        A    Yes.

15        Q    What is this?

16        A    This is what we call a writ for the US

17   Marshals to take Mr. Jessup out for court.

18        Q    Is this something that would trigger a

19   transfer petition -- oh, no.  What would this trigger

20   the records office to do, if anything?

21        A    It would trigger a transfer petition actually

22   because this is out of the Eastern District which

23   would be closer to Graterford.  We would notify --

24   well, actually, we would enter the transfer petition

25   for him to go to Graterford for court and at that time

1   he would be -- not necessarily at that time but closer

2   to his court date he would be transferred to

3   Graterford for pick up.

4        Q    Okay.  And who would get this document?

5   Would this come to records, this Kodack 14?

6        A    Yes.

7        Q    And a records specialist would handle it?

8        A    No.  Typically I handle these.

9        Q    And why is that?

10       A    They have enough to do basically.  It just

11  makes it easier if these come directly to me.

12            (Whereupon, a document was produced and

13  marked as Kodak Exhibit No. 15 for identification.)

14  BY MS. TOBIN:

15       Q    I'm showing you Kodack 15.  Do you recognize

16  that document?

17       A    Yes.

18       Q    What is it?

19       A    It's a hit confirmation.

20       Q    And can you just explain what this is and why

21  it's in his file?

22       A    This is -- basically when we ran wanted query

23  which is part of his criminal history check, the rap

24  sheet, an active warrant came up and this is sent to

25  the issuing agency saying we have this person in our

1    custody.

2         Q    So the issuing agency is that listed on here?

3         A    Their terminal ID number is listed at the

4    top.  In the center it says DRI.  The actual name of

5    the agency isn't on here.

6         Q    What does DRI refer to?

7         A    That's the -- that's basically their terminal

8    ID number for their CLEAN.  Every CLEAN terminal's

9    assigned an ID number and that's what that is.

10        Q    So do you have any way of looking at this and

11   knowing who the issuing agency for the warrant is?

12        A    Just by looking at the letters, it looks like

13   maybe it was ATF.

14        Q    Is this the federal ATF?

15        A    Yes.

16        Q    Alcohol, Tobacco, and Firearms?

17        A    Yes.

18        Q    And you routinely run the CLEAN checks on

19   anybody who's coming in to see if there's any warrants

20   outstanding for them?

21        A    Correct.  That's part of our procedures.

22        Q    And if there had been other warrants, for

23   example, a state, another state's warrant or some

24   other warrant for a state charge, that would show up

25   as well?

133

1    A    As long as it was entered in the CLEAN

2    system, yes, it would show up.

3            (Whereupon, a document was produced and

4    marked as Kodack Exhibit No. 16 for identification.)

5    BY MS. TOBIN:

6    Q    Okay.  This is Kodack 16.  Do you recognize

7    that document?

8    A    This is a federal detainer.

9    Q    And what information would you use from this

10   document, if any?

11   A    I would ensure that this was lodged on the

12   inmate as a detainer to hold him.

13   Q    So in terms of this is a document saying that

14   he was sentenced to 162 months.  Would you do anything

15   with that information, the 162 months?

16   A    Just reflect it in the detainer screen that

17   he was sentenced to 162 months.

18   Q    But it has no impact on the state sentence?

19   A    No, it does not.

20   Q    And then on this document the first

21   paragraph, second sentence says the attached judgment

22   and commitment order commits the subject to the

23   custody of the US Attorney General to serve the

24   following sentence of imprisonment.

25           And do you get the judgment and commitment

1   orders along with the detainers?  Do you get that

2   attachment and put it in the file?

3       A    If we receive it, yes.

4       Q    Is it not required for you to have it in the

5   file?

6       A    No.  This is the only thing we're required to

7   have to lodge it as a detainer.

8       Q    So that judgment and commitment --

9           MR. KEATING:  She doesn't necessarily need to

10  have it.  This is the detainer.  Sometimes they do get

11  it.  I think that's what she testified to.

12  BY MS. TOBIN:

13      Q    And so this would just be lodged in the

14  computer system?

15      A    Yes.

16      Q    And that would mean when he's done with his

17  state sentence, he goes and serves his -- he is held

18  for the marshals to come and get him for his federal

19  sentence?

20      A    Correct.

21          MR. KEATING:  Or they're required to be

22  notified as it says.

23          (Whereupon, a document was produced and

24  marked as Kodack Exhibit No. 17 for identification.)

25  BY MS. TOBIN:

135

1    Q    Showing you Kodack 17.  Can you identify what

2    this is?

3    A    This is a detainer modifying his federal

4    sentence from 162 months to 95 months.

5    Q    And would you do anything with this?

6    A    Again, just modify it in the detainer screen

7    that he was resentenced to 95 months.

8    Q    On his federal sentence?

9    A    Correct.

10   Q    On this one in the middle part on Kodack 17,

11   there's a notation 95 months, credit time served

12   9/23/02, four years S. rel, concurrent with state.

13   What does that mean to you, if anything?

14   A    Again, I believe I had said before all

15   federal detainers even if they do say they're

16   concurrent with the state, they get applied as a

17   detainer unless we receive a calculation from the

18   Bureau of Prisons.  If the Bureau of Prisons does not

19   provide us with a calculation, it stays on as a

20   detainer.

21   Q    And did you -- do you know whether you got

22   such a notification or calculation from the BOP in

23   this case?

24   A    No, we did not.

25   Q    So in terms of the information concurrent

1    with state, do you just note that in the computer but

2    it has no impact on the state sentence?

3         A    Yes.

4         Q    So at this point, November 21st, 2006 on

5    Kodack 17, Mr. Chappelle's still in the DOC system,

6    you get this piece of paper, and his time in the DOC

7    system's still just going to his DOC sentence?

8         A    That's correct.

9         Q    Okay.

10        (Whereupon, a document was produced and

11   marked as Kodack Exhibit No. 18 for identification.)

12   BY MS. TOBIN:

13        Q    Showing you Kodack 18.  Do you recognize this

14   document?

15        A    Yes.  This is -- it's a warrant for arrest

16   for paroled prisoner.

17        Q    Is this one of the required documents when

18   someone comes back from parole or is this different

19   than the detainer document?

20        A    This is different.

21        Q    So if you look at Kodack 12 and compare it to

22   Kodack 18, how do you use Kodack 18, the warrant for

23   the arrest of paroled prisoner, if you use it at all?

24        A    Typically we do not use this.  This is

25   something that the parole board issues if they have

1  someone I think that they're picking up from another

2  agency.

3       Q    This Kodack 18 is signed by the Director of

4  Interstate Services on August 14th of 2007.

5       A    Yes.

6       Q    So that's after Mr. Chappelle has already

7  been taken by the Feds to go serve his federal

8  sentence; is that correct?

9       A    That's correct. This was their detainer to

10 the Feds for him to return to Pennsylvania.

11      Q    So the parole board issued this and delivered

12 it to the BOP?

13      A    Correct.

14      Q    Do you know why it's in his DOC file?

15      A    I can take a guess that they returned it to

16 us when they brought him back.

17           MR. KEATING:  The Feds?

18           THE WITNESS:  When the Feds brought him back.

19           MR. KEATING:  As part of their paperwork or

20 something?

21           THE WITNESS:  Or I should say when parole

22 picked him up.

23 BY MS. TOBIN:

24      Q    So he was actually returned -- he was

25 arrested in October 2001 after he was out for six

138

1    months on parole and this warrant for his arrest is

2    dated August of 2007, six years later, and in the

3    meantime he was here at Coal Township.  Do you have

4    any idea why the warrant for his arrest would come six

5    years after?

6        A    Again, because he went out to the Feds on

7    July 19th of '07 to serve that sentence.  The parole

8    board wanted him back so they issued this warrant for

9    them to know that they needed to notify Pennsylvania

10   to come and get him.

11       Q    I see.  Okay.

12       A    So just as the Feds issued a detainer for us

13   to send him, the parole board issued a detainer for

14   them.

15       Q    Okay.  This clears up a question in the case

16   of who issued the detainer.  Okay.  So in terms of

17   looking into why a detainer is issued, you mentioned

18   that the parole board will tell you that one is issued

19   and then if you question why, can you ask them?

20       A    I can, yes.  Yes.

21            (Whereupon, a document was produced and

22   marked as Kodack Exhibit No. 19 for identification.)

23   BY MS. TOBIN:

24       Q    This is Kodack 19.  Do you recognize this

25   document?

139

1      A    This is a -- looks like this is a letter from

2   the Eastern -- the Federal Eastern District advising

3   our office that he was resentenced.  That Mr. Jessup

4   was resentenced.

5      Q    And is this -- this is something that was

6   sent to the records room here?

7      A    Yes.

8      Q    At Coal Township.  And this is after he

9   was -- he had been brought back here?

10     A    Yes.

11     Q    April 22nd, 2009?

12     A    Yes.

13     Q    The first paragraph describes his federal

14  sentencing and says that he had been initially

15  sentenced 162 months, then he was resentenced to 95

16  months, and then he was resentenced again to 24 months

17  on November 24th, 2008.

18          And then on April 14th, 2009, he completed

19  his federal sentence and was released to a detainer by

20  the parole board.

21          The second paragraph.  We confirmed that Mr.

22  Jessup is presently incarcerated at your facility with

23  no set release date.  The purpose of this letter is to

24  request that our office be notified when Mr. Jessup is

25  scheduled to be released from custody.

140

1        Please have Mr. Jessup sign this letter --

2   this is the third paragraph -- to verify his

3   understanding of his federal supervision status.  A

4   copy of this letter should be mailed to this office at

5   the above address.  Please keep a signed copy of this

6   letter in Mr. Jessup's institutional file and provide

7   him with a copy.

8        MR. KEATING:  Okay.  You skipped a sentence.

9   It says at that time he will commence his four-year

10  supervised release term just for the record.

11       MS. TOBIN:  Yes.  You're right.  I skipped a

12  whole paragraph.

13       MR. KEATING:  Okay.  But he still had some

14  parole left on his federal sentence.

15       THE WITNESS:  Exactly.

16  BY MS. TOBIN:

17   Q   So on the next page of this exhibit signed by

18  Alice Colloton.  Do you know who that is?

19   A   It says she's the supervising US probation

20  clerk.

21   Q   Not someone you have contact with?

22   A   No.

23   Q   And then at the bottom it has a space for Mr.

24  Jessup and Mr. Chappelle's signature and a date.  It

25  looks like he signed it on April 29th, '09.  When the

ERVIN BLANK ASSOCIATES, INC.

141

1  records office got this letter, did you handle this?

2  Do you know if a records specialist handled this?

3      A    I don't recall.  I don't recall at all.

4      Q    But somebody got Mr. Chappelle to sign this

5  so someone followed the instructions?

6      A    It appears that way, yes.

7      Q    Okay.  And it is directed to the record room?

8      A    Yes.

9      Q    Okay.  So I think we can take a lunch break.

10 I will have more questions for you, and I apologize

11 for the length of time.

12          (Whereupon, a luncheon recess was taken from

13 12:27 p.m. until 1:03 p.m.)

14                    AFTER RECESS

15 BY MS. TOBIN:

16     Q    I had a question about you mentioned

17 technical parole violators and convicted parole

18 violators.  TPV and CPV.  For a convicted parole

19 violator does that refer to a state conviction?

20     A    It refers to -- it can be -- it's any

21 conviction.

22     Q    Federal or state?

23     A    Correct.

24     Q    So from your understanding, when the parole

25 board recommits somebody as a CPV, convicted parole

1  violator, and it's a federal conviction not a state

2  conviction, how is that person treated -- is that

3  person treated differently than a TPV?

4      Can the parole board recommit somebody as a

5  CPV if it's not a state conviction?  Are they able to

6  do that?

7      A    Yes.

8      Q    From your understanding?

9      A    Yes.

10      Q    Okay.  And then -- but that conviction

11  wouldn't figure in to any additional time for them,

12  that's just the basis for them going back in?

13      MR. KEATING:  You mean that conviction for

14  additional time relative to the calculation by the

15  parole board?

16      MS. TOBIN:  Yes.

17      MR. KEATING:  I think you have to ask the

18  parole board that question.

19  BY MS. TOBIN:

20      Q    Well, let me just ask you this.  I'm trying

21  to get clear CPV versus TPV.  Technical parole

22  violator you violate a condition of your parole, you

23  don't report.  You do something but it's not a crime

24  and it's not a state conviction or a federal

25  conviction.  The parole board has the authority to

143

1   recommit the person, right?

2       A    Yes.

3       Q    And in that situation, the parole board can

4   make that person serve the rest of their original

5   sentence and not even give them the chance to apply

6   for parole; is that correct?  They can choose not to

7   allow them?

8       A    From my understanding, yes.

9       Q    Okay.  If they're a convicted parole

10  violator, then the parole board can also put them back

11  in based on the fact that they incurred a criminal

12  charge and they have a conviction.  And then any new

13  amount of time added to that custody would be coming

14  from a court, right?

15      A    Yes.

16      Q    For a convicted parole violator?

17      A    That's correct.

18      Q    Okay.  But the parole board can put somebody

19  back in even if they just have a federal conviction,

20  just the fact of having committed a crime and being

21  charged?

22          MR. KEATING:  Okay.  I really don't want to

23  interrupt but you're really asking a lot of questions

24  that are based towards what the parole board can do

25  and cannot do, and I think it's more --

1    MS. TOBIN:  I'm just trying to understand

2  when a parole violator -- I'm trying to get her

3  understanding of what happens when a person has

4  violated parole and how the records department

5  classifies and deals with them.

6    MR. KEATING:  Okay.  And I just want the

7  record to reflect that this may be my client's

8  understanding but she can't be held to what the parole

9  board can or cannot do legally under their rules and

10  regulations.

11    MS. TOBIN:  That's understandable.  I just

12  want to know how the DOC handles these people that the

13  parole board are sending back to prison.  That's the

14  goal.  So that's helpful.

15  BY MS. TOBIN:

16    Q   I'm gonna ask you some more questions about

17  records office functions and look at the release

18  section of Policy 11.5.1.  And this will be Kodack 20.

19    (Whereupon, a document was produced and

20  marked as Kodack Exhibit No. 20 for identification.)

21  BY MS. TOBIN:

22    Q   If you could take a look at that.  This is

23  Kodack 20.  Do you recognize that document?

24    A   Yes, I do.

25    Q   And what is that?

145

1      A     This is our policy on releases.

2      Q     And is this something that you have to use

3   every time an inmate is released from the institution?

4      A     Yes.

5      Q     Okay.  If you'll take a look at page 2-3,

6   Section B at the bottom.  Types of releases.

7      A     Yes.

8      Q     Talks about a sentence complete SC type of

9   release.  Is this the type of release where you

10  mentioned earlier you have a nine-month out file.  You

11  have a report that's nine months out.  Is this a type

12  of release that you would -- that would be included on

13  that report?

14     A     Yes, it is.

15     Q     Okay.  So if you could just explain to me^--

16  obviously the document says what it says.  But if you

17  could explain to me how you prepare -- first of all,

18  how do you even know that an inmate is going to be

19  released in nine months?  What triggers that in the

20  records office?  How do you know to include somebody

21  on their -- on the nine-month out report?

22     A     Basically I run a query in our mainframe and

23  it generates a report.  I run a query requesting

24  inmates being released for say December of 2012.  And

25  it'll generate a list of inmates with those maximum

146

1    dates or minimum dates and recomputed max dates.

2        Q    So you do that on -- how frequently do you

3    run the query?

4        A    Once a month.

5        Q    And that gives you your list of people that

6    you have to generate the nine-month out report for?

7        A    Yes.

8        Q    Okay.  So it's computer generated.  You don't

9    have like a card file where you're like oh, so and

10   so's getting out?

11       A    Right.

12       Q    Okay.  And if an inmate comes to you and says

13   hey, you know, I should have maxed out, writes a

14   request slip, what steps do you take to look into that

15   claim?  What do you -- if he's not on your nine-month

16   out list and you didn't know about this until he

17   alerted you, what's your next step?

18       A    First thing I would do is I would bring him

19   up in our computer just to see what his max date is.

20   If there's any basis to his claim.  And I would pull

21   the file and review it to see exactly what it is he's

22   saying if he's not -- if I look at the computer and

23   he's not beyond his max date and he's claiming that

24   maybe he should have gotten credit, I would pull the

25   file and I would review it and see if there's any

147

1   basis to his claim.

2         Q    And that's your standard procedure --

3         A    Yes.

4         Q    -- for doing that?

5         A    Yes.

6         Q    Is there a section of the records office

7   operations manual that goes -- that provides you with

8   the steps you would take to handle such a claim or

9   question?

10        A    No.

11        Q    That's just your practice?

12        A    Yes.

13        Q    Do you meet with the inmate if you need to to

14  talk with him?

15        A    If I would need to, I would, yes.

16        Q    And then other than that, you would

17  communicate by writing?

18        A    Yes.  Or through his counselor.

19        Q    And if you'd turn to page 2-6 of this

20  document.  The state parole type of release.  And is

21  this another type of release that would be

22  incorporated into the nine-month out report?

23        A    Yes.  No.  No.  I'm sorry.  Well, it would

24  generate the minimum dates.  Inmates coming up on

25  their minimum dates it would reflect.

1    Q   So the nine-month out report, is there

2  another name for that?

3    A   I call it pending release report.  It's

4  called the pending release report.

5    Q   The pending release report is only for maxing

6  out or just any -- it could also be for parole

7  releases?

8    A   It could also -- it tells me that they're

9  eligible for parole.  Their minimum dates are for that

10  specific month that I ran the report.

11    Q   Okay.  And then obviously the parole board

12  decides whether they get paroled or not?

13    A   Correct.

14    Q   Okay.  Are there any policies on releases or

15  procedures other than this one from the procedures

16  manual?

17    A   No.  No.

18    MR. KEATING:  You mean concerning releases?

19    MS. TOBIN:  Yes.

20  BY MS. TOBIN:

21    Q   Okay.  On page 2-7 of this Section I,

22  PBPP-140, order to release from temporary detention or

23  to cancel warrant to commit and detain.  States that

24  an inmate who has been returned to the department by

25  the PBPP may have his/her warrant to commit and

149

1    detained canceled.  Have you ever had that happen?

2        A    Oh, yes.  Yes.

3        Q    And under what circumstances does that

4    happen?

5        A    Again, we go back to the PVP status of an

6    inmate.  If an inmate's brought back as a parole

7    violator and he has -- because he was arrested,

8    they're bringing him back pending disposition of those

9    charges.

10        If they have no technical violations to

11   violate him on and all that's holding him are those

12   pending charges, if those charges at any time are

13   released, we will -- the parole board will issue a

14   release of warrant.

15        Q    And then does he get then released directly

16   to the streets, then back on parole?

17        A    Yeah.  Yes.  He continues on parole.  It's

18   what we call no recommit action.

19        Q    Okay.  So he would be incarcerated for such

20   time until you're notified by the parole board that

21   they're withdrawing that?

22        A    That's correct.

23        Q    If that happens, the time that he was in does

24   that get credited to his original sentence then in the

25   event that -- do you credit it to his original

ERVIN BLANK ASSOCIATES, INC.

150

1  sentence in the event that he comes back in, let's say

2  he violates parole again?

3      A    Anytime -- after an inmate is paroled, any

4  change in his original sentence is done by the parole

5  board.  It's no longer done by the Department of

6  Corrections.  It comes from the parole board.

7      Q    So that credit for that time while they're

8  figuring out whether or not they can keep him, they

9  would be responsible for tracking that?

10     A    That's correct.

11     Q    But you have access to that information I

12 would imagine?

13     A    Yes.  That's all reflected like in his moves

14 report.  I can see when he was here and when he

15 wasn't.

16     Q    Okay.  I am -- actually, I would like to get

17 copies made of that.  I couldn't locate it.

18     A    Do you want me to run and do that?

19     Q    We don't need it now, but thank you for

20 bringing that.  And then the next part.  Time for

21 processing the lift of a PBPP warrant.  The inmate

22 shall be processed as soon as possible.  If there are

23 problems obtaining information, the inmate cannot be

24 held any longer than four working days from the date

25 of the lift of a warrant.

151

1          And then the last item, 2C, if the inmate is
2    past his or her sentence complete date, the inmate
3    must be cleared for immediate release.  Have you had
4    that happen before?

5          A    Yes.

6          Q    And under what circumstances?  Like how does
7    that work out mechanically?

8          A    Again, a lot of times we'll have an inmate
9    brought in.  Maybe he's not necessarily past his
10   maximum at the time he's brought in but he may have
11   new charges or technical violations.  They may be
12   holding him on delinquency time.

13         But if we're holding him and we have that
14   letter to hold him, we will have that letter to hold
15   him past his maximum date.  If they at any time after
16   that cancel their warrant, basically we process them
17   the same day and they're released that day.

18         Q    And how are you -- so how are you notified --
19   in the past when this has happened, how have you been
20   notified of this situation that the sentence complete
21   date?

22         A    I've gotten faxes, I've gotten e-mails, a
23   phone call.

24         Q    Does the inmate sometimes tell you?

25         A    No.

152

1      Q    You haven't heard from the inmate that^--

2      A    His warrant was lifted?

3      Q    No.  That he is past his sentence complete

4   date?

5      A    As a parole violator pending do you mean?

6      Q    Right.

7      A    Oh, yes.  Yes.

8      Q    So what steps do you take in that case?

9      A    I tell them to contact the parole board.  We

10  have no control over their PVP status.  When they're

11  in PVP status, at that time everything is on the

12  parole board to recommit them or to release them.

13      Q    But you have access to their sentence -- you

14  have access to the data, the information in your

15  computer system about when they've been in and what

16  their max dates are, right?

17      A    Yes.

18      Q    So you could check that?

19      A    Yes.

20      Q    The delinquent time that you mentioned

21  earlier is something that the parole board calculates,

22  right?

23      A    That's correct.

24      Q    Where does DOC record that if anyplace?  Do

25  you have that in the file?

153

 1      A    We don't record the actual dates.   Usually

 2  we're provided a number of days from the parole board

 3  that they were delinquent.

 4      Q    And where would that be documented?

 5      A    If they had delinquent time, it's documented

 6  on their 16E.   There's a box on their 16E that records

 7  their delinquent time.

 8      Q    Okay.   And that's something that the parole

 9  board would give you and then you would put it into

10  the computer that would then be in the 16E?

11      A    Yes.

12      Q    Okay.   If you turn to page 2-9 of this

13  document.   Section five.   Parole violator pending with

14  federal sentences.   What does this part of the

15  procedures manual mean to you?   If you could walk me

16  through what you do when someone comes in with this

17  situation.

18      A    If we get a parole violator in with a federal

19  sentence -- is it okay if I just take you through the

20  policy because this is what I would do?

21      Q    Certainly.

22      A    Because we don't get them very often.

23          MR. KEATING:   Are you just going to read the

24  thing into the record?

25  BY MS. TOBIN:

154

1     Q     I might have questions for you as you read

2   it.

3     A     Okay.   Again, if a new sentence is imposed

4   upon the parolee, the service of the balance of said

5   term originally imposed shall precede the commencement

6   of the new term.

7           If a person is paroled from any state penal

8   or correctional facility under the control and

9   supervision of the Department of Justice and the new

10  sentence imposed upon him or her is to be served in

11  any such state penal or correctional facility.

12          If a person is paroled from a county penal or

13  correctional facility and the new sentence imposed

14  upon him or her is to be served in the same county

15  penal or correctional facility.

16          In all other cases, the service of the new

17  term for the latter crime shall precede commencement

18  of the balance of the term originally imposed.

19    Q     Okay.   So on that part, I have a question for

20  you.

21    A     Sure.

22    Q     My understanding of that, and I want to know

23  yours, is if you come -- if a person comes in after

24  violating parole and only has a federal sentence, this

25  seems to say that the federal sentence should be

ERVIN BLANK ASSOCIATES, INC.

155

1  served at that point and then the person should come

2  back and serve the original state sentence?

3       A    Correct.

4       Q    So who makes sure that that happens and how

5  do you make sure that that is the process that's

6  followed?

7       A    In these cases, again, at this time because

8  things have changed.  At that time what we did with

9  Mr. Chappelle he was actually here in DOC custody when

10 he was sentenced originally on his federal sentence.

11 Those charges were pending up until I'm not sure what

12 the exact date was.  Up until it looks like September

13 of 2002.

14            And what we require from the parole board in

15 order -- because he was already recommitted by the

16 parole board.  He had been recommitted by the parole

17 board.  And what we required at that time was they

18 issued a relinquishment letter relinquishing custody

19 from the Department of Corrections to the Feds that

20 was provided to the Feds when they picked him up.

21      Q    So you required that of the parole board?

22      A    Yes.

23      Q    In order to give him to the Feds?

24      A    Yes.

25      Q    Do you know if there's a copy of that letter

1    in the file?

2        A    Yes, there is.

3        Q    Okay.  And so that letter was issued by the

4    parole board to -- it was directed to the Feds?

5        A    I'm not sure who it was directed to.  I

6    believe it's addressed to whom it may concern is how

7    it's addressed I believe.

8        Q    Okay.  So we know from your moves report and

9    from other documents that he didn't go to the Feds

10   until July 19th of 2007; is that matching?

11       A    Yes.

12       Q    So from the time he was sentenced in the Feds

13   which was 2002 to the time he was sent to the Feds to

14   serve that sentence in 2007, that five years he was

15   still here?

16       A    That's correct.

17       Q    So this -- going back to the policy.  He

18   wasn't immediately sent to serve his federal sentence?

19       A    No.

20       Q    Okay.  And that time that he was here that

21   went to his state -- that credit went to his state

22   sentence?

23       A    That's correct.

24       Q    Okay.  And then the next -- do you have any

25   idea why the delay in getting the relinquishment?  I

157

1  mean I know that comes from the parole board but it

2  was in 2007.

3      A   I can't answer that.  Again, that's something

4  you would have to ask them.  As long as -- as far as

5  we're concerned as long as he had been recommitted by

6  the parole board we cannot release him to the Feds

7  without something from the parole board.

8      Q   Okay.  So by the time he was sentenced in his

9  federal charges which took about a year, from 2001 to

10 2002, parole board had already said we're recommitting

11 you?

12     A   Yes.  Once -- it looks like once he was

13 convicted, they pretty much recommitted him almost

14 immediately.

15     Q   Okay.  Who is in charge -- if you know, who

16 is in charge of overseeing this whole process of who

17 gets him, the Feds or us?

18     A   That's dictated by the Parole Act which is

19 actually referred to.

20     Q   Yeah.  That's what we're -- the Parole Act

21 says that the new term for the latter crime shall

22 precede commencement.  But it didn't happen in this

23 case because he didn't start serving his federal

24 sentence until 2007.  So it didn't precede

25 commencement of the balance so who's the person who's

1  supposed to -- person or department that's supposed to

2  make sure that this section two happens?

3      A    I don't even know how to answer that.

4      Q    It's a statute and --

5      A    Right.  Right.  We do our notifications and

6  say this is what we need.  And all we can do is

7  follow-up to make sure that we get it.

8      Q    Okay.  And then the next part is B, federal

9  law/policy contends that in this situation the state

10 has primary jurisdiction since there has been no final

11 action by the PBPP.  The result of this conflict is

12 that the federal authorities refuse to take custody

13 and the PBPP refuses to recommit the inmate.

14         Then C.  The following procedures are to be

15 followed until the conflict can be resolved:  When an

16 inmate is received and meets the criteria stated in

17 Section B.4.a and b above, a memorandum stating the

18 facts is to be sent to the records

19 administrator/assistant records administrator.

20         So how does that play out in terms of what

21 you do?

22     A    This isn't -- that wasn't the case in Mr.

23 Chappelle's situation because in this case, in Mr.

24 Chappelle's situation, the parole board did recommit

25 him and that's where we ran into issues because they

1   had already recommitted him and they weren't issuing a

2   new board action to revert him back to a PVP.

3       Q    What does that mean?

4       A    A lot of the times we'll have instances where

5   you have an inmate that they recommit.   In his

6   instance they recommitted him as a TCB.   What they can

7   do the board can issue a new -- they'll record a new

8   board action saying we are now changing you back to a

9   parole violator pending and making you available to go

10  serve this sentence.

11          They can't serve that sentence -- they can't

12  serve a new conviction at the same time that they're

13  serving their parole violation.

14      Q    Okay.

15      A    So when they change them back to PVP status,

16  that makes them available to serve the new sentence

17  that they've incurred.

18      Q    The new state sentence or new federal?

19      A    Any sentence.   Any sentence.   That's what

20  happened in this case.   For whatever reason it took

21  them forever to revert him back to a parole violator

22  pending.

23      Q    So the parole board delayed giving him some

24  kind of status that then you're saying that prevented

25  him from going to the Feds?

160

1        A    That's correct.

2             MR. KEATING:  I'm going to object to the use

3    of the word delayed.

4    BY MS. TOBIN:

5        Q    Okay.  The parole board took from 2001 to

6    2007 to change his status back to PVP and that had to

7    happen before he went to the Feds to serve his

8    sentence?

9        A    That's correct.

10       Q    Okay.  So during that six-year period, 2001

11   to 2007, he wasn't serving his federal sentence so the

12   only sentence he could have been serving was his state

13   sentence?

14       A    That's correct.

15       Q    Section -- so back to the policy on page 2-9.

16   Was there a memorandum stating the facts of this sent

17   to the records administrator?

18       A    No.

19       Q    And that's because the board had already

20   recommitted him?

21       A    That's correct.

22       Q    And so you followed a different procedure for

23   that?

24       A    That's correct.

25       Q    And you said you asked for a relinquishment

161

1  letter from the parole board?

2      A    Yes.

3      Q    Do you recall when you asked for that?

4      A    No, I do not.

5      Q    But that would have been reflected in some

6  communication from you to the parole board?

7      A    It should have been.  I'm not sure if there

8  is or not.

9      Q    Okay.  Section two, the facility shall track

10  these inmates so that their incarceration does not

11  exceed the length of the federal sentence and the time

12  that he or she would serve if the PBPP issued a final

13  recommitment action.  How do you track them?

14      A    I'm sorry.  Where were you referring to?

15          MR. KEATING:  We're down here.  The

16  facilities shall track.

17          MS. TOBIN:  2-9.

18          MR. KEATING:  If there's a conflict, the

19  following procedures are to be followed until the

20  conflict can be resolved.  Two, the facility shall

21  track these inmates.

22          If there is such a conflict.  Not necessarily

23  in this case.  If this were to happen, what happens to

24  track them?

25          THE WITNESS:  We track -- there's really not

ERVIN BLANK ASSOCIATES, INC.

162

1    a set -- there's nothing in the procedures that says

2    how we track them.  We have a calendar that we utilize

3    that we set reminders to check on certain things

4    periodically.

5           If we have an inmate that's a parole violator

6    pending and he's beyond his maximum date, we will set

7    a reminder to check on his say active charges or

8    sentence at a certain time, at a pertinent time.

9    BY MS. TOBIN:

10       Q    Okay.  And is that an electronic calendar?

11       A    Yes.

12       Q    And who's responsible for doing that checking

13   process in the records?

14       A    The specialists will usually check on that.

15   And, again, if they have questions, they come to me.

16       Q    Okay.  So in Mr. Chappelle's case, was he

17   tracked?

18       A    No.  Because he was recommitted.

19       Q    Okay.  So he was in, you knew he was in

20   because the parole board recommitted him so there was

21   no question that he was serving his state sentence?

22       A    That's correct.

23       Q    Did you contact the records administrator or

24   assistant records administrator in Mr. Chappelle's

25   case at all?  Was there any -- do you remember any

163

1  communication?

2       A    I don't -- I can't recall at this time.  I

3  would have to look through his file to see if there's

4  anything in there.

5       Q    But nothing with regard to this tracking

6  business?

7       A    No.

8            MR. KEATING:  I think she said this section

9  didn't apply.

10           MS. TOBIN:  Right.  I'm trying to understand

11  generally what the procedures are and then

12  additionally what happened in this case.

13           MR. KEATING:  You keep asking about whether

14  she tracked under this section here, and I think she

15  keeps saying it didn't apply to this section.

16  BY MS. TOBIN:

17      Q    Okay.  On page 2-12, there's a section about

18  vacated sentences and convictions.  If you'd just take

19  a minute to read that to yourself, and let me know

20  when you're done.

21      A    Okay.

22      Q    So this section is my understanding correct

23  that it's only referring to state sentences, not

24  federal?

25      A    That's correct.

ERVIN BLANK ASSOCIATES, INC.

164

```
 1       Q    Okay.  So, again, federal doesn't mean you
 2  have to do anything except lodge a detainer?
 3       A    That's correct.
 4       Q    On page 2-15, item 12, inter-facility
 5  transfers.  Is that the process that you were
 6  describing earlier where you have to file a petition
 7  for -- transfer petition?
 8       A    Yes.
 9       Q    And on page 2-17, Section E, processing
10  temporary transfers.  Is that the procedure governing
11  what you talked about earlier in terms of transferring
12  temporarily to court?
13       A    Yes.
14       Q    Okay.  On section -- or excuse me, page 2-19,
15  item C.  If you could read that to yourself and just
16  let me know -- actually, just to the bottom of the
17  page, and let me know when you're done.
18       A    Okay.
19       Q    Is this a release checklist you were
20  referring to earlier?
21       A    Yes, it is.
22       Q    And are there any other -- I think I may have
23  asked this.  I apologize if I did.  Other than this
24  one release checklist, are there other checklists that
25  you go through for releasing inmates?
```

165

1       A    No.  No.

2       Q    Okay.  If you turn to page 2-21.  Section D

3  refers to sentence computation errors and says that

4  sentence computation errors shall be reported to the

5  BOSS, technical records supervisor via a sentence

6  computation error information sheet, attachment 2J, as

7  soon as the error is discovered.

8       When an error has occurred, the records

9  supervisor shall ensure that the error is corrected

10 after receiving direction from the records

11 administrator/assistant records administrator, and

12 issue the inmate a new 16E with the recalculation.

13 What is the BOSS?

14      A    I have no idea what they're referring to

15 there to be honest with you.  I have no idea.

16      Q    The -- who is the technical records

17 supervisor?

18      A    There's a few.  Right now I'm not even --

19 they have a unit within the CSCU.  It's called

20 technical records.  They're specifically used for

21 questions to answer questions amongst institutions in

22 the field.

23      But there's a general mailbox that we send

24 the sentence computation sheets to -- or the error

25 sheets.  There's a general inbox that we send them to.

1    Q    Okay.  And then if you take a look at

2  attachment 2J, is it the same form that you use?

3    A    Yes.

4    Q    And have you filled these out before?

5    A    Yes, I have.

6         MR. KEATING:  Who'd you send it to?  The

7  BOSS?  Who's the BOSS?

8         THE WITNESS:  I don't know what that means to

9  be honest with you.  Again, we send them.  There's a

10  general inbox that we send them to.

11  BY MS. TOBIN:

12    Q    The technical records supervisor.  And then

13  you do that by e-mail?

14    A    Yes.

15    Q    And then how do you get response or

16  resolution?  Is that also by e-mail?

17    A    Typically what happens it all depends on

18  where the error occurred at.  If the error occurred,

19  originated from CSCU, they will change or modify the

20  sentence and they'll notify us via e-mail that they

21  did, they corrected the error and a new 16E was

22  generated.

23         If it's from another institution, if it

24  originated from another institution, they'll respond

25  back and say yes, you are correct.  Please make an

1  adjustment.

2       Q    And that communication would be in the DC-15?

3       A    Yes.

4       Q    And I'm looking at the attachment 2J has

5  different categories.  Institution, inmate number,

6  inmate name, sentence calculation error, yes/no.  What

7  was the error?  How was the error discovered is fourth

8  from the bottom.  How are these errors discovered?

9       A    Sometimes when we receive an inmate in from

10  another institution, again, it's while we're checking

11  to make sure all documents are there.  Sometimes it'll

12  be upon release.  Sometimes it will be if an inmate is

13  being processed for what we call outside clearance

14  which means they're going to go work outside the

15  fence.

16       Sometimes when they're being processed for

17  that, we'll discover them.  Sometimes it'll be

18  somebody contacted us whether it be the inmate or a

19  counselor regarding a question they had.

20       Q    So any variety of people?

21       A    Yes.

22       Q    Who gets notified of the errors within -- who

23  gets the notification?  Would that be the records

24  specialist who is notified of the error or would it be

25  you?  What's the internal DOC procedure for notifying

1    records of errors in a sentence computation?

2        A    I'm not --

3        Q    Who handles getting notified of that?  I mean

4    there's an error out there.  Is there a procedure that

5    you have in the records office for responding to that,

6    handling that?

7        A    I would say if a specialist discovers the

8    error, they're coming to me.  If there is an error, if

9    they have a question if there is an error, they will

10   come to me with it regardless of how they were

11   notified.  There's no specific procedure.  Again,

12   we're notified a variety of ways by a variety of

13   people so it all depends.

14       Q    And if this was filled out, would a copy be

15   in the DC-15?

16       A    Yes.

17       Q    And the response from whomever you sent it

18   to, the technical records supervisor would be there,

19   too?

20       A    Correct.

21       Q    And then the next section on page 2-21,

22   Section E, erroneous release or held past sentence

23   complete date.  If you could just read -- well, have

24   you dealt with this before, too, this issue of held

25   past sentence complete date?

169

 1     A    Are you referring to, again, with parole

 2   violators as well?

 3     Q    Just anyone.  Have you ever -- how do you

 4   handle people -- how do you handle held past sentence

 5   complete date issues?

 6     A    We've already had ones where inmates have

 7   been resentenced and now they're past their max and

 8   you have to process them out immediately.  We contact

 9   our records administrator and let them know the

10   situation.  We also do an extraordinary occurrence

11   report which is also in here.

12     Q    And what do you -- what steps do you take

13   when you're notified of a possible problem with this,

14   with being held past sentence complete date?  What are

15   the steps that you take?

16     A    The first step is to review the sentence

17   structure to make sure it is either correct or what

18   happened that he was beyond his max.  And then we

19   notify central office which would be the records

20   administrator of the error or that there was an issue.

21     Q    And then do you notify them?

22     A    After we notify them, then we go to the

23   institution chain of command to let them know what's

24   going on and what the situation is and that this --

25   again, I would prepare an extraordinary occurrence

ERVIN BLANK ASSOCIATES, INC.

170

1  report at that time and then we would process the

2  inmate for release.

3      Q    When you're reviewing the sentence structure,

4  what specifically do you do to do that?

5      A    We're reviewing the sentencing orders, any

6  detainers that we may possibly have, any credit,

7  credit memos.  If there's any letters from the judge,

8  they're also reviewed.

9      Q    So are you doing a calculation to

10 double-check whatever the date is?

11     A    Yes.

12     Q    So you're adding up time in, comparing it to

13 the orders?

14     A    Yes.

15     Q    When you're -- so you can be informed about a

16 possible problem like this by an inmate?  That's a

17 possible source of a complaint?

18     A    Yes.

19     Q    When that happens, do you interview the

20 inmate?

21     A    No.  Typically not.

22     Q    And why not?

23     A    The information that we have is -- I mean we

24 have everything that we need available to us in the

25 file.  If I feel something was missing, would I, yes.

171

1     Q   So it's a possibility?

2     A   Yes.  It's always a possibility.

3     Q   How many sentence -- held past sentence

4 complete dates have you dealt with since you've become

5 records supervisor?

6     A   That I can recall?  Again, these were ones

7 that inmates were either -- their sentences were

8 recalculated by the parole board which was in Mr.

9 Chappelle's case or an inmate was resentenced, his

10 sentence was vacated and he was resentenced by the

11 county and he's now past his max.  I can recall three.

12    Q   From 2007 until now?

13    A   Yes.

14    Q   And when it involves a parole board

15 recalculation issue, what steps do you take in those

16 cases?

17    A   It's a little different.  We do notify the

18 records administrator and we do also do -- we don't do

19 the extraordinary occurrence report because basically

20 it was -- we're just being notified.  We're just being

21 notified by the parole board that his sentence

22 changed.

23    Q   Well, if someone comes -- an inmate comes to

24 you and said I think I'm being held past my max date

25 and you suspect that it's a parole related issue, what

1  do you -- what's your next step then?

2      A    I tell him he needs to contact the parole

3  board.

4      Q    And if he does contact the parole board and

5  comes back and still has an issue, what's your next

6  step then?

7      A    I've already contacted the parole board and

8  asked them to review things.  But, again, it's not

9  up -- there's nothing I can do.  I can ask them to

10  review it.  Just because I ask them doesn't mean

11  they're actually going to.

12     Q    So have you done that in the past?

13     A    I have, yes.

14     Q    And the results were?

15     A    Sometimes they'll come back and they'll say

16  yeah, we checked into it.  It's right.  I've had them

17  come back and say oh, you're right.  There's something

18  we missed.

19          But, again, I can't change anything unless I

20  get something from the parole board.

21     Q    We're going to leave that for now.  I want to

22  take a look at -- I didn't bring many copies of this.

23  This is the computation manual.  But I did have just a

24  few questions for you about that.

25          When did the computation manual come into

173

1  existence?  Has it always been in existence as far as

2  you know?

3      A   There's been a lot of different versions of

4  it.  I know as long as I can recall there's been some

5  sort of computation manual.

6      Q   Okay.

7      A   And it's always changing.  The laws are

8  always changing so it's never actually up-to-date.  In

9  fact, I think that's outdated.  I'm sure it is.  And,

10 again, I think that's outdated because ever since they

11 did triple RI and whatnot.  I don't think triple RI is

12 in there.

13          (Whereupon, a document was produced and

14 marked as Kodak Exhibit No. 21 for identification.)

15 BY MS. TOBIN:

16     Q   So I'm showing you what's been marked as

17 Kodack 21.  So can you identify this document?

18     A   Yes.  This is part of the computation manual.

19 This is the slides.

20         MR. KEATING:  This is the what?

21         THE WITNESS:  The slides.  Like the

22 slideshow.

23         MR. KEATING:  Like a slide presentation?

24         THE WITNESS:  Yeah.

25 BY MS. TOBIN:

174

1      Q    So the first page it's Bate stamped at the

2   bottom 936.   Parole violators with new criminal

3   charges.   Just want to confirm that that's -- well,

4   ask you is that new criminal charges that are state

5   criminal charges or federal criminal charges?

6      A    By looking at this, it says county or another

7   state.

8      Q    Okay.  So --

9      A    It's not referring to federal.

10     Q    Okay.  And if you skip to the next page, the

11  top slide, parole violators with new criminal charges.

12  Custody for return or effective date of PV return

13  equal the date established by the board of probation

14  and parole and reported on the recommitment order

15  indicating when the inmate started to serve his or her

16  backtime.

17          Is that the same thing as the arrest date,

18  when they're arrested?

19     A    Not necessarily, no.  Again, I mean it does

20  say it's established by the board of probation and

21  parole.

22     Q    So you just get a date and however they

23  establish it, you don't --

24     A    That's correct.  I don't know how they

25  establish it.

175

1    Q    Okay.

2    A    Sometimes you can kind of guess how they

3    established it.  Other times it's kind of like they

4    pulled it out of thin air.

5    Q    So what's your understanding of what backtime

6    is?

7    A    Backtime is -- we have two different things

8    with backtime.  We have backtime owed or we have

9    backtime credit.  Backtime is any time that they --

10   it's kind of like what you were referring to as street

11   time.  That they were out on the street.  That's

12   considered backtime.

13   Q    Is it accurate to say that the parole board

14   calculates backtime and can make the inmate serve a

15   period of backtime before he can apply for parole

16   again?

17   A    Yes.  That is correct.

18   Q    So when I see things in the documents that

19   say backtime sentence, it's not a new sentence of

20   commitment, is it?

21   A    No.

22   Q    It's just your original sentence, you have

23   to -- you have 20 days left on your sentence.  We're

24   going to make you wait until you've served 10 before

25   you file for parole again and that 10 days is your

1  backtime sentence?

2      A    Yes.

3      Q    Okay.  So it's not -- parole board can't

4  issue a new sentence?

5      A    No, they cannot.

6      Q    So then the backtime -- if I see something

7  that says backtime sentence in these files, that can't

8  then exceed the total number of days that the person

9  was sentenced to by a court; is that correct?

10     A    From what I understand, correct.

11          MR. KEATING:  That's correct.

12  BY MS. TOBIN:

13     Q    So you get a sentence of five years, that's

14  365 times five.  It's that number of days.  You're out

15  for six months.  You then have a backtime sentence and

16  the parole board says you can't apply until this date.

17  That date can't be beyond the total number of days

18  that that person served?

19     A    Correct.

20     Q    Okay.  So these backtime, this basic

21  convicted parole violator formula on Bates 937, is

22  this a calculation that the records office does?

23     A    No, it is not.

24     Q    But it's in your slide so is it something

25  that your people need to know about?

177

1       A    All this is for us is a guide explaining to

2   us how they determine backtime and how they get the

3   new PV max date.  It's only a guide.

4       Q    So that you know where these dates are coming

5   from?

6       A    Correct.

7       Q    How does backtime impact -- so your office

8   does a calculation for a controlling minimum and a

9   controlling maximum, right?

10      A    Yes.

11      Q    And what is a controlling minimum?

12      A    Controlling minimum that's their -- that's

13  the minimum that controls when they are able to --

14  when they're eligible for parole.

15      Q    And then what's a controlling maximum?

16      A    That's their longest max.  That's their

17  longest maximum date.

18      Q    Is it fair to say that the controlling

19  maximum is the max date of each of their sentences

20  that they're serving at that time?  Or let me just ask

21  you.  How do you calculate the controlling max date?

22      A    It's done with their initial commitments.

23  Sometimes you have an inmate serving multiple

24  sentences.  If you have sentences running concurrently

25  to each other, you're going to have multiple min and

178

1  maximum dates.

2        The controlling min is ultimately the longest

3  minimum and same for the maximum.  So you could

4  actually have an inmate serving six different cases

5  say A, B, C, D, E, F and A has the controlling min and

6  F could have the controlling maximum.  I don't know if

7  that makes any sense or not.

8        Q    Sure.

9        A    It's very complicated.

10       Q    And so the controlling min and max are dates

11  that the records department calculates?

12       A    That's correct.

13       Q    Based on orders from a judge?

14       A    That's correct.

15       Q    And if somebody's held past their controlling

16  max, that would be one of those situations held past

17  sentence complete date?

18       A    That's correct.

19       Q    So if the parole board gives you a backtime,

20  I'll call it a backtime sentence or a backtime, that

21  can't extend the sentence that a court has imposed on

22  the person?  It can extend the date but it can't

23  extend the number of days that that person was ordered

24  to serve; is that right?

25       A    That's my understanding, yes.

179

1        MR. KEATING:  But it can change the
2   controlling max?
3        MS. TOBIN:  It can change the date.
4        MR. KEATING:  Because of the backtime.
5   BY MS. TOBIN:
6      Q    So just so I'm clear on that.  If someone in
7   the records office or you gets a calculation, a
8   backtime calculation from the parole board that seems
9   out of line with your controlling min, controlling
10  max, your sentence calculations seems out of line with
11  what everything your office has done and you get this
12  date or this backtime sentence, what do you do when
13  that happens?
14     A    If I feel it's incorrect?
15     Q    Yes.
16     A    Again, I would contact our parole office and
17  ask them to send it down for review.  And that's all I
18  can do.  I can't change their calculation.
19     Q    So you have to get them to look into it to
20  recalculate it to send you a new date?
21     A    Correct.
22     Q    And if you did that, that would be in the
23  DC-15?
24     A    That's correct.
25     Q    What would rise to the level of making you

180

1  feel like it was necessary to look into it?

2      A    If I feel that -- again, like I said, some of

3  these dates that they're coming up with I don't know

4  where they're getting them.  So that's why it's so

5  hard for me or any of my staff to look at them and

6  like have an alarm go off saying that this is wrong.

7  It's difficult to look at them and just think oh, this

8  is wrong.

9          If his max date was greatly extended or the

10 backtime maybe, maybe the number of days that they

11 issued for backtime owed looks wrong, I may contact

12 them if it looks excessive.  But other than that, not

13 really.  Not really any set triggers that would cause

14 me to contact them.

15     Q    Do you get training on this issue?  Like does

16 the parole board offer you or any records staff

17 training on how they do their part?

18     A    No, they do not.

19     Q    And do you train parole board people on how

20 things work in the records office?

21     A    No, we do not.

22     Q    Do you know why there's no inter-training?

23     A    No, I do not.

24         (Whereupon, a document was produced and

25 marked as Kodack Exhibit No. 22 for identification.)

ERVIN BLANK ASSOCIATES, INC.

BY MS. TOBIN:

    Q    Showing you Kodack 22.  Do you recognize this document?

    A    Obviously looks like some type of memo.  I'm not sure where it came from.

    Q    This was produced as part of discovery in this case.  And I'm actually not sure where it came from either, so I was hoping you would.

    A    I'm not sure if this was something -- I know I didn't produce -- I didn't generate this.

    Q    If you would just take a moment to read it to yourself, and let me know when you're done.

    A    Okay.

    Q    On the first line, when checking file in and when doing release checklist or any other verification of sentence structure:

    First step, check date of arrest on rap sheet for the OTN's of current sentences, if credit date is before arrest date, need to contact county to determine dates sat in custody on that OTN.

    Is that precommitment credit?

    A    Yes.

    Q    The second one, check dates of sentence of other sentences to verify that credit isn't past date of sentence of current sentence or any sentences

1    imposed prior to any other sentences.

2          What does that mean to you?

3     A    Basically we're checking to make sure that

4    there wasn't double credit issued.  To make sure he

5    wasn't serving say a county sentence at the time

6    during the time period they're attempting to give him

7    precommitment credit for.

8     Q    So you check to make sure that he doesn't get

9    double credit?

10    A    Yes.  And, again, this is something that we

11   did years back.  This isn't done anymore.

12    Q    In 2009 was this done?

13         MR. KEATING:  If you remember.

14         THE WITNESS:  We started issuing double

15   credit in 2007 and sending letters after the credit

16   was issued.

17   BY MS. TOBIN:

18    Q    Was Mr. Chappelle, did he get double credit

19   for anything as far as you know?

20    A    Not that I'm aware of.

21    Q    And then the third item, check every

22   commitment order and verify calculation.  Westmoreland

23   and Montgomery County often provide long form that has

24   discrepancies between 300B and long form.

25         Is this when you have to check the DC-300B to

183

1    make sure that you have accurately accounted for

2    commitment credit?

3         A    Yes.

4         Q    Does anything on here -- what is double dip?

5         A    Double credit letter is what I believe this

6    is referring to.

7         Q    And what is a double credit letter?

8         A    At the time -- and, again, I'm going to go

9    back because I actually think this is starting to come

10   back to me where it came from.  I want to say my prior

11   supervisor, Don Young.  This is something he typed up

12   it looks like just by looking at the terminology.

13        Double dip letter we used to send that out if

14   we found that an inmate had double credit.  Previously

15   prior to we call it the Oakman decision, we didn't

16   used to give double credit.  We would not apply it and

17   then we would send a letter to the judge saying you

18   ordered double credit.  Please respond if you wish for

19   the inmate to receive it.

20        If not, the credit -- the inmate's sentence

21   has been calculated without the credit.  And unless we

22   hear from you within I believe it was 60 days, this

23   calculation would stand.

24        Q    Do you hear back from the judges on that?

25        A    Sometimes we would.  But, again, our

184

1   procedure has since changed due to the Oakman

2   decision.   Things have changed.

3       Q    Okay.

4       A    We now apply the double credit and then send

5   the letter.

6       Q    You apply it and then ask the question?

7       A    Yes.   Yes.

8       Q    So the double credit letter goes to a judge?

9       A    Yes.

10      Q    Okay.   I want to take a look at some of Mr.

11  Chappelle's documents in his file including the

12  DC-16E's.

13           (Whereupon, a document was produced and

14  marked as Kodack Exhibit No. 23 for identification.)

15  BY MS. TOBIN:

16      Q    This will be Kodack 23.   Do you recognize

17  this?

18      A    Yes.   This is actually a DC-16D.

19      Q    And what's the difference between a D and an

20  E?

21      A    E is just the electronic format.   It's a more

22  updated format of the sentence status summary.

23      Q    And what information -- how are these

24  generated?

25      A    This one in particular?

185

1        Q    Yes.

2        A    They used to be typed on a typewriter.  And

3   what they used to do there's a sentence computation

4   screen in our mainframe that we can go in and

5   basically you're entering credit and the total term of

6   the sentence, and it'll provide you with effective

7   date and min and max dates.

8        Q    And that information was input at the

9   Diagnostic and Classification Center?

10       A    Yes.  At that time.

11       Q    And now it's input at the institution?

12       A    No.  Now it's input at CSCU.

13       Q    Okay.  So what information can you tell me

14   about Mr. Chappelle's sentences based on this first

15   page of this exhibit?

16       A    He is -- was serving a 6 to 12-year sentence

17   with an effective date of 1/26/1995, a minimum date of

18   1/26/2001, and a maximum date of 1/26/2007.

19       Q    And in the dates section that is calculated

20   by the computer?

21       A    Yes.

22       Q    Is there -- so when someone in the records

23   office is -- so you got this transmitted from at the

24   time it was the Diagnostic and Classification Center,

25   this piece of paper came from them to Coal Township

ERVIN BLANK ASSOCIATES, INC.

186

1    and landed at the records office.  I realize you

2    weren't there.  But is that how the process would

3    work?

4        A    Yes.

5        Q    And what would be -- what would the person

6    receiving this document do once they got this piece of

7    paper?

8        A    At that time they would have made a copy or

9    we discussed earlier the time files.  They would have

10   reviewed the documentation, made sure everything was

11   correct and that they had original commitment orders.

12       Q    So would they double-check these dates, the

13   minimum -- expiration of minimum and expiration of

14   maximum?

15       A    Yes, they would.

16       Q    And then at the bottom references an

17   identification.  It looks like it's tracked every time

18   the person comes back in.  What does the first

19   admission what is the date in that box?

20       A    That's the date he was initially received

21   into Camp Hill.

22       Q    1/29/96?

23       A    Yes.

24       Q    And then the second admission date in the

25   second box?

187

1        A    That -- actually, I'm sorry.  The first

2    admission -- I'm sorry.  That was actually the Eastern

3    Diagnostic Center which refers to Graterford and then

4    the second one is Camp Hill.

5        Q    Okay.  And what does the T mean before that

6    EDCC?

7        A    He was transferred.

8        Q    Okay.  And at this point in time is there a

9    date when it is actually completed?

10       A    No.  I don't believe so.

11       Q    Okay.  So whenever this -- this was early on

12   and he only had the one sentence.  Would you call it

13   an aggregate sentence?

14       A    Yes.

15       Q    Because you add the two together?

16       A    That's correct.

17       Q    Okay.  And then the following pages after the

18   first one.  It's double sided.

19            MR. KEATING:  Did we send these to you double

20   sided?

21            MS. TOBIN:  No.  I made them double sided.

22   BY MS. TOBIN:

23       Q    What are these and are they normally attached

24   to the 16D?

25       A    I don't know why they're attached in this

188

1  case.  Typically they're not.  This is what we call a

2  Philadelphia Court history.  Basically goes -- gives

3  us a list of court cases from Philadelphia County.

4      Q    And is this something that the records office

5  or the Diagnostic Classification Center would print

6  out and put in the file?

7      A    Typically, yes.  We don't -- again, it's not

8  done anymore.

9      Q    And is the purpose just to check to make sure

10 that yes, he did actually have a conviction on this

11 case?

12     A    Yes.  And, again, to make sure there's no

13 other outstanding cases.

14     Q    Okay.  What's the procedure now in terms of

15 checking that information?

16     A    This system is no longer -- it's kind of

17 obsolete and we now -- I referred to JNet before.

18 That's the system that we utilize now to check cases.

19     Q    And you just do that on the computer?

20     A    Yes.

21     Q    All right.  So at that point in time back

22 when Mr. Chappelle was first incarcerated, these

23 calculations were all done at Camp Hill but then

24 checked when he got here?

25     A    That's correct.

189

1          (Whereupon, a document was produced and

2    marked as Kodack Exhibit No. 24 for identification.)

3    BY MS. TOBIN:

4        Q    This is Kodack 24.  This is a multi document

5    exhibit.  Can you take a look at the first page of

6    that exhibit, and let me know when you're done.

7        A    Sure.  I'm done.

8        Q    You're done?

9        A    I'm done.  I know what it is.

10       Q    So what is this?

11       A    This is, again, what we refer to as a PVP-16.

12   Basically just shows that he's in parole violator

13   pending status and his original min and max dates were

14   brought forward.

15       Q    Okay.  So who completed -- this still looks

16   like it's a typed form?

17       A    Yes.

18       Q    So who would have completed this form and

19   typed in the change number one information?

20       A    Again, at that time there was no date listed

21   on here so it's hard to tell.

22       Q    Would that have been done at Coal Township?

23       A    It most likely was because I think it looks

24   like we paroled him on 4/9/01.  So I would say that it

25   was done here.

190

1      Q     And then would have been done when he came
2  back?
3      A     Correct.
4      Q     Okay.  And then down at the bottom, the
5  fourth admission -- excuse me.  Go back to the third
6  admission.  4/19/96.  Do you know what that date
7  signifies?
8      A     That's the date he was transferred to Coal
9  Township.
10     Q     Okay.
11     A     After his initial classification.
12     Q     Okay.  And then the fourth admission is when
13  he came back?
14     A     As a parole violator.
15     Q     As a parole violator.  Okay.  What if someone
16  has more than four admissions?  Do you have to have a
17  new form?
18     A     Well, considering we don't do this anymore, I
19  don't know what they did because not long after I
20  started, they started -- they updated the form, so I'm
21  not sure what they did after that.  I think they just
22  kind of made notes down below.
23     Q     Okay.  And then on the next page it's Bate
24  stamp 979 at the bottom.  There's a section at the
25  top, actions:  Pennsylvania Board of Parole and then

191

1    there's section five, actions:  Board of pardons.

2    There's nothing on this one.  When would that be

3    filled in and by whom?

4        A    Again, that's not -- when I start -- when I

5    was here, this updated these forms.  The 16E's came

6    shortly after I started and I really didn't utilize

7    these very much.  So I'm not sure.

8        Q    Okay.  So we will turn to the next document

9    which is Bate stamped 883 at the bottom.  And what is

10   this?

11       A    That's a DC-16E.

12       Q    Okay.  And this is the new computerized way

13   of tracking sentences?

14       A    Correct.

15       Q    Is there a date on which this one was

16   created?

17       A    10/16/02.

18       Q    Okay.  Down at the bottom?

19       A    Yes.

20       Q    So this is saying as of 10/16/02 he still had

21   the same two sentences?

22       A    Correct.  And also if you look under summary

23   or remarks, it says and add federal detainer.  So at

24   that time his detainer was added.

25       Q    And who would have put those remarks in?

192

1     A    It looks like Mr. Carta who was a records

2 specialist at the time.

3     Q   Okay.  Is the federal detainer noted anywhere

4 on this group of documents?

5     A   Yes.  Page three under the detainer section,

6 section four.  He has the type wrong.  I'm looking at

7 that now.  He has execution listed.

8     Q   What are the other options of type?

9     A   There's a federal.  I believe there's a

10 federal, there's a county, there's a DOC detainer,

11 there's a confidential detainer.

12     Q   So this execution I realize you mentioned it

13 was an error but what does the word execution signify

14 there?  That he's scheduled to be executed?

15     A   Yep.

16     Q   Not that the sentence is scheduled to be

17 executed?

18     A   Correct.

19     Q   But that the person.  That's just --

20     A   Error, yes.  Yes.

21     Q   Okay.  So as of this date, 10/16/02, he still

22 had the same two state sentences.  And I see there's

23 no place for you to input min and max for the federal

24 sentence because you don't track that?

25     A   Right.

1     Q    Okay.  And then on the next group, Bates 886

2   at the bottom, how does this differ from the previous

3   three?

4     A    At this time if you look on page one under

5   the summary section, it's summary remarks it says

6   version two created due to inmate being recommitted as

7   a technical convicted parole violator.  Sentence

8   recomputed in accordance with PBPP Form 39 dated

9   12/02/2003.

10    Q    Okay.  So what is technical convicted parole

11  violator?  I thought there was a technical parole

12  violator and a convicted.  Is it just a way of saying

13  both at once?

14    A    Yes.

15    Q    And where's the recomputed sentence?

16    A    It's listed on page one.  If you go -- it's

17  right across from his controlling minimum date.  It

18  says new maximum PV is 2/16/08.

19    Q    And how did that come to be in that spot?

20    A    That's what the computer programers did.  I

21  don't know.

22    Q    No.  No.  No.  I mean how did that date get

23  entered on this 16E?

24    A    We enter that information into our mainframe.

25    Q    And the records specialist did that?

194

1    A    Yes.

2    Q    And how did the records specialist get

3    notified about that new date?

4    A    The parole board mails us their new

5    calculations.

6    Q    Okay.

7    A    In the US mail.

8    Q    Okay.  So it also says in the comments,

9    remarks section sentence recomputed in accordance with

10   Form 39 dated 12/2/03?

11   A    That's correct.

12   Q    So I can possibly find Form 39.  Okay.  Is

13   this a Form 39?  Is that what this is?

14   A    Yes, it is.

15   Q    Order to recommit?

16   A    Yes.

17   Q    So there should be something in the file

18   dated 12/2/03 that looks like this?

19   A    Correct.

20   Q    And that's how the records specialist got

21   that date?

22   A    Yes.

23   Q    When he or she got that date or got this form

24   that had the date on it, it was really just data

25   processing, type it in there or was there any

195

1  double-checking of this date?

2       A    It's data processing.  We record their

3  information.

4       Q    Is the inmate notified about the new date?

5       A    They are sent a copy of the new status sheet.

6       Q    Of this?

7       A    Yes.

8            MR. KEATING:  When you say of this, can you

9  say for the record what this is?

10           MS. TOBIN:  Yes.  Of Bates 886.

11  BY MS. TOBIN:

12       Q    Do you know if the inmate's notified by the

13  parole board of the new maximum PV?

14       A    I believe they are.

15       Q    Do you know how?

16       A    No, I do not.

17       Q    Okay.  Going back to Bates 886.  So what can

18  you tell me about Mr. Chappelle's new sentence?  Like

19  how much was it increased by based on this?

20       A    It looks like not quite 13 months.

21       Q    From 1/26/07?

22       A    To 2/16/08.

23       Q    So going back to the general time like of his

24  time, he was out on the streets for about six months.

25  So how could his new maximum be more than six months?

ERVIN BLANK ASSOCIATES, INC.

196

1    A    Because the custody for return date that the

2    parole board provided us with was 9/23/2002.  We go

3    according to the dates that they give us.  The

4    backtime owed was 5 years, 4 months, and 23 days.

5    Q    And they told you that you should start

6    adding that 5 years, 4 months, and 23 days as of?

7    A    9/23/02.

8    Q    But he was arrested in September of '01.  So

9    that's a whole year?

10    A    Again, these dates are provided to us by the

11    parole board.

12    Q    So in terms of where he sat during that year

13    between the date of his arrest and the date of the

14    custody for return, he was in the DOC system?

15    A    Yes.

16    Q    Okay.  So he was sitting in a state prison

17    during that time?

18    A    Yes.

19    Q    So if you got something -- when you got

20    this^-- or I don't know if you were working there at

21    this time or not.

22    A    Yeah.

23    Q    When the records department got this, is

24    there any double-checking of this date compared to

25    when the guy was sitting?

197

1     A    Again, they provide us with the custody for

2    return date.  We typically do not question it.  It is

3    provided to us.  They do their calculations.  Where

4    they get their dates I don't know.

5     Q    Have you ever in your experience has the

6    parole board ever made mistakes?

7     A    Yes.

8     Q    And is there -- and there's no procedure in

9    place, no set procedure for how you investigate those

10   possible mistakes?

11    A    No, there's no set procedure.

12    Q    Okay.  So down at the bottom of Bates 887

13   under total sentence, Mr. Chappelle is still -- it's

14   still saying 6 years to 12 years?

15    A    Correct.

16    Q    So his sentence hasn't changed?

17    A    Correct.

18    Q    And at the top indictments included on Bates

19   887, is that referring to his two convictions?

20    A    Yes, it is.

21    Q    Okay.  And if you go to 889, how has the data

22   changed, if at all, here?  Actually, this looks

23   like -- oh, it's version three at the bottom.

24    A    Yes.

25    Q    Is there any new information or why was this

198

1  form created?

2      A    It was created due to a board action dated

3  6/25/2007 to remove the technical convicted parole

4  violator status and reflect that the inmate is now

5  serving as a PVP.  Inmate will return to the custody

6  of the US Marshals prior to serving PBPP backtime.

7      Q    So is this what you were referring to earlier

8  that by the -- I think you testified earlier that by

9  the time Mr. Chappelle was sentenced on his federal

10 sentence, the board had already recommitted him, had

11 already issued a recommitment order?

12     A    No.  I had said that not long after.  Very

13 shortly after he was sentenced is when they

14 recommitted him.  He was originally sentenced in 2002

15 and actually it was a while after.  It was 2003 when

16 they recommitted him.

17     Q    And then this board action reflecting that

18 he's now serving as a PVP, is this what you refer to

19 as making him available to serve --

20     A    Yes.

21     Q    -- backtime?

22     A    Yes.

23          MR. KEATING:  You have to let her finish the

24 question.

25          THE WITNESS:  I'm sorry.

ERVIN BLANK ASSOCIATES, INC.

199

BY MS. TOBIN:

1    Q    Okay.  So not until 2007 did they say he's
2    available to serve his backtime?
3    A    No.  It was in 2007 where they said he was
4    available to serve his federal sentence.
5    Q    Okay.  But then after that, he will come back
6    and serve backtime?
7    A    That's correct.
8    Q    So the time it took to get to that point he
9    was still in prison here?
10   A    That's correct.
11        MR. KEATING:  To get to what point?
12        MS. TOBIN:  To get to 2007 where they said
13   you can go serve your federal sentence.
14   BY MS. TOBIN:
15   Q    And, again -- okay.  And where's the board
16   action?  Would there be a document in the file --
17   A    Yes.
18   Q    -- that relates to that dated 6/25/07?  Okay.
19   And going to page 890.  Still the same two sentences,
20   indictments at the top.
21        MR. KEATING:  Is that a question?
22   BY MS. TOBIN:
23   Q    I'm asking -- actually, I will ask a
24   question.  Has the parole board at this point given

200

1  him a new max date?

2      A   No.  They rescinded it by changing him to PVP

3  status.

4      Q   They rescinded what?

5      A   They -- they had changed -- if you refer to

6  886, the new max date at that time they recalculated

7  as 2/16/2008.  When they issued the new board action

8  dated 6/25/07, they removed the technical convicted

9  parole violator status and reverted him back to a

10 parole violator pending.

11     Q   So they undid the calculation of the new max

12 date?

13     A   That's correct.

14     Q   Has that happened -- does that happen often?

15     A   Yes.

16     Q   What affect does that have on the time that

17 he was serving?

18     A   That's calculated by the parole board.  The

19 parole board determines what goes -- what time goes

20 where.

21     Q   But he was here?

22     A   Yes.

23     Q   Under commitment credit -- I should have

24 asked this on the first one.  Is that -- that's just

25 the pretrial commitment credit?

201

 1      A    Yes.

 2      Q    Okay.  When you got the notification of this

 3 rescinding of the previous max date, did that raise

 4 any red flags for you?

 5      A    I'm not sure what you mean by did it raise

 6 red flags.  I mean at that time I did what the board

 7 action was basically telling us to do and I think not

 8 long after on July 19th he was transferred to the

 9 Feds.  The Feds picked him up.  I'm not sure what

10 date.  Shortly thereafter we probably have a --

11           MR. KEATING:  I think the question was did

12 the rescinding of that in that document raise any red

13 flags, and I think your answer is no.

14           THE WITNESS:  That's correct.

15           MR. KEATING:  Okay.

16 BY MS. TOBIN:

17      Q    Does any like action of the parole board -- I

18 mean have you ever run into problems that do raise red

19 flags at the parole board, mistakes that they make?

20      A    Do you mean with reference to calculations or

21 just board actions in general?

22      Q    Calculations.  Things that impact an inmate's

23 sentence, that impact your job?

24      A    Again, we're basically recording the dates.

25 They provide us with the dates.  They provide us with

202

1   the backtime owed.  I have already said to them is

2   this right?  Can you please check this?  But for the

3   most part we do not question the dates that they

4   provide to us.

5       Q    But in Mr. Chappelle's case, you didn't --

6   did you call the parole board about this?

7       A    No.  I don't recall that I did.

8       Q    Okay.

9            MR. KEATING:  You mean at the time that this

10  was generated and received?

11           MS. TOBIN:  Right.

12  BY MS. TOBIN:

13      Q    And if you go to 892.  Bates 892.  The

14  remarks say version four created to show PVP status.

15  What's the significance of that?

16      A    This was done when he was returned to us from

17  the Feds.

18      Q    Okay.  And what changed on this?  Where is

19  the PVP status?

20      A    It would be on the second page.  It just

21  shows PVP.  He's still pending.

22      Q    And that means that the parole board hasn't

23  told you --

24      A    What his new max date is.

25      Q    Okay.  So on this page, 893, under

203

1  computation three, still shows the two indictments,

2  the state sentences, and the maximum is still showing

3  as 1/26/07.  And what is the sentence computation

4  date?

5       A    That's the date that this was initiated.

6       Q    That this form was initiated?

7       A    Yes.

8       Q    And then the creation date at the bottom is

9  4/21/09?

10      A    That's the date that it was signed off on.

11      Q    The one at the bottom?

12      A    Yes.

13      Q    Okay.  So what triggered this to be

14  initiated, this version four?

15      A    He was received back by the Feds as a parole

16  violator -- or from parole board I think.  From the

17  parole board.

18      Q    Because he had already been received back

19  once as a parole violator back in 2001?

20      A    Correct.

21      Q    So he couldn't have violated parole again

22  because he was in prison constantly from that point

23  until he got back?

24      A    But he went out to serve his sentence that he

25  incurred while he was out on parole.

204

1      Q    Correct.  Right.  So -- okay.  So you

2    generated this new one.  And how long are these

3    pending?  Is there a deadline that you know of that

4    the parole board has for giving you a new max date?

5      A    No.  Again, in Mr. Chappelle's case, he was

6    already beyond his maximum date and from what I

7    recall, I know there's a letter in the file stating

8    that his new sentence is being recalculated due to^--

9    I reviewed it before I came up here -- a new

10   conviction and a period of delinquency.  So I know we

11   have that letter in the file.

12          And as far as we're concerned as long as we

13   have that, that's all we need to hold him.  Sometimes

14   they'll provide us with a tentative max date and

15   sometimes they don't.  I don't believe in Mr.

16   Chappelle's case they did.

17     Q    I think I have that letter, too.  I wanted to

18   ask you about that.

19          (Whereupon, a document was produced and

20   marked as Kodack Exhibit No. 25 for identification.)

21   BY MS. TOBIN:

22     Q    So this will be I believe Kodack 25.  If you

23   could take a look at that.  Is this the letter you

24   were referring to?

25     A    Yes, it is.

ERVIN BLANK ASSOCIATES, INC.

1    Q    Okay.  So this was received by the

2    superintendent.  And who was the superintendent at

3    that time?  Was that Varano or was it Piazza?

4    A    I believe it was Piazza.

5    Q    Okay.  So it went to the superintendent's

6    office?

7    A    No, it does not.  It's addressed to the

8    superintendent but he doesn't actually see a copy of

9    it.

10   Q    It goes to the records office?

11   A    Yes.

12   Q    Okay.  It says on blank the above parole

13   violator was lodged in your institution.  Although his

14   original maximum sentence was 1/26/2007, his maximum

15   sentence is being extended due to a new conviction, a

16   period of delinquency 6/15/2001.  His new maximum

17   sentence is:  Will be computed by the board.  What

18   does the 6/15/2001 mean?

19   A    I do not know.

20   Q    Okay.  And then when the records -- you were

21   in the position of records supervisor at this point?

22   A    Yes.

23   Q    So what did you do when you got this letter?

24   A    This would have been put with his file

25   pending his recommit.

206

1    Q    So he wasn't back yet?

2    A    I don't believe.  I'm not sure how this

3    worked.  I know sometimes if we have inmates coming in

4    from federal institutions, they'll sometimes send us

5    all the documents ahead of time.  So I believe that we

6    got this before he came in along with his warrant and

7    everything.  They provided us with the documents ahead

8    of time.

9    Q    Okay.  So it indicates a new conviction.  Did

10   you research what that new conviction was?

11   A    They were referring to his federal

12   conviction.

13   Q    Okay.  And how did you know that?

14   A    Just based on the information that we had

15   previously.

16   Q    And then the period of delinquency 6/15/2001,

17   no idea what that --

18   A    I assume that it means effective 6/15/01.  I

19   don't know.  That would be a question for the parole

20   board.

21   Q    Okay.  So just so I'm clear, the parole board

22   can't impose a new sentence on him for the conviction?

23   A    That's correct.

24   Q    They can only put him in for a technical, a

25   TPV, a technical parole violation or a convicted

 1   parole violation until such time that it's either

 2   withdrawn or nolle prossed or dropped, and then I

 3   think you testified earlier you have to release him.

 4   If they can't find any TPV basis to keep him, you have

 5   to let him go?

 6        A    That's correct.

 7        Q    Okay.  So at this point the new conviction

 8   was the federal conviction but that's the sentence

 9   that he had just served?

10        A    Correct.

11        Q    And the only thing remaining is possibly the

12   delinquency in terms of authority for keeping him in

13   prison?

14        A    The delinquency and a new conviction

15   according to what they're telling me.

16        Q    Okay.  So that was at the point in time when

17   you got this, the new -- that was an invalid basis for

18   returning him?  Would you agree that that's an invalid

19   basis for returning him in 2009?

20        A    No.

21        Q    And why not?

22        A    Because he was unavailable to be serving his

23   parole violation while he was serving his federal

24   sentence.

25        Q    Even though he had served from 2001 to 2007

1   in state prison?

2       A    Yes.   However, he was out serving a federal

3   sentence for a period of time and he wasn't serving

4   his parole violation at that time.

5       Q    But he served six years prior to serving his

6   federal sentence so doesn't that -- I mean how is that

7   counted, the six years?

8       A    That's something you would need to talk to

9   the parole board about.  I don't know.  I don't know

10  how they figure their calculation or where what time

11  went to what sentence.  I don't know.  I can't answer

12  that.

13      Q    Okay.  We'll put that aside for now and go

14  back to the other Exhibit 24.  Okay.  Page 894

15  indicates it was last modified by Deborah Herbst and

16  signed off by you?

17      A    Yes.

18      Q    And to sign off on it you reviewed each item

19  of data that's in the version four?

20      A    That's correct.

21      Q    Okay.  When you were doing that, did you do

22  any manual calculations about related to his

23  sentences?

24      A    No.

25      Q    And what did your review consist of?

209

1    A    Just reviewing the commitment orders, making

2  sure that all the information that was entered into

3  our system was accurate.

4    Q    Okay.  And under deleted detainers on page

5  894, there's a notation date deleted, 7/19/2007.

6  Remarks:  Inmate released to this detainer.  Is that

7  something that the records office input?

8    A    Yes.

9    Q    And so the records office can lodge detainers

10  and delete them even if they're not state detainers?

11    A    Correct.

12        MR. KEATING:  I want to object to that

13  question.  I don't know what you mean by lodge a

14  detainer or delete a detainer.

15  BY MS. TOBIN:

16    Q    Do you know what -- what does lodge a

17  detainer mean?

18    A    I know what you're referring to and I know

19  what she's referring to.  I think we are able to enter

20  it into our system with the required paperwork.

21    Q    Okay.  You don't issue it?

22    A    Correct.

23    Q    You just lodge it?  You make a note of it?

24    A    Correct.

25    Q    And you're also able to delete it from your

210

1    system after you've been -- actually, what triggers

2    that?  When the person leaves?

3         A    Yes.  In Mr. Chappelle's case, he was

4    transferred to the US Marshals to serve this sentence

5    so in order for us to release -- to delete an inmate

6    from our system, we have to remove the detainer.  It

7    will not allow us to move him out of our system with a

8    detainer on him.

9              MR. KEATING:  And you can delete it on your

10   own?

11             THE WITNESS:  Yes.

12             MR. KEATING:  And no one's lifted it.  You

13   can just say the detainer's gone?

14             THE WITNESS:  Right.  Because he went out to

15   serve it and I have a body receipt that the US

16   Marshals signed to pick him up.

17   BY MS. TOBIN:

18        Q    So nothing in version four at least at the

19   point 4/21/09, nothing struck you as strange or odd

20   that he was coming back and the parole board said

21   pending for his status?

22        A    No.

23        Q    Even though he'd been here for six years

24   prior to serving his federal sentence?

25        A    No.

1    Q    Is that a usual thing, a usual occurrence?

2    A    For them to sit that long?  No, not

3  necessarily.  But for them to change from TCV or TPV

4  to PVP and then go out and serve a sentence and come

5  back, no, it's very typical.

6    Q    And seeing that it's still the same two state

7  sentences on the indictments, no new state sentences,

8  did that trigger you to think anything odd?

9    A    No.  I had all required documentation to hold

10  him.

11    Q    So version five starts on page 895.  And

12  how -- okay.  What changed with this version on his

13  data?

14    A    He was recommitted by the parole board and

15  issued a new max date.

16    Q    Okay.  And that max date was September 6th,

17  2014?

18    A    That's correct.

19    Q    And this version was also modified on page

20  897 by Deborah Herbst but signed off on by you?

21    A    That's correct.

22    Q    So you did sign off, you reviewed it?

23    A    Yes.

24    Q    So what triggered this new max?  Did Deborah

25  Herbst input that 9/6/2014 in there?

212

1      A    Yes.

2      Q    What triggered her to do that?

3      A    Another Parole Board 39 Form.

4      Q    Okay.  How would I know which form it is?

5  Would it be in the remarks section?

6      A    I don't believe she listed a date there when

7  she entered those remarks.  It's a PBPP-39 form.  I'm

8  not sure what the date is.  It's probably April of

9  2009.

10     Q    This will be Kodack 26.  Is this -- there's

11  two so I'm gonna label them both and give them both to

12  you.

13          (Whereupon, two documents were produced and

14  marked as Kodack Exhibit Nos. 26 and 27 for

15  identification.)

16  BY MS. TOBIN:

17     Q    Here's 27.  Okay.  So Kodack 26 has Bates 945

18  on the first page.  Kodack 27 has Bates 901.  Are

19  either of these the document that may have triggered

20  the input of this new max date on the DC-16E?

21     A    Yes.

22     Q    Which one or both?

23     A    Both.

24     Q    Okay.  So let's start with -- let's start

25  with 26.  This is something that -- how would you get

1    this document?

2         A    These come to us in the US mail.

3         Q    Okay.  So do you have access to the parole

4    board's computer system?

5         A    No, I do not.

6         Q    Earlier you had said that you had access to

7    something?

8         A    We have access to one document.

9         Q    Okay.  But not their whole computer system?

10        A    No.  No.  And that was the 257N that we have

11   access to.  That's the only document we have access

12   to.

13        Q    And which is that?  Is that the warrant to

14   commit and detain?

15        A    No.  That is basically their adjustment while

16   out on parole.

17        Q    Okay.  So this comes in the mail and who

18   receives it?  A records specialist?

19        A    It's typically addressed to me.

20        Q    Okay.  What do you do -- what did you do when

21   you got this?

22        A    I would give it to the specialist that is

23   assigned to that caseload which obviously in this case

24   was Deborah Herbst.

25        Q    And what would she do with it?

214

```
1        A    She would go in to our mainframe system and

2   enter -- well, first she would pull the file and then

3   go into the mainframe system and record the

4   information as provided to us on this form and

5   generate a new DC-16E.

6        Q    And is there a way to know when this was

7   received by you in the mail?

8        A    No.  It's not date stamped, so no.

9        Q    So she would record this information in the

10  system.  Would she do any checks, any kind of

11  recalculations or just checking the dates against what

12  you already had in your system?

13       A    It would be pretty much just checking the

14  dates against what we already had.

15       Q    So this is the one where his max date becomes

16  September 6th, 2014?

17       A    That's correct.

18       Q    And his original max date is still listed as

19  1/26/07.  And the parole date is still 4/09/01?

20       A    Yes.

21       Q    Custody for return.  What is that date?

22       A    That's the date he was available to begin

23  serving his backtime.

24       Q    Is that the date that he was brought back

25  here?
```

1    A    We received him 4/15/09.

2    Q    Okay.  So this is the calculation where

3    suddenly he has 1,971 days of backtime?

4    A    Correct.

5    Q    And --

6         MR. KEATING:  I'm going to object to the word

7    suddenly.  Go ahead.

8    BY MS. TOBIN:

9    Q    And his new maximum date is 9/16/2014.  Did

10   that raise any red flags for you or for anyone in

11   records that his max date was seven years -- almost

12   seven years beyond his original max date?

13        MR. KEATING:  I'm going to object to you

14   asking her if that raised any red flags to anyone else

15   in records.  She can testify as to what it did to her.

16   BY MS. TOBIN:

17   Q    Did it raise any red flags for you?

18   A    I don't recall in this specific case.

19   Q    If you had looked at this when it -- does it

20   now?

21   A    Obviously now it does after they -- I mean

22   after they changed the max date two months later or

23   three months later, yes, it does at that time.  But I

24   don't recall at the time.

25        MR. KEATING:  Question is does it raise red

216

1    flags to you today?

2            THE WITNESS:  Yes.

3    BY MS. TOBIN:

4        Q    Yeah.  And if you ever don't understand one

5    of my questions, feel free to ask me.  I'll rephrase

6    it.  And then this backtime dates from 9/26/2001 to

7    2/20/2002, time period 147 days.  What does that refer

8    to?

9        A    That's the backtime credit.

10       Q    And that's credit for time from his arrest to

11   the time that he was recommitted here at Coal

12   Township?

13       A    I don't know.  Again, I don't know where the

14   parole board got their dates.  I can only guess.

15       Q    Okay.  And then if you take a look at the

16   front page of Kodack 27 which is Bates 901.  At the

17   bottom this document says last modified 4/17/2009.

18   And the previous one, Kodack 26, says last modified

19   4/16/2009.  What is the difference?  Why are there two

20   of these?

21       A    That's not something I can answer.  I don't

22   know.  There's no -- there is no difference.

23       Q    And if you look back at Kodack 26 at the

24   bottom right-hand corner, it says page one of two.

25   And I actually stapled these before coming here today.

217

1   So the next page wasn't stapled in the file.  To your

2   understanding what is the second page of this PBPP-39

3   form.  What is it normally?

4        A    Normally I'm going to refer to 947.

5        Q    That's normally the back page of it?

6        A    Yes.  It just has notes.

7        Q    And then under note conviction, what does

8   that mean?

9        A    If they have a conviction -- if an inmate has

10  a conviction that the parole board is not taking any

11  action on, they will list it there.

12       Q    Okay.  If there were any convictions, they'd

13  be listed below that?

14       A    If there were any convictions that the parole

15  board was not taking action on, yes, they would be

16  listed there.

17       Q    Okay.  So this is just a label, this note

18  conviction?

19       A    That's correct.

20       Q    Okay.  And do you know whether the second

21  page of the 4/16/2009 one where that would be?  Should

22  that be in the file as well?

23       A    It should be.  I'm not sure why it's not

24  there.

25       Q    But it would resemble this second page?

218

1      A     That's correct.

2            MR. KEATING:  Resemble number 947?

3            MS. TOBIN:  Yes.  Sorry about that.

4            MR. KEATING:  That's okay.

5   BY MS. TOBIN:

6      Q     Okay.  And then let's look at 946.  Bates

7   946.  It's still part of Kodack 26.  What information

8   do you pull from this?  What would you --

9      A     Again, they generated this on -- they

10  modified this on 7/29 of '09 at 2:43 p.m. and modified

11  it to reflect his new maximum date of 7/14 of 2009.

12     Q     And when the parole board sends you these

13  forms, do they send you other documents with them,

14  like supporting documents?

15     A     Sometimes.  Sometimes no.

16     Q     What do the supporting documents consist of?

17     A     Typically what we get it's called a PBPP-15

18  which is what we call board action.  If they're just

19  modifying his calculation like in this case, we

20  typically would not get a new PBPP-15.  If they're

21  just -- if they're initially recommitting him like

22  back on 4/16, then we would have gotten a parole board

23  action with that.

24     Q     So for the one where his sentence -- his

25  recomputed max date went to 9/06/2014, you would have

ERVIN BLANK ASSOCIATES, INC.

1   got a board action for that?

2       A    That's correct.

3       Q    And that's a PBPP-15?

4       A    Yes.

5       Q    And that would be in the file, also?

6       A    Yes.

7       Q    Okay.  Would you be able to find it in your

8   file?

9       A    Yes.  Which one are you looking for?  From

10  April?

11      Q    The one on Bates 945 for April 16th, 2009.

12      A    Okay.

13      Q    So it's a green sheet?

14      A    Yes.

15      Q    Do the inmates refer to them as green sheets?

16      A    Yes, they do.

17      Q    Okay.  So you did get a copy of that board

18  action.  And what information is on there about why

19  his max date --

20           MR. KEATING:  You want to make a copy of it

21  and just put it as part of the record?

22           MS. TOBIN:  That would be great.  Actually,

23  if we could get a copy of that document and then if

24  there's -- if there is a similar board action document

25  that goes with the 7/29/09.

220

1          THE WITNESS:  Yes, there is.  There is one in
2     here.
3          MR. KEATING:  You should have it.
4          MS. TOBIN:  I should have that.  I should be
5     able to lay hands on that.
6          MR. KEATING:  Why don't you just make copies
7     now.
8          THE WITNESS:  How about all of his green
9     sheets?
10          MS. TOBIN:  All of the board actions would be
11     great because then I can see the backup for what --
12     because they're sending you dates.
13          THE WITNESS:  Do you want his paroling
14     actions as well or just the ones after he came back?
15          MS. TOBIN:  The paroling actions.
16          MR. KEATING:  I assume you have most of these
17     documents.  Do you have those?
18          MS. TOBIN:  I don't think I have the parole
19     documents.
20          MR. KEATING:  Because they're from 14 and 15.
21     They're in his DOC file, right?
22          THE WITNESS:  Yes.  I think they should have
23     been copied.
24          MR. KEATING:  Yeah.  Okay.
25          MS. TOBIN:  I don't remember seeing them.

1    I've seen those in the past generally in other cases.

2    I would like to get his parole actions to see and then

3    also the moves report which I thought I had a copy of.

4    BY MS. TOBIN:

5        Q    So you get a copy -- the parole board

6    notifies you of its decisions?

7        A    Yes.

8        Q    In addition to just sending you the new

9    calculations?

10       A    Yes.  That's correct.

11           MR. KEATING:  You're saying you didn't get

12   any of these documents at all?

13           MS. TOBIN:  I don't have my huge file with

14   me.  I think I would have pulled them.  I'm not sure.

15   I think I would have pulled them.  We can go off the

16   record.

17           (Whereupon, the deposition was adjourned at

18   2:59 p.m.)

19

20

21

22

23

24

25

222

1  COUNTY OF UNION            :

2  COMMONWEALTH OF PENNSYLVANIA:

3         I, Faith A. Culp, the undersigned Notary

4  Public, do hereby certify that personally appeared

5  before me, MICHELLE KODACK; the witness, being by me

6  first duly sworn to testify the truth, the whole truth

7  and nothing but the truth, in answer to the oral

8  questions propounded to her by the attorneys for the

9  respective parties, testified as set forth in the

10 foregoing deposition.

11        I further certify that before the taking of

12 said deposition, the above witness was duly sworn,

13 that the questions and answers were taken down

14 stenographically by the said Faith A. Culp, Court

15 Reporter, Winfield, Pennsylvania, approved and agreed

16 to, and afterwards reduced to typewriting under the

17 direction of the said Reporter.

18        In testimony whereof, I have hereunto

19 subscribed my hand this 29th day of June, 2012.

20                    _Faith A. Culp_____

21                    Faith A. Culp
                       Reporter-Notary Public
22                    My Commission Expires
                       August 23,2014
23

24

25

ERVIN BLANK ASSOCIATES, INC.

Commonwealth of Pennsylvania                                                                STD-3?

## POSITION DESCRIPTION

| Last Name | First Name | MI | Employee Number |
|---|---|---|---|
| Kodack | Michelle | | 00495348 |

| Job Title | Job Code | Working Title | Position Number |
|---|---|---|---|
| Rcrds Supv | 47635 | Rcrds Supv | 00186482 |

| Department | Organization | Organization Code |
|---|---|---|
| Corrections | CR SCI Coal Twp | 1800 |

| Supervisor's Last Name | Supervisor's First Name | Supervisor's Job Title | Supervisor's Pos Number |
|---|---|---|---|
| Chismar | Linda | Corr Clsftn Prgm Mgr | 00182121 |

**Days Worked**
(Check all that apply)

| Start Time | End Time | Hours/Week | S | M | T | W | T | F | S | Explain any schedule variations: |
|---|---|---|---|---|---|---|---|---|---|---|
| 0800 | 1630 | 37.5 | ☐ | ☑ | ☑ | ☑ | ☑ | ☑ | ☐ | |

**Position Purpose:** Describe the primary purpose of this position and how it contributes to the organization's objectives. Example: *Provides clerical and office support within the Division to ensure its operations are conducted efficiently and effectively.*

Responsible for the supervision of the Records Office operation.

**Description of Duties:** Describe in detail the duties and responsibilities assigned to this position. Descriptions should include the major end result of the task. Example: *Types correspondence, reports, and other various documents from handwritten drafts for review and signature of the supervisor.*

Process inmate population movement in and out of the State Correctional Institution at Coal Township.

Prepare DC 15 Inmate Record Jackets for all commitments and maintain security of the DC 15.

Complete a record check on all inmates prior to Pre-Release, Release or Transfer.

Certify sentences for inmates being released using the Audit Tool.

Work closely with D.O.C. Central Office Records Chief and Chief Counsel's Office to receive guidance on questions related to commitment orders, sentence structures, release orders and other matters.

Communicate with other criminal justice agencies and the courts as necessary to inquire into the status of inmate's sentence related matters.

Prepare and record daily population reports.

Review the computation data involving inmate's sentence status to insure accuracy in sentence structure.

Process requests for criminal history information in accordance with Criminal History Information Act.

Process inactive records in accordance with applicable provisions of the state records retention schedule.

Coordinate release processing with the PBPP. Upon receiving a urine request by the Parole Office, the assigned Records Specialist is to initiate Section 5 of the Release Checklist(which includes sentence structure review.) Signature of both the Records Specialist and Records Supervisor is required. This is to be completed within six working days.

Respond to inmate request slips and interview inmates to explain responses when necessary.

Attend and testify at judicial hearings as required.

Maintain time files and alpha indexes.



**EXHIBIT**
Kodack-1

DEF001169

Ensure preparation of inmate I.D.'s.

Prepare wanted flyers as necessary.

Prepare county parole applications as required.

Prepare monthly reports.

Maintain A.C.A. accreditation standard files for records area.

Supervise and train Records Specialists.

Coordinate DNA Collection Policy with Medical and Unit Management teams.

Coordinate Sexually Violent Offender Registration Policy with appropriate staff.

Prepare Escape Packets.

Coordinate court ordered Funeral and Death Bed Visits.

Record Victim Input and Notification.

Research unreported dispositions.

Coordinate Act 84 with Business Office.

Identify Act 143 inmates for the Education Department.

Perform other related duties as required.

---

*Decision Making: Describe the types of decisions made by the incumbent of this position and the types of decisions referred to others. Identify the problems or issues that can be resolved at the level of this position, versus those that must be referred to the supervisor. Example: In response to a customer inquiry, I research the status of an activity and prepare a formal response for my supervisor's signature.*

Responsible for making all decisions regarding the supervision of the Records Office.

*Requirements Profile: Identify any requirements, such as a licensure, registration, or certification, which may be necessary to perform the functions of the positions. Position-specific requirements should be consistent with a Necessary Special Requirement or other criteria identified in the classification specification covering this position. Example: Professional Engineer License*

1. N/A

2. N/A

3. N/A

---

**Essential Functions:** Provide a list of essential functions for this position. Example: *Transports boxes weighing up to 60 pounds.*

1. Verify legality/accuracy of court orders
2. Access inmate records system.
3. Access CLEAN terminal.
4. Fingerprints/photographs inmates.
5. Interviews inmates.
6. Computes/recomputes sentence structure
7. Employee is able to attend, participate and successfully complete all mandatory training.
8. Changes data on DC 16E.
9. Access PC Terminal in Control.
10. Supervise/instruct Records Specialists.

DEF001170

# CERTIFICATION

By entering my name below, I certify to the best of my knowledge all statements contained in this position description are correct.

| Employee's Acknowledgement | Job Title: | Date |
|---|---|---|
| Michelle Kodack | Rcrds Supv | 7/15/2008 2:43:32 PM |
| Supervisor's Acknowledgement | Job Title: | Date |
| Linda Chismar | Corr Clsftn Prgm Mgr | 7/15/2008 11:06:06 AM |
| Reviewing Officer's Acknowledgement | Job Title: | Date |
| Joseph T. Mushinski COV for DSCS | Dep Corr Supt 2 | 7/17/2008 9:33:40 AM |

DEF001171

## Section 1 - Processing of Receptions

An inmate shall be received at the Diagnostic and Classification Center (DCC) or designated reception unit; however, a parole violator shall be received at the closest facility and transferred to the appropriate state correctional facility.

### A. Initial Receptions

1. When an inmate is delivered to the Department, the Records Office shall:

   a. ensure that the committing agents are representatives of the committing authority;

   b. collect appropriate documents relating to the reception, including, for an initial reception, the certified sentencing order *or* the **DC-300B, Court Commitment State or County Correctional Institution (Attachment 1-A)** or the county's commitment form;

   c. review the sentencing order and/or commitment form to ensure its authenticity;[1]

   d. review the confinement order to ensure that it meets the Department's jurisdictional threshold and designates the Department as the place of confinement;

      (1) Sentences of confinement for a period of less than two years must be served in a county prison *with the exception of 5-B transfers and for females only a proclamation county commitment*.

      (2) Sentences of confinement for a period of between two years and five years may be served in the Department if the sentencing order designates the Department as the place of confinement.

      (3) Sentences of confinement for a period in excess of five years must be served in the Department.

2. When an inmate whose sentence does not meet the jurisdictional threshold is received at a facility, the facility shall advise the Records ***Administrator/Assistant Records Administrator*** by telephone before declining the commitment. No improper commitment shall be accepted, except upon approval from the Records ***Administrator/Assistant Records Administrator***. As soon as possible after accepting or refusing an improper commitment, the Records Office shall forward to the Central Office Records Coordinator a memorandum concerning the matter, including a copy of the commitment order.

3. The Records Office shall check for prior commitments to determine if the inmate was previously confined in the Department. If so, staff shall determine his/her previous Department number. Check the **Inmate Records System** to determine if the inmate's

14-4285

1-1

EXHIBIT

Kolaclu-2

CONFID-DEF-000001

original maximum sentence date has expired. Listed below is necessary to determine whether the inmate's record needs to be cross-referenced:

*a. SID numbers for both the old and new Department numbers must match for cross-referencing;*

*b. the personal/ID data and names associated with the previous inmate number will be displayed when the new inmate number is entered;*

*c. the inmate's new Department number should be entered as previous number and the inmate's previous department number entered as the new inmate number; and*

*d. extreme caution must be used when cross-referencing files; data cannot be un cross-referenced.*

4. Once the inmate is interviewed and the documents are reviewed and approved by the Records Office, a Department number shall be assigned to the inmate[2] and a **DC-151A, Body Receipt (Attachment 1-B)** issued to the delivering authority.

5. The Records Office shall:

   a. conduct a reception interview to:

      (1) obtain basic data (birthplace, date of birth, marital status, etc.) and initiate a **DC-2A, Reception Checklist (Attachment 1-C);**[3]

      (2) *complete a DC150B Reception Worksheet (Attachment 1-D);*

      (3) obtain a **DC-155, Legal Dispositions Form (*Attachment 1-E*)** authorizing disposition of property and opening of mail.[4] The form must be fully explained to the inmate. No mail shall be allowed where the inmate refuses to sign this form. The mailroom must be notified in writing of any inmate who refuses to sign. Unless a **DC-155** is signed authorizing the Department to cash checks/ money orders on an inmate's behalf, the facility shall be unable to post money received from outside sources to an inmate's account. *In accordance with the DC-155, inmates will also be advised of their rights of communication and the grievance process.* The **DC-155** shall be signed using the inmate's name of commitment;

      (4) *identify Guardian of property, including the relationship to the inmate, complete address and phone number on the DC-155 for Part 2, Designation of Guardian of Property;*

---

[2] 4-4285
[3] 4-4285

[4] 4-4285

CONFID-DEF-000002

(5) **determine if the inmate was a previously required to register under Megan's Law for a 10 year period;**

    a. **if a previously registered individual who was required to register for ten-years is returned to the custody of the Department, the running of the ten-year period will be tolled by the Pennsylvania State Police (PSP). The Department is required to notify the PSP of an individuals return to custody IAW Department policy 11.6.1 Sexually Violent Offender and Registration; and**

    b. **notification must be made via NCIC/CLEAN using the fixed screen TEXT PSP/INMINF**

(6)  ask the inmate if he/she has any enemies at the facility or if there are persons at the facility whom the inmate believes are a danger to him/her. This information shall be forwarded to the counselor and Security Captain.

b. Obtain a set of fingerprints from the inmate.[5] Fingerprinting shall meet the requirements of the Records and Identification Division of the PSP. At a minimum, one set of fingerprints shall be placed in the **DC-15, Inmate Records Jacket**.

c. Place a **Dissemination of Information Form** in the DC-15 and obtain a criminal history report in accordance with Department policy **1.1.4, "NCIC/CLEAN."** A **WANTED INQUIRY** must be done for each inmate upon reception to ensure he/she is not wanted in another jurisdiction.

(1) Examples and instructions are contained within the CLEAN Operations Manual located with each CLEAN terminal.

(2) It shall be noted that Only personnel who have been trained and certified by the PSP are provided with the access codes needed to enter the system. Unauthorized use is a violation of Federal law.

(3) Questions regarding this procedure shall be referred to the facility's CLEAN Coordinator or to the Department's CLEAN Terminal Agency Coordinator in the Office of Professional Responsibility (OPR).

6. At the conclusion of the reception interview the Records Office shall make all required data entries in the Department's **Inmate Records System/DOCNET**.

7. **If any court order indicates the inmate has received a Recidivism Risk Reduction Incentive (RRRI) minimum sentence, the RRRI flag must be marked in the DCC sentence data screen.**

8. Within five working days of an inmate's reception, the Records Office shall:

---

[5] 4-4285

CONFID-DEF-000003

    a. organize the **DC-15** according to procedures outlined in **Section 3, Filing Procedures** of this procedures manual;

    b. notify the inmate's assigned counselor, that he/she is a registered sex offender, in accordance with Department policy 11.6.1, "Sexually Violent Offender Registration (Megan's Law); and

    c. review commitment papers to determine Boot Camp eligibility;

9. *All initial reception inmates' commitment orders will be sent to the Central Sentence Computation Unit (CSCU).*

    a. *CSCU will* use the commitment paper(s) to establish the sentence structure according to the **Sentence Computation Manual (Appendix A)**. Prepare a **16E, Sentence Status Summary (Attachment 1-*F*)** listing appropriate sentence structure and reflecting commitment name associated with the controlling sentence structure.

    **NOTE:** If a subsequent commitment order(s) is received which would become the controlling sentence and the commitment name is different, then a name change shall be completed to reflect the name associated with the new controlling sentence;

    b. *CSCU will provide e-mail notification to the records office, assigned counselor. When a 16E for an RRRI case has been completed the Office of the Victim Advocate (OVA) shall be notified.*

    c. *The original sentencing documents will be returned to the institutions and a copy will remain in the inmate's Central Folder.*

10. *Upon notification that the DC16E has been completed and receipt of the original orders, the institutions will prepare and distribute appropriate documents to necessary departments for the Classification process (to include DC-1, Classification Summary [Attachment 1-G], DC-16D/16E, etc.);*

11. The inmate is to be photographed as soon as possible and in accordance with Department policy **1.3.3, "Inmate Identification Cards."**[6]

12. Every inmate commitment shall be reviewed for applicability of Department policy **11.6.1, "Megan's Law" and 11.6.2, "Act *185* DNA Data and Testing"** as well as **Act 143 of 1998, 61 P.S. §331.21 (b.1).**

## B. Parole Violators (PVs)

The Pennsylvania Board of Probation and Parole (PBPP) District Office will contact the facility to notify staff that they will be returning a parole violator including, Community

6 4-4285

CONFID-DEF-000004

Parole Center Program (CPC["halfway back"]) and Out-of-State Parole Violators (OPV) cases.

1.  The Records Office shall:

    a.  collect the appropriate documents relating to the reception, including:

        (1) **PBPP 141, Warrant to Commit and Detain;**

        (2) **PBPP 257N, Notice of Charges and Hearing;**

        (3) **PBPP 257T, Technical Violation Arrest Report;**

        (4) **PBPP 257C, Criminal Arrest and Disposition Report; and/or**

        (5) **PBPP 227 Return of Parole Violator Report**

        (6) **PBPP 257H, Summary of Adjustment.** This is forwarded to the facility Record Office prior to the first level hearing (and within 14 calendar days of the PV return for cases detained for new criminal charges when the first level hearing is conducted at the Magisterial District Justice level). The original will be filed with the items a. (1) through (45) above, and a copy will be forwarded to the inmate's counselor for inclusion in the **DC-14, Counselor File.**

    b.  review the confinement documents to verify their authenticity and that the inmate is properly being returned to the Department. If it appears that the parole violator is being returned to the Department improperly, the facility shall advise the Records Coordinator Administrator or Assistant Records Coordinator Administrator Central Office Records Supervisor by telephone before declining the commitment. Improper commitments shall not be accepted, except upon approval from the Records Coordinator Administrator or Assistant Records Coordinator Administrator Central Office Records Supervisor. After accepting or refusing an improper commitment, the Records Office shall forward to the Central Office Records Coordinator a memorandum concerning the matter, including a copy of the commitment documents;

    c.  upon verifying the commitment documents, a DC-151A shall be issued to the delivering authority;

    d.  conduct the reception interview as described in Subsection A.5.a. (1) - (**6**), above.

    e.  obtain a letter from the PBPP to hold the inmate past his/her maximum date, if applicable; and

    f.  complete and update all associated screens (personal, physical, cross-referencing, etc.) in accordance with Section 6, Inmate Records System/Movements Reports of this procedures manual;

CONFID-DEF-000005

Case 4:11-cv-00304-CCC   Document 46-3   Filed 09/24/12   Page 234 of 365

**11.5.1, Records Office Operations Procedures Manual**
**Section 1 - Processing of Receptions**            *Revised November, 2008*

**NOTE:** If the parole violator is being returned on a commuted sentence, a letter indicating this information shall be prepared and submitted to the Pardons Case Specialist in the BIS at Central Office.

g. if fingerprint cards for the inmate are not readily available at the facility, obtain a set of fingerprints. Fingerprinting shall meet the requirements of the Records and Identification Division of the PSP. One set of fingerprints shall be placed in the **DC-15;**

h. place a dissemination of information form in the **DC-15** if one is not contained therein and obtain a criminal history report in accordance with Department policy **1.1.4.** A Wanted Inquiry must be done for each inmate. Refer to **Section 1, A.** above for additional information; and

i. notify the Records Administrator/Assistant Records Administrator when an inmate is a PV who has a federal detainer/sentence.

2. If a parole violator is received from the PBPP at his/her paroling facility, then his/her **DC-15** shall be reactivated. If a parole violator is received at any other facility, a temporary file shall be created. At a minimum, the temporary file shall consist of the following: **PBPP 141, PBPP 257N, PBPP 257T, PBPP 257C, PBPP 257H**, fingerprints, DC-2A, *four mug shots,* DC-151A, DC-155, and any other compiled documentation. The decision whether to retain or transfer the parole violator shall be in accordance with Department policy **11.2.1, "Reception and Classification."** Procedures for transfers are outlined in **Section 2, Releases and Discharges** of this procedures manual. If the **DC-15** has been archived, then the facility that received the parole violator shall request the archived file *from technical records in BSS. Technical Records* shall forward the archived **DC-15** as requested to either the facility retaining the parole violator or to the facility to which the parole violator is transferred.

3. If the parole violator is being returned to the Department from another state, the inmate may arrive via a transportation service. The transportation schedule may require the inmate to arrive at a Department facility after hours or on a weekend. When that occurs, the Facility Parole Supervisor/Agent shall provide the Records Office with a copy of the Board's **PBPP-141**, Warrant to Commit and Detain or **PBPP-61,** Warrant for Arrest of Paroled Prisoner, prior to the arrival of the prisoner. This procedure will enable parole violators to be lodged in a Department facility by transporting personnel and negate the need for Records Office staff and PBPP staff to be physically present upon the inmate's arrival. If a parole violator is expected to be returned during other than normal business hours, a **DC-151A** or Automated Body Receipt shall be prepared and provided to appropriate receiving staff. The required Records Office functions shall be performed on the following business day.

## C. Out-of-State Parole Violators (OPV)

*An OPV is a person who was serving a sentence in another state and has been granted parole. With prior agreement by the PBPP, the offender is permitted to move to Pennsylvania and is supervised by the PBPP. When the offender commits a*

CONFID-DEF-000006

*violation he/she is returned to the Pennsylvania DOC as opposed to the sending state or a county facility. The PA DOC will continue to house such persons until they are returned to the sending state or continued on parole. NOTE – upon release of an OPV, the same procedures outlined in Section 2 of this procedures manual apply. If an OPV has pending criminal charges in any County in Pennsylvania, the offender must remain in the county facility until the matter has been disposed of. All county prison time must be served prior to PBPP returning an OPV to the DOC.*

## D. Community Parole Center (CPC) Program

*Commonly referred to as "halfway back" is an alternative to confinement for offenders who are violating technical conditions of their supervision. Offenders will be received in the Department pending the PBPP arranging placement in the program. Reception procedures outlined in B.1- 3 will apply.*

*NOTE- the typical stay for "halfway back" inmates in an SCI is about one week. Upon reception of a known halfway back case, the records staff should begin to review the file for release using procedures outlined in Section 2 of this procedures manual.*

## E. County Prison Transfers

1. An inmate confined to a county jail may be transferred to a state correctional facility. Such transfers require Department approval. The county prison warden seeks approval for such a transfer by submitting a **DC-5B, Petition for Transfer: County Prisons (Attachment 1-H)**, along with form **DC-185, Transmittal of Data for County Prison Transfer (Attachment 1-I)**, to the Director of the BIS. He/She reviews the petition and designates a facility, if approved. The **DC-185** is sent to the receiving facility along with copies of all appropriate confinement orders and/or detainers.

2. When a county prisoner is delivered to the Department, the Records Office shall:

   a. collect the appropriate documents relating to the reception, including the unburst **DC-5B** and applicable **Act 84** documents as outlined in this procedures manual;

   b. review the **DC-5B** to verify its authenticity and that it has been approved by the Director, BIS. If it appears that the county prisoner is being transferred to the Department improperly, the facility shall advise the Records *Administrator/ Assistant Records Administrator* by telephone before declining the transfer. An improper transfer shall NOT be accepted, except upon approval from the Records *Administrator/Assistant Records Administrator*. As soon as possible after accepting or refusing an improper transfer, the Records Office shall forward to the Central Office Records *Administrator* a memorandum concerning the matter including a copy of the relevant documents;

   c. upon verifying the transfer documents, a Department inmate number shall be assigned and a **DC-151A** issued to the delivering authority.

   d. conduct the reception interview, as described in **Subsection A., 5-8,** above.

CONFID-DEF-000007

Case 4:11-cv-00304-CCC   Document 46-3   Filed 09/24/12   Page 236 of 365

**11.5.1, Records Office Operations Procedures Manual**
**Section 1 - Processing of Receptions**          **Revised November, 2008**

**F. Return from Authorized Temporary Absence (ATA)**

1. The Records Office staff shall:

   a. prepare a **DC-151A** and meet the transporting authorities in the reception area to obtain their signatures. The **DC-151A** shall be signed and dated along with the time of arrival. The signed **DC-151A** is filed in the **DC-15** per the filing procedures outlined in **Section 3** of this procedures manual;

   b. closely review any court commitments or other documents delivered by the transporting authority to determine if the inmate's sentence structure must be changed or if his custody level should be reviewed. Any documents delivered by the transporting authority must be processed in accordance with procedures outlined in the **Sentence Computation Manual (Appendix A)** or **Section 5**, **Detainers** of this procedures manual;

   c. make all required entries in the Inmate Records System within two hours. After hours receptions must be done immediately on the next working day.;

   d. ask the inmate if he/she has any enemies at the facility or if there are persons at the facility whom the inmate believes are a danger to him/her. This information shall be forwarded to the respective counselor and Security Captain;

   e. if any of the inmate's responses to the questions or the inmate's actions indicate that the inmate is suffering from an active mental health issue, the inmate shall be referred to the Psychology Department.

2. Records Office Staff are responsible for monitoring the status of ATA inmates. If the inmate is not returned to the facility within three months, the Inmate Records Office shall contact the receiving authority to determine the status of the case. If the inmate has been released by the receiving authority or otherwise, the procedures outlined in **Section 2** of this procedures manual shall be followed.

   *NOTE: if the inmate was released in error by the receiving authorities immediately notify the Records Administrator/Assistant Records Administrator.*

3. Every inmate returning from ATA shall be reviewed for *new convictions* in accordance with **Department policy 11.6.1, 11.6.2**, as well as **Act 143 of 1998**.

**G. Inter-Facility Transfer**

1. The Inmate Records Supervisor/designee is responsible to monitor the van schedule generated by the Automated Transfer Petition and Transportation systems weekly to determine whether an inmate is to be transferred to or from the facility.

2. When an inmate is transferred from one Department facility to another Department facility, upon reception, the transporting officers shall present a **DC-151A** for each inmate. (NOTE: Multiple inmates can be placed on one **DC-151A** if the destination is the

CONFID-DEF-000008

same for all). Photo(s) shall be attached *if not already on the DC151A.* The Reception Officer shall review/identify each inmate and process the DC-151A. The original shall be retained and forwarded to the Inmate Records Office. The Reception Officer shall also ensure that an Inmate Record has been received for each inmate.

3. Upon completion of the **DC-151A** processing, the Inmate Record Office of the facility receiving the inmate shall:[7]

   a. examine the **DC-151A** to identify each inmate received and acknowledge receipt of the inmate by signing the **DC-151A**;

   b. if a DC-15 is not received with the inmate, the Inmate Records Office shall contact the transferring facility, and arrange for the sending facility to send the record to the receiving facility;[8]

   c. b. distribute the inmate records to the appropriate departments as needed;

   d. upon completion of review by the Initial Reception Committee and the inmate's medical screening, verify that the inmate's photograph is in accordance with Department policy 1.3.3 and Subsection A. above;

   e. review the inmate's sentence structure for possible release processing;

   f. place a copy of the Transfer Petition and Routing Sheet in the **DC-15** in accordance with **Section 3** of this procedures manual; and

   g. determine if the inmate is subject to Department policy 11.6.1, 11.6.2, as well as Act 143 of 1998.

## H. Detentioners

1. A Detentioner is an inmate who is in the Department's custody in one of the following situations:

   a. the inmate has satisfied his/her state sentence and is being held on another jurisdiction's detainer pending transfer to the other jurisdiction;

   b. the inmate has been transferred from a county jail to a state correctional facility prior to the imposition of a sentence or the sentence was ordered to be served in the county jail;

   c. the inmate has been transferred to the Department for a psychiatric evaluation prior to the imposition of sentence as an aid in imposing sentence; or

---

[7] 2-CO-1E-04
[8] 4-4096

          CONFID-DEF-000009

    d. the inmate has been transferred from a county to the Forensic Treatment Center at SCI-Waymart as the result of a commitment under the Mental Health Procedures Act.

    ***e. The inmate has been referred to the DOC for evaluation for the SIP program.***

2. A **DC-5B** and a **DC-185** form must be completed for an inmate in categories **F. 1. b.,** above and a certified copy of the detainer or confinement order obtained. Only the Mental Health Procedures Act commitment is required for an inmate in category **F. 1. d.,** above.

3. Every procedure for **Initial Receptions (Subsection A. above)** shall be followed when a detentioner is transferred to the Department.

4. Refer to **Subsection M.4.** below for procedures to process an inmate being returned to Pennsylvania as a detentioner and not an added escape.

## I. Interstate Corrections Compact (ICC) Receptions

1. An ICC case from another state shall be received at the DCC and processed as an initial reception EXCEPT:

    a. collecting the appropriate documents. The sending state shall provide acceptance letter and confinement orders;

    b. previewing for DNA criteria; and (any PA conviction will require DNA to be done)

    c. establishing sentence structure.

2. Make all data entries in the Inmate Records System to include that a reception is reported as an ADD, OS as the population movement code. Use the standard alpha code to identify the state from which the inmate was received. Report OS as the Court on Line 5. OS shall be used to identify this inmate as an out of state ICC case. NOTE: A PA SID may not be available in these cases.

## J. ICC Inmates from Other States

1. All documentation between Pennsylvania and the sending state must go through the Central Office Records Administrator.

2. All major incidents (i.e., death, attempted suicide, commission of a crime, misconduct, move to a MHU, SMU, or SNU, etc.) are to be reported immediately to the Central Office Records Administrator. If the Central Office Records Administrator is not available, it is to be reported to the Assistant Records Administrator. It is the responsibility of the Central Office Records Administrator to notify the Secretary/designee and the sending state of these types of occurrences.

CONFID-DEF-000010

3.  The Central Office Records Administrator/designee shall complete a progress report every six months on every inmate sent to the Department from another state. The progress report shall be sent to the Records Administrator of the sending state, and a copy of the progress report shall be kept in the Central Office Records Division.

4.  All requests for pre-release must go through the Central Office Records Administrator. The facility should forward the approved Pre-Release Packet to the Central Office Records Administrator who will in turn request approval from the sending state. Once approval from the sending state is received, the packet will be forwarded to the Secretary/designee for final approval unless the inmate is considered problematic. In problematic cases, the Central Office Records Administrator will forward the packet to the Regional Deputy Secretary for review who will then forward the packet to the Secretary/designee for final approval.

5.  If important documents (i.e., release orders, etc.) are received at the facility without going through the Central Office Records Administrator, the Central Office Records Administrator must be notified immediately and the documents forwarded via fax

## K.  Bail Returns

1.  A bail return is the result of re-sentencing and may return directly to the releasing facility.

2.  A bail return is processed the same as an initial reception except for the following:

    a.  the appropriate record shall be restored in the **Inmate Records System** instead of assigning a new Department number; and

    b.  all physical and personal data (marital status, next of kin, etc.) shall be reviewed and updated, if necessary.

3.  Consider the need to update photos depending on length of time the inmate was on bail, if there has been a change to appearance, etc.

4.  Compute new sentence structure according to the Sentence Computation Manual.

## L.  Return of Inmate Following Retrial or Re-sentence

1.  A retried or re-sentenced case is not to be treated as a new commitment and **is** not entered under a new Department number. He/She is processed the same as an initial reception except for the following:

    a.  the appropriate record shall be restored in the **Inmate Records System**;

    b.  all physical and personal data (marital status, next of kin, etc.) shall be reviewed and updated, if necessary; and

CONFID-DEF-000011

c. such a case is to have his/her sentence recomputed *using DOCNET sentence computation program with the appropriate basis for computation listed.*

## M. Escape Returns

1. Once the detaining authority contacts the state correctional facility from which the inmate escaped and indicates the date that the subject is available for pick up.

   a. for every in-state and out-of-state return contact the Bureau of Standards, Practices, and Security; and

   b. instructions regarding the Return of Apprehended Escapees as outlined in Department policy 6.3.1, Section 13 shall be followed.

2. An escape return is processed the same as an initial reception except for the following:

   a. the appropriate record shall be restored in the **Inmate Records System** instead of assigning a new Department number;

   b. all physical and personal data (marital status, next of kin, etc.) shall be reviewed and updated, if necessary;

   c. the inmate photos shall be updated depending on the length of time the inmate was *at large or absent*, if there has been a change to appearance, etc.;

   d. calculate escape time according to the sentence computation section of this policy;

   e. research and resolve issues relating to any detainers or open charges; and

   f. a returned escapee is given notice that the Department is recalculating his/her sentence by using **(Attachment 1- J)** and he/she has 15 days from the date of the notice to challenge the recalculation. **Calculations are challenged by the inmate via PRC.**

3. When an inmate escapes from a CCC, charges for the escape are filed by the District Attorney in the county where the CCC is located. When the inmate commits a new crime in another jurisdiction (Federal or other state) he/she is tried and sentenced to a prison in that other jurisdiction. The Pennsylvania District Attorney files a detainer for the new escape charges and the Department files a detainer for the inmate to return to Pennsylvania to complete his/her unsatisfied sentence. The inmate or the Pennsylvania District Attorney files under the Interstate Agreement on Detainers (IAD) to resolve the open charges (new escape charge). The Bureau of Standards and Practices will arrange for the transportation for the inmate to return to Pennsylvania.

4. In the scenario listed above only, some District Attorneys will not prosecute for the new escape charge unless the Department pays the cost of transportation *of the inmate* to return to Pennsylvania and for the housing for the new charges. The Department has

CONFID-DEF-000012

Case 4:11-cv-00304-CCC   Document 46-3   Filed 09/24/12   Page 241 of 365

**11.5.1, Records Office Operations Procedures Manual**
**Section 1 - Processing of Receptions**                    **Revised November, 2008**

agreed to do this. When this occurs and the Department has received the inmate, the following procedure will be used to process the inmate:

a.  the inmate is here as a detentioner, not as an added escapee;

b.  add the inmate as a detentioner with a new number and cross reference it with the old number;

c.  the inmate will remain in escape status on the old number and the escape time is still accumulating;

d.  when the inmate has completed the criminal proceedings on the new escape charges, he/she must be returned to the sending state to complete the sentence he/she is serving;

e.  the Bureau of Standards, Practices and Security must be contacted to arrange the return of the inmate to the sending state; and

f.  the delete move will be release detentioner.

5.  The escape time for the Pennsylvania sentence that the inmate escaped from does not stop until the inmate  has been permanently released from the other state (parole or maximum) and is available to be transported back to Pennsylvania to start serving the completion of his/her original sentence.

6.  ***Escape Time Scenarios***

a.  ***Escape from DOC custody, no charges, escape time will be from date of escape to IC, In Custody date.***

b.  ***Escape from DOC custody, new escape charge only, escape time will be date of escape to return to DOC custody. The IC date to the date of return to DOC custody will be credit on the new escape charge IF ordered by the county. If not, the escape time must be corrected and recalculated as outlined in a. above.***

c.  ***Escape from DOC custody, new criminal charges; escape time is calculated as outlined in b. above.***

d.  ***Escape from DOC custody, new criminal charges out of state, the inmate is continued on escape status until completion of the other authority's sentence.***

## N. CCC Returns

1.  A CCC return results when an inmate with pre-release status (and who has been placed in a CCC) violates the conditions of the pre-release program and is returned to the Support Facility. The only exceptions to this are female resident's detained pending return to a female facility. An inmate may be returned directly from the CCC or via a

CONFID-DEF-000013

Case 4:11-cv-00304-CCC   Document 46-3   Filed 09/24/12   Page 242 of 365

**11.5.1, Records Office Operations Procedures Manual**
**Section 1 - Processing of Receptions**                    **Revised November, 2008**

county prison. The Records Office staff issues a **DC-151A** upon arrival of the inmate and collects appropriate documents to include **DC-7X, Temporary Transfer Information (Attachment 1-K)**, detainer (if applicable), misconducts (if applicable), etc.

2. Consider the need to update photos.

3. Support Facility's Records Office staff shall research and resolve issues relating to any open charges or escapes.

4. It shall be the responsibility of appropriate staff at the Support Facility to determine if the individual remains at the facility or shall be permanently transferred back to the Parent Facility.

5. If the decision is to return the inmate to the Parent Facility, a computerized transfer petition shall be generated. When appropriate, the inmate shall be processed for transfer in accordance with Section 2 of this procedures manual.

6. If the CCC Return is due to escape, calculate escape time according to the Sentence Computation Manual.

O. *Proclamation Counties*

1. *The Department can accept female inmates to serve county sentences in the Department from Proclamation counties; based on former Governor Thornburgh's proclamation of April 8, 1986 permitting female prisoners sentenced in Allegheny, Armstrong, Beaver, Butler, Cameron, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Venango, Warren, Washington, and Westmoreland to be housed at SCI Muncy.*

2. The Department shall accept the inmate and process her for service of her sentence in accordance with the procedures outlined in **Subsection A.,** above. *Upon completion of processing at the DCC, an inmate may be transferred to* another facility if deemed appropriate. The Records Office Staff is responsible to maintain a suspense time file in order to ensure that the inmate is processed for county parole in accordance with the established minimum, and/or released at completion of the maximum sentence.

P. **Inmates Who Regularly Use Names Different from the Name on the Commitment Form**

1. An inmate, who has made a permanent legal change in his/her name, so that it differs from the commitment name, may submit a request to the Facility Manager for permission to use the new name for limited purposes. This request must include the reason(s) why the inmate wishes to use the new name.

2. The Facility Manager shall review and grant permission for limited use of the name if the name was changed for legitimate reasons. Legitimate reasons shall include changes

CONFID-DEF-000014

because of change in marital status, religious reasons, and ethnic identification. Only permanent changes will be approved. Multiple changes will not be honored.

3. The Facility Manager shall notify the inmate of his/her decision on the request to use the new name. If the request is approved, the Facility Manager shall inform the inmate in writing of the permitted uses of the new name. The Facility Manager shall advise the inmate that the approved new name may not be used to mislead or commit fraud and that abuse of the guidelines established for this procedure may result in withdrawal of approval to use the new name. If this request is disapproved, the Facility Manager shall explain the reasons for disapproval.

4. The facility is not required to permit an inmate to use a new name, which has not been approved by these procedures.

5. The new name shall be added to the inmate's records as an AKA (also known as). No Department records will be changed absent a court order specifically directing that the records be changed. If such an order is issued, it shall be referred to the Office of Chief Counsel for review. This type of change will not be handled pursuant to the procedures established here. A court order authorizing and ordering a change of name does not automatically mandate changes in existing records.

6. **When an inmate changes his/her name, the Records Office shall notify the Office of Victim Advocate (OVA) and the Parole Supervisor at the facility.**

7. The inmate must continue to respond when addressed by his/her commitment name and to sign the commitment name for all purposes except those listed below:

   a. a visitor may identify the inmate he/she wishes to visit by using the approved new name;

   b. the inmate may execute a **DC-155, Section 1 Power of Attorney**, authorizing the receipt of mail and endorsement of checks in the approved new name. A notation shall be made on the second form indicating this form does not supersede the **DC-155** under the commitment name, but is only additional authorization;

   c. after the execution of the new power of attorney form the inmate may receive and send mail, packages, and publications using the approved new name. The inmate may also receive checks and money orders addressed in the approved new name;

   d. it is the inmate's responsibility to advise any person who wishes to use the approved new name for the purposes described above that he/she must, whenever using the new name, also provide other data; inmate number and commitment name, so that the facility can identify the inmate. A visitor, correspondence, and publication that does not present or contain data sufficient to identify the inmate may be disapproved; and

   e. it is the inmate's responsibility to change his/her name on his/her social security card. Form SS-5 (See Department policy **7.2.1, "Counseling Services," Section 2,**

**Attachment 2-B)** is to be used for a name change. A new card will be issued with the inmate's original social security number. A new number is not issued for a name change. The inmate will have to send the original Court Order that grants the legal name change with the application for name change. Photocopies or notarized copies of documents are not accepted.

8. An inmate must be issued and charged for the replacement ID Card when there has been an authorized name change **in accordance with Department policy 1.3.3, "Inmate Identification Cards."**

9. The inmate shall be charged ten dollars ($10) for a new fingerprint card that is required for a name change.

10. Abuse by the inmate of any of these guidelines shall be treated as disobedience of a direct order, and may be grounds for revocation of permission to use the new name, and for disciplinary action.

An inmate may appeal a decision pursuant to these procedures to the Secretary. Exceptions to this procedure shall be made only with the approval of the Secretary.

CONFID-DEF-000016

DC-300B (PART IV) For Use with Recidivism Risk Reduction
Incentive (RRRI)
Rev. 5/08

**COURT COMMITMENT**
STATE OR COUNTY CORRECTIONAL INSTITUTION
Commonwealth of Pennsylvania
vs.

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
BOX 598 CAMP HILL, PA. 17001-0598
ATTN: CENTRAL OFFICE RECORDS

NOTE: Additional supply of this form available at above address

❑ DC-300B (PART V) for additional RRRI sentences attached

COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)

| SEX | Date of Birth | SID | OTN | COURT OF INITIAL JURISDICTION | ❑ | COMMON PLEAS | ❑ |
|-----|---------------|-----|-----|-------------------------------|---|--------------|---|
| ❑ F ❑ M | | | | | | | |

COMMITTING COUNTY | COURT NUMBER | DATE -TERM

| | | |
|---|---|---|
| MANDATORY SENTENCE | ❑ Yes | ❑ No | |
| BOOT CAMP RECOMMENDED | ❑ Yes | ❑ No | |
| RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ❑ Yes | ❑ No | COUNTY REFERENCE #: |
| RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ❑ Yes | ❑ No | |

| The above defendant after | ❑ Pleading guilty | ❑ Nolo contendre | ❑ Alford | ❑ Being found guilty | ❑ GBMI |
|---|---|---|---|---|---|

was on _____, _____, sentenced by Judge _____
to an **original** term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a **RRRI** term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or _____ for the offense of _____ (Section _____ of the Crimes Code) (or other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____.

| Fine: | Cost: | Restitution: |
|---|---|---|
| Amount $ _____ | Amount $ _____ | Amount $ _____ |
| Balance $_____ | Balance $_____ | Balance $_____ |

CREDIT FOR TIME SERVED (EXPLANATION OF CREDIT COMPUTATION ON REVERSE SIDE) | EFFECTIVE DATE OF SENTENCE

THIS SENTENCE IS CONCURRENT WITH:

THIS SENTENCE IS CONSECUTIVE TO:

| PROSECUTING ATTORNEY | DISPOSITION ON NON-INCARCERATION OFFENSE(S) |
|---|---|
| DEFENSE ATTORNEY | |
| COURT REPORTER | |
| | (THIS BLOCK NOT TO BE USED FOR INCARCERATION OFFENSE) |

(SEAL)

In witness, whereof I have hereunto set my hand and seal
of said court, this _____ day of _____, _____.

_____
AUTHORIZED SIGNATURE

The sentence of this defendant was computed as follows:

| Date of Sentence | County or Magisterial Dist. | Court Number and Term | Type Sent. | Minimum | | | Maximum | | | Judge or District Justice | OTN (Include Alpha Suffix) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yrs. | Mos. | Days | Yrs. | Mos. | Days | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | Total Sent. | | | | | | | | |

**Credit for Time Served**

| Locked Up (Location) | Dates | | No. of Days |
|---|---|---|---|
| | From | To | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total | |

| All Detainers Must Be Attached To This Form | | Total Number Of Detainers Attached | |
|---|---|---|---|
| Dated | Indict - Warrant Nos. | Remarks | |
| | | | |
| | | | |
| | | | |
| | | | |

**Recommendations of the Court**

| The Following Additional Reports are Attached | | | | The Following Additional Reports will be Forthcoming | |
|---|---|---|---|---|---|
| ☐ Continuation Sheet (DC-300B, Part II, III, IV,V) | ☐ Arrest Report | ☐ FBI | | ☐ Arrest Report | ☐ Presentence or Postsentence Investigation |
| ☐ Presentence or Postsentence Investigation | ☐ Behavior Clinic | ☐ PSP | | | |

| DC-300B (PART V) *For Use with Recidivism Risk Reduction Incentive (RRRI)<br>Rev. 5/08<br><br>COURT COMMITMENT<br>CONTINUATION SHEET<br>STATE OR COUNTY CORRECTIONAL INSTITUTION<br>Commonwealth of Pennsylvania<br>vs. | Type or Print Legibly<br><br>COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS<br>BOX 598 CAMP HILL, PA. 17001-0598<br>Attn:  Central Office Records |
|---|---|

COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | | COUNTY REFERENCE #: |
|---|---|---|---|
| MANDATORY SENTENCE: | ❏ Yes ❏ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ❏ Yes ❏ No |
| BOOT CAMP RECOMMENDED | ❏ Yes ❏ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ❏ Yes ❏ No |
| The above defendant after | ❏ Pleading guilty | ❏ Nolo contendre  ❏ Alford  ❏ Being found guilty | ❏ GBMI |

was on _____, _____, sentenced by Judge _____

to an original term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a RRRI term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or _____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____.

| Fine:<br>Amount $ _____<br>Balance $ _____ | Cost:<br>Amount $ _____<br>Balance $ _____ | Restitution:<br>Amount $ _____<br>Balance $ _____ |
|---|---|---|

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|

THIS SENTENCE IS CONCURRENT WITH: _____

THIS SENTENCE IS CONSECUTIVE TO: _____

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | | |
|---|---|---|---|
| MANDATORY SENTENCE: | ❏ Yes ❏ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ❏ Yes ❏ No |
| BOOT CAMP RECOMMENDED | ❏ Yes ❏ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ❏ Yes ❏ No |
| The above defendant after | ❏ Pleading guilty | ❏ Nolo contendre  ❏ Alford  ❏ Being found guilty | ❏ GBMI |

was on _____, _____, sentenced by Judge _____

to an original term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a RRRI term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or _____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____.

| Fine:<br>Amount $ _____<br>Balance $ _____ | Cost:<br>Amount $ _____<br>Balance $ _____ | Restitution:<br>Amount $ _____<br>Balance $ _____ |
|---|---|---|

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|

THIS SENTENCE IS CONCURRENT WITH:

THIS SENTENCE IS CONSECUTIVE TO:

| (SEAL) | In witness to the above sentence(s) for offense(s) as well as those found on the reverse side of this document, I hereunto set my hand and seal of said court, this _____ day of _____, _____.<br><br>Authorized Signature |
|---|---|

CONFID-DEF-000019
*Attachment 1-A*
*Page 3 of 4*

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | COUNTY REFERENCE #: |
|---|---|---|

| MANDATORY SENTENCE: | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes | ☐ No |
|---|---|---|---|---|---|
| BOOT CAMP RECOMMENDED | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes | ☐ No |

The above defendant after ☐ Pleading guilty ☐ Nolo contendre ☐ Alford ☐ Being found guilty ☐ GBMI

was on _____, ____, sentenced by Judge _____
to an **original** term of not less than ____ years, ____ months, ____ days nor more than ____ years, ____ months, ____ days, and a **RRRI** term of not less than ____ years, ____ months, ____ days nor more than ____ years, ____ months, ____ days, or _____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____

| Restitution: Amount $_____  Balance $_____ | Restitution: Amount $_____  Balance $_____ | Restitution: Amount $_____  Balance $_____ |
|---|---|---|

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|
| THIS SENTENCE IS CONCURRENT WITH: | |
| THIS SENTENCE IS CONSECUTIVE TO: | |

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | COUNTY REFERENCE #: |
|---|---|---|

| MANDATORY SENTENCE: | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes | ☐ No |
|---|---|---|---|---|---|
| BOOT CAMP RECOMMENDED | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes | ☐ No |

The above defendant after ☐ Pleading guilty ☐ Nolo contendre ☐ Alford ☐ Being found guilty ☐ GBMI

was on _____, ____, sentenced by Judge _____
an **original** term of not less than ____ years, ____ months, ____ days nor more than ____ years, ____ months, ____ days, and a **RRRI** term of t less than ____ years, ____ months, ____ days nor more than ____ years, ____ months, ____ days, or _____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____

| Restitution: Amount $_____  Balance $_____ | Restitution: Amount $_____  Balance $_____ | Restitution: Amount $_____  Balance $_____ |
|---|---|---|

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|
| THIS SENTENCE IS CONCURRENT WITH: | |
| THIS SENTENCE IS CONSECUTIVE TO: | |

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | COUNTY REFERENCE #: |
|---|---|---|

| MANDATORY SENTENCE: | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes | ☐ No |
|---|---|---|---|---|---|
| BOOT CAMP RECOMMENDED | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes | ☐ No |

The above defendant after ☐ Pleading guilty ☐ Nolo contendre ☐ Alford ☐ Being found guilty ☐ GBMI

was on _____, ____, sentenced by Judge _____
to an **original** term of not less than ____ years, ____ months, ____ days nor more than ____ years, ____ months, ____ days, and a **RRRI** term of not less than ____ years, ____ months, ____ days nor more than ____ years, ____ months, ____ days, or _____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____

| Fine: Amount $_____  Balance $_____ | Cost: Amount $_____  Balance $_____ | Restitution: Amount $_____  Balance $_____ |
|---|---|---|

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|
| THIS SENTENCE IS CONCURRENT WITH: | THIS SENTENCE IS CONSECUTIVE TO: |

# Department of Corrections

## BODY RECEIPT

| Receipt Date | Receipt Time | Agency |
|---|---|---|
| [illegible] | [illegible] | Dept of Correction |

| Received From | Title | Institution | Authority |
|---|---|---|---|
| [illegible] | [illegible] | Other ▼ | [illegible] |

*(Select 'Other' from Institution to print any other Authority in adjacent box)*

### Enter up to 30 inmate numbers

Comments: *(Max 300 characters)* [30[?]] characters left

☐ To Detainer  ☐ Confinement Papers  ☐ RA  ☐ Court Writ-ATA

☐ 7X given To Sherriff  ☐ Other (Specify) [_____]

| Received By | Title | Agency |
|---|---|---|

Generate

DC-

## BODY RECEIPT

COMMONWEALTH OF PENNSYLVANIA

| DATE | TIME | A.M. P.M. | INSTITUTION | | |
|---|---|---|---|---|---|
| RECEIVED FROM | | | TITLE | | AGENCY |

PRISONER(S)

| | | To Detain | Court Writ- ATA | DC-16D Photocopy Given to | OTHER (SPECIFY) |
|---|---|---|---|---|---|
| ☐ Confinement | ☐ | ☐ | ☐ | ☐ RA | |

| RECEIVED BY -SIGNATURE | TITLE | AGENCY |
|---|---|---|

| DC-2A | DIAGNOSTIC-CLASSIFICATION REPORT RECEPTION CHECKLIST | | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | |
|---|---|---|---|---|---|
| DC Number | NAME | LOCATION | RECEIVED FROM | DATE | TIME |
| | | | | | |

| OBSERVATION AND COMMITMENT INFORMATION | Yes | No |
|---|---|---|
| 1. Obvious pain, bleeding? | ___ | ___ |
| 2. Wearing medical tags? | ___ | ___ |
| 3. Skin in poor condition (wounds, rash, vermin, swelling)? | ___ | ___ |
| 4. Wearing prostheses (artificial limb)? | ___ | ___ |
| 5. Carrying medication? | ___ | ___ |
| 6. Signs of illness (eyes glassy, bloodshot, pupils dilated or constricted)? | ___ | ___ |
| 7. Signs of possible mental disturbance (confused, anxious, disoriented, fearful, exagerated body movements-slow or rapid, rigidity, unusually tense or suspicious)? | ___ | ___ |
| 8. Signs of possible intoxication-alcohol or drugs (rapid, shallow breathing, staggering, dizziness, tremors, thick, slurred speech)? | ___ | ___ |
| 9. Signs of possible suicide (depression, fear, scars suggesting suicide attempts, history of suicide attempts/threats, expressed intent)? | ___ | ___ |
| 10. Signs of assaultiveness (verbally abusive, uncooperative, threatening, history of violence)? | ___ | ___ |
| 11. Escape history, including attempts or threats? | ___ | ___ |
| 12. Separations necessary? | ___ | ___ |
| 13. Any other problems? | ___ | ___ |

Prev. DC#s

| Observation concerning the inmate during reception processing? | KEEP INMATE SEPARATED FROM |
|---|---|
| | |

MEDICAL OFFICER: Perform medical screening. If not medically cleared, take appropriate action. If cleared for other housing, indicate restrictions by checking appropriate spaces below and list any special observations to be made by officers.

Preliminary Medical Screening Remarks

Indicate recommended housing for initial placement following medical clearance:

| | Receiving Officer | Medical Officer | |
|---|---|---|---|
| General DDC | ___ | ___ | |
| Administrative Custody | ___ | ___ | |
| Ground Floor (medical recommendation) | N/A | ___ | Signature - Receiving Officer |
| Close Observation (Behavior/Medical) | ___ | ___ | |
| Protective Custody | ___ | N/A | |
| Self-Confine | ___ | N/A | Signature - Medical Officer |

If yes is answered to the following questions, make immediate referral as indicated.

| Question Numbers | Who |
|---|---|
| 1 through 8 | Medical Department |
| 7 through 11 | Psychiatrist/Psychologist |
| 12 | Counselor/Ranking Officer |
| 13 | Personnel Appropriate for Stated Problem |

Special Observation Instructions:

Immediate referral to

WHITE DC-15      CANARY Referral #1      PINK Referral #2      GOLDENROD Housing Unit

**11.5.1, Records Office Operations Procedures Manual**
**Section 1 - Processing of Receptions**

**Attachment 1-C**

CONFID-DEF-000023

DC-150B (revised 8/98)

# COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS

## RECEPTION WORKSHEET

| DC NUMBER | PBPP NUMBER | Commitment Name | | Institution SMI | Date |
|---|---|---|---|---|---|

| Aliases | | | Race | Sex |
|---|---|---|---|---|

| Age | DOB | POB | | Religion | Martial Status |
|---|---|---|---|---|---|

| Height | Weight | Build | Color Eyes | Color Hair | Complexion |
|---|---|---|---|---|---|

| Legal Address | Arrest Address |
|---|---|

| Military Service | Serial No. | Dates of Service | Type of Discharge |
|---|---|---|---|

| Social Security No. | USINS No. | Selective Service No. | FBI No. |
|---|---|---|---|

Marks and Scars (ID Body Inspection)

| Method of Reception | Committing County | Plea | Prosecuting Police Dept. | Quarters Assignment |
|---|---|---|---|---|

| Reception Steps | Date | Official's Signature |
|---|---|---|
| 1.   Deliverance of prisoners, examination of commitment papers,  DC-151A  issued | | |
| 2.   Removal of valuables (DC-152 issued) | | |
| 3.   Removal of personal clothing | | |
| 4.   Photographing and fingerprinting | | |
| 5.   Reception interview (DC-155 issued) | | |
| 6.   Preliminary Medical Examination | | |
| A. Information to be received for a Reception from a County Facility | | |
| (1) Court Commitment Order | | |
| (2) Record of Institutional Adjustment (include misconduct and escape history) | | |
| (3) Written notice of current medical or psychological conditions regarding treatment (include suicide attempts) | | |
| (4) Written notice of current or previously ordered/administered medications | | |
| (5) A forty-eight (48) hour supply of medication(s). | | |
| B. Information to be received within twenty (20) days of reception | | |
| (1) PSI or official version of the crime or guilty pleas transcript or colloquy or preliminary hearing transcript or docket transcript form | | |
| (2) Criminal complaint or affidavit of probable cause accompanying The arrest warrant | | |
| (3) Police report summarizing the facts of crime, when available | | |
| (4) Guideline Sentence Form issued by the PA Sentencing Commission | | |
| (5) Record of any monies paid by the inmate and any balance remaining towards satisfaction of restitution or any other court ordered financial obligations. | | |
| C. Reception from PBPP | | |
| (1) Warrant to Commit and Detain (PBPP-141) | | |
| (2) Notice of charges of Hearing (PBPP) | | |
| (3) 257AR Report | | |

NOTIFY INCASE OF ILLNESS OR DEATH:
NAME:                                        RELATIONSHIP:
ADDRESS:                                   PHONE #

| DC-155<br>Rev. 1/05 | **LEGAL DISPOSITIONS** | **COMMONWEALTH OF PENNSYLVANIA**<br>**Department of Corrections** |
|---|---|---|
| | _____<br>(Facility) | |

## 1. POWER OF ATTORNEY

I, (print inmate's name and number) _____, do make, constitute, and appoint the Facility Manager/Director, or his/her authorized representative, of any facility or center within the Department of Corrections to which I am then confined my true and lawful attorney for me and in my name to sign my name as endorsement of all checks, money orders, or bank drafts for deposit to my credit in the Inmate General Welfare Fund Cash Account and to receive and document receipt of mail on my behalf. This power shall continue so long as I am an inmate of any facility or center within the Department of Corrections and shall not be affected by my subsequent disability or incapacity while confined therein unless sooner revoked. This power shall be for the doing of all lawful acts necessary to carry out the purposes set forth above. I hereby ratify, confirm, and intend to be bound by any and all acts, as described in the previous sentence, which these attorneys or substitutes shall commit pursuant to this power of attorney.

Witnessed by: _____

Witnessed by: _____

Inmate's
Signature: _____

## 2. DESIGNATION OF GUARDIAN OF PROPERTY

I, (print inmate's name and number) _____, hereby designate

(print guardian's name) _____ who lives at (print street address)

_____, (print city or town) _____,

(print county) _____ (print state) _____, (postal zip code) _____, telephone

(____)_____ as the guardian of all property to which I hold lawful title at the time of my death which is either in my personal possession or in one of the facilities or an account of the Department of Corrections to hold until such property shall be disposed of according to law. This designation shall be null, void and of no further effect upon my release from the jurisdiction of the Department of Corrections.

| | |
|---|---|
| _____<br>Inmate's Signature | _____<br>Date |
| _____<br>Witness | _____<br>Date |
| _____<br>Witness | _____<br>Date |

## 3. ADVISEMENT OF RIGHT OF COMMUNICATION

If any problem arises within the facility concerning your confinement, you may bring the matter to the attention of the appropriate staff members for assistance. The Inmate Grievance System may be used if applicable. In addition, you may address privileged communication at any time to the Facility Manager, the Regional Deputy Secretary of Corrections, the Secretary of Corrections, the Attorney General, the Governor, or any elected local official or any appointed or elected state or federal official. This is not to be construed as limiting your access to the courts in any way. I have read or have been read the following advisement and hereby acknowledge receipt thereof.

_____ _____ _____
Inmate's Signature                    Witness                                    Date

*11.5.1, Records Office Operations Procedures Manual*                    **Attachment 1-E**
*Section 1 - Processing of Receptions*                    CONFID-DEF-000025



## COMMONWEALTH OF PENNSYLVANIA
## DC16E – SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

Name:                        Inmate #:

### 1.   REFERENCES AND IDENTIFICATION

| DOC # | Commitment Name | | PBPP # | SID # | FBI # | Phila Photo # |
|-------|-----------------|--|--------|-------|-------|---------------|
| DOB | Place of Birth | | | | Race | Sex |

### 2.   SENTENCE SUMMARY (RRRI)

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum | | | Maximum | | |
|-----------|----------------------|-------------|-----------|---|---|---|---|---|---|
| | | | | Y | M | D | Y | M | D |
| | | | | | | | | | |
| Plea: | | OTN: | Judge: | | | | | | |
| Offense: | | | | | | | | RRRI | |

| Reception Date | | Reentered from DOC # | |
|----------------|--|----------------------|--|
| Controlling Minimum Date | | New Maximum – PV | |
| Controlling Maximum Date | | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

**Summary or Remarks on Sentence**

| Remarks | |
|---------|--|

### 3.   SENTENCE STRUCTURE

| Commitment Credit |
|-------------------|
| |

| Remarks | |
|---------|--|
| | |

**Bail/Escape/Interruption Time Date**

| None |
|------|

Name:                                     Inmate #:

### 3. SENTENCE STRUCTURE (Cont'd)

| Item | Computation 2 | | | |
|---|---|---|---|---|
| Indictments Included | | | | |
| Eff Date | | | | |
| Expiration of Minimum | | | | |
| Expiration of Maximum | | | | |
| Custody for Return – PV | | | | |
| Delinquent Time | | | | |
| Backtime Credit | | | | |
| Backtime Owned | | | | |
| New Maximum – PV | | | | |
| Sentence Computation Date | | | | |
| Basis for Computation | | | | |
| Total Sentence | | | | |
| Status | | | | |

| Name: | Inmate #: |
|-------|-----------|

## 4.   NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|-----------|----------------------|-------------|
| None | | |

Comments

## 5.   DETAINERS

**Active Detainers**

| Detainer # | Date | Agency | Agency Identification | OTN | Type |
|------------|------|--------|-----------------------|-----|------|
| | | | | | |

Charges

**Deleted Detainers (For those deleted since last DC16)**

| Detainer # | Date Deleted | Agency | Agency Identification | OTN | Type |
|------------|--------------|--------|-----------------------|-----|------|
| None | | | | | |

Remarks

## 6. PRIOR DOC NUMBERS

| None | | | | | | | | |
|------|--|--|--|--|--|--|--|--|

## 6.   ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---------------|-------------|--------|----------|
| | | | |

| PA Dept. of Corrections | **DC1 Face Sheet** | Date: **11/12/2008** |
|---|---|---|
| Time: | ***Confidential*** | **Page: 1** |

Initial ( )          Parole Violator ( )          Continuation ( )                    Update ( )

| DOC # | SID # | PBPP # | **Name** | **Institution** |
|---|---|---|---|---|

| **Race** | **Sex** | **Date of Birth** |
|---|---|---|
| **Height** | **Weight** | **Eyes** |
| **Complexion** | **Build** | **Marital Status** |
| **SSN #** | | **Religion** |

**Problematic Offenses**

| **Custody Level** | **Program Codes** |
|---|---|

| **Problem Area:** | **V = Verified** | **NV = Not Verified** |
|---|---|---|
| Assault: __ | Alcohol: | Escape: __ | Drugs: |
| Suicide: | Sexual:__ | Psychiatric: __ |

**Recomputed PV Max Date:**

| | **Factored Sentences** | **Expiration Date** |
|---|---|---|
| **Minimum:** | | |
| **Maximum:** | | |

| **Priors:** | **Detainers: Yes/No** | **More Sentences: Yes/No** |
|---|---|---|
| **Legal Address:** | **Notify Address:** | |

**Scars, Marks, Tattoos:**

**Alias:**

**Assault Escape:**
Sex Offense ( )                    Victim Killed ( )                    Escape/Attempt ( )
Serious Assault ( )                Violated Probation/Parole/Bail ( )

| **Separations:  Yes/No** | **Misconducts: Yes/No** | **STG: Yes/No** |
|---|---|---|

**DC-5B**
5M-2-03

## PETITION FOR TRANSFER: COUNTY PRISONS

### COMMONWEALTH OF PENNSYLVANIA
### DEPARTMENT OF CORRECTIONS
Forward Petition unburst with DC-185 Form

## 1. PETITIONING FACILITY

TO: Deputy Secretary – Specialized Facilities and Programs

| FROM: | Name of Official | Title | Prison or Jail |
|---|---|---|---|
| | | | |

| RE: | County Prison No. | Parole Board No. | Prisoner's Name | |
|---|---|---|---|---|
| | Indictments, Term, and Court | Total Sentence | Effective Date | |
| | If Not Sentenced or Tried, Reason for Confinement | If Not Sentenced, Date of Conviction | If Not Tried, Date of Confinement | |

In accordance with the provisions of the Act of July 11, 1923, P.L. 1044, as amended 61 P.S. §72, I hereby petition for the transfer of the above inmate to such other facility authorized by law to receive him/her, the specific reason for this petition is as follows: (Check appropriate box.)

☐ Security Risk       ☐ Overcrowded Conditions        ☐ Medical Treatment        ☐ Psychiatric Evaluation

☐ Other: (specify)

_____

(Petitioning Official's Signature)                          (Date)

*In submitting this petition, the county authorities understand that approval is subject to extraordinary costs related to medical treatment, psychiatric treatment, transportation and overtime costs related to the provision of treatment or other extraordinary expenses related to the care, custody, and control of this inmate. County authorities are responsible for extraordinary costs associated with inmates transferred into the Department via the 5-B process. The submitting authority further understands that approval of this petition is subject to rescission by the Pennsylvania Department of Corrections for any reason deemed appropriate by the Department upon notice to the county.*

## 2. ORDER of TRANSFER

I hereby approve this transfer and authorize the following facility to receive this prisoner:

_____

(Facility)

_____

(Deputy Secretary – Specialized Facilities and Programs Signature/Date)

## 3. RECEIVING FACILITY TRANSMITTAL

DATE RECEIVED:                                SERIAL NUMBER ASSIGNED:

White – DC-15 IRJ Copy        Green – Dept. of Corrections        Yellow – Parole Board
Pink – County Commissioners          Goldenrod – Transferring Facility

Form **DC-185**

**TRANSMITTAL OF DATA FOR
COUNTY PRISON TRANSFER**

**COMMONWEALTH OF PENNSYLVANIA**

**Department of Corrections**

# INSTRUCTIONS

Complete this form, retaining yellow copy for your file. Forward it to the Deputy Secretary for Specialized Facilities and Programs, Department of Corrections, Box 598, Camp Hill, Pennsylvania 17001, ALONG WITH the **DC-5B** and copies of ALL appropriate commitment papers, confinement papers, and detainers. Section 1 in the DC-5B must be completed on all inmates you wish to transfer. Also, Section 2 in the DC-5B must be completed for any unsentenced or untried inmates you wish to transfer. Upon approval of the transfer, the Deputy Secretary for Specialized Facilities and Programs will forward the DC-185, along with necessary documents, to the facility he/she has approved for the transfer. The DC-5B will be returned to you intact. You will then obtain the Judge's approval, remove only the Goldenrod sheet for your records, and forward the remaining parts of the DC-5B UNBURSTED to the facility approved for this transfer with the delivering Sheriff and the inmate. No transfer will be approved between a county prison and a Department of Corrections facility UNLESS forms DC-185 and DC-5B are completed as outlined above.

| County Prison No. | Parole Board No. | Inmate's Name | County Prison | Date of Request |
|---|---|---|---|---|
| | | | | |

DETAILED REASON FOR REQUESTING THIS TRANSFER:

## THIS INMATE IS SERVING THE FOLLOWING SENTENCE:

| DATE OF SENTENCE | EFFECTIVE DATE | COURT, INDICTMENT, NUMBER, TERM | MINIMUM | | | MAXIMUM | | | JUDGE | OFFENSE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Y | M | D | Y | M | D | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| SUMMARY OR REMARKS ON SENTENCE | TOTAL SENTNECE: | | | | COMMITMENT CREDIT |
|---|---|---|---|---|---|
| | | | | | |

## FOLLOWING THE ABOVE SENTENCE, THIS INMATE HAS THE FOLLOWING DETAINERS:

| DATED | FROM (Include address) | CHARGING | INDICT-WARRANT NOS. | REMARKS |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## THIS INMATE IS NOT SENTENCED; NOTE THE FOLLOWING:

| DATE OF CONFINEMENT | DATE OF CONVICTION | DATE OF TRIAL | INDICTMENT No., TERM | CHARGING |
|---|---|---|---|---|
| | | | | |

| SIGNATURE | TITLE |
|---|---|
| | |

DATE: _____

Subject:   Recomputation of Sentence

TO:

FROM:   Records Supervisor

This is to inform you that your sentence has been tentatively recomputed as follows:

ESCAPE:

ORIGINAL EFFECTIVE DATE:

NEW ADJUSTED MINIMUM:

NEW ADJUSTED MAXIMUM:

You are advised that you may make a written request for a hearing by the Program review committee for this recomputation of sentence within 15 days of your receipt of this memorandum. At that hearing you may question the Records Officer and present documentary evidence on your own behalf.

If you do not make a written request for a hearing within 15 days of receipt of this memorandum, the tentative recomputed sentence indicated above shall become effective, and you will receive written notice of the same.

RECEIVED: _____
                                    Inmate's Signature

DATE:         _____

WITNESS:   _____

cc:  DC-15
      inmate

| FORM **DC-7X**<br><br>## TEMPORARY TRANSFER INFORMATION<br><br>(THIS FORM IS TO BE FORWARDED TO AUTHORITIES ACCEPTING TEMPORARY CUSTODY OF INMATE) | **COMMONWEALTH OF PENNSYLVANIA**<br><br>**DEPARTMENT OF CORRECTIONS** |
|---|---|

| TO: _____ | FROM: _____<br><br>(SEE INSTRUCTIONS BELOW) |
|---|---|

RE:   Name: _____                    Age: _____

      Home Address: _____

      Charge: _____

      Sentence: _____                    Bill & Term No. _____

      Minimum Date: _____                    Maximum Date: _____

      Detainer(s): _____

The above named inmate is being transferred on _____ for

the purpose of _____

To assist in supervising this inmate while in your custody, the following information is furnished:

      Custodial Classification:

      Special Problems:

      Medical Information:

      Recommendation:

| DATE: | SIGNATURE: | TITLE:<br><br>RECORD OFFICER |
|---|---|---|

***11.5.1, Records Office Operations Procedures Manual***
***Section 1 – Processing of Receptions***

***Attachment 1-K***
CONFID-DEF-000033

# COMMONWEALTH OF PENNSYLVANIA
## Department of Corrections
### BODY RECEIPT

| Receipt Date 4/15/2009 | Receipt Time 9:15 PM | Agency Dept of Corrections |
|---|---|---|

| Received From _Barry Spain_ | Title _Officer_ | Institution |
|---|---|---|

| Inmate # | Inmate Name | Race | Sex | Sent Stat | Custody Lvl | Program Codes |
|---|---|---|---|---|---|---|
| CX8799 | JESSUP, Kevin | Black | Male | SP | | |



Inmate Number: CX8799
Name: JESSUP, Kevin
Photo Date: 7/18/2007

|__| To Detainer
|__| Court WRIT-ATA
|__| Other ( Specify )

|__| Confinement Papers
|__| 7X Given to Transporting Authority

|__| RA

| Received By _D Riddle_ | Title _ALt._ | Agency SCI Coal Township |
|---|---|---|

EXHIBIT
tabbies
Varano-3

Kodak-3

DEF001048

BODY RECEIPT

COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF CORRECTIONS

| RECEIPT DATE | RECEIPT TIME | INSTITUTION |
| 1/22/2002 | | GRATERFORD |

| RECEIVED FROM | TITLE | AGENCY |
| DONALD T. VAUGHN | SUPERINTENDENT | SCI-GRATERFORD |

| INMATE NUMBER | INMATE NAME | RACE | SEX | SENT STAT | CUST LVL | PGM CODES |
|---|---|---|---|---|---|---|
| CX8799 | JESSUP, KEVIN | BLACK | M | DC | | |

PAR
4-9-01

COA

| |_| TO DETAINER | |_| CONFINEMENT PAPERS | |_| RA | |_| OTHER (SPECIFY) |
| |_| COURT WRIT-ATA | |_| 7X GIVEN TO SHERIFF | | |

| RECEIVED BY | TITLE | AGENCY |
| | | SCI-COAL |

EXHIBIT
Kokack 4

DEF001144

DC-151A

**BODY RECEIPT**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| DATE 10-22-01 | TIME 13/5 A.M. P.M. | INSTITUTION SCIG | |
|---|---|---|---|
| RECEIVED FROM | | TITLE Warrant Officer | AGENCY PBPP Phila |

PRISONER(S)

AM-9468 - 6101A - Maller, Jeffrey

BD-8389 - 5408R - Edwards, Douglas

BK-3727 - 6261W - Burns, Jeffrey

DN-5029 - 157AG - Boone, Carmen

DY-6276 - 013AL - Robinson, Allen

BX-3243 - 1971I - Williford, Derrick

CA-8079 - 1140R - Muhammad, Carl

ED-1321 - 130AP - Rodriguez, Domenic

CX-8799 - 496AS - Jessup, Kevin

| ✓ CONFINEMENT PAPERS | ☐ TO DETAINER | ☐ COURT WRIT-ATA | ☐ DC-16D PHOTO-COPY GIVEN TO SHERIFF | ☐ RA | OTHER (SPECIFY) |
|---|---|---|---|---|---|
| RECEIVED BY — SIGNATURE | | TITLE CRS | | AGENCY DOC | |

EXHIBIT
Kodech 5

DC-151A

**BODY RECEIPT**

**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF CORRECTIONS

| DATE 1-29-96 | TIME 13:17 A.M. P.M. | INSTITUTION SCI G |
|---|---|---|

| RECEIVED FROM A. Hall + see | TITLE JSO | AGENCY PCSD |
|---|---|---|

PRISONER(S)

Winslow Shaw    No PST          CX8744
Manuel Gonzalez    No PST        CX8755
Anthony Mancino    PST           CX8766
Harvey Hill    No PST            CX8777
Donald Moore    No PST           CX8788
Kevin Jessey    PST              CX8799
Kareem Stone    No PST           CX8807
Jermaine Walker    No PST        CX8818
Eric Morris    No PST       (10) CX8829
Michael Bradley    No PST        CX8830

| ☒ CONFINEMENT PAPERS | ☐ TO DETAINER | ☐ COURT WRIT-ATA | ☐ DC-16D PHOTO-COPY GIVEN TO SHERIFF | ☐ RA | OTHER (SPECIFY) |
|---|---|---|---|---|---|

| RECEIVED BY — SIGNATURE M. Jenneisen | TITLE CRS | AGENCY SCIG |
|---|---|---|

EXHIBIT
Kodack-6



**PA Department of Corrections**

Total Number of l

12/21/2006 12:00:32 PM

## Petition System - Temporary Transfer Petition

### Inmate Information

| Inmate Number: CX8799 | Name: JESSUP, Kevin | | Commit County: PHI |
|---|---|---|---|
| Sex: M | Race: B | | DOB: 04/03/1975 |
| SID: 21714127 | SSN1: 180508810 | SSN2: | Age: 31 |

### Petition Information

| Petition Status: Approved | Purpose of Transfer: Temporary Return |
|---|---|
| Transfer From: GRATERFORD | Transfer To: COAL TOWNSHIP |
| Requesting Official: Smith,Raymond H | Petition Date: 12/6/2006 10:59:07 AM |
| Petition Entered By: Smith, Raymond H | Petition Approval Date: 12/6/2006 10:59:07 AM |
| Petition Approved By: GEN, SYS | Petition History Date: |

### Pending Information

Petition Status:

Comments:

### Sentence Information

| IPS Offense: CC3701   ROBBERY (GENERAL) | | | | | | GBMI: N |
|---|---|---|---|---|---|---|
| CLS Offense: TCV   TECHNICAL AND CONVICTED PAROLE VIOLATOR | | | | | | |

| Min Sentence: 008 | Y | 000 | M | 0000 | D | Min Exp Date: 1/26/2001 |
|---|---|---|---|---|---|---|
| Max Sentence: 012 | Y | 000 | M | 0000 | D | Max Exp Date: 2/16/2006 |

### Classification Information

| Custody Level: 3 | Program Codes: |
|---|---|

### Problem Areas and Needs Assessment Information

Page 1 of



EXHIBIT
Kodack-7

DEF001090

1/21/2004 12:00:23 PM

**Problem Areas**

| | |
|---|---|
| Alcohol: | Drugs: |
| Sexual: | Assault: Verified |
| Escape: | Suicide: |
| Psychiatric: | |

Emotional Needs: NO IDENTIFIED IMMR NEEDS - A    Sexual Problem:

Drug/Alcohol Need: NO AOD SERVICE    Type of DA Problem: NONE

## Miscellaneous Information

| | | |
|---|---|---|
| Separations: YES | Active Detainers: YES | Active Miscellaneous: YES |
| Disciplinary Custody: NO | Disciplinary Custody/Commit Exp: | Active Mental Health case: NO |
| Individual Treatment Plan: NO | Commutation Applicant: NO | Confidential Information: NO |
| Other Information: NO | | |

## Transfer Rationale Information

Reasons for Transfer and Institutional Recommendation:

Passenger List Comment:

INMATE IS FINISHED WITH FEDERAL COURT AND CAN BE RETURNED TO HIS HOME INSTITUTION.

DEF001091



# Pennsylvania Department of Corrections

crjpr000003

mkodack 2/8/2012 12:41:37 PM          Transfer Petition System - Petition Transfer History

**Inmate Apps** \ **Inmate Inquiry** \ **Reports** \ **Photos** \ **JNET**

Return to Last Inmate

| | | | |
|---|---|---|---|
| **Inmate #:** CX8799 | **INACTIVE** | **Name:** JESSUP, Kevin | **Cust Lvl:** | **Prog Cd:** | **Last Perm Loc:** Coal Town |
| **Race:** Black | | **DOB:** 04/03/1975 | | **Housing Unit:** | **Temp Loc:** |
| **SID:** 217-14-12-7 | **FBI #:** 511135TA5 | **PBPP #:** 496AS | **Counselor:** Foulds, Renee M | **Detainers:** NO |

**Active Petition Details**

⦿ Permanent   ⦾ Temporary   [Create New]

Hide History

**History**

[Preview] [Action Override] [View] [Resubmit]

| Inmate # | History Dt | Type | Purpose | From | To | Status | Petition Requested By |
|---|---|---|---|---|---|---|---|
| CX8799 | 12/28/2006 | T | Temporary Return | GRA | COA | Transferred | Smith, Raymond H |
| CX8799 | 11/15/2006 | T | Federal Court | COA | GRA | Transferred | Roberts, Melissa R |
| CX8799 | 09/07/2006 | T | Temporary Return | GRA | COA | Transferred | Smith, Raymond H |
| CX8799 | 08/08/2006 | T | Federal Court | COA | GRA | Transferred | Brandt, Tanya S |
| CX8799 | 10/10/2002 | T | Temporary Return | GRA | COA | Transferred | Kriczky, Joseph |
| CX8799 | 02/14/2002 | T | Federal Court | COA | GRA | Transferred | Kay, Joyce |
| CX8799 | 01/22/2002 | P | PV Return | GRA | COA | Transferred | Miller, Linda |

Page 1 of 1



EXHIBIT
Kodack-8

DEF000931

**DC-300B (PART 1)**
(Rev. 10-85)

(MC 95-01-3038)
COURT COMMITMENT

STATE OR COUNTY CORRECTIONAL INSTITUTION
Commonwealth of Pennsylvania

vs.

Type or Print Legibly

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

NOTE: Additional supply of this form available at abov address:

☒ DC-300B (Part II) attached

Jessup Kevin
COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)

| SEX | DATE OF BIRTH | DPN | OTN | COURT OF INITIAL JURISDICTION | COMMON PLEAS |
|-----|--------------|-----|-----|------------------------------|--------------|
| ☐ F ☒ M | 4/13/75 | PP# 750487 | M 6413794 | ☐ | |

COMMITTING COUNTY / MAGISTERIAL DISTRICT#
Philadelphia

COURT NUMBER
06337,

DATE - TERM
95-03

The above defendant after ☐ pleading guilty ☐ nolo contendre ☒ being found guilty was on

Jan. 25 19 96 sentenced by Judge/District Justice A.J. De Fino to a term

not less than 5 years _____ months _____ days nor more than 10 years _____ months _____ days, or _____

_____ for the offense of Robbery

(Section 3701 of the Crimes Code) or (other statute) _____

It is further ordered that the said defendant be delivered by the proper authority to and treated as the law

directs at the State facility located at Graterford

| FINE AMOUNT $ | COSTS AMOUNT $ 19/00 | RESTITUTION |
|---------------|----------------------|-------------|
| To Be Paid To: ☐ COUNTY ☐ COMMONWEALTH | To Be Paid By: ☐ COUNTY ☒ DEFENDANT | / |

CREDIT FOR TIME SERVED (EXPLANATION OF CREDIT COMPUTATION ON REVERSE SIDE)
1/24/95 - 1/25/96 IF NOT ALREADY CREDITED

EFFECTIVE DATE OF SENTENCE
1/25/96

This sentence shall be deemed to run concurrent to any existing sentences, effective the date of imposition unless otherwise stipulated below:

C.C.F.
95 JAN 26 PM 6: 21

PROSECUTING ATTORNEY

DEFENSE ATTORNEY
John Cotler Esq.

COURT REPORTER

DISPOSITION OF NON-INCARCERATION OFFENSE(S)
VUFA (6106), PIC, T/T, REAP, C/CONSP. - guilty w/o pu penalty
POW - not guilty
THEFT, RSP, S/A - merges

(THIS BLOCK NOT TO BE USED FOR INCARCERATION OFFENSE)

In witness, whereof I have hereunto set my hand and seal of sa

court, this 25th day of January 19 96

AUTHORIZED SIGNATURE 001157

(SEAL)

EXHIBIT
Varano-6

DEPOSITION EXHIBIT
Kabob 9
PENGAD-Bayonne, N.J.

DC-300B   (PART II)

(TO BE ATTACHED TO PART I — COURT COMMITMENT)

Type or Print Legibly

### COURT COMMITMENT
### CONTINUATION SHEET
### STATE OR COUNTY CORRECTIONAL INSTITUTION
Commonwealth of Pennsylvania

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

*Jessup, Kevin*

VS.

NOTE: Additional supply of this form available a
address:

COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)

COURT NUMBER *CP 75-03-0033 1.*    OFFENSE TRACKING NUMBER (OTN) *M6413194*

The above defendant after ☐ pleading guilty ☐ nolo contendre ☒ being found guilty    was on

*Jan. 25* 19 *96* sentenced by Judge/District Justice *A.J. Mc Tino* to a

not less than *1* years ____ months ____ days nor more than *2* years ____ months ____ days, or ____

for the offense of *VUFA*

(Section *6108* of the Crimes Code) or (other statute) ____

| FINE | COSTS | RESTITUTION |
|---|---|---|
| AMOUNT $____ | AMOUNT $____ | |
| To Be Paid To: | To Be Paid By: | |
| ☐ COUNTY  ☐ COMMONWEALTH | ☐ COUNTY  ☐ DEFENDANT | |

CREDIT FOR TIME SERVED *7/24/95 - 1/25/96*    EFFECTIVE DATE OF SENTENCE *1/25/96*

This sentence shall be deemed to run concurrent to any existing sentences, effective the date of imposition unless otherwise stipulated below:
*concurrent to Robbery*

COURT NUMBER    OFFENSE TRACKING NUMBER (OTN)

The above defendant after ☐ pleading guilty ☐ nolo contendre ☐ being found guilty    was on

____, 19 ____ sentenced by Judge/District Justice ____ to a t

not less than ____ years ____ months ____ days nor more than ____ years ____ months ____ days, or ____

for the offense of ____

(Section ____ of the Crimes Code) or (other statute) ____

| FINE | COSTS | RESTITUTION |
|---|---|---|
| AMOUNT $____ | AMOUNT $____ | |
| To Be Paid To: | To Be Paid By: | |
| ☐ COUNTY  ☐ COMMONWEALTH | ☐ COUNTY  ☐ DEFENDANT | |

CREDIT FOR TIME SERVED    EFFECTIVE DATE OF SENTENCE

This sentence shall be deemed to run concurrent to any existing sentences, effective the date of imposition unless otherwise stipulated below:

(Seal)

In witness to the above sentence(s) for offense(s) as we
as those found on the reverse side of this document,
have hereunto set my hand and seal of said court

This *25* day of *Jan* 19 *9*

AUTHORIZED SIGNATURE

ROOM 675 CITY HALL
PHILADELPHIA, PA 19107
(215) 686-1260 or 61 or 62

*CX 8799*

Villie T. Joffe
Clerk of Quarter Sessions

Charles L. Williams
First Deputy

Brenda P. Cooney
Second Deputy

DATE: 1-27-96

TO THE SUPERINTENDENT
STATE CORRECTIONAL INSTITUTION

COMMONWEALTH
vs.

Jessup, Kevin

RE: CREDIT TIME

C.P.# 95-03-0033

M.C.# 95-01-3038

A/K/A

Bobb.

P.P.# 750487

DEAR SUPERINTENDENT:

IN CHECKING THE RECORD OF THE ABOVE CAPTIONED DEFENDANT, HE/SHE IS TO BE
CREDITED WITH TIME SERVED WHILE INCARCERATED IN THE PHILADELPHIA COUNTY
PRISON SYSTEM AWAITING TRIAL, IF NOT ALREADY APPLIED ON ANOTHER MATTER.

FROM ___1-26-95___ TO ___1-29-96___

FROM _____ TO _____

FROM _____ TO _____

FROM _____ TO _____

THE ABOVE CREDIT TIME WAS CALCULATED BY ___c/o M Rybl___
OF THE PHILADELPHIA COUNTY PRISON. THIS LETTER SHALL BE CONSTRUED AS AN
AMENDMENT TO THE ORIGINAL COMMITMENT, AND IS BEING SENT TO YOU UNDER
THE SEAL OF THE COURT.

SINCERELY,

MYRTIS K. GORDON
COURT SERVICES MANAGER
CLERK OF QUARTER SESSIONS
ROOM 555 CITY HALL
(215) 686-6290 & 555-1159

DEM001159

EXHIBIT
Varano-7

DEPOSITION
EXHIBIT
Kodak 10

COURT OF COMMON PLEAS
OFFICE OF COURT ADMINISTRATION
APPEALS   DIVISION

DATE 1

RECEIV

OCT 3 1 19

COUNT

TO -  RECORD ROOM SUPERVISOR, STATE INSTITUTIONS

FROM -  SUSAN A. CARMODY, SUPERVISOR, APPEALS UNIT.

RE- JESSUP, KEVIN          REC.CNTRL# CP 9503-0033 1/1     PHOTO# 750

STATUS- PRISON   LOCATION- P.A. ST. CORR.  C-X8799   DATE SENTENCED- 1

JUDGE-  ANTHONY J DEFINO

ATTORNEY FOR APPELLANT- JOHN P COTTER          APPELLATE# 0646PH

APPEAL TO-  SUPERIOR COURT      DATE FILED-  2/21/96   DOCKET PAGE- 0090


        ON 10/22/97, THE RECORD IN THE ABOVE CAPTIONED MATTER WAS RETUR
TO THE JURISDICTION OF THE PHILADELPHIA COURT OF COMMON PLEAS, WITH TH
FOLLOWING APPELLATE DISPOSITION-


        JUDGMENT OF SENTENCE AFFIRMED AND ALLOCATUR DENIED BY SUPREME C


        THEREFORE, THE SENTENCED IMPOSED ON  1/25/96 BY THE HONORABLE
ANTHONY J DEFINO STANDS.


CC - JUDGE ANTHONY J DEFINO
     COURT RECORD
     FILE



**DEPOSITION EXHIBIT**
Kodack 11

DEF001156

Kodack-11

PBPP 141      (12/79)      *Original Qwento US Marshals*

AGENT JOSEPH RYAN
TELEPHONE 215-560-6750
SSAN 185566610
DOB 04 / 03 / 1975
SID 21714127
PICTUREID750487
JUDGE **ALBERT DEFINO**
BILL & TERM 950300033
ORIGINAL CHARGE ROBBERY: VUFA
MAX DATE 01/26/2007
NEW CHARGE  NEW CRIM CHAR CSA
MANUF/DEL/ PWID

HEARING DATE   10/02/01
CONCURRENCE BY **AUDREY STARLING**
ON **09/27/2001**

Bail 10/4/01

COMMONWEALTH OF PENNSYLVANIA
BOARD OF PROBATION AND PAROLE

# WARRANT TO COMMIT AND DETAIN

### DATE 09/27/2001

To the Superintendent, Warden, or other authorized representative of any
Detention Facility or State Correctional Institution in the Commonwealth
of Pennsylvania ;

By virtue of the authority delegated to me by the Pennsylvania Board of Probation
and Parole, you are hereby authorized and directed to commit and detain for
violation of parole/probation KEVIN JESSUP

Parole No. 496AS           , Paroled on 04/09/2001

from SCI - Coal Township           , Institution No. CX 8799

Subject to further order of the Board

PENNSYLVANIA BOARD OF PROBATION AND PAROLE

By:

*Willie E. Jones Jr.*

**District Director**

Warrant Number:  1C2-01-082

EXHIBIT
Kodak -12

DEF001061

# UNITED STATES DISTRICT COURT
## Eastern District of Pennsylvania

UNITED STATES OF AMERICA

V.

DAMON CHAEPPELLE aka "Kevin Jessup"

**WARRANT FOR ARREST**
Case Number: CR-02-23

To: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest <u>Damon Chappelle</u>

and bring him or her forthwith to the nearest magistrate to answer a(n) Indictment charging him or her with

> Possession w/intent to distribute "Crack" cocaine; Possession w/intent to distribute "Crack" cocaine within 1,000 Ft. of school; felon in possession of firearm; possession of firearm in furtherance of drug trafficking crime

in violation of Title    United States Code, Section(s)    21:841(a)(1);  21:860(a);  18:922(g)(1);
18:924(c)(1)(A)

**MICHAEL E. KUNZ**
Name and Title of Issuing Officer

_____    1/22/02, PHILA, PA.
Signature of Issuing Officer    Date and Location

Bail fixed at $ recommended by HON. M. FAITH ANGELL
Name of Judicial Officer

---

# RETURN

This warrant was received and executed with the arrest of the above-named defendant at

_____

_____

Date Received _____    Date of Arrest _____

Name and Title of Arresting Officer _____

Signature of Arresting Officer _____



EXHIBIT
Koduch-13

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

Criminal No. 02-32-1

vs.

DAMON CHAPPELLE, a/k/a KEVIN JESSUP
Inmate No. CX8799

O R D E R

AND NOW, this 1st day of ~~January~~ Feb., 2002, it is hereby

ORDERED, ADJUDGED AND DECREED that the Warden of F.C.I.

COAL TOWNSHIP, Coal Township, PA and the United States Marshal(s)

for the Eastern District of Pennsylvania produce before this Court

the body of **Damon Chappelle, a/k/a Kevin Jessup** on **Thursday,**

**February 21, 2002** at 10:30 a.m. before Magistrate Judge Carol Sandra

Moore Wells to appear for arraignment in the above-captioned matter,

and that immediately upon termination of the said proceedings, he be

delivered into the custody of the said superintendent of the said

institution.

BY THE COURT:

_____
JAY C. WALDMAN,          J.

cc: U.S. Marshal (2)

2·4·02
_____        _____
DATE                 By Whom

Cr 2 (8/80)

A TRUE COPY CERTIFIED TO FROM THE RECORD

DATED: 2-4-02

ATTEST:

DEPUTY CLERK UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

DEF001124

**EXHIBIT**
Kodecli 14

YQ                    PENNSYLVA    STATE POLICE - HIT CONFIRM,

ORI: PA049055C          DRI: DCATF0000      CTL: lsr

OCA: 18461                              NIC: w472285155
RTY: WP                 RNO: 1          PRI: R
RNA: Christine Fobia                    RAG: SCI COAL TWP
PHO: 5706447890         EXT: 120        FAX: 5706443414
REM: This person is currently an inmate at sci coal twp prison
Please advise status of warrant
Our inmate No CX8799 Jessup,Kevin AKA Chappelle,Damon

| | | | |
|---|---|---|---|
| STOLEN/FELONY   (SV) - LIC | VIN | VYR | VMA |
| WANTED   PERSON (WP) - NAM Chappelle,Damon | | DOB 19750403 | SEX M |
| MISSING PERSON (MP) - NAM | | DOB | SEX |
| PROTECTION ORDR (PO) - NAM | | DOB | SEX |
| STOLEN LICENSE (SL) - LIC | LIS   LIY   LIT | | |
| STOLEN ARTICLE (SA) - TYP | SER | BRA | |
| STOLEN SECURITY (SS) - TYP | SER | DEN | |
| STOLEN BOAT   (SB) - REG | BHN | BMA | |
| STOLEN PART   (SP) - SER | BRA | CAT | |
| STOLEN GUN    (SG) - SER | CAL   MAK | MOD | |

MSG RCVD      1      FEB 01, 2002  10:27:12          SAN: 4RQR1A0K8Z3J



EXHIBIT
Kodach-15

DEF001106

*A*

**United States Department of Justice**
United States Marshals Service



# DETAINER
## BASED ON FEDERAL JUDGEMENT AND COMMITMENT

UNITED STATES MARSHAL
_____EASTERN_____ DISTRICT OF _____PENNSYLVANIA_____

*Please type or print neatly:*
TO:  SCI Graterford

*E. A*

DATE:  September 26, 2002
SUBJECT: Chappelle, Damond
AKA:
DOB/SSN: 4/3/1975 - 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
USMS #:56079-066
CR#: 02-32-01
Local# CX-8799

Please accept this Detainer against the above-named subject who is currently in your custody. The United States District Court for the _____Eastern_____ District of _____Pennsylvania_____ has issued a **Judgement and Commitment Order** against the subject. The attached **Judgement and Commitment Order** commits the subject to the custody of the U.S. Attorney General to serve the following sentence of imprisonment:

162 Months

Prior to the subject's release from your custody, please notify this office at once so that we may assume custody of the subject for service of his Federal sentence on imprisonment. If the subject is transferred from your custody to another detention facility, we request that you forward our Detainer to said facility at the time of transfer and advise this office as soon as possible. The notice and speedy trial requirements of the Interstate Agreement on Detainers Act do **NOT** apply to this Detainer.

Please acknowledge receipt of this Detainer. In addition, please provide one copy of the Detainer to the subject and return one copy of the Detainer to this office in the enclosed self-addressed envelope.

Very truly yours,

*Call Jodi for Pick Up*

*United States Marsh*
Gary Shovlin

By: Mike Matzelt
215-597-9735

**EXHIBIT**
*Kolack-16*

NS ARE OBSOLETE AND NOT TO BE USED

Form USM-16b

DEF001107



United States Department of Justice
United States Marshals Service

# DETAINER
## BASED ON FEDERAL JUDGEMENT AND COMMITMENT

UNITED STATES MARSHAL
__EASTERN__ DISTRICT OF __PENNSYLVANIA__

**Please type or print neatly:**

**TO:**   **SCI COAL TOWNSHIP**
**CX 8799**

**DATE:** *November 21, 2006*
**SUBJECT:** *CHAPPELLE, Damon Donyel*
**AKA:** *JESSUP, Kevin*
**DOB/SSN:** *04/03/1975, 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*
**USMS #:** *56079-066*
**CR#:** *02-032-01*

Please accept this Detainer against the above-named subject who is currently in your custody. The United States District Court for the __Eastern__ District of __Pennsylvania__ has issued a Judgement and Commitment Order against the subject. The Judgement and Commitment Order commits the subject to the custody of the U.S. Attorney General to serve the following sentence of imprisonment:

*95 Months, Credit Time Served 09/23/02, 4 Yrs S. Rel, Concurrent w/State*

Prior to the subject's release from your custody, please notify this office at once so that we may assume custody of the subject for service of his Federal sentence on imprisonment. If the subject is transferred from your custody to another detention facility, we request that you forward our Detainer to said facility at the time of transfer and advise this office as soon as possible. The notice and speedy trial requirements of the Interstate Agreement on Detainers Act do **NOT** apply to this Detainer.

Please acknowledge receipt of this Detainer. In addition, please provide one copy of the Detainer to the subject and return one copy of the Detainer to this office in the enclosed self-addressed envelope.

Very truly yours,

**United States Marshal**
**GARY SHOVLIN**

**By: Cookie Burnstine**
**215-597-9443**

| RECEIPT |
|---|
| Date: |
| Signed: |
| By: |
| Title: |

**EXHIBIT**
Kodak. 17

INSTITUTION

PBPP 6 (07/2003)

### COMMONWEALTH OF PENNSYLVANIA



**Board of Probation and Parole**
**1101 South Front Street, Suite 5800 - Harrisburg, PA. 17104-2538**
**717-787-6134**

# WARRANT

### For Arrest of Paroled Prisoner

To any Parole Agent of the Pennsylvania Board of Probation and Parole or any Officer Authorized to Serve Criminal Process or any Peace Officer in the United States of America:

You are hereby authorized to arrest and detain for parole violation JESSUP KEVIN Parole No. 496AS, paroled on April 9, 2001 from SCICT, under Institution No CX8799 on the sentence at No. CP 950300033 under the jurisdiction of the Pennsylvania Board of Probation and Parole. For his (or her) arrest and detention this shall be your sufficient warrant.

It is hereby ordered that the said JESSUP KEVIN be retaken and returned forthwith to the actual custody within the Pennsylvania enclosure, and we hereby require an officer of The Pennsylvania Board of Probation and Parole, to so retake and return JESSUP KEVIN and for so doing this shall be sufficient warrant.

Signed and sealed at Harrisburg, Pennsylvania
this 14 day of August, 2007
PENNSYLVANIA BOARD OF PROBATION AND PAROLE



*Director, Interstate Services*

ATTEST:

*Chairman*

Warrant No. 496AS



EXHIBIT

DEF001051

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA
### PROBATION OFFICE

**DANIEL W. BLAHUSCH**
**CHIEF U.S. PROBATION OFFICER**

FEDERAL OFFICE BUILDING
600 ARCH STREET, SUITE 2400
PHILADELPHIA, PA  19106-1679
215-597-7950
FAX # 215-597-8856

**April 22, 2009**

SCI Coal Township
1 Kelley Drive
Coal Township, PA 17866-1020

Attn:  Record Room

**RE:    JESSUP, Kevin**
**AKA Damon Chappelle**
**DOB - 4/3/75**
**Inmate No. CX 8799**

Dear Sir:

On September 23, 2002, Mr. Jessup appeared before the Honorable Jay Waldman in the Eastern District of Pennsylvania under docket 02-CR-032-01 and was sentenced to 162 months custody to be followed by six years supervised release. On November 21, 2006, this sentence was vacated and Mr. Jessup was re-sentenced by the Honorable Timothy Savage to 95 months custody to be followed by four years supervised release. His sentence was subsequently reduced to 24 months custody on November 24, 2008. On April 14, 2009. Mr. Jessup completed his federal custodial sentence and was released to a detainer located by the Pennsylvania Board of Probation and Parole.

We confirmed that Mr. Jessup is presently incarcerated at your facility with no set release date. The purpose of this letter is to request that our office be notified when Mr. Jessup is scheduled to be released from custody. At that time, he will commence his four year supervised release term. Therefore, Mr. Jessup will be required to report to the U.S. **Probation Office at the William J. Green Federal Building, 600 Arch Street, Suite 2400, Philadelphia, PA 19106** within 72 hours of release from custody or to the Probation Office in the state of his residence.

Please have Mr. Jessup sign this letter to verify his understanding of his federal supervision status. A copy of this letter should be mailed to this office at the above address. Please keep a signed copy of this letter in Mr. Jessup's institution file and provide him with a copy.

**EXHIBIT**
*Kodak 19*

DEF001030

RE:   **JESSUP, Kevin**
      **AKA Damon Chappelle**
      **Inmate No. CX 8799**
      **Page Two**

Your assistance rendered in this matter will be greatly appreciated.  If you have any
questions, please feel free to contact me at 267-299-4595.

                                        Sincerely,

                                        Daniel W. Blahusch, Chief
                                        U.S. Probation Officer

                                        *Alice Colloton*

                                        Alice Colloton
                                        Supervising U.S. Probation Clerk

/ac
cc:   Kevin Jessup/Damon Chappelle

_____          _____
      Kevin Jessup/Damon Chappelle              Date
                                                4/27/c9

_____          _____
      Witness                                   Date

DEF001031

## Section 2 – Releases

### A. Information Applicable to <u>ALL</u> Permanent Releases

1. An inmate is released for Pre-Release, Parole/Re-Parole, Sentence Complete (SC), Bail, Vacated Sentence/Conviction, Transfer to County, and Release to Custody of Other Authorities.

2. Every facility is involved in the release of inmates. Certain steps are required and must be followed in the release process. A key document in this procedure is the **Department Release Checklist (Attachment 2-A)**. This form describes the steps to be covered by the Records Specialist, Corrections Records Specialist, Corrections Records Supervisor, and the Records Supervisor prior to the release of an inmate.

3. A time file must be maintained in each Record's Office containing a copy of each inmate's **16E, Sentence Status Summary** in order of release dates.

4. The **Department Release Checklist** must be completed for every inmate who is being released. This form shall be completed and signed by the Records Specialist/Corrections Records Specialist and the Records Supervisor/Corrections Records Supervisor/designee.

5. As an inmate is processed for release, the Records staff must perform that an in-depth review of the **DC-15, Inmate Record**. Records staff are cautioned to review the **DC-15** to identify any open/unresolved criminal cases, open warrants or detainers, and to identify required information to be provided to county officials for an inmate being transferred to the county (including ATA cases).[1]

6. Records Office staff shall review the files of an inmate scheduled for release as early as possible to identify potential obstacles to discharge. This review shall identify:

   a. the requirement for DNA Testing and/or registration under Megan's Law in accordance with Department policies **11.6.1, "Sexually Violent Offender Registration (Megan's Law)"** and **11.6.2, "Act 185 DNA Data and Testing;"** and

   b. detainers, arrests with unreported disposition, open cases or unfulfilled cases.

7. Unreported Dispositions

   When an inmate is being considered for pre-release programming, assignment outside the enclosure of the facility, or release, Records staff must investigate unreported dispositions according to the procedures listed below.

   a. *The following offenses must be researched indefinitely:*

      (1) homicide/murder;



---

[1] 4-4446

CONFID-DEF-000034

(2)   involuntary manslaughter; and

(3)   Megan's Law offenses.

b.   ***The disposition of arrests for offenses the PA Board of Probation and Parole lists as a crime of violence (Attachment 2-B) shall be researched 15 years prior to the date of the current DOC commitment.***

c.   ***All other offenses shall be researched 5 years from the date of the current DOC commitment except as noted in 7.d. below.***

d.   ***In the event that there is a legislative program (i.e. Boot Camp, SIP, etc.) that mandates research additional to the requirements above, the research must be conducted in accordance with the legislation.***

e.   Records staff must attempt to obtain disposition using the resources available through JNET, Common Pleas Court Management System (CPCMS/web dockets), county websites, AQ screen on CLEAN, telephone inquiry to the arresting agency, etc).

f.   If disposition is obtained via a telephone call, the Records Specialist will record on a **DC-14A, Cumulative Adjustment Record** for Unreported Dispositions **(Attachment 2-C)**, the name of the person with whom he/she spoke, time and date and what information was received. This information will be filed under the ID section of the DC-15 with the rap sheet.

g.   If disposition cannot be resolved using **Section A.7.e. above,** Records staff must generate a **DC-26, Detainer Action Letter** to the appropriate agency. A copy of this form must be filed under the ID separator of the **DC-15** with the rap sheet.

h.   Information regarding the disposition shall not be recorded on the rap sheet. The information will be lost when a new rap sheet is requested and the old one destroyed. The information is to be recorded on the **DC-14A.**

i.   If staff is unable to obtain an unreported disposition, then the documents listed under **Section A.7.e, and f. above,** will verify his/her attempt to do so and transfer the liability to the arresting agency rather than the Department.

j.   If the rap sheet shows a similar crime from another jurisdiction, then staff shall relate that crime to the Pennsylvania equivalent and provide a record search accordingly.

8.   A new criminal history rap sheet shall be run within seven working days prior to release, for all releases, except paroles. A Wanted Query (QWA) shall also be run the last day prior to release.

9.   When the sentence structure for an inmate being released has been certified, except as outlined in **Section 1 "Processing Receptions," E.3.e.** of this procedures manual and no changes are pending, the sentence structure does not need to be checked again when completing the Release Checklist.

CONFID-DEF-000035

10. If the sentence has not been certified, it will be done at this time using the Audit Tool. Records with errors will not be certified. They will be given to a Records Specialist at the facility where the inmate is housed to be corrected and then returned to the auditor for certification.

11. On the last working day prior to discharge, the Records Office staff/designee shall run an FS QWA on the NCIC/CLEAN System to ensure that there are no new open warrants for the inmate.

12. The Records Specialist shall initiate the **DC-158, Release Worksheet (Attachment 2-D)** as far in advance of the scheduled release date as possible, but at the latest it shall be initiated on the last working day before the release. The Records Office shall notify other departments within the facility to advise them of the inmate's pending release.

13. The inmate is required to visit designated discharge stations at least one day prior to discharge. Mandatory discharge stations include: Business Office, Dental Office, Education Department, Library, Medical Department, Parole Office, Record Office, Property Room. Staff at each discharge stations shall review appropriate files and signify that the inmate is "cleared" for discharge by signing the **DC-158**. A facility may supplement the above list as necessary to include additional departments.

14. When an inmate is to be released from other than general population housing, or is physically unable to move about the facility, the Records Office will initiate an abbreviated **DC-158** and forward to appropriate staff.

15. On the day of release, the Shift Commander/Designee must verify that the inmate has been properly identified, check the **DC-158** to ensure that the inmate has "cleared" all mandatory discharge stations, and that funds, gratuities, and personal belongings are issued to the inmate.[2]

16. When the inmate is being released to another authority, the documentation of the transporting officials shall be examined and the **DC-151A, Body Receipt** must be signed.

17. The Records Specialist shall access the Inmate Records System (IRS) and/or appropriate DOCNet program, and update the status of the inmate. An important part of this process is entering a correct discharge address for the inmate into the IRS and/or appropriate DOCNet program.

18. The final step in the release process is storing the **DC-15** in accordance with the records retention and disposition schedule located in **Section 8** of this procedures manual.

**B. Types of Releases**

1. Sentence Complete (SC) (formerly Final Discharge Maximum Expiration – FDME)

---

[2] 4-4446

CONFID-DEF-000036

a. This is a release upon completion of the inmate's maximum sentence term. This type of release is commonly referred to as a "max-out" and describes the release of an inmate upon completion of the maximum sentence of incarceration or parole period. The procedures set forth in **Section A. above** shall be followed for this type of release.

b. For an inmate being released SC to the community, the procedures in **Section A. above** shall be followed and a **Release Notification Letter (Attachment 2-E)** is to be sent to the District Attorney of the committing county. This letter is to be prepared by the Records Office Supervisor/designee and approval, and signed by the Facility Manager/designee. This letter is to be sent 30 days prior to the inmate's scheduled release date. If an inmate is ordered to be released and a 30-day period is not available, the **Release Notification Letter** shall be faxed to the District Attorney when the order for discharge is received.

c. **Megan's Law, Act 24 of 1995** and as amended by **Act 18 of May 10, 2000 and Act 152 of November 24, 2004, 42 Pa. C.S.A. §9791 et. seq.** requires that an individual convicted of any one of the statutorily enumerated sex offenses as defined in the Act must be registered with the Pennsylvania State Police (PSP) at the time of release from incarceration in accordance with Department policy **11.6.1**.

   (1) The facility's Records Office (or Community Corrections staff in conjunction with the support facility's Records Office) will review the central files of inmates to identify each inmate currently serving time for a conviction of a Megan's Law offense or who has <u>ever</u> been convicted (if adjudicated delinquent, it is excluded) of a Megan's Law offense, even if the inmate has served the maximum sentence for that offense.

   (2) When the inmate is scheduled to be released from a facility because of SC, the Records Office of the releasing facility shall collect registration information from the inmate no later than 30 days prior to the SC date and forward the original registration information to the PSP no later than 10 days prior to the release date.

   (3) 30 days prior to the anticipated release date, the Registering Official (Records staff for inmates being released as SC) will complete the **PSP Sexual Offender Registration Notification Form (Attachment 2-F)**, for the inmate and obtain one photograph (within 24 hours) of the inmate's face and any scars, marks, tattoos, or other unique features of the individual to be attached to the original copy of the registration form or to be submitted via the Commonwealth Photo Imaging Network if such submission is required by the PSP, and one completed fingerprint card. In those cases that the inmate wears prescription eyeglasses, one photograph of the inmate wearing the glasses and one photograph of the inmate without the glasses is required. If the inmate is completing his/her sentence from a Community Corrections Center (CCC), the support facility's staff will complete the registration form with information supplied by CCC staff. A copy of the registration form (without the photographs) will be placed into the inmate's **DC-15** file, and a copy of the registration form (without the photographs) will be forwarded to the facility parole representative.

CONFID-DEF-000037

Note: In all cases, the original registration form shall be mailed to the PSP no later than 10 days prior to the maximum expiration date. In emergency situations, where it is determined that an inmate must be registered at the last minute, the registration form may be faxed (717-772-3681) to the PSP, followed with the mailing of the completed original form.

(4) PSP will provide notification to the facility via a CLEAN system terminal message that registration information has been received. The notification will be directed to the facility's Records Supervisor/Corrections Records Supervisor. The notification will be placed into the inmate's **DC-15** file; records staff will acknowledge receipt of the CLEAN message by responding via the CLEAN system.

(5) When an inmate who is scheduled to be released from a facility due to SC refuses to provide the registration information, the Records Office of the releasing facility shall notify the PSP barracks with jurisdiction over the facility of the inmate's failure to provide the required registration information and of the expected date, time, and location of the release of the offender. The PSP will arrive at the time of release and allow the offender the opportunity to register, prior to arresting the offender for refusing to register.

(6) The Records Supervisor/designee shall monitor the sending of the registration forms to the PSP and receipt of the CLEAN system terminal messages. In the event that a CLEAN system terminal message is not received within five days of the registration form being mailed, the Records Supervisor/designee shall contact the PSP, via telephone, to inquire if the information was received. If the information was received a CLEAN system terminal message shall be requested. If the information as not received, a copy of the registration form shall be faxed (717-772-3681) to the PSP.

(7) If an inmate who meets the registration requirements refuses to provide information necessary for completion of the registration form, including properly signing the form, the Facility Manager/designee will notify the local PSP barracks. The notification will include the name of the inmate, the location, date and time of release, as well as the fact that the inmate may be in violation of Megan's Law.

(8) If a previously released inmate, who is already registered and was returned to the custody of the Department is to be released SC, the Records Supervisor/designee is responsible for notifying the PSP of the inmate's release via the CLEAN system using the fixed screen which can be found at TEXT PSP/INMINF, and completing a **Sexual Offender Address Work Sheet (Attachment 2-G)** that must be forwarded to PSP, in accordance with **Department policy 11.6.1.**

(9) Any inmate who refuses to comply with the completion of the form, and still has time to serve, will be placed in Administrative Custody in accordance with Department policy **DC-ADM 802, "Administrative Custody Procedures."**

(10) If an inmate who initially refuses to register changes his/her mind and then registers prior to release, the PSP will be notified that the inmate has registered.

CONFID-DEF-000038

2. State Parole

   a. This is a release to the supervision of the PBPP upon completion of at least the minimum term of confinement. Unless parole is revoked, the inmate serves the remainder of the sentence under the supervision of the PBPP. The inmate is subject to re-incarceration for violation of any of the conditions of parole.

   b. Upon receipt of the order to parole, re-parole, or to continue on parole, the Records Specialist shall review the order to confirm that the information recorded on the PBPP Release Order is correct and accurate. This include a review to ensure that all current cases are listed on the order and that the minimum and maximum dates are correctly stated. The release date must be on or after the controlling minimum date with the exception of inmates participating in the Quehanna Boot Camp Program. In all cases where the release order is not correct, the Records Officer shall not permit the inmate to be released until the order has been corrected or the issue resolved.

   c. Upon written notification from the Facility Parole Office that an inmate is ready for release on parole, re-parole or to continue on parole status, the Records Specialist/Corrections Records Specialist shall initiate the procedures set forth in **Section A. above**.

   d. The facility Parole Office will forward to the Records Office, via email to the Records Office general email address, a copy of the request for urinalysis, as soon as the urinalysis is requested.

   e. When the request is received by the Records Office, the assigned Records Specialist is to complete Section 5 of the Release Checklist for review of the sentence structure (this includes the certification of the **16E, Sentence Computation Summary),** and review the criminal history (a new one must be requested), research unreported dispositions, etc.

   f. Section 5 of the Release Checklist will be completed by the Records Specialist and the Records Supervisor/designee within six working days from the date the request for urinalysis is received. The signature of the Records Specialist and the Supervisor/designee is required when this portion is completed.

   g. If there is an extraordinary circumstance where this process cannot be completed within six working days, the Records Supervisor must contact the Records Administrator or Assistant Records Administrator via email explaining the circumstance and the reason that the task cannot be completed within the allotted time frame. The Records Administrator or the Assistant records Administrator will either approve or deny the request for extension by return email and will copy the Facility Parole Supervisor on the response.

   h. Upon receipt of the release order and when a release date is known, the Records Specialist will complete the remainder of mandatory items listed under Section 1 of the Release Checklist as previously instructed. This includes running another QWA that last working day prior to release. It is not necessary to run another RAP Sheet

CONFID-DEF-000039

unless a JNET Notification advises that there has been a new arrest, Want, or disposition (a disposition notification requires a check of the JNET Secure Web Docket, since running the new criminal history as noted in the previous paragraph). Signatures are again required in the designated space above Section 5 of the Release Checklist when these functions are completed. You are required to track this process on an Excel spreadsheet which will be supplied by the Records Administrator. No changes are to be made to the format unless they are made by the Records Administrator or the Assistant Records Administrator.

i. **PBPP-140, Order to Release from Temporary Detention or to Cancel Warrant to Commit and Detain**

   (1)  An inmate who has been returned to the Department by the PBPP may have his/her **Warrant to Commit and Detain** cancelled by the PBPP. The Records Office staff must have a release **(PBPP-140)** of the board warrant in their possession before the inmate is discharged. The inmate shall be cleared for discharge in accordance with the **Department Release Checklist**.

   (2)  Time for Processing the Lift of a PBPP Warrant:

        (a)  The inmate shall be processed as soon as possible (that day or the next).

        (b)  If there are problems obtaining information, etc., the inmate cannot be held any longer than four working days (unless there is a detainer from another authority) from the date of the lift of a PBPP Warrant (which should be the same it is received).

        (c)  If the inmate is past his/her sentence complete date, the inmate must be cleared for immediate release.

j. Inmates Paroled to a Detainer with a Bed Date to a CCC

If an inmate is to be paroled and has a detainer that must be satisfied prior to going to a CCC, the Records Office shall notify the regional headquarters of the receiving CCC that this inmate will not be arriving at the CCC until the inmate has satisfied the detainer. The notification will be sent to the Referral Specialist at the Regional Office while copying the Regional Director via email. This is to prevent the inmate from being reported as a non-report by the CCC.

3. Parole, Re-Parole, or Sentence Complete (SC) from CCC

   a. Bureau of Community Corrections (BCC) Regional Offices and Contract Facilities shall contact the facility Records Office with notification of the inmate's imminent release. The completed **DOC Release Checklist** shall be forwarded/faxed to the Regional Office, Contract Facility Coordinator, rather than directly to Community Contract Facilities.

CONFID-DEF-000040

b. All procedures required for the release of an inmate from a correctional facility also apply to the release of an inmate from a CCC or a Contract Facility including the Department Release Checklist.

4. Act 24 of 1995, Megan's Law

a. **Megan's Law, Act 24 of 1995** and as amended by **Act 18 of May 10, 2000 and Act 152 of November 24, 2004, 42 Pa. C.S.A. §9791 et. seq.** requires that an individual convicted of any one of the statutorily enumerated sex offenses as defined in the Act must be registered with the Pennsylvania State Police (PSP) at the time of release from incarceration in accordance with Department policy **11.6.1**.

b. The facility's Records Office (or Community Corrections staff in conjunction with the support facility's Records Office) will review the central files of inmates to identify each inmate currently serving time for a conviction of a Megan's Law offense or who has ever been convicted (if adjudicated delinquent, it is excluded) of a Megan's Law offense, even if the inmate has served the maximum sentence for that offense.

c. If the inmate who is being paroled meets the criteria for Megan's Law, the Records Office will provide the facility parole staff with two current photographs (within 24 months) of the inmate's face and any scars, marks, tattoos, or other unique features of the individual.

d. A copy of the completed registration form and confirmation will be sent to the facility's Records Office for placement in the legal section of the inmate's **DC-15** file. Photographs shall be in electronic format if the PSP requires submission of photographs using the Commonwealth Photo Imaging Network.

e. The PSP will provide notification to the Department via a CLEAN system terminal message that the registration information has been received **(Attachment 2-H)**. This notification will be placed into the inmate's **DC-15** file. The notification will be directed to the facility's Records Supervisor/Corrections Records Supervisor. The records staff will acknowledge receipt of the CLEAN message by responding via the CLEAN system.

f. The Records Supervisor/designee shall monitor the sending of the registration forms to the PSP and receipt of the CLEAN system terminal messages. In the event that a CLEAN system terminal message is not received within five days of the registration form being mailed, the Records Supervisor/designee shall contact the PSP, via telephone, to inquire if the information was received. If the information was received a CLEAN system terminal message shall be requested. If the information as not received, a copy of the registration form shall be faxed (717-772-3681) to the PSP.

g. If an inmate who meets the registration requirements of this policy refuses to provide information necessary for the completion of the registration form, including properly signing the form, the Facility Manager/designee will notify the local PSP barracks. The notification will include the name of the inmate, the location, date and time of release, as well as the fact that the inmate may be in violation of Megan's Law.

CONFID-DEF-000041

h. If a previously released individual, who is already registered and who was returned to the custody of the Department is to be released from Department custody, the Records Officer Supervisor/designee is responsible for notifying the PSP of the inmate's release via the CLEAN system using the fixed screen which can be found at TEXT PSP/INMINF, and completing a Change of Address form that must be forwarded to PSP, in accordance with **Department policy 11.6.1.**

i. Any inmate who refuses to comply with the completion of the form, and still has time to serve, will be placed in Administrative Custody in accordance with Department policy **DC-ADM 802, "Administrative Custody Procedures."**

j. If an inmate who initially refuses to register changes his/her mind and then registers prior to release, the PSP will be notified that the inmate has registered.

5. Parole Violator Pending (PVP) with Federal Sentences

a. The Parole Act 61 Pa C.S. §331.21a, regarding other violations of terms of parole states:

(1) "If a new sentence is imposed upon such parolee, the service of balance of said term originally imposed shall precede the commencement of the new term imposed in the following cases:

If a person is paroled from any state penal or correctional facility under the control and supervision of the Department of Justice and the new sentence imposed upon him/her is to be served in any such state penal or correctional facility.

If a person is paroled from a county penal or correctional facility and the new sentence imposed upon him/her is to be served in the same county penal or correctional facility.

(2) In all other cases, the service of the new term for the latter crime shall precede commencement of the balance of the term originally imposed."

b. Federal law/policy contends that in this situation the state has primary jurisdiction since there has been no final action by the PBPP. The result of this conflict is that the federal authorities refuse to take custody and the PBPP refuses to recommit the inmate.

c. The following procedures are to be followed until the conflict can be resolved.

(1) When an inmate is received and meets the criteria stated in **Section B.4.a. and b. above,** a memorandum stating the facts is to be sent to the Records Administrator/Assistant Records Administrator.

(2) The facility shall track these inmates so that their incarceration does not exceed the length of the federal sentence and the time that he/she would serve if the PBPP issued a final recommitment action. Normally, the Board Action will state

CONFID-DEF-000042

how long he/she would have to serve even though there is no final recommitment action.

(3)   The Records Administrator/Assistant Records Administrator shall be notified three months prior to the expiration of the combined total of the times stated in **Section B.4. above,** if the inmate has not been transferred to federal custody.

(4)   The Records Administrator/Assistant Records Administrator shall be notified if the PBPP issued a final recommitment action or if the federal authorities agree to take custody. All questions should be directed to the Records Administrator/Assistant Records Administrator.

6.   County Parole

The sentencing court retains authority to parole any inmate whose aggregate maximum sentence is less than two years. All other cases (aggregate sentences of two years or more) are within the jurisdiction of the PBPP. Records Office staff shall prepare the **DC-309, County Parole Application** (sentencing information only) **(Attachment 2-I)** and forward it to the Unit Management Team for processing in accordance with Department policy **11.4.1, "Case Summary."** If an inmate seeks "early (county) parole" then it is his/her responsibility to contact the court. If the inmate is to be released from Department custody the procedures in **Section A. above** shall be followed when the inmate is placed on county parole.

7.   Release for Serious Illness

a.   The sentencing court has the authority to make a temporary modification of a criminal sentence to facilitate medical treatment when an inmate is seriously ill and cannot receive necessary medical care in the facility.

b.   When an inmate is granted release because of a serious illness, the Records Office staff must ensure that the Judge issued an order authorizing the change of place of confinement. The order must indicate that the inmate is to be released from the facility and the new place of confinement must be within the Commonwealth. The order shall be referred to the Office of Chief Counsel for review prior to release of the inmate.

c.   The procedures in **Section A. above** shall be followed.

d.   The family member, law enforcement official, or health care professional shall sign a **DC-151A** taking custody of the inmate.

8.   Bail

a.   Bail may be granted either prior to trial, following conviction but prior to sentencing, or pending resolution of an appeal of the inmate's conviction. Bail may not be granted in cases where the individual may face the imposition of capital punishment or a life sentence.

CONFID-DEF-000043

b.  When bail is granted to an inmate who has been transferred to a county jail, the Department's obligation is limited to informing the county jail whether the inmate has any other sentences or outstanding detainers, and whether he/she is required to register under Megan's Law or provide a DNA sample.

c.  When bail is granted to an inmate who is in the custody of the Department, Records Office staff shall verify that sealed copies of the following documents have been received:

   (1)  order vacating the inmate's sentence (except that no such order is required when bail is granted pending appeal of the inmate's sentence or conviction); and

   (2)  receipt indicating that bail has been paid.

d.  The Records Office shall fax to the Office of Chief Counsel: the inmate's **DC-16D/16E**, copies of the documents described above, and the prosecutor's name, if known.

e.  The Office of Chief Counsel shall determine if any appeals are pending that would stay the bail order; advise the Regional Deputy Secretary of the inmate's impending release; and inform the Records Office staff whether the Regional Deputy Secretary has approved the release.

f.  When the Records Office staff is informed of the approved release, the inmate shall be transferred to the county to sign the bail papers and then be released from the county jail, or Records Office staff shall request that the sheriff bring the bail paperwork to the facility and have the inmate sign the paperwork. The Records Office shall have the inmate sign the bail paperwork if the county refuses to use either of the preceding options. The Records Office shall have the inmate sign the bail paperwork if the inmate has other detainers or sentences, which require that he/she be returned to the Department.

g.  An inmate who is serving sentences in addition to the one for which bail has been granted shall not be released unless bail is granted on all of his/her outstanding charges. When the inmate is serving sentences in addition to the one for which bail is granted, the documents identified above shall be faxed to the Office of Chief Counsel. The Office of Chief Counsel shall determine whether the bail order is being appealed and inform the Records Office accordingly.

h.  The Records Office shall prepare the **DC-151A**. The transporting county official shall be required to sign for the inmate prior to release.

i.  The procedures in **Section A. above** must be followed when an inmate is being released on bail.

j.  A new **16E** will be generated, indicating the inmate's bail status.

k.  The Records Office shall establish a system in order to monitor the status of an inmate in bail status on a quarterly basis. Records Office staff are responsible for

CONFID-DEF-000044

obtaining certified documentation relating to the final disposition of the case. An inquiry shall be made quarterly of any inmate who has been on bail status for up to two years and shall be monitored until resolution.

9.  Release Pursuant to Executive Clemency

An inmate may be released upon being granted executive clemency by the Governor. Any documents received directing that an inmate be released pursuant to executive clemency shall be forwarded to the Office of Chief Counsel.

10. Vacated and Modified Sentences and Convictions

a.  Vacated Sentences and Convictions

(1)  A court can vacate an inmate's sentence. This allows the court to re-sentence the inmate but does not vacate the inmate's conviction. A court can also vacate both an inmate's sentence and conviction. In such cases the court can order a new trial for the inmate, grant the inmate bail or direct that the inmate be released from custody. A court also can vacate an inmate's conviction. If the court vacates the inmate's conviction, the sentence is automatically vacated and the court can order a new trail for the inmate, grant the inmate bail, or direct that the inmate be released from custody.

(2)  A vacate order that will result in an inmate being released from custody, shall be referred to the Office of Chief Counsel for direction. The Office of Chief Counsel will advise the Regional Deputy Secretary of the inmate's impending release. If the Office of Chief Counsel, the Records Coordinator or the Assistant Records Coordinator determines that the situation is not one that is considered routine, they will request approval from a Regional Deputy Secretary. A Regional Deputy Secretary's approval is not required for a routine release. Prior to referral to the Office of Chief Counsel, the Records Office staff is responsible to determine and report if either the trail court or appellate court has entered a stay order and report if there is any pending litigation concerning the stay request.

(3)  Upon notification from the Office of Chief Counsel that the vacate order is valid; Records Office staff shall contact the appropriate county sheriff and request that they take custody of the inmate as soon as possible.

(4)  The procedures in **Section A. above** shall be followed when an inmate is released as the result of a vacated sentence or conviction.

(5)  The inmate's **DC-15** must be retained until final resolution. Cases will be reviewed with the county by Records staff on a quarterly basis.

(6)  If an inmate whose sentence or conviction has been vacated is serving other unaffected state sentences or convictions, the inmate shall remain at the facility where incarcerated and shall not be returned to the county.

CONFID-DEF-000045

b. Modification of Sentence Resulting in Release

    (1) A number of legal proceedings can result in modification of an inmate's sentence. Modification can change the length of the inmate's sentence and may result in the inmate's release. When the sentence of a Department inmate who has been transferred to a county jail is modified, the Department's obligation is limited to informing the county jail whether the inmate has any other sentences or outstanding detainers.

    (2) When the sentence of an inmate in the custody of the Department is modified and the modification will result in the inmate's release from custody, Records Office staff shall:

        (a) verify that a sealed copy of the order modifying the inmate's sentence has been received;

        (b) fax the inmate's current **16E**, a copy of the order modifying the inmate's sentence, and the prosecutor's name, if known, to the Office of Chief Counsel; and

        (c) the Office of Chief Counsel shall determine if any appeals are pending that would stay the modification order and advise the Regional Deputy Secretary of the inmate's impending release. If it is determined by the Office of Chief Counsel, the Records Coordinator or the Assistant Records Coordinator that the situation is not one that is considered routine, they will request approval from a Regional Deputy Secretary. A Regional Deputy Secretary's approval is not required for routine releases.

    (3) When the sentence of an inmate in the custody of the Department is modified and the modification will not result in the inmate's release from custody, the documents identified above shall be faxed to the Technical Records Supervisor. The Technical Records Supervisor will coordinate with the Office of Chief Counsel and advise the Records Office accordingly.

    (4) The procedures in **Section A. above** shall be followed when an inmate is released as the result of a sentence modification.

11. Temporary Absences

    a. Courts are empowered to issue writs or orders authorizing the temporary removal of an inmate to the custody of law enforcement officials for official court related business. The court can issue either a writ of habeas corpus ad testificundum or a court order to authorize the inmate's removal. The writ or court order will direct the Secretary/designee or a Facility Manager/designee to release the inmate into the custody of a county sheriff or other law enforcement official for the purpose of a court appearance or other business of the court.

CONFID-DEF-000046

b. A court may direct the county sheriff or other law enforcement official to transport an inmate to the county court. A Judge cannot order the Department to transport an inmate to county court. The Facility Manager/designee shall contact the Office of Chief Counsel prior to honoring any writ or order directing the Department to transport an inmate to court proceedings.

c. Department personnel are responsible for transporting an inmate to federal court to participate in civil or criminal proceedings.

d. The following court-ordered releases are without legal basis. The court-ordered releases listed below shall not be honored:

   (1)  court ordered parole from a sentence within the jurisdiction of the PBPP;

   (2)  modification of sentence after 30 days (and not in connection with a Post Conviction Relief Act [PCRA] Motion) as the result of a remand by an appellate court); and

   Note: except as noted above, no court has the authority to modify any sentence when more than 30 days have passed since the date of sentencing unless the release is ordered through the PCRA process or other procedure, which results in a finding, that the original sentence is illegal. All court-ordered releases from custody are modifications of sentence, regardless of the purpose or duration of the release. All orders directing a release shall be faxed to the Office of Chief Counsel for review prior to initiating any action. Orders that modify an inmate's sentence, but will not result in the inmate's release shall be referred to the Records Administrator/Assistant Records Administrator.

   (3)  Court Ordered Furloughs

   Courts retain the authority to order such releases for an inmate confined in a county jail, but not for an inmate confined under the jurisdiction of the Department. The exclusive authority to release on furlough an inmate confined in the Department is contained in Department policy **DC-ADM 805, "Application, Review, and Approval for Inmates Requesting Pre-Release Status and Outside Assignments."** An inmate who participates in a funeral or deathbed visit shall be handled as described in Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

e. Processing Authorized Temporary Absence (ATA)

   (1)  Upon notification by law enforcement officials of a writ or court order for transport of an inmate, the Records Office shall notify all appropriate departments. The Department facilities shall request a minimum of 24 hours notice for processing any request for ATA. In cases where 24 hours notice is not provided, Records Offices shall still complete the ATA process while complying with Act 84 requirements.

CONFID-DEF-000047

(2) The Records Office shall prepare a **DC-151A** using DOCNet. In the event an automated **DC-151A** is not available, Records Staff will manually prepare a **DC-151A** (snap set) and provide a photograph of the inmate.

(3) The Records Office shall also prepare the temporary transfer information. This document shall be used to advise the officials taking custody of the inmate of information regarding the inmate's custody level, separations, problem areas, misconduct information, and other pertinent issues. The Records Office shall also prepare a **Department Release Checklist** for an inmate being released ATA in order to be released on appeal, or bail pending appeal, or permanent transfer of an inmate's place of confinement to a county or federal facility.

(4) During the course of normal work hours, upon arrival of the transporting officials, a Records Specialist shall review and evaluate the certified writ or court order for validity and correctness. If there is any doubt regarding validity or accuracy, the order shall be faxed to the Records Administrator/Assistant Records Administrator or the Technical Records Supervisor for review and resolution. If an ATA is to take place outside of the normal working hours, arrangements shall be made to ensure that the release is made in accordance with Department procedures.

(5) WRITs for ATA must be signed by a Common Pleas Court Judge. WRITs signed by a magisterial District Justice are not valid.

(6) The Records Office shall maintain a list of inmates who are out of the facility in ATA status. Every three months Records Staff shall ask the other authority the status of the ATA inmate. If the inmate has been released by the other authority, the Records Staff shall obtain certified copies of the court order and implement release procedures; the IRS shall be updated to reflect the status of the inmate.

12. Inter-Facility Transfers

a. Scheduling of Releases and/or Transfers

(1) Every Records Office staff member shall be familiar with pending releases and transfers. Accordingly, at each facility the Records Office shall maintain a tracking system to monitor scheduled releases and transfers.

(2) Records Supervisors shall provide to appropriate staff, on a monthly basis, a listing of every inmate scheduled for release at least two months in advance based upon maximum dates and parole violator maximum dates. Additionally, the Records Office shall develop internal procedures to notify appropriate departments of scheduled releases and transfers. This list shall be used to advise facility and parole staff of the name, inmate number, date, and type of release or transfer.

CONFID-DEF-000048

b. Permanent and Temporary Transfers

(1) A permanent transfer between any Department facility, including CCC's, must be authorized by Central Office, in accordance with **11.2.1, "Reception and Classification, Section 8."** A request for a permanent transfer is accomplished via the Automated Transfer Petition System. Upon approval of a request, the inmate shall be scheduled for movement via the Automated Transportation System.

(2) A temporary transfer between facilities may be necessary for a variety of reasons including, but not limited to: medical care, psychiatric care, release to federal authorities, participation in court proceedings, etc.

c. Processing Permanent Transfers and Pre-Release Transfers

(1) A transfer petition shall be initiated in the Automated Transfer Petition System providing complete justification for the requested transfer in accordance with Department policy **11.2.1.**

(2) If approved, the inmate's name is added to the available list for transfer to the designed facility. Facility staff shall monitor the list of inmates available for transfer and identify any inmate who may be temporarily unavailable for transfer due to medical conditions, disciplinary custody (DC) sanctions, PBPP hearings, etc. These inmates shall be placed in pending status until the situation is resolved.

(3) Upon notification that an inmate is scheduled for movement, the Records Office will notify all appropriate departments of the pending transfer.

(4) The transferring Records Office shall prepare the **DC-160, Transfer Routing Sheet** for inclusion in the record packet being sent with the inmate. This form serves as the control sheet and checklist for both sending and receiving Records Offices.

(5) The sending Records Office is responsible for organizing and preparing the **DC-15** record for shipment along with the inmate. Other departments are responsible to prepare the **DC-14, Counselor File**, Property File, Employment File, and Education File, for shipment. These departments must deliver the records to the Records Office for shipment no later than 48 hours prior to the scheduled departure of the inmate. Any required records not transferred with the inmate shall be annotated on the **DC-160.**

(6) The Records Office shall prepare a **DC-151A**. A photograph of the inmate shall be provided to the transporting officers. Inmates traveling to different destinations shall not be mixed on the same Body Receipt.

CONFID-DEF-000049

(7)   All records must be transported with the inmate in accordance with Department policy **6.3.1, "Facility Security."** Records Office staff shall coordinate with other departments to ensure that all files are sent together.

d.   Processing CCC Transfers

(1)   The Records Office at the sending facility shall ensure that the inmate's records are forwarded to the CCC's support facility within one week of the inmate's reception at the CCC. Records Office staff must prepare a **DC-158** and ensure that the inmate has cleared all mandatory departments prior to being released for transport to the CCC. The records specialist/Corrections Records Specialist and records supervisor/Corrections Records Supervisor shall complete and sign the **Department Release Checklist** to verify the inmate's eligibility for transfer to CCC.

(2)   On the day of transfer, the sending facility must send an email notice to the CCC, the receiving support facility Records Office, and the Regional CCC office of the inmate's departure. The notice must include the inmate's name and number, method and time of departure, and estimated time of arrival. If the inmate is traveling via private automobile the notice must also include the person responsible for transport and the vehicle's license plate number.

(3)   Upon arrival at the CCC, the CCC must notify the sending facility of the inmate's arrival and the time he/she arrived. The sending facility will not process the transfer in the IRS until receipt of this notification.

(4)   If notification or arrival is not received by 0800 following the day of departure, Records Office staff must call the CCC and verify the inmate's arrival. If the inmate did not arrive, he/she will be considered an escapee and the sending facility will process the escape, in accordance with Department policy **6.3.1.**

e.   Processing Temporary Transfers (TT)

(1)   Upon notification that an inmate is scheduled for transfer to another Department facility, Records Office shall notify all appropriate departments of the pending transfer. The transferring Records Office shall prepare the **DC-160** for inclusion in the packet being sent along with the inmate. This form will serve as the control sheet and checklist for both sending and receiving Records Offices.

(a)   The **DC-14** and **DC-15** shall be sent for any Department programs that require a TT from the parent facility;

(b)   90 days worth of the **DC-14**;

(c)   **DC-15** for inmates who are TT for extended medical treatment and mental health placement;

CONFID-DEF-000050

    (d)   TT packets for PBPP hearings, arraignments, short term medical, and federal court and miscellaneous hearings.

(2)   The TT packet shall include the following:

    (a)   **DC-160**;

    (b)   copy of the transfer petition;

    (c)   Integrated Case Summary;

    (d)   wanted poster;

    (e)   copy of the **16E**;

    (f)   automated misconduct report; and

    (g)   if the inmate is going TT for federal court the original court order (if available) or the faxed copy in absence of the original must also be included.

(3)   The Records Office shall prepare a **DC-151A**. A photograph of the inmate shall be provided to the transporting officers. Inmates traveling to different destinations shall not be mixed on the same Body Receipt.

(4)   All records are to be transported with the inmate in accordance with Department policy **6.3.1**.

f.   Immigration and Customs Enforcement (ICE)

(1)   A male inmate with an ICE detainer who is ready for transfer to SCI-Camp Hill is processed with a temporary transfer petition. Records Office staff shall initiate the transfer petition. The inmate's record shall be processed for transfer as if the inmate is being permanently transferred, to include any parole packets provided by the facility parole office. SCI-Camp Hill shall notify the sending facility's records office when ICE takes custody of the inmate; the sending facility will delete the inmate from the IRS. SCI-Camp Hill shall return the inmate's records to the sending facility to be placed in inactive status.

(2)   SCI-Cambridge Springs and SCI-Muncy will arrange with ICE for direct pick up of a female inmate.

g.   Interstate Compact Cases (ICC)

(1)   There are two types of ICCs; cases received from other states and cases sent from Pennsylvania to other states.

CONFID-DEF-000051

(2) When an inmate is approved for transfer to another state from Pennsylvania, the records of the inmate will be forwarded to the Central Office Technical Records Section pending return of the inmate. The IRS/DOCNet will show the inmate as transferred to another state and inactive. However, the files must be kept in active status until the inmate is released or returns to Pennsylvania and the records will be returned/forwarded to the Pennsylvania facility where the inmate will be housed.

(3) An inmate in another state is tracked and returned for parole, when applicable, by the ICC Coordinator in conjunction with the PBPP. The Central Office Technical Records Section is responsible for contacting the ICC Coordinator nine months prior to completion of the minimum sentence or scheduled review date to request a progress report. Upon release, the file will be deactivated and stored for purging.

## C. Release Checklist

1. The **DOC Release Checklist** includes specific instructions for the review of an inmate's file prior to authorizing his/her release from a Department facility.[3]

2. Completion of the **DOC Release Checklist**

   a. **Section 1** requires a mandatory review of the **DC-15, DC-16D/16E** and the initiation of a new NCIC/CLEAN check to determine the existence of:

   (1) any concurrent county, out-of-state or federal sentences;

   (2) any active detainers (see **Section 5** of this procedures manual);

   (3) any offenses that qualify for DNA registration, in accordance with Department policy **11.6.2, "Act 57 DNA Data and Testing;"**

   (4) any offenses that qualify for Megan's Law registration, in accordance with Department policy **11.6.1, "Sexually Violent Offender Registration (Megan's Law);"**

   (a) if the inmate is a parolee, ensure that the Facility Parole Representative has registered the inmate for current and past offenses that qualify;

   (b) if the inmate is being released at his/her SC, the Records Office must register the inmate for current and past offenses that qualify;

   (c) if the inmate is already registered with PSP, the Records Office shall notify the counselor and follow all requirements in accordance with Department policy **11.6.1** and forward the Change of Address Form to the PSP prior to the inmate's release.

---

[3] 4-4446

CONFID-DEF-000052

    (5)  any possible open charges and unreported dispositions, including unresolved charges for which the inmate was on ATA status or for which a video conference hearing was conducted.

    (6)  if not certified, verify that the inmate's sentence structure is correct and certify the sentence.

    (7)  prepare the Release Notification Letter to the DA for all SC cases; and

    (8)  a new complete criminal history must be run and reviewed for outstanding charges and unreported dispositions within seven days of release except as noted in **B.2.h.** A QWA must be run the last working day prior to discharge.

b. **Section 2 (Release to Bail)** requires, in addition to the mandatory review as noted above, that the following requirements are met prior to the inmate's release:

    (1)  certified Court Order allowing bail;

    (2)  certified Court Order setting bail;

    (3)  signed receipt that bail was paid;

    (4)  contact the county District Attorney to determine if bail is being appealed; and

    (5)  contact the Office of Chief Counsel if the inmate is to be released from incarceration.

c. **Section 3 (Transfer to Community Corrections)** requires, in addition to the mandatory review as noted above, that an approved Transfer Petition is available.

d. **Section 5 (Release to Parole)** requires, in addition to the mandatory review as noted above, that the parole or re-parole orders be reviewed by Records Office staff to ensure that all active indictments are listed correctly, the appropriate county is indicated, and the release date is correct. A faxed copy or a copy of the release order must be given to the Records Office in advance of the inmate's scheduled sign-out. The Records Office must be in possession of the original signed release order prior to the inmate's discharge.

e. **Release to Parole** also relates to **Act 84 Information Requirements** upon transfer to county facilities, as well as release on state parole and SC. Please refer to **Section 7** of this procedures manual.

3. Upon completion of the **DOC Release Checklist**, the Records Specialist/Corrections Records Specialist and the Records Supervisor/Corrections Records Supervisor/designee are required to sign the form, indicating that all required steps have been completed. In the absence of the Records Supervisor, the Records Specialist designated by the supervisor shall sign the form. When the inmate has been cleared for

CONFID-DEF-000053

release using the **DOC Release Checklist**, the **DC-158** shall be initiated and the release process implemented.

### D. Sentence Computation Errors

Sentence computation errors shall be reported to the BOSS, Technical Records Supervisor, via a **Sentence Computation Error Information Sheet (Attachment 2-J)** as soon as the error is discovered. When an error has occurred, the Records Supervisor shall ensure that the error is corrected after receiving direction from the Records Administrator/Assistant Records Administrator, and issue the inmate a new **16E** with the recalculation.

### E. Erroneous Release or Held Past Sentence Complete (SC) Date

1. An erroneous release occurs anytime an inmate is released prior to his/her authorized legal date of release which could be due to sentence calculation error, improper paperwork, lack of paperwork, error by our agency and/or error by another agency. If an inmate returns as a parole violator, and when checking the sentence structure, Records staff determines that there was an error that, when recalculated, results in the inmate being released prematurely, it is considered an erroneous release.

2. If an inmate is held past his/her SC date due to a sentence calculation error, improper paperwork, lack of paperwork, and error by the Department and/or error by another agency, these procedures also apply.

3. Records staff shall notify the Records Administrator/Assistant Records Administrator of every erroneous release and inmate held past his/her SC date immediately; **PRIOR** to completing the **DC-121, Extraordinary Occurrence Report**. If the Records Administrator is not available, staff is to notify one of the Assistant Records Administrators, and in their absence the Technical Records Supervisor will be notified.

4. If Records staff are not sure if the situation in question constitutes an erroneous release or held past the SC date, they shall contact the Records Administrator/Assistant Records Administrator prior to taking any action;

   a. the Records Specialist, must notify the supervisor immediately, the supervisor will notify the Records Administrator/Assistant Records Administrator immediately for instructions on how to proceed;

   b. the facility chain of command must be notified;

   c. prepare an **Extraordinary Occurrence Report.** This report will be faxed to the Records Administrator in addition to the normal distribution as required in Department policy **6.3.1, Section 17**; and

   d. a **16E** reflecting changes will not be distributed until approved by the Records Administrator/Assistant Records Administrator.

CONFID-DEF-000054

## F. Input into the Inmate Records System (IRS)

1. Every release of an inmate, with the exception of a prerelease transfer, must be entered into the IRS within two hours of the activity. The IRS/DOCNet is automatically updated for an inmate being transferred between Department facilities via the automated Transfer Petition and Transportation System.

2. Records Office Staff are responsible to enter the appropriate codes into the IRS for an inmate being released for parole, re-parole, and continue on parole, transfer to CCC, SC, ATA, Bail, or Vacated Conviction/Sentence. The **Frequently Used Abbreviations (Attachment 2-K)** includes samples of data to be entered for these various types of releases.

## G. Proclamation Counties

1. The Department accepts an inmate for the service of designated counties' sentences at SCI Muncy and SRCF Mercer. These counties are: Allegheny, Armstrong, Beaver, Butler, Cameron, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Venango, Warren, Washington, and Westmoreland.

2. Records Office staff is responsible to maintain a suspense time file in order to ensure that the inmate is processed for county parole in accordance with the established minimum, and/or released when SC.

CONFID-DEF-000055

| Department Release Checklist | |
|---|---|
| Inmate Name: | Method of Release: |
| Inmate Number: | Date of Release: |

| Section 1 – Mandatory Procedures | |
|---|---|
| Check Box | Review the DC-15 inmate Records Jacket as follows: |
| | The DC-16D looking for concurrent county, out of state, and federal sentences. |
| | The DC-16D detainer section for active detainers. |
| | The DC-16D for current offenses that qualify for DNA registration |
| | The DC-16D and completed criminal history (PA, RAP, and NCIC) for offenses that require Megan's Law registration. If the inmate is a parolee, you must ensure that the facility Parole Representative has registered the inmate for current and past offenses that qualify and completed the Change of Address form for registered sexual offender's. If the inmate is SC, the records office must register the inmate for past offenses that qualify. |
| | Review the entire legal section to include ATA orders for possible open charges, sentence structures and that it is correct, the PBPP recommitment forms (PBPP-39, PBPP-141, warrant to commit and detain with attachments for possible open charges, the release of the warrant to commit and detain). |
| | Review the complete criminal history for outstanding charges. A Wanted Inquiry must be run the last working day prior to discharge. |

| Section 2 – Release to Bail | |
|---|---|
| | Complete all Mandatory Procedures in Section 1 above. |

| Section 3 – Transfer to Community Corrections | |
|---|---|
| | Complete all Mandatory Procedures in Section 1 above. |
| | Ensure there is an approved Transfer Petition. |

| Section 4 – Transfer to County Facility | |
|---|---|
| | Complete all Mandatory Procedures in Section 1 above. |
| | This is to verify the above listed mandatory actions completed |

_____     _____     _____     _____
Records Specialist Signature          Date              Records Supervisor Signature            Date

| Section 5 – Release to Parole | |
|---|---|
| | Complete the following Mandatory Procedures found in Section 1 above within six working days of receiving the request for urinalysis from the Facility Parole Representative. |
| | The DC-16D looking for concurrent county, out of state, and federal sentences. |
| | The DC-16D detainer section for active detainers. |
| | The DC-16D for current offenses that qualify for DNA registration. |
| | Review the entire legal section to include ATA orders for possible open charges, sentence structures and that it is correct, and PBPP recommitment forms (PBPP-39, PBPP-141, warrant to commit and detain with attachments for possible open charges, the release of the warrant to commit and detain). |
| | Review the complete criminal history for outstanding charges to include running a QW |
| | This is to verify the above listed mandatory actions were completed |

_____     _____     _____     _____
Records Specialist Signature          Date              Records Supervisor Signature            Date

| | |
|---|---|
| | Review Parole/ReParole orders to ensure that all active indictments are listed, that they are correctly listed, the correct county is shown, and to double-check the release date. |

| Department Release Checklist (continued) | | |
|---|---|---|
| **Sentence Complete (SC)** | | |
| Complete all Mandatory Procedures in Section 1 above. | | |
| This is to verify the above listed mandatory actions were completed | | |
| | | |
| Records Specialist Signature   Date | Records Supervisor Signature | Date |
| **Section 6 – Act 84 information Requirements** | | |
| **Transfer to County Facility** | | |
| Record of facility adjustment (include misconduct and escape history). | Completed On: | |
| Written notice of current medical or psychological conditions requiring treatment (include suicide attempts). | Medical Notified On: | Received: |
| Written notice of current or previously ordered/administered medications. | Medical Notified On: | Received: |
| A forty-eight hour supply of medications | Medical Notified On: | Received: |
| **Release to Parole** | | |
| Record to the PBPP of any monies paid by the inmate and any balance remaining towards satisfaction of restitution or any other court ordered financial obligations. | Business Office Notified On: | Received: |
| Packet that contains the following (unless previously supplied with 13A): | | |
| Record of facility adjustment (including misconduct and escape history) | | |
| Official version of crime (if available) | | |
| Preliminary hearing transcript or docket transcript form (if available) | | |
| Police report summarizing facts of the crime | | |
| PSI (if available) | | |
| Guilty plea transcript or colloquy (if available) | | |
| Criminal complaint, affidavit, or probable cause accompanying the arrest warrant | | |
| Guideline Sentence Form issued by the PA Sentencing Commission | | |
| **Sentence Complete (SC)** | | |
| Record to County of any monies paid by the inmate and any balance remaining towards satisfaction of restitution or any other court ordered financial obligations. | Business Office Notified On: | Received: |
| Notes/Comments: | | |
| | | |

**Section 2 – Releases**
Revised 4/2008

**Attachment 2-A, Page 2**

**CONFID-DEF-000057**

# VIOLENT/SEXUAL CRIMES CHART

CONFID-DEF-000058

# VIOLENT/SEXUAL CRIMES CHART
## PAGE 1 of 5 (rev'd 3/19/08)

| 42 Pa.C.S. §9714(g) Act 143 Offenses Effective if sentenced on or after 2/19/99 | 44 Pa.C.S. §2301 Act 185 of 2004, DNA Data and testing | 42 Pa.C.S. §9795.1 Megan's Law Offenses Effective if offender has not completed sentence by 7/12/95 | 42 Pa.C.S. §9795.1 Megan's Law Offenses and Sexual Offenses Effective sentenced on 4/12/96 | 42 Pa.C.S. §9718.1 Act 98 of 2000, Sexual Offender Txt.Reqt. Applies to crime committed on or after 1/20/00 |
|---|---|---|---|---|
| *Mandatory sentence offenses from crimes of violence under the Sentencing Code.* | *Offenses requiring DNA sample be submitted to State Police DNA database.* | *Offenses requiring registration and community notification for sexually violent predators.* | *Offenses Board has designated as Violent and Sexual. \* requires 5 votes to parole.* | *Offenses prohibited from interviewing without participating in DOC programming.* |
| 1. Murder of the Third Degree, 18 Pa. C.S.A. § 2502(c) | A DNA sample must be taken from anyone incarcerated, on probation, or on parole for: | 1. Kidnapping, where victim is a minor, 18 Pa. C.S.A. § 2901 | *1. Murder, Regardless of Degree (18 Pa.C.S. § 2502) | 1. Involved a minor under 18 years of age and offense is: |
| 2. Voluntary Manslaughter, 18 Pa. C.S.A. § 2503 | Any felony offense or any misdemeanor offense or attempt under: | 2. Indecent Assault, where the offense is a misdemeanor of the first degree, 18 Pa. C.S.A. § 3126(a)(7) | 2. Voluntary Manslaughter (18 Pa.C.S. § 2503) | ➤ Rape (18 Pa. C.S. § 3121) |
| 3. Aggravated Assault, graded as a felony of the first degree, 18 Pa. C.S.A. § 2702(a)(1) & (2) | 1. Luring a Child into a Motor Vehicle, 18 Pa. C.S.A. § 2910 | 3. Incest, where the victim is 12 years of age or older but under 18 years of age, 18 Pa. C.S.A. § 4302 (ten year registration) | 3. Aggravated Assault (18 Pa.C.S. § 2702) | ➤ Statutory Sexual Assault (18 Pa. C.S. § 3122.1) |
| 4. Kidnapping, 18 Pa. C.S.A. § 2901 | 2. Indecent Assault, 18 Pa.C.S.A. § 3126 | 4. Incest, where the victim is under 12 years of age, 18 Pa. C.S.A. § 4302 (lifetime registration) | *4. Rape (18 Pa.C.S. § 3121) | ➤ Involuntary Deviate Sexual Intercourse (18 Pa.C.S.A. § 3123) |
| 5. Rape, 18 Pa. C.S.A. § 3121 | Any attempt, conspiracy, or solicitation to commit a felony offense under: | 5. Prostitution and related offenses, where the actor promotes the prostitution of a minor, 18 Pa. C.S.A. | *5. Statutory Sexual Assault (18 Pa. C.S. § 3122.1) | ➤ Sexual Assault (18 Pa.C.S. § 3124.1) |
| 6. Involuntary Deviate Sexual Intercourse, 18 Pa. C.S.A. § 3123 | 1. Sex Offenses, 18 Pa. C.S.A. Ch. 31 | | *6. Involuntary Deviate Sexual Intercourse (18 Pa.C.S. § 3123) | ➤ Institutional Sexual Assault (18 Pa.C.S. § 3124.2) |
| 7. Arson Endangering Persons, 18 Pa. C.S.A. § 3301(a) | 2. Incest, 18 Pa., C.S.A. § 4302 | | *7. Sexual Assault (18 Pa.C.S. § 3124.1) | ➤ Aggravated Indecent Assault (18 Pa.C.S. A. § 3125) |
| 8. Burglary of a structure adapted for overnight accommodation in which at the time of the offense any | 3. Prostitution and Related Offenses, 18 Pa. C.S.A § 5902 (C) | | *8. Institutional Sexual Assault (18 Pa.C.S. § 3124.1) | ➤ Indecent Assault (18 Pa.C.S. § 3126) |
| | | | *9. Aggravated Indecent Assault (18 Pa.C.S. § 3125) | ➤ Indecent |
| | | | *10. Conduct Relating to Sex Offenders (18 | |

CONFID-DEF-000059

# VIOLENT/SEXUAL CRIMES CHART
## PAGE 2 of 5 (rev'd 3/19/08)

| 42 Pa.C.S. §9714(g) Act 143 Offenses Effective if sentenced on or after 2/1/1995 | 44 Pa.C.S. §2301 Act 185 of 2004 DNA Data and Testing | 42 Pa.C.S. §9795.1 Megan's Law Offenses Effective if offender has not completed sentence by 4/21/96 | Board Designated Violent Offenses and Sexual Offenses | 42 Pa.C.S. §9718.1 Act 98 of 2000 Sexual Offender 1st Req. Applies to crime committed on or after 12/20/00 |
|---|---|---|---|---|
| person is present, 18 Pa. C.S.A. § 3502 | (1) (III) and (IV) | § 5902(b) | Pa.C.S.A. § 3130 | Exposure (18 Pa.C.S. § 3127) |
| 9. Robbery, graded as a felony of the first degree, 18 Pa. C.S.A. § 3701(a)(1)(i), (ii) or (iii) | 4. Obscene and Other Sexual Materials and Performances, 18 Pa. C.S.A. § 5903(A), where the Offense Constitutes a Felony | 6. Obscene and other sexual materials and performances, where the victim is a minor, 18 Pa. C.S.A. § 5903(a)(3), (4), (5) or (6) | *11. Incest (18 Pa.C.S. § 4302) | Sexual Intercourse with Animal (18 Pa. C.S.A. § 3129) |
| 10. Robbery of a Motor Vehicle, 18 Pa. C.S.A. § 3702 | 5. Sexual Abuse of Children, 18 Pa. C.S.A. § 6312 | 7. Sexual Abuse of Children, 18 Pa. C.S.A. § 6312 | 12. Stalking When Graded as a Felony of the Third Degree [18 Pa. 2709(b), graded under §2709(c)(2)(ii)] | ^ Conduct Relating to Sex Offenders (18 Pa.C.S. § 3130) |
| 11. Sexual Assault, 18 Pa. C.S.A. §3124.1 | 6. Unlawful Contact With Minor, 18 Pa. C.S.A. § 6318, where the Most Serious Underlying Offense for which the Defendant Contacted the Minor is graded as a Felony | 8. Unlawful Contact or Communication with Minor, 18 Pa. C.S.A. § 6318 | 13. Arson (18 Pa.C.S. § 3301) | 1. Endangering Welfare of Children, (18 Pa.C.S. § 4304) If the offense involved sexual contact with the victim |
| 12. Aggravated Indecent Assault, 18 Pa. C.S.A. § 3125 | 7. Sexual Exploitation of Children, 18 Pa. C.S.A. § 6320 | 9. Sexual Exploitation of Children, 18 Pa. C.S.A. § 6320^ | *14. Kidnapping (18 Pa.C.S. § 2901) | 2. Corruption of Minors, (18 Pa.C.S. § 6301) if the offense involved sexual contact with the victim |
| 13. Incest, 18 Pa. C.S.A. § 4302 | | 10. Rape, 18 Pa. C.S.A. § 3121 | 15. Burglary (18 Pa.C.S. § 3502) | 3. Open Lewdness, (18 Pa.C.S. § 5901) if the offense involved a minor under 18 years of age |
| 14. Criminal Attempt, Conspiracy, or Solicitation to commit any of the offenses listed above. | | 11. Involuntary Deviate Sexual Intercourse, 18 Pa. C.S.A. § 3123 | 16. Robbery (18 Pa.C.S. § 3701) | 4. Prostitution, (18 Pa.C.S. § 5902) if the offense |
| | | 12. Sexual Assault, 18 Pa. C.S.A. § 3124.1 | 17. Robbery of a Motor Vehicle ("Carjacking") (18 Pa.C.S. § 3702) | |
| | | 13. Aggravated Indecent Assault, 18 Pa. C.S.A. § 3125 | 18. Theft by Extortion, Where a Threat of Violence is Made (18 Pa.C.S. § 3923) | |
| | | 14. Luring a Child into a Motor Vehicle, 18 Pa. C.S.A. § 2910 | 19. Aggravated Harassment by Prisoner (18 Pa.C.S. § 2703.1) | |
| | | 15. Institutional Sexual | 20. Assault by Prisoner (18 Pa.C.S. § 2703) | |
| | | | 21. Assault by Life | |

# VIOLENT/SEXUAL CRIMES CHART
## PAGE 3 of 5 (rev'd 3/19/08)

| 42 Pa.C.S. §9714(d)(1) Act 143 Offenses Effective if sentenced on or after 2/19/99 | 44 Pa.C.S. §2301 Act 185 of 2004 DNA Data and Testing | 42 Pa.C.S. §9795.1 Megan's Law Offenses Effective if offender has not completed sentence by 4/21/96 | Board Designated Violent Offenses and Sexual Offenses | 42 Pa.C.S. §9718.1 Act 98 of 2000 Sexual Offender Tx Reqt Applies to crime committed on or after 1/20/00 |
|---|---|---|---|---|
| | | Assault, 18 Pa. C.S.A. § 3124.2<br>16. Criminal Attempt to commit any of the above offenses | Prisoner (18 Pa.C.S. §2704)<br>*22. Murder of Unborn Child, Regardless of Degree (18 Pa.C.S. § 2604)<br>23. Voluntary Manslaughter of Unborn Child (18 Pa.C.S. § 2605)<br>24. Aggravated Assault of Unborn Child (18 Pa.C.S. § 2606)<br>*25. Promoting Prostitution, Where the Actor Promotes the Prostitution of a Child Under the Age of 16 years [18 Pa.C.S. § 5902(b) and graded as a third degree felony under §5902(c)(1)(iii)]<br>*26. Obscene and Other Sexual Materials and Performances Involving a Victim who is a Minor, where the Conviction is Graded as a Felony (18 Pa.C.S. § | involved a minor under 18 years of age<br>5. Obscene and Other Sexual Materials and Performances, (18 Pa.C.S. § 5903) if the offense involved a minor under 18 years of age<br>6. Sexual Abuse of Children, (18 Pa.C.S. § 6312)<br>7. Unlawful Contact or Communication with a Minor (18 Pa.C.S. § 6318)<br>8. Sexual Exploitation of Children (18 Pa.C.S. § 6320)<br>9. Incest, (18 Pa.C.S. § 4302) if the offense involved a minor under 18 years of age<br>10. An attempt or solicitation to commit any of the offenses listed in this subsection. |

CONFID-DEF-000061

# VIOLENT/SEXUAL CRIMES CHART
## PAGE 4 of 5 (rev'd 3/19/08)

| 42 Pa.C.S. §9714(d) Act 143 Offenses Effective if sentenced on or after 2/1/99 | 44 Pa.C.S. §2301 Act 185 of 2004 DNA Data and Testing | 42 Pa.C.S. §9795.1 Megan's Law Offenses Effective if offender has not completed sentence by 4/21/96 | Board Designated Violent Offenses and Sexual Offenses | 42 Pa.C.S. §9718.1 Act 98 of 2000 Sexual Offender Txt Reqt Applies to crime committed on or after 12/20/00 |
|---|---|---|---|---|
| | | | 5903) | |
| | | | *27. Indecent Assault, Where the Victim is Younger than 13 Years of Age [18 Pa.C.S. § 3126(a)(7) and graded as a misdemeanor of the first degree under § 3126(b)] | |
| | | | *28. Sexual Abuse of Children (18 Pa.C.S. § 6312) | |
| | | | *29. Unlawful Contact or Communication with Minor (18 Pa.C.S. § 6318) | |
| | | | *30. Sexual Exploitation of Children (18 Pa.C.S. §6320) | |
| | | | *31. Luring a Child into a Motor Vehicle (18 P.S. § 2910) | |
| | | | *32. Open Lewdness (18 P.S. § 5901) | |
| | | | 33. Sexual Intercourse with Animal (18 P.S. § 3129) | |
| | | | *34. Corruption of Minors (18 Pa.C.S. §6301) if the offense involved sexual contact with the | |

CONFID-DEF-000062

# VIOLENT/SEXUAL CRIMES CHART
## PAGE 5 of 5 (rev'd 3/19/08)

| 42 Pa.C.S. §9714(g) Act 143 Offenses Effective if sentenced on or after 2/1/1999 | 44 Pa.C.S. §2301 Act 185 of 2004 DNA Data and Testing | 42 Pa.C.S. §9795.1 Megan's Law Offenses Effective if offender has not completed sentence by 4/21/96 | Board Designated Violent Offenses and Sexual Offenses | 42 Pa.C.S. §§9718.1 Act 98 of 2000 Sexual Offender Txt Reqt Applies to crime committed on or after 12/20/00 |
|---|---|---|---|---|
| | | | victim.<br><br>35. Criminal Attempt, Criminal Solicitation or Criminal Conspiracy to commit any of the above-listed offenses (18 Pa.C.S. §§ 901, 902 and 903, respectively)<br><br>36. Homicide by Vehicle (75 Pa. C.S.A. §3732)<br>37. Homicide by Vehicle while driving under Influence (75 Pa C.S.A. §3735)<br><br>A crime equivalent to any of the above-listed offenses under the laws of the Commonwealth in effect at the time of the commission of the offense. | |

CONFID-DEF-000063

**ADJUSTMENT RECORD**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

**FOR INTERNAL RECORDS OFFICE USE ONLY**

_____
Facility

**UNREPORTED DISPOSITIONS**

| FACILITY NUMBER | PBPP NUMBER | NAME |
|---|---|---|
| | | |

**DATE_____**

Arresting Agency _____

Date of Arrest _____ OTN _____

Charges _____

Person/Agency Contacted _____

Disposition _____

_____

**DATE_____**

Arresting Agency _____

Date of Arrest _____ OTN _____

Charges _____

Person/Agency Contacted _____

Disposition _____

_____

**DATE_____**

Arresting Agency _____

Date of Arrest _____ OTN _____

Charges _____

Person/Agency Contacted _____

Disposition _____

_____

Open Case:  Yes   No                    Megan's Offender:  Yes    No

Information verified by: _____
                                          Signature and Title

**This Document is an original copy and should not be reproduced without the following criteria established in CHRIA. All reproduced copies of this document should be logged before dissemination. This CHRI is only that which is contained within the Department files. A summary of statewide CHRI may be obtained by the PSP, Records and Identification Division.**

| DC-158 Revised 3/08 **RELEASE WORKSHEET** | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | | |
|---|---|---|---|---|
| Facility Number | Name | County | Race | Date of Release |
| Method of Release | Eff. Date of Sentence | Time Served Y-M-D | Remarks | |

| RELEASE STATIONS   *Mandatory | Date | Signature |
|---|---|---|
| 1. Barber Shop | | |
| 2. Block Officer | | |
| 3. Business Office* | | |
| 4. Chaplain | | |
| 5. Commissary | | |
| 6. Control Desk | | |
| 7. Dental Office* | | |
| 8. Deputy Superintendent | | |
| 9. Education Office* | | |
| 10. Facility Manager | | |
| 11. Gate/Lobby Officer | | |
| 12. Library* | | |
| 13. Medical Office* | | |
| 14. Parole Office* | | |
| 15. Records Office* | | |
| 16. Property Room* | | |
| 17. Tailor shop | | |
| 18. Employment Office | | |
| 19. Counselor | | |
| 20. TV and/or Radio | | |
| 21. Security Storeroom | | |
| 22. Inmate Telephone System Administrator | | |

Inmate is leaving by:          Train          Automobile          Plane          Other (specify)

| Inmate is leaving with: | | Reason: | | |
|---|---|---|---|---|
| Time leaving: | Name(s) of Escorting Officer(s) | Placed On: | Location: | Time: |

DNA _____          Megan's Law  _____          Problematic  _____

***11.5.1, Records Office Operations Procedures Manual***          ***Attachment 2-D***
***Section 2 – Releases***

CONFID-DEF-000065

Release Notification Letter (Sample)

<u>(Date)</u>

(District Attorney of the Committing County)
Street Address
City, State, Zip

      RE:   Release of <u>(Inmate)</u>

Dear _____ :

     This letter is intended to inform you that on <u>(date)</u>, inmate <u>(name and inmate number)</u> will have served his maximum sentence on his convictions for <u>(charges)</u> and, thus, will be released from the State Correctional Institution at <u>(name of institution)</u>.  The Department of Corrections believes he may return to your area upon release.

     *Because the charges of which <u>Mr./Ms.</u> (name) has been convicted fall under the DNA Act, his/her DNA sample was taken before <u>his/her</u> release. (optional paragraph)*

     If you have any questions or would like any additional information, you may contact me at the above address.

                       Sincerely,

                       Facility Manager
                       SCI- _____

SP 4-218 (3-2007)



## PENNSYLVANIA STATE POLICE
# SEXUAL OFFENDER REGISTRATION NOTIFICATION
### MEGAN'S LAW



| | |
|---|---|
| ☐ | As set forth in Title 42, Judicial Code, Chapter 97, Subchapter H, you are required to register with the Pennsylvania State Police because you have been convicted of a sexually violent offense or were required to register in another jurisdiction. You will be required to register for a minimum of ten (10) years and may be required to register for a period up to your lifetime. You will be notified by the Pennsylvania State Police when you have completed your required registration period. |
| 2. ☐ | You are hereby advised of the following requirements, as set forth in Title 42, Judicial Code, Chapter 97, Subchapter H: |
| a. ☐ | You shall immediately register with the Pennsylvania State Police and submit a photograph and fingerprints. Your signature is mandatory upon your verification of the information contained on the appended registration form. Failure to provide your signature, photograph, or fingerprints will result in you not being registered and subject to immediate arrest. |
| b. ☐ | You must appear in person, within 48 hours, at any approved registration site to notify the Pennsylvania State Police of any change in your residence, place of employment/vocation, or school. You may only report changes to your residence, employment/vocation, or school on the Sexual Offender Address Work Sheet, Form SP 4-219. |
| c. ☐ | Periodically, to remind you of your verification requirements, the Sexual Offender Address Work Sheet will be sent to your registered mailing address. This form will not be forwarded to any other address. Failure to receive the Sexual Offender Address Work Sheet does not relieve you of your verification requirements. |
| d. ☐ | If you have been designated as a Sexually Violent Predator, you are required to appear quarterly between January 5 and January 15, April 5 and April 15, July 5 and July 15, and October 5 and October 15, of each calendar year at an approved registration site to complete the Sexual Offender Address Work Sheet, and to be photographed. Otherwise, you are required to appear within ten (10) days before each annual anniversary date of your initial registration at a Pennsylvania State Police Station or other approved registration site to complete a Sexual Offender Address Work Sheet, and to be photographed. |
| e. ☐ | You shall register with the appropriate law enforcement agency of another state within 48 hours of moving, obtaining employment, or enrolling in any school outside of the Commonwealth of Pennsylvania. You shall also notify the Pennsylvania State Police within the same time period by completing a Sexual Offender Address Work Sheet in the manner prescribed in paragraph 2. b. |
| 3. ☐ | You will be committing a felony criminal offense should you fail to fulfill any of the above requirements or other applicable provisions of Title 42, Judicial Code, Chapter 97, Subchapter H, and will be subject to prosecution. |
| 4. ☐ | In accordance with Title 42, Judicial Code, Chapter 97, Subchapter H, your name, address, and other identifying factors will be disseminated to law enforcement agencies. Additionally, certain information about you will be made available to the public on the Megan's Law Website. If you have been designated as a Sexually Violent Predator or an out-of-state offender subject to community notification, this information will also be disseminated to victim(s), neighbors, schools, day care centers, colleges, county children and youth agencies, and to the general public upon request. |
| 5. ☐ | Any questions regarding your registration requirements should be directed to the Pennsylvania State Police, Megan's Law Section by calling toll free 1-866-771-3170 or by writing the Pennsylvania State Police, Megan's Law Section, 1800 Elmerton Avenue, Harrisburg, PA 17110-9758. |

**I acknowledge the above requirements as set forth by applicable provisions of Title 42, Judicial Code, Chapter 97, Subchapter H. I understand I will be committing a felony criminal offense should I fail to fulfill any requirement.**

| 6. SIGNATURE - OFFENDER | 7. DATE |
|---|---|
| | |

**I certify that I have read to the offender the requirements set forth above.**

| 8. SIGNATURE - REGISTERING OFFICIAL | 9. TITLE | 10. DATE |
|---|---|---|
| | | |

| 11. PRINTED NAME – REGISTERING OFFICIAL | 12. DEPARTMENT/AGENCY/FACILITY (INCLUDE PSP STATION NAME) | 13. TELEPHONE NUMBER (EXTENSION IF NECESSARY) |
|---|---|---|
| | | -     -          Ext. |

<u>Forward this form, with a current photograph and fingerprint card, to:</u>

**Pennsylvania State Police
Bureau of Records and Identification
Megan's Law Section
1800 Elmerton Avenue
Harrisburg, PA 17110-9758**

CONFID-DEF-000067

SP 4-218A (3-2007)

| | SEXUALLY VIOLENT PREDATOR | ☐ |
|---|---|---|

## PENNSYLVANIA STATE POLICE
# SEXUAL OFFENDER REGISTRATION
### MEGAN'S LAW

| PENNSYLVANIA SEXUAL OFFENDER | ☐ |
|---|---|
| OUT-OF-STATE SEXUAL OFFENDER | ☐ |

## ARREST INFORMATION

| 1. PA SID | 2. FBI NUMBER | 3. INMATE NUMBER |
|---|---|---|
| | | |

| 4. OTN | 5. DATE OF RELEASE | 6. MAXIMUM DATE OF SENTENCE | 7. WAS THE VICTIM A MINOR? ☐ YES  ☐ NO |
|---|---|---|---|

8. OFFENSE(S)

| 9. ARE YOU UNDER SUPERVISION? ☐ YES  ☐ NO | 10. SUPERVISING AGENCY | 11. END DATE OF SUPERVISION | 12. PAROLE # |
|---|---|---|---|

| 13. STATE/COUNTRY OF CONVICTION | 14. ARRESTING AGENCY | 15. COUNTY OF CONVICTION |
|---|---|---|

## OFFENDER INFORMATION

| 16. LAST NAME | 17. FIRST NAME | 18. MIDDLE NAME | 19. SUFFIX |
|---|---|---|---|

| 20. DATE OF BIRTH | 21. PLACE OF BIRTH | 22. SOCIAL SECURITY NUMBER |
|---|---|---|

| 23. GENDER | 24. RACE | ETHNICITY | 25. HEIGHT | 27. EYE COLOR | 28. HAIR COLOR |
|---|---|---|---|---|---|
| ☐ MALE ☐ FEMALE ☐ UNKNOWN | ☐ WHITE ☐ BLACK ☐ ASIAN/PACIFIC ISLANDER ☐ INDIAN/ALASKAN NATIVE ☐ UNKNOWN | ☐ HISPANIC ☐ NON-HISPANIC ☐ UNKNOWN | 26. WEIGHT | 29. DOES OFFENDER WEAR GLASSES? ☐ YES ☐ NO | |

30. SCARS/MARKS/TATTOOS

31. ALIASES/NICKNAMES

AMPUTATIONS

## ADDRESS INFORMATION

### RESIDENCE(S) ADDRESS(ES) – PHYSICAL LOCATION OF OFFENDER
**IF ADDITIONAL SPACE IS REQUIRED FOR MORE THAN 2 PHYSICAL RESIDENCE ADDRESSES, USE BLOCK 102.**

### Residence 1

33. STREET ADDRESS 1

| 34. STREET ADDRESS 2 – INCLUDE APARTMENT/ROOM # | 35. MUNICIPALITY (CITY/TOWNSHIP/BORO) |
|---|---|

| 36. CITY | 37. STATE | 38. ZIP CODE | 39. COUNTY |
|---|---|---|---|

| 40. POLICE AGENCY HAVING JURISDICTION | 41. POLICE ORI NUMBER |
|---|---|

| 42. TELEPHONE NUMBERS | RESIDENCE     -     - | CELLULAR     -     - |
|---|---|---|

### Residence 2

43. STREET ADDRESS 1

| 44. STREET ADDRESS 2 – INCLUDE APARTMENT/ROOM # | 45. MUNICIPALITY (CITY/TOWNSHIP/BORO) |
|---|---|

| 46. CITY | 47. STATE | 48. ZIP CODE | 49. COUNTY |
|---|---|---|---|

| 50. TELEPHONE NUMBER     -     - | 51. POLICE AGENCY HAVING JURISDICTION | 52. POLICE ORI NUMBER |
|---|---|---|

| 53. IS THE MAILING ADDRESS THE SAME AS THE PHYSICAL ADDRESS? ☐ YES  ☐ NO |
|---|
| **(IF NO, COMPLETE THE MAILING ADDRESS INFORMATION BELOW)** |

54. MAILING ADDRESS - STREET ADDRESS 1

| MAILING ADDRESS - STREET ADDRESS 2 | 56. TELEPHONE NUMBER     -     - |
|---|---|

| 57. CITY | 58. STATE | 59. ZIP CODE | 60. COUNTY |
|---|---|---|---|

## SCHOOL INFORMATION
### IF ADDITIONAL SPACE IS REQUIRED TO LIST ADDITIONAL SCHOOLS, USE BLOCK 102.

| 61. NAME OF SCHOOL | 62. TELEPHONE NUMBER - - |
|---|---|

| STREET ADDRESS 1 |
|---|

| 64. STREET ADDRESS 2 – INCLUDE APARTMENT/ROOM # | 65. MUNICIPALITY (CITY/TOWNSHIP/BORO) |
|---|---|

| 66. CITY | 67. STATE | 68. ZIP CODE | 69. COUNTY |
|---|---|---|---|

| 70. POLICE AGENCY HAVING JURISDICTION | 71. POLICE ORI # | 72. DATE OF ENROLLMENT |
|---|---|---|

## EMPLOYMENT INFORMATION
### EMPLOYER 1 INFORMATION
### IF ADDITIONAL SPACE IS REQUIRED TO LIST ADDITIONAL EMPLOYERS, USE BLOCK 102.

| 73. NAME OF EMPLOYER | 74. TELEPHONE NUMBER - - |
|---|---|

| 75. OCCUPATION/JOB TITLE | 76. SUPERVISOR'S NAME |
|---|---|

| 77. STREET ADDRESS 1 |
|---|

| 78. STREET ADDRESS 2 | 79. MUNICIPALITY (CITY/TOWNSHIP/BORO) |
|---|---|

| 80. CITY | 81. STATE | 82. ZIP CODE | 83. COUNTY |
|---|---|---|---|

| 84. POLICE AGENCY HAVING JURISDICTION | 85. POLICE ORI # |
|---|---|

## VEHICLE INFORMATION
### IF ADDITIONAL SPACE IS REQUIRED FOR MORE THAN 2 VEHICLES REGISTERED OR OWNED, USE BLOCK 102.

| | 86. STATE | 87. PLATE # | 88. YEAR | 89. MAKE | 90. MODEL | 91. COLOR |
|---|---|---|---|---|---|---|
| VEHICLE 1 | | | | | | |
| VEHICLE 2 | 92. STATE | 93. PLATE # | 94. YEAR | 95. MAKE | 96. MODEL | 97. COLOR |

## TREATMENT INFORMATION - (SEXUALLY VIOLENT PREDATORS ONLY)

| 98. TREATMENT PROVIDER | 99. TREATMENT LOCATION |
|---|---|

## SWORN STATEMENT OF OFFENDER

I verify the facts set forth in this form are true and correct to the best of my knowledge, information, and belief.  This verification is made subject to the penalties of Sections 4904 and 4915 of Title 18, Crimes Code, relating to Unsworn falsification to authorities, and Failure to comply with registration of sexual offenders requirements, and any of the applicable provisions contained in Title 18, Crimes Code, Chapter 49, Subchapter A, and Title 42, Judicial Code, Chapter 97, Subchapter H.

| 100. SIGNATURE - OFFENDER | 101. DATE |
|---|---|

| 102. ADDITIONAL INFORMATION - PLEASE INDICATE THE SECTION NAME (ADDRESS, SCHOOL, EMPLOYMENT, VEHICLE) FOR ANY INFORMATION BELOW. |
|---|

SP 4-219 (3-2007)

**PENNSYLVANIA STATE POLICE**
# SEXUAL OFFENDER ADDRESS WORK SHEET
**MEGAN'S LAW**

**NOTE: THIS FORM IS TO BE COMPLETED BY
THE REGISTERING OFFICIAL ONLY AND
ALL BLOCKS ARE TO BE COMPLETED, EVEN IF THERE IS NO CHANGE.**

| 1. PA SID | 2. LAST NAME | 3. FIRST NAME | 4. MIDDLE NAME | 5. SUFFIX |
|---|---|---|---|---|
| | | | | |

| 6. GENDER | 7. RACE | ETHNICITY | 8. DATE OF BIRTH | 10. WEIGHT | 11. HAIR COLOR |
|---|---|---|---|---|---|

6. GENDER
☐ MALE
☐ FEMALE
☐ UNKNOWN

7. RACE
☐ WHITE
☐ BLACK
☐ ASIAN/PACIFIC ISLANDER
☐ INDIAN/ALASKAN NATIVE
☐ UNKNOWN

ETHNICITY
☐ HISPANIC
☐ NON-HISPANIC
☐ UNKNOWN

8. DATE OF BIRTH - -

9. SOCIAL SECURITY NUMBER - -

10. WEIGHT

11. HAIR COLOR

12. DOES OFFENDER WEAR GLASSES?   ☐ YES   ☐ NO

13. ALIASES/NICKNAMES (NEW ONLY):

14. AMPUTATIONS (NEW ONLY):

15. SCARS/MARKS/TATTOOS (NEW ONLY):

## ADDRESS INFORMATION
**RESIDENCE(S) ADDRESS(ES) – PHYSICAL LOCATION OF OFFENDER**
**IF ADDITIONAL SPACE IS REQUIRED FOR MORE THAN 2 PHYSICAL RESIDENCE ADDRESSES, USE BLOCK 105.**
### Residence 1

16. STREET ADDRESS 1

17. STREET ADDRESS 2 – INCLUDE APARTMENT/ROOM #

18. MUNICIPALITY (CITY/TOWNSHIP/BORO)

| 19. CITY | 20. STATE | 21. ZIP CODE | 22. COUNTY |
|---|---|---|---|
| | | | |

23. POLICE AGENCY HAVING JURISDICTION

24. POLICE ORI NUMBER

25. TELEPHONE NUMBERS   RESIDENCE   -   -   CELLULAR   -   -

### Residence 2

26. STREET ADDRESS 1

27. STREET ADDRESS 2 – INCLUDE APARTMENT/ROOM #

28. MUNICIPALITY (CITY/TOWNSHIP/BORO)

| 29. CITY | 30. STATE | 31. ZIP CODE | 32. COUNTY |
|---|---|---|---|
| | | | |

| 33. TELEPHONE NUMBER | 34. POLICE AGENCY HAVING JURISDICTION | 35. POLICE ORI NUMBER |
|---|---|---|
| - - | | |

36. IS THE MAILING ADDRESS THE SAME AS THE PHYSICAL ADDRESS?   ☐ YES   ☐ NO
**(IF NO, COMPLETE THE MAILING ADDRESS INFORMATION BELOW)**

37. MAILING ADDRESS - STREET ADDRESS 1

| 38. MAILING ADDRESS - STREET ADDRESS 2 | 39. TELEPHONE NUMBER - - |
|---|---|
| | |

| 40. CITY | 41. STATE | 42. ZIP CODE | 43. COUNTY |
|---|---|---|---|
| | | | |

## SCHOOL INFORMATION
**IF ADDITIONAL SPACE IS REQUIRED TO LIST ADDITIONAL SCHOOLS, USE BLOCK 105.**

44. NAME OF SCHOOL

45. STREET ADDRESS 1

46. STREET ADDRESS 2 – INCLUDE APARTMENT/ROOM #

47. MUNICIPALITY (CITY/TOWNSHIP/BORO)

| 48. CITY | 49. STATE | 50. ZIP CODE | 51. COUNTY |
|---|---|---|---|
| | | | |

| 52. TELEPHONE NUMBER | 53. DATE OF ENROLLMENT | 54. DATE OF TERMINATION |
|---|---|---|
| - - | | |

55. POLICE AGENCY HAVING JURISDICTION

56. POLICE ORI #

CONFID-DEF-000070

## EMPLOYMENT INFORMATION
### EMPLOYER 1 INFORMATION
**IF ADDITIONAL SPACE IS REQUIRED FOR MORE THAN 2 EMPLOYERS, USE BLOCK 105.**

| NAME OF EMPLOYER | 58. TELEPHONE NUMBER |
|---|---|
| | - - |

| 59. OCCUPATION/JOB TITLE | 60. SUPERVISOR'S NAME |
|---|---|

| 61. STREET ADDRESS 1 |
|---|

| 62. STREET ADDRESS 2 | 63. MUNICIPALITY (CITY/TOWNSHIP/BORO) |
|---|---|

| 64. CITY | 65. STATE | 66. ZIP CODE | 67. COUNTY |
|---|---|---|---|

| 68. POLICE AGENCY HAVING JURISDICTION | 69. POLICE ORI # |
|---|---|

### EMPLOYER 2 INFORMATION

| 70. NAME OF EMPLOYER | 71. TELEPHONE NUMBER |
|---|---|
| | - - |

| 72. OCCUPATION/JOB TITLE | 73. SUPERVISOR'S NAME |
|---|---|

| 74. STREET ADDRESS 1 |
|---|

| 75. STREET ADDRESS 2 | 76. MUNICIPALITY (CITY/TOWNSHIP/BORO) |
|---|---|

| 77. CITY | 78. STATE | 79. ZIP CODE | 80. COUNTY |
|---|---|---|---|

| 81. POLICE AGENCY HAVING JURISDICTION | 82. POLICE ORI # |
|---|---|

## VEHICLE INFORMATION
**IF ADDITIONAL SPACE IS REQUIRED FOR MORE THAN 2 VEHICLES REGISTERED OR OWNED, USE BLOCK 105.**

| | 83. STATE | 84. PLATE # | 85. YEAR | 86. MAKE | 87. MODEL | 88. COLOR |
|---|---|---|---|---|---|---|
| VEHICLE 1 | | | | | | |
| VEHICLE 2 | 89. STATE | 90. PLATE # | 91. YEAR | 92. MAKE | 93. MODEL | 94. COLOR |

## TREATMENT INFORMATION - (SEXUALLY VIOLENT PREDATORS ONLY)

| 95. TREATMENT PROVIDER | 96. TREATMENT LOCATION |
|---|---|

## SWORN STATEMENT OF OFFENDER

I verify the facts set forth in this form are true and correct to the best of my knowledge, information, and belief.  This verification is made subject to the penalties of Sections 4904 and 4915 of Title 18, Crimes Code, relating to Unsworn falsification to authorities, and Failure to comply with registration of sexual offenders requirements, and any of the applicable provisions contained in Title 18, Crimes Code, Chapter 49, Subchapter A, and Title 42, Judicial Code, Chapter 97, Subchapter H.

| 97. SIGNATURE - OFFENDER | 98. DATE |
|---|---|

| 99. SIGNATURE – REGISTERING OFFICIAL | 100. TITLE | 101. DATE |
|---|---|---|

| 102. PRINTED NAME – REGISTERING OFFICIAL | 103. DEPARTMENT/AGENCY/FACILITY (INCLUDE PSP STATION NAME) | 104. TELEPHONE NUMBER (EXTENSION IF NECESSARY) |
|---|---|---|
| | | - - Ext. |

| 105. ADDITIONAL INFORMATION - PLEASE INDICATE THE SECTION NAME (ADDRESS, SCHOOL, EMPLOYMENT, VEHICLE) FOR ANY INFORMATION BELOW. |
|---|

CONFID-DEF-000071

SN Megan1                                                                     Page 1 of 1

ATTENTION RECORDS SUPERVISOR

THIS IS TO ADVISE YOU THAT THE MEGAN'S LAW SECTION OF THE PENNSYLVANIA STATE POLICE IS IN POSSESSION OF THE REGISTRATION PAPERWORK FOR THE FOLLOWING SUBJECT INMATE:

INMATE NAME:                                    SID NUMBER:

INMATE NUMBER:                          DATE: (        /       /       )

IN THE EVENT THAT YOU HAVE ANY FURTHER QUESTIONS CONCERNING THIS MATTER, PLEASE CONTACT THIS OFFICE AT (717) 783-4363.

PLEASE ACKNOWLEDGE RECEIPT OF THIS MESSAGE BY ACCESSING THE FIXED SCREEN RESPONSE (TEXT PSP / INMATE).

AUTH:  DIRECTOR RECORDS AND IDENTIFICATION DIVISION / OPR:            XMIT HERE

---

SN Megan1                                                                     Page 1 of 1

THIS MESSAGE IS TO ACKNOWLEDGE THE RECEIPT OF THE CLEAN MESSAGE PERTAINING TO THE FOLLOWING SUBJECT INMATE:

INMATE NAME:                                    SID NUMBER:

DATE RECEIVED:   (      /      /      ).              INMATE NUMBER:

******** PLEASE INCLUDE THE SID NUMBER IN THIS ACKNOWLEDGEMENT MESSAGE. ***********

AUTH:                                            / OPR:            XMIT HERE

*11.5.1, Records Office Operations Procedures Manual*
*Section 2 Release/Discharges*                          *Attachment 2-H*

CONFID-DEF-000072

| FORM **DC-309** **Application For County Parole** From State Or County Correctional Facility | **COMMONWEALTH OF PENNSYLVANIA** DEPARTMENT OF CORRECTIONS Box 598, Camp Hill, PA 17001 Note: Additional Supplies of this Form are Available at the Above Address |
|---|---|

**COMMONWEALTH OF PENNSYLVANIA**
**VS**

COUNTY OF _____Pennsylvania

| ☐ COURT OF COMMON PLEAS | ☐ PHILADELPHIA MUNICIPAL COURT |
|---|---|
| Indictment NO. | TERM-SESSION | 19 ____ |

_____
**(Defendant)**

SENTENCING JUDGE

| PRISON NO. | SEX | DATE OF BIRTH | AGE | PBPP NO. | PRESENTLY CONFINED AT |
|---|---|---|---|---|---|
| | | | | | |

**SENTENCE DATA**

| OFFENSE | SENTENCE |
|---|---|
| DATE OF SENTENCE | EFFECTIVE DATE OF SENTENCE | MINIMUM EXPIRTION DATE | MAXIMUM EXPIRATION DATE |
| DETAINERS (If any see attached) ☐ | FINES | COSTS | RESTITUTION |

PERSONAL HISTORY (See attached Summary) ☐

**RELEASE PLAN**

| HOME (Address) | WITH | RELATIONSHIP |
|---|---|---|
| EMPLOYMENT WITH | TYPE OF JOB | SALARY |

ASSETS
    Money on deposit at Prison:         Other:

I hereby apply for parole and certify that I have read the above statements
And they are true and correct to the best of my knowledge.    Signature of Inmate _____

FOR COUNTY PROBATION & PAROLE DEPARTMENT    FOR CORRECTIONAL FACILITY

| RECOMMENDATION | SIGNATURE |
|---|---|
| | TITLE |
| | DATE |

**ORDER**

Upon consideration of the above application for parole, the petition of _____

for release from imprisonment ☐ under supervision of the Probation and Parole Department of the Criminal

courts of _____ County, or ☐ under supervision of the Pennsylvania Board of Probation

and Parole for the remainder of the maximum sentence is ☐ **DENIED** ☐ **GRANTED.**

It is further ordered that the official in charge of _____ shall release said

inmate on _____ and direct the inmate to report immediately to the above designated
supervision division.

                                   _____     _____
                                     (DATE)         (JUDGE)

DISTRIBUTION: WHITE-FILE   CANARY-PAROLE-PROBATION   PINK-CLERK OF COURTS GOLDENROD-INMATE

*11.5.1, Records Office Operations Procedures Manual*       *Attachment 2-I*
*Section 2 – Releases*

CONFID-DEF-000073

| FORM<br>DC-309<br>**Application For**<br>**County Parole**<br>**From State Or County Correctional Facility** | **COMMONWEALTH OF PENNSYLVANIA**<br>**DEPARTMENT OF CORRECTIONS**<br>**Box 598, Camp Hill, PA 17001**<br>**Note: Additional Supplies of this Form are Available at the Above Address** |

**COMMONWEALTH OF PENNSYLVANIA**
**VS**

COUNTY OF _____Pennsylvania

☐ COURT OF COMMON PLEAS    ☐ PHILADELPHIA MUNICIPAL COURT

| Indictment NO. | TERM-SESSION | 19 ____ |

SENTENCING JUDGE

_____
**(Defendant)**

| PRISON NO. | SEX | DATE OF BIRTH | AGE | PBPP NO. | PRESENTLY CONFINED AT |

**SENTENCE DATA**

| OFFENSE | | SENTENCE |
|---|---|---|
| DATE OF SENTENCE | EFFECTIVE DATE OF SENTENCE | MINIMUM EXPIRTION DATE | MAXIMUM EXPIRATION DATE |
| DETAINERS (If any see attached) ☐ | FINES | COSTS | RESTITUTION |

PERSONAL HISTORY (See attached Summary) ☐

**RELEASE PLAN**

| HOME (Address) | WITH | RELATIONSHIP |
| EMPLOYMENT WITH | TYPE OF JOB | SALARY |

ASSETS
      Money on deposit at Prison:                          Other:

I hereby apply for parole and certify that I have read the above statements
And they are true and correct to the best of my knowledge.          Signature of Inmate _____

FOR COUNTY PROBATION & PAROLE DEPARTMENT          FOR CORRECTIONAL FACILITY

| RECOMMENDATION | SIGNATURE |
| | TITLE |
| | DATE |

**ORDER**

Upon consideration of the above application for parole, the petition of _____

for release from imprisonment ☐ under supervision of the Probation and Parole Department of the Criminal

courts of _____ County, or ☐ under supervision of the Pennsylvania Board of Probation

and Parole for the remainder of the maximum sentence is ☐ **DENIED** ☐ **GRANTED.**

It is further ordered that the official in charge of _____shall release said
inmate on _____ and direct the inmate to report immediately to the above designated
supervision division.

_____          _____
(DATE)                          (JUDGE)

DISTRIBUTION: WHITE-FILE     CANARY-PAROLE-PROBATION     PINK-CLERK OF COURTS GOLDENROD-INMATE

*11.5.1, Records Office Operations Procedures Manual*          **Attachment 2-I**
*Section 2 – Releases*

CONFID-DEF-000074

## Sentence Computation Error Information Sheet

| Institution | |
| --- | --- |
| Inmate Number | |
| Inmate Name | |
| Sentence Calculation Error (Y/N)? | |
| What was the error? Include days calculated too long or too short. | |
| Month/Year Error was Detected | |
| Month/Year of Event | |
| Month/Year of Original Error | |
| Where (institution) was the error made? | |
| If possible name of person who made the error | |
| How was the error discovered? | |
| Explanation of error | |
| Name of person completing this form and date completed | |
| Date | |

## Frequently Used Abbreviations

| | |
|---|---|
| AA | Add Administrative (Move Code) |
| A/Aslt. | Aggravated Assault |
| AB | Add Bail (Move Code) |
| AC | Administrative Custody Add Court Commitment (Move Code) |
| ACT | Add County Transfer (Move Code) |
| ADET | Add Detentioner (Move Code) |
| AE | Add Escape (Move Code) |
| AFED | Add Federal Commitment (Move Code) |
| AG | Attorney General |
| AIT | Add In Transit-Temporary (Move Code) |
| AKA | Also Known As |
| AOTH | Add Other-Use Sparingly (Move Code) |
| APV | Add Parole Violator (Move Code) |
| ARD | Accelerated Rehabilitative Disposition |
| ASH | Add State Hospital (Move Code) |
| ATA | Authorized Temporary Absence |
| ATT | Add Temporary Transfer (Move Code) |
| AW | Add Writ/ATA>1 Year (Move Code) |
| CA | Criminal Attempt |
| CAR | Cumulative Adjustment Record |
| CC | Corrections Counselor/Criminal Conspiracy/Commitment Credit/Concurrent |
| CCC | Community Corrections Center |
| CCPM | Corrections Classification and Program Manager |
| CDCC | Central Diagnostic and Classification Center |
| CHRIA | Criminal History Record Information Act |
| CL | Custody Level |
| CLEAN | Commonwealth Law Enforcement Agency Network |
| COM | Corruption of Minors |
| CORC | Central Office Review Committee |
| CP | (Court of) Common Pleas |
| CPV | Convicted Parole Violator |
| CS | Consecutive |
| D | Discharge/Delete (Move Code) |
| DA | Discharge Administrative (Move Code) |
| DBOA | Detained by Other Authority |
| DC | Disciplinary Custody |
| DCC | Diagnostic and Classification Center |
| DIT | Delete in Transit-Use with AIT only (Move Code) |
| DJ | District Justice |
| DM | District Magistrate |
| DOB | Date of Birth |
| DOC | Department of Corrections |
| DTT | Delete Temporary transfer-Use with ATT Only (Move Code) |
| DUI | Driving Under the Influence |
| DUS | Driving Under the Suspension |
| DWI | Driving While Influenced |
| ETA | Estimated Time of Arrival |
| EWOC | Endangering the Welfare of Children |
| FA w/o LIC | Firearm without a License |

## Frequently Used Abbreviations

| | |
|---|---|
| FCI | Federal Correctional Institution |
| FOC | Facts of Crime |
| FTA | Failure to Appear |
| FTC | Forensic Treatment Center |
| FTR | Failure to Report |
| FYI | For Your Information |
| GBMI | Guilty But Mentally Ill |
| GED | General Equivalency Diploma |
| GP | General Population |
| IAD | Interstate Agreement on Detainers |
| IC | In Custody |
| ICC | Interstate Compact Commission |
| ICE | Immigrations Customs Enforcement |
| ICS | Incident Command System |
| ICSA | Integrated Case Summary |
| ICU | Intermediate Care Unit |
| IDSI | Involuntary Deviate Sexual Intercourse |
| IRC | Initial reception Committee |
| IRS | Inmate Records System |
| ITP | Individual Treatment Plan |
| JNET | Justice Network |
| K/I PWID | Knowledge/Intent to Possess with Intent to Deliver |
| LAN | Local Area Network |
| LOP | Lack of Prosecution/Loss of Privileges |
| MAX | Maximum (Sentence Date) |
| MC | Municipal Court |
| MH/MR | Mental Health/Mental Retardation |
| MHU | Mental Health Unit |
| MIN | Minimum (Sentence Date) |
| MIS | Management Information System |
| N/A | Not Available or Not Applicable |
| NCIC | National Crime Information Center |
| NLETS | National Law Enforcement Telecommunications |
| NRA | No Recommit Action |
| NV | Not Verified |
| OOR | Operation Outward Reach |
| OPR | Office of Professional Responsibility |
| OTN | Offense Tracking Number |
| OVS | Office of Victim Services |
| OVA | Office of Victim Advocate |
| PACT | Pennsylvania Addictive Classification Tool |
| PBPP | Pennsylvania Board of Probation and Parole |
| PC | Protective Custody/Personal Computer |
| PD | Police Department |
| PFA | Protection From Abuse |
| PHC | Pre-Hearing Confinement |
| PIC | Possession of Instrument of Crime |
| PIC-Gen | Possession of Instrument of Crime – Generally |
| POA | Psychiatric Observation Area |

## Frequently Used Abbreviations

| | |
|---|---|
| POC | Psychiatric Observation Cell |
| POW | Possession of Weapon |
| PP# | Philadelphia Photo Number |
| PPP | Prescriptive Program Plan |
| PRC | Program Review Committee/Publication Review Committee |
| PSI | Pre-Sentence Investigation |
| PSP | Pennsylvania State Police |
| PV | Parole Violator |
| PVP | Parole Violator Pending |
| PWID | Possession with Intent to Deliver |
| QBC | Quehanna Motivational Boot Camp |
| RA | Resisting Arrest |
| RAP(Sheet) | Record of Arrests and Prosecutions |
| REAP | Recklessly Endangering Another Person |
| RHU | Restricting Housing Unit |
| ROR | Release on Own Recognizance |
| RSP | Receiving Stolen Property |
| RTT | Return Temporary Transfer |
| S/Aslt. | Simple Assault |
| SC | Status Change |
| SCI | State Correctional Institution |
| SMU | Special Management Unit |
| SNU | Special Needs Unit |
| SRCF | State Regional Correctional Facility |
| SSN | Social Security Number |
| STT | Send Temporary Transfer |
| TBUT | Theft by Unlawful Taking |
| TCV | Technical and Convicted (Parole) Violator |
| TFM | Transfer From Medical |
| TN | True Name |
| TPV | Technical Parole Violator |
| TRN | Transfer to Other Institution or CCC (Move Code) |
| TT | Temporary Transfer/Terroristic Threats |
| TTM | Transfer to Medical |
| USM | United States Marshall |
| UUA | Unauthorized Use of Auto |
| VCSA | Violation of Controlled Substance Act |
| VCSDD&CA | Violation of Controlled Substance, Drug, Device, and Cosmetic Act |
| VODA | Violation of Drug Act |
| VOP | Violation of parole/Violation of Probation |
| VUFA | Violation of Uniform Firearms Act |

## COUNTY CODES

| | | | |
|---|---|---|---|
| ADA | Adams | LAN | Lancaster |
| ALL | Allegheny | LAC | Lackawanna |
| ARM | Armstrong | LAW | Lawrence |
| BEA | Beaver | LEB | Lebanon |
| BED | Bedford | LEH | Lehigh |
| BLA | Blair | LUZ | Luzerne |
| BRA | Bradford | LYC | Lycoming |
| BUC | Bucks | MCK | McKean |
| BUT | Butler | MER | Mercer |
| CAB | Cambria | MIF | Mifflin |
| CAE | Cameron | MOR | Monroe |
| CAR | Carbon | MOG | Montgomery |
| CEN | Centre | MOU | Montour |
| CHE | Chester | NAM | Northampton |
| CLA | Clarion | NUM | Northumberland |
| CLE | Clearfield | PER | Perry |
| CLI | Clinton | PHI | Philadelphia |
| COL | Columbia | PIK | Pike |
| CRA | Crawford | POT | Potter |
| CUM | Cumberland | SCH | Schuylkill |
| DAU | Dauphin | SNY | Snyder |
| DEL | Delaware | SOM | Somerset |
| ELK | Elk | SUL | Sullivan |
| ERI | Erie | SUS | Susquehanna |
| FAY | Fayette | TIO | Tioga |
| FOR | Forrest | UNI | Union |
| FRA | Franklin | VEN | Venango |
| FUL | Fulton | WAT | Warren |
| GRE | Greene | WAS | Washington |
| HUN | Huntingdon | WES | Westmoreland |
| IND | Indiana | WYO | Wyoming |
| JEF | Jefferson | YOR | York |
| JUN | Juniata | OUT | Out of State |

## Frequently Used Abbreviations

### State Correctional Facilities

| | | | | |
|---|---|---|---|---|
| ALB | Albion | | GRN | Greene |
| **BEN** | **Benner Township** | | HOU | Houtzdale |
| CAM | Camp Hill | | HUN | Huntingdon |
| CBS | Cambridge Springs | | LAU | Laurel Highlands |
| CHS | Chester | | MAH | Mahanoy |
| COA | Coal Township | | MER | Mercer |
| CRE | Cresson | | MUN | Muncy |
| DAL | Dallas | | PIT | Pittsburgh |
| FYT | Fayette | | PNG | Pine Grove |
| FRS | Forest | | QUE | Quehanna |
| FRA | Frackville | | RET | Retreat |
| GRA | Graterford | | ROC | Rockview |
| **GFE** | **Graterford East** | | SMI | Smithfield |
| **GFW** | **Graterford West** | | SMR | Somerset |
| GRE | Greensburg | | WAM | Waymart |

## Parole Violators With New Criminal Charges



- The Pennsylvania Supreme Court has ruled that if a defendant is being held in custody solely because of a warrant lodged by the Parole Board, and has otherwise met the requirements of bail on the new criminal charges, the time which he/she spent in custody shall be credited against his/her original sentence (backtime). This is known as backtime credit. If a defendant, however, remains incarcerated prior to trial because he failed to satisfy bail requirements on the new criminal charges, then the time spent in custody shall be credited to his/her new sentence. (ref Gaito v. PBPP).
- NOTE: Credit cannot be applied to both the new sentence and the backtime for the same period of time.
- A parole violator, convicted and sentenced to the same jurisdiction (PA Department of Corrections) for another offense, must serve his/her backtime and the new sentence in consecutive order. (ref Dorian v. Commonwealth)

## Parole Violators With New Criminal Charges



- A parole violator, convicted and sentenced to another jurisdiction (county or another state) for a new offense must serve his/her new sentence prior to serving backtime.

- If the sentence for the new conviction is to a jurisdiction other than one from which the inmate was paroled, then he/she must serve the new sentence first and the backtime last.

- **Backtime**- The amount of time, usually expressed in years, months, and days, that is derived by the PA Board of Probation and Parole by subtracting the inmate's actual date of parole from his/her original date of maximum expiration.



EXHIBIT

Kodach-21

DEF000936



# Parole Violators With New Criminal Charges



- Custody for Return
  - Custody for Return or Effective Date of PV Return = The date established by the Board of Probation and Parole and reported on the Recommitment Order indicating when the inmate started to serve his/her backtime.

- Recomputed Maximum
  - New PV Maximum Date = The date that results when the inmate's backtime owed is added to the effective date of PV return.

- FOR INFORMATIONAL PURPOSES ONLY – The sole responsibility for the computation of Parole Violator Backtime rests with the PA Board of Probation and Parole.

# Basic Convicted Parole Violator Formula



- **BASIC CONVICTED PAROLE VIOLATOR EXAMPLE**

This calculation is used to adjust the maximum expiration date of the sentence.

| | |
|---|---|
| Original Expiration of Maximum | 03-28-2000 |
| - Parole Date | - 04-18-1999 |
| = Backtime | = 11 months 10 days |

| | |
|---|---|
| Effective Date of PV Return | 07-13-1999 |
| + Backtime | +11 months 10 days |
| = New PV Maximum Date | = 06-23-2000 |





# Convicted Parole Violator Narrative

- On 02-24-1998 Inmate Jackson was sentenced to a term of 1 to 2 years for Aggravated Indecent Assault. The effective date of this sentence was 02-24-1998, with a minimum date of 02-24-1999 and a maximum date of 02-24-2002.

- Inmate Jackson was paroled on 02-28-1999.

- On 03-01-1999 Inmate Jackson was arrested and charged with Simple Assault. The same day the Parole Agent lodged a PBPP warrant to commit and detain on Jackson.

- Jackson was sentenced on 03-15-1999 on the charge of Simple Assault and sentenced to serve 3 months to 6 months in a county prison. Jackson was granted County Parole on 05-15-1999.

- The State Board of Probation and Parole then recommitted Inmate Jackson as a Convicted Parole Violator. On his Recommit Action (PBPP-39) the board gave Inmate Jackson 11 months, 26 days backtime owed, Custody for Return Date of 05-15-1999. Inmate Jackson's new PV Maximum Date is 05-11-2000.



# How Backtime and New PV Maximum are Computed

| For backtime owed | Year | Month | Day |
|---|---|---|---|
| Original Maximum Date | 2000 | 2 | 24 |
| − Date Paroled | − 1999 | 2 | 28 |
| Backtime Owed | | 11 | 26 |

| To get new PV Maximum | | Year | Month | Day |
|---|---|---|---|---|
| Custody for Return Date | | 1999 | 5 | 15 |
| + Backtime Owed | + | | 11 | 26 |
| New PV Maximum | | 1999 | 16 | 41 or |
| | | 2000 | 5 | 11 |

- Recomputed Maximum Date is 05-11-2000.



## Convicted Parole Violator Narrative



- On 02-24-1998 Inmate Jackson was sentenced to a term of 1 to 2 years for Aggravated Indecent Assault. The effective date of this sentence was 02-24-1998, with a minimum date of 02-24-1999 and a maximum date of 02-24-2002.

- Inmate Jackson was paroled on 02-28-1999.

- On 03-01-1999 Inmate Jackson was arrested and charged with Simple Assault. The same day the Parole Agent lodged a PBPP warrant to commit and detain on Jackson.

- Jackson was sentenced on 03-15-1999 on the charge of Simple Assault and sentenced to serve 3 months to 6 months in a county prison. Jackson was granted County Parole on 05-15-1999.

- The State Board of Probation and Parole then recommitted Inmate Jackson as a Convicted Parole Violator. On his Recommit Action (PBPP-39) the board gave Inmate Jackson 11 months, 26 days backtime owed. Custody for Return Date of 05-15-1999. Inmate Jackson's new PV Maximum Date is 05-11-2000.

## How Backtime and New PV Maximum are Computed



| For backtime owed | Year | Month | Day |
|---|---|---|---|
| Original Maximum Date | 2000 | 2 | 24 |
| - Date Paroled | - 1999 | 2 | 28 |
| Backtime Owed | | 11 | 26 |

| To get new PV Maximum | Year | Month | Day |
|---|---|---|---|
| Custody for Return Date | 1999 | 5 | 15 |
| + Backtime Owed | + | 11 | 26 |
| New PV Maximum | 1999 | 16 | 41 or |
| | 2000 | 5 | 11 |

- Recomputed Maximum Date is 05-11-2000.

DEF000939





- **Attachment 9-D PBPP Warrant to Commit and Detain (PBPP-141).**

- **Attachment 9-E PBPP Recommitment Action (PBPP-39)** indicating backtime owed on original sentence, conviction resulting in recommitment, custody for, return date, and new PV maximum.

- **Attachment 9-F DC-16D Sentence Status Summary** to include recommitment calculation.



# Complex Sentences

- Precommitment Credit

- The calculation and application of commitment credit is governed by 42 Pa.C.S.A. § 9760, Credit for Time Served and Pa.R.Crim.P. 705, Imposition of Sentence: Computation and Service.

- 42 Pa.C.S.A. § 9760, Credit for Time Served provides:

  - Credit against the maximum term and any minimum term shall be given to the defendant for all time spent in custody as the result of the criminal charge for which a prison sentence is imposed or as the result of the conduct on which such charge is based. Credit shall include credit for all time spent in custody prior to trial, pending sentence, and pending the resolution of an appeal.

39



Credit Issues:

When checking file in and when doing release checklist or anyother verification of sentence structure:

Check date of arrest on Rap sheet for the OTNs of current sentences, if credit date is before arrest date, need to contact county to determine dates sat in custody on that OTN.

Check dates of sentence of other sentences to verify that credit isn't past date of sentence of current sentence or any sentences imposed prior to any other sentences.

Check every commitment order and verify calculation, Westmoreland and Montgomery county often provide long form that has discrepancies between 300B and long form. When in doubt check with the County when the two differ.

If it is a county sentence, the county provides the calculation and we go by their calculation, using their effective dates, min/max etc.    Same goes for a county PVCO sentence.    Cannot have credit on state sentence after effective date of a county sentence or a county PVCO sentence.    When in doubt ask.

Double Dip (everyone should know by now what that is)



**DC-16D**

## SENTENCE STATUS SUMMARY

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

### 1. SENTENCE SUMMARY    MR. MERROW CRS

| Class of Sentence | ☐ DEFINITE | ☒ INDEFINITE | ☐ GENERAL | ☐ LIFE | ☐ COMMUTED LIFE | ☐ EXEC |
|---|---|---|---|---|---|---|

| Date | County | Number, Term Court, Indictment | Type Sent | Min Y | Min M | Min D | Max Y | Max M | Max D | Judge | Offense | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-25-96 | PHILADELPHIA | CP#0033;3/95 | | 5 | | | 10 | | | ALBERT DEFINO | ROBBERY | M6 |
| 1-25-96 | PHILADELPHIA | CP#0033;3/95 | CS | 1 | | | 2 | | | DEFINO | VUFA | M6 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

| Continued From DC# | Plea NOT GUILTY | Total Sentence: 6 | 12 | Commitment Credit FROM 1-26-95. |
|---|---|---|---|---|

| Fines | Costs | Restitution |
|---|---|---|

Summary or Remarks on Sentence

### 2. DATES SECTION

| Item | Original | Change #1 | Change #2 | Change #3 | Change #4 | Chang |
|---|---|---|---|---|---|---|
| DATE OF RECEPTION | 1-29-96 | | | | | |
| EFFECTIVE DATE | 1-26-95 | | | | | |
| EXPIRATION OF MINIMUM | 1-26-2001 | | | | | |
| EXPIRATION OF MAXIMUM | 1-26-2007 | | | | | |
| EFFECTIVE DATE - PV | XXXXX | | | | | |
| DELINQUENT TIME | XXXXX | | | | | |
| BACKTIME | XXXXX | | | | | |
| NEW MAXIMUM - PV | XXXXX | | | | | |
| SENTENCE CHANGE | XXXXX | | | | | |
| BASIS FOR CHANGE | XXXXX | | | | | |
| NEW SENTENCE | XXXXX | | | | | |

| 1st Release: Method—Inst.—Date | 2nd Release: Method—Inst.—Date | 3rd Release: Method—Inst.—Date | 4th Release: Method—Inst.—Date |
|---|---|---|---|

### 3. REFERENCES AND IDENTIFICATION

| 1st Admission: Inst.—Date C/EDOC 1-29-96 | 2nd Admission: Inst.—Date T/CDCC 2-2-96 | 3rd Admission: Inst.—Date | 4th Admission: Inst.—Date |
|---|---|---|---|

| Prosecuting Police Department PHILA. PD | Place of Birth PHILADELPHIA, PA | Date of Birth 4-3-75 | Marital Status SINGLE | R-S B/M |
|---|---|---|---|---|

| DC Number CX-8799 | PBPP Number | SIO Number 21714127 | Name JESSUP, KEVIN | ☐ TN | ☐ ALIAS |
|---|---|---|---|---|---|

**EXHIBIT**
Kodach 22

(OVER)

DEF001001

```
SYS073P            C O U R T  H I S T O R Y   (CHF1,        01/13/04
PID  750487                            SID 00000000
NAME- JESSUP, KEVIN                    POLICE NO    750487
     01325 S RINGGOLD   ST             BIRTH DATE  04/13/75
     PHILA      PA 19146               SEX- M  RACE- WHITE
```

---

```
   CRIMINAL CONSPIRACY      WAIVER GUIL SENT. IMP.  SENTENCE SUSPENDED
```

```
****************************************************************************
DC01-17-051945 CP#0112-1361 1/1 JUD-FLEISHER,L     ARST-09/25/01 SNT-03/11/02
ATTY SCIOLLA GUY -
   MFG/DEL/POSS W/I M/D C S NOLLE PROS
   CARRY FIREARMS W/O LIC    NOLLE PROS
   CAR FIRE ARMS PUB ST/PL   NOLLE PROS
   POSS ARMS-CONV CRIM VIOL  NOLLE PROS
   POSS INSTRUMENTS CRIME    NOLLE PROS
   KNOW/POSS CONTROLLED SUB  NOLLE PROS


****************************************************************************
DC93-17-026139 MC#9306-1946 1/1 JUD-MEKEL,E        ARST-06/24/93 SNT-08/10/93
ATTY DEFENDER ASSOC. -
MORE...
PF1 HELP  PF3 ALIAS  PF5 CLEAR  PF7 SCROLL BACK  PF8 SCROLL FORWARD  PF12 EXIT
```

DEF001003

```
SYS073P              C O U R T  H I S T O R Y  (CHF1)          01/13/0(
PID  750487                          SID 00000000
NAME- JESSUP, KEVIN                  POLICE NO    750487
      01325 S RINGGOLD  ST           BIRTH DATE  04/13/75
      PHILA     PA 19146             SEX- M  RACE- WHITE
--------------------------------------------------------------------
   CAR FIRE ARMS PUB ST/PL  DISM/DISCH LACK EVID/WI
   POSS INSTRU CRIME WEAPON DISM/DISCH LACK EVID/WI
   CARRY FIREARMS W/O LIC   DISM/DISCH LACK EVID/WI

*********************************************************************
DC95-17-003908 MC#9501-3038 1/1 JUD-ROBBINS,H    ARST-01/26/95 SNT-02/24/9!
ATTY DEFENDER ASSOC. =
   ROBBERY                 HELD FOR COURT
   THEFT REC STOLEN PROPERT HELD FOR COURT
   RECKLS ENDANG PERSON    HELD FOR COURT
   CARRY FIREARMS W/O LIC  HELD FOR COURT
   POSS INSTRU CRIME WEAPON HELD FOR COURT
   PROHIBITED OFFENSIVE WEA HELD FOR COURT
   THEFT UNL TAK/DISP      HELD FOR COURT
   SIMPLE ASSAULT          HELD FOR COURT
MORE...
PF1 HELP  PF3 ALIAS  PF5 CLEAR  PF7 SCROLL BACK  PF8 SCROLL FORWARD  PF12 EXI'
```

DEF001005

```
SYS073P              C O U R T  H I S T O R Y   (CHF1)              01/13/0·
PID  750487                             SID 00000000
NAME- JESSUP, KEVIN                     POLICE NO   750487
      01325 S RINGGOLD  ST              BIRTH DATE  04/13/75
      PHILA     PA 19146                SEX- M  RACE- WHITE
```

```
 CNTRL NO.      CHARGE              PLEA              VERDICT

 910905836201   RETAIL THEFT                          DISCHARGED LOP
```

```
P R E S E N T E N C E  A N D  P S Y C H I A T R I C  R E P O R T   I N F O .
MICRO                                   PRE-SENTENCE   PSYCHIATRIC
FILM#     REC. CNTRL#   JUDGE           COMPLETION DT  COMPLETN DT

 952304 CP9503-0033 1/1 DEFINO,A             08/18/95      08/09/95
```

```
END OF INFO.           C-CONCURRENT, M-MERGED, S-CONSECUTIVE, O-CONSOLIDATED
PF1 HELP  PF3 ALIAS  PF5 CLEAR  PF7 SCROLL BACK  PF8 SCROLL FORWARD  PF12 EXIT
```

DEF001007

**DC-16D.**

**EXHIBIT**
tabbies
Verano - 5

# SENTENCE STATUS SUMMARY

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

## 1. SENTENCE SUMMARY

MR. MERROW CRS

| Class of Sentence | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DEFINITE | | XXX INDEFINITE | | GENERAL | | LIFE | | COMMUTED LIFE | | EXECU | |

| Date | County | Number; Term Court, Indictment | Type Sent | Minimum Y | M | D | Maximum Y | M | D | Judge | Offense |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-25-96 | PHILADELPHIA | CP#0033;3/95 | | 5 | | | 10 | | | ALBERT DEFINO | ROBBERY |
| 1-25-96 | PHILADELPHIA | CP#0033;3/95 | CS | 1 | | | 2 | | | DEFINO | VUFA |

| Continued From DC# | Plea NOT GUILTY | Total Sentence: 6 | | 12 | Commitment Credit FROM 1-26-95. |
|---|---|---|---|---|---|
| Fines | | Costs | | | |
| Summary or Remarks on Sentence | | Restitution | | | |

## 2. DATES SECTION

| Item | Original | Change #1 | Change #2 | Change #3 | Change #4 | Change # |
|---|---|---|---|---|---|---|
| DATE OF RECEPTION | 1-29-96 | 10-22-2001 | | | | |
| EFFECTIVE DATE | 1-26-95 | 1-26-95 | | | | |
| EXPIRATION OF MINIMUM | 1-26-2001 | 1-26-2001 | | | | |
| EXPIRATION OF MAXIMUM | 1-26-2007 | 1-26-2007 | | | | |
| EFFECTIVE DATE - PV | X X X X X | PVP | | | | |
| DELINQUENT TIME | X X X X X | | | | | |
| BACKTIME | X X X X X | | | | | |
| NEW MAXIMUM - PV | X X X X X | | | | | |
| SENTENCE CHANGE | X X X X X | | | | | |
| BASIS FOR CHANGE | X X X X X | | | | | |
| NEW SENTENCE | X X X X X | | | | | |

| 1st Release: Method—Inst.—Date PARhcc-CoA-49-01 | 2nd Release: Method—Inst.—Date | 3rd Release: Method—Inst.—Date | 4th Release: Method—Inst.—Date |
|---|---|---|---|

## 3. REFERENCES AND IDENTIFICATION

| 1st Admission: Inst.—Date C/EDCC 1-29-96 | 2nd Admission: Inst.—Date T/CDCC 2-2-96 | 3rd Admission: Inst.—Date 4-19-96 SGCT | 4th Admission: Inst.—Date T/COA 1-22-02 |
|---|---|---|---|
| Prosecuting Police Department PHILA. PD | | Place of Birth PHILADELPHIA, PA | Date of Birth 4-3-75 | Marital Status SINGLE | R-S B/M |
| DC Number CX-8799 | PBPP Number 496A5 | SID Number 21714127 | Name JESSUP, KEVIN | | |

(OVER)

DEPOSITION EXHIBIT Kodak 24

## 4. ACTIONS: PENNSYLVANIA BOARD OF PAROLE

| Date | Action | Date | Action |
|------|--------|------|--------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## 5. ACTIONS: BOARD OF PARDONS

| Date | Cal Page | Action |
|------|----------|--------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## 6. DETAINERS

| Dated | From (Incl. Address) | Charging | Indict—Warrant Nos. | Remark |
|-------|----------------------|----------|---------------------|--------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## 7. SELECTIVE SERVICE SYSTEM CONTROLS

☐ Registered At Time of Reception   ☐ Unregistered At Time of Reception   Remarks

## 8. UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE CONTROLS

| USINS Number | ☐ USINS Notification of No Contemplated Action | ☐ USINS Proceedings Instituted and Pending | ☐ USINS Proceedings Completed Detainer; See Above |
|--------------|-----------------------------------------------|--------------------------------------------|--------------------------------------------------|

## 9. NOTIFY IN EVENT OF ILLNESS OR DEATH

Name   NADIRA MORRISON

Address   1311 S. 53RD ST., PHILA., PA 19143

Relationship   GERTEND

Telephone   (215)727-2067

## 10. REMARKS - ATA - ETC.

| 1st Reception |  |
|---------------|--|
| 2nd Reception |  |
| 3rd Reception |  |
| 4th Reception |  |
| Previous DC# |  |



| DC-16E | SENTENCE STATUS SUMMARY | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS |
|---|---|---|

## 1. REFERENCES AND IDENTIFICATION

| DOC Number | Commitment Name | | PBPP No | SID No | FBI Number | Phila Photo # |
|---|---|---|---|---|---|---|
| CX8799 | KEVIN JESSUP | | 496AS | 21714127 | 511135TA5 | 750487 |
| Date of Birth | Place of Birth | | | | Race | Sex |
| 04/03/1975 | PHILADELPHIA  PA  USA | | | | B | M |

## 2. SENTENCE SUMMARY

| Sent Date | County | Indictments | | Sent Type | Minimum | | | Maximum | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Y | M | D | Y | M | D |
| 01/25/1996 | PHILADELPHIA | CP#0033/9503 | | | 5 | | | 10 | | |
| **Plea:** Found Guilty | | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | | |
| **Offense:** ROBBERY (GENERAL) | | | | | | | | | | |
| 01/25/1996 | PHILADELPHIA | CP#0033/9503 | | CS | 1 | | | 2 | | |
| **Plea:** Found Guilty | | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | | |
| **Offense:** VUFA | | | | | | | | | | |

| Controlling Minimum Date | 01/26/2001 | | Reentered from Previous DOC#: | |
|---|---|---|---|---|
| Controlling Maximum Date | 01/26/2007 | | New Maximum - PV | |

**Non-incarcerated Offenses**
01/25/1996, PHILADELPHIA, CP#0033/9503, DEFINO,ALBERT
VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY POW-NOT GUILTY THEFT,RSP,S/A-MERGES
Comments:

**Summary or Remarks on Sentence**
CONVERSION FROM 16D TO 16E TO MAKE INMATE PVP AND ADD FEDERAL DETAINER

Inmate Number: CX8799 - KEVIN JESSUP     Version 1     Closed   10/16/2002 8:35:35 AM
Distribution:  Inmate  PBPP  PSP  BIS  Counselor  DC-15  Time File
Page 1 of 3

DEF000883



### 3. SENTENCE STRUCTURE

**Commitment Credit**
FROM 1-26-95 TO 1-25-96

| Item | Computation 1 | Computation 2 | ―― | ― |
|---|---|---|---|---|
| Indictments Included | CP#0033/9503 CP#0033/9503 | | | |
| Effective Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return – PV | | | | |
| Delinquent Time | | | | |
| Backtime Credit | | | | |
| Backtime Owed | | | | |
| New Maximum – PV | | | | |
| Sentence Computation Date | 02/12/1996 | | | |
| Basis for Computation | PVP | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Pending | | | |

DEF000884



## 4. DETAINERS

| Number | Date | From | Indict-Warrant Nos. | OTN | Type |
|--------|------|------|---------------------|-----|------|
| 1 | 09/26/2002 | USMS EASTERN | CR# 02-32-01 | | Execution |

| Detainer Remarks | | |
|------------------|--|--|
| Detainer # | Date Deleted | Remarks  (for those deleted since last DC16) |
| None | | |

## 5. PRIOR DOC NUMBERS

| None | | | | | | | | |
|------|--|--|--|--|--|--|--|--|

## 6.  FINES, COSTS AND RESTITUTION AT TIME OF RECEPTION

| Date | County | Indictment | Fines | Costs | Restitution |
|------|--------|------------|-------|-------|-------------|
| 01/25/1996 | PHILADELPHIA | CP#0033/9503 | | $191.00 | |

## 7.  ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---------------|-------------|--------|----------|
| | | | |

Last Modified by:  wcarta

DEF000885



# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

Name: Kevin  Jessup                     Inmate #: CX8799            Closed Version 2  Dated 12/19/2003 3:06:06 PM

## 1.   REFERENCES AND IDENTIFICATION

| DOC #<br>CX8799 | Commitment Name<br>KEVIN  JESSUP | PBPP #<br>496AS | SID #<br>21714127 | FBI #<br>511135TA5 | Phila Photo #<br>750487 |
|---|---|---|---|---|---|
| DOB<br>04/03/1975 | Place of Birth<br>PHILADELPHIA   PA USA | | | Race<br>B | Sex<br>M |

## 2.   SENTENCE SUMMARY

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum | | | Maximum | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Y | M | D | Y | M | D |
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| **Plea:** | Found Guilty | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** | CC3701 - ROBBERY (GENERAL) | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| **Plea:** | Found Guilty | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** | CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | |

| Reception Date | 10/22/2001 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | 02/16/2008 |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

**Summary or Remarks on Sentence**

| Remarks | Version 2 created due to inmate being recommited as a Technical Convicted Parole Violator (TCV).   Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003. |
|---|---|

## 3.   SENTENCE STRUCTURE

**Commitment Credit**

Computation 1          CP0033/9503 : 01/26/1995 to 01/25/1996

| Remarks | |
|---|---|

**Bail/Escape/Interruption Time Data**

| None |
|---|

DEF000886

Name: Kevin Jessup                    Inmate #: CX8799      Closed Version No:2 Dated 12/19/2003 3:06:06 PM

### 3.   SENTENCE STRUCTURE (Cont'd)

| Item | Computation 1 | | | |
|------|---------------|---|---|---|
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | 09/23/2002 | *PBPP came up w/ this date, when was arrested on 9/26/01 and put in* | | |
| Delinquent Time | | *Del ...* | | |
| Backtime Credit | 4M24D | *I do not know how this is calc.* | | |
| Backtime Owed | 5Y4M23D | *I do not know how this is calc.* | | |
| New Maximum - PV | 02/16/2008 | | | |
| Sentence Computation Date | 12/19/2003 | | | |
| Basis for Computation | TCV | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Active | | | |

DEF000887

Name: Kevin Jessup                     Inmate #: CX8799      Closed Version No:2 Dated 12/19/2003 3:06:06 F

## 4.  NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| **Description:** | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| **Comments** | | |

## 5.  DETAINERS

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| 1 | 09/26/2002 | Usms Eastern | Cr# 02-32-01 | | Federal |
| **Charges** | - 162 M  To 162 M | | | | |

| Deleted Detainers (For those deleted since last DC16) | | | | | |
|---|---|---|---|---|---|
| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
| None | | | | | |
| **Remarks** | None | | | | |

## 6.  PRIOR DOC NUMBERS

| None | | | | | | | |
|---|---|---|---|---|---|---|---|

## 7.  ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---|---|---|---|
| None | | | |

**Last Modified By: Young, Don F**

**Signed Off By: Stahl, James N**                                    **Institution: Frackville**

DEF000888

# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

Name: Kevin  Jessup                Inmate #: CX8799          Closed Version 3  Dated 6/27/2007 3:13:38 PM

## 1.   REFERENCES AND IDENTIFICATION

| DOC #<br>CX8799 | Commitment Name<br>KEVIN  JESSUP | | PBPP #<br>496AS | SID #<br>21714127 | FBI #<br>511135TA5 | Phila Photo #<br>750487 |
|---|---|---|---|---|---|---|
| DOB<br>04/03/1975 | Place of Birth<br>PHILADELPHIA   PA USA | | | Race<br>B | | Sex<br>M |

## 2.   SENTENCE SUMMARY

| Sent<br>Date | County/State/Federal | Indictments | Sent<br>Type | Minimum | | | Maximum | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Y | M | D | Y | M | D |
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| Plea: | Found Guilty | OTN:  M6413794 | Judge: DEFINO,ALBERT | | | | | | |
| Offense: | CC3701 - ROBBERY (GENERAL) | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| Plea: | Found Guilty | OTN:  M6413794 | Judge: DEFINO,ALBERT | | | | | | |
| Offense: | CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | |

| Reception Date | 10/22/2001 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

### Summary or Remarks on Sentence

| Remarks | Version 3 created due to board action dated 6/25/2007 to remove TCV status and reflect inmate is now serving as a PVP.  Inmate will return to the custody of the U.S. Marshals prior to serving PBPP backtime.<br><br>Version 2 created due to inmate being recommited as a Technical Convicted Parole Violator (TCV).   Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003. |
|---|---|

## 3.   SENTENCE STRUCTURE

| Commitment Credit | |
|---|---|
| Computation 2 | CP0033/9503 : 01/26/1995 to 01/25/1996 |

| Remarks | |
|---|---|
| | |

DEF000889



Name: Kevin Jessup                     Inmate #: CX8799          Closed Version No:3  Dated 6/27/2007 3:13:38 PM

### Bail/Escape/Interruption Time Data

| None |
|---|

| Item | Computation 2 | | | |
|---|---|---|---|---|
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | | | | |
| Delinquent Time | | | | |
| Backtime Credit | | | | |
| Backtime Owed | | | | |
| New Maximum - PV | | | | |
| Sentence Computation Date | 06/27/2007 | | | |
| Basis for Computation | PVP | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Pending | | | |

DEF000890



Name: Kevin Jessup                     Inmate #: CX8799        Closed Version No:3  Dated 6/27/2007 3:13:38 P

## 4.   NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|-----------|----------------------|-------------|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| **Description:** | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY  THEFT,RSP,S/A-MERGES | |
| **Comments** | | |

## 5.   DETAINERS

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|-----------|------|--------|-----------------------|-----|------|
| 1 | 09/26/2002 | USMS EASTERN | CR# 02-32-01 | | Federal |
| **Charges** | - 162 M  To 162 M | | | | |

| Deleted Detainers (For those deleted since last DC16) | | | | | |
|-----------|------|--------|-----------------------|-----|------|
| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
| None | | | | | |
| **Remarks** | None | | | | |

## 6.   PRIOR DOC NUMBERS

| None | | | | | | | | |
|------|--|--|--|--|--|--|--|--|

## 7.   ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---------------|-------------|--------|----------|
| None | | | |

**Last Modified By: Kodack, Michelle L**

**Signed Off By: Fobia, Christina M**                     **Institution:  Coal Township**

DEF000891



# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

Name: Kevin  Jessup                     Inmate #: CX8799          Closed Version 4  Dated 4/21/2009 10:05:54 AM

## 1.   REFERENCES AND IDENTIFICATION

| DOC #<br>CX8799 | Commitment Name<br>KEVIN  JESSUP | | PBPP #<br>496AS | SID #<br>21714127 | FBI #<br>511135TA5 | Phila Photo #<br>750487 |
|---|---|---|---|---|---|---|
| DOB<br>04/03/1975 | Place of Birth<br>PHILADELPHIA  PA USA | | | | Race<br>B | Sex<br>M |

## 2.   SENTENCE SUMMARY

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum | | | Maximum | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Y | M | D | Y | M | D |
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| Plea: | Found Guilty | OTN:  M6413794 | Judge: DEFINO,ALBERT | | | | | | |
| Offense: | CC3701 - ROBBERY (GENERAL) | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| Plea: | Found Guilty | OTN:  M6413794 | Judge: DEFINO,ALBERT | | | | | | |
| Offense: | CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | |

| Reception Date | 04/15/2009 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

### Summary or Remarks on Sentence

*Remarks*   VERSION 4 CREATED TO SHOW PVP STATUS

Version 3 created due to board action dated 6/25/2007 to remove TCV status and reflect inmate is now serving as a PVP.  Inmate will return to the custody of the U.S. Marshals prior to serving PBPP backtime.

Version 2 created due to inmate being recommitted as a Technical Convicted Parole Violator (TCV).   Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003.

## 3.   SENTENCE STRUCTURE

| Commitment Credit | |
|---|---|
| Computation 3 | CP0033/9503 : 01/26/1995 to 01/25/1996 |

| *Remarks* | |
|---|---|
| | |

DEF000892

Name: Kevin Jessup                    Inmate #: CX8799      Closed Version No:4  Dated 4/21/2009 10:05:54 /

## Bail/Escape/Interruption Time Data

| None |
|---|

| Item | Computation 3 | | | |
|---|---|---|---|---|
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | | | | |
| Delinquent Time | | | | |
| Backtime Credit | | | | |
| Backtime Owed | | | | |
| New Maximum - PV | | | | |
| Sentence Computation Date | 04/16/2009 | | | |
| Basis for Computation | PVP | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Pending | | | |

DEF000893



Name: Kevin Jessup               Inmate #: CX8799      Closed Version No:4  Dated 4/21/2009 10:05:54 AM

## 4.  NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| **Description:** | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| **Comments** | | |

## 5.  DETAINERS

**Active Detainers**

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| **Charges** | None | | | | |

**Deleted Detainers (For those deleted since last DC16)**

| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| 1 | 7/19/2007 | USMS EASTERN | CR# 02-32-01 | | Federal |
| **Remarks:** | INMATE RELEASED TO THIS DETAINER | | | | |

## 6.  PRIOR DOC NUMBERS

| None | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

## 7.  ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---|---|---|---|
| None | | | |

**Last Modified By: Herbst, Deborah K**

**Signed Off By: Kodack, Michelle L**                    **Institution:  Coal Township**



# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

Name: Kevin  Jessup                    Inmate #: CX8799          Closed Version 5  Dated 5/1/2009 10:26:44 AM

## 1.   REFERENCES AND IDENTIFICATION

| DOC # CX8799 | Commitment Name KEVIN  JESSUP | PBPP # 496AS | SID # 21714127 | FBI # 511135TA5 | Phila Photo # 750487 |
|---|---|---|---|---|---|
| DOB 04/03/1975 | Place of Birth PHILADELPHIA   PA USA | | | Race B | Sex M |

## 2.   SENTENCE SUMMARY

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum | | | Maximum | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Y | M | D | Y | M | D |
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| **Plea:** | Found Guilty | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** | CC3701 - ROBBERY (GENERAL) | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| **Plea:** | Found Guilty | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** | CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | |

| Reception Date | 04/15/2009 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | 09/06/2014 |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

### Summary or Remarks on Sentence

| *Remarks* | VERSION 5 CREATED TO SHOW TCV STATUS ACCORDING TO PBPP<br>VERSION 4 CREATED TO SHOW PVP STATUS<br>Version 3 created due to board action dated 6/25/2007 to remove TCV status and reflect inmate is now serving as a PVP.  Inmate will return to the custody of the U.S. Marshals prior to serving PBPP backtime.<br><br>Version 2 created due to inmate being recommited as a Technical Convicted Parole Violator (TCV).   Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003. |
|---|---|

## 3.   SENTENCE STRUCTURE

**Commitment Credit**

Computation 4          CP0033/9503 : 01/26/1995 to 01/25/1996

| *Remarks* | |
|---|---|

5/1/2009 10:26:44 AM        Inmate #: CX8799 -  Kevin  Jessup      Version 5    Closed  5/1/2009 10:26:44 AM        Page 1 of 3
                            Distribution: Inmate  PBPP  PSP  BIS  Counselor  DC-15 Time File

DEF000895



Name: Kevin  Jessup                          Inmate #: CX8799        Closed Version No:5  Dated 5/1/2009 10:26:44 AM

### Bail/Escape/Interruption Time Data

| None |
|---|

| Item | Computation 4 | | | |
|---|---|---|---|---|
| Indictments Included | CP0033/9503<br>CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | 04/14/2009 | | | |
| Delinquent Time | | | | |
| Backtime Credit | 147D | | | |
| Backtime Owed | 1971D | | | |
| New Maximum - PV | 09/06/2014 | | | |
| Sentence Computation Date | 04/28/2009 | | | |
| Basis for Computation | TCV | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Active | | | |

5/1/2009 10:26:44 AM            Inmate #: CX8799 - Kevin  Jessup    Version 5   Closed  5/1/2009 10:26:44 AM        Page 2 of 3
                                Distribution: Inmate  PBPP  PSP  BIS  Counselor  DC-15  Time File

DEF000896

Name: Kevin Jessup                    Inmate #: CX8799      Closed Version No:5  Dated 5/1/2009 10:26:44 A

## 4.   NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|-----------|---------------------|-------------|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| **Description:** | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| *Comments* | | |

## 5.   DETAINERS

**Active Detainers**

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|-----------|------|--------|----------------------|-----|------|
| | | | | | |
| *Charges* | None | | | | |

**Deleted Detainers (For those deleted since last DC16)**

| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
|-----------|--------------|--------|----------------------|-----|------|
| None | | | | | |
| *Remarks* | None | | | | |

## 6.   PRIOR DOC NUMBERS

| None | | | | | | | | | |
|------|--|--|--|--|--|--|--|--|--|

## 7.   ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---------------|-------------|--------|----------|
| None | | | |

**Last Modified By: Herbst, Deborah K**

**Signed Off By: Kodack, Michelle L**                    **Institution:  Coal Township**

# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

Name: Kevin  Jessup                    Inmate #: CX8799                    Closed Version 6  Dated 7/30/2009 2:36:10 PM

## 1.   REFERENCES AND IDENTIFICATION

| DOC #<br>CX8799 | Commitment Name<br>KEVIN  JESSUP | | PBPP #<br>496AS | SID #<br>21714127 | FBI #<br>511135TA5 | Phila Photo #<br>750487 |
|---|---|---|---|---|---|---|
| DOB<br>04/03/1975 | Place of Birth<br>PHILADELPHIA  PA USA | | | | Race<br>B | Sex<br>M |

## 2.   SENTENCE SUMMARY

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum | | | Maximum | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Y | M | D | Y | M | D |
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| Plea: Found Guilty | | OTN:  M6413794 | Judge: DEFINO,ALBERT | | | | | | |
| Offense: CC3701 - ROBBERY (GENERAL) | | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| Plea: Found Guilty | | OTN:  M6413794 | Judge: DEFINO,ALBERT | | | | | | |
| Offense: CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | | |

| Reception Date | 04/15/2009 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum – PV | 07/14/2009 |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

### Summary or Remarks on Sentence

*Remarks*   Version 6 created to show modified TCV calculation per PBPP39.
VERSION 5 CREATED TO SHOW TCV STATUS ACCORDING TO PBPP
VERSION 4 CREATED TO SHOW PVP STATUS
Version 3 created due to board action dated 6/25/2007 to remove TCV status and reflect inmate is now serving as a PVP.  Inmate will return to the custody of the U.S. Marshals prior to serving PBPP backtime.
Version 2 created due to inmate being recommitted as a Technical Convicted Parole Violator (TCV).  Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003.

## 3.   SENTENCE STRUCTURE

**Commitment Credit**
Computation 5      CP0033/9503 : 01/26/1995 to 01/25/1996

*Remarks*

DEF000898

Name:  Kevin  Jessup                    Inmate #: CX8799        Closed Version No:6  Dated 7/30/2009 2:36:10 F

### Bail/Escape/Interruption Time Data

| None |
|------|

| Item | Computation 5 | | | |
|------|---------------|--|--|--|
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | 04/14/2009 | | | |
| Delinquent Time | | | | |
| Backtime Credit | 2027D | | | |
| Backtime Owed | 91D | | | |
| New Maximum - PV | 07/14/2009 | | | |
| Sentence Computation Date | 07/30/2009 | | | |
| Basis for Computation | TCV | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Active | | | |

DEF000899



Name: Kevin  Jessup                     Inmate #: CX8799        Closed Version No:6  Dated 7/30/2009 2:36:10 P

## 4.   NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| **Description:** | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| **Comments** | | |

## 5.   DETAINERS

**Active Detainers**

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| | | | | | |
| **Charges** | None | | | | |

**Deleted Detainers (For those deleted since last DC16)**

| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| None | | | | | |
| **Remarks** | None | | | | |

## 6.   PRIOR DOC NUMBERS

| None | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

## 7.   ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---|---|---|---|
| None | | | |

**Last Modified By: Kodack, Michelle L**

**Signed Off By: Kodack, Michelle L**                     **Institution:  Coal Township**

DEF000900



**COMMONWEALTH OF PENNSYLVANIA**
**BOARD OF PROBATION AND PAROLE**

*Interstate Parole Services Division*
*1101 South Front Street, Suite 5800*
*Harrisburg, PA 17104-2538*
*(717) 787-6134*

April 2, 2009

SCI-COAL TOWNSHIP

Re:  KEVIN JESSUP
Inst. No. CX-8799
Parole No. 496-AS

Dear Superintendent:

On            , the above parole violator was lodged in your institution.  Although his original maximum sentence was 1/26/2007, his maximum sentence is being extended due to:

☒ a new conviction
☒ a period of delinquency 06/15/2001

His new maximum sentence is:

☐ _____
☒   will be computed by the Board

Sincerely,
FOR THE BOARD

*Kay Longenberger*

Kay Longenberger
Director
Interstate Parole Services

By:  Raquel A. Coughlin
Parole Manager



An Equal Employment Opportunity Employer
Accredited by the Commission on Accreditation for Corrections

DEF001041



PBPP-?
(Revised 02-04)

# ORDER TO RECOMMIT
## COMMONWEALTH OF PENNSYLVANIA BOARD OF PROBATION AND PAROLI

**Name:** KEVIN JESSUP     **Inst. No:** CX8799     **Parole No:** 496AS

**District:** CO - Central Office     **SID:** 21714127     **Date Paroled:** 04/09/2001

**Inst Parole From:** SCICT - SCI - Coal Township

**Recommit To:** SCICT - SCI - Coal Township     **Status:** ● TPV ● CPV

The above-named individual who was conditionally released on parole by the Pennsylvania Board of Probation and Parole has been found by th
Board to have violated the conditions of parole. Therefore, the Board, by virtue of the authority conferred on it by law, orders said individu
recommitted for further imprisonment for the remainder of the unexpired maximum term, or until otherwise released or discharged according to law

### County, Bill & Term and OTN

| County Name | OTN | Indictment Number | Minimum Date |
|---|---|---|---|
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |

### Parole Violation Date Calculation

| | |
|---|---|
| **Original Maximum Date:** | 01/26/2007 |
| **- Parole/Reparole/Delinquency/Board Warrant Date:** | 04/09/2001 |
| **+Constructive Parole Time Added:** | 0D |
| **- Confinement Time:** | 0D |
| **- Backtime Credit:** | 147D |
| **= Backtime Owed:** | 1971D |
| **+ Custody for Return:** | 04/14/2009 |
| **= Recomputed Maximum Date:** | 09/06/2014 |
| **+ Escape Time:** | 0D |
| **= New Maximum Date:** | 09/06/2014 |

**Backtime Dates:**

| From | To | Time Period |
|---|---|---|
| 09/26/2001 | 02/20/2002 | 147D |

**Time Lost Due to:**

| | |
|---|---|
| **Delinquency:** | 0D |
| **Service of Another Sentence:** | 0D |

### Conviction(s) Resulting in Recommitment

| # | Sentence Date | Sentence County | Indictment | Period | Type | Place of Confinement |
|---|---|---|---|---|---|---|
| 2 | 11/24/2008 | FEDERA - FEDERAL COUNTY | 02CR00032-01 | 24 MONTHS | | FED - FEDERAL |

**Parole/Release/Max Date:** 04/14/2009     **Confined:** Y

**Comments:** ORIGINALLY SENTENCED ON 9/23/2002 TO 162 MONTHS. CONVICTION & SENTENCE VACATED ON 11/21/2006 AND RESENTENCED ON 11/21/2006 TO 95 MONTHS. RE-SENTENCED AGAIN ON 11/24/2008 TO 24 MONTHS



EXHIBIT

Kobach-26

DEF000945

PBPP-39
Revised (02-04)

**MODIFIED**

# ORDER TO RECOMMIT
## COMMONWEALTH OF PENNSYLVANIA BOARD OF PROBATION AND PAROLE

| | | | |
|---|---|---|---|
| **Name:** KEVIN JESSUP | **Inst. No:** CX8799 | | **Parole No:** 496AS |
| **District:** CO - Central Office | **SID:** 21714127 | | **Date Paroled:** 04/09/2001 |
| **Inst Parole From:** SCICT - SCI - Coal Township | | | |
| **Recommit To:** SCICT - SCI - Coal Township | | | **Status:** ◉ TPV  ◉ CPV |

The above-named individual who was conditionally released on parole by the Pennsylvania Board of Probation and Parole has been found by the Board to have violated the conditions of parole. Therefore, the Board, by virtue of the authority conferred on it by law, orders said individual recommitted for further imprisonment for the remainder of the unexpired maximum term, or until otherwise released or discharged according to law.

### County, Bill & Term and OTN

| County Name | OTN | Indictment Number | Minimum Date |
|---|---|---|---|
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |

### Parole Violation Date Calculation

| | |
|---|---|
| **Original Maximum Date:** | 01/26/2007 |
| **- Parole/Reparole/Delinquency/Board Warrant Date:** | 04/09/2001 |
| **+Prior Parole Liberty Forfeited:** | 0D |
| **- Confinement Time:** | 0D |
| **- Backtime Credit:** | 2027D |
| **= Backtime Owed:** | 91D |
| **+ Custody for Return:** | 04/14/2009 |
| **= Recomputed Maximum Date:** | 07/14/2009 |
| **+ Escape Time:** | 0D |
| **= New Maximum Date:** | 07/14/2009 |

**Backtime Dates:**

| From | To | Time Period |
|---|---|---|
| 09/26/2001 | 02/20/2002 | 147D |
| 02/20/2004 | 04/14/2009 | 1880D |

**Time Lost Due to:**

| | |
|---|---|
| **Delinquency:** | 0D |
| **Service of Another Sentence:** | 0D |

### Conviction(s) Resulting in Recommitment

| # | Sentence Date | Sentence County | Indictment | Period | Type | Place of Confinement |
|---|---|---|---|---|---|---|
| 2 | 11/24/2008 | FEDERA - FEDERAL COUNTY | 02CR00032-01 | 24 MONTHS | | FED - FEDERAL |

**Parole/Release/Max Date:** 04/14/2009    **Confined:** Y

**Comments:** ORIGINALLY SENTENCED ON 9/23/2002 TO 162 MONTHS. CONVICTION & SENTENCE VACATED ON 11/21/2006 AND RESENTENCED ON 11/21/2006 TO 95 MONTHS. RE-SENTENCED AGAIN ON 11/24/2008 TO 24 MONTHS

DEF000946



Miscellaneous Notes

Note Conviction

GIVEN under the hand of the Pennsylvania Board of Probation and Parole this  07/29/2009

By The Board

*Cynthia L. Daub*

Board Secretary

DEF000947



**COMMONWEALTH OF PENNSYLVANIA**
**BOARD OF PROBATION AND PAROLE**

*Interstate Parole Services Division*
*1101 South Front Street, Suite 5800*
*Harrisburg, PA 17104-2538*
*(717) 787-6134*

April 2, 2009

SCI-COAL TOWNSHIP

Re:  KEVIN JESSUP
     Inst. No. CX-8799
     Parole No. 496-AS

Dear Superintendent:

On          , the above parole violator was lodged in your institution.  Although his original maximum sentence was 1/26/2007, his maximum sentence is being extended due to:

☒ a new conviction
☒ a period of delinquency 06/15/2001

His new maximum sentence is:

☐ _____
☒   will be computed by the Board

Sincerely,
FOR THE BOARD

*Kay Longenberger*

Kay Longenberger
Director
Interstate Parole Services

By:  Raquel A. Coughlin
Parole Manager

An Equal Employment Opportunity Employer
Accredited by the Commission on Accreditation for Corrections

DEF000948

PBPP-39
Revised (02-04)

# ORDER TO RECOMMIT
# COMMONWEALTH OF PENNSYLVANIA BOARD OF PROBATION AND PAROLE

**Name:** KEVIN JESSUP      **Inst. No:** CX8799      **Parole No:** 496AS

**District:** CO - Central Office      **SID:** 21714127      **Date Paroled:** 04/09/2001

**Inst Parole From:** SCICT - SCI - Coal Township

**Recommit To:** SCICT - SCI - Coal Township      **Status:** ◉ TPV ◉ CPV

The above-named individual who was conditionally released on parole by the Pennsylvania Board of Probation and Parole has been found by the Board to have violated the conditions of parole. Therefore, the Board, by virtue of the authority conferred on it by law, orders said individual recommitted for further imprisonment for the remainder of the unexpired maximum term, or until otherwise released or discharged according to law.

## County, Bill & Term and OTN

| County Name | OTN | Indictment Number | Minimum Date |
|---|---|---|---|
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |

## Parole Violation Date Calculation

| | |
|---|---|
| **Original Maximum Date:** | 01/26/2007 |
| **- Parole/Reparole/Delinquency/Board Warrant Date:** | 04/09/2001 |
| **+Constructive Parole Time Added:** | 0D |
| **- Confinement Time:** | 0D |
| **- Backtime Credit:** | 147D |
| **= Backtime Owed:** | 1971D |
| **+ Custody for Return:** | 04/14/2009 |
| **= Recomputed Maximum Date:** | 09/06/2014 |
| **+ Escape Time:** | 0D |
| **= New Maximum Date:** | 09/06/2014 |

**Backtime Dates:**

| From | To | Time Period |
|---|---|---|
| 09/26/2001 | 02/20/2002 | 147D |

**Time Lost Due to:**

**Delinquency:** 0D

**Service of Another Sentence:** 0D

## Conviction(s) Resulting in Recommitment

| # | Sentence Date | Sentence County | Indictment | Period | Type | Place of Confinement |
|---|---|---|---|---|---|---|
| 2 | 11/24/2008 | FEDERA - FEDERAL COUNTY | 02CR00032-01 | 24 MONTHS | | FED - FEDERAL |

**Parole/Release/Max Date:** 04/14/2009      **Confined:** Y

**Comments:** ORIGINALLY SENTENCED ON 9/23/2002 TO 162 MONTHS. CONVICTION & SENTENCE VACATED ON 11/21/2006 AND RESENTENCED ON 11/21/2006 TO 95 MONTHS. RE-SENTENCED AGAIN ON 11/24/2008 TO 24 MONTHS



EXHIBIT
Kodach

PBPP-39
Revised (02-04)

**MODIFIED**

# ORDER TO RECOMMIT
# COMMONWEALTH OF PENNSYLVANIA BOARD OF PROBATION AND PAROLE



**Name:** KEVIN JESSUP  **Inst. No:** CX8799  **Parole No:** 496AS

**District:** CO - Central Office  **SID:** 21714127  **Date Paroled:** 04/09/2001

**Inst Parole From:** SCICT - SCI - Coal Township

**Recommit To:** SCICT - SCI - Coal Township  **Status:** ◉ TPV  ◉ CPV

The above-named individual who was conditionally released on parole by the Pennsylvania Board of Probation and Parole has been found by the Board to have violated the conditions of parole. Therefore, the Board, by virtue of the authority conferred on it by law, orders said individual recommitted for further imprisonment for the remainder of the unexpired maximum term, or until otherwise released or discharged according to law.

## County, Bill & Term and OTN

| County Name | OTN | Indictment Number | Minimum Date |
|---|---|---|---|
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |

## Parole Violation Date Calculation

| | |
|---|---|
| **Original Maximum Date:** | 01/26/2007 |
| **- Parole/Reparole/Delinquency/Board Warrant Date:** | 04/09/2001 |
| **+Prior Parole Liberty Forfeited:** | 0D |
| **- Confinement Time:** | 0D |
| **- Backtime Credit:** | 2027D |
| **= Backtime Owed:** | 91D |
| **+ Custody for Return:** | 04/14/2009 |
| **= Recomputed Maximum Date:** | 07/14/2009 |
| **+ Escape Time:** | 0D |
| **= New Maximum Date:** | 07/14/2009 |

**Backtime Dates:**

| From | To | Time Period |
|---|---|---|
| 09/26/2001 | 02/20/2002 | 147D |
| 02/20/2004 | 04/14/2009 | 1880D |

**Time Lost Due to:**

| | |
|---|---|
| **Delinquency:** | 0D |
| **Service of Another Sentence:** | 0D |

## Conviction(s) Resulting in Recommitment

| # | Sentence Date | Sentence County | Indictment | Period | Type | Place of Confinement |
|---|---|---|---|---|---|---|
| 2 | 11/24/2008 | FEDERA - FEDERAL COUNTY | 02CR00032-01 | 24 MONTHS | | FED - FEDERAL |

**Parole/Release/Max Date:** 04/14/2009  **Confined:** Y

**Comments:** ORIGINALLY SENTENCED ON 9/23/2002 TO 162 MONTHS. CONVICTION & SENTENCE VACATED ON 11/21/2006 AND RESENTENCED ON 11/21/2006 TO 95 MONTHS. RE-SENTENCED AGAIN ON 11/24/2008 TO 24 MONTHS