# EXHIBIT C

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
    DAMON CHAPPELLE,                     :
 3                          Plaintiff    :    COPY
                                         :
 4
                                         :
 5         vs.                           :
                                         :
 6  DAVID VARANO, SUPERINTENDENT,        :
    SCI-COAL TOWNSHIP; MICHELLE          :    NO. 11-0304
 7  KODACK, RECORDS SUPERVISOR,
    SCI-COAL TOWNSHIP; DEBORAH           :
 8  HERBST, RECORDS SPECIALIST,
    SCI-COAL TOWNSHIP; MR. DUNN,         :
 9  UNIT MANAGER, SCI-COAL
    TOWNSHIP; MS. FOULDS,                :
10  COUNSELOR, SCI-COAL TOWNSHIP,
                        Defendants:
11

12

13
                Deposition of: MICHELLE KODACK
14
                Taken by      : Plaintiff
15
                Before        : Faith A. Culp
16                              Reporter-Notary Public

17              Beginning     : June 21, 2012; 10:59 a.m.

18              Place         : SCI-Coal Township
                                1 Kelley Drive
19                              Shamokin, Pennsylvania

20

21
    COUNSEL PRESENT:
22
        JENNIFER J. TOBIN, ESQUIRE
23      718 Arch Street, Suite 304 South
        Philadelphia, Pennsylvania  19106
24          For - Plaintiff

25
```

ERVIN BLANK ASSOCIATES, INC.

**RECEIVED**

JUL **0 9** 2012

**Office of Attorney General**
Litigation Section

2

```
1   COUNSEL PRESENT (continued):

2        TIMOTHY P. KEATING, ESQUIRE
         Senior Deputy Attorney General
3        Pennsylvania Office of Attorney General
         Litigation Section
4        15th Floor, Strawberry Square
         Harrisburg, Pennsylvania  17120
5            For - Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

INDEX TO WITNESSES

| FOR - PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michelle Kodack | 5 | 93 | 97 | 98 |


INDEX TO EXHIBITS

| FOR - PLAINTIFF | MARKED | ADMITTED |
|---|---|---|
| Kodack Exhibit No. 28 | 5 | -- |
| Kodack Exhibit No. 29 | 15 | -- |
| Kodack Exhibit No. 30 | 22 | -- |
| Kodack Exhibit No. 31 | 33 | -- |
| Kodack Exhibit No. 32 | 36 | -- |
| Kodack Exhibit No. 33 | 39 | -- |
| Kodack Exhibit No. 34 | 42 | -- |
| Kodack Exhibit No. 35 | 49 | -- |
| Kodack Exhibit No. 35-B | 52 | -- |
| Kodack Exhibit No. 36 | 54 | -- |
| Kodack Exhibit No. 37 | 55 | -- |

4

```
 1              INDEX TO EXHIBITS

 2   FOR - PLAINTIFF                      MARKED   ADMITTED

 3   Kodack Exhibit No. 38                  59       --

 4   Kodack Exhibit No. 39                  74       --

 5   Kodack Exhibit No. 40                  74       --

 6   Kodack Exhibit No. 41                  75       --

 7   Kodack Exhibit No. 42                  77       --

 8   Kodack Exhibit No. 43                  78       --

 9   Kodack Exhibit No. 44                  83       --

10   Kodack Exhibit No. 45                  84       --

11   Kodack Exhibit No. 46                  88       --

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

STIPULATION

1

2          It is hereby stipulated by and between

3     counsel for the respective parties that sealing,

4     certification and filing are hereby waived; and that

5     all objections except as to the form of the question

6     are reserved to the time of trial.

7

8                         *        *        *

9

10         MICHELLE KODACK, called as a witness, having

11    been duly sworn or affirmed, testified as follows:

12                      DIRECT EXAMINATION

13    BY MS. TOBIN:

14         Q    So yesterday you testified and talked about

15    but we didn't introduce into evidence the moves

16    report.  I've got one.  Actually, located this in my

17    stack of discovery.

18              (Whereupon, a document was produced and

19    marked as Kodack Exhibit No. 28 for identification.)

20    BY MS. TOBIN:

21         Q    I'll show you what's been marked as Kodack

22    28.  And just to be clear on the record, is this the

23    document you were talking about yesterday when you

24    said moves report?

25         A    Yes, it is.

6

1          MR. KEATING:   It's the same one?

2          THE WITNESS:   Yes.

3    BY MS. TOBIN:

4      Q    And I just -- now that we have the document

5    and are looking at it as an exhibit, if you could

6    describe what each column means, what the significance

7    of each column is.

8      A    Sure.   The first column says time and date.

9    I think that's self-explanatory.   The inmate number.

10   Each inmate's assigned a unique number when they come

11   into the system and that lists his number.

12         The move code.   We have different codes for

13   different moves that are made within our system and we

14   have a listing that's available to us if we don't know

15   what a move -- what one of the codes are, what the

16   abbreviations are.

17         Location is the institution or county or

18   federal facility where the inmate is at.   Sentence

19   status that tells me currently -- currently or

20   previously what status he is in.   Whether he's

21   actively serving or whether he's being classified out

22   to court, so on.

23         Parole status.   Also, I think that's

24   self-explanatory.   I know we went over that yesterday.

25   Not applicable.   Whether or not they were paroled and

7

1   currently if they're recommitted or pending.

2       Q    So backing up just a bit.  For the move

3   codes, is there a name of a document that gives you

4   all of those?  You said you have access to that if you

5   don't remember what, for example, STT is?

6       A    It's available in one of our help screens in

7   the mainframe.

8       Q    And I believe it was produced in discovery

9   some of the move codes.  Is it available -- is it

10  available in a paper format as well?

11      A    I could print that screen out.

12      Q    Okay.  And so just picking out a few of

13  these.  Do you know what the XPT move code is?

14      A    That's transfer point.

15      Q    Okay.  And then the D move code?

16      A    That's delete.

17      Q    And what does delete mean?

18      A    When we see a D, we went through yesterday a

19  little bit our population count and our population

20  movements.  When I see that on our report, that means

21  he was completely taken out of the system, taken off

22  of both physical and our committed count.

23      Q    And so for this particular document four

24  lines down the date is 7/19/2007.  Does that mean that

25  Mr. Chappelle was -- because he was transferred out of

8

1    the institution, that's why that was done?

2         A    Correct.

3         Q    And who makes sure that that D or that delete

4    function happens?

5         A    Somebody in the records office does that

6    move.

7         Q    What does APV which is the one right above

8    the fourth line?

9         A    Add parole violator.

10        Q    And does that refer to what you were

11   testifying about yesterday when the parole board

12   notified you all that he was a -- is it a PVP?

13        A    Yes.

14        Q    What is SC?

15        A    Status change.

16        Q    And with regard to Mr. Chappelle, what does

17   that mean to you, that SC move code in that spot?

18        A    Are you referring to the 4/28/2009 date?

19        Q    Yes.

20        A    At that time he went from being a parole

21   violator pending to being a technical convicted parole

22   violator.  And that changed his status as a parole

23   violator.

24        Q    So going down to near to the bottom of this

25   sheet, the sixth line from the bottom the date is

9

1   10/22/2001 at 1346?

2        A    Yes.

3        Q    That is an APV code as well.  What does that

4   mean to you?

5        A    Add parole violator.

6        Q    And is that when he was first brought back in

7   to the DOC system after being out on parole?

8        A    Yes.   That's correct.

9        Q    And then the line directly above that, the SC

10  move code, again, that's status change?

11       A    That's correct.

12       Q    And his -- what does writ/ATA mean in the

13  sentence status column?

14       A    Means he was taken out to court.

15       Q    Does that have any connection with the parole

16  status?

17       A    No, it does not.

18       Q    And the SC, status change code, does that

19  correspond to him becoming a parole violator --

20  actually, what does that refer to in that line, the

21  12/26/2001?

22       A    You mean direct -- you mean the 1530?

23       Q    No.   The 7:47 time.

24       A    Just that he was taken out to court as a

25  parole violator pending.

10

1      Q    Okay.  So that status change could refer to
2  either the parole status changing or the sentence
3  status changing?
4      A    That's correct.
5      Q    And then the 1530 entry for 12/26/2001.
6      A    Yes.
7      Q    What does that mean, the whole line mean to
8  you?
9      A    He was brought back from court.  The sheriffs
10  returned him.
11      Q    And then the line right above that, 1/22/2002
12  at 5:41, what does that line mean?
13      A    He went from diagnostic classification to
14  actively serving.
15      Q    But he stayed at Graterford?
16      A    Well, if you look at the line above that,
17  that's when he was transferred.
18      Q    So there's more than one entry for that
19  series of events?  He was not only changed in his
20  sentence status but he was physically transferred?
21      A    Hang on.  No.  I'm sorry.  I'm jumping ahead.
22           MR. KEATING:  You can mark this one up if you
23  want to figure it out.
24           THE WITNESS:  No.  On 12/26, he was
25  diagnostic classification.  He was still diagnostic

11

1    classification.  And which line were you referring to?

2    I'm sorry.

3    BY MS. TOBIN:

4        Q    Both of the ones for -- I guess there's

5    multiple ones for 1/22.  What happened on January

6    22nd, 2002?

7        A    He went from Graterford as actively serving

8    to he was then put on a bus.  There was then a

9    transfer point at SCI Smithfield at 9:40, and then at

10   12:47 p.m. he was -- the bus departed from SCI

11   Smithfield and then arrived here at 1612 at SCI-Coal

12   Township.

13       Q    Okay.  And then from that point all the way

14   up to 7/19/2007, the majority of this page, all of

15   those entries.  There's transfer, is that TR?  TRN

16   means transfer?

17       A    Yes.

18       Q    Does that mean permanently transferred?

19       A    Yes.

20       Q    And then XPT is a transfer point so just a

21   temporary you're getting on the bus, you're getting

22   off the bus?

23       A    Correct.

24       Q    And what does STT mean?

25       A    Send temporary transfer.

12

1    Q    What does that mean?

2    A    Means he's being sent from his permanent

3    facility to another institution temporarily.

4    Q    For example, for court?

5    A    Correct.

6    Q    And so throughout this time period, is it

7    accurate to say he's designated to stay here at Coal

8    Township but he's doing a lot of traveling to court or

9    not a lot but he's being sent to other places but his

10   main institution is Coal Township?

11       MR. KEATING:  Objection.  What time period

12   are you making reference to?

13   BY MS. TOBIN:

14   Q    From January 22nd, 2002 to July 19th, 2007.

15   The majority of this sheet.

16   A    That's correct.

17   Q    When somebody is transferred to -- has the

18   X -- excuse me.  Is transferred to another DOC

19   institution for purposes of court, for example, when

20   he was going to Graterford because that's closer to

21   the Eastern District courthouse, that time that can

22   take -- can that take days that they're away or can it

23   take varying amounts of time that they're not

24   physically in the institution?

25   A    Yeah.  I mean I think if you look at the

ERVIN BLANK ASSOCIATES, INC.

13

1    report, you can see generally how long he was out.  It

2    can vary from a few weeks to months.

3        Q    And during that time, is he still getting

4    credit -- sentence credit for serving his sentence

5    even though he's not physically here?

6        A    Yes.

7        Q    Is that because he's on a writ, some kind of

8    writ to go to court?

9        A    Yes.

10        Q    Okay.  Who has access to the moves report?

11        A    Pretty much any DOC employee can view it as

12   long as they know how to access it.

13        Q    And what computer system -- how is it

14   accessed?

15        A    Through DOCNet.  This particular one.

16        Q    Is that a relatively new system?

17        A    I want to say it came on-line around 2001.  I

18   don't believe this was available at that time but in

19   2001 it slowly progressed.

20        Q    Okay.  And then in 2001, was there a lot of

21   data entry?  So, for example, the first entry on this

22   page at the bottom is dated in 1996.  Was there some

23   method of getting all that information into DOCNet?

24        A    DOCNet a lot of the information was pulled

25   from our old system.  It was just automatically pulled

14

1  over what we call the mainframe I referred to it a few

2  times.  DOCNet pulled a lot of that information over.

3       Q    Okay.  And what did you use the moves report

4  for?

5       A    In Mr. Chappelle's case?

6       Q    Yes.

7       A    Just to be able to see when certain things

8  occurred.

9       Q    Meaning when he was -- what do you mean

10 certain things?

11      MR. KEATING:  You mean after the complaint

12 was filed or what would you --

13      THE WITNESS:  Yeah.  At what point?

14 BY MS. TOBIN:

15      Q    Well, let me ask you that.  When did you

16 first look at the moves report in Mr. Chappelle's

17 case?

18      A    I don't know.

19      Q    And generally apart from Mr. Chappelle's

20 case, what do you use the moves report for?

21      A    Pretty much everything we do.  Anytime

22 reviewing a release checklist, I look at the moves

23 screen to see when he came into the system to see if

24 the inmate had any -- was out to court at all.  If he

25 was out to court, it would trigger me to look and see

15

1    if he has any active cases; and if he does, if they

2    were disposed of.

3         Q    One more question about this particular

4    document.  Actually, a couple more.  You mentioned

5    that it would show -- how do you know if he's serving

6    a federal sentence?  So, for example, on the fourth

7    line down dated 7/19/2007, what does in sentence

8    status what does SRV prev cnty slash state slash fed

9    mean?

10        A    Serving previous county, state or federal

11   sentence.

12        Q    So you know that it's one of those three, but

13   you don't know which category of sentence?

14        A    That's correct.

15        Q    But you could get that information?

16        A    Yes.

17        Q    And in the sentence status column and the

18   parole status column, are those entries as of the time

19   and date in the far left?

20        A    Yes.

21             (Whereupon, a document was produced and

22   marked as Kodack Exhibit No. 29 for identification.)

23   BY MS. TOBIN:

24        Q    I'm going to show you Kodack 29.  Do you

25   recognize this document?

16

 1      A     I recognize what it is.  I don't recognize
 2   specifically.
 3      Q     What does this signify to you?
 4      A     This is -- again, we reviewed another one of
 5   these yesterday.  It's a slideshow from one of our
 6   records manuals.
 7      Q     Is it from the computation manual?
 8      A     Yes.
 9      Q     What is -- can you describe what is the
10   computation manual?
11      A     It's a guide that explains different
12   scenarios of sentences.
13      Q     And who uses it?
14      A     Records staff.
15      Q     Is it a training tool for records staff?
16      A     It's available to us.  We're not -- there's
17   no formal training.
18      Q     So it's available to you just in the course
19   of doing your job in records?
20      A     Correct.
21      Q     And you mentioned yesterday that it's updated
22   regularly?
23      A     No, I did not say that.
24      Q     Okay.  Is it updated?
25      A     I said it is not.  It's not up-to-date

17

1  currently.  It is currently not up-to-date.

2     Q    And who's in charge of updating it?

3     A    The central office.

4     Q    And would that be the records administrator?

5     A    Yes.

6     Q    And the assistant records administrator?

7     A    Yes.

8     Q    And do they convey to you or send to you the

9  updates as they come out?

10        MR. KEATING:  If you know.

11        THE WITNESS:  Yeah.  I don't know.  It's been

12 a long time.

13 BY MS. TOBIN:

14    Q    Who's responsible for training the records

15 staff at the institution?

16    A    Each supervisor.

17    Q    So you train your records staff.  Who trains

18 you as a records supervisor?  Who gives you that

19 training?

20    A    As a supervisor, supervisory training?

21    Q    Yes.

22    A    The only supervisory training I ever had was

23 called supervisory development.  It wasn't specific to

24 records.

25    Q    So the records administrator at Camp Hill

18

1   doesn't train you?

2       A    No.

3       Q    Okay.   On the top slide of this document it

4   states in the last paragraph -- this is about sentence

5   running concurrent with parole violation backtime.

6   And the last paragraph of the top slide if you could

7   read that to yourself, and let me know when you're

8   done.

9       A    Okay.

10      Q    Okay.   What does that second -- that last

11  paragraph in the top slide what does that mean to you?

12  What's the plain English meaning of that?

13      A    It basically explains the above situation of

14  the reasons for incarceration and the main question is

15  what sentence gets the precommitment credit in the

16  situation.

17      Q    And would the -- does the answer to that

18  question change if the sentence is the two new

19  criminal charges are not state sentences?   I guess the

20  first --

21          MR. KEATING:   I guess I want to object to

22  that because we don't know what the answer to this

23  question is.

24  BY MS. TOBIN:

25      Q    Let me ask you that.   What is the answer to

19

1    this question, the one that's posed on the document?

2        A    Is it okay if I read?  I'm going to read a

3    little bit here.

4        Q    Sure.

5        A    You want to know the answer to this question?

6        Q    Yes.  As it's posed on this slide.

7        A    He would be eligible for credit on the

8    sentence -- on the new sentence because it was not a

9    reason for recommit and they're running it concurrent

10   with his parole violation backtime.

11       Q    So if you could walk me through that.  How --

12   what are the steps that you would take to figure out

13   where to apply the credit?

14       A    Well, in his case, again, I had mentioned

15   Oakman yesterday.  Even if he was credited with

16   backtime credit on this case --

17       Q    And when you say this case, you mean the

18   original?

19       A    Yes.  On his original case if he was credited

20   with backtime credit on his original case that he was

21   previously paroled on, he would -- we would still

22   apply the credit if the judge ordered it on the new

23   sentence and then what we would do is we would send a

24   letter to the judge advising him, telling him that he

25   was given credit previously.  However, it has been

1  applied and it will remain applied unless we hear back

2  from him or her.

3      Q   Okay.  So same situation here except let's

4  say the person is paroled like Mr. Chappelle, paroled

5  from his original sentence and then doesn't catch any

6  new state sentences.  Where would the credit go, the

7  commitment credit go for him when he comes back after

8  being violated?

9      A   That's not my decision to make.

10          MR. KEATING:  She's saying she doesn't know.

11          THE WITNESS:  I don't know.  That's not my

12  decision to make.  That's the parole board's

13  determination.  I don't determine that.

14  BY MS. TOBIN:

15      Q   But how many -- I guess logically though if

16  he only has a state sentence, I'm just asking you,

17  and^--

18          MR. KEATING:  No.  No.  You're asking

19  logically.  If you want to ask factual questions

20  concerning this, that's fine.  If you want to ask her

21  opinion, that's fine.  But you've asked her opinion

22  relative to a specific thing and she said that's up to

23  the parole board to determine.

24  BY MS. TOBIN:

25      Q   Let me ask you this.  I'll ask you something

1  else later.  But you're saying that if somebody comes

2  back and doesn't have a new state sentence or even if

3  they do have a new state sentence, there's commitment

4  credit, the parole board determines where that's

5  applied to; is that what you're saying?

6      A    No.  On which sentence though?  On the

7  sentence that he violated on or on the new one?

8      Q    Who makes the determination where the

9  commitment credit goes?

10     A    For which sentence?

11         MR. KEATING:  Either sentence.

12 BY MS. TOBIN:

13     Q    For either one.  For both.

14         MR. KEATING:  Does it tell you where it goes?

15         THE WITNESS:  The parole board tells us where

16 it goes on the parole violation.

17 BY MS. TOBIN:

18     Q    On the original sentence?

19     A    On the original sentence.  On the new

20 sentence, the court orders the credit.  We apply what

21 the court orders us to apply.

22     Q    On the new sentence?

23     A    Correct.

24     Q    Okay.  But a parole board -- I believe you

25 said this yesterday.  It's correct that a parole board

22

1   recommitment order is not the same thing as a court

2   order?

3        A    Correct.

4             (Whereupon, a document was produced and

5   marked as Kodack Exhibit No. 30 for identification.)

6   BY MS. TOBIN:

7        Q    I'm showing you Kodack 30.  If you could take

8   a look at that, please.

9        A    Okay.

10       Q    Do you recognize what this document is?

11       A    Yes.

12       Q    What is it?

13       A    Again, it's a slideshow printout from our

14   records computation manual.

15       Q    Okay.  If you'll take a look at the bottom

16   paragraph of the bottom slide which the heading is 42

17   PA CSA Section 9760, credit for time served.  States

18   credit against the maximum term and minimum term shall

19   be given to the defendant for all time spent in

20   custody as the result of the criminal charges for

21   which a prison sentence is imposed.  Credit shall

22   include all time spent in custody prior to trial

23   pending sentence.

24            What does that paragraph, what does that mean

25   to you?

23

1    MR. KEATING:  Are you asking her for a legal

2    interpretation of what 42 PA CSA Section 9760 is?

3    BY MS. TOBIN:

4    Q    No.  I'm asking what it means to you as a

5    records supervisor at Coal Township.

6    A    That just tells me that he's eligible to be

7    given credit for all time spent in custody prior to

8    being sentenced.

9    Q    And then is he also eligible to be given

10   credit for all time spent in custody as a result of

11   the charges that he's been sentenced for?

12   MR. KEATING:  Well, now you're asking for a

13   legal.  That's exactly what you're asking.

14   BY MS. TOBIN:

15   Q    Do you apply credit -- does your office apply

16   credit in such a way that if you are serving a

17   sentence imposed on you by a court and you're sitting

18   in the DOC's institution, you apply the credit, the

19   sentence credit to that sentence, right?

20   You apply the time, the days that people are

21   sitting to the sentences that they have active in your

22   system; is that correct?

23   A    I don't believe I understand.  Are you asking

24   me precommitment?

25   Q    Not precommitment.  Just when you're serving

24

1   your sentence.

2          MR. KEATING:  Do you apply the credit or do

3   you go by what the court tells you?

4          THE WITNESS:  We go by what the court tells

5   us.  What the court awards we put that --

6   BY MS. TOBIN:

7      Q    You put that in the system?

8      A    That gets put in the system.  If the court

9   didn't award it, we don't enter it.

10     Q    But you keep track of the time that the

11  person's in?

12     A    Correct.

13     Q    And then it's awarded in accordance with what

14  the court said?

15     A    Correct.

16         MR. KEATING:  Well, they don't award

17  anything.

18  BY MS. TOBIN:

19     Q    It's applied?

20     A    It's applied.

21         MR. KEATING:  It's put in the system that

22  way.

23  BY MS. TOBIN:

24     Q    You keep track of the time that they're in^--

25  physically in the prison and you apply those days in

25

1  accordance with what the court says?

2      A    Correct.

3      Q    Okay.  Do you have any authority to not apply

4  that time in accordance with what the court said?

5      A    No, I do not.

6      Q    I'm gonna go back to something you testified

7  about yesterday.  When a parole violator comes back

8  after violating.  And I believe you said, correct me

9  if I'm wrong, that there can be a period of time when

10 the person is a PVP, parole violator pending?

11     A    That's correct.

12     Q    And is it correct that that's the time period

13 when the parole board is deciding whether to recommit

14 them?

15     A    That's correct.

16     Q    And if to recommit them, how to recommit

17 them?

18     A    Yes.

19     Q    If a person comes back and is a PVP, parole

20 violator pending, and while they're waiting for the

21 parole board to take that next step and calculate

22 their new PV max date, their max date arrives, hasn't

23 been told to you by the parole board yet so they're

24 just sitting here, is that person released?

25     A    It all depends.  We track those.  I believe

26

1    we discussed that yesterday.  We do track those.  And

2    when they do come up on their maximum dates with

3    usually a few weeks ahead of time, we will request

4    from the parole board either a recommit, a warrant --

5    or I'm sorry, a cancellation of their warrant to

6    release him or a letter extending his maximum date

7    tentatively.

8         Q    You'll ask the parole board for that?

9         A    Yes, we ask the parole board for that.

10        Q    And I believe you said that that's done on a

11   regular basis, periodic basis?

12        A    Yes.  Yes.

13        Q    And who's in charge of doing that process?

14        A    The specialist that's assigned to that

15   caseload.

16        Q    So if that request were made by the

17   specialist to the parole board, would that be in the

18   DC-15?

19        A    It may or may not be.

20        Q    Where would that be kept?

21        A    It would be in the legal section.

22        Q    The legal section of what?

23        A    The DC-15.

24        Q    I'm not sure if I got the legal section in

25   discovery.

27

1        A    You did.

2        Q    I did?  So it would be in that particular

3    section of the DC-15?

4        A    Yes.

5        Q    Okay.  And in that case, the question of

6    backtime is a moot question, right?  They aren't going

7    to apply for parole again so they don't have a

8    backtime sentence, am I understanding that correctly?

9    If they're going to be released because their max date

10   has happened, then you don't have to find out what the

11   backtime sentence is from the parole board?

12            MR. KEATING:  I think she said they could ask

13   for a new maximum date.

14            MS. TOBIN:  I really appreciate it if I could

15   ask the deponent a question and have her answer it.

16            MR. KEATING:  I apologize.  You're right.

17   BY MS. TOBIN:

18       Q    If you don't understand, just let me know.

19       A    Again, in us asking for either the recommit

20   which would give us the backtime.  But no, a

21   backtime^-- we don't ask specifically for backtime.

22   That's what -- backtime is part of the recommit of the

23   recommitment action.  It's part of it.  So by us

24   asking for a recommitment action, that's included on

25   there.

28

1    Q   But my question is a little bit different.

2  If the inmate is in this particular situation and

3  they're going to be released, you've noticed that

4  their max date is coming up, you're writing to the

5  parole board, the parole board either responds,

6  doesn't respond, whatever they do with your request

7  for information, if their max date has come, if

8  they're scheduled to get out the next day, then the

9  issue of backtime is moot.  Do you understand what I'm

10  asking?

11    A   No.  Because the back -- the parole board

12  hasn't recalculated it at that point as far as I know.

13  I don't understand the question I guess because --

14    Q   So let me ask you this.  Is backtime -- I

15  believe you said this yesterday.  Backtime is a period

16  of time that the parole board tells the inmate you

17  have to wait this long until this date, you have to

18  wait from here to here from these -- this chunk of

19  time before you can apply for parole again.  We're not

20  going to let you apply for parole until this time?

21    A   Technically, yes.

22    Q   So that's backtime?

23    A   No.  That's not -- no.  They're ordering

24  them -- they can order them to serve so much backtime

25  prior to applying again.  They may say a recommit --

29

1   or one of their board actions may say serve six months

2   backtime and review again at that time.

3       Q    And what does that mean though, serve six

4   months backtime?

5       A    Means basically they have to sit for another

6   six months prior to being seen by the parole board

7   again or being eligible for parole again.

8       Q    So if someone's getting out -- back to my

9   hypothetical.  If someone's getting out because

10  they're maxing out on their sentences, the issue of

11  applying for parole another time doesn't come up?

12      A    Well, it all depends on if the parole board's

13  going to recommit him or not.  If the parole board's

14  going to recommit him and he has say 500 days

15  delinquency time to do, they can -- that's going to

16  extend his maximum date that's coming up say tomorrow

17  by 500 days.

18          So they may say in that recommitment action

19  that he has to serve so much of that time prior to

20  applying for parole again.  I can't say in a very

21  general sense that they -- it's a moot point.  You're

22  asking that in a very general sense and I can't say.

23      Q    So delinquency time is -- could you just tell

24  me what that is?

25      A    It was a period of time while they were out

ERVIN BLANK ASSOCIATES, INC.

30

1   on parole that they were -- weren't reporting or that

2   their parole agent did not know where they were.

3       Q    Is that also known as street time?

4       A    No.  Street time is basically the time from

5   when they were out on parole until the time they were

6   brought back.

7       Q    Is delinquency time it's time that they're

8   not incarcerated?

9       A    Right.

10      Q    So is it fair to say or accurate to say that

11  delinquency time is a subset of street time?  Is

12  delinquency time a particular category of time that

13  they're on the street?

14      A    That would be a question to ask parole.  I

15  really -- I don't want to say one way or another.

16      Q    So delinquency time we know they're not

17  physically incarcerated during that time?

18      A    Correct.

19      Q    And street time we also know that they are

20  not physically incarcerated during that time?

21      A    Correct.

22      Q    So the parole board has the authority under

23  the statutes to make them physically serve delinquency

24  time and street time?

25      A    I can't answer that.  I don't know.

31

1      Q    Okay.  But your earlier -- you earlier said

2   that the parole board could come back and say this

3   guy's got 500 some days of delinquency time;

4   therefore, his new date is this?

5      A    Yes.

6      Q    Okay.  What if someone comes back from being

7   out on parole and tells you or tells the parole board

8   I'm not gonna apply for parole again.  I'm just not.

9   I'm not gonna seek it.  I'm just gonna max out.  I

10  just want to serve my sentence.  What information, if

11  any, do you use at that point to figure out when he's

12  supposed to get out?

13     A    I don't even receive that information if

14  they're asking to max out.  That's not information

15  that's given to me.  That's strictly between the

16  inmate and the parole office.  We may get a board

17  action saying that but if that's the case, then he'll

18  max out.

19     Q    And similar question.  What if somebody comes

20  back after violating parole and has a conviction for a

21  nonparolable offense such as murder, a particular kind

22  of murder.  So applying for parole again isn't an

23  issue.  He's not -- he can't because he's going to be

24  stuck.  So is backtime relevant in that person's

25  situation?

32

1      A    Well, in that person's situation he has to

2  serve the parole violation first and technically he

3  could be paroled to the new sentence.  At that point

4  he's not going to get out physically but he could

5  still be paroled to that new life sentence.

6      Q    Start serving the new sentence.  Okay.  How

7  did you -- let me back up.  Did you read the complaint

8  in this case?

9      A    Yes.

10     Q    Okay.  So you're familiar with the

11 allegations in the complaint?

12     A    Yes.

13     Q    How did you first learn -- did you learn that

14 Mr. Chappelle was asserting that he'd been kept past

15 his max date while he was here at Coal Township?

16     A    You want to know when I learned?

17     Q    Did you learn while he was here?

18     A    I believe I responded to a grievance that he

19 filed.  Other than that.

20     Q    Was the grievance the first time that you

21 learned about that?

22     A    From what I can recall, yes.

23     Q    Okay.

24          MR. KEATING:  You heard her.  That's what he

25 was asserting.

33

1        MS. TOBIN:  Yes.

2        (Whereupon, a document was produced and

3   marked as Kodack Exhibit No. 31 for identification.)

4   BY MS. TOBIN:

5     Q   I'm going to show you Kodack 31.  If you

6   could please take a look at that.  Do you recognize

7   this document?

8     A   This specific document, no.

9     Q   Okay.  If you could take a few minutes to

10   read it, and please let me know when you're done.

11    A   Okay.

12    Q   So what is this document?

13    A   It's a request from Mr. Jessup claiming he is

14   beyond his maximum date.

15    Q   And this one is dated April 17th of '09.  And

16   is this one directed to you?

17    A   No, it is not.

18    Q   It's directed to Mr. Varano?

19    A   Yes.

20    Q   And was he the superintendent at the time in

21   2009, in April of 2009, Mr. Varano?

22    A   He signed it that way so yes, I'm assuming.

23    Q   And at the bottom there's a CC line that

24   lists you.  Do you remember getting this document from

25   Mr. Varano?

34

1      A    No, I do not.

2      Q    Where would this have gone in the records

3  office if it lists you as the CC?

4      A    Either it would have gone directly into the

5  file or somebody would have handed it to me.

6      Q    Who would have delivered it to the records

7  department?

8      A    Our office -- we pick up our own mail so

9  somebody from my office would have gotten it.

10     Q    Do you know who would have done that?

11     A    No, I do not.

12     Q    Who regularly gets the mail?

13     A    One of our records specialists.

14     Q    If it had gone into the file, are you

15  referring to the DC-15?

16     A    Yes.

17     Q    What's the procedure for putting CC'd items

18  in the file if it's directed to you?

19     A    Typically it would come directly to me.  I

20  can't recall in this specific matter.

21     Q    Do you remember whether Mr. Varano followed

22  up with you about this request to staff member?

23     A    No, I do not.

24     Q    You don't remember?

25     A    I don't remember.

35

1      Q    If he had followed up with you, would you

2    have -- what would you have done?

3      A    If he would have called me about it, I

4    probably would have looked him up or pulled his file

5    and gone over it with him or explained to him what we

6    were waiting on or what we were doing about it.   I

7    wouldn't have documented it anywhere.

8      Q    Is it your practice to -- when the

9    superintendent asks you to look into something, what's

10   your practice in terms of responding?

11     A    If he's just picking up the phone and calling

12   me, typically I give him a verbal response over the

13   phone unless something else is required which

14   typically it's not.

15     Q    Do you know whether any other records office

16   staff person reviewed this request when it was

17   delivered?

18     A    No.

19     Q    Would there be a way to find out?

20     A    No.

21     Q    Which section of the inmate's DC-15 file are

22   requests to staff members kept in?

23     A    The correspondence section.

24     Q    Is that where this would have been filed?

25     A    Yes.

36

1    Q    So back on April 17th of '09, do you remember

2  not just Mr. Varano but any DOC person contacting you

3  about Mr. Jessup's complaint about being over

4  detained?

5    A    No, I do not.

6    Q    Do you remember any non-DOC person contacting

7  you to alert you about this issue?

8    A    No.

9    Q    I'm going to show you what's been previously

10  marked as Dunn 3.

11         MR. KEATING:  Do you want to make it an

12  exhibit to her deposition?

13         MS. TOBIN:  I'll just keep it as Dunn 3.

14         MR. KEATING:  Why don't we mark one for

15  Kodack.

16         MS. TOBIN:  And Kodack 32.  I'll add that.

17         MR. KEATING:  Yeah.  Mark one for Kodack.

18  Makes it cleaner when you go through the depositions.

19         (Whereupon, a document was produced and

20  marked as Kodack Exhibit No. 32 for identification.)

21  BY MS. TOBIN:

22    Q    So this is Dunn 3 and Kodack 32.  If you

23  could take a moment to read that, please.

24    A    Okay.

25    Q    Do you recognize that document?

ERVIN BLANK ASSOCIATES, INC.

37

1    A    It's another request.

2    Q    And this one is also to Mr. Varano?

3    A    Yes.  That's correct.

4    Q    Do you recall getting a copy of this

5  document?

6    A    No, I do not.

7    Q    At the bottom Mr. Varano writes this is an

8  issue which can be directed to both parole and the

9  institution records office.  Both of the office

10  supervisors should be able to assist you.  Is this --

11  let me ask you this.  Is this one also relating to his

12  issue of having served his max sentence?

13    A    Yes.  That's correct.

14    Q    So if you could read the part in section

15  eight out loud.

16    A    I'll do my best.  I can't make some of the

17  words out.  Mr. Varano, I served 12 years in this

18  institution from 1/26/95 to 4/9/07 or is that a one?

19  I'm not sure what that year is.  Returned for

20  violations on 9/26/01 to 7/18/07.  I am --

21            MR. KEATING:  Somehow.

22            THE WITNESS:  -- somehow back here for parole

23  violations but I maxed this sentence out.  I have all

24  my status sheets, green sheets and documents, et

25  cetera.  I've been back for a week and none of the

38

1   state or parole it looks like have been helpful.  Can

2   you please schedule me an appointment for me to talk

3   to you about this situation.  I'm exhausted.  I've

4   exhausted all remedies to something and resolve this

5   matter.  Thank you in advance.

6   BY MS. TOBIN:

7        Q    So reading that -- so you don't recall having

8   read that before?

9        A    No.

10       Q    Do you recall Mr. Varano contacting you

11  after^-- in connection with this request slip to

12  discuss it?

13       A    No, I do not.

14       Q    Do you recall anyone in DOC contacting you to

15  discuss this?

16       A    No, I do not.

17       Q    Reading that section, reading that writing in

18  section eight, what does that mean to you?

19       A    It means that he's back here on a parole

20  violation and we're waiting on the parole board to

21  recommit him or release their warrant.

22       Q    And what is -- in terms of his complaint, do

23  you know what he's complaining about in section eight?

24       A    He's complaining that he's beyond his max.

25       Q    And down at the bottom CC file.  Do you know

ERVIN BLANK ASSOCIATES, INC.

39

1  what that refers to?

2       A    He's copied his DC-15.

3       Q    That would refer to the DC-15?

4       A    Yes.

5       Q    And, again, that's kept in the records

6  office?

7       A    That's correct.

8       Q    Do you recall anyone from the

9  superintendent's office contacting you about this

10 issue related to this staff member?

11      A    No.

12      Q    Even if not the superintendent himself?

13      A    No, I do not.

14           (Whereupon, a document was produced and

15 marked as Kodack Exhibit No. 33 for identification.)

16 BY MS. TOBIN:

17      Q    I'm showing you Kodack 33.  Can you identify

18 this document?

19      A    It's a grievance.

20      Q    If you could take some time to read that, and

21 let me know when you're done.

22      A    Okay.

23      Q    Okay.  Do you remember seeing this document?

24      A    No, I do not.

25      Q    Do you remember being referred -- having this

40

1   grievance referred to you for resolution by the
2   superintendent?
3        A    No, I do not.
4        Q    Let me show you --
5        A    I recall reviewing my response through the
6   whole --
7        Q    Through the litigation?
8        A    Yes.  Yes.
9        Q    Okay.  So if you could just read Section A
10  out loud.
11       A    Sure.  On May 4th, 2009, I received from the
12  records office a new status summary of which I
13  respectfully disagree with how records office has
14  credited my time I have spent in custody.  There's
15  five years, ten months that is not being credited to
16  my backtime on federal sentence.
17            I signed a letter on 4/29/09 from the federal
18  probation office.  The records office called me to
19  sign the letter so they made me aware of my new
20  sentence reduction of 24 months effective from 7/18/07
21  to 4/14/09 which completes my federal time.
22            I was arrested on 9/26/01.  So from that date
23  til 7/18/07 pursuant to PA -- to 42 PA Section 9760, I
24  am entitled to all time spent in custody that was not
25  credited towards my federal sentence.  I request that

41

1    this five years, ten months be credited to my

2    sentence.  This will put me over my max date.

3        Q    And what is that -- what do you think he's

4    complaining about there?  How do you interpret that?

5        A    He wasn't credited with the time that -- he

6    wasn't credited with all the time that he was entitled

7    basically.

8        Q    And at the bottom there's a list of actions

9    taken and staff contacted.  Includes Ms. Ellis.  Do

10   you know who Ms. Ellis is?

11       A    I believe that's supposed to be Ms. Ellit.

12       Q    Ellit?

13       A    Yes.

14       Q    And who is that?

15       A    She was the deputy.

16       Q    Do you know which deputy?

17       A    At the time I believe she was of centralized

18   services.

19       Q    And there's a Mr. Stout and a Ms. P. Jar.

20   And who are they?

21       A    They are in the parole office.  Mr. Stout has

22   since retired.

23       Q    And the records department is listed and Mr.

24   Varano.  Do you recall even if not receiving a request

25   slip from Mr. Jessup, do you recall him talking to

42

1   you, contacting you through some other means?

2        A    No.   There's no other means for them to

3   contact me other than the request slip.

4        Q    Do you know whether he contacted any other

5   records office staff?

6        A    No, I do not.

7             (Whereupon, a document was produced and

8   marked as Kodack Exhibit No. 34 for identification.)

9   BY MS. TOBIN:

10        Q    Okay.  I'm showing you Kodack 34.  If you

11   could take a moment to review that and when you're

12   done, let me know.  What is this document?

13        A    This is my response to Mr. Jessup.

14        Q    And is this your response to the grievance

15   which is Kodack 33?

16        A    Yes, it is.

17        Q    So you had to read the grievance in order to

18   respond?

19        A    Yes.

20        Q    When you did that, what other steps did you

21   take after reading the grievance?  What was your first

22   step after reading Kodack 33?

23        A    I reviewed the file.  Well, can I say in

24   general what I would do?  I'm not sure exactly what I

25   did because I don't recall.

43

1        Q    Sure.

2        A    Generally I would review the file to see what

3   his claim is and why he's claiming it.  And I would

4   also review the parole board recommitment action and

5   respond based on that information.

6        Q    When you say review the file, what part of

7   the DC-15 would you review?

8        A    Mostly the legal section.

9        Q    And what documents in the legal section would

10  you review?

11       A    The Parole Board 39 would be the main

12  document.

13       Q    And remind me what that is.

14       A    That's the recommitment giving us the

15  backtime and the new maximum date.

16       Q    And any other documents you'd review in the

17  legal section?

18       A    Not in the legal section, no.

19       Q    Any other documents in the DC-15 that you

20  would review?

21       A    Yes.  The DC-16E.

22       Q    Would you review all of those?  I understand

23  they accumulate.  Would you review all of the past

24  ones?

25       A    Not all of them.  Maybe I would probably

44

1    review the one prior to that, to the most current.

2        Q    So the most current and then the most recent

3    before that?

4        A    Right.

5        Q    And in Mr. Chappelle's case or Mr. Jessup's

6    case, do you recall specifically what your review was?

7        A    No, I do not.

8        Q    Do you have any reason to believe your review

9    would be different than what you just described?

10       A    No, I do not.

11       Q    So looking at Kodack 34, if you could just

12   read that to yourself, and let me know when you're

13   done.

14       A    Sure.

15       Q    You're done?

16       A    I read it already.

17       Q    So you wrote that the parole board and the

18   Department of Corrections are two separate entities.

19   As such the Department of Corrections has no authority

20   over the parole board.  The issues that you address in

21   this grievance need to be addressed to the parole

22   board.

23            Additionally, your parole violation backtime

24   is calculated by the parole board and provided by them

25   to the institution's record department for recording

45

1    on your sentence status summary.

2            Any questions or problems with your parole

3    violation backtime calculation needs to be addressed

4    to the parole board.  We have no authority to change

5    their calculation.  Taking all information into

6    consideration, your grievance is denied.

7            So my question is his grievance talks about

8    sentence credit not being credited with the amount of

9    time he spent in prison.  And I'm wondering why you

10   referred him to the parole board as opposed to

11   answering his question about sentence credit?

12       A    Because, again, he was referring to backtime

13   credit and he's referring to a sentence that was a

14   reason for his parole violation.

15           Once an inmate is paroled and they come back

16   as a parole violator, I have no authority to change

17   what the parole board gives me.  The parole board has

18   control at that point of their maximum date.  I have

19   no control over changing that.  I record it and that's

20   it.

21       Q    So if he's claiming he's been -- he's being

22   kept past his max date, did you talk with the parole

23   board about this after you read the grievance?

24       A    I can't recall specifically.

25       Q    Did you write to them?

46

1      A    I can't recall.

2      Q    If you did, would it have been in the DC-15?

3      A    It may be.

4      Q    Do you remember if the parole board contacted

5   you about this, about Mr. Jessup's complaint?

6      A    I don't recall.

7      Q    Did you talk with Mr. Varano about it?

8      A    I don't recall.

9      Q    Did you talk with any of your staff at the

10  records office?

11     A    I'm sure I did.  I don't remember who

12  specifically.

13     Q    Do you know who the staff person was who was

14  assigned to Mr. Jessup's case?

15     A    I believe it was Deb Herbst.  I'm not sure.

16  I can't say for sure.

17     Q    Did you ever get contacted by Ms. Foulds or

18  Mr. Dunn about Mr. Chappelle's issues?

19     A    I can't say one way or another.  I don't

20  know.

21     Q    Did you ever get contacted by somebody

22  outside of the institution about Mr. Chappelle's

23  issues?

24     A    I don't recall.

25     Q    If you had, would that communication or

47

1    that -- would that contact be reflected in the file?

2        A    No.

3        Q    And why not?

4        A    I get probably 20 to 30 phone calls a day

5    regarding inmates.  I don't have time to document

6    every time I get a phone call regarding an issue.

7        Q    After you issued this response to him, did

8    you have further involvement in the issue, in Mr.

9    Chappelle's complaint about being over detained?

10       A    I don't remember.

11       Q    Did you consult with the legal department at

12   Camp Hill about his complaint?

13       A    I can't recall.

14       Q    Are you familiar with a system by which you

15   can make a request to legal if you have a question?

16       A    Yes, I am.

17       Q    And is there a form associated with that

18   request?

19       A    We have a form.  It's called a legal opinion

20   request, yes.

21       Q    And if you did do a legal opinion request,

22   would that be in the legal section of the DC-15?

23       A    Yes, it would.

24       Q    But you don't remember if you did one?

25       A    I don't believe I did, no.

48

1    Q    Did you contact the records administrator or

2    the assistant records administrator at Camp Hill?

3    A    I'm not sure.

4    Q    And if you had contacted them, would that be

5    in the DC-15?

6    A    Most likely, yes.

7    Q    And I know you testified yesterday that your

8    supervisor here, the CCPM is technically your

9    supervisor but doesn't necessarily do just this kind

10   of work.  But did you consult her about this issue, a

11   Linda Chismar I believe?

12   A    I can't recall.

13   Q    When you were researching or looking in the

14   file to respond to this grievance, did you look at Mr.

15   Chappelle's convictions and sentences on the DC-16E?

16   A    I would have, yes.

17   Q    And did you look at the sentence computations

18   or the other data on the DC-16E?

19   A    I would have, yes.

20   Q    And that would have been anything that was in

21   the file as of the date you reviewed this?

22   A    Yes.  That's correct.

23   Q    Do you know when you got this grievance, the

24   Kodack 33?

25   A    No, I do not.

49

1    Q    Presumably sometime after 5/7/09 if that's

2    when the grievance coordinator signed it?

3    A    Yes.  And once the grievance coordinator

4    signs them, they would go to my boss and then she

5    forwards them to me.

6    Q    Did you interview Mr. Chappelle or have him

7    come to your office after you got this grievance?

8    A    I don't believe so, no.

9    Q    And did you talk with him at any time after

10   that about his complaint that he was being detained on

11   this sentence?

12   A    No.  No, I did not.

13   Q    Did you direct any of your staff to talk with

14   him?

15   A    I can't recall.

16   Q    Did you talk to Ms. P. Jar or Mr. Stout after

17   you got this?

18   A    I may have.  I don't know.  I can't say for

19   sure.

20   Q    Do you recall them ever talking to you about

21   his situation?

22   A    No.

23        (Whereupon, a document was produced and

24   marked as Kodack Exhibit No. 35 for identification.)

25   BY MS. TOBIN:

50

1      Q     Showing you Kodack 35.  If you could review
2  that and when you're done, let me know.
3      A     Okay.
4      Q     Do you know -- or did you ever receive this
5  document?
6      A     This would have just been put in his file.
7  This would have been filing.
8      Q     In the DC-15?
9      A     Yes.
10     Q     So this is the appeal from your response to
11 him, his appeal to the facility manager?
12     A     That's correct.
13     Q     And that would have been Mr. Varano?
14     A     That's correct.
15     Q     Did Mr. Varano approach you to talk about
16 this appeal after 5/23/09?
17     A     I don't recall.
18     Q     Did you look into Mr. Chappelle's DC-15 again
19 after your first time of reviewing it to respond?  Did
20 you look in his file again to do some more research
21 after that?
22     A     I don't recall.
23     Q     Is there any kind of system, an audit system
24 or a tracking system every time a DC-15 is checked out
25 of the records office?

51

1      A    They don't leave our office.

2      Q    So they're just there?

3      A    Yes.

4      Q    If somebody wants to look at it, they have to

5   come to your office?

6      A    Yes.   The superintendent is the only person

7   who can check a file out.

8      Q    Had you gotten this -- or had you read this,

9   would you have done any additional research in the

10   DC-15?

11          MR. KEATING:   I'm going to object.   You can

12   go ahead and answer.

13          THE WITNESS:   I don't know.   Probably not

14   because, again, like I said, once an inmate is

15   released on parole and comes back on parole

16   violations, the Department of Corrections is no longer

17   responsible for their calculation.   We record the

18   information as provided to us by the parole board.

19   That is our role at that point.

20   BY MS. TOBIN:

21      Q    So you might not have -- wouldn't have looked

22   in his file?

23      A    No.   No.   Because at that point his fight

24   isn't with the Department of Corrections, it's with

25   the parole board.

52

1          (Whereupon, a document was produced and

2    marked as Kodack Exhibit No. 35-B for identification.)

3    BY MS. TOBIN:

4        Q    I'm showing you Kodack 35.  If you could read

5    that to yourself, and let me know when you're done.

6        A    Okay.

7        Q    What is this document?

8        A    It's the superintendent's response to Mr.

9    Jessup's appeal.

10       Q    And, again, there's a CC line to you, to Mr.

11   Dunn, to the DC-15 and the DC-14, and then to the

12   file.  Did you get a copy of this after Mr. Varano

13   gave it to Mr. Jessup?

14       A    I don't recall specifically.

15       Q    Do you remember speaking with Mr. Varano

16   about the information in this document?

17       A    No, I do not.

18       Q    And it indicates that the DC-15 got a copy of

19   this and that Ms. Kodack also got a copy of this.  So

20   do you have a separate file where you keep memos or

21   grievance responses that the superintendent is giving

22   you or other communications?

23       A    No.  If it pertains to a specific inmate, I

24   would review it and put it in the file.

25       Q    So if it came to you, you would review it and

53

1   then put it in the DC-15?

2       A    That's correct.

3       Q    So it doesn't just get filed without you

4   reading it?

5       A    It shouldn't, let's put it that way.

6       Q    And then this particular document says that

7   Mr. Chappelle can address his issues with the parole

8   board.  Do you know whether he did address his issues

9   with the parole board?

10      A    No, I do not know.

11      Q    Did you -- how would he address his issues

12  with the parole board?

13           MR. KEATING:  I'm going to object to that

14  question.  You're asking her to speculate as to how

15  your client would have addressed something to a parole

16  board.

17  BY MS. TOBIN:

18      Q    Do you know how inmates can communicate with

19  the parole board?

20           MR. KEATING:  Thank you.

21           THE WITNESS:  The same as they do with us.

22  They would send a request to the institutional parole

23  office.

24  BY MS. TOBIN:

25      Q    So just like you testified yesterday, they

54

1  don't have a hall pass to come knock on your door,

2  they also don't have a hall pass as far as you know to

3  go knock on the institutional parole office door?

4       A    No.   The parole office can request for an

5  inmate to be sent to them if they feel it's necessary.

6       Q    Has the institutional parole office ever

7  contacted you in connection with a sentence or parole

8  backtime sentence issue and had you and the inmate

9  come to their office or meet with them as a group?

10      A    No.

11      Q    After you reviewed this document, did you

12 take any further action with regard to his sentence

13 calculation issue?

14      A    I don't know.

15           (Whereupon, a document was produced and

16 marked as Kodack Exhibit No. 36 for identification.)

17 BY MS. TOBIN:

18      Q    I'm showing you Kodack 36.   If you could

19 please take a look at that.   And do you recognize this

20 document?

21      A    No, I do not.

22      Q    Do you know what an appeal to Secretary's

23 Office of Inmate Grievances and Appeals is?

24      A    Yes, I do.

25      Q    What is it?

55

1      A    He's appealing the superintendent's decision

2  to uphold my grievance response.

3      Q    And is this the next step in the grievance

4  process for the DOC for an inmate?

5      A    From what I understand, yes.

6      Q    This is dated June 4th, 2009 as received by

7  the Inmate Grievances and Appeals Office.  After that

8  date, do you recall anyone from the DOC contacting you

9  to discuss Mr. Chappelle's complaint?

10     A    No, I do not.

11     Q    Do you recall anybody from outside the DOC

12  contacting you?

13     A    No.

14     Q    After that date?

15     A    No.

16          (Whereupon, a document was produced and

17  marked as Kodack Exhibit No. 37 for identification.)

18  BY MS. TOBIN:

19     Q    This is Kodack 37.  Do you recognize this

20  document?

21     A    Yes, I do.

22     Q    And what is this?

23     A    This is the secretary's office.  This is

24  their response to Mr. Jessup's grievance appeal.

25     Q    And what's your understanding of the

56

1    response?

2         A    They upheld the institution's decision to

3    deny his appeal.

4         Q    The main paragraph of the response, the

5    second sentence, the responses provided to you by the

6    institutional staff are correct and if you have a

7    dispute with the PV maximum date, you must address

8    that with them.

9              Do you recall anybody from the secretary's

10   office contacting you to ask about Mr. Chappelle's

11   complaint in this grievance?

12        A    I don't recall anybody contacting me, no.

13        Q    Had they contacted -- does the secretary's

14   office ever contact you when they're trying to review

15   an inmate's grievance if it has to do with sentence

16   credit issues?

17        A    I have received phone calls from them, yes.

18        Q    And do they ask you to -- what do they ask

19   you?  I mean what is the nature of that communication?

20        A    Sometimes they'll ask me to pull the file and

21   maybe look something up that's not available for them

22   to see on the computer.

23        Q    But in this case you don't remember them

24   doing that?

25        A    No, I do not.

1    Q   Had they done that would there be a notation
2    in the file?

3    A   Most likely, no.

4        MS. TOBIN:  Could I take a look at your
5    exhibits?  I mislabeled two exhibits.   Kodack 35.
6    Let's relabel these.   Bates number --

7        MR. KEATING:  Kodack 35 is Bates stamp
8    DEF000571.  And that is the written letter from Mr.
9    Jessup or Chappelle titled appeal to facility manager.

10       MS. TOBIN:  We're going to call 570 then
11   which is the next in the series we're going to call
12   that Kodack 35-B because I --

13       MR. KEATING:  Why?

14       MS. TOBIN:  Because I also called that Kodack
15   35.

16       MR. KEATING:  I have that down as Kodack 36.

17       MS. TOBIN:  I mislabeled these.  So Bates
18   number 570 is going to be relabeled Kodack 35-B.

19       MR. KEATING:  570 Kodack 35-B.  Okay.

20       MS. TOBIN:  We're at a good point to break
21   for lunch.  So we could take --

22       MR. KEATING:  How much more time do you think
23   you have with Michelle?

24       MS. TOBIN:  I think probably another hour.
25   So if we could break for a short lunch break, about

58

1    half an hour.  Does that work?

2         MR. KEATING:  Um-hum.

3         (Whereupon, a luncheon recess was taken from

4    12:20 p.m. until 1:08 p.m.)

5                    AFTER RECESS

6    BY MS. TOBIN:

7         Q    Just backing up to a question that was posed

8    on the interrogatories in response to the question for

9    you to identify the caption number and case name of

10   any other lawsuits that you're a defendant in, you

11   responded Shannon Williams versus Varano.

12        A    Um-hum.

13        Q    And you indicated it was still active.  But

14   that was as of the time of the interrogatories which

15   was back in February.  Is that case still active?

16        A    You know what, I'm not sure.  I haven't heard

17   anything.

18        Q    All right.  Have you been deposed in that

19   case?

20        A    No.

21        Q    Okay.  What is that case about?

22        A    You know what, I honestly have no idea.

23        Q    Okay.

24        A    I don't even know if I'm a defendant or a

25   witness.  I really have no idea.

ERVIN BLANK ASSOCIATES, INC.

59

 1    Q    Okay.  Fair enough.  Yesterday at the end of

 2  the deposition you made me copies of parole documents

 3  from Mr. Chappelle's file from his DC-15.  I will just

 4  collectively label these 38.  If you could just look

 5  through that.

 6           (Whereupon, several documents were produced

 7  and marked collectively as Kodack Exhibit No. 38 for

 8  identification.)

 9  BY MS. TOBIN:

10    Q    So, again, for the record what are those

11  documents, Kodack 38?

12    A    These are parole board actions.

13    Q    And would those be sent from the parole board

14  to the records department at Coal Township?

15    A    Yes.

16    Q    And who would get them within the records

17  department?

18    A    Typically the specialist assigned to the case

19  reviews each one and determines whether or not any

20  action needs to be taken.

21    Q    And if the action -- if action does need to

22  be taken, what kind of action would that be?

23    A    Well, it all depends.  There's a variety of

24  different board actions that can come in.  So it

25  depends on what the decision is.

60

1    Q    Would receiving and reviewing those documents

2  sometimes result in an updated 16E form?

3    A    One of these alone sometimes, yes, on

4  occasion.

5    Q    And then what are the other types of actions

6  that could be taken when you get the parole notice of

7  board decisions?

8    A    The board decisions can be anything from

9  granting an inmate parole, denying an inmate parole,

10  changing his status from parole violator pending to a

11  technical parole violator or a convicted parole

12  violator to continue on parole.  It can be many

13  different things.

14    Q    And then the records office would -- would

15  you update your records based on the information

16  that's on those sheets?

17    A    Again, it depends on whether or not what the

18  decision was.  Certain things we would update.  But

19  for the most part, no.  Like I said, sometimes one of

20  these would trigger us to generate a new 16E.  For the

21  most part they don't though.

22    Q    Is there any kind of procedures, manual or

23  instructions that you have for how to handle these

24  particular documents, documents from the parole board?

25    A    No.

61

1      Q     Would they just be handled under Policy

2  11.5.1?

3      A     Yes.

4      Q     And either sections one or two?

5      A     Yes.

6      Q     Okay.  Any other section that you can think

7  of that would be relevant to these?

8      A     No.  I don't believe so.

9      Q     And what section of the DC-15 do these reside

10  in?

11      A     It's called the prerelease section.

12      Q     Okay.  And that's a regular part of the file?

13      A     Yes, it is.

14      Q     I did check to see if I had gotten those that

15  are Bate stamped and I didn't see them.  So if you

16  could do a double-check to see if there's other

17  documents in the prerelease section that I didn't get

18  from Mr. Chappelle, I'd appreciate it.

19      A     Okay.  Typically this is all that's in there.

20      Q     Okay.  So as you testified yesterday in July

21  of 2009, Mr. Chappelle was released from Coal

22  Township?

23      A     Yes.

24      Q     The moves report would say the exact date if

25  we could look at that.

62

1     A     I believe it was July 30th.  It was July
2  30th, 2009.

3     Q     Okay.

4     A     At 1554.

5     Q     Okay.  So how did he come to be released?
6  What's your understanding of why that happened?

7     A     I'm gonna refer to Kodack 38 board action
8  dated July 29th, 2009 modifying his parole violation
9  max date.  There would also be an attachment to this.
10  The Parole Board 39 Form would have also been attached
11  to this.

12     Q     So you're referring to the top page of that
13  exhibit which we haven't Bate stamped.  What's the
14  date of that?

15     A     July 29th, 2009.

16     Q     And is that -- I see on the document that
17  that is -- looks like a stamp.  Is that the date that
18  it was received here or the date that the parole board
19  issued it?

20     A     That's the date the parole board issued it.

21     Q     And how is that conveyed, this document?  How
22  is that conveyed to the records department?

23     A     I don't recall.  It may have been e-mailed.
24  It may have been faxed.  I can't say for sure.

25     Q     Well, what was your involvement in either

63

1    receiving that document or in the whole release

2    process for Mr. Chappelle?

3         A    Again, I can't say exactly how I received it.

4    However, when we received it, we would have

5    immediately taken note of the maximum date already

6    being in the past and we would have updated his

7    sentence status sheet which was done and we would have

8    cleared his file to make sure there was no additional

9    arrests or outstanding warrants and arranged for his

10   departure.

11        Q    And do you -- were you contacted by anyone at

12   the parole board either before or after getting this

13   document, this first page of Kodack 38?

14        A    I can't say for sure in this case.

15        Q    So you don't recall them calling you?

16        A    No, I do not.

17        Q    Do you remember if you yourself were involved

18   in updating the DC-16E to reflect this information?

19        A    I believe I was.

20        Q    I'm going to refer you back to Kodack 24 from

21   yesterday.  And this is -- we discussed that

22   yesterday.  If you could take a look at version six

23   which is Bates number 898.  Can you describe what this

24   document is?

25        A    This is his sentence status sheet.

64

1     Q   Was this -- was this created in response to

2  that Kodack 38, page one?

3     A   Yes, it was.

4     Q   And can you describe how the input of

5  information or how this was created in response, the

6  process of creating this DC-16E?

7     A   When we received this, we would have input

8  the information.  Again, we get the information from

9  the Parole Board 39 Form.  The specifics, the backtime

10  that gets entered into our mainframe and then we go

11  into DOCNet and we would go into the 16E system and go

12  through the sentence computation and basically update

13  it to reflect the new maximum date, and that's pretty

14  much it.

15     Q   And so on the second page on page Bates

16  number 899, there's a column that says computation

17  five.

18     A   Yes.

19     Q   And the new maximum PV, that box that says

20  7/14/2009, is that automatically generated by the

21  computer or does someone type that in?

22     A   It's pulled from our mainframe.  That

23  information gets entered into our mainframe and then

24  when we go into DOCNet and go to the 16E program, it

25  gets automatically pulled from the mainframe.

65

1    Q    So you entered information about -- actually,

2    I apologize.  I don't have extra copies.  But which

3    information on Kodack 38 was entered into the

4    mainframe?

5    A    Again, I referred to Parole Board Form 39

6    which isn't attached to this.  It's -- we reviewed it

7    yesterday.  We had looked at it yesterday I know that.

8    But that's where most of the information is obtained

9    from.

10    Q    Is that the recommitment order?

11    A    Yes, it is.

12    Q    Okay.

13    A    I'm not sure if that's the one.

14    Q    So it looks like this?

15    A    Yes, that's what it looks like.  It should be

16    dated 7/29.

17    Q    Okay.  So referring to Kodack 26.  If you

18    could find the recommitment order if it's in that

19    stapled packet.

20    A    Yeah.  It's Bate stamp 946.

21    Q    Okay.  So that's the document that you got

22    information from to put into the mainframe which

23    generated the DC-16E?

24    A    That's correct.

25    Q    And specifically which information was

66

1    inputted?  Which of these numbers?

2         A    The backtime credit, the backtime owed, and

3    the new maximum date.  That all gets entered.  And

4    then there's also a note section in our mainframe that

5    allows us to enter the conviction resulting in

6    recommit.

7         Q    And does a records specialist do that

8    usually?

9         A    Typically, yes.

10        Q    And you review their work?

11        A    Yes.

12        Q    Is there a place on the DC-16E to show who

13   entered it?

14        A    I show as the one who last modified it.

15   However, I can't -- somebody would have created it and

16   that just means that I made a change after it was

17   created.  I don't know who would have created it.

18        Q    Created it meaning?

19        A    Who initiated it and routed it to me.

20        Q    And that would be initiated on whatever the

21   date is?

22        A    7/30/2009 at 2:36 p.m.

23        Q    Okay.  Any other involvement on your part or

24   on the part of records office staff in Mr. Chappelle's

25   release on the 30th of July?

67

1     A    The only thing we would have done was we

2    would have sent out the memo that you referred to

3    here.  We would have sent out a similar release memo

4    releasing him and then contacted the necessary

5    departments.

6         Because this was a last minute release, we

7    would have contacted them and arranged for

8    transportation.  Just by the time that he left, it

9    looks like he probably took an afternoon bus.

10    Q    So you were referring to -- were you

11   referring to Dunn 8?

12    A    Not that memo.  It wouldn't have been that

13   memo because obviously that was when he went out to

14   serve his federal detainer sentence.  But it would

15   have looked like that, yes.

16    Q    Would that be in the file as well, the

17   release memo?

18    A    It may be.  I believe it may be.

19    Q    Okay.  Do you know -- were you contacted

20   prior to July 30th of '09 by anyone in DOC chief

21   counsel's office about Mr. Chappelle?

22    A    I believe I was.

23    Q    And who were you contacted by?

24    A    I don't remember the name.

25    Q    Do you -- what was that -- the nature of that

68

1  conversation?

2          MR. KEATING:  I'm going to object to you

3  asking questions about any conversations she had with

4  chief counsel or legal counsel.

5          MS. TOBIN:  It relates to why he was

6  released.

7          MR. KEATING:  Whether it relates to why he

8  was released or not, if you're talking about

9  conversations she had with legal counsel, as legal

10 counsel that's protected conversations.

11         MS. TOBIN:  How is it protected if this

12 lawsuit wasn't even filed yet?  It has nothing to do.

13         MR. KEATING:  Doesn't make any difference

14 whether it's about a specific lawsuit or not.  It has

15 to do with legal counsel information is legal counsel.

16 It's a protected conversation regardless of whether

17 what lawsuit it's about.

18         MS. TOBIN:  I disagree with that.  I think

19 that the privilege doesn't apply.

20         MR. KEATING:  So if I talk to your client and

21 ask him about what he spoke to his public defenders

22 about concerning his prior convictions, you would

23 allow me to do that because it doesn't relate to this

24 case?  I think any discussion with counsel that has to

25 do with legal matters is protected.

69

1          MS. TOBIN:  Well, I'm not asking her about

2     legal matters.  I'm not asking her --

3          MR. KEATING:  You're asking her about legal

4     counsel and what else would they be talking about?  It

5     wouldn't be a legal matter if it wasn't legal

6     counsel.

7          MS. TOBIN:  That's what I'm trying to find

8     out.  If it's not having to do with a case.

9          MR. KEATING:  She can testify to the fact

10    that she may have spoken with legal counsel or they

11    contacted her.  But the nature of the conversation and

12    what was discussed is protected.  She could have been

13    talking about a totally different case.  She could

14    have been talking about another case.  And

15    regardless^--

16         MS. TOBIN:  I understand your point.

17         MR. KEATING:  -- of what the case is about,

18    it's discussions with legal counsel about a legal

19    matter.  You can't ask her what she spoke to me about.

20    You can't ask what she spoke to legal counsel about.

21    BY MS. TOBIN:

22       Q    Was it about a legal matter?

23       A    Yes, it was.

24       Q    Relating to Mr. Chappelle?

25         MR. KEATING:  Period.  Period.  Doesn't make

ERVIN BLANK ASSOCIATES, INC.

70

1    any difference who it was related to.

2          MS. TOBIN:  Well, she already testified it

3    was about Mr. Chappelle.

4          MR. KEATING:  Well, regardless.

5    BY MS. TOBIN:

6    Q    And that happened prior to July 30th?

7    A    I believe so, yes.

8    Q    Okay.  Would a record of that conversation

9    not the content but the fact that it happened be in

10   the DC-15?

11   A    I believe it was via e-mail and I believe

12   there's -- I have an e-mail in the file.

13   Q    Just about the fact that the conversation

14   happened, not the content?

15   A    No.  I believe the content is in the file.

16   Q    Was that provided in discovery?

17   A    I don't know.  I know there's an e-mail from

18   chief counsel in the file regarding Mr. Chappelle.

19   Q    Okay.

20   A    What its content is I don't recall.

21   Q    Not asking you about the content.  But after

22   that conversation, did you take any further action

23   with regard to Mr. Chappelle's release?

24   A    No.  It was my understanding it was -- they

25   were dealing with matters and it was out of my hands.

71

1    Q    Okay.  So in terms of your involvement with

2  his release, can you explain or describe what the

3  steps, if any, that you took?  You said that the

4  records department got the recommitment order and then

5  the DC-16E you reviewed it.  Anything else other than

6  those steps?

7    A    No.  Again, we just make arrangements to make

8  sure that he gets out.  We send out the notification

9  that he's to be leaving and how he is leaving and

10  that's it.

11    Q    Did you speak with Mr. Chappelle at that

12  time?

13    A    No, I did not.

14    Q    Did you speak with anybody in the

15  institutional parole office at that time?

16    A    I don't know.  I don't recall.

17    Q    Was there anyone else in the records

18  department who was involved in his release process?

19    A    Yes.  There's always -- when we review the

20  DC-15 prior to release, we complete what I discussed

21  yesterday a release checklist and a specialist

22  completes that, and then I review it and sign off on

23  it.

24    Q    Okay.  Do you know why the parole board

25  issued the new document crediting him with backtime?

72

1    A    No, I do not.

2    Q    Did you follow-up with them to find out why?

3    A    No.

4    Q    Why not?

5    A    I don't question what they do.  They send me

6    the documents and they send me the information and,

7    again, we record it as provided to us by them.

8    Q    Were you aware that Mr. Chappelle had filed a

9    Mandamus petition in state court, in common law court

10   about his excessive detention?

11   A    No, I was not.

12   Q    After you reviewed the grievance that Mr.

13   Chappelle filed which we talked about earlier,

14   Kodack^--

15   A    Thirty-three?

16   Q    Yes.  After you reviewed that, did you

17   prepare a DC-121 extraordinary occurrence report?

18   A    No.

19   Q    Why didn't you?

20   A    There's no reason to.  Based on an inmate's

21   grievance?

22   Q    Well, in his grievance he's complaining that

23   he's been held past his max date.  Isn't there a

24   procedure where you're supposed to complete an

25   extraordinary occurrence report when you're alerted to

1   that?

2       A   No.  If he is, in fact, being held beyond his

3   maximum date and I have the information that supports

4   that, yes.  But according to all the information I

5   have -- I had, he was not being held beyond his

6   maximum date.

7       Q   And that includes information in his DC-15?

8       A   Yes.  That's correct.

9       Q   So your review of that in your opinion you

10  didn't have enough information to fill out a DC-121?

11      A   No.

12          MR. KEATING:  What's a DC-121?

13          THE WITNESS:  An extraordinary occurrence

14  report.

15          MR. KEATING:  She asked you whether you had

16  enough information to fill out a 121.

17          MS. TOBIN:  Right.  And her answer was no.

18          MR. KEATING:  And she said it wasn't

19  necessary to do that.

20          MS. TOBIN:  Correct.

21          MR. KEATING:  Okay.

22  BY MS. TOBIN:

23      Q   Were there any other documents apart from the

24  DC-16E dated July 30th, '09 and the parole board

25  recommitment order and this document, Kodack 38, any

74

1    other documents related to -- and the release

2    checklist, related to Mr. Chappelle's release in July

3    of '09?

4        A    Again, just the notification that he was

5    being released.

6            (Whereupon, a document was produced and

7    marked as Kodack Exhibit No. 39 for identification.)

8    BY MS. TOBIN:

9        Q    I'm showing you Kodack 39.   This is Kodack

10   39.   Can you identify what this document is?

11       A    Yes.   We refer to that as 23B.

12       Q    And is this something that the records office

13   uses?

14       A    Not anymore, no.

15       Q    When was it used?

16       A    These were used prior to the implementation

17   of the DC-16E program.

18       Q    So the 16E updating process replaces this

19   form?

20       A    Yes.

21           (Whereupon, a document was produced and

22   marked as Kodack Exhibit No. 40 for identification.)

23   BY MS. TOBIN:

24       Q    I'm showing you Kodack 40.   Can you identify

25   what that document is?

ERVIN BLANK ASSOCIATES, INC.

75

1    A    This is an internal document just saying that

2    all his dispositions have been reviewed and accounted

3    for.

4    Q    And what does that mean?

5    A    It means his rap sheet has been reviewed and

6    there's no outstanding dispositions.

7    Q    And you mean --

8    A    As of that date.  As of the date listed on

9    there.

10    Q    And who's responsible for looking at his

11    dispositions or looking at his rap sheet?

12    A    The specialist reviews them and fills that --

13    well, we no longer use this either.  The specialist

14    reviews them and they would fill that out; and then

15    when I do the release checklist, that's something I

16    also review.

17    Q    And by dispositions, are you referring to

18    dispositions of a criminal case?

19    A    Yes.

20    Q    Can you also get that information through the

21    CLEAN system?

22    A    That's where it's obtained from.

23    Q    Is that the same thing as the rap sheet then?

24    A    Yes.

25         (Whereupon, a document was produced and

76

1    marked as Kodack Exhibit No. 41 for identification.)

2    BY MS. TOBIN:

3        Q    I'm showing you Kodack 41.  If you could

4    please look at that.  Do you recognize that document?

5        A    Yes, I do.

6        Q    And what is this document?

7        A    It is a dissemination sheet.

8        Q    And what is that?

9        A    Anytime a rap sheet is run on an inmate, that

10   gets filled out and it tells you whether or not it was

11   disseminated to someone or if it was just kept for the

12   file.

13       Q    So is it referring to dissemination of just

14   the rap sheet information?

15       A    Yes.

16       Q    So not dissemination of the entire file?

17       A    That's correct.

18       Q    Do you have other dissemination sheets for

19   other pieces of information in the file?

20       A    No.

21       Q    What's the purpose behind this sheet?

22       A    We are required by law to record any

23   dissemination of his criminal history.

24       Q    To keep track of who you give it to?

25       A    That's correct.  The state police actually

77

1  come in and audit us every few years to ensure that

2  we're doing that.

3       Q    So is this something that's still done?

4       A    Yes.

5       Q    Is it done in this format or electronically?

6       A    No.  In this format.

7            (Whereupon, a document was produced and

8  marked as Kodack Exhibit No. 42 for identification.)

9  BY MS. TOBIN:

10      Q    This is Kodack 42.  Do you recognize that

11 document?

12      A    Yes, I do.

13      Q    And what is this?

14      A    This is a release checklist.

15      Q    And is this the same document you were

16 talking about yesterday?

17      A    Yes, it is.

18      Q    Okay.  Is that your signature on this

19 checklist?

20      A    Yes, it is.

21      Q    And who is the other person who is signing

22 this?

23      A    Kristi Macaluse.

24      Q    And who was she?

25      A    She was a records specialist.

78

1      Q    So is this the checklist that was completed

2  when Mr. Chappelle was sent to his federal sentence in

3  July?

4      A    Yes, it is.

5      Q    Of '07.  Okay.  And a similar one would be

6  filled out, the same kind of form would be filled out

7  when he was released on parole in 2001?

8      A    Yes.

9      Q    And also when he was released for good on

10  July 30th, 2009?

11      A    That's correct.

12      Q    What section of the DC-15 is this document

13  kept in?

14      A    The legal section.

15          (Whereupon, a document was produced and

16  marked as Kodack Exhibit No. 43 for identification.)

17  BY MS. TOBIN:

18      Q    Showing you Kodack 43.  Do you recognize this

19  document?

20      A    It's a fax transmission report.

21      Q    And do you recognize the fax number at the

22  top of the sheet?

23      A    No, I do not.  It looks like a Pittsburgh

24  area number.

25      Q    It's what?

79

1     A    The 412 area code it's a Pittsburgh area

2  code.

3     Q    Do you know where the -- so this transmission

4  report indicates there were nine pages transmitted.

5  Do you know where the other -- where the nine pages

6  would be?

7     A    No, I do not.

8     Q    Does your office send faxes outside -- to

9  outside entities related to inmates' accounts or

10  inmates' records?

11     A    I'm not sure what you mean by outside

12  entities.

13     Q    Anything outside DOC or outside this

14  building?

15     A    Typically, no.  Not typically outside DOC,

16  no.

17     Q    This document was produced as part of

18  discovery as part of Mr. Chappelle's DC-15 but the

19  nine pages weren't with it.  So do you have any idea

20  what fax machine this came from or who may have sent

21  this fax so that this document would be in his file?

22     A    I have no idea.  I don't know who sent it.  I

23  mean there's no other information.  There's not

24  even -- I don't even know if this came from our fax

25  machine.

1      Q    Would you be able to check your fax machine's

2    records for a log of faxes that were sent on this

3    date?

4      A    I have no idea how to do that.

5      Q    Do you have an office manager or an office

6    administrator who handles fax machines?

7      A    No.  No.  We don't even have the same fax

8    machine anymore.  We actually just got a new one.

9      Q    Do you have communication with any office or

10   entity or person in Pittsburgh in order to do your

11   job?

12     A    We frequently correspond with the Allegheny

13   County Sheriffs, with the Allegheny County Clerk of

14   Courts.  That's pretty much it.  Sometimes SCI

15   Pittsburgh.  I don't know.  Again, this could have^--

16   for all I know this could have been put in his file by

17   error.  It could have ended up there by mistake.  I

18   don't know.

19     Q    But you haven't seen it before?

20     A    No.

21     Q    Do you keep track of the faxes that the

22   records department sends related to an inmate's

23   records?  Like if you did send a fax related to Mr.

24   Chappelle, would you have some record of that being

25   sent?

81

1      A    Not necessarily, no.

2      Q    What do you do after you send a fax?

3      A    It all depends on what it's regarding.  I

4  mean sometimes it's very standard documents that are

5  being requested or that we're sending so we don't

6  always keep record of it.

7      Q    Do you recall sending any faxes related to

8  Mr. Chappelle on July 29th, 2009?

9      A    No, I do not.

10     Q    Do you recall directing anyone in your office

11 to do so?

12     A    No, I do not.

13     Q    Who's in charge of maintaining the DC-15

14 file?

15     A    The records office.

16     Q    And what are the procedures to maintain those

17 files in terms of keeping track of what's in them?

18     A    I'm not sure by what you mean keeping track

19 what's in them.

20     Q    My understanding of the DC-15 is that there's

21 maybe six or seven sections divided by topic and

22 there's certain forms and documents that are supposed

23 to be in each section; is that correct?

24     A    Yes.

25     Q    Who makes sure that those documents are

ERVIN BLANK ASSOCIATES, INC.

82

1  actually in those sections?

2      A    I mean I guess we do really.  But, again, we

3  can only maintain what was received from other

4  departments or other entities, you know.  Like, again,

5  like parole or the clerk of courts.

6      Q    Is there -- okay.  Is there an audit process

7  where you do review of each inmate's DC-15 to make

8  sure that it's accurate and all the documents are in

9  it?

10     A    I believe I addressed this yesterday.  I told

11 you when we do the release checklist, that's when the

12 file and when the inmate initially comes in.  When the

13 inmate initially comes in, we go through the file and

14 make sure that all appropriate documentation is there.

15         And, again, when they're released or at any

16 time if they're screened for outside clearance or

17 prerelease work, we also review the file at that time.

18     Q    For certain documents?

19     A    Correct.

20     Q    Not for every piece of paper?

21     A    Right.  I have no clue as to what is -- what

22 every single piece of paper should be in an inmate's

23 file.  There's no way for me to tell.

24     Q    So you're just looking for the things you

25 need to do your release checklist?

83

1      A      That's correct.

2             (Whereupon, a document was produced and

3      marked as Kodack Exhibit No. 44 for identification.)

4      BY MS. TOBIN:

5      Q      This is Kodack 44.   Can you identify this

6      document?

7      A      Yes.   This is the release checklist that was

8      completed prior to Mr. Jessup's departure on 7/30.

9      Q      And is that your signature in both sections?

10     A      Yes, it is.

11     Q      And does that -- that signature reflect that

12     you reviewed the work of the records specialist?

13     A      Yes.   That's correct.

14     Q      Did you yourself look at these -- do these

15     processes in section one?   When you reviewed her work,

16     how did you do that review?

17     A      What happens is they run a rap sheet and they

18     review each section like number one is the DC-16D

19     looking for concurrent, out-of-state, and federal

20     sentences.   They basically review all of that and I

21     just double-check basically their work.

22     Q      So you have to do the review as well?

23     A      Yes.

24     Q      Section five on this document says released

25     to parole.   In this case on 7/30/09, Mr. Jessup was

84

1    being released to the street, right?

2        A    Yes.

3        Q    Why was that section completed, the release

4    to parole section?

5        A    It's standard procedure.  I'm not sure I

6    understand what the basis is for the question, but

7    it's standard procedure.

8        Q    He wasn't being released to parole though?

9        A    No.  He was completing his sentence.

10   However, at the time this was completed it was

11   obviously something that was last minute.

12       Q    And then the top part section one, mandatory

13   procedures, those are followed regardless of what the

14   reason for the release is?

15       A    That's correct.

16            (Whereupon, a document was produced and

17   marked as Kodack Exhibit No. 45 for identification.)

18   BY MS. TOBIN:

19       Q    I'm showing you what's been previously marked

20   as Dunn 4 and also will be marked as Kodack 45.  Do

21   you recognize that document?

22       A    Yes, I do.

23       Q    And what is that?

24       A    It's an inmate request.

25       Q    And that is one directed to records, correct?

85

1      A    Yes.

2      Q    And if you could read the inmate request

3 section.

4      A    Can you please schedule me to talk to you or

5 someone in records concerning my total time spent

6 incarcerated at this institution.  I believe there is

7 an error in my sentence calculation.  Thanks.  Kevin

8 Jessup.

9      Q    And did you respond to this request?

10     A    No.

11     Q    Who responded to it?

12     A    Ms. Herbst.

13     Q    Why would Ms. Herbst respond to it if it was

14 directed to records to you?

15     A    Because it was most likely assigned to her

16 caseload.

17     Q    So did you tell Ms. Herbst to respond to this

18 after it came to you?

19     A    I may not have even seen this.  It may have

20 just gone directly to her.

21     Q    And if you could read the response that's

22 typed there.

23     A    If you need answers for time from your

24 technical convicted parole violation, you'll need to

25 talk to parole.  We have nothing to do with their

86

1   calculations.  As for your original sentence it
2   would've had to be right before you were paroled.

3       Q    Did you talk with Ms. Herbst about this
4   request when it was filed?

5       A    I don't recall.

6       Q    Did you review it after she gave it to Mr.
7   Chappelle?

8       A    I don't recall.

9       Q    But you typically review all of the
10  specialists' work?

11      A    Not all of it.  Not requests, no.

12      Q    Why don't you review those?

13      A    Because it's not necessary.

14      Q    Why is it not necessary?

15      A    I can't review every single piece of paper
16  that goes through their desks.  It's not -- it's not
17  time permitting.  It's just not.  There are certain
18  things that they are responsible for on their own and
19  inmate requests is one of them.  If they have
20  questions regarding them, then they come to me.

21      Q    And you don't remember if Ms. Herbst had a
22  question about this one?

23      A    If I have a specialist that comes to me in
24  regards to an inmate request, typically I answer it
25  myself.  I will take it and answer it myself.

ERVIN BLANK ASSOCIATES, INC.

87

1     Q    That request is dated on May 18th, '09.  Did

2    you review the request and the response before you

3    responded to his grievance when that was assigned to

4    you to respond to?

5     A    I don't recall.

6          MR. KEATING:  Are you talking about this one?

7          MS. TOBIN:  The grievance.

8          MR. KEATING:  This is not -- yeah.  Why don't

9    you show her a copy of the grievance.  Are we talking

10   about the grievance again?

11         THE WITNESS:  I have that.

12         MS. TOBIN:  The grievance is --

13         THE WITNESS:  Is it 33?

14         MS. TOBIN:  Kodack 34.

15         MR. KEATING:  What was the question about the

16   grievance?

17   BY MS. TOBIN:

18    Q    So when you made this response to his

19   grievance --

20         MR. KEATING:  And that's Kodack 34?

21         MS. TOBIN:  Right.

22   BY MS. TOBIN:

23    Q    Did you review Kodack -- the request dated^--

24         MR. KEATING:  The one responded to by Herbst?

25         MS. TOBIN:  Yes.

ERVIN BLANK ASSOCIATES, INC.

88

BY MS. TOBIN:

1     Q    Did you review Kodack 45 when you were
3 compiling your response?

4     A    I don't recall.  If it was in the file, I
5 would have looked at it.

6     Q    Okay.  And do you remember not necessarily in
7 connection with that request but at any time do you
8 remember discussing Mr. Chappelle's allegations of
9 over detention with Ms. Herbst?

10     A    No, I do not recall.

11     (Whereupon, a document was produced and
12 marked as Kodack Exhibit No. 46 for identification.)

13 BY MS. TOBIN:

14     Q    This is Kodack 46.  Do you recognize this
15 document?

16     A    Yes.  It's an inmate request.

17     Q    And who is this one directed to?

18     A    This is directed to Ms. Dascani.

19     Q    And who is she?

20     A    She was the correction superintendent's
21 assistant.

22     Q    Okay.  This one is dated May 21st, '09.  If
23 you could just take a moment and read to yourself the
24 section eight.

25     A    Sure.  Okay.

ERVIN BLANK ASSOCIATES, INC.

89

1      Q     After -- do you recall seeing a copy of this
2   request in the past?
3      A     No, I do not.
4      Q     And after May 21st, '09, did Ms. Dascani or
5   anyone from the superintendent's office talk to you
6   about the subject of this request which is, again, the
7   max date issue?
8      A     I don't recall.
9      Q     If they had spoken with you, would you have
10  noted that in the file?
11     A     No.
12     Q     Were you ever -- were you ever contacted --
13  did Mr. Varano ever let you know that Mr. Chappelle's
14  family had called about his max date?
15     A     I don't recall.
16     Q     Were you ever notified by Mr. Varano about
17  any contact he'd had with Mr. Chappelle's lawyer about
18  his max date?
19     A     I don't recall.
20     Q     You never had any discussions about --
21     A     Not that I can recall, no.
22     Q     Had you been contacted by Mr. Chappelle's
23  lawyer about the max date issue, do you know what
24  steps you would have taken?
25     A     I would have --

90

```
 1            MR. KEATING:  I'm objecting to that question.
 2   You're asking for speculation.
 3            THE WITNESS:  I can't recall and I --
 4            MR. KEATING:  She's saying if he had called,
 5   what -- do you know what you would have done?
 6            THE WITNESS:  If he would have called, if I
 7   would have spoken to him, I would have directed him to
 8   the parole board.
 9   BY MS. TOBIN:
10       Q    Who is in charge of purging DC-15's?
11       A    Records office.
12       Q    At each institution?
13       A    Yes.
14       Q    And who specifically is in charge of that
15   within the records office?
16       A    Records specialists.
17       Q    Do they purge their own caseload files?
18       A    No.  No.  We take turns.  Each year somebody
19   different will do it.
20       Q    And there's a retention schedule that's
21   followed?
22       A    Yes.  That's correct.
23       Q    Is that schedule number 67?
24       A    I don't know off the top of my head.
25       Q    Where's the retention schedule located in
```

91

terms of your policies and procedures?

    A    I'm not sure.

    Q    And what happens when you purge the records?

    A    We keep the records for two years.  After two years, we purge certain information out of the file. And then the following year which would be the third year, they're taken down to the state records center and they're obtained there for ten years.

    Q    So some are destroyed after two years and some are kept for longer?

    A    No.  Only certain information is destroyed after two years.  All legal information is obtained and certain information is destroyed.

    Q    Do you know which information is destroyed?

    A    I believe the -- most of the correspondence is destroyed.  Not having it in front of me, I don't recall.  I can't say for sure everything.

    Q    And that's after the two years after the inmate's released?

    A    That's correct.

    Q    Is there a document that's put in the file notifying or just making a note of what was destroyed?

    A    No.

    Q    So if things are destroyed but you don't -- but whoever's looking at the file in the future

92

1  doesn't necessarily know what was destroyed?

2      A    That's correct.

3      Q    Who comes up with the DOC policy on records

4  retention?  Do you know?

5      A    That gets handled through our records -- the

6  records section.

7      Q    At the?

8      A    At the central office.

9      Q    Would that be the records administrator?

10     A    Yes.

11          MR. KEATING:  Who makes the policy?

12          MS. TOBIN:  That was the question, yeah.  Who

13  makes the policy?

14          MR. KEATING:  Is that who you believe makes

15  the policy?

16          THE WITNESS:  That's who I believe makes the

17  policy.

18          MS. TOBIN:  I just need to take like a quick

19  five-minute review and make sure I have no more

20  questions for you, and I think I'm almost done.  So we

21  can just take a short break, and I'll double-check

22  that.

23          (Whereupon, a recess was taken from 2:00 p.m.

24  until 2:06 p.m.)

25                        AFTER RECESS

BY MS. TOBIN:

Q    Just to get confirmation.  Do you recall ever interviewing Mr. Chappelle about his complaint in his grievance?

A    No, I do not.

Q    Do you think that you did or did not?

A    No, I did not.

Q    So you know that you did not?

A    No.  I know that I did not.

Q    Okay.  Do you have any criminal convictions?

A    No, I do not.

Q    Do you have any military history?

A    No.

MS. TOBIN:  I have no further questions for you.

MR. KEATING:  I have a couple.

MS. TOBIN:  Unless he asks one that triggers one.

CROSS-EXAMINATION

BY MR. KEATING:

Q    I want to make reference to Kodack Number 36 and that's the appeal from facility manager's decision by Mr. Jessup.  As I recollect, and correct me if I'm wrong, you testified you don't recall whether you had read that before or not; is that a correct statement?

94

1      A    That is a correct statement.

2      Q    Have you had the opportunity today to review

3   what he wrote in this -- the first couple pages here?

4      A    Yes, I have.

5      Q    Now, if you had interviewed Mr. Jessup at any

6   time and if he told you exactly what he said here,

7   what would you have advised him?

8      A    I would have advised him to contact the

9   parole board.

10     Q    Now, on Kodack number I believe it's 35, he

11  writes in his appeal from the initial review response

12  if there is a mistake either made by the courts and/or

13  the board in giving an inmate credit for time spent in

14  custody, the Department of Corrections has the

15  authority to credit an inmate the correct time spent

16  in custody to the new sentence and/or the original

17  sentence.  Is that true?

18     A    No, it is not.

19     Q    Once the board of probation and parole make a

20  decision as to what an inmate's max date is, do you

21  have the ability to change that without their

22  permission?

23     A    No, I do not.

24     Q    I believe you testified that since you have

25  been working here, I'm not sure in what capacity, that

95

there have been three instances where inmates have

been kept past their max and Mr. Chappelle was one of

them?

    A    That is correct.

    Q    Is that since you've been a records

supervisor or since you've been here totally?

    A    Since I've been here totally.

    Q    Now, I believe the records show that the

probation and parole recalculated his max date for

July 14th, 2009; is that a correct statement?

    A    Yes.  That's correct.

    Q    And he was ultimately released on July 30th,

2009, correct?

    A    That's correct.

    Q    So the records would show he was kept here

past his max by 16 days?

    A    Correct.

    Q    The parole decision changing his maximum was

done on July 29th as reflected by the records we have

here today?

    A    Yes.  That's correct.

    Q    And he was released the next day?

    A    That's correct.

    Q    So can I assume for the sake of discussion

that someone at parole had contacted this institution

96

1   saying that that was about to happen and that you did

2   not get that decision through regular mail?

3       A    Yes.  Correct.

4       Q    Because it was the next day you released him?

5       A    Correct.

6       Q    We've had a lot of discussion on calculation

7   of backtime and street time and all that.  Would you

8   agree with me the calculations of time can be fairly

9   complicated?

10      A    Absolutely.

11      Q    And who has more training on calculating

12   parole time and backtime?  Would it be individuals in

13   your office or would it be individuals at the

14   Pennsylvania Board of Probation and Parole?

15      A    Board of probation and parole.

16      Q    Has anyone at the Department of Corrections

17   ever filed a detainer on inmates to keep them longer?

18      A    No.

19      Q    Does anyone in the Department of Corrections

20   have the ability to lift detainers by other

21   administrative agencies?

22      A    No.

23      Q    If an inmate's family or other members of the

24   outside public contact you either directly or

25   indirectly and complain that the inmate they are

1  talking about is being held past his max, do you -- do
2  you always check into that and check the records on
3  it?
4       A    Yes.
5            MR. KEATING:   I have no further questions.
6                  REDIRECT EXAMINATION
7  BY MS. TOBIN:
8       Q    With regard to Kodack 35, counsel asked
9  you^--
10            MR. KEATING:   Is that 35 or 35-B?  I'm not
11  sure if you changed that one or not.
12  BY MS. TOBIN:
13       Q    Well, counsel just now asked you --
14            MR. KEATING:   It's a letter dated May 23rd,
15  2009 written by Mr. Jessup titled reappeal from
16  initial review response.  Appeal to facility.  That's
17  the one I was talking about.
18  BY MS. TOBIN:
19       Q    Okay.  Counsel asked you if you had an
20  opportunity to read that just today at the deposition
21  or was that this one?
22            MR. KEATING:   That was 36.
23  BY MS. TOBIN:
24       Q    Okay.  I misspoke then.  And then followed up
25  by asking you if you had the authority to change a

98

1  parole board calculation and you responded no, you do

2  not.  What's your understanding of the basis for your

3  inability to do that?  Why can't you do that?

4      A    Because I don't have the proper

5  documentation.  That's like me changing a court order

6  just because I think it's wrong.  I don't have the

7  authority to do that.  I don't have the authority to

8  change what the parole board has given me.

9          If it's in writing and it's given to me by

10  the parole board and it's an official document, I

11  record it as provided to me.  I cannot change it.

12      Q    So the only thing you could do is ask -- you

13  could call the parole board and say what is this?

14  What's the basis for this?

15      A    Correct.

16      Q    But you can't change it?

17      A    That's correct.

18          MS. TOBIN:  I have no further questions.

19          THE WITNESS:  Okay.  Great.

20                  RECROSS-EXAMINATION

21  BY MR. KEATING:

22      Q    As part of the parole board can you talk to

23  the institutional parole officer in here and notify

24  them of the problem?

25      A    That would be what I would do.  I would

99

1   contact them and they would go -- they're our liaison

2   through the parole central office.

3        Q    And that's what you told Mr. Jessup to do?

4        A    Yes.

5             MR. KEATING:  Okay.

6             MS. TOBIN:  Thank you very much.

7             (Whereupon, the deposition was concluded at

8   2:14 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

100

1  COUNTY OF UNION            :

2  COMMONWEALTH OF PENNSYLVANIA:

3         I, Faith A. Culp, the undersigned Notary

4  Public, do hereby certify that personally appeared

5  before me, MICHELLE KODACK; the witness, being by me

6  first duly sworn to testify the truth, the whole truth

7  and nothing but the truth, in answer to the oral

8  questions propounded to her by the attorneys for the

9  respective parties, testified as set forth in the

10 foregoing deposition.

11        I further certify that before the taking of

12 said deposition, the above witness was duly sworn,

13 that the questions and answers were taken down

14 stenographically by the said Faith A. Culp, Court

15 Reporter, Winfield, Pennsylvania, approved and agreed

16 to, and afterwards reduced to typewriting under the

17 direction of the said Reporter.

18        In testimony whereof, I have hereunto

19 subscribed my hand this 29th day of June, 2012.

20                          *Faith A. Culp*

21                          Faith A. Culp
                            Reporter-Notary Public
22                          My Commission Expires
                            August 23, 2014
23

24

25

ERVIN BLANK ASSOCIATES, INC.



# Pennsylvania Department of Corrections

## Moves Report

mk

2/8/2012 12:41:18 PM

Inmate Number: CX8799

Inmate Name: JESSUP, Kev

| Time & Date | Inmate # | Move Code | Location | Sent. Status | Parole Status |
|---|---|---|---|---|---|
| 15:54 07/30/2009 | CX8799 | D | COA - Coal Township | Sentence Completed | Tech/convicted Pa |
| NA 04/28/2009 | CX8799 | SC | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 21:15 04/15/2009 | CX8799 | APV | COA - Coal Township | Actively Serving | Parole Violator Pe |
| 09:07 07/19/2007 | CX8799 | D | COA - Coal Township | Srv Prev Cnty/state/fed | Parole Violator Pe |
| 08:02 06/25/2007 | CX8799 | SC | COA - Coal Township | Actively Serving | Parole Violator Pe |
| 08:01 06/25/2007 | CX8799 | SC | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 08:00 06/25/2007 | CX8799 | SC | COA - Coal Township | Actively Serving | Parole Violator Pe |
| 11:39 12/28/2006 | CX8799 | RTT | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 10:34 12/28/2006 | CX8799 | RTT | BUS | Actively Serving | Tech/convicted Pa |
| 09:45 12/28/2006 | CX8799 | XPT | MAH - Mahanoy | Actively Serving | Tech/convicted Pa |
| 06:03 12/28/2006 | CX8799 | RTT | BUS | Actively Serving | Tech/convicted Pa |
| 14:25 11/29/2006 | CX8799 | SC | GRA - Graterford | Actively Serving | Tech/convicted Pa |
| 12:00 11/17/2006 | CX8799 | SC | FPH - Federal Auth-philadelphia | Writ/ata | Tech/convicted Pa |
| 18:03 11/14/2006 | CX8799 | STT | GRA - Graterford | Actively Serving | Tech/convicted Pa |
| 12:24 11/14/2006 | CX8799 | STT | BUS | Actively Serving | Tech/convicted Pa |
| 10:33 11/14/2006 | CX8799 | XPT | SMI - Smithfield | Actively Serving | Tech/convicted Pa |
| 07:55 11/14/2006 | CX8799 | STT | BUS | Actively Serving | Tech/convicted Pa |
| 11:24 09/07/2006 | CX8799 | RTT | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 10:20 09/07/2006 | CX8799 | RTT | BUS | Actively Serving | Tech/convicted Pa |
| 09:21 09/07/2006 | CX8799 | XPT | MAH - Mahanoy | Actively Serving | Tech/convicted Pa |
| 05:28 09/07/2006 | CX8799 | RTT | BUS | Actively Serving | Tech/convicted Pa |
| 12:40 08/25/2006 | CX8799 | SC | GRA - Graterford | Actively Serving | Tech/convicted Pa |
| 13:35 08/16/2006 | CX8799 | SC | FPH - Federal Auth-philadelphia | Writ/ata | Tech/convicted Pa |
| 20:46 08/08/2006 | CX8799 | STT | GRA - Graterford | Actively Serving | Tech/convicted Pa |
| 12:43 08/08/2006 | CX8799 | STT | BUS | Actively Serving | Tech/convicted Pa |
| 10:26 08/08/2006 | CX8799 | XPT | SMI - Smithfield | Actively Serving | Tech/convicted Pa |
| 07:42 08/08/2006 | CX8799 | STT | BUS | Actively Serving | Tech/convicted Pa |
| 09:00 12/19/2003 | CX8799 | SC | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 13:30 10/10/2002 | CX8799 | RTT | COA - Coal Township | Actively Serving | Parole Violator Pend |
| 11:27 10/10/2002 | CX8799 | RTT | BUS | Actively Serving | Parole Violator Pend |
| 10:45 10/10/2002 | CX8799 | XPT | MAH - Mahanoy | Actively Serving | Parole Violator Pend |
| 05:05 10/10/2002 | CX8799 | RTT | BUS | Actively Serving | Parole Violator Pend |
| 12:15 09/26/2002 | CX8799 | SC | GRA - Graterford | Actively Serving | Parole Violator Pend |
| 11:35 02/20/2002 | CX8799 | SC | FPH - Federal Auth-philadelphia | Writ/ata | Parole Violator Pend |
| 13:24 02/14/2002 | CX8799 | STT | GRA - Graterford | Actively Serving | Parole Violator Pend |
| 10:33 02/14/2002 | CX8799 | STT | BUS | Actively Serving | Parole Violator Pend |
| 09:14 02/14/2002 | CX8799 | XPT | MAH - Mahanoy | Actively Serving | Parole Violator Pend |
| 08:33 02/14/2002 | CX8799 | STT | BUS | Actively Serving | Parole Violator Pend |
| 16:12 01/22/2002 | CX8799 | TRN | COA - Coal Township | Actively Serving | Parole Violator Pend |
| 12:47 01/22/2002 | CX8799 | TRN | BUS | Actively Serving | Parole Violator Pend |
| 09:40 01/22/2002 | CX8799 | XPT | SMI - Smithfield | Actively Serving | Parole Violator Pend |
| 05:41 01/22/2002 | CX8799 | TRN | BUS | Actively Serving | Parole Violator Pend |
| 05:41 01/22/2002 | CX8799 | SC | GRA - Graterford | Actively Serving | Parole Violator Pend |
| 15:30 12/26/2001 | CX8799 | SC | GRA - Graterford | Diagnostic/classificatn | Parole Violator Pend |
| 07:47 12/26/2001 | CX8799 | SC | PHI - Philadelphia | Writ/ata | Parole Violator Pend |
| 13:46 10/22/2001 | CX8799 | APV | GRA - Graterford | Diagnostic/classificatn | Parole Violator Pend |
| 07:30 04/09/2001 | CX8799 | D | COA - Coal Township | Paroled | State Parole |
| 07:11 04/19/1996 | CX8799 | TRN | COA - Coal Township | Actively Serving | Not Applicable |
| 07:10 04/19/1996 | CX8799 | SC | CAM - Camp Hill | Actively Serving | Not Applicable |
| 05:35 02/02/1996 | CX8799 | TRN | CAM - Camp Hill | Diagnostic/classificatn | Not Applicable |
| 14:14 01/29/1996 | CX8799 | AC | GRA - Graterford | Diagnostic/classificatn | Not Applicable |



EXHIBIT

Kodach-28

DEF000930

## Sentence Running Concurrent With Parole Violation Backtime

☐ Note: A parole violator, convicted and sentenced to prison for another offense, must serve his or her backtime and the new sentence in consecutive order if that sentence/conviction was the reason for the recommit.

    C        08-08-1997     Philadelphia     1 Year to 2 Years

☐ The Pennsylvania Board of Probation and Parole noted the conviction in this case but voted not to recommit on this conviction. Therefore, it can run concurrent with the parole violation backtime.

☐ More than likely, the inmate was incarcerated on all three situations prior to any final disposition. Therefore, there were three reasons for incarceration, (1) the Parole Board Warrant to Commit and Detain, and (2) two new criminal charges. That being the situation, the question becomes "which sentence/recommit gets the pre-commitment credit?"

## Sentence Running Concurrent With Parole Violation Backtime

☐ The Pennsylvania Supreme Court has ruled that if a defendant is being held in custody solely because of a detainer lodged by the Board, and has otherwise met the require-ments of bail on the new criminal charges, the time which he spent in custody shall be credited against his/her original sentence (the parole violation backtime). If a defendant, however, remains incarcerated prior to trial because he/she failed to satisfy bail requirements on the new criminal charges, then the time spent in custody shall be credited to his/her new sentence. Gaito v. PBPP, 412 A.2d 568 (1980).

☐ That being the case, it is entirely possible for a portion of the pre-commitment credit to go to the Parole Violation backtime and a portion of it to his new sentence. If this is the case, the Parole Board will indicate on the Recommitment Order what portion, if any, of the pre-commitment credit is to be applied to the parole violation backtime.



EXHIBIT

Kolacz-29

### Definite Sentences:

In this class of sentence, there is *one* set time period. An example of a flat or definite sentence would be 90 days for DUI (also known as a flat sentence).

The sentencing court may impose a flat sentence only when this type of sentence is legislatively mandated (ref. Commonwealth v. Filius). You must check the sentencing code and/or current case law as stated above to ensure that a flat sentence is proper for the offense.

Example: Sentence for marijuana trafficking of at least 50 pounds was five years; minimum and maximum sentences were equal and statute which stated the minimum sentence should not exceed one-half of the maximum sentence could be disregarded because it did not invoke constitutional concerns (ref. Commonwealth v. Bell).

Another example of a proper flat sentence is 90 days for the offense of Driving While Operating Privilege is Suspended or Revoked. This charge is a summary offense, which allows for a maximum sentence of not more than 90 days.

Note: The Record Specialist must check the sentencing code and/or current case law as stated above to ensure that an excessive minimum is *appropriate* for the offense. In situations where the court has inappropriately imposed an excessive minimum term and does not make any correction, the inmate is eligible for parole upon expiration of one-half the maximum sentence imposed. If the Records Specialist is not sure he/she should contact the Records Coordinator, Corrections at the Bureau of Inmate Services.

### Computing Commitment Credit
### Pre-commitment Credit

Pre-commitment credit is time spent in custody **prior** to being sentenced, which *may* subsequently be applied towards satisfaction of that sentence. Because it is pre-commitment credit, an individual *ceases* to accumulate any additional credit time once he/she has been sentenced by *ANY* court. From the date of his/her first sentencing forward, he/she is **committed** and serving that sentence and is not accumulating additional credit on any other sentence.

### 42 Pa.C.S.A. § 9760, Credit for Time Served provides:

Credit against the maximum term and minimum term shall be given to the defendant for all time spent in custody as the result of the criminal charges for which a prison sentence is imposed. Credit shall include all time spent in custody prior to trial, pending sentence.

The effective date of a sentence is the date that is derived when appropriate pre-commitment credit is applied.



Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Commonwealth of Pennsylvania
Department of Corrections

**INSTRUCTIONS**

Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

*Mr. VARANO*

1. To: (Name and Title of Officer)
   Mr. VARANO ~~Superintendent~~

2. Date: 4/17/09

3. By: (Print Inmate Name and Number)
   Kevin Jessup CX-8799
   *Kevin Jessup*
   Inmate Signature

4. Counselor's Name
   APR 20 2009

5. Unit Manager's Name

6. Work Assignment

7. Housing Assignment
   D.O.C.

8. Subject: State your request completely but briefly. Give details.

I WAS RELEASED FROM FEDERAL custody on 4/14/09 and immeditately DETAINED to PA parole on violations. I Arrived at S.C.I coal on 4/15/09 and Has not spoken to any one from parole about this matter. There has been an error I maxed out my remainder of sentence in 2007. Records will verify I was initally incarcerated on 1-25-95 served to max on a 6 to 12 yr sentence paroled on 4-9-01 re-arrested on 9-26-01 and remained in S.C.I coal until 7-18-07. On 7-18-07 I signed out of S.C.I coal and was taken into the US Marshall custody for a Federal Detainer. I served 24 months and was discharge 4-14-09 now I back in SCI coal and I should not be because this sentence is over max out. CAN somebody tell me whats going on.

Response: (This Section for Staff Response Only)

your issues can be addressed with both Parole and our Records office.

Obviously we would not be keeping you past your max date.

To DC-14 CAR only ☐                    To DC-14 CAR and DC-15 IRS ☐

Staff Member Name ___D.A. Varano Supt___
                     Print         Sign              Date 4-22-09

Revised July 2000

CC: Ms Kodack
     Parole office
     File

EXHIBIT
Kodack-31

Exhibit Varano 9.

DEF000566

DC.

| Form DC-135A | Commonwealth of Pennsylvania |
| --- | --- |
| **INMATE'S REQUEST TO STAFF MEMBER** | Department of Corrections |

**INSTRUCTIONS**
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer)
mr. VARANO

2. Date: 4/22/09

3. By: (Print Inmate Name and Number)
Kevin Jessup cx 8799

_Kevin_ (Inmate Signature)

4. Counselor's Name
FOULDS

5. Unit Manager's Name
DUNN

6. Work Assignment
NONE

7. Housing Assignment
B-2 cell 26

8. Subject: State your request completely but briefly. Give details.

mr. VARANO,

I served 12 years in state institution From 1-26-95 to 4-5-01 returned for violations on 9-26-01 to 9-12-07 I am retaining sometime back there for parole violations for I maxed this sentence out I have all my status sheets and documents etc. I've been back for a week and none of the staff up here has been helpful. Can you "please" schedule me an appointment for me to talk to you about this situation. I've exhausted all remedies to try and resolve this matter.
Thank you in ADVANCE.

9. Response: (This Section for Staff Response Only)

This is an issue which can be directed to both Parole and the Institution Records office

Both of the office Supervisors should be able to ASSIST you!

To DC-14 CAR only ☐          To DC-14 CAR and DC-15 IRS ☐

Staff Member Name  D.A. Varano Supt (Print) _____ (Sign)     Date 4-27-09

Revised July 2000

CC: file

EXHIBIT
Dunn-3

DEF000564

Kodech-37

Varano-10

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P. O. BOX 598
CAMP HILL, PA 17001-0598

FOR OFFICIAL USE ONLY
271957
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: S.C.I. COALTOWNSHIP | DATE: 5/5/09 |
|---|---|---|

FROM: (INMATE NAME & NUMBER)
KEVIN JESSUP  CX 8799

SIGNATURE of INMATE:

WORK ASSIGNMENT:   GLP

HOUSING ASSIGNMENT:   B 2   26 cell

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any actions you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

**A.** Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). *State all relief that you are seeking.*

On May 4, 2009, I received from Records office a new status Summary, of which I respectfully Disagree with How Records office Has credited the time I Have spent in custody There is 5 yrs 10 months that is not being credited to Reflect my backtime or Federal sentence I signed a Letter on 4/29/09 from the Federal Probation office the records office called to see the Letter so they aware of my new sentence Reduction of 65 months effective from 7/18/07 to 4/14/09 which completes my federal time. I was arrested on 9/26/01, so from that Date til 7/18/07, pursuant to 42 Pa. C.SC. 9760 I am entitled to all time spent in custody that was not credited towards my Federal sentence. I Request that this 5 yrs 10 months and counting be credited to my sentence. This will put me over my max Date.

**B.** List actions taken and staff you have contacted, before submitting this grievance.

Notices and court Documents to the following:
MS. ELLIS          Mr. VARANO
Mr. Stout
MS. P. JAR
Records Dept.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator          5/7/09
                                                       Date

WHITE - Facility Grievance Coordinator Copy  CANARY - File Copy  PINK - Action Return Copy  GOLDENROD - Inmate Copy
Revised
April 2005

EXHIBIT
Varano-12

DEPOSITION
EXHIBIT
Kodack 33

DEF000005

Kodack-33

DC-ADM 804, Inmate Grieva    S     m                                    Attachment B

DC-804
Part 2

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO. | 271957

| TO: (Inmate Name & DC No.) | FACILITY | HOUSING LOCATION | GRIEVANCE DATE |
|---|---|---|---|
| JESSUP, Kevin CX-8799 | SCI-COA | B-B | 5/5/2009 |

The following is a summary of my findings regarding your grievance:

This is in response to Grievance Number: 271957

Mr. Jessup:

The Parole Board and the Department of Corrections are two separate entities.  As such, the Department of Corrections has no authority over the Parole Board.  The issues that you address in this grievance need to be addressed to the Parole Board.

Additionally, your parole violation backtime is calculated by the Parole Board and provided by them to the institutions Records Department for recording on your sentence status summary.  Any questions or problems with your parole violation backtime calculation needs to be addressed to the Parole Board.   We have no authority to change their calculation.

Taking all information into consideration your grievance is denied.

cc:  Ms. Dascani
     DC-15 Inmate Records
     DC-14
     File

| Print Name and Title of Grievance Officer | SIGNATURE OF GRIEVANCE OFFICER | DATE |
|---|---|---|
| Michelle Kodack, Records Supervisor | *michelle Kodack* | May 21, 2009 |





DEF000573

GRIEVANCE No. 27

## Appeal to Facility Manager

From Inmate: Jessup, Kevin, CX8799
Facility: SCI-Coal Township
Housing Location: BB-Block

2009 MAY 26 PM 2:18
Superintendent's Assistant
SCI COAL TOWNSHIP

RE: Appeal From Initial Review Response

Inmate Jessup, respectfully appeals the denial of his Initial Grievance No. 271957. Inmate Jessup does understand that the Parole Board and the Department of Corrections are two separate entities, but Inmate Jessup is not requesting the Department of Corrections to use any Authority over the Parole Board. Under 42 Pa.C.S.A § 9760, the Department of Corrections has Authority to credit Inmates for time spend in custody. If there is a mistake either made by the courts and/or the Board in giving an Inmate credit for time spend in custody, the Department of Corrections has the authority to credit an inmate the Correction time spend in custody to the new sentence and/or the original sentence. As such the grievance clearly states that Inmate Jessup is owed a Total of 5 years 10 months and counting that need to be credited towards his original sentence. For that reason Inmate Jessup respectfully Reques that the Facility Manager grant Inmate Jessup this Appeal and have the 5 years 10 months plus credit towards his current sentence.

Respectfully Submitted

Kevin Jessup

Date: 5/23/09
cc File

EXHIBIT
Varano-14

DEPOSITION
EXHIBIT
Koziuk 35

DEF000571

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
State Correctional Institution Coal Township
(570) 644-7890
May 26, 2009

SUBJECT:   Appeal from Initial Review Grievance #271957

TO:   Kevin Jessu~~~~~~~~~
      B-B-1026

FROM:   David A. Varano
        Superintendent

I have reviewed the initial grievance as submitted, investigation/response provided by Ms. Kodack and information that you now provide at the Facility Manager Review.

Ms. Kodack clearly reflects in her response that the Pennsylvania Parole Board is responsible for crediting of any back-time which you feel is warranted. Once credited, the Institution records Office would then be notified and reissue an updated sentence status sheet.

As she further states, any issues which you have at present, can be addressed with the Parole Board. If there should be any calculation issues, they would also address such.

The Facility Manager upholds initial response provided.

DAV/jh

cc:   Ms. Kodack
      Mr. Dunn
      DC-15
      DC-14 File – Counselor Foulds
      File

V

Varano – 15



EXHIBIT
Kodack-35 (5)

DEF000570

FUll ApI
7|17

GRIEVANCE NO. 271957

## APPEAL TO SECRETARY'S OFFICE OF INMATE GRIEVANCES AND APPEALS

From Inmate: Jessup, Kevin CX-8799

Facility: SCI-Coal Township

Housing Unit: BB-Block

Inmate Grievances & Appeals

JUN 04 2009

RE: *Appeal from Facility Manager's Decision*

Inmate Kevin Jessup respectfully appeals the denial of his initial grievance and response No. 271957 (Exhibit A attached hereto) and the Facility Manager's Decision and Appeal (Exhibit B attached hereto). The initial review response and the Facility Manager's Decision have clearly not addressed the issue and continued to keep incarcerated Kevin Jessup well past his statutory maximum sentence.

The history of the actual events leading up to this point is set forth in the initial grievance No. 271957 as (Exhibit A). It is clear that since Mr. Jessup has been re-sentenced twice on his Federal sentence and since it has gone from a total of 162 months down to a total of now 24 months, there is a total of 5 years and 10 months plus not credited to either his Federal sentence or his original state sentence. (See Exhibit C). This is the basis for the grievance and the Records Office here at SCI-Coal Township and the Facility Manager here continue to refuse to exercise their statutory authority pursuant to 42 Pa.C.S.A. §9760, in crediting Mr. Jessup with this 5 years and 10 months plus against his original sentence.

The Department of Corrections has clear statutory authority pursuant to §9760 (2), (3). To not exercise this authority in crediting time spend in custody where there is a clear intent by the sentencing judge to credit this time, as well as, to not credit this time to his original sentence that has not been credited towards his Federal sentence is unconstitutional. This has also cause inmate Jessup to be detained unlawfully well past his maximum sentence that was imposed by the sentencing judge in his original case.



EXHIBIT

Varano-16



DEPOSITION
EXHIBIT
Kolack 36

DEF000002

Koleuch - 36

For the reasons set forth in inmate Jessup's initial grievance, appeal and now in this appeal, it is respectfully requested that inmate Jessup be granted relief by this appeal and the 5 years and 10 months plus be credited towards his original sentence and released from custody.

Respectfully Submitted,

Kevin Jessup

Date: 6/1/09

cc: file

DEF000003

# EXHIBIT "A"

DEF000004

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P. O. BOX 598
CAMP HILL, PA 17001-0598

FOR OFFICIAL USE ONLY
271957
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: S.C.I. COALTOWNSHIP | DATE: 5/5/09 |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) KEVIN JESSUP CX 8799 | SIGNATURE of INMATE: | |
| WORK ASSIGNMENT: GLP | HOUSING ASSIGNMENT: B 2   20cell | |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any actions you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

**A.** Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). *State all relief that you are seeking.*

On May 4, 2009, I received from records office a new status summary, of which I respectfully disagree with how records office has credited the time. I have spent in custody. There is 5 yrs 10 months that is not being credited to either my backtime or federal sentence. I signed a letter on 4/29/09 from the federal probation office the records office called to sign the letter so they aware of my new sentence reduction ___ effective from 7/18/07 to 4/14/09 which completes ___ federal time. I was arrested on 9/26/01, so from that date til 7/18/07, pursuant to 42 Pa.C.S.C. 9760 I am entitled to all time spent in custody that was not credited towards my federal sentence. I request that this 5 yrs 10 months and counting be credited to my sentence. This will put me over my max date.

**B.** List actions taken and staff you have contacted, before submitting this grievance.

NOTICES AND COURT DOCUMENTS TO THE FOLLOWING:
MS. ELLIS         MR. VARANO
Mr. STOUT
MS. P.JAR
RECORDS DEPT.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator          5/7/09   Date

WHITE - Facility Grievance Coordinator Copy  CANARY - File Copy  PINK - Action Return Copy  GOLDENROD - Inmate Copy
Revised
April 2005                                                    DEF000005

DC-ADM 804, Inmate Grievance System                                      **Attachment B**

DC-804
Part 2

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA  17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.          271957

| TO: (Inmate Name & DC No.) | FACILITY | HOUSING LOCATION | GRIEVANCE DATE |
|---|---|---|---|
| JESSUP, Kevin CX-8799 | SCI-COA | B-B | 5/5/2009 |

The following is a summary of my findings regarding your grievance:

This is in response to Grievance Number:  271957

Mr. Jessup:

The Parole Board and the Department of Corrections are two separate entities.   As such, the Department of Corrections has no authority over the Parole Board.  The issues that you address in this grievance need to be addressed to the Parole Board.

Additionally, your parole violation backtime is calculated by the Parole Board and provided by them to the institutions Records Department for recording on your sentence status summary.  Any questions or problems with your parole violation backtime calculation needs to be addressed to the Parole Board.   We have no authority to change their calculation.

Taking all information into consideration your grievance is denied.

cc:   Ms. Dascani
      DC-15 Inmate Records
      DC-14
      File

| Print Name and Title of Grievance Officer | SIGNATURE OF GRIEVANCE OFFICER | DATE |
|---|---|---|
| Michelle Kodack, Records Supervisor | *Michelle Kodack* | May 21, 2009 |

DEF000006

# EXHIBIT "B"

DEF000007

GRIEVANCE No. 271195

## Appeal To Facility Manager

From Inmate: Jessup, Kevin, CX8799
Facility: SCI-Coal Township
Housing Location: BB-Block

RE: Appeal From Initial Review Response.

Inmate Jessup, respectfully appeals the denial of his Initial Grievance No. 271957. Inmate Jessup does understand that the Parole Board and the Department of Corrections are two separate entities, but Inmate-Jessup is not requesting the Department of Corrections to use any authority over the Parole Board. Under 42 PCSA §9760, the Department of Corrections has Authority to credit Inmates for time spend in custody. If there is a mistake either made by the courts and/or the Board in giving an Inmate credit for time spend in Custody, the Department of Corrections has the authority to credit an inmate the Correction time spend in custody to the new sentence and/or the original sentence. As such the grievance clearly states that Inmate-Jessup is owed a Total of 5 years 10 months and counting that need to be credited towards his original sentence. For that reason Inmate Jessup respectfully Request that the Facility Manager grant Inmate-Jessup this Appeal and have the 5 years 10 month plus credit towards his current sentence.

Respectfully Submitted

Kevin Jessup

Date: 5/23/09

cc. File

DEF000008



**COMMONWEALTH OF PENNSYLVANIA**
Department of Corrections
State Correctional Institution Coal Township
(570) 644-7890
May 26, 2009

SUBJECT:    Appeal from Initial Review Grievance #271957

TO:         Kevin Jessup CX-8799
            B-B-1026

FROM:       David A. Varano
            Superintendent

I have reviewed the initial grievance as submitted, investigation/response provided by Ms. Kodack and information that you now provide at the Facility Manager Review.

Ms. Kodack clearly reflects in her response that the Pennsylvania Parole Board is responsible for crediting of any back-time which you feel is warranted. Once credited, the Institution records Office would then be notified and reissue an updated sentence status sheet.

As she further states, any issues which you have at present, can be addressed with the Parole Board. If there should be any calculation issues, they would also address such.

The Facility Manager upholds initial response provided.

DAV/jh

cc:    Ms. Kodack
       Mr. Dunn
       DC-15
       DC-14 File – Counselor Foulds
       File

DEF000009

# EXHIBIT "C"

DEF000010

RE:   JESSUP, Kevin
      AKA Damon Chappelle
      Inmate No. CX 8799
      Page Two

Your assistance rendered in this matter will be greatly appreciated. If you have any questions, please feel free to contact me at 267-299-4595.

Sincerely,

Daniel W. Blahusch, Chief
U.S. Probation Officer

Alice Colloton
Supervising U.S. Probation Clerk

/ac
cc:   Kevin Jessup/Damon Chappelle

_____          _____
Kevin Jessup/Damon Chappelle          4/29/09
                                       Date

_____          _____
Witness                                Date

DEF000011

*Max*

# FINAL APPEAL DECISION
## Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
P.O. Box 598, 2520 Lisburn Road
Camp Hill, PA 17001-0598

This serves to acknowledge receipt of your appeal to final review for the grievance noted below. In accorda
with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being prov
based on a review of the entire record of this grievance. The review included your initial grievance, the
grievance officer's response, your appeal to the facility manager, the facility manager's response, the issues
raised to final review, and (when applicable) any revised institutional responses required as a result of a
subsequent remand action by this Office. As necessary, input from appropriate Central Office Bureaus (e.g.
Health Care Services, Chief Counsel, Office of Professional Responsibility, etc.) may have been solicited in
making a determination in response to your issue as well.

| Inmate Name: | Kevin Jessup | Inmate Number: | CX-8799 |
|---|---|---|---|
| SCI Filed at: | Coal Township | Current SCI: | Coal Township |
| Grievance #: | 271957 | | |
| Publication (if applicable): | | | |

**Decision:  Uphold Response (UR)**

*The original or revised responses provided at the institutional level are reasonable and appropriate in accordance with Department of Corrections' policy and procedure. Accordingly, your final appeal is denied.*

**Response:**

A review of the record shows that you are filing an appeal based on your claim that you were not given credit for time served credited to your sentence.

An investigation into the matter reveals that your Parole Violator Maximum date is calculated by the Pennsylvania Board of Probation and Parole. The responses provided to you by the institutional staff are correct and if you have a dispute with the PV maximum date, you must address that with them. You received a Board Action with this information on it and had the opportunity to address it with them. The Department of Corrections must use the date provided by the Parole Board. Your request to receive additional credit towards your PV Maximum date must be addressed with them. Your request for the Records Staff to change your maximum date is denied.

| Signature: | Dorina Varner *Dorina Varner* |
|---|---|
| Title: | Chief Grievance Officer |
| Date: | 7-16-09 |

DLV/TLW

cc:   ~~DC-15/Superintendent Varano~~
      Grievance Office



DEPOSITION
EXHIBIT
Kozlack 37

DEF000572



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE

1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

## NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP

PAROLE NO: 496AS

INSTITUTION: SCI - COAL TOWNSHIP

INSTITUTION NO: CX8799

AS RECORDED ON JULY 29, 2009 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

MODIFY BOARD ACTION OF 4/16/2009 BY DELETING THE REVIEW PORTION AND BY CHANGING THE PAROLE VIOLATION MAX DATE TO READ:

-- PAROLE VIOLATION MAX DATE: 7/14/2009.

REMAINDER OF THE BOARD ACTION REMAINS THE SAME.

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR ADMINISTRATIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER. THIS REQUEST SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR THE ALLEGATIONS. SEE 37 PA CODE SEC. 73. YOU HAVE THE RIGHT TO AN ATTORNEY IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH COURT.          DATE MAILED:

YKB  07/29/2009

JUL 29 2009

PAROLE VIOLATION MAX DATE: 07/14/2009

**EXHIBIT**

Kodach-28

Rec dep - Sas - CT
INSTITUTION

Cynthia L. Daub

Cynthia L. Daub

Board Secretary

Notice of Board Decision

PBPP 15(08/02) 1 of 1



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE

1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

## NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP                                   ~~PAROLE NO: 496AS~~

INSTITUTION: SCI - COAL TOWNSHIP                     INSTITUTION NO: CX8799

AS RECORDED ON APRIL 16, 2009 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

REFER TO BOARD ACTION OF 6/25/2007 TO RECOMMIT TO A STATE CORRECTIONAL INSTITUTION AS A TECHNICAL AND CONVICTED PAROLE VIOLATOR TO SERVE 36 MONTHS BACKTIME.

WHILE CONFINED, YOU MUST COMPLY WITH THE INSTITUTION'S PRESCRIPTIVE PROGRAM REQUIREMENTS AND HAVE NO MISCONDUCTS.
YOU MUST PARTICIPATE IN DRUG AND ALCOHOL COUNSELING.

REVIEW IN OR AFTER NOVEMBER 2011.

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR ADMINISTRATIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER. THIS REQUEST SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR THE ALLEGATIONS. SEE 37 PA CODE SEC. 73. YOU HAVE THE RIGHT TO AN ATTORNEY IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH COURT.          DATE MAILED:

YKB  04/16/2009                    *APR 2 3 2009*

PAROLE VIOLATION MAX DATE: 09/06/2014

*Rll Ayo Sc.-C.T*
INSTITUTION

ADVANCE COPY FOR D.O.C.
NOT FOR DISTRIBUTION TO INMATE

*Cynthia L. Daub*

Cynthia L.Daub

Board Secretary

Notice of Board Decision
PBPP 15(08/02) 1 of 1



# COMMONWEALTH OF PENNSYLVANIA
## BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

### NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP                           PAROLE NO:   496AS
INSTITUTION:   SCI - COAL TOWNSHIP           INSTITUTION NO:   CX8799

AS RECORDED ON JUNE 25, 2007 THE BOARD OF PROBATION AND PAROLE RENDERED
THE FOLLOWING DECISION IN YOUR CASE:

REFER TO BOARD ACTION OF 03/14/2002 TO RECOMMIT TO A STATE CORRECTIONAL
INSTITUTION AS A TECHNICAL PAROLE VIOLATOR TO SERVE 18 MONTHS BACKTIME, WHEN
AVAILABLE, AND NOW;

RECOMMIT TO A STATE CORRECTIONAL INSTITUTION AS A CONVICTED PAROLE VIOLATOR
WHEN AVAILABLE TO SERVE 36 MONTHS CONCURRENTLY FOR A TOTAL OF 36 MONTHS
BACKTIME.
-- 36 MONTHS FOR THE OFFENSES OF POSSESSION WITH INTENT TO DISTRIBUTE CRACK
COCAINE; POSSESSION WITH INTENT TO DISTRIBUTE CRACK COCAINE WITHIN 1000 FEET
OF A SCHOOL AND FELON IN POSSESSION OF A FIREARM AND AMMUNITION.
EVIDENCE RELIED ON: CERTIFIED COPY OF COURT RECORD PROVING CONVICTION.
REASON: CONVICTION IN A COURT OF RECORD ESTABLISHED.  FIREARM USED IN ORIGINAL
OFFENSE AND AGAIN IN PRESENT CASE.  PRIOR FIREARMS CASES IN 1993.

WHILE CONFINED, YOU MUST COMPLY WITH THE INSTITUTION'S PRESCRIPTIVE PROGRAM
REQUIREMENTS AND HAVE NO MISCONDUCTS.
YOU MUST PARTICIPATE IN DRUG AND ALCOHOL COUNSELING.

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR
ADMINISTRATIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER.
THIS REQUEST SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR
THE ALLEGATIONS.  SEE 37 PA CODE SEC. 73.  YOU HAVE THE RIGHT TO AN
ATTORNEY IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH

(CONTINUE ON PAGE 2)

Rec. Supr.  SCI-CT
INSTITUTION

ADVANCE COPY FOR D.O.C.
NOT FOR DISTRIBUTION TO INMATE

PAROLE NO:  496AS

(CONTINUED FROM PAGE 1)
    COURT.          DATE MAILED:
(H.R.  05/25/07)
CAF  06/25/2007          JUN 2 9 2007

INSTITUTION

*Cynthia L. Daub*

Cynthia L. Daub
Board Secretary

Notice of Board Decision
PBPP 15(08/02) 2 of 2



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

### NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP             PAROLE NO: 496AS
INSTITUTION: SCI - COAL TOWNSHIP      INSTITUTION NO: CX8799

AS RECORDED ON MARCH 02, 2007 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

RESCIND BOARD ACTION OF 5-6-2003, 12-2-2003, 3-5-2004, 9-17-2004, 9-23-2005 AND 11-9-2006; AND NOW:

REAFFIRM BOARD ACTION OF 3-14-2002 TO RECOMMIT TO A STATE CORRECTIONAL INSTITUTION AS A TECHNICAL PAROLE VIOLATOR TO SERVE 18 MONTHS BACKTIME, WHEN AVAILABLE.

(U.S. DISTRICT COURT DOCKET #02-32-1)
WTH  03/02/2007

_Rec for Stmt_
INSTITUTION

07JUN -6 PM 4:50

_Cynthia L. Daub_

Cynthia L. Daub
Board Secretary

Notice of Board Decision
PBPP 15(08/02) 1 of 1



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP
INSTITUTION:  SCI - COAL TOWNSHIP

PAROLE NO:  496AS
INSTITUTION NO:  CX8799

AS RECORDED ON NOVEMBER 09, 2006 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW WITH YOU AND A REVIEW OF YOUR FILE, AND HAVING CONSIDERED ALL MATTERS REQUIRED PURSUANT TO THE PAROLE ACT, THE BOARD OF PROBATION AND PAROLE, IN THE EXERCISE OF ITS DISCRETION, HAS DETERMINED AT THIS TIME THAT: YOUR BEST INTERESTS JUSTIFY YOU BEING PAROLED/REPAROLED; AND, THE INTERESTS OF THE COMMONWEALTH WILL NOT BE INJURED. THEREFORE, YOU ARE GRANTED PAROLE/REPAROLE AT THIS TIME. THE REASONS FOR THE BOARD'S DECISION INCLUDE THE FOLLOWING:

THE EXISTENCE OF DETAINERS FILED AGAINST YOU.

REPAROLE TO FEDERAL DETAINER SENTENCE. APPROVED HOME TO BE AVAILABLE.

YOU SHALL ABIDE BY THE RULES AND REGULATIONS OF THE INSTITUTION--MANDATORY.

YOU SHALL PAY A MONTHLY SUPERVISION FEE AS DETERMINED BY PAROLE SUPERVISION STAFF TO THE PAROLE BOARD WHILE UNDER SUPERVISION WITHIN THE COMMONWEALTH OF PENNSYLVANIA (ACT 35 OF 1991).

WHEN RELEASED TO THE COMMUNITY YOU MUST REPORT IN PERSON TO THE DISTRICT OFFICE OR SUB OFFICE THE NEXT BUSINESS DAY (MONDAY THROUGH FRIDAY) BETWEEN THE WORKING HOURS OF 8:30 A.M. - 5:00 P.M. THE DECISION ANNOUNCED BY THIS BOARD ACTION (PBPP-15) WILL NOT TAKE AFFECT UNTIL YOU HAVE SIGNED THE CONDITIONS (PBPP-11), AND THE RELEASE ORDERS (PBPP-10) HAVE BEEN ISSUED.  YOU REMAIN

(CONTINUE ON PAGE 2)

PAROLE VIOLATION MAX DATE:  02/16/2008

CC: DISTRICT ATTORNEY

INSTITUTION

PAROLE NO:  496AS

(CONTINUED FROM PAGE 1)
UNDER THE JURISDICTION AND CONTROL OF THE DEPARTMENT OF CORRECTIONS UNTIL YOU
HAVE SIGNED THE PBPP-11, AND THE PBPP-10 HAS BEEN ISSUED.  THIS PBPP-15 DOES
NOT AUTHORIZE YOU TO CHANGE YOUR RESIDENCE FROM ANY COMMUNITY CORRECTIONS
CENTER OR GROUP HOME IN WHICH YOU MAY BE RESIDING WHEN YOU RECEIVE IT.

KLS  11/09/2006

---

PAROLE VIOLATION MAX DATE:   02/16/2008
CC: DISTRICT ATTORNEY

INSTITUTION

Cynthia L. Daub
Board Secretary
Notice of Board Decision
PBPP 15(08/02) 2 of 2



# COMMONWEALTH OF PENNSYLVANIA
## BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

### NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP

PAROLE NO:   496AS

INSTITUTION:   SCI - COAL TOWNSHIP

INSTITUTION NO:   CX8799

AS RECORDED ON SEPTEMBER 23, 2005 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW WITH YOU AND A REVIEW OF YOUR FILE, AND HAVING CONSIDERED ALL MATTERS REQUIRED PURSUANT TO THE PAROLE ACT, THE BOARD OF PROBATION AND PAROLE, IN THE EXERCISE OF ITS DISCRETION, HAS DETERMINED AT THIS TIME THAT: YOUR BEST INTERESTS DO NOT JUSTIFY OR REQUIRE YOU BEING PAROLED/REPAROLED; AND, THE INTERESTS OF THE COMMONWEALTH WILL BE INJURED IF YOU WERE PAROLED/REPAROLED. THEREFORE, YOU ARE REFUSED PAROLE/REPAROLE AT THIS TIME. THE REASONS FOR THE BOARD'S DECISION INCLUDE THE FOLLOWING:

THE RECOMMENDATION MADE BY THE DEPARTMENT OF CORRECTIONS.

YOUR INSTITUTIONAL BEHAVIOR, INCLUDING REPORTED MISCONDUCTS OR CCC FAILURE.

YOU WILL BE REVIEWED IN OR AFTER SEPTEMBER, 2006.

AT YOUR NEXT INTERVIEW, THE BOARD WILL REVIEW YOUR FILE AND CONSIDER:

WHETHER YOU HAVE RECEIVED A FAVORABLE RECOMMENDATION FOR PAROLE FROM THE DEPARTMENT OF CORRECTIONS.

WHETHER YOU HAVE RECEIVED A CLEAR CONDUCT RECORD AND COMPLETED THE DEPARTMENT OF CORRECTIONS' PRESCRIPTIVE PROGRAM(S).

SLS  09/23/2005

PAROLE VIOLATION MAX DATE:   02/16/2008

INSTITUTION

RECORDS OFFICE

05 OCT 24  PM 4: 18

SCI COAL TOWNSHIP

*Lawrence F. Murray*

Lawrence F. Murray
Board Secretary

Notice of Board Decision
PBPP 15(08/02) 1 of 1



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

## NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP                                    PAROLE NO:   496AS
INSTITUTION:   SCI - COAL TOWNSHIP                    INSTITUTION NO:   CX8799

AS RECORDED ON SEPTEMBER 17, 2004 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW WITH YOU AND A REVIEW OF YOUR FILE, AND HAVING CONSIDERED ALL MATTERS REQUIRED PURSUANT TO THE PAROLE ACT OF 1941, AS AMENDED, 61 P.S. § 331.1 ET SEQ., THE BOARD OF PROBATION AND PAROLE, IN THE EXERCISE OF ITS DISCRETION, HAS DETERMINED AT THIS TIME THAT: YOUR BEST INTERESTS DO NOT JUSTIFY OR REQUIRE YOU BEING PAROLED/REPAROLED; AND, THE INTERESTS OF THE COMMONWEALTH WILL BE INJURED IF YOU WERE PAROLED/REPAROLED. THEREFORE, YOU ARE REFUSED PAROLE/REPAROLE AT THIS TIME. THE REASONS FOR THE BOARD'S DECISION INCLUDE THE FOLLOWING:

YOUR VERSION OF THE NATURE AND CIRCUMSTANCES OF THE OFFENSE(S) COMMITTED.

YOUR PRIOR HISTORY OF SUPERVISION FAILURE(S).

YOUR INTERVIEW WITH THE HEARING EXAMINER AND/OR BOARD MEMBER.

YOUR NEGATIVE INTEREST IN PAROLE.

YOU WILL BE REVIEWED IN OR AFTER SEPTEMBER, 2005.

AT YOUR NEXT INTERVIEW, THE BOARD WILL REVIEW YOUR FILE AND CONSIDER:

WHETHER YOU HAVE MAINTAINED A FAVORABLE RECOMMENDATION FOR PAROLE FROM THE DEPARTMENT OF CORRECTIONS.

(CONTINUE ON PAGE 2)
PAROLE VIOLATION MAX DATE:   02/16/2008

RECORDS OFFICE   04 SEP 24  PM 3: 58   SCI COAL TOWNSHIP

INSTITUTION

PAROLE NO:  496AS

(CONTINUED FROM PAGE 1)

WHETHER YOU HAVE MAINTAINED A CLEAR CONDUCT RECORD AND COMPLETED THE DEPARTMENT OF CORRECTIONS' PRESCRIPTIVE PROGRAM(S).

SLS  09/17/2004

PAROLE VIOLATION MAX DATE:   02/16/2008

INSTITUTION

Lawrence F. Murray

Lawrence F. Murray
Board Secretary

Notice of Board Decision
PBPP 15(08/02) 2 of 2



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

### NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP                                 PAROLE NO:   496AS
INSTITUTION:  SCI - COAL TOWNSHIP                  INSTITUTION NO:  CX8799

AS RECORDED ON MARCH 05, 2004 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW WITH YOU AND A REVIEW OF YOUR FILE, AND HAVING CONSIDERED ALL MATTERS REQUIRED PURSUANT TO THE PAROLE ACT OF 1941, AS AMENDED, 61 P.S. § 331.1 ET SEQ., THE BOARD OF PROBATION AND PAROLE, IN THE EXERCISE OF ITS DISCRETION, HAS DETERMINED AT THIS TIME THAT: YOUR BEST INTERESTS DO NOT JUSTIFY OR REQUIRE YOU BEING PAROLED/REPAROLED; AND, THE INTERESTS OF THE COMMONWEALTH WILL BE INJURED IF YOU WERE PAROLED/REPAROLED. THEREFORE, YOU ARE REFUSED PAROLE/REPAROLE AT THIS TIME. THE REASONS FOR THE BOARD'S DECISION INCLUDE THE FOLLOWING:

THE RECOMMENDATION MADE BY THE DEPARTMENT OF CORRECTIONS.

YOUR INSTITUTIONAL BEHAVIOR, INCLUDING REPORTED MISCONDUCTS OR CCC FAILURE.

YOU WILL BE REVIEWED IN OR AFTER SEPTEMBER, 2004, OR EARLIER, IF RECOMMENDED BY THE DEPARTMENT OF CORRECTIONS.

AT YOUR NEXT INTERVIEW, THE BOARD WILL REVIEW YOUR FILE AND CONSIDER:

WHETHER YOU HAVE RECEIVED A FAVORABLE RECOMMENDATION FOR PAROLE FROM THE DEPARTMENT OF CORRECTIONS.

WHETHER YOU HAVE RECEIVED A CLEAR CONDUCT RECORD AND COMPLETED THE DEPARTMENT OF CORRECTIONS' PRESCRIPTIVE PROGRAM(S).

(CONTINUE ON PAGE 2)

PAROLE VIOLATION MAX DATE:   02/16/2008

RECORDS OFFICE
04 MAR 10 PM 4:06
RECEIVED
SCI COAL TOWNSHIP

INSTITUTION

PAROLE NO:  496AS

(CONTINUED FROM PAGE 1)

SLS  03/05/2004

PAROLE VIOLATION MAX DATE:   02/16/2008

INSTITUTION

Charles Myers
Acting Board Secretary

Notice of Board Decision
PBPP 15(08/02) 2 of 2



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

### NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP
INSTITUTION:   SCI - COAL TOWNSHIP

PAROLE NO:   496AS
INSTITUTION NO:   CX8799

AS RECORDED ON DECEMBER 02, 2003 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

REFER TO BOARD ACTION OF 05/06/2003 TO RECOMMIT TO A STATE CORRECTIONAL INSTITUTION AS A TECHNICAL PAROLE VIOLATOR AND AS A CONVICTED PAROLE VIOLATOR TO SERVE A TOTAL OF 18 MONTHS BACKTIME.

WHILE CONFINED, YOU MUST COMPLY WITH THE INSTITUTION'S PRESCRIPTIVE PROGRAM REQUIREMENTS AND HAVE NO MISCONDUCTS.
YOU MUST PARTICIPATE IN DRUG AND ALCOHOL COUNSELING.

LIST FOR REPAROLE-REVIEW ON THE NEXT AVAILABLE DOCKET.

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR ADMINISTRATIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER. THIS REQUEST SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR THE ALLEGATIONS.  SEE 37 PA CODE SEC. 73.  YOU HAVE THE RIGHT TO AN ATTORNEY IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH COURT.         DATE MAILED:
[JEM 12/02/2003]          **DEC 0 8 2003**

PAROLE VIOLATION MAX DATE:   02/16/2008

CC: PUBLIC DEFENDER
CC: PUBLIC DEFENDER

ADVANCE COPY FOR D.O.C.
NOT FOR DISTRIBUTION TO INMATE

*Rec Sup-Sci-Ct*
INSTITUTION

Charles Myers
Acting Board Secretary

Notice of Board Decision
PBPP 15(08/02) 1 of 1

PBPP-39 (Rev. 4/97)



**COMMONWEALTH OF PENNSYLVANIA**
**BOARD OF PROBATION AND PAROLE**

Name: KEVIN JESSUP                     District: #1

Parole No.: 496-AS                     Parole Date: 04-09-01

Inst. Paroled From: SCI-COAL TOWNSHIP            Inst. No.: CX8799

S.I.D. No.: 21714127          County, Bill & Term & OTN: PHILADELPHIA CO -- CP 950300033, 0033

---

The above-named individual who was conditionally released on parole by the Pennsylvania Board of Probation and Parole has been found by the Board to have violated the conditions of parole. Therefore, the Board, by virtue of the authority conferred on it by law, orders said individual recommitted for further imprisonment for the remainder of the unexpired maximum term, or until otherwise released or discharged according to law.

---

Status: X -TPV   X -CPV

Recommit to: SCI-COAL TOWNSHIP

|   |   |
|---|---|
| Maximum: | 01-26-07 |
| - Par/Rep/Deliq/ Bd. Warrant Date: | 04-09-01 |
| Parole Time Added: |   |
| - Confinement Time: |   |
| - Backtime Credit: | 0Y 4M 24D |
| Backtime Owed: | 5Y 4M 23D |
| +Custody for Return: | 09-23-02 |
| Recomputed Max.: | 02-16-08 |

Conviction(s) resulting in recommitment:
09-23-02 -- U.S. DISTRICT CT -- EASTERN -- 02 CR 00032-01 -- CTS 1, 2, 3 -- 102 MOS CC -- CT4 -- 60 MOS CS - FCI

Backtime Dates - From: 09-26-01 To: 02-20-02

Time Lost Due To:
  Delinquency:
  Service of Another Sentence:

---

Also Recommit On:

-

---

Original Minimum Date: 01-26-01

GIVEN under the hand of the Pennsylvania Board of Probation and Parole this

2ND day of DECEMBER, 2003

CAM/sad                     BY THE BOARD                     ACTING BOARD SECRETARY



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

### NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP                                      PAROLE NO:   496AS
INSTITUTION:   SCI - COAL TOWNSHIP              INSTITUTION NO:   CX8799

AS RECORDED ON MAY 06, 2003 THE BOARD OF PROBATION AND PAROLE RENDERED
THE FOLLOWING DECISION IN YOUR CASE:

REFER TO BOARD ACTION OF 3/14/2002 TO RECOMMIT TO A STATE CORRECTIONAL
INSTITUTION AS A TECHNICAL PAROLE VIOLATOR TO SERVE 18 MONTHS BACKTIME WHEN
AVAILABLE AND NOW;

RECOMMIT TO A STATE CORRECTIONAL INSTITUTION AS A CONVICTED PAROLE VIOLATOR TO
SERVE 18 MONTHS CONCURRENTLY, FOR A TOTAL OF 18 MONTHS BACKTIME, WHEN
AVAILABLE.

- 18 MONTHS FOR THE OFFENSES OF POSSESSION WITH INTENT TO DISTRIBUTE
COCAINE BASE-CRACK, POSSESSION WITH INTENT TO DISTRIBUTE COCAINE BASE-CRACK
WITHIN 1,000 FEET OF SCHOOL, FELON IN POSSESSION OF A FIREARM AND POSSESSION
OF A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME.
EVIDENCE RELIED ON: CERTIFIED COPY OF COURT RECORD PROVING CONVICTIONS.
REASON: CONVICTIONS IN A COURT OF RECORD ESTABLISHED.

WHILE CONFINED, YOU MUST COMPLY WITH THE INSTITUTION'S PRESCRIPTIVE PROGRAM
REQUIREMENTS AND HAVE NO MISCONDUCTS.
YOU MUST PARTICIPATE IN DRUG AND ALCOHOL COUNSELING.

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR
ADMINISTRATIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER.
THIS REQUEST SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR

(CONTINUE ON PAGE 2)

CC: PUBLIC DEFENDER

INSTITUTION

SCI CT

"ADVANCE COPY FOR D.O.C."
NOT FOR DISTRIBUTION TO INMATE

PAROLE NO:  496AS

(CONTINUED FROM PAGE 1)
THE ALLEGATIONS.  SEE 37 PA CODE SEC. 73.  YOU HAVE THE RIGHT TO AN
ATTORNEY IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH
COURT.          DATE MAILED:

{H.R. 4/28/2003  - MR 5/6/2003}      MAY 1 2 2003

CC: PUBLIC DEFENDER

INSTITUTION

*Kathleen Zwierzyna*

Kathleen Zwierzyna
Board Secretary

Notice of Board Decision
PBPP 15(08/02) 2 of 2



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE

1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

## NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP
INSTITUTION:   SCI - COAL TOWNSHIP

PAROLE NO:   496AS
INSTITUTION NO:   CX8799

AS RECORDED ON MARCH 02, 2007 THE BOARD OF PROBATION AND PAROLE RENDERED
THE FOLLOWING DECISION IN YOUR CASE:

RESCIND BOARD ACTION OF 5-6-2003, 12-2-2003, 3-5-2004, 9-17-2004, 9-23-2005
AND 11-9-2006; AND NOW:

REAFFIRM BOARD ACTION OF 3-14-2002 TO RECOMMIT TO A STATE CORRECTIONAL
INSTITUTION AS A TECHNICAL PAROLE VIOLATOR TO SERVE 18 MONTHS BACKTIME, WHEN
AVAILABLE.

(U.S. DISTRICT COURT DOCKET #02-32-1)
WTH  03/02/2007

INSTITUTION

*Cynthia L. Daub*

Cynthia L. Daub
Board Secretary
Notice of Board Decision
PBPP 15(08/02) 1 of 1



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE

1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

### NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP                                    PAROLE NO: 496AS

INSTITUTION: SCI - COAL TOWNSHIP                      INSTITUTION NO: CX8799

AS RECORDED ON APRIL 16, 2009 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

REFER TO BOARD ACTION OF 6/25/2007 TO RECOMMIT TO A STATE CORRECTIONAL INSTITUTION AS A TECHNICAL AND CONVICTED PAROLE VIOLATOR TO SERVE 36 MONTHS BACKTIME.

WHILE CONFINED, YOU MUST COMPLY WITH THE INSTITUTION'S PRESCRIPTIVE PROGRAM REQUIREMENTS AND HAVE NO MISCONDUCTS.
YOU MUST PARTICIPATE IN DRUG AND ALCOHOL COUNSELING.

REVIEW IN OR AFTER NOVEMBER 2011.

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR ADMINISTRATIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER. THIS REQUEST SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR THE ALLEGATIONS. SEE 37 PA CODE SEC. 73. YOU HAVE THE RIGHT TO AN ATTORNEY IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH COURT.          DATE MAILED:

YKB  04/16/2009

SCI-COAL TOWNSHIP
09 APR 23  AM 8: 58
PA. BOARD OF PROBATION & PAROLE

PAROLE VIOLATION MAX DATE: 09/06/2014

INSTITUTIONAL PAROLE OFFICE

*Cynthia L. Daub*

Cynthia L.Daub
Board Secretary
Notice of Board Decision
PBPP 15(08/02) 1 of 1



# COMMONWEALTH OF PENNSYLVANIA
# BOARD OF PROBATION AND PAROLE
1101 S. Front Street
Harrisburg, Pa. 17104 - 2519

## NOTICE OF BOARD DECISION

NAME: KEVIN JESSUP                                          PAROLE NO:  496AS
INSTITUTION:  SCI - COAL TOWNSHIP                           INSTITUTION NO:  CX8799

AS RECORDED ON NOVEMBER 09, 2006 THE BOARD OF PROBATION AND PAROLE RENDERED
THE FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW WITH YOU AND A REVIEW OF YOUR FILE, AND HAVING
CONSIDERED ALL MATTERS REQUIRED PURSUANT TO THE PAROLE ACT, THE BOARD OF
PROBATION AND PAROLE, IN THE EXERCISE OF ITS DISCRETION, HAS DETERMINED AT
THIS TIME THAT: YOUR BEST INTERESTS JUSTIFY YOU BEING PAROLED/REPAROLED; AND,
THE INTERESTS OF THE COMMONWEALTH WILL NOT BE INJURED. THEREFORE, YOU ARE
GRANTED PAROLE/REPAROLE AT THIS TIME. THE REASONS FOR THE BOARD'S DECISION
INCLUDE THE FOLLOWING:

THE EXISTENCE OF DETAINERS FILED AGAINST YOU.

REPAROLE TO FEDERAL DETAINER SENTENCE. APPROVED HOME TO BE AVAILABLE.

YOU SHALL ABIDE BY THE RULES AND REGULATIONS OF THE INSTITUTION--MANDATORY.

YOU SHALL PAY A MONTHLY SUPERVISION FEE AS DETERMINED BY PAROLE SUPERVISION
STAFF TO THE PAROLE BOARD WHILE UNDER SUPERVISION WITHIN THE COMMONWEALTH OF
PENNSYLVANIA (ACT 35 OF 1991).

WHEN RELEASED TO THE COMMUNITY YOU MUST REPORT IN PERSON TO THE DISTRICT
OFFICE OR SUB OFFICE THE NEXT BUSINESS DAY (MONDAY THROUGH FRIDAY) BETWEEN THE
WORKING HOURS OF 8:30 A.M. - 5:00 P.M. THE DECISION ANNOUNCED BY THIS BOARD
ACTION (PBPP-15) WILL NOT TAKE AFFECT UNTIL YOU HAVE SIGNED THE CONDITIONS
(PBPP-11), AND THE RELEASE ORDERS (PBPP-10) HAVE BEEN ISSUED.  YOU REMAIN

(CONTINUE ON PAGE 2)

PAROLE VIOLATION MAX DATE:   02/16/2008

CC: DISTRICT ATTORNEY

INSTITUTION

Notice of Board Decision
PBPP 15(08/02) 1 of 2

NOTICE OF BOARD DECISION
PBPP-15(6/96)

## COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

### DATE: 11/29/2000

CLIENT NAME:  **KEVIN JESSUP**        PAROLE NO:  **496AS**
INSTITUTION:  **SCI - COAL TOWNSHIP**     INSTITUTION NO:  **CX8799**

AS RECORDED ON **11/29/2000** THE BOARD OF PROBATION AND PAROLE RENDERED THE
FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW AND REVIEW OF YOUR FILE, THE PENNSYLVANIA BOARD OF
PROBATION AND PAROLE HAS DETERMINED THAT THE FAIR ADMINISTRATION OF JUSTICE
MAY BE ACHIEVED THROUGH YOUR RELEASE ON PAROLE, AND SUBJECT TO YOUR COMPLIANCE
WITH ALL OF THE TERMS AND CONDITIONS OF PAROLE SUPERVISION.  YOU ARE THEREFORE:

PAROLED ON OR AFTER 01-26-2001 TO A COMMUNITY CORRECTIONS CENTER ONLY FOR A
MINIMUM OF 3 MONTHS. YOU SHALL ENTER INTO AND ACTIVELY PARTICIPATE IN THE
COMMUNITY CORRECTIONS PROGRAM UNTIL SUCCESSFULLY DISCHARGED BY THE PAROLE
SUPERVISION STAFF. YOU SHALL ABIDE BY ALL THE ESTABLISHED RULES AND
REGULATIONS OF THE COMMUNITY CORRECTIONS PROGRAM.  ANY VIOLATION OF THE
PROGRAM RULES OR REGULATIONS MAY CONSTITUTE A VIOLATION OF PAROLE AND RESULT
IN YOUR ARREST.  YOU MUST HAVE AN APPROVED PLAN PRIOR TO RELEASE FROM THE
CENTER.
BEFORE YOU CAN BE RELEASED, YOU SHALL PROVIDE PROOF OF PAYMENT OF AT LEAST
$30.00 OF MANDATORY COURT COSTS {IN ACCORDANCE WITH 18.P.S. {11.1101}.

YOU MUST SUBMIT TO URINALYSIS TESTING MANDATORY.
YOU SHALL NOT CONSUME OR POSSESS ALCOHOL UNDER ANY CONDITION OR FOR ANY REASON.
YOU SHALL NOT ENTER ESTABLISHMENTS THAT SELL OR DISPENSE ALCOHOL (EXCEPT AS
APPROVED BY THE SUPERVISION STAFF.

(CONTINUE ON PAGE 2)

CC: DISTRICT ATTORNEY

*Region I*

*Kathleen Zwierzyna*

KATHLEEN ZWIERZYNA
BOARD SECRETARY

INSTITUTION

NOTICE OF BOARD DECISION
PBPP-15(6/96)

# COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

### DATE: 11/29/2000

CLIENT NAME: **KEVIN JESSUP**                    PAROLE NO: **496AS**

INSTITUTION: **SCI - COAL TOWNSHIP**             INSTITUTION NO: **CX8799**

AS RECORDED ON 11/29/2000 THE BOARD OF PROBATION AND PAROLE RENDERED THE
FOLLOWING DECISION IN YOUR CASE:

(CONTINUED FROM PAGE 1)
YOU SHALL SUPPORT YOUR DEPENDENTS, IF ANY.
YOU SHALL NOT CONTACT OR ASSOCIATE WITH THE CO-DEFENDANT(S) FOR ANY
REASON--MANDATORY.
YOU SHALL MAINTAIN EMPLOYMENT/VOCATIONAL TRAINING/EDUCATIONAL TRAINING AS
APPROVED BY PAROLE SUPERVISION STAFF.
YOU SHALL ENGAGE IN AN ACTIVE JOB SEARCH DURING ANY PERIOD OF UNEMPLOYMENT AND
PROVIDE VERIFICATION AS DIRECTED BY THE PAROLE SUPERVISION STAFF.
YOU SHALL CONSULT WITH THE COUNTY COLLECTION AGENT WITHIN 72 HOURS OF RELEASE
AND PROVIDE PROOF OF A PLAN FOR PAYMENT OF RESTITUTION AND/OR ANY
COURT-ORDERED FINANCIAL OBLIGATIONS.  YOU SHALL MAKE CONTINUING PAYMENTS ON
RESTITUTION AND/OR ANY OTHER COURT-ORDERED FINANCIAL OBLIGATIONS.
YOU SHALL NOT HAVE CONTACT WITH VICTIM(S), OR VICTIM'S FAMILIES INCLUDING
CORRESPONDENCE, TELEPHONE CONTACT OR COMMUNICATION THROUGH THIRD
PARTIES--MANDATORY.
YOU SHALL BE PLACED ON CURFEW RESTRICTIONS FOR 90 DAYS AFTER CCC AND DURING
PERIODS OF UNEMPLOYMENT.
REMOVAL OR TERMINATION FROM THE COMMUNITY CORRECTION CENTER FOR ANY REASON
OTHER THAN SUCCESSFUL COMPLETION IS A VIOLATION OF YOUR PAROLE.
YOU SHALL PARTICIPATE IN ENHANCED SUPERVISION FOR A MINIMUM OF 6 MONTHS AFTER

(CONTINUE ON PAGE 3)

CC: DISTRICT ATTORNEY

*Kathleen Zwierzyna*

KATHLEEN ZWIERZYNA
BOARD SECRETARY

**INSTITUTION**

NOTICE OF BOARD DECISION
PBPP-15(6/96)

## COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

### DATE: 11/29/2000

| | |
|---|---|
| CLIENT NAME: **KEVIN JESSUP** | PAROLE NO: **496AS** |
| INSTITUTION: **SCI - COAL TOWNSHIP** | INSTITUTION NO: **CX8799** |

AS RECORDED ON 11/29/2000 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

(CONTINUED FROM PAGE 2)
CCC--MANDATORY.
POSSESSION OF FIREARMS, AMMUNITION OR WEAPONS OF ANY KIND IS A DIRECT VIOLATION OF PAROLE AND WILL RESULT IN IMMEDIATE ARREST--MANDATORY.

YOU SHALL PAY A MONTHLY SUPERVISION FEE OF $25.00 TO THE PAROLE BOARD WHEN UNDER SUPERVISION WITHIN THE COMMONWEALTH OF PENNSYLVANIA (ACT 35 OF 1991).

WHEN RELEASED TO THE COMMUNITY YOU MUST REPORT IN PERSON TO THE DISTRICT OFFICE OR SUB OFFICE WITHIN 24 HOURS (MONDAY THROUGH FRIDAY) BETWEEN THE HOURS OF 8:30 A.M. - 5:00 P.M.

MAX. 01-26-2007.
*SLR 11-29-2000*

CC: DISTRICT ATTORNEY

*Kathleen Zwierzyna*

KATHLEEN ZWIERZYNA
BOARD SECRETARY

INSTITUTION

NOTICE OF BOARD DECISION
PBPP-15(6/96)

## COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE



### DATE: 03/14/2002

02 MAR 20  PM 12: 51

CLIENT NAME:  **KEVIN JESSUP**                    PAROLE NO:  **496AS**
INSTITUTION:  **SCI - GRATERFORD**          INSTITUTION NO:  **CX8799**

AS RECORDED ON **03/14/2002** THE BOARD OF PROBATION AND PAROLE RENDERED THE
FOLLOWING DECISION IN YOUR CASE:

REFER TO BOARD ACTION OF 10/24/2001 TO DETAIN PENDING DISPOSITION OF CRIMINAL
CHARGES; AND NOW -

RECOMMIT TO A STATE CORRECTIONAL INSTITUTION AS A TECHNICAL PAROLE VIOLATOR TO
SERVE 18 MONTHS BACKTIME, WHEN AVAILABLE.

-  18 MONTHS FOR MULTIPLE TECHNICAL PAROLE VIOLATIONS.
-  CONDITION #2, CHANGE OF RESIDENCE WITHOUT PERMISSION.
-  CONDITION #7, (2 COUNTS).
   -  COUNT 1, FAILURE TO SUCCESSFULLY COMPLETE COMMUNITY PAROLE CENTER PROGRAM
AT VOLUNTEERS OF AMERICA.
-  COUNT 2, POSSESSION OF CELL PHONE.
EVIDENCE RELIED ON:  YOUR ADMISSION.  DOCUMENTED PBPP FORM.
REASONS:  EARLY FAILURE ON PAROLE.  DECLARED DELINQUENT BY THE BOARD.
VIOLATIONS ESTABLISHED.

WHILE CONFINED, YOU MUST COMPLY WITH THE INSTITUTION'S PRESCRIPTIVE PROGRAM
REQUIREMENTS AND HAVE NO MISCONDUCTS.
YOU MUST PARTICIPATE IN DRUG AND ALCOHOL COUNSELING.

(CONTINUE ON PAGE 2)

CC: PUBLIC DEFENDER

**ADVANCE COPY FOR D.O.C.
NOT FOR DISTRIBUTION TO INMATE**

Rec Sup
**INSTITUTION**
SCI-G

Kathleen Zwierzyna

**KATHLEEN ZWIERZYNA
BOARD SECRETARY**

NOTICE OF BOARD DECISION
PBPP-15(6/96)

## COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

### DATE: 03/14/2002

CLIENT NAME: **KEVIN JESSUP**                           PAROLE NO: **496AS**

INSTITUTION: **SCI - GRATERFORD**                  INSTITUTION NO: **CX8799**

AS RECORDED ON **03/14/2002** THE BOARD OF PROBATION AND PAROLE RENDERED THE
FOLLOWING DECISION IN YOUR CASE:

(CONTINUED FROM PAGE 1)

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR
ADMINISTRATIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER.
THIS REQUEST SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR
THE ALLEGATIONS.   SEE 37 PA CODE SEC. 73.   YOU HAVE THE RIGHT TO AN
ATTORNEY IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH
COURT.                    DATE MAILED: MAR 1 9 2002

(H.R. 1/9/2002  -  MR 3/14/2002)

CC: PUBLIC DEFENDER

INSTITUTION

*Kathleen Zwierzyna*

KATHLEEN ZWIERZYNA
BOARD SECRETARY

FORM  DC-23B

# SENTENCE STATUS
# CHANGE REPORT

## COMMONWEALTH OF PENNSYLVANIA

### DEPARTMENT OF CORRECTIONS

| INSTITUTIONAL NUMBER | PBP  NUMBER | COMMITMENT NAME | INSTITUTION | DATE OF REPORT |
|---|---|---|---|---|

**A SENTENCE STATUS CHANGE REPORT IS SUBMITTED ON THE ABOVE INMATE, AS INDICATED BY THE CHECKED SECTION (S)**

☐ 1.  THE SENTENCE WHICH THIS INMATE IS CURRENTLY UNDERGOING IS AS FOLLOWS:

| SENTENCE | EFFECTIVE DATE | EFFECTIVE DATE-PV | MINIMUM DATE | MAXIMUM DATE | BACKTIME IF PV | PV MAXIMUM DATE |
|---|---|---|---|---|---|---|

| OFFENSE (S) | COURT — INDICTMENT NUMBER — TERM |
|---|---|

| COUNTY | REMARKS |
|---|---|

☐ 2.  THE SENTENCE WHICH THIS INMATE IS CURRENTLY UNDERGOING IS CHANGED AS FOLLOWS:

| TYPE OF CHANGE | ☐ OVERLAPPING CONCURRENT SENT. | ☐ UNDERLAPPING CONCURRENT SENT. | ☐ RECONSIDERED SENTENCE | ☐ CORRECTED COMMITMENT | ☐ COMMUTED SENTENCE | ☐ RECOMPUTED SENTENCE |
|---|---|---|---|---|---|---|

| SENTENCE | EFFECTIVE DATE | EFFECTIVE DATE-PV | MINIMUM DATE | MAXIMUM DATE | BACKTIME IF PV | PV MAXIMUM DATE |
|---|---|---|---|---|---|---|

| PROSECUTING POLICE DEPARTMENT | JUDGE | DATE OF SENTENCE | PLEA | ESCAPE TIME |
|---|---|---|---|---|

| OFFENSE (S) | COURT — INDICTMENT NUMBER — TERM |
|---|---|

| COUNTY | REMARKS |
|---|---|

☐ 3.  FOLLOWING COMPLETION OF THIS INMATE'S CURRENT SENTENCE, HE WILL BE REENTERED TO SERVE THE FOLLOWING:

| SENTENCE | JUDGE | DATE OF SENTENCE | PLEA | REENTER AT |
|---|---|---|---|---|

| OFFENSE (S) | COURT — INDICTMENT NUMBER — TERM |
|---|---|

| COUNTY | REMARKS |
|---|---|

☐ 4.  A DETAINER HAS BEEN LODGED AGAINST THIS INMATE AS FOLLOWS: (PLEASE SEE OVER)

| FROM (INCLUDING ADDRESS) | CHARGING |
|---|---|

| DETAINER DATE | INDICTMENT-WARRANT NOS. | REMARKS |
|---|---|---|

☐ 5.  A DETAINER PREVIOUSLY LODGED AGAINST THIS INMATE HAS BEEN DROPPED AS FOLLOWS:

| FROM (INCLUDING ADDRESS) | CHARGING |
|---|---|

| DETAINER DATE | INDICTMENT-WARRANT NOS. | METHOD OF DISPOSITION | REMARKS |
|---|---|---|---|

☐ 6.  YOUR APPLICATION FOR COMMUTATION HAS BEEN REVIEWED BY THE BOARD OF PARDONS, AND IT WAS:

| ☐ GRANTED -- SEE SECTION #2 ABOVE | ☐ CONTINUED | ☐ REFUSED |
|---|---|---|
| ☐ HELD UNDER ADVISEMENT | ☐ WITHDRAWN | ☐ PASSED |

☐ 7.

**EXHIBIT**

| RECORD OFFICER'S SIGNATURE | RECORD OFFICER'S NAME |
|---|---|

DISPOSITIONS UNREPORTED HAVE BEEN CHECKED

As per Policy 11.5.1-7 this inmates file has been checked and all dispositions have been researched as of:

| Date | Comments | Signature of Records Personnel |
|------|----------|-------------------------------|
| 9.16.8 | all accounted for | *signature* |
| 6/21/10 | all dispositions accounted for | *signature* |
| 3/19/11 | all dispositions accounted for | *signature* |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

***Please note that this date is only current if after the date of the current RAP sheet.

rwr



EXHIBIT
Kildrd-40

DEF001165

## DISSEMINATION SHEET

INMATE NAME (Last, First) _Jessup, Kevin_   DC# _CX 8799_

| DATE OF DISSEMINATION | NAME OF PERSON REQUESTING INFORMATION (Last, First) | TITLE/AGENCY OF PERSON REQUESTING INFORMATION | REASON FOR DISSEMINATION OF INFORMATION |
|---|---|---|---|
| 8.2.99 | UNIT MANAGER   BLOCK | DOC | COUNSELING |
| 9.16.99 | Kaskie - UM | DOC | 2R/1C |
| 1/26/00 | Kaskie - UM | E block | " |
| 7.18.01 | Macaluso | Records | Release |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

*DISSEMINATION OUTSIDE THE DOC SHOULD INCLUDE THE ADDRESS OF THE RECEIVING AGENT/AGENCY.



EXHIBIT

Kodach-41

1168

## Department Release Checklist

| Inmate Name:  Jessup, Kevin | Method of Release: US Marshals |
|---|---|
| Inmate Number:  CX-8799 | Date of Release: 07/19/07 |

### Section 1 - Mandatory Procedures

| Check Box | Review the DC-15 Inmate Record Jacket as Follows: |
|---|---|
| X | The DC-16D looking for concurrent county, out of state, and federal sentences. |
| X | The DC-16D detainer section for active detainers. |
| X | The DC-16D for current offenses that qualify for DNA registration.  **Drawn:** 06/02/03 |
| X | The DC-16D and completed criminal history (PA, RAP, and NCIC) for offenses that require Megan's law registration. If the inmate is a parolee, you must ensure that the facility Parole Representative has registered the inmate for current and past offenses that qualify. If the inmate is SC, the Record's Office must register the inmate for past offenses that qualify. |
| X | Review the entire legal section to include ATA orders for possible open charges, sentence structures and that it is correct, and PBPP recommitment forms (PBPP-39, PBPP-141, warrant to commit and detain with attachments for possible open charges, the release of the warrant to commit and detain). |
| X | Review the complete criminal history for outstanding charges. A Wanted Inquiry (WQ) must be run the last working day prior to discharge |

### Section 2 - Release to Bail

| | Complete all Mandatory Procedures in Section 1, above. |
|---|---|
| | The inmate will not be released without a certified court order allowing bail, an order setting bail, and a signed receipt that bail was paid. It is mandatory that you check with the District Attorney's Office to inquire as to whether they are going to appeal the bail order. |

### Section 3 - Transfer to Community Corrections

| | Complete all Mandatory Procedures in Section 1, above. |
|---|---|
| | Ensure there is an approved Transfer Petition. |

### Section 4 - Transfer to County Facility

| | Complete all Mandatory Procedures in Section 1, above. |
|---|---|

### Section 5 - Release to Parole

| | Complete all Mandatory Procedures in Section 1, above. |
|---|---|
| | Review Parole/Re-Parole orders to ensure that all active indictments are listed, that they are correctly listed, the correct county is shown, and to double-check the release date. |

### Release to Final Discharge Maximum Expires (FDME)

| | Complete all Mandatory Procedures in Section 1, above. |
|---|---|

This is to verify the above listed mandatory actions were completed.

Kristi S Marahan, RSI                          Michelle Chalvk  7/18/07
Records Specialist Signature                   Records Supervisor Signature

### Section 6 - ACT 84 Information Requirements
#### Transfer to County Facility

| Record of facility adjustment (include misconduct and escape history). | Completed On: | |
|---|---|---|
| Written notice of current medical or psychological conditions requiring treatment (include suicide attempts). | Medical Notified On: | Received: |
| Written notice of current or previously ordered/administered medications. | Medical Notified On: | Received: |
| A forty-eight hour supply of medications | Medical Notified On: | |

#### Release to Parole

| Record to the PBPP of any monies paid by the inmate and any balance remaining towards satisfaction of restitution or any other court ordered financial obligations. | Business Office Notified On: | Received: |
|---|---|---|
| Packet that contains the following (unless previously supplied with 13A). | | |
|     Record of facility adjustment (include misconduct an escape history). | | |
|     Official version of crime (if available). | | |
|     Preliminary hearing transcript or docket transcript form (if available). | | |
|     Police report summarizing facts of the crime. | | |
|     PSI (if available). | | |
|     Guilty plea transcript or colloquy (if available). | | |
|     Criminal complaint, affidavit, or probable cause accompanying the arrest warrant. | | |
|     Guideline Sentence Form issued by the PA Sentencing Commission. | | |

#### Sentence Complete (SC)

| Record to PBPP of any monies paid by the inmate and any balance remaining towards satisfaction of restitution or any other court ordered financial obligations. | Business Office Notified On: | Received: |
|---|---|---|

Notes/Comments:

_____ DA Letter sent for Max Cases   _____ Release Notification Memo



EXHIBIT
Kobach - 42

*Attachment 2-A*
DEF001057

TRANSMISSION VERIFICATION REPORT

TIME : 07/29/2009 08:2!
NAME :
FAX :
TEL :

| | |
|---|---|
| DATE,TIME | 07/29 08:21 |
| FAX NO./NAME | 9--1412442E850 |
| DURATION | 00:04:03 |
| PAGE(S) | 09 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

Kodach 43



DEF001034

## Department Release Checklist

| Inmate Name:  JESSUP, Kevin | Method of Release:  BUS |
|---|---|
| Inmate Number:  CX8799 | Date of Release:  7-30-09 |

### Section 1 – Mandatory Procedures

| Check Box | Review the DC-15 inmate Records Jacket as follows: |
|---|---|
| X | The DC-16D looking for concurrent county, out of state, and federal sentences. |
| X | The DC-16D detainer section for active detainers. |
| X | The DC-16D for current offenses that qualify for DNA registration  Drawn 6-2-2003 |
| X | The DC-16D and completed criminal history (PA, RAP, and NCIC) for offenses that require Megan's Law registration. If the inmate is a parolee, you must ensure that the facility Parole Representative has registered the inmate for current and past offenses that qualify and completed the Change of Address form for registered sexual offender's. If the inmate is SC, the records office must register the inmate for past offenses that qualify. |
| X | Review the entire legal section to include ATA orders for possible open charges, sentence structures and that it is correct, the PBPP recommitment forms (PBPP-39, PBPP-141, warrant to commit and detain with attachments for possible open charges, the release of the warrant to commit and detain). |
| X | Review the complete criminal history for outstanding charges. A Wanted Inquiry must be run the last working day prior to discharge. |

### Section 2 – Release to Bail

| | |
|---|---|
| | Complete all Mandatory Procedures in Section 1 above. |

### Section 3 – Transfer to Community Corrections

| | |
|---|---|
| | Complete all Mandatory Procedures in Section 1 above. |
| | Ensure there is an approved Transfer Petition. |

### Section 4 – Transfer to County Facility

| | |
|---|---|
| | Complete all Mandatory Procedures in Section 1 above. |

This is to verify the above listed mandatory actions completed

| _Heather Durlet_   7-29-09 | _Michelle Rodak_   7/30/09 |
|---|---|
| Records Specialist Signature    Date | Records Supervisor Signature    Date |

### Section 5 – Release to Parole

| X | Complete the following Mandatory Procedures found in Section 1 above within six working days of receiving the request for urinalysis from the Facility Parole Representative. |
|---|---|
| X | The DC-16D looking for concurrent county, out of state, and federal sentences. |
| X | The DC-16D detainer section for active detainers. |
| X | The DC-16D for current offenses that qualify for DNA registration.  Drawn 6-2-2003 |
| X | Review the entire legal section to include ATA orders for possible open charges, sentence structures and that it is correct, and PBPP recommitment forms (PBPP-39, PBPP-141, warrant to commit and detain with attachments for possible open charges, the release of the warrant to commit and detain). |
| X | Review the complete criminal history for outstanding charges to include running a QW |

This is to verify the above listed mandatory actions were completed

| _Heather Durlet_   7-29-09 | _Michelle Rodak_   7/30/09 |
|---|---|
| Records Specialist Signature    Date | Records Supervisor Signature    Date |

| | Review Parole/ReParole orders to ensure that all active indictments are listed, that they are correctly listed, the correct county is shown, and to double-check the release date. |
|---|---|

EXHIBIT
Kodak-44

26

| Form DC-135A | Commonwealth of Pennsylvania |
|---|---|
| **INMATE'S REQUEST TO STAFF MEMBER** | Department of Corrections |

**INSTRUCTIONS**

Complete items number 1-8.  If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

*RecorDS*

| 1. To: (Name and Title of Officer) *Ms. KodAck* | 2. Date: *5/18/09* |
|---|---|
| 3. By: (Print Inmate Name and Number) *Kevin Jessup cx-8799* | 4. Counselor's Name *FoulDS* |
| _Inmate Signature_ | 5. Unit Manager's Name *Dunn* |
| 6. Work Assignment *GLP* | 7. Housing Assignment *B2 26* |

8. Subject: State your request completely but briefly.  Give details.

Can you please scHeDule me talk to you or Someone in RecorDS conceRning my Total time Spent incarcerated at this institution I believe there is An eRRoR in my Sentence calculation.
Thanks
Kevin Jessup cx-8799

IF YOU NEED ANSWERS FOR TIME FROM YOUR TCV YOU WILL NEED TO TALK TO PAROLE. WE HAVE NOTHING TO DO WITH THERE CALCULATIONS.  AS FOR YOUR ORIGINAL SENTENCE IT WOULD'VE HAD TO BE RIGHT BEFORE YOU WERE PAROLED.

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name _DHERBST_ , _DHerbst_ Date _5-19-09_
            Print             Sign

Revised July 2000

*Kodack-45*

**EXHIBIT**
Dunn-4

| Form DC-135A  **INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania Department of Corrections |
|---|---|

Superintendents Ascarani

**1.   To: (Name and Title of Officer)**
Ms. DASCANI

**3.   By: (Print Inmate Name and Number)**
Kevin Jessup  cx-8799

_____
Inmate Signature

**6.   Work Assignment**
GLIP

**2.   Date:**
5/11/09

**4.   Counselor's Name**
FOULDS

**5.   Unit Manager's Name**
DUNN

**7.   Housing Assignment**
B2   26

**8.   Subject: State your request completely but briefly. Give details.**

I have not gotten a response back from the grievance I filed on 5/5/09 regarding on 5/5/09 Grievance No. # 271957 in regards to my time credit issue. I have been in the custody of S.C.I. correctionMillo from sept 26 2002 until July 13,2004 and have been receiving I have copies of the same reason I am now requesting credit for any of those years spent in state custody. Records office will verify that I have in fact been detained on parole violators since Sept 26,2001 I am now well over my max date and should be incorrectly released. My attorney has sent Mr. Varano a letter verifying this matter but no action was taken.

Your grievance was responded to on 5/20/09 by Mr. Kodak.

DEPOSITION EXHIBIT
Kodack 44

To DC-14 CAR only ☐          To DC-14 CAR and DC-15 IRS ☐

**Staff Member Name** KKDascani , KKDascani   **Date** 5/29/09
Print                    Sign

Revised July 2000

cc: Kevin Jessup  cx-8799

DEF000565