# EXHIBIT D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAMON CHAPPELLE,                    :
                    Plaintiff
                                    :

       vs.                          :

                                    :

DAVID VARANO, SUPERINTENDENT,
SCI-COAL TOWNSHIP; MICHELLE    :   NO. 11-0304
KODACK, RECORDS SUPERVISOR,
SCI-COAL TOWNSHIP; DEBORAH     :
HERBST, RECORDS SPECIALIST,
SCI-COAL TOWNSHIP; MR. DUNN, :
UNIT MANAGER, SCI-COAL
TOWNSHIP; MS. FOULDS,          :
COUNSELOR, SCI-COAL TOWNSHIP,
                    Defendants :


Deposition of: DEBORAH HERBST

Taken by       : Plaintiff

Before         : Faith A. Culp
                 Reporter-Notary Public

Beginning      : July 6, 2012; 9:52 a.m.

Place          : SCI-Coal Township
                 1 Kelley Drive
                 Shamokin, Pennsylvania


COUNSEL PRESENT:

    JENNIFER J. TOBIN, ESQUIRE
    718 Arch Street, Suite 304 South
    Philadelphia, Pennsylvania  19106
       For - Plaintiff


ERVIN BLANK ASSOCIATES, INC.

2

```
 1   COUNSEL PRESENT (continued):

 2       TIMOTHY P. KEATING, ESQUIRE
         Senior Deputy Attorney General
 3       Pennsylvania Office of Attorney General
         Litigation Section
 4       15th Floor, Strawberry Square
         Harrisburg, Pennsylvania  17120
 5            For - Defendants

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

INDEX TO WITNESSES

| FOR - PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Deborah Herbst | 5 | 117 | 126, 128 | 127,128 |

4

INDEX TO EXHIBITS

| FOR - PLAINTIFF | MARKED | ADMITTED |
|---|---|---|
| Herbst Exhibit No. 1 | 17 | -- |
| Herbst Exhibit No. 2 | 25 | -- |
| Herbst Exhibit No. 3 | 46 | -- |
| Herbst Exhibit No. 4 | 52 | -- |
| Herbst Exhibit No. 5 | 88 | -- |
| Herbst Exhibit No. 6 | 90 | -- |
| Herbst Exhibit No. 7 | 91 | -- |
| Herbst Exhibit No. 8 | 92 | -- |
| Herbst Exhibit No. 9-A | 94 | -- |
| Herbst Exhibit No. 9-B | 96 | -- |
| Herbst Exhibit No. 10 | 97 | -- |
| Herbst Exhibit No. 11 | 100 | -- |
| Herbst Exhibit No. 12 | 103 | -- |
| Herbst Exhibit No. 13 | 105 | -- |
| Herbst Exhibit No. 14 | 107 | -- |
| Herbst Exhibit No. 15 | 111 | -- |
| Herbst Exhibit No. 16 | 113 | -- |
| Herbst Exhibit No. 17 | 113 | -- |
| Herbst Exhibit No. 18 | 114 | -- |

5

```
 1              STIPULATION
 2          It is hereby stipulated by and between
 3   counsel for the respective parties that sealing,
 4   certification and filing are hereby waived; and that
 5   all objections except as to the form of the question
 6   are reserved to the time of trial.
 7
 8                  *       *       *
 9
10          DEBORAH HERBST, called as a witness, having
11   been duly sworn or affirmed, testified as follows:
12              DIRECT EXAMINATION
13   BY MS. TOBIN:
14       Q   Good morning, Ms. Herbst.  Am I saying that
15   correctly?
16       A   Herbst, yes.
17       Q   My name's Jennifer Tobin.  I'm the lawyer for
18   the Plaintiff in this case, Damon Chappelle.  And I'm
19   just going to go over some brief instructions on how
20   the deposition will go today.
21          Have you ever had a deposition taken before?
22       A   No.
23       Q   Okay.  So a deposition is essentially a
24   question and answer session.  And in order for the
25   record to be clear at the end of the deposition, there
```

6

1  will be a typed transcript with all of the words that
2  I say and all of the words that you say on a piece of
3  paper, on a transcript.

4       In order for that to be clear, the first rule
5  of depositions is for you to please wait until I'm
6  done asking a question before you start with your
7  answer.  It just makes it easier for everyone to read
8  the transcript later.  And I will also try to abide by
9  the same rule.  And sometimes we're human so we forget
10 that.  And if you do that, that's fine.

11      The other deposition -- main thing about a
12 deposition is that all of your answers need to be
13 vocal.  So instead of nodding your head or shaking
14 your head, if you could give a yes or a no.
15 Something that the court reporter, Ms. Culp, can hear
16 so that she can type it down.  Does that make sense?

17      A    Yes.

18      Q    Okay.  If you don't remember something, it's
19 perfectly fine to say that.  Just that's an adequate
20 answer.  If you are approximating an answer, let me
21 know this is an approximation.

22      If you answer the question that I ask, I'm
23 going to assume that you understood the question.  So
24 if you don't understand a question, if it's unclear to
25 you in any way, let me know and I'll rephrase it.  I

7

1   want to ask questions that you're able to understand

2   and then answer.  Does that make sense?

3       A   Yes.

4       Q   Okay.  Other thing is if you need to take a

5   break for any reason, just let me know.  We are not

6   going to be incredibly long today.  I imagine it'll

7   take some time to ask all the questions I need to and

8   we may break for lunch.  But if you need a break other

9   than that, let me know.  All I ask is that you answer

10  the question that's pending before we take the break.

11      A   Okay.

12      Q   Are you taking any medications today that

13  would affect your ability to answer my questions

14  completely and truthfully?

15      A   No.

16      Q   Any other reason you can think of that you

17  wouldn't be able to answer my questions completely and

18  truthfully?

19      A   No.

20      Q   Okay.  I understand that you're retired from

21  your position at Coal Township?

22      A   Yes.

23      Q   When did you retire?

24      A   5/28/09.

25      Q   Okay.  And what was the position from which

8

1  you retired?

2      A    Records specialist two.

3      Q    Okay.  How long were you in that position?

4      A    I'm not quite sure when I was made a two.  I

5  was a one when I came here.

6      Q    When did you start?

7      A    October '09 -- I mean '06.  Sorry.

8      Q    Okay.  So October '06 you started as a

9  records specialist one?

10      A    Yeah.

11      Q    And then do you have an idea of how long you

12  were a one before you were promoted?

13      A    I think you need to be a one for a year

14  before they put you in the two position.  But I'm not

15  quite sure when I was made a two.

16      Q    Okay.  Did your job duties change radically

17  from going from a one to a two?

18          MR. KEATING:  Objection to the question.

19  What do you mean by radically?

20  BY MS. TOBIN:

21      Q    Did your job duties change at all going from

22  a records specialist one to a records specialist two?

23      A    Only thing between a one and a two is I

24  picked up a caseload.

25      Q    And when you were a records specialist one,

9

1  you didn't have a caseload?

2      A   No.  I was doing inside work going in doing

3  photos, things like that.  Checking the new charts.

4      Q   And when you picked up a caseload, does that

5  mean that you were responsible for a certain number of

6  files?

7      A   Yes.

8      Q   And those were inmate files?

9      A   Yes.

10     Q   Okay.  When you picked up the caseload for

11 the first time, approximately how many inmate files

12 were you responsible for?

13     A   I have no idea.  I don't remember how many it

14 was.  I had three numbers, but I don't remember how

15 many.

16     Q   When you say you had three numbers?

17     A   I had seven, eight, and nine.  The inmate

18 numbers ended in a seven, eight or nine, but I don't

19 know how many that would have been.

20     Q   Okay.  How many other records specialist twos

21 were with you at the time you became a records

22 specialist two?

23     A   I know of two.  I don't know.  I think that

24 was it, just two.

25     Q   And so the three of you had a caseload that

ERVIN BLANK ASSOCIATES, INC.

10

```
 1    consisted of all the inmates at the institution?

 2         A    Yes.

 3         Q    Okay.  So you split them up evenly?

 4         A    Pretty much so, yeah.

 5         Q    Before you started in October of '06 as a

 6    records specialist one, had you worked in the

 7    Pennsylvania DOC prior?

 8         A    Yeah.  I worked at Camp Hill.

 9         Q    What did you do at the --

10         A    I worked at the central records where all the

11    new inmates' records were done.

12         Q    When did you start that job?

13         A    April of '06.

14         Q    And what was your title there?

15         A    Records specialist one.

16         Q    And what were your duties at the central

17    records office?

18         A    We just got the new charts and put everything

19    in the system of the new inmates that came into the

20    system.

21         Q    Is that the process of putting it into the

22    computer system?

23         A    Yes.

24         Q    And prior to April of '06, had you worked at

25    DOC?
```

ERVIN BLANK ASSOCIATES, INC.

1    A    No.

2    Q    Could you give me a brief overview of your

3    jobs that you've had, professional jobs after high

4    school?

5    A    I worked for the state police CLEAN center

6    and then I had part-time jobs before I started working

7    for the Department of Welfare at the Selinsgrove

8    Center.

9    Q    I didn't catch that.  At the where?

10   A    Selinsgrove Center.

11   Q    And that was the state Department of Welfare?

12   A    Yes.

13   Q    What did you do for them?

14   A    I was an aide there.  I took care of the

15   individuals that lived there.

16   Q    And that was in Selinsgrove?

17   A    Um-hum.

18   Q    Can you describe who lived there?

19   A    People with mental problems.

20   Q    And when you worked for the state police

21   CLEAN center, what was your job there?

22   A    Mostly I took care of -- I worked in the

23   computer center where if anyone was having problems

24   with their terminal, we would call and see what was

25   wrong and see if we could get them back working.

12

1    Q    And then after the Department of Welfare^--
2  roughly what time period was the Department of Welfare
3  job?

4    A    I started December of '85 until I transferred
5  to the DOC.

6    Q    '85 to 2006?

7    A    Um-hum.

8         MR. KEATING:  You have to say yes or no.  You
9  can't just say um-hum.

10        THE WITNESS:  Yes.  Sorry.

11  BY MS. TOBIN:

12   Q    Thank you.  And then how long were you at the
13  CLEAN center prior to the Department of Welfare?

14   A    About two years.

15   Q    Did you graduate from high school?

16   A    Yes.

17   Q    And did you get -- have any post high school
18  education?

19   A    Yes.

20   Q    What was that?

21   A    I went to HACC.  I have an associate's degree
22  in police administration.

23   Q    And I'm sorry.  I missed that.  Where did you
24  go?

25   A    HACC.

ERVIN BLANK ASSOCIATES, INC.

1        MR. KEATING:  Harrisburg Area Community

2   College.

3        THE WITNESS:  Harrisburg Area Community

4   College.  Sorry.

5        MR. KEATING:  H-A-C-C.

6        MS. TOBIN:  Thank you.

7   BY MS. TOBIN:

8   Q    When did you get that?

9   A    '72.

10  Q    And do you have a job now in your retirement?

11  A    I have a part-time job, yes.

12  Q    What is that?

13  A    I'm a merchandiser for American Greetings.

14  Q    Is that the card company?

15  A    Yes.

16  Q    Why did you retire?

17  A    Tired of driving 61 and working full time.

18  Q    Are you enjoying it?

19  A    Yes, I am.

20  Q    I'm going to get a little bit into your job

21  here as a records specialist.  Can you describe for me

22  what your main duties were as a records specialist

23  two?

24  A    We just took care of the charts, made sure

25  the legal work was done.  If the inmates had any

14

1 requests, we took care of them.  We watched to see

2 when their maxes or mins were coming up.  If they were

3 put on parole, they were left out on parole, we took

4 care of all of that.  Whatever paperwork needed to be

5 done before they were released, we had to do.

6      Q    And when you say you took care of the charts,

7 what are the charts?

8      A    The inmates' files with all their paperwork

9 in.

10     Q    Is that also called a DC-15?

11     A    Yeah.  I don't remember that kind of stuff.

12          MR. KEATING:  If you don't remember, the

13 answer is I don't remember.  You don't have to just go

14 ahead and agree with everything.  Just think about

15 what the question is and try to answer.

16          THE WITNESS:  Yeah.

17 BY MS. TOBIN:

18     Q    So the chart is the whole file?

19     A    The whole thing, yes.

20          MR. KEATING:  You also have to let her finish

21 the question before you answer.

22          THE WITNESS:  Sorry.

23          MR. KEATING:  I know.  It's normal.  Very

24 normal.

25 BY MS. TOBIN:

15

```
 1      Q    So you were responsible for putting papers
 2  into the files or the charts as you say?
 3      A    Yes.  If it was something that came in, we
 4  took care of it.
 5      Q    Were you also responsible for keeping track
 6  of what papers were in the files?
 7      A    Not necessarily, no.  I mean there was stuff
 8  in there that was in there before I started here.  I
 9  don't know who was responsible for that.
10      Q    And you took care of inmate -- you said
11  inmate requests?
12      A    Sometimes they sent back asking for
13  information on different things and we answered them
14  best we could.
15      Q    And you monitored their max and min dates.
16  How did you do that?
17      A    Mostly their max.  We had a -- there was a
18  system in the computer that said who was up for max
19  dates.
20      Q    And so how did you as a records specialist
21  two monitor that?
22      A    We checked it to see who was coming up for
23  max dates and we'd do what we had to do to take care
24  of it.
25      Q    You would look on a computer screen?
```

16

1    A    Yeah.  Yes.

2    Q    How often would you do that?

3    A    I don't remember how often we did it.

4    Q    Was there a procedure that you followed for
5 checking on max and min dates?

6    A    I don't know if there was a system for that
7 or not.  We just -- you know.

8    Q    How did you learn how to do that?  How did
9 you learn that that was part of your job?

10    A    Someone explained it to me.

11    Q    And so you had some kind of training?

12    A    Yes.

13    Q    Who gave you your training?

14    A    Mostly Michelle and if I had a lot of
15 questions, I asked Chris.  She's been there for a
16 while.

17    Q    And so you mean Michelle Kodack?

18    A    Yes.

19    Q    Okay.  And who's Chris?

20    A    Chris she's one of the ladies that works over
21 in the office.

22         MR. KEATING:  Do you know her last name?

23         THE WITNESS:  Phobia (phonetically).

24 BY MS. TOBIN:

25    Q    Was she also a records specialist?

ERVIN BLANK ASSOCIATES, INC.

```
 1        A     Yes.

 2        Q     Chris Phobia.   Okay.   Did you have any

 3    training on how to do the records specialist job

 4    before you started at Camp Hill in '06?

 5        A     No.

 6        Q     Did your job at Camp Hill in '06 have any

 7    similar duties to your records specialist job at the

 8    institution?

 9        A     Not really.   The only thing would be putting

10    legal stuff into the system.   That was it.

11        Q     Data entry into the computer?

12        A     Right.

13        Q     What kind of things would you put into the

14    computer at Camp Hill?

15        A     Their sentence.   If they had any detainers.

16        Q     And did you also do that duty when you

17    started working at Coal Township as a records

18    specialist?

19        A     Yes.

20        Q     I'm going to show you a document.

21              (Whereupon, a document was produced and

22    marked as Herbst Exhibit No. 1 for identification.)

23    BY MS. TOBIN:

24        Q     I'm showing you what's been marked as Herbst

25    1.   If you could -- you'll see on the first page of
```

18

1  this document there's what looks like the top of a box
2  and the first paragraph in the box says position
3  purpose.  If you could read to yourself, just review
4  that and the following pages, and let me know when
5  you're done.
6       A    Okay.
7       Q    Are you done?
8       A    Yes.
9       Q    Do you recognize the text of this document?
10  Do you know what this is?
11       A    This?
12       Q    Yes.
13       A    This is my job description.
14       Q    Okay.  And this is your description as a
15  records specialist two?
16       A    Yes.
17       Q    Okay.  I'm going to go through just a few
18  things that I have questions about within the job
19  description.
20            Looking at the first paragraph, functions as
21  a records specialist two at SCI-Coal Township and is
22  responsible for the maintenance of the inmate DC-15
23  file.
24            Was there anyone else aside from the records
25  specialist two who was responsible for the maintenance

ERVIN BLANK ASSOCIATES, INC.

19

```
 1  of the file?
 2            MR. KEATING:  The DC-15 file?
 3            MS. TOBIN:  Yes.
 4            MR. KEATING:  That you know.
 5            THE WITNESS:  I don't know.
 6  BY MS. TOBIN:
 7       Q    What did the maintenance -- what does that
 8  mean to you?
 9       A    Just putting in what needed to be put in it.
10  Sometimes people would come in and write stuff in it
11  that^--
12       Q    Did you have to control who would write
13  things in it or could people access the file without
14  going through you?
15       A    They can access the file without going
16  through us.
17       Q    Okay.  Skipping to the next section,
18  description of duties.  The first paragraph, the
19  records specialist two position is assigned to the
20  inmate records office under the direct supervision of
21  the records supervisor.
22            Was Michelle Kodack your records supervisor
23  during the whole time you were a records specialist
24  two?
25       A    No.  Don Young was the supervisor when I
```

ERVIN BLANK ASSOCIATES, INC.

1    first came.

2        Q    And at what point -- do you remember at what

3    point Michelle Kodack became your supervisor?

4        A    No.   Don moved on to a different institution

5    and she got the position.

6        Q    Okay.   Was there anyone else at Coal Township

7    that supervised you in doing your duties?

8        A    No.

9        Q    The next sentence.   This is an advanced,

10   specialized information management and documentary

11   investigative duty position.

12           What does that mean to you?   What does that

13   sentence mean?

14       A    I don't know.

15       Q    Documentary investigative duty.   Does that

16   have any meaning to you?

17       A    Just that I guess if something needed to be

18   looked into, we looked into it.

19       Q    You would look at the documents in the file?

20       A    If we had to.

21       Q    A little further down on that paragraph.   The

22   responsibilities assigned to the records specialist

23   two are the computation and recomputation of state and

24   county sentences imposed by the court system in

25   accordance with the mandates of the court and the

21

1    Commonwealth sentencing rules, regulations and laws,
2    and Department of Corrections policy.
3            What is computation and recomputation of
4    sentences?
5        A    Sometimes when they went out, they got new
6    sentences.  Sometimes.  And then we had to put them in
7    the system.
8        Q    So when you computed a sentence, what did
9    that mean that you had to do?
10       A    We put the new thing -- we put the new
11   sentence in the computer and figured out how long
12   either they had to do time.
13       Q    Would you do -- would you do the math?  Would
14   you do the calculation to compute how long they had to
15   be there or what did you -- you just typed in?
16       A    You just typed in what was done and it
17   automatically took care of it.
18       Q    Would you type in dates then?
19       A    Yes.
20       Q    Okay.  And where would you get those dates
21   from?
22       A    Off the sentencing orders.
23       Q    And where would you get the sentencing
24   orders?
25       A    From the courts.

22

1  Q   And the last part of that -- or the next part
2  rather.  To ensure that inmates are properly committed
3  and confined; analysis and interpretation of court
4  orders and/or supporting documentation to determine
5  appropriate course of action as it relates to imminent
6  release, change in place of confinement or commitment
7  credit, to ensure timely and appropriate presentation
8  for parole consideration or discharge at expiration of
9  maximum sentence.

10      You said you got the court orders, the
11 sentencing orders from the courts.  Did you get
12 sentencing information from any other source apart
13 from courts?

14  A   Not the original sentence, no.

15  Q   And if they got sentenced again, you'd also
16 get that from a court?

17  A   If it was a new one, yeah.

18  Q   What was the supporting documentation in
19 addition to court orders?

20  A   I have no idea.  I don't remember is what I
21 should say.

22  Q   The next sentence, initiate action to obtain
23 additional data or information necessary to reconcile
24 identified discrepancies or inconsistencies in court
25 determination.  What does that mean?

23

1      A    I don't remember what that --

2      Q    What would you do if you discovered an error

3  or a discrepancy?

4      A    I'd check into it.

5      Q    How would you do that?

6      A    Call the courts.

7      Q    And who would you call at the court?

8      A    Usually a court clerk.

9      Q    For the county courts?

10     A    For the counties.

11     Q    Would that resolve the problem?

12     A    Not necessarily.

13     Q    What would your next step be if that didn't

14  resolve the problem?

15     A    I'd go to my supervisor to find out what the

16  next step would be.

17     Q    But you had authority to call the court to

18  try to figure out a problem?

19     A    If there was a problem, we called the court,

20  yes.

21     Q    Would you let your supervisor know that you

22  were calling the court or could you do that on your

23  own?

24     A    If we realized there was a problem, we could

25  do it on our own, yes.

24

1      Q    And if you did that, would there be some kind

2   of notation in the file that you did that?

3      A    Yes.

4      Q    What form would that notation take?

5      A    I don't remember what we used.  But we put a

6   note in the --

7      Q    There would be some kind of --

8      A    Right.  Written.

9      Q    -- written form?  Could you look into -- what

10  other access -- what other information did you have

11  access to if you needed to check on somebody's

12  sentence whether you had the right information?

13     A    I don't remember what we had.  There's a lot

14  of things I don't remember, period.

15     Q    That's a legitimate answer.

16     A    Right.

17     Q    I just need to ask the questions though.

18     A    I know.

19     Q    So the next part, ensure accurate information

20  is maintained in the inmate records system computer

21  and that changes are entered as they occur as a result

22  of sentence recalculation via the DC-23B sentence

23  status change report.

24          Who would do sentence recalculation?  It

25  mentions sentence recalculation there.  Who did that?

25

1  How did that come about?

2      A    I don't -- we did some of it if their

3  sentences were changed.

4      Q    Did anyone else do sentence recalculation

5  besides the records specialist two?

6      A    Parole would have a little bit of say if they

7  came back off parole.

8      Q    Anyone else within the DOC records

9  department?

10     A    No.  Everything came from the courts.

11         MR. KEATING:  No.  No.  No.  I think the

12 question was does anyone in the DOC records department

13 would do sentence recalculations?

14         MS. TOBIN:  Yes.

15         MR. KEATING:  Other than --

16         MS. TOBIN:  Other than a records specialist

17 two.

18 BY MS. TOBIN:

19     Q    For example, could your supervisor do that?

20     A    Yes.

21     Q    Okay.  But a records specialist one could

22 not?  Do you know?

23     A    I don't know.

24     Q    Okay.

25         (Whereupon, a document was produced and

26

1  marked as Herbst Exhibit No. 2 for identification.)

2  BY MS. TOBIN:

3      Q    I'm showing you what was previously marked as

4  Kodack 39 and it's Herbst 2.  Do you recognize that

5  document?

6      A    No.

7      Q    You've never seen this before?

8      A    I probably seen it before, but I don't

9  remember what it is.

10     Q    You don't remember using these?

11     A    No.

12     Q    If you could just take a moment to review,

13 just read it to yourself.  Just review it to yourself

14 and let me know when you're done.  Are you done

15 looking at it?

16     A    Yeah.

17     Q    Do any of the categories of information or

18 the labels on this correspond to doing sentence

19 computations?

20         MR. KEATING:  I'm going to object to that.

21 BY MS. TOBIN:

22     Q    If you understand my question, you can answer

23 it.

24         MR. KEATING:  It's not a question whether she

25 understands or not.  She doesn't recall this at all.

ERVIN BLANK ASSOCIATES, INC.

BY MS. TOBIN:

    Q    For example, let's take a look at section two.

        MR. KEATING:  You're asking her questions about a document that she's testified that she doesn't know what it is and she doesn't recall what it is.

        MS. TOBIN:  I understand that.  But there's some labels and words on this document that she might understand so I'm going to ask her about that.

        MR. KEATING:  I think she understands.  Most of the words are in English.

BY MS. TOBIN:

    Q    For example, overlapping concurrent sentence is a box in section two.  Do you know what an overlapping concurrent sentence is?

    A    Yeah.  He got two sentences and he's doing them at the same time.

    Q    Okay.  And underlapping concurrent sentence is the box next to that.  What is an underlapping concurrent sentence?

    A    That I don't remember.

    Q    Reconsidered sentence?

    A    I don't remember that one either.

    Q    Corrected commitment?

    A    Don't remember that either.

28

 1       Q     Recomputed sentence at the far right?

 2       A     They had to redo his sentence for a reason or

 3  other.

 4       Q     When you say they, do you mean DOC?

 5       A     Could be coming from the court, could be

 6  coming from parole, could be coming from anybody.

 7       Q     When you got information that somebody's

 8  sentence was being changed or they got a new sentence

 9  or they -- something changed to their sentencing, what

10  would you do as a records specialist two?

11       A     Go back in the system and put it in.

12       Q     Would you put that in -- you would do that

13  just directly into the computer?

14       A     Yes.

15       Q     Would you do that on a screen that had the

16  label DC-16E?  Does that sound --

17       A     Yeah.

18       Q     -- familiar?  Would you also --

19             MR. KEATING:  You have to allow her to finish

20  the question before you answer.

21             THE WITNESS:  Sorry.

22  BY MS. TOBIN:

23       Q     Would you also fill out a DC-16E in paper

24  form or would you just type it onto a computer screen?

25       A     It would get printed back out and it would

ERVIN BLANK ASSOCIATES, INC.

29

1   have to go through the supervisor.

2       Q    Okay.  But you don't recall using this DC-23B

3   form?

4       A    No.

5       Q    Going back to the first document, Herbst 1.

6   The last phrase on the top paragraph, as necessary,

7   records office staff meets with inmates to explain

8   complex or multiple sentence status changes.  Did you

9   meet with inmates yourself?

10      A    No.

11      Q    Who met with the inmates?

12      A    I have no idea.  I don't know.

13      Q    This is your job description.

14      A    That's my job description, but I never met

15  with any inmate to talk about his sentencing.

16      Q    Did you sometimes answer inmate request forms

17  about sentencing issues, the papers?

18      A    Yes.

19      Q    But you wouldn't follow-up with an interview?

20      A    No.

21      Q    Is there a reason you didn't meet with them?

22      A    Not that I know of.

23      Q    Did anyone tell you that you couldn't meet

24  with them?

25      A    No.

30

1    Q    Then why -- you don't know why you didn't?

2    A    I never had to.  I don't remember ever

3    meeting with an inmate on any of their sentencing.  If

4    they had any questions on their sentencing, they had

5    to go back to the courts.

6    Q    If they had a question about a sentence

7    calculation, they could ask you though, right?

8    A    They could ask.

9    Q    And would you respond to that?

10   A    I would respond.

11   Q    How would you respond?

12   A    Back in another -- answer his request and

13   send it back to him.

14   Q    In writing?

15   A    In writing.

16   Q    Next paragraph about three lines down.

17   Written contact with court officials when it has been

18   determined that the Department cannot legally honor a

19   court order.

20        When can the Department not legally honor a

21   court order?

22   A    If the min and max aren't right.

23   Q    And how do you know if the min and max aren't

24   right?

25   A    Min has to be at least half his complete

31

1    sentence.

2        Q    And so --

3        A    Or it doesn't have to be but it can't be more

4    than half of his max, the min.  He can get one to

5    something but he can't get -- he can't get six to ten.

6    He can get five to ten.

7        Q    So if you discovered that on a court order,

8    you would call -- you would write to the court or call

9    them?

10       A    We would call.

11            MR. KEATING:  I'm going to object to that

12   question.  You're giving her an either or option to

13   answer that and it's misleading.

14            THE WITNESS:  Actually, that should have been

15   taken care of before we got the court paperwork for

16   them.  Central office should have taken care of that.

17   BY MS. TOBIN:

18       Q    Would you contact central office then?  If

19   you discovered an error, would the central office be

20   your first place to contact?

21       A    They should have taken care of that before we

22   got it.

23            MR. KEATING:  That's not the question.  You

24   have to listen to the question.

25   BY MS. TOBIN:

32

1    Q    If they didn't take care of it, if they

2  missed it and it got to you and you discovered a

3  problem?

4    A    I'd go to Michelle.  I go to the supervisor.

5    Q    The comprehensive review of an inmate's file

6  when processing inmates pending prerelease status,

7  outside clearance, parole or final discharge to

8  include the investigation of all arrests with unknown

9  dispositions.

10       What would you look at during the review of

11  the inmate's file when they're pending prerelease

12  status?

13    A    We just make sure he didn't have any

14  outstanding charges.

15       MR. KEATING:  The question is what would you

16  look at?

17       THE WITNESS:  I would look at his file or we

18  have to do a CLEAN backup on him before we send it

19  out.

20  BY MS. TOBIN:

21    Q    In the file, what documents would you look

22  at?

23    A    I don't remember what we looked at.

24    Q    What types of information -- you mentioned

25  earlier you wanted to make sure he didn't have any

33

1  outstanding arrests?

2      A    We ran a rap sheet on him on the CLEAN

3  system.

4      Q    To see if he didn't have any pending charges?

5      A    Right.

6      Q    What would you look at if he was pending

7  parole or final discharge?

8      A    We'd have to -- he'd have to go to parole if

9  he was pending parole.

10         MR. KEATING:  The question is what would you

11  look at in the file if the inmate was pending -- the

12  question is what would you look at in the file if he

13  were pending parole release?  Is that the question?

14         MS. TOBIN:  Or final discharge.

15         THE WITNESS:  I don't remember what we looked

16  at.

17  BY MS. TOBIN:

18     Q    This mentions the investigation of arrests

19  and unknown dispositions.  Is that what you referred

20  to as the rap sheet?

21     A    Yes.

22     Q    And is that something that comes -- how do

23  you access the rap sheet?

24     A    Through the CLEAN system.

25     Q    And is the -- what is the CLEAN system?

34

1      A    Commonwealth Law Enforcement Assessment

2  Network.

3      Q    And that's where you used to work?

4      A    Yeah.

5      Q    So what kind of information did you get at

6  the CLEAN -- through the CLEAN system?

7      A    All their arrests.

8      Q    And were you -- did you also have access to

9  their convictions through the CLEAN system?

10      A    That I don't remember.

11      Q    Could you access other sources of information

12  to find out what their convictions were?

13      A    I don't remember that either.

14      Q    What about other sources besides their file

15  to find out what their sentences were?

16      A    I can't recall what we looked at.

17      Q    Through independent analysis of presentence

18  investigation reports.  What does that mean?

19      A    I don't know.

20      Q    Do you know what a presentence investigation

21  report is?

22      A    No.

23           MR. KEATING:  Where are we at on this?

24           MS. TOBIN:  We're on the second paragraph.

25  BY MS. TOBIN:

ERVIN BLANK ASSOCIATES, INC.

35

1      Q   Did you have -- it mentions the National

2  Crime Information Center.  Did you have access to

3  NCIC?  Was that part of the CLEAN system or was that

4  separate?

5      A   I'm not quite sure if it was or not.  It

6  might have been.

7      Q   And the Pennsylvania State Police Central it

8  says Respiratory but I'm guessing that means

9  Repository.  Did you have access to that system as

10  well?

11     A   I don't remember if we did or not.

12     Q   Do you remember what the -- what was the

13  reason for doing these checks before somebody was

14  released?

15     A   I guess to make sure he had no outstanding

16  court things that maybe somebody would need him for.

17     Q   Was it to make sure that you didn't release

18  him erroneously?

19     A   Could have been.

20     Q   At the very bottom of this page, page two,

21  the last paragraph gives a job duty as the interview

22  of parole violators returned by PBPP field agents.

23  Who did the interviews of parole violators?

24     A   Parole.

25     Q   Did you do interviews when they came back as

1   part of your job as a records specialist?

2       A    The only thing I remember doing is going in

3   and making new photos of them, new ID's, and doing

4   their fingerprint.  Make sure they have the right

5   paperwork when they came in.

6       Q    And what paperwork was that?

7       A    They had to have some kind of form that said

8   they were bringing them back.

9       Q    Was that a body receipt?

10      A    Probably.  I don't quite remember but yeah,

11  probably it was.

12      Q    Any other paperwork that had to come back

13  with the inmate?

14      A    I don't remember.

15      Q    Did you actually talk with the inmate when he

16  came back?

17      A    Just long enough to do his fingerprints and

18  do the photo.

19      Q    And take another photo.  The next part, the

20  monitoring of parole violators who are in pending

21  status.  What is pending status?

22      A    I don't remember.

23      Q    To ensure timely recommitment or appropriate

24  release by the board.  What is monitoring of parole

25  violators?  Do you remember what monitoring you did?

1    A    No.

2    Q    The review and analysis of board actions to

3   include but not limited to paroling, detain, continue

4   and when available actions.  What did you do to review

5   and analyze the board actions?

6    A    I don't remember.

7    Q    Did you review parole paperwork?  Do you

8   remember reviewing that at all?

9    A    No, I don't remember doing that.  I'm sure I

10   did it, but I don't remember it.

11    Q    Do you remember the purpose of doing it?

12    A    No.

13    Q    What's a recommitment order?

14    A    That comes from parole.  They're being

15   recommitted.

16    Q    And what does that mean?

17    A    It means he messed up and they brought him

18   back to jail.

19    Q    Is that something that you would review when

20   the person came back?

21    A    I don't remember.  I'm sure, but I don't

22   remember.

23    Q    Did you have interactions with anyone in

24   parole as part of your job as a records specialist?

25   When a parole violator came back and he was in your

38

1   caseload, did you talk to someone in either the

2   institutional parole office or the parole board if you

3   had questions about his sentences or his status?

4        A    If we had questions, yes.

5        Q    Do you remember talking with anybody -- did

6   you ever do that?

7        A    Sometimes, yeah.

8        Q    And who would you talk with?

9        A    Anybody in parole.

10       Q    Would it be the institutional parole office?

11       A    Yes.

12       Q    And what kind of questions would you have

13  that would make you talk with them?

14       A    Oh, I don't remember.

15       Q    Did you ever meet with the inmate's counselor

16  or unit manager if you had questions about what's

17  going on with the inmate?

18       A    Nope.  No.

19       Q    Did you -- but you did meet with your

20  supervisor?

21       A    If I had a question, I asked my supervisor,

22  yes.

23       Q    Okay.  If you skip to the next page, page

24  three.  Third paragraph down.  The processing of

25  inmate receptions.  What did you do when an inmate

39

1  first came in to Coal Township, not a parole violator
2  but just a brand new inmate coming to Coal Township,
3  what was your function or role there?
4      A   Just to make sure that everything was okay in
5  their chart.
6      Q   What would you look -- what specific things
7  would you look for in their charts?
8      A   We always checked the legal stuff.  Make sure
9  everything was okay.
10     Q   And is that the court orders?
11     A   Yes.
12     Q   Did you have a checklist that you followed to
13 do that job?
14     A   No.
15     Q   How did you know what to check, what to
16 review?
17     A   It was kind of we were told what to check but
18 we didn't have an official list.
19     Q   Is there anything besides court orders?
20     A   That was about it.
21     Q   And this mentions that you reviewed the
22 detainer status?
23     A   Yes.
24     Q   What does that mean?
25     A   Detainers means another county wants him

40

1  for^--

2      Q    And how did you review the detainer status?

3      A    We just checked to see if they had any.

4      Q    Would you check in the paper file or on the

5  computer or where would you check?

6      A    On their -- it's usually on their sentencing

7  on the computer.

8      Q    And is that the information that would have

9  been put in at Camp Hill at central office?

10     A    Yes.

11         MR. KEATING:  You have to let her finish the

12  question before you answer it, please.

13         THE WITNESS:  Okay.  Sorry.

14         MR. KEATING:  It's okay.

15  BY MS. TOBIN:

16     Q    What's current legal disposition authority in

17  that same paragraph?

18     A    I don't remember what that is.

19     Q    And official version/PSI and current criminal

20  history.  Is that something that would also be in the

21  DC-15 that you would check?

22     A    Yeah.

23     Q    Skip the next paragraph, and then the next

24  one after that is certification by the Pennsylvania

25  State Police to access NCIC/CLEAN system, with

41

1   recertification being obtained every two years.  You

2   were CLEAN certified?

3       A    Yes.

4       Q    And then three more paragraphs down, the

5   maintenance, storage, and access of all inmate

6   records, excluding the medical record jacket and the

7   responsibility for the security of the inmate records

8   jacket, DC-15, maintained on every inmate, both active

9   and inactive.

10          Where were the files stored at Coal Township?

11      A    In the records office.

12      Q    Did you have any system of checking in or

13  checking out the files if someone borrowed a file?

14      A    They had to sign a paper saying they had it.

15  But most of the time they just left it there.

16      Q    And was there a system in place where either

17  you or someone else in records would go through the

18  file to audit it and make sure that all of the

19  required documents were in it?

20      A    No.

21      Q    So if somebody took something out of the

22  file, you wouldn't necessarily know that until later?

23      A    Yes.

24          MR. KEATING:  If at all.

25          THE WITNESS:  Yeah.

42

BY MS. TOBIN:

Q    At the bottom of this page, filing correspondence and reports received from outside agencies on a daily basis.

What outside agencies would you receive documents from to put in the file?

A    Courts.  I don't remember if there was anybody else or not.

Q    And then dissemination of information regarding population movements via count and the end of the month report.  What's the end of the month report?

A    I have no idea.

Q    What's population movements?

A    That's the coming and going of inmates.

Q    So would you keep track of that as a records specialist, where the inmate was if he was in your caseload?

A    No.

Q    Who would keep track of that?

A    There's a daily report done every day they do count.  I could check that to see if an inmate was in or out.

Q    And this mentions dissemination of information.  Who would get the information about the

43

1    population movements?

2        A    I don't remember who all got -- who all got

3    that every day.

4        Q    Were there other reports that you were

5    involved in producing?

6        A    I don't remember what all I had to.

7        Q    If you go to the next page.  Prepare county

8    parole applications, computation summaries, inmate

9    records reviews, and DC-13A reports.  What's an inmate

10   records review?

11       A    I don't remember what that was.

12       Q    Do you remember what a DC-13A report is?

13       A    No.

14       Q    Did you ever attend a judicial hearing?

15       A    Yes.

16       Q    What kind of judicial hearing did you attend?

17       A    If they were going to be extradicted out of

18   the state.

19       Q    What was your purpose at the hearing?

20       A    Just to take the paperwork in; and if they

21   had any questions, answer them.

22       Q    And computing the daily count.  How did you

23   do that?

24       A    I only did it a few times.  I could do it.

25   You took count of everybody that was here, who was out

44

1    like at hearings or who was in the hospital or who was

2    out doing another sentence somewhere else.

3        Q    And would you compute that on the computer?

4        A    It was done on the computer.  Actually,

5    mostly done physically and then --

6        Q    Where would you get the information to go

7    into that?

8        A    I don't remember where we got it from.  That

9    I don't remember.  I know I've done it already, but I

10   don't remember doing it.

11       Q    You didn't do that every day?

12       A    No, I didn't do it every day.  No.

13       Q    Assist staff with inquiries regarding

14   inmate's records.  Which staff would have inquiries or

15   what does that mean to you?

16       A    If someone come in and wanted to check the

17   chart and find out or something, we could answer them.

18       Q    So you were available to meet with staff

19   people about inmates' files?

20       A    If they came into the office, yes.

21       Q    Initiate OVRT's upon reception of 2R, 1G

22   screenings.  What does that mean?

23       A    I have no idea.  I don't remember.  I have no

24   idea.

25       Q    OVRT.  Do you know what a 2R, 1G screening

45

1    is?

2        A    No.  Don't remember that either.

3        Q    And recommitment of parole violators and new

4    inmates received into this institution.  Is that the

5    process you talked about earlier where they would come

6    in and you would fingerprint them again?

7        A    Yes.

8        Q    And new picture?

9        A    Yeah.

10       Q    And you said you would review the file?

11       A    Yeah.

12       Q    Any other tasks associated with recommitment

13   of parole violators?

14       A    Not unless it was my number and then I would

15   redo his sentencing when he got in, whatever that is.

16   16E I think it is.

17       Q    Were you -- did you supervise or give

18   direction to the records specialist ones?  Do you

19   remember doing that?

20       A    If they came and asked me a question, I'd

21   answer as best I could.

22       Q    Anything else that's not on this paper that

23   you remember as your job duties as a records

24   specialist two?

25       A    No.

46

1          (Whereupon, a documents was produced and

2     marked as Herbst Exhibit No. 3 for identification.)

3     BY MS. TOBIN:

4          Q    I'm showing you what's been marked as Kodack

5     2 and it'll be Herbst 3.   Do you recognize that

6     document?

7          A    A little bit.

8          Q    What is it?

9          A    It's just a process we go through when they

10    come in from being out.

11         Q    If you could take a look at page 1-4 at the

12    bottom.

13              MR. KEATING:   What are we Bate stamps at?

14              MS. TOBIN:   Bates CONFID-DEF-4.

15    BY MS. TOBIN:

16         Q    At the bottom there's a section labeled B,

17    parole violators.   And it says the Pennsylvania Board

18    of Probation and Parole District Office will contact

19    the facility to notify staff that they will be

20    returning a parole violator.

21              Did they notify you as part of the records

22    office that they were returning a parole violator?

23         A    Yes.

24         Q    How did they do that?

25         A    They called up and said we're returning

1    somebody.

2        Q    Would you be the one who took the information

3    on the phone?

4        A    Depending on who took the call.

5        Q    And what would be your next step after the

6    parole office called up and said they're returning

7    somebody?

8        A    We would let know whoever was doing the

9    inside work that day that they were coming.

10       Q    Okay.  And then if you move the next -- move

11   to the next page, 1-5.  At the top there's a section

12   one.  The records office shall collect the appropriate

13   documents relating to the reception including PB-141,

14   warrant to commit and detain; PBPP-257N, notice of

15   charges and hearing.  And then it gets through four

16   other documents.

17           As a records specialist two for the

18   inmates -- let me back up.  If somebody came back

19   after being out on parole and you had had them prior,

20   would you get them in your caseload again?

21       A    Yeah.  Because their number would stay the

22   same.

23       Q    Okay.  And so as a records specialist two did

24   you collect these documents, these parole documents

25   for people who came back from parole?

48

1     A   Whoever went inside collected them, yes.  I

2  didn't necessarily go in and check him in.  Somebody

3  was assigned that day to go inside to do the inside

4  work.  They made sure they had all the paperwork with

5  them.

6     Q   So someone from records was assigned --

7     A   Right.

8     Q   -- to do that?

9     MR. KEATING:  You have to let her finish the

10  question.

11     THE WITNESS:  I'm sorry.

12  BY MS. TOBIN:

13     Q   So when you say somebody was assigned to go

14  inside, you're referring to going into some kind of

15  intake unit?

16     A   Yes.

17     Q   Is that what it's called?

18     A   Intake, yes.

19     Q   And then item B, review the confinement

20  documents to verify their authenticity and that the

21  inmate is properly being returned to the Department.

22     Would that review also be done by the person

23  who was assigned that day to go to intake, that review

24  of confinement documents?

25     A   Yes.

49

1      Q    So that would happen right when the inmate
2   was coming back, not when you got his file back?
3      A    If he didn't have the right paperwork, we
4   couldn't take him.
5      Q    But if somebody who was -- I guess my -- what
6   I'm trying to understand is if he was an inmate who
7   was on your caseload, were you responsible for making
8   sure he had the right paperwork or was that just a
9   rotating duty, anybody who was assigned to do the
10  intake stuff that day?  You didn't have to go to^--
11     A    I didn't have to go to intake, no.
12     Q    Okay.  And then this next part, verifying the
13  commitment documents.  A DC-151A shall be issued to
14  the delivering authority.  Was that also something
15  that happened at intake?
16     A    I don't remember.
17     Q    And the reception interview?
18         MR. KEATING:  What?  What's your question?
19  BY MS. TOBIN:
20     Q    The reception interview would also happen at
21  intake?
22         MR. KEATING:  Well, you said also happen.
23  She said she didn't remember if the other thing
24  happened at intake or not.
25  BY MS. TOBIN:

50

1    Q    Did you ever do the job of going to intake

2  and receiving a parole violator and doing these tasks?

3    A    I've done it.  I just don't remember

4  everything I had to do.

5    Q    Okay.  When the person went through the

6  intake process after coming back, the parole violator,

7  and they were received at intake, what would be

8  your -- and you weren't the person doing that process.

9  You were still in the records office.  What would be

10  your next task with regard to that file or that parole

11  violator?

12       They just came back that day, somebody else

13  is doing all the parole paperwork and checking the

14  commitment orders.  What would be your next task as

15  the person who managed that inmate's file?

16    A    Do a new 16E on them.

17    Q    The DC-16E?

18    A    The 16E, yeah.  Sentencing order.

19    Q    Is that also called the PVP-16E?

20    A    Yeah.

21    Q    It's the same thing?

22    A    Right.

23    Q    Okay.  And what would you do in order to do

24  the new DC-16E?  What does that mean?

25    A    Just go back into the computer and put his

ERVIN BLANK ASSOCIATES, INC.

1  return date in and --

2          MR. KEATING:  And what?

3          THE WITNESS:  If he had any backtime, put it

4  in.  But that all came from parole what he got, you

5  know.

6  BY MS. TOBIN:

7      Q    How much information did you have at the time

8  that he came back?  So if he was just returned,

9  brought in by the parole agent that day, what

10 information did you have to put into the DC-16E?

11     A    Oh, God.  I don't remember everything they^--

12         MR. KEATING:  Everything they what?  I'm just

13 asking you to finish your sentences because I'm afraid

14 we're going to have these trailing off all the time.

15         THE WITNESS:  Yeah.  I don't remember

16 everything we had to put into them.  I just remember

17 it had to be done.  But I don't remember everything

18 that went into it.

19         MR. KEATING:  Okay.  Don't get frustrated.

20 We just want to make sure the record's fairly clean.

21         THE WITNESS:  Sorry.

22         MR. KEATING:  That's okay.  That's okay.

23 BY MS. TOBIN:

24     Q    I'm going to show you a DC-16E and maybe this

25 will help with the questions, my questions and just to

52

1    get a sense of what goes into this form.

2            (Whereupon, a document was produced and

3    marked as Herbst Exhibit No. 4 for identification.)

4    BY MS. TOBIN:

5        Q   So I'm showing you what's been previously

6    marked as Kodack 24.  This will be Herbst 4.  And

7    unfortunately, I didn't make another copy.  I

8    apologize for that.

9            Could you take a look?  This is a

10   multidocument exhibit.  If you could take a look at

11   the documents and see if you find a DC-16E.  There

12   should be one in there.

13           MR. KEATING:  Is that it there?

14           THE WITNESS:  Yeah, that's it there.

15   BY MS. TOBIN:

16       Q   Okay.  So you're looking at --

17           MR. KEATING:  Bate stamp DEF-000883.

18   BY MS. TOBIN:

19       Q   Okay.  So is this the DC-16E that you just

20   referred to, the form you just referred to?

21       A   Yes.

22       Q   Okay.  From looking at this 16E, are you able

23   to tell whether it is one that would be filled out

24   when a parole violator came back?

25       A   Yeah.  Yes.

53

1     Q    And how do you know that?

2     A    It says new maximum PV right on the

3  controlling maximum date.

4     Q    On the first -- on --

5     A    On the first page, yeah.

6     Q    Okay.  And so when you had a parole violator

7  come back to Coal Township, what would be your task

8  when you said you fill out a DC-16E?  This is a form

9  in the computer, right?

10     A    Yes.

11     Q    So what would you -- walk me through the

12  steps.  What would you do to fill out the new DC-16E?

13     A    I don't remember all the steps to it.  If

14  they had time -- backtime they had to put in, we put

15  it in.  Whatever parole sent in.  If there was

16  something that he needed to go back and do.

17     Q    You referred to backtime.  What is backtime?

18     A    Whatever they owe the state from a sentence

19  from when they went out.  They owe the state time.

20  That's their backtime.

21     Q    So it's what they owe on their original

22  sentence?

23     A    Yes.

24     Q    And you -- where would you get that

25  information?

    1        A     That came from parole.

    2        Q     And when -- did parole always send it to

    3   you -- well, do you know when parole would send it to

    4   you for each person?

    5        A     I don't remember when they sent it, but it

    6   came from parole.

    7        Q     And where would you put -- what field would

    8   you put the backtime in?

    9        A     Oh, God.  On the second page.

   10        Q     Is that Bates 884?

   11        A     Yeah.

   12        Q     So on this page there's a column that says

   13   computation one?

   14        A     Um-hum.

   15        Q     Let's just -- what does indictments included

   16   mean at the top?

   17        A     All the sentences he has on the front, on the

   18   first page.

   19        Q     And those are his state sentences?

   20        A     Yes.

   21        Q     And then effective date.  What's that?

   22        A     That's when he starts it.

   23        Q     And then expiration of minimum?

   24        A     That's his min date.  That's the minimum he

   25   got in time.

55

```
 1      Q    Is that the date on which he could first be
 2  paroled?
 3      A    Yes.
 4      Q    And then the maximum date?
 5      A    That's when he completed his sentence.
 6      Q    And up at the very top, commitment credit.
 7  What does that mean?
 8      A    If he put in any time before he came in, they
 9  get credit for county time.
10      Q    What do you mean before he came in?
11      A    Before he came to the state.
12      Q    So if he was serving in a county jail?
13      A    He got time for it.
14      Q    Okay.  Custody for return PV.  What is that?
15      A    That's when he come in -- back in.
16      Q    And so on this sheet that section is blank.
17  Would you be the person who would input that?  How
18  would that get filled in?
19      A    We would fill that in.
20      Q    And where would you get that information?
21      A    From when he was picked up with the parole
22  board.
23      Q    Would it be on a document?
24      A    They should be on the paperwork that they
25  brought in with him.
```

56

1     Q     Is that custody for return PV is that the

2  date that he arrives back at Coal Township?

3     A     That I don't remember.

4     Q     What is delinquent time?

5     A     I don't remember delinquent time.

6     Q     Would that be something the parole board

7  would give you?

8     A     I don't remember where that came from.

9     Q     And then backtime credit.  What's backtime

10 credit?

11    A     I don't know either.

12    Q     What about backtime owed?

13    A     Don't remember that either.

14    Q     Are those the numbers that you said earlier

15 the parole board gives you?

16    A     Yes.

17    Q     So you would just type those in when you got

18 that information?

19    A     Yes.

20    Q     What form -- how would that information come

21 to you from the parole board?

22    A     I don't remember how.

23    Q     Would they call you?  Would they send you a

24 document?

25    A     I don't remember how we got it.

57

1    Q    New maximum PV.  What is that?

2    A    That would be his new max date.

3    Q    And is that something that you would type in

4    or how would that be filled in here?

5    A    That would just automatically come up with

6    what we typed in before that.

7    Q    So that was a calculation that the computer

8    did or did --

9    A    No.  The computer did it.

10   Q    And it was based on which --

11        MR. KEATING:  You said is that a calculation

12   the computer did and you said no, the computer would

13   do it.

14   BY MS. TOBIN:

15   Q    So is it a yes?

16   A    Yes.

17        MR. KEATING:  Yes, the computer?

18        MS. TOBIN:  Thank you.

19        THE WITNESS:  Sorry.

20        MR. KEATING:  That's okay.

21   BY MS. TOBIN:

22   Q    So the computer would do that based on

23   other^--

24   A    The dates we -- finish.

25   Q    The other dates that you would put in?

58

```
 1      A    Right.

 2      Q    Okay.  When the computer did that and put --

 3  would that be a date would be in that field, new

 4  maximum PV?

 5      A    Yes.

 6      Q    Did you double-check that date against his

 7  previous max date?  Did you do a calculation on your

 8  own?  When the computer spit out whatever date it

 9  spits out, did you then compare that to information

10  that you had in your file already?

11      A    No.

12      Q    Did you double-check any of the dates that

13  the parole department sent you backtime credit,

14  backtime owed?

15      A    No.

16      Q    Why not?

17      A    That was their date.  They would have to

18  be -- they would be the ones that would give us the

19  dates and that's what we put in.  So if they wanted to

20  check anything on that, it would have to go through

21  parole.

22      Q    But his max date would be changed in the DOC

23  system?

24      A    Yes.

25      Q    And then sentence computation date.  What is
```

59

that?

    A    That's when it was done.

    Q    When what was done?

    A    When the 16E was done.

    Q    Oh, the date that this form was filled out?

    A    Yeah.

    Q    Okay.  Is this the date that the form was initially filled out or the -- I'm confused.

    A    I don't know.  It is from --

    MR. KEATING:  Wait a minute.  She didn't ask a question.

BY MS. TOBIN:

    Q    So this 2/12/1996 on this document, sentence computation date, is that the date that -- and we're talking about Mr. Chappelle, Kevin Jessup's DC-16E here.  Is that the date that his sentence was first computed?

    A    No.  That should be the date that it was done.  This one here.  That's the date for this one.

    Q    For this computation?

    MR. KEATING:  For this form?

    THE WITNESS:  For that form there, yeah.

BY MS. TOBIN:

    Q    And then I'm looking down at the bottom it says version one closed 10/16/2002.  What does that

60

1  refer to at the very bottom of the sheet?

2      A    It's the date -- that's the original date.

3  This is the date that this version was done.  I got^--

4  sorry.  I got it backwards, but yeah.  That's the

5  original up there.  This is the date that this was

6  done.

7      Q    Okay.  So the sentence computation date is

8  the date that his sentence was first computed?

9      A    The original.

10     Q    Okay.  And then down right below that basis

11  for computation PVP.  What does PVP mean?

12     A    Parole violator pending.

13     Q    And what does that mean?

14     A    It means he's back in for parole and the

15  status is pending.

16     Q    And you're waiting for parole to tell you

17  what his status will be after pending?

18     A    Yes.

19     Q    What are the possibilities of statuses?  What

20  are the possibilities of what they'll tell you?

21     A    I don't remember everything.  I don't know.

22  Could be anything.

23     Q    And then below that total sentence 6 years to

24  12 years; is that what that means, 6Y to 12Y?

25     A    Yes.

61

1        Q     Where does that come from?

2        A     The sentencing.

3        Q     Does that relate to the very top -- not the

4   very top but the indictments included?

5        A     Yes.

6        Q     So that's the total amount of time that he's

7   supposed to serve?

8        A     Right.

9        Q     And his status is pending?

10       A     Yes.

11       Q     How long can someone's status be pending?

12       A     I don't know.

13       Q     Do you remember waiting a week to hear from

14   parole, a month?

15       A     I don't remember.

16       Q     And is it the case that whenever parole sent

17   you the information whether it was a week, a month or

18   any length of time, that's when you would do the 16E?

19   That's what would trigger it?

20       A     I don't remember that either.

21       Q     You would only --

22             MR. KEATING:  I don't understand that

23   question.  If she understands the question, then

24   that's fine.

25   BY MS. TOBIN:

62

1      Q    When would you do the DC-16E?

2      A    When he came in.

3      Q    And would you do it again later when parole

4  would send you follow-up information?

5      A    We'd do a new one, yes.

6      Q    Would you do a DC-16E any other time or only

7  when the inmate came back and then when you got new

8  information from parole?

9      A    When we got new information from parole.

10     Q    Would you also do a new 16E if you got new

11  information from a court?

12     A    Yes.

13     Q    Would you do a new 16E in any other case or

14  are those the -- any other times you would do a 16E?

15     A    If we had to add a detainer.  It only gets

16  done when something's changed on there.  If any

17  information is changed, then a new one is done.

18     Q    Is it normally done soon after the new

19  information comes in?

20     A    Yes.

21     Q    Is there a time frame for doing it?

22     A    I don't remember.  I don't think there was.

23     Q    But you wouldn't just go in and do a new 16E

24  if there hadn't been any new information coming in?

25     A    No.

63

1    Q    And on the next page which is Bates 885 at

2    the bottom, in this top section number four, would you

3    be responsible for entering information about the

4    detainers?

5    A    Um-hum.  Yes.

6    Q    And where would you get that information?

7    A    We'd have to have a sealed document to put

8    that in there.

9    Q    What kind of document?

10   A    A thing, detainer that says he has to do time

11   with them.

12   Q    Would it be a warrant or an order?

13        MR. KEATING:   It would be a detainer.

14   BY MS. TOBIN:

15   Q    Did you input federal detainers as well as

16   state detainers?

17   A    Yes.

18   Q    Did you have to have the judgment and

19   commitment in order to put a federal detainer in?

20   A    No.  We just put it in as a detainer.

21   Q    You just had to have a piece of paper?

22   A    Paper that says they want him.

23   Q    That just says detainer?

24   A    Yes.

25   Q    Did you input the fines, costs, and

64

1    restitution as well?

2         A    No.   That was done -- when I worked here,

3    that was done at central.

4         Q    Okay.   Did it change?   Was that a change from

5    before?   Do you know?   Do you know whether that used

6    to be done at the institution?

7         A    Before they started central, yeah.

8         Q    But you didn't do that while you were here?

9         A    I didn't do that while I was here, no.

10        Q    And then the board of pardon's information,

11   were you responsible for putting that in?

12        A    I never did it.

13             MR. KEATING:   Did you ever know anyone that

14   got a pardon?

15             THE WITNESS:   No.

16   BY MS. TOBIN:

17        Q    So going back to the first page of this

18   document which is Bates 883 at the bottom.   Under

19   non-incarcerated offenses.   The box that says

20   non-incarcerated offenses.   What does that mean,

21   non-incarcerated offenses?

22        A    That means he committed something but he

23   wasn't accused of it.   Didn't get any time on it.

24        Q    As a records specialist would you be the

25   person who typed in the information there in that box?

65

1    A    That came with his paperwork, yeah.  Not here
2  it didn't.  When I worked here, it came -- central got
3  it.
4    Q    So that would have been there when you were
5  here at the institution?
6    A    Yes.
7    Q    And then summary or remarks on -- do you have
8  a question?
9         MR. KEATING:  Yeah.  So is the answer to that
10 you would not personally type that in?  Would it
11 already be there?
12        THE WITNESS:  It would already be there on
13 the ones that I got, yes.
14        MR. KEATING:  Okay.  Thank you.
15 BY MS. TOBIN:
16   Q    Same question for the box right below that.
17 Summary or remarks on sentence.  In this case it says
18 conversion from 16D to 16E to make inmate PVP and add
19 federal detainer.  Is that a comment that you would
20 have written in here at the institution?
21   A    Yes.  That's the reason why the 16E was being
22 made.
23   Q    So did you write that?  Did you type that
24 note in?
25   A    I didn't, no.  Whoever did the 16E put it in

66

```
 1   there.
 2        Q    Here at the institution though?
 3        A    Yes.
 4        Q    Okay.  And that box, that section is the
 5   reason that this form was generated?
 6        A    Yes.
 7        Q    Does that always have to be -- does a reason
 8   always have to be given for why the 16E is generated?
 9        A    Yes.
10        Q    And section two, sentence summary.  Here on
11   this form it just has two sentences.  What's an OTN in
12   section two?
13        A    That's the number on the court case.
14        Q    And in this case there's a sentence of five
15   years minimum, ten years maximum and one year minimum,
16   two years maximum.
17             What would you do with that information
18   pretending that he's not coming back as a parole
19   violator but you just are getting that information,
20   would you type that into the computer system from the
21   court documents?
22        A    Yes.
23        Q    And then would you calculate what the
24   controlling max and controlling min are or would the
25   computer spit that out?
```

67

1      A    The computer spits it out.

2      Q    So in this case what would be the controlling

3  min and the controlling max based on section two?

4      A    Six to twelve.

5      Q    And is that on page 884 where the total

6  sentence comes out?

7      A    Um-hum.

8      Q    So that --

9           MR. KEATING:   That was a yes?

10          THE WITNESS:   Yes.

11 BY MS. TOBIN:

12     Q    So that total sentence box is automatically

13 generated by the computer?

14     A    Yes.

15     Q    Okay.   If this inmate -- if Kevin Jessup had

16 had more than two sentences, would the computer

17 automatically make space for more sentences on the

18 16E?

19     A    Yes.

20     Q    But those would have to be manually typed in

21 every time he got a new sentence?

22     A    Yes.

23          MR. KEATING:   OTN is offense tracking number.

24 BY MS. TOBIN:

25     Q    Okay.   So the next set of documents within

68

1    this exhibit starts with 886 at the bottom.  If you

2    could take a look at that one.  And all the way to

3    888.  Those three.

4         So this one at the bottom says version two

5    closed 12/19/2003.

6         MR. KEATING:  That's 886?

7         MS. TOBIN:  Yes.

8    BY MS. TOBIN:

9    Q    And then under summary or remarks on sentence

10   it says version two created due to inmate being

11   recommitted as a technical convicted parole violator.

12   Sentence recomputed in accordance with PBPP Form 39

13   dated 12/02/03.

14        Is that remark -- that remark is something

15   someone here at the institution would have put in?

16   A    Yes.

17   Q    The reason why this document was generated?

18   A    Yes.

19   Q    And so the person would have had in their

20   hand the Form 39 dated 12/02/03?

21   A    Yeah.

22   Q    And do you remember working with those forms

23   from parole, the parole board?

24   A    No.

25   Q    Have you ever input information from a parole

69

1   board form?

2       A    Yeah.

3       Q    What is a technical convicted parole

4   violator?

5       A    I don't remember what they are.

6       Q    How did Mr. Jessup's sentence change on this

7   DC-16E?  What was the change?  Can you figure that out

8   based on what's on the forms?

9       A    He added backtime.

10      Q    You're looking at Bates number 887?

11      A    Yeah.

12      Q    So backtime -- are you looking at the

13  backtime credit section?  When you say he added

14  backtime.

15      A    There's backtime credit there and backtime

16  owed.

17      Q    And the backtime credit says 4M 24D?

18      A    Yes.

19      Q    And that information would have come from the

20  parole board?

21      A    Yes.

22      Q    Would that information have come on the PB

23  Form 39?  Where would that 4M 24D come from?

24      A    From the parole board form.  I don't remember

25  seeing.  I don't remember them.

70

```
 1              MR. KEATING:  I think the question is do you
 2   know if that would have came from a Form 39 or not?
 3              THE WITNESS:  No.  I don't remember if that's
 4   where it came from.
 5              MR. KEATING:  Okay.
 6   BY MS. TOBIN:
 7       Q    Do you remember whether that information
 8   would have to be typed in by a records specialist?
 9       A    Yes.
10       Q    So someone would type in on the computer 4M
11   24D?
12       A    (Witness indicated in the affirmative.)
13       Q    And then backtime owed 5Y 4M 23D.  Someone
14   would get that information and type it into the
15   computer?
16              MR. KEATING:  Five years, four months,
17   twenty-three days?
18              THE WITNESS:  Yeah.  I don't remember.
19   BY MS. TOBIN:
20       Q    You don't remember whether the records
21   specialist would type that into the DC-16 form on the
22   computer?
23       A    They would type it in.  Yeah.
24       Q    And now the next date -- the next line, new
25   maximum PV.  Is that date, that 2/16/2008, is that
```

71

1    automatically generated by the computer?

2         A    Yes.

3         Q    So that's not something you would type in?

4         A    No.

5         Q    And then the next one, sentence computation

6    date.  We went over this a little before.  12/19/2003.

7    Is that the date that this computation was done?

8         A    Yeah.  Yes.

9              MR. KEATING:  You said the sentence

10   computation in the box or are you saying the closed?

11             THE WITNESS:  It's the same as down here so

12   it's the same.

13   BY MS. TOBIN:

14        Q    Okay.  So going back to the -- it says

15   computation one at the top.

16             MR. KEATING:  What number?

17             MS. TOBIN:  On Bates 887.

18             MR. KEATING:  Okay.

19             MS. TOBIN:  The column says computation one.

20             MR. KEATING:  Yes.

21   BY MS. TOBIN:

22        Q    If you look at Bates 884, the DC-16E we

23   looked at before, that also says computation one.  Is

24   there a reason that there would be two computation

25   ones for this one inmate?

72

1      A    I don't remember.

2      Q    I'll ask another question about that later.

3  Is it the case that every time the sentence is

4  recomputed, there's another column, another

5  computation on this form?

6      A    I don't remember that.

7      Q    If you'll -- okay.  If you'll look at Bates

8  890 which is a few pages further into the stack.  The

9  first column on that page says computation two.  What

10 I'm trying to understand is is all of the history of

11 the computations maintained even if a new computation

12 is done or is it the case that it's just a new form

13 every time?  There seem to be multiple columns here so

14 that there could be a series.

15         MR. KEATING:  Okay.  You asked one question,

16 then you started asking more and following up.  Why

17 don't you just -- what is the question exactly?

18 BY MS. TOBIN:

19     Q    The question is every time a new computation

20 is done, does that mean that a new DC-16E is done and

21 that that information is only kept on that new DC-16E?

22     A    I don't know.  I don't remember.

23     Q    Okay.  So going back to 887.  Bates 887.  Ms.

24 Herbst, the sentence computation date we just

25 established was the date that this computation was

ERVIN BLANK ASSOCIATES, INC.

73

```
1    done.  Basis for computation says TCV.  Is that a
2    field that the records specialist would type in, TCV?
3         A    Yes.
4         Q    Okay.  And then total sentence is that a
5    field that would -- that would automatically be
6    generated by the computer?
7         A    Yes.
8         Q    And that's still tied to the top row
9    indictments included?
10        A    Yes.
11        Q    This one says status active and the earlier
12   one said status pending.  What does active mean?
13             MR. KEATING:  When you say the earlier one,
14   you're making reference to 898?
15             MS. TOBIN:  I'm making reference to 884.
16   BY MS. TOBIN:
17        Q    What does active mean when compared to
18   pending?
19        A    That means he's serving this one.  This is
20   the official one.  That's just pending.  He come in
21   here and this is what they did.  This is his active
22   sentence.
23             MR. KEATING:  She's pointing to number 887
24   when she's saying that.
25             THE WITNESS:  Yeah.
```

74

BY MS. TOBIN:

    Q   Okay.  When the new maximum PV on 887 is generated, that's a date that's generated by the computer?

    A   Yeah.

    Q   Based on the backtime credit, backtime owed?

    A   Yes.

    Q   If that new maximum PV conflicts or is different than his old maximum or if something doesn't look right about it, what would you do?

    MR. KEATING:  Can you --

BY MS. TOBIN:

    Q   Yeah.  If something about that new maximum PV date that's automatically generated by the computer --

    MR. KEATING:  On 887?

    MS. TOBIN:  Yeah.

BY MS. TOBIN:

    Q   In this one it's 2/16/2008.  Do you do a double-check of that date to make sure that it's correct?

    A   I don't think we did.  The computer generated it.  If there's a question with it, they go back to parole.

    Q   And if the new maximum PV is -- is that the amount of time he had left to serve on his sentence

75

1  when he had first been paroled?

2      A    That plus whatever time they -- if they added

3  any new time in to it.

4      Q    If who added any new time?

5      A    Parole did.   I'm confused.

6      Q    So what I'm trying to get at is or ask you

7  he's got a new max date now.   In the first -- in the

8  first sheet his max date on page 884 was 1/26/2007.

9  This max date on 887 is 2/16/2008.   So it added time?

10     A    Right.

11     Q    As a records specialist do you double-check

12 to make sure that it didn't add too much time?

13     A    No.   Because the computer automatically did

14 it.

15     Q    If there was a question about whether it

16 added too much time, if somebody had a question, hey,

17 we think this is wrong, what would you do?

18         MR. KEATING:   If someone had a question about

19 it?

20 BY MS. TOBIN:

21     Q    If someone in records had a question about it

22 or if the inmate had a question about it, what would

23 you do?

24     A    Check with parole to make sure that's what

25 was in there.   They're the ones that send what time.

76

1    And when they recompute it, everything gets sent out

2    to them.

3         Q    So you could call parole and double-check on

4    whether this was accurate?

5         A    We could.

6         Q    And have you done that in the past?

7         A    I don't remember doing that, no.

8         Q    Is there any directive or policy that says

9    that you shouldn't double-check this date?

10        A    I don't know.

11        Q    What is the reason that you don't

12   double-check it?

13             MR. KEATING:  No.  No.  No.  She says she

14   didn't know if there was a rule or regulation.

15   BY MS. TOBIN:

16        Q    But I'm asking you a new question.  What's

17   the reason that you don't double-check the

18   calculations of new max PV?

19        A    That's what the computer sent out.  We go by

20   what the computer said.  If that's how it computed it

21   up.

22        Q    And what is the -- who trains you how to do

23   that?  How did you learn how to just go by what the

24   computer said?

25        A    That's how I was trained.  You just put it in

77

1  the way it is and that's how it came out.

2      Q    Are you -- okay.  Turning further down in the

3  pile of documents if you look at starting with 894.

4  Actually, sorry.  Bates 892.  So at the bottom this

5  one is version four, closed 4/21/2009.  If you'll just

6  take a look at the three pages that are 892, 893, and

7  894.  So why was this DC-16E completed?

8      A    The version four is why it was created to

9  show PVP status.  In other words, he was brought back

10  and we did a new 16E on him.

11     Q    And you got that PVP status from the parole

12  board?

13     A    Yes.

14     Q    And what was the -- and did you create this

15  form?

16     A    Yeah, I did.  Yes.

17          MR. KEATING:  You mean her personally?

18          MS. TOBIN:  Yes.

19          THE WITNESS:  Yeah.  I typed it in, yeah.

20  BY MS. TOBIN:

21     Q    So going to the next page, 893.  What was

22  new^-- did you type anything in on computation three,

23  that column?

24     A    No, I didn't.

25     Q    So what did you -- when you created this

78

1  form, what data entry did you do?  What did you type

2  in when you created this form?

3      A    Just the fact that it was created because he

4  was a PVP status.

5          MR. KEATING:  At which point are we talking

6  about?  893 or 892?

7          MS. TOBIN:  I'm speaking of the three

8  documents as one DC-16E form.

9          MR. KEATING:  Okay.

10 BY MS. TOBIN:

11     Q    So the only thing you typed in was in the

12 remarks section on page 892 version four created to

13 show PVP status?

14     A    That's all I remember doing.  I don't even

15 remember this.

16     Q    And then -- and there's no new sentences

17 added?

18     A    No.

19     Q    Is that correct?  Okay.  Still the same two

20 sentences, still the same 6 to 12?

21     A    Yes.

22     Q    Under reception date, is that the date he was

23 brought back to Coal Township?

24         MR. KEATING:  Where are we?

25         MS. TOBIN:  On page 892.

1         THE WITNESS:   Yes.

2    BY MS. TOBIN:

3         Q    So that's the new reception date, not his

4    initial reception date?

5         A    Yes.

6         Q    And then controlling minimum 1/26/2001,

7    controlling maximum 1/26/2007.   Those are both

8    automatically generated by the computer still?

9         A    Yes.

10         Q    Okay.   On version -- on the remarks section

11    it says version three created due to board action

12    dated 6/25/2007 to remove TCV status and reflect

13    inmate is now serving as a PVP.   If somebody comes

14    back and they're a PVP, that's parole violator

15    pending, right?

16         A    Yes.

17         Q    And then they go from pending to active and

18    that means that the parole board has then made them a

19    technical parole violator or a convicted parole

20    violator; is that what that means?

21         A    Yes.

22         Q    How then can they go back to a PVP status?

23         A    If they're paroled and come back.

24         Q    If they're paroled again and come back again?

25         A    Um-hum.

80

1     Q    Is there any other way they could be -- could

2  come back again -- their status would change back to

3  PVP?

4     A    I don't know.

5     Q    And that's something that the parole board

6  tells you and you just type it in?

7     A    Yes.

8     Q    So did anything change on this DC-16E, this

9  version four?  Did anything change about Mr. Jessup's

10  max date?

11    A    From the previous ones?

12    Q    Right.

13    A    The max dates are the same on this one but on

14  that other one that they did it was different.

15    Q    So looking back at version two which is Bates

16  886, 887, and 888.  So on Bates 887, what's the new

17  maximum PV?

18    A    12/16/08.

19    Q    Is it 2/16/08?

20    A    No.

21    Q    Or 12?

22         MR. KEATING:  It's 2/16.

23         THE WITNESS:  Okay.  All right.

24  BY MS. TOBIN:

25    Q    So that was as of December 19th, 2003, his

ERVIN BLANK ASSOCIATES, INC.

81

1   new maximum was 2/16/08.  And then going forward to

2   version four which was dated April 21st, 2009, his new

3   max PV it looks like that section is blank.  Why would

4   that be blank?  Where did that new max PV number go?

5       A    That went.  He didn't have -- the new time

6   wasn't put in this one here.

7       Q    But where did that 2/16/2008 date go to

8   because it was calculated back in version two?

9       A    I don't know where it went.

10      Q    That was his -- that was his max date as of

11  December 19th of '03, right?

12      A    Right.

13      Q    And why would this -- why would it not be on

14  this new form?

15      A    It goes back to its old one before they put

16  the time in and he owes -- this is pending status

17  here.

18      Q    So there's no new information added?

19      A    Right.

20      Q    Okay.  So then go to the next version which

21  is version five which was created on 5/1/2009.  And

22  did you create this version?

23      A    No, ma'am, I did not.

24      Q    If you take a look at page 897, it indicates

25  last modified by Deborah Herbst.

ERVIN BLANK ASSOCIATES, INC.

82

1      A    Right.

2      Q    So you didn't input this version five?

3      A    No.  I retired 5/29.  5/28.  I would have

4  been gone.  This was done -- this one I did.

5      Q    You did version five?

6      A    This is -- yeah, I did five.  But I didn't do

7  the next one.

8      Q    Yeah.  That's what I was asking about.

9           MR. KEATING:  When you say five, we're

10 talking about Bates stamp 897; is that correct?

11          MS. TOBIN:  Yes.  Version five.

12 BY MS. TOBIN:

13     Q    So on version five, if you look at actually

14 Bates 896, there's backtime credit of 147 days,

15 backtime owed 1,971 days.  So you input those two

16 numbers into computation four?

17     A    Um-hum.

18     Q    And then the new max PV the computer

19 generated the date 9/6/2014?

20     A    Yes.

21     Q    And the sentence computation date is

22 4/28/2009.  Does that mean the date that you did this

23 data entry, the date that you did the computation?

24     A    Yes.

25     Q    Is there a reason there's a difference

83

1    between the version five closed date and the sentence

2    computation date?

3         A    That would have been when Michelle signed it

4    off.

5         Q    So it's closed when she reviews your work?

6         A    Right.

7         Q    Okay.  And the basis for computation is TCV.

8    And that means technical -- what does that mean?

9         A    I don't remember what that stood for but --

10        Q    It's a parole status?

11        A    It's a parole status, yes.

12        Q    Okay.  And then total sentence 6 years to 12

13   years.  That's computer generated?

14        A    Yes.

15        Q    Okay.  And status active.  Is that something

16   that you also typed in?

17        A    No.

18        Q    That automatically the computer generated

19   that?

20        A    Right.

21        Q    When you put in the backtime and it came up

22   with a new maximum PV date of 9/6/2014, did that cause

23   any red flags for you that that date was his new max

24   date?

25        A    No.

84

1    Q   It's five years after -- approximately five

2  years after the date that that -- that you did the

3  computation.  So it added that much time.  That didn't

4  cause any --

5       MR. KEATING:  The answer was no, it did not

6  cause a red flag the new date.  Asked and answered.

7  BY MS. TOBIN:

8    Q   Did you discuss that new date with anybody in

9  records?

10    A   No.

11    Q   Did you discuss that new date with anyone in

12  parole?

13    A   No.

14    Q   Did you double-check any of the calculations

15  for the backtime credit or contact parole about the

16  backtime credit?

17    A   No.

18    Q   Or the backtime owed?

19    A   No.

20    Q   So when you look at the total sentence of 6

21  years to 12 years, do you double-check to see if

22  that's correct after the computer spits that out?

23    A   No.  Because it's over on the other side.

24    Q   Meaning it's on?

25    A   It's on the front.

85

1  Q It's on the sentence summary?

2  A Right.

3  Q Do you compare the information under the

4 sentence summary section with the total sentence

5 section?  Do you compare those two?

6  A Only when it's initially done.

7  Q But if you needed to find out what went into

8 that 6 years to 12 years, you could?

9  A I guess so.

10  Q You could look on the sentence summary.

11 Could you look also in the DC-15 to see what the

12 sentences were?

13  A Yes.

14  Q Have you ever done that?

15  A No.

16  Q Do you remember speaking with Ms. Kodack,

17 with Michelle Kodack about Mr. Jessup's max dates?

18  A No.

19  Q Did you ever speak with any other records

20 staff about his max dates?

21  A No.

22  Q Do you recall ever speaking with anyone in

23 the institutional parole office about his max date or

24 his sentences?

25  A No.

86

1      Q    Or his parole status?

2      A    No.

3      Q    If you had had any conversations about his

4  sentences or parole status, would those conversations

5  be noted in the file?

6      A    Probably.

7      Q    Under the remarks section of Bates 892, it

8  says version four created to show -- pardon me.  I

9  looked at the wrong document.  I apologize.  It's

10  actually 895 that I'd like you to look at.

11          Under the remarks section of Bates 895, it

12  says version five created to show TCV status according

13  to PBPP.  Would that status have been on a parole

14  board form that you got?  Is that where you would have

15  gotten that TCV status?

16      A    Yes.

17      Q    Do you know what kind of form?

18      A    No.  I don't remember what kind it was.

19      Q    Are you -- is it your practice to note the

20  forms that you are using to put data on here?  For

21  example, on version two it says sentence recomputed in

22  accordance with PBPP Form 39 dated 12/02/2003.  Is

23  that something that was a records office practice to

24  put the actual form that caused the DC-16E to change?

25      A    Yes.

87

```
 1       Q    Okay.  Do you know why there is no reference
 2  on version four or five specifically to a specific
 3  parole board form?
 4       A    No.
 5       Q    And then looking at version six which starts
 6  with Bates 898.  This one is closed 7/30/2009.  And
 7  that's after you left, right?
 8       A    Um-hum.
 9       Q    In between May 1st of 2009 and July 30th of
10  2009, do you recall taking any other steps or actions
11  related to Mr. Jessup's sentence computations?
12       A    Nope.
13       Q    So this document --
14            MR. KEATING:  What number are we at?
15            MS. TOBIN:  Version five.
16            MR. KEATING:  What Bate stamp is that?
17            MS. TOBIN:  Bates 895.
18  BY MS. TOBIN:
19       Q    895 through 897 would have been the last
20  document you created --
21       A    Yes.
22       Q    -- related to his sentences?  Okay.  Is there
23  a procedure that you use for -- did you use the
24  computation manual to learn what to do to update the
25  DC-16E?  Did you use a document called a computation
```

1    manual?

2        A    I don't remember.  I don't think so.

3        Q    Was your training on-the-job training then?

4        A    Yes.

5        Q    Did you go to any other training besides

6    on-the-job training here at Coal Township on how to do

7    this?

8        A    No.

9            MR. KEATING:  When you say how to do this.

10   BY MS. TOBIN:

11       Q    Sorry.  Update the DC-16E.  Have you ever

12   filled out a form called a sentence error sheet?

13       A    I don't remember if I ever did or not.

14           MR. KEATING:  I assume you want this back.

15   Are we done with these?

16           MS. TOBIN:  We might go back to them so I

17   will want them to stay out.

18           (Whereupon, a document was produced and

19   marked as Herbst Exhibit No. 5 for identification.)

20   BY MS. TOBIN:

21       Q    So I'm showing you Herbst 5.  Can you take a

22   look at that document, please?  Do you recognize that?

23       A    No.

24       Q    The copy is very dark but are you able to

25   read the text on the left column?

89

1      A    Yes.

2      Q    Have you used any form not necessarily this

3   form but was there a different form for noting

4   sentence computation errors when you were a records

5   specialist?

6      A    I don't remember.

7      Q    What would you do if you did notice an error?

8      A    Go to Michelle.

9      Q    And do you know what she would do at that

10  point?

11          MR. KEATING:   Objection.   Speculation.

12  BY MS. TOBIN:

13     Q    If you know.   If you know, you can answer it.

14     A    No.

15     Q    Did you ever notice any sentence computation

16  errors in your cases?

17     A    No.

18     Q    Do you remember anyone else bringing any

19  sentence computation errors to your attention?

20     A    If we did the original ones wrong or when we

21  did the new 16E if there was something wrong with it,

22  Michelle brought it back and we always fixed it.

23     Q    So she would catch that and bring it back to

24  you?

25     A    Yes.

90

1      Q    Would you then do the correction yourself?

2      A    Yeah.

3      Q    Do you remember any discussions about

4  sentence computation errors related to Mr. Jessup's

5  case?

6      A    No.

7           (Whereupon, a document was produced and

8  marked as Herbst Exhibit No. 6 for identification.)

9  BY MS. TOBIN:

10     Q    I'm showing you Herbst 6.  It was previously

11  Kodack 9.  Do you recognize Herbst 6?

12     A    No.

13     Q    When you would input information into the

14  computer system about an inmate's sentences, you

15  testified earlier that you would get it from a court

16  order; is that right?

17     A    Yeah.

18     Q    Would you also sometimes get it from a

19  DC-300B form?

20     A    I guess.

21          MR. KEATING:  Well, don't guess.

22  BY MS. TOBIN:

23     Q    So it isn't looking familiar to you at all?

24     A    No.

25          MR. KEATING:  She testified to that already.

ERVIN BLANK ASSOCIATES, INC.

91

BY MS. TOBIN:

1     Q     When you worked at the central office
2  inputting the sentence and detainer information, where
3  did you get the information to do that job?
4     A     The court orders were in it.
5     Q     So you got them directly from the court
6  orders?
7     A     Yeah.
8     Q     Were you authorized to put any information in
9  about an inmate's sentence without a court order?
10    A     No.
11    Q     Why not?
12    A     It had to be a signed legal document before
13 we put anything in.
14    Q     Did you ever respond to inmate grievances
15 about records information?
16    A     No.
17    Q     Were you ever consulted by other DOC staff in
18 connection with an inmate grievance about records?
19    A     No.
20         MR. KEATING:  You have to let her finish the
21 question.
22         (Whereupon, a document was produced and
23 marked as Herbst Exhibit No. 7 for identification.)
24 BY MS. TOBIN:

92

1     Q   I'm showing you what's marked as Herbst 7.

2  If you could read just to yourself the bottom box.

3  How did you first learn what backtime was?

4      MR. KEATING:  Objection.  That's assuming she

5  knows what backtime is.

6  BY MS. TOBIN:

7     Q   Do you know what backtime is?

8     A   It's what's owed the state by parole.

9     Q   And how did you learn that?

10    A   Just being over in the office.  They taught

11  me over there.

12    Q   Did anyone from the parole board ever give

13  you any training or guidance on their terminology?

14    A   No.

15    Q   Or on how they come up with their dates?

16    A   No.

17    Q   And reading on Herbst 7 the definition of

18  backtime there, does that match what your

19  understanding is of what backtime is?

20    A   Yes.

21      (Whereupon, a document was produced and

22  marked as Herbst Exhibit No. 8 for identification.)

23  BY MS. TOBIN:

24    Q   I'm showing you Herbst 8 which was previously

25  marked as Kodack 10.  Do you recognize that document?

93

1      A    It says credit time.   This is what he served
2  before he came here.
3           MR. KEATING:   The question is do you
4  recognize this document?
5           THE WITNESS:   Yes.
6  BY MS. TOBIN:
7      Q    And is this the precommitment credit?
8      A    Yes.
9      Q    And is that information kept also on the
10 DC-16E form in a field?
11     A    Yes.
12     Q    Where is that kept?   Take a look at Bates 886
13 to 888.   Is there a place for precommitment credit?
14 If you look at Bates 886, is the precommitment credit
15 listed there under the commitment credit box under
16 sentence structure?
17     A    Yeah.
18     Q    And this form, Herbst 8, is where that comes
19 from?
20     A    Yes.
21     Q    And that is typed in onto the DC-16E by the
22 records specialist?
23     A    Whoever did the original one.   Whether it --
24 I guess at one time it started here but Camp Hill does
25 it.

94

1     Q   Okay.  If someone is on parole and they get

2  arrested and they're kept in a county jail until

3  they're -- they come back to Coal Township, how is

4  that credit tracked, the time that they're in county

5  before they come back?

6     A   Parole keeps that.

7     Q   Is there another form that's generated by

8  parole that's similar to the Herbst 8?

9     A   I don't remember if there was or not.

10     Q   Do you get that information from parole, the

11  pre-recommitment credit information?

12     A   I don't remember.

13     (Whereupon, a document was produced and

14  marked as Herbst Exhibit No. 9-A for identification.)

15  BY MS. TOBIN:

16     Q   I'm showing you Herbst 9.  Do you recognize

17  that document?

18     A   Yes.

19     Q   What is it?

20     A   It's a checkup we did on a case he had

21  pending off of JNet.

22     Q   And what's the reason that this document is

23  filled out?

24     A   4/4/03?  Must have had a wrong date on it.

25     MR. KEATING:  You have to speak up so the

95

1    stenographer can hear you.

2             THE WITNESS:  We were doing a checkup for

3    when they were going to release him again to make sure

4    he wasn't sentenced on this.

5    BY MS. TOBIN:

6         Q    So this -- why did you say that you think you

7    did the wrong date on it?

8         A    Because I wasn't here in '03.

9         Q    And that's your signature at the bottom?

10        A    Yes.

11        Q    In the text of -- or the middle part of the

12   form, what do those fields mean?  What is that

13   information?

14        A    He was arrested in '01 with charges.  There's

15   a court date there and the information it was nolle

16   processed.

17        Q    And what does that mean?  What did you say

18   that information is?

19        A    Nolle processed.

20        Q    And what does that mean?

21        A    He wasn't charged on it.

22        Q    So does that mean that the state authorities

23   chose not to prosecute him on those charges?

24        A    Philadelphia Police.

25        Q    Okay.

96

1        MR. KEATING:   Excuse me.   Can we go off the

2   record for a second?

3        (Whereupon, a discussion was held off the

4   record.)

5   BY MS. TOBIN:

6        Q     So what is the reason that you would have

7   filled out this form?   Why did you fill out this form?

8        A     To make sure he wasn't wanted by the

9   Philadelphia Police for anything.

10       Q     And it says person contacted JNet.   What's

11   JNet?

12       A     It's a thing on the computer we can go check

13   and see if they have any outstanding cases.   It's

14   almost like the CLEAN but it's the state one.

15       Q     So if he had been wanted, what would you have

16   done then?

17       A     We'd have called -- we'd have called down to

18   the court system and check on this OTN number.

19       Q     Okay.   So he had initially been charged with

20   a state crime but then not prosecuted; is that what

21   this means?

22       A     Yes.

23       Q     Okay.

24       (Whereupon, a document was produced and

25   marked as Herbst Exhibit No. 9-B for identification.)

ERVIN BLANK ASSOCIATES, INC.

97

BY MS. TOBIN:

1   BY MS. TOBIN:

2       Q    I'm showing you Herbst 9.  Do you recognize

3   that document?

4       A    It's a body receipt.

5       Q    And is that your signature at the bottom?

6       A    Yes.

7       Q    Does this mean that on this day you were the

8   person from records assigned to do the intake process?

9       A    Yes.

10      Q    And it's just a coincidence that you were

11  doing intake process on the person assigned to your

12  caseload?

13      A    Yes.

14      Q    Okay.  And then right above your signature

15  the section that says other.  The X is marked other.

16  What does TT slash return mean?

17      A    I'm not sure I remember what the TT stood

18  for.  He was just being returned from -- where did he

19  come from?  He's being returned from Graterford when

20  he went out for court.

21      Q    Okay.  And this document shows that you now

22  have his body and you give the receipt to whoever

23  delivered him to you?

24      A    Yes.

25           (Whereupon, a document was produced and

98

1  marked as Herbst Exhibit No. 10 for identification.)

2  BY MS. TOBIN:

3      Q    I'm showing you what's been marked as Kodack

4  28.  It will be Herbst 10.  Do you recognize that

5  document?

6      A    No.

7      Q    Not something you would use in your job as a

8  records specialist?

9      A    Not every day, no.

10     Q    Had you ever used it on occasion?

11     A    I don't remember it, no.

12     Q    Looking at the content of the document, do

13  any of the -- do these fields, sentence status and

14  parole status, what do those mean to you?

15         MR. KEATING:  I think she testified she

16  doesn't recognize the document.

17  BY MS. TOBIN:

18     Q    Does the information that's on this document,

19  whether or not you recognize it or not, recognize the

20  document itself, what does actively serving mean?

21     A    What he's here for.  Why he's here.

22     Q    And writ/ATA?

23     A    That means he's out.

24     Q    And parole violator pending?

25     A    Means parole hasn't totally sentenced him

99

1    yet.

2        Q    Is that the PVP status you talked about

3    earlier?

4        A    Yes.

5        Q    If you needed to know where one of the

6    inmates who was in your caseload was at any time in

7    the past, how would you get that information as a

8    records specialist?

9        A    I guess go into the screen.  There's probably

10   a screen where you can get it.  I don't remember what

11   it was.

12       Q    A computer screen?

13       A    Yeah.

14       Q    That would be something that wouldn't be in

15   the paper file?

16       A    Not like this, no.

17            MS. TOBIN:  Okay.  We can break for lunch.

18            (Whereupon, a luncheon recess was taken from

19   12:08 p.m. until 12:51 p.m.)

20                      AFTER RECESS

21            MS. TOBIN:  Just as an administrative thing,

22   I realize I marked two documents with the same exhibit

23   number.  So I wanted to clarify that.  Bates number

24   1166 is currently marked as Herbst 9.  We'll call that

25   Herbst 9-A.  And Bates 1066 which is the body receipt

100

1  is also called Herbst 9.  And we'll call that Herbst

2  9-B.

3      (Whereupon, a document was produced and

4  marked as Herbst Exhibit No. 11 for identification.)

5  BY MS. TOBIN:

6      Q    Showing you what I have marked as Herbst 11,

7  a two-page document.  Do you recognize that document?

8      A    It's an order to recommit.

9      Q    Is this a document that you would get from

10 the parole board?

11     A    Yes.

12     Q    And is this what you testified earlier that

13 you would get to get the backtime numbers to put into

14 the DC-16E?

15     A    Yes.

16     Q    And on the first page I see backtime credit

17 147 D and backtime owed 1,971 D.  Are there any -- and

18 those are the two items of data that you would input

19 into the computer when you got this document from the

20 parole board?

21     A    Yes.

22     Q    How did you actually get this document from

23 them?  How did that come to you?

24     A    I don't remember how we got them.

25     Q    Do you remember if you got it in paper form

ERVIN BLANK ASSOCIATES, INC.

1 or if it came -- if you could access this over the

2 computer?

3     A    This would come in paper form.

4     Q    And do you remember whether it came from the

5 institutional parole office or from the main parole

6 board office, wherever that was?

7     A    That I don't remember.

8     Q    When you would get this -- a document like

9 this, what would your first step be?  What would you

10 do?

11     A    Create a new 16E and put these numbers in.

12     Q    And would you only put in those two numbers,

13 backtime credit and backtime owed?

14     A    Yes.

15     Q    Do you know what these other fields, what the

16 meaning of these other fields are on this form?

17     A    No.

18     Q    And would you look at any of these dates and

19 double-check them with the dates you had in your

20 records for the inmate?

21     A    No.

22     Q    And down at the bottom there would be --

23 there's a section called convictions resulting in

24 recommitment.  Did you do anything with that

25 information?

102

1      A    I don't remember if I did or not.

2      Q    On the second page which is Bates 1046.

3           MR. KEATING:  Is this a separate exhibit?

4           MS. TOBIN:  It's the same exhibit.  It's a

5      two-page exhibit.  The Bates numbers are not

6      sequential.  But I could ask Ms. Herbst.

7      BY MS. TOBIN:

8      Q    Do these two documents based on the time

9      stamp in the bottom right corner, do you think they go

10     together?

11     A    Yeah.

12     Q    Okay.  So is this second page Bates 1046 is

13     that something that would usually accompany the front

14     page?

15     A    I guess so since it came from the parole

16     board.

17     Q    What do the two fields under miscellaneous

18     notes and note conviction, what do those mean?

19     A    I have no idea.

20     Q    If there had been something written there,

21     would you handle that information, also?

22     A    That I don't know.

23     Q    So what you would do with this form is input

24     just backtime credit and backtime owed?

25     A    Yes.

ERVIN BLANK ASSOCIATES, INC.

103

1      Q    Okay.  And then after you did that with

2   the -- into the DC-16E, what would you do with this

3   piece of paper?

4      A    This would go in his file.

5      Q    And then would there be any other steps that

6   you would take with regard to the inmate computer

7   system or his file?

8      A    No.

9      Q    And if you had a question about anything on

10  the order to recommit, what would you do?

11     A    Get a hold of parole.

12          MR. KEATING:  Is that an answer or question?

13          THE WITNESS:  No.  I would get a hold of

14  parole.

15          MR. KEATING:  The way you said it it sounded

16  like a question.

17          THE WITNESS:  No.  I would get a hold of

18  parole.

19          MR. KEATING:  It sounded like get a hold of

20  parole?

21          (Whereupon, a document was produced and

22  marked as Herbst Exhibit No. 12 for identification.)

23  BY MS. TOBIN:

24     Q    I'm showing you what's been marked as Kodack

25  12 and it'll be Herbst 12 as well.  Do you recognize

ERVIN BLANK ASSOCIATES, INC.

104

1  that document?

2      A    Yeah.   This is a document they need when they

3  come back in.

4      Q    And what would your involvement be with

5  handling this document, if any?

6      A    Make sure it got on his chart.

7      Q    And how would that happen?

8      A    Bring him back and put it in.

9      Q    Would you put it into the physical file?

10     A    Yes.

11     Q    Is this a task that would be for the person

12  handling the intake process on a particular day?

13     A    To put it in the file?

14     Q    Yes.

15     A    No.

16     Q    Whose job would that be?

17     A    This is a records job.

18     Q    And would it be the person in records who is

19  assigned to this particular inmate's case who would

20  put it in the file?

21     A    Yes.

22     Q    Anything else you would do with this document

23  besides put it in the file?

24     A    I don't remember if we did anything else with

25  them or not.

105

1          (Whereupon, a document was produced and

2    marked as Herbst Exhibit No. 13 for identification.)

3    MS. TOBIN:

4        Q    I'm showing you Herbst 13.   Do you recognize

5    that document?

6              MR. KEATING:   Do you know what it is?

7              THE WITNESS:   No.

8    BY MS. TOBIN:

9        Q    So this isn't something that you would have

10   any dealings with as a records specialist?

11       A    Other than maybe receive it when he came in.

12       Q    You wouldn't do any data entry related to

13   this?

14       A    Not that I remember.

15       Q    Apart from the backtime information that you

16   got on the recommitment order document, did you track

17   any other aspect of your inmate's parole activities?

18       A    I don't remember doing it.

19       Q    Did you -- so nothing besides the backtime?

20       A    That's it that I remember doing.

21             MR. KEATING:   Are you saying that she

22   testified that they did track the backtime?

23             MS. TOBIN:   Well, she testified that on the

24   recommitment order she used the two backtime dates to

25   input and that that's the information she dealt with.

ERVIN BLANK ASSOCIATES, INC.

106

1       MR. KEATING:  Okay.

2  BY MS. TOBIN:

3       Q    So I'm trying to find out if you did

4  anything, any other tracking of information related to

5  parole other than that?

6       A    No.

7            MR. KEATING:  Because I don't want the record

8  to mischaracterize what she said.

9            MS. TOBIN:  I don't think I mischaracterized

10  it.

11  BY MS. TOBIN:

12      Q    Is that accurate, you only used the -- you

13  extract the two backtime dates from the recommitment

14  order and put those into the DC-16E form?

15      A    Yes.

16      Q    That's accurate?

17      A    Yes.

18      Q    Okay.  If the inmate was coming back after

19  violating parole, did you have anything to do with

20  making sure he got his notice of his hearing and his

21  parole violation hearing?

22      A    No.

23      Q    Do you know who, if anyone, did at DOC?  If

24  any staff member was in charge of that?

25      A    Not unless parole was.

107

1      Q     But you didn't track whether he's going to

2   his hearing?

3      A     Only if someone called and said we're picking

4   him up to take him out somewhere, that would be the

5   only thing.

6      Q     Okay.  So you didn't make sure that he was

7   going to have a hearing?

8      A     No.

9            (Whereupon, a document was produced and

10  marked as Herbst Exhibit No. 14 for identification.)

11  BY MS. TOBIN:

12     Q     Showing you what's been marked as Herbst --

13  excuse me.  It's been marked as Kodack 45.  It's

14  Herbst 14.  Could you take a look at that?  Do you

15  recognize that document?

16     A     Um-hum.

17     Q     What is that?

18     A     That is --

19           MR. KEATING:  Is that a yes?

20           THE WITNESS:  Yes.  It's an inmate request.

21  BY MS. TOBIN:

22     Q     And is that your signature at the bottom?

23     A     Yes.

24     Q     And if you could just take a moment to read

25  it to yourself and let me know when you're done.

108

1       A    Okay.

2       Q    So this is from Mr. Jessup to Ms. Kodack?

3       A    Right.

4       Q    So it's not directed to you.  Do you know why

5   you were the one who answered it?

6       A    Because it was my number.  It ended in a

7   nine.

8       Q    Okay.  Was that assigned -- so was this -- do

9   you remember how you got this piece of paper?

10      A    It would have been put in my -- we had slots

11  you put stuff in.

12      Q    Okay.  When you got this document, what did

13  you -- what was your first thing you did?

14      A    I read it and then I answered it.

15      Q    And if you could read just to yourself

16  what -- actually, read for the record what the inmate

17  is saying in the request.

18      A    Could you please schedule me, talk to you or

19  someone in records containing my total time spent

20  incarcerated at this institution?  I believe there is

21  an error in my sentence calculation.

22      Q    And what did you do right after you read

23  that?

24      A    I informed him that he had to talk to parole

25  because they're the ones that calculated his time.  We

109

1   don't have anything to do with -- sorry.

2          MR. KEATING:   Just answer the question that's

3   before you.

4   BY MS. TOBIN:

5      Q   Did you look in his DC-15 file for

6   information about the time he'd spent in the

7   institution?

8      A   I don't remember if I did or not.

9      Q   Did you look at his information on the

10  computer system after getting this?

11     A   I think I just answered it saying he had to

12  get a hold of parole.

13     Q   Why is the response typewritten?

14     A   Because my handwriting sucks.  I just typed

15  it out and taped it on.

16     Q   And did you do that with other requests as

17  well?

18     A   Yes.

19     Q   Did you schedule an appointment to talk with

20  Mr. Chappelle -- or excuse me, Mr. Jessup, after he

21  submitted this?

22     A   No.

23     Q   And why not?

24     A   Because he would have had to talk to parole.

25     Q   The request -- in his request, his

110

1   handwritten part doesn't mention parole.  So what

2   triggered you to respond that he had to talk to

3   parole?

4        A    Parole was the one that gave him his time.

5   They're the ones that calculated what he needed to do.

6   We didn't calculate it.  We got the time from them.

7        Q    Did you talk with your supervisor, Ms.

8   Kodack, after you got this request?

9        A    No.  I just answered it.

10       Q    Do you remember whether you got any requests

11  after this from Mr. Jessup?

12       A    No.  I don't remember if I did or not.

13       Q    If you had gotten any, would they be in the

14  file?

15       A    Yes.

16       Q    In the request, he asserts that he thinks

17  there's a problem with his sentence calculation.  Did

18  you look at his max date or any aspect of his

19  computation in response to that assertion?

20       A    No.

21       Q    Did you contact parole to find out what was

22  going on with his sentence --

23       A    No.

24       Q    -- computation?

25            MR. KEATING:  You have to let her finish the

111

1    question.

2              THE WITNESS:  Okay.  Sorry.

3    BY MS. TOBIN:

4        Q    So you didn't contact -- you just responded

5    and didn't contact -- is it accurate to say you didn't

6    contact anyone?

7        A    Right.

8        Q    Did you look at any of the parole information

9    that you had received as of that date to look at that,

10   the recommitment order or any other parole document?

11       A    Not the documents, no.

12       Q    Did you look anywhere for any parole

13   information?

14       A    I might have pulled him up on the screen to

15   see who he was and what he was talking about.

16       Q    At any point after that date or before it,

17   did anyone from records or anyone at the institution

18   contact you to ask you about Mr. Jessup's sentence

19   computations?

20       A    Not that I remember.

21       Q    Did any parole person contact you to talk

22   about Mr. Jessup's sentence?

23       A    Not that I remember.

24            (Whereupon, a document was produced and

25   marked as Herbst Exhibit No. 15 for identification.)

ERVIN BLANK ASSOCIATES, INC.

112

BY MS. TOBIN:

     Q    I'm showing you Herbst 15, previously marked
as Kodack 31.  If you could review that, and let me
know when you're done.  Are you done?

     A    Yeah.

     Q    Before today, have you seen this document
before?

     A    No.

     Q    And this one is dated April 17th of '09.
After reading this part in section eight, what the
inmate states, what does that mean to you what he is
asserting in section eight?

          MR. KEATING:  You want her just to read it
out for the record?  I mean it says what it says.

          MS. TOBIN:  I just want --

          MR. KEATING:  She hasn't seen it before.

          MS. TOBIN:  I understand that.

BY MS. TOBIN:

     Q    Just what does that mean to you in your own
understanding of what that means?

     A    He's assuming he's being held past his max.

     Q    And have you ever had inmates other than
this, aside from this, complain to records or to you
that they are being held past their max?

     A    I don't remember if I did or not.

113

1    Q    If you had, is there a procedure to follow

2    to^--

3         MR. KEATING:  If she had remembered?

4    BY MS. TOBIN:

5    Q    Is there a procedure to follow when an inmate

6    complains that he is being held past his max?

7    A    I don't know.  I don't remember ever having

8    to do it.

9    Q    Did Superintendent Varano ever come talk to

10   you about Mr. Jessup's complaint?

11   A    Not me he didn't.

12        (Whereupon, a document was produced and

13   marked as Herbst Exhibit No. 16 for identification.)

14   BY MS. TOBIN:

15   Q    I'm showing you Herbst 16, previously Kodack

16   25.  Do you recognize that document?

17   A    No.

18   Q    This is not something that you would handle

19   as a records specialist?

20   A    No.  Not that I remember.

21        (Whereupon, a document was produced and

22   marked as Herbst Exhibit No. 17 for identification.)

23   BY MS. TOBIN:

24   Q    I'm showing you Herbst 17.  Do you recognize

25   this document?

1      A    No.

2      Q    As a records specialist did you have any duty

3  to track or handle information related to federal

4  sentences for state inmates?

5      A    Not that I remember.

6      Q    So if somebody had a federal sentence, you

7  didn't have any input to do -- data input to do about

8  that?

9      A    We might have had to put it in, but I don't

10  remember if we did or not.

11      Q    And you've never seen this document before?

12      A    I never saw this before, no.

13          (Whereupon, a document was produced and

14  marked as Herbst Exhibit No. 18 for identification.)

15  BY MS. TOBIN:

16      Q    I'm showing you Herbst 18.  Do you recognize

17  that document?

18      A    I don't recognize it.  Oh.  This is his

19  destruction date.  This would be when he -- I don't

20  remember what it is.

21          MR. KEATING:  Okay.  If you don't remember

114

1    A    No.

2    Q    As a records specialist did you have any duty

3  to track or handle information related to federal

4  sentences for state inmates?

5    A    Not that I remember.

6    Q    So if somebody had a federal sentence, you

7  didn't have any input to do -- data input to do about

8  that?

9    A    We might have had to put it in, but I don't

10  remember if we did or not.

11    Q    And you've never seen this document before?

12    A    I never saw this before, no.

13         (Whereupon, a document was produced and

14  marked as Herbst Exhibit No. 18 for identification.)

15  BY MS. TOBIN:

16    Q    I'm showing you Herbst 18.  Do you recognize

17  that document?

18    A    I don't recognize it.  Oh.  This is his

19  destruction date.  This would be when he -- I don't

20  remember what it is.

21         MR. KEATING:  Okay.  If you don't remember

22  what it is, that's fine.

23         THE WITNESS:  I don't remember what it is,

24  no.

25  BY MS. TOBIN:

1      Q     What is a dissemination sheet?

2      A     I don't remember what it is.

3      Q     As a records specialist when you were

4   maintaining the DC-15, was there a procedure you used

5   when it was time to destroy the file?

6      A     There were certain things you took out of the

7   chart before it got sent to Harrisburg where they kept

8   it for so long down there.

9      Q     And was there a policy or some kind of

10  document that told you what things to keep?

11     A     I don't know if there was or not.

12     Q     On this document, there is a column the third

13  one from the right that says name of person

14  disseminating or destroying information.  Is that your

15  name below that?

16     A     Yes.

17     Q     And then the far -- the column immediately to

18  the right what does that column say?

19     A     Which way you going?

20     Q     Immediately to the right of your name.

21     A     I don't know what that says.  I can't read

22  it.

23     Q     You don't remember filling this form out?

24     A     I don't remember filling it out, no.

25     Q     And in the far left column it says date of

ERVIN BLANK ASSOCIATES, INC.

116

1    dissemination or destruction.  I might need to get a

2    better copy of this.  It is hard to read.

3            MR. KEATING:  I think that's about the best

4    copy you're gonna get.

5            MS. TOBIN:  This is one that you did.  Yeah,

6    you got me a better copy.  Well, in the far right

7    column.

8            MR. KEATING:  And the 4/16/2009 Herbst below

9    there where it's written on that, that's my

10   handwriting.  I wrote that.

11   BY MS. TOBIN:

12       Q    So in the far right column, the column to the

13   far right at least on the copy that I made this from

14   appears to say destroyed.  Have a column for destroyed

15   and then the column immediately to the left says

16   disseminated.  There's an X in the box to the far

17   right column.  Do you remember destroying Mr. Jessup's

18   file?

19       A    No.

20       Q    Have you -- and you have no idea why this

21   form was filled out?

22       A    Unless it was destroyed and we had to recall

23   it from Harrisburg.

24       Q    Does Harrisburg handle the destruction of

25   files or just the retention of files?

117

1          A     They retain them for I think it's ten years.

2          Q     So you don't have a place here where you

3    actually shred files or destroy them?

4          A     No.

5          Q     Do you remember filling out dissemination

6    sheets in any other cases?

7          A     No, I don't remember filling them out.

8          Q     How did you track people who were going to

9    max out?

10         A     There's a list on the computer system on who

11   maxes out and what their dates are.

12         Q     And what would your duties be with regard to

13   tracking that?

14         A     We just pull up who's gonna max out.  We get

15   a list of who's maxing out and do what we had to do.

16         Q     What kind of things did you have to do?

17         A     Find out how they're leaving, where they're

18   going, how they're leaving.

19              MS. TOBIN:  I have no further questions.

20                      CROSS-EXAMINATION

21   BY MR. KEATING:

22         Q     On Herbst Exhibit Number 18 that we were

23   looking at, the dissemination sheet inmate DC-15 that

24   we were talking about.  Did you see that?

25         A     Um-hum.

ERVIN BLANK ASSOCIATES, INC.

118

1      Q    And can you tell from that assuming that

2  something was destroyed, can you tell if that means

3  destroying the entire file or portions of the file?

4      A    Just portions of it.

5      Q    How do you know what portions if there were

6  or what documents were destroyed if you were -- if you

7  were to destroy some of it?

8      A    It was told to me what was kept and what

9  wasn't kept.

10     Q    Okay.  The second column from the left it

11 says identify document.  Can you read what it says in

12 that exhibit below there, right here?

13     A    No.

14     Q    And then in the fourth column it says

15 something title or agency of person requesting

16 information.  What does that say?

17     A    That's RS two.  That's my title.

18     Q    That's your title?

19     A    Yes.

20     Q    And these are for dissemination of

21 information it says what next to it?

22     A    That's the rap sheet.

23     Q    Does it say DC-15?

24     A    It says DC-15, yeah.

25     Q    You said the rap sheet.  What does that mean?

ERVIN BLANK ASSOCIATES, INC.

119

1        A     That might be underneath the document.

2        Q     That may be rap, r-a-p?

3        A     Yeah.

4        Q     Does the DOC routinely destroy the rap sheet

5    of a DC-15 after the inmate is released, if you know?

6        A     I don't know.

7        Q     Okay.  Is there any reason why you can think

8    of that you would have destroyed an inmate's rap sheet

9    that was in their DC-15?

10       A     Made a new one.  They probably did -- we

11   probably did a new one when he came back in.

12       Q     Well, does every inmate when they come back

13   in, do they always -- do you always do a new rap sheet

14   form?

15       A     I don't remember if we did everybody.

16       Q     And when you do that for an inmate coming

17   back in, do you always destroy the old rap sheet?

18       A     Um-hum.  Yes.

19       Q     And when you destroy the old rap sheet, does

20   the person destroying always fill out a document such

21   as this?

22       A     Yes.

23       Q     Okay.  I'm looking for document Bates stamp

24   887.  Let's see if I can find it in here.  Referring

25   to a document which the Bate stamp is DEF 000887.

120

1    This is page two of what type of document?  What's it

2    called?

3         A    The 16E.

4         Q    The 16E.  And the sentence computation date

5    on that document there is the date that you put in for

6    the computation of the sentence?  Is that a correct --

7    is that -- what does the sentence computation date

8    reflect?

9         A    Right.  When it was done.

10        Q    When it was done?

11        A    When it was done.

12        Q    Okay.  And then down at the bottom when it

13   says closed, that date there is that when that would

14   have been reviewed by Michelle?

15        A    Right.

16        Q    Does Michelle review every single one of

17   these?

18        A    Yes, sir.

19        Q    And sign off on them?

20        A    Yes.

21        Q    And I think you were asked whether you

22   double-checked the max time from what the computer

23   generated the new max time.  You answered no, you did

24   not.  Is that what you testified to?

25        A    Yes.

121

1      Q    Okay.  And that max time's computer

2   generated?

3      A    Computer generated.

4      Q    From the information you receive from parole;

5   is that correct?

6      A    Yes.

7      Q    Now, when you got this sheet here, did you

8   double-check and see that the indictment included up

9   top where it says CP 0033-9503, did you double-check

10  that to see if that was correct?  Did you double-check

11  and see if that was a correct indictment on that paper

12  when it came back?

13     A    Yes.

14     Q    You double-checked and you checked it with

15  everything?

16     A    Yeah.

17     Q    And you double-check the effective date?

18     A    Yes.

19     Q    Okay.  What information did you double-check

20  and what information did you not double-check?

21          MS. TOBIN:  Are you talking about on Bates

22  887?

23          MR. KEATING:  I'm talking about 887.

24          THE WITNESS:  I wouldn't have checked 887.

25  BY MR. KEATING:

ERVIN BLANK ASSOCIATES, INC.

122

1      Q    I don't mean the number.  I'm saying of all
2    the information that's contained on 887, what
3    information did you double-check and what information
4    did you not?  You already testified you did not check
5    the new maximum date, correct?
6      A    Right.
7      Q    Did you check the backtime owed?
8      A    We check that.  Make sure that was right and
9    the backtime credit was right what was on the papers
10   we were given.
11     Q    Okay.  So you check that with what you
12   receive from probation and parole?
13     A    Right.
14     Q    And did you check the custody for return?
15     A    Yes.
16     Q    Okay.  Is there anything you didn't check
17   that was correct?  Did you check to make sure it was
18   Kevin Jessup up top?
19     A    Yes.  It would have had to have been.  We
20   pull up his records to do it that way.
21     Q    So the computer generates it, you just check
22   that it's the correct information from the computer
23   given the information you got from parole?
24     A    Right.
25     Q    And when it says backtime credit and it says

123

1    4M 24D, does that mean 4 months, 24 days?

2        A    Yes, sir.

3        Q    And backtime owed is 5Y 4M 23D.  Does that

4    mean 5 years, 4 months, 23 days?

5        A    Yes.

6        Q    Now, on Herbst 11 which is Bates stamp 901,

7    there's an indication of recomputed max date of

8    September 6th, 2014, correct?

9        A    Yes.

10       Q    And is that a probation and parole document

11   that you received?

12       A    Yes.

13       Q    Did you call up probation and parole and ask

14   them where they got September 6th, 2014?

15       A    No.

16       Q    Why not?

17       A    I assumed it was right.

18       Q    You were asked if the parole board ever gave

19   you any training about how they calculate backtime.  I

20   believe your answer was no; is that correct?

21       A    Correct.

22       Q    Did the justice department ever give you any

23   training as to how to lodge a detainer?

24       A    Not the justice department, no.

25       Q    Did any other agency that computed sentencing

124

1  give you training on how they compute the sentencing

2  or how they do their job?

3      A   No.

4      Q   If the parole board erred in calculating an

5  inmate's backtime, could you change it?

6      A   No.

7      Q   Why not?

8      A   I can change it if they changed it.

9      Q   If a person is out on parole and they commit

10 a new offense and they're waiting on the new charges

11 and they're sitting in jail waiting on the new

12 charges, who decides the time -- where the time they

13 sit in prison on those new charges go for their

14 backtime, whether it goes for the old charges or new

15 charges?  Who computes or decides that time?

16     A   I don't know.

17     Q   Does the Department of Corrections?

18     A   No.

19     Q   Was it your duty to make sure the inmates

20 whose records you were keeping were lawfully

21 convicted?

22     A   Pardon?

23     Q   Was it your duty to make sure that the

24 inmates whose records you were keeping were lawfully

25 convicted?  Do you understand what I mean?

125

1      A    No.  Explain.

2      Q    Okay.  If an inmate sent you a request saying

3   I shouldn't be here, the judge made an error at my

4   sentencing in my trial and I'm not lawfully convicted,

5   was it up to you to make sure they were lawfully

6   convicted and are here?

7      A    No.

8      Q    So you wouldn't call the judge up and say

9   judge, the inmate told me that you made an error

10  during his trial.  You should change it?

11     A    No.

12     Q    Would you tell him to go back to the judge

13  and take it up with him?

14     A    Yes.  Actually, I think we preferred to tell

15  them to get in contact with their lawyer.

16     Q    Okay.  When you got the request slip about

17  Mr. Jessup complaining that he was being held past his

18  max, did you ignore his request?

19     A    No.  I answered it right away.

20     Q    Did you pull his file out and review his file

21  to look at it before you answered it?

22     A    No.  I just answered it.

23     Q    Did you know off the top of your head who he

24  was and what it was?

25          MS. TOBIN:  I believe she testified earlier

ERVIN BLANK ASSOCIATES, INC.

126

1    that she pulled it up on the computer.

2            THE WITNESS:  I pulled it up on the computer.

3    His number up on the computer.

4    BY MR. KEATING:

5        Q    Okay.  And did the computer tell you that the

6    parole board had him for a certain max date?

7        A    Yes.

8        Q    And he didn't max that date out, did he?

9        A    No.

10       Q    On Herbst Number 15, Mr. Varano puts in

11   writing here "Obviously we would not be keeping you

12   past your max date.".  Did you have any interest in

13   keeping Mr. Jessup past his maximum date?

14       A    No.

15       Q    Did you have any interest in keeping any

16   inmate past their maximum date?

17       A    No.

18           MR. KEATING:  I have no other questions.

19           MS. TOBIN:  I have one.

20                   REDIRECT EXAMINATION

21   BY MS. TOBIN:

22       Q    You testified when your counsel asked you

23   whether or not you could change a calculation that the

24   parole board made and you said no, I can't.  Is there

25   a directive or some kind of instruction that you were

127

1   given that told you that?

2       A    We can't change anything unless it would come

3   from parole, then we can change it.

4       Q    And how did you come to learn that, that you

5   can't change anything unless it comes from parole?

6       A    You were told that.  You can't change

7   anything without a legal document.

8       Q    And who told you that?

9       A    I learned that at Camp Hill.  You can't

10  change anything unless you have a legal document to do

11  it.  It has to be signed, sealed to do anything to it.

12  Parole stuff might not be but anything from the

13  courts, anything from anywhere has to be a sealed

14  document.

15       MS. TOBIN:  Okay.  Thank you.  No further

16  questions.

17  RECROSSEXAMINATIONBY MR. KEATING:

18       Q    You said parole documents might not have to

19  be.  You mean the parole documents don't have to be

20  sealed?

21       A    Right.  That comes from inside the

22  institution.  Anything that comes in from outside, may

23  be sealed.

24       Q    But if you get a detainer from parole such as

25  Herbst Exhibit Number 12?

128

1      A      That would have to be sealed.  Some kind of

2    seal on it.

3           MS. TOBIN:  Tim, you were right.  I do have

4    one more.

5                    REDIRECT EXAMINATION

6    BY MS. TOBIN:

7      Q      So you can't change anything unless -- you

8    can't change anything unless parole changes it.   Is

9    there anything that prohibits you from questioning it

10   or questioning parole board's calculation?

11     A      I don't know.

12          MS. TOBIN:  Okay.  No further questions.

13                    RECROSS-EXAMINATION

14   BY MR. KEATING:

15     Q      Is there a parole -- institutional parole

16   officer here at SCI-Coal Township?

17     A      Yeah, a parole officer is here.

18     Q      How many parole officers do they have?

19     A      I don't know how many they have.

20     Q      And when Mr. Jessup filed his request about

21   his sentence computation, you wrote back and said

22   look, this is what the maximum date the parole has.

23   You have to take it up with parole, correct?

24     A      Correct.

25     Q      Why didn't you just call down at parole and

129

say hey or did you?  Did you call down to parole and

say this inmate's --

    A   No.  That's his doing.  If he wants it

checked into, he has to do it.

    Q   How would he do that?

    A   Send another request down to parole, ask to

see them.

    Q   Do you know if he did that or not?

    A   I have no idea.  Couldn't tell you.  No clue.

    MR. KEATING:  Okay.  I have no other

questions.

    MS. TOBIN:  Nothing further.

    (Whereupon, the deposition was concluded at

1:34 p.m.)

130

COUNTY OF UNION                    :

COMMONWEALTH OF PENNSYLVANIA:


        I, Faith A. Culp, the undersigned Notary
Public, do hereby certify that personally appeared
before me, DEBORAH HERBST; the witness, being by me
first duly sworn to testify the truth, the whole truth
and nothing but the truth, in answer to the oral
questions propounded to her by the attorneys for the
respective parties, testified as set forth in the
foregoing deposition.

        I further certify that before the taking of
said deposition, the above witness was duly sworn,
that the questions and answers were taken down
stenographically by the said Faith A. Culp, Court
Reporter, Winfield, Pennsylvania, approved and agreed
to, and afterwards reduced to typewriting under the
direction of the said Reporter.

        In testimony whereof, I have hereunto
subscribed my hand this 13th day _____

                        Faith A. Culp
                        Reporter-Notary Public
                        My Commission Expires
                        August 23, 2014

## Jennifer Tobin

**From:** Keating, Timothy P. [tkeating@attorneygeneral.gov]
**Sent:** Thursday, July 05, 2012 12:41 PM
**To:** jtobin@pailp.org
**Subject:** 2009 document of Herbst containing description of duties

> **EXHIBIT**
> tabbies
> _Herbst 1_

| Last Name | First Name | MI | Personnel Number |
|---|---|---|---|

| Job Title | Job Code | Working Title | Position Number |
|---|---|---|---|

| Department | Organization | Organization Code |
|---|---|---|

| Supervisor's Last Name | Supervisor's First Name | Supervisor's Job Title | Supervisor's Pos Number |
|---|---|---|---|

| Start Time 0800 | End Time 1600 | Hours/Week 37.5 | Days Worked (Check all that apply) S M T W T F S ☐ ☐ ☐ ☐ ☐ ☐ ☐ | Explain any schedule variations: |
|---|---|---|---|---|

**Position Purpose:** Describe the primary purpose of this position and how it contributes to the organization's objectives. Example: *Provides clerical and office support within the Division to ensure its operations are conducted efficiently and effectively.*

Functions as a Records Specialist 2 at SCI Coal Township and is responsible for the maintenance of the inmate DC 15 file.

**Description of Duties:** Describe in detail the duties and responsibilities assigned to this position. Descriptions should include the major end result of the task. Example: *Types correspondence, reports, and other various documents from handwritten drafts for review and signature of the supervisor.*

The Records Specialist 2 position is assigned to the Inmate Records Office under the direct supervision of the Records Supervisor. This is an advanced, specialized information management and documentary investigative duty position. Responsibilities assigned to the Records Specialist 2 are: The computation and re-computation of state and county sentences imposed by the court system in accordance with mandates of the Court and the Commonwealth's Sentencing Rules, Regulations and Laws, and Department of Corrections policy, to ensure that inmates are properly committed and confined; analysis and interpretation of court orders and/or supporting documentation to determine appropriate course of action as it relates to imminent release, change in place of confinement or commitment credit, to ensure timely and appropriate presentation for parole consideration or discharge at expiration of maximum sentence. Initiate action to obtain additional data or information

necessary to reconcile identified discrepancies or inconsistencies in court determination. Ensure accurate information is maintained in the Inmate Records System computer and that changes are entered as they occur as a result of sentence re-calculation via the DC-23B Sentence Status Change Report and that required information is relayed to the inmate, institutional staff, the Pennsylvania Board of Probation and Parole, PSP and Central Office; as necessary, Records Office staff meets with inmates to explain complex and or multiple sentence status changes.

The initiation of contact, both written and verbal, with various criminal justice agency officials to obtain/exchange information relative to an inmates criminal history and subsequent activity within the criminal justice system; written contact with court officials when it has been determined that the Department cannot legally honor a court order. The comprehensive review of an inmates file when processing inmates pending pre-release status, outside clearance, parole or final discharge to include the investigation of all arrests with unknown dispositions, through the independent analysis of pre-sentence investigation reports, the National Crime Information Center (NCIC), the Pennsylvania State Police Central Respiratory and all available sources to ensure all pending judicial processes have been satisfied prior to any manner of release for incarceration.

The arrangements for surrendering inmates to demanding authorities for court appearance or at time of release from current sentence, ensuring appropriate authorization is presented by the requesting agency for all releases including authorized temporary absence and verification of identity of transporting officials prior to relinquishing custody of an inmate. The representation of the Department at extradition hearings or other judicial proceedings when required by the court, testifying on matters relating to identification of an inmate and/or current sentence status.

The administration of Act 57 of 2002, DNA Act, and the identification of offenders who fall subject to this act, ensuring that the required DNA sample is obtained prior to outside clearance status or any manner of release.

The administration of Act 18 of 2000, Megan's law, and the identification of offenders who fall subject to this act, ensuring they are registered prior to any manner of release. The Records Specialist 2 will interview the inmate prior to registration in order to complete the registration form. Shall inform the inmate in person about the law, how to maintain registry, notify the Pennsylvania State Police of address changes, registration requirements when moving and the consequences of failure to register. Answer all questions from inmate on this subject.

The administration of Act 84 of 1998, Information Exchange and Victims Restitution Legislation, by ensuring appropriate documentation from the county is provided to the Institutional Business office in order that an inmates financial obligations are identified. Ensure the exchange of required information when an inmate is released or transferred to any county facility.

The identification of offenders who are subject to Act 143 of 1998, the Victims Awareness Education Classes, in order that required programming can be scheduled.

The interview of parole violators returned by PBPP field agents; the monitoring of parole violators who are in pending status to ensure timely recommitment or appropriate release by the Board; the review and analysis of Board actions to include but not limited to paroling, detain, continue and "when available" actions; the analysis of recommitment orders issued by the Board to ensure accuracy and the recomputation of sentence of technical and/or convicted parole violators to include the determination of appropriate credit due on convictions resulting in recommitment as a convicted

violator.

Ensure an inmate due process under the Interstate Agreement on Detainers, in order that disposition may be had of indictments, information's or complaints filed against inmates of one state by officials of another state; maintain contact with the prosecutor of the requesting state in order to monitor adherence to Article III and Article IV of the Act which outlines time frames under which the inmate must be brought to trial.

The institution notification of inmates transferring in/out of the institution, reviewing Central Office notification of pending transfers to ensure no inappropriate transfers occur due to an inmates current classification status.

The processing of inmate receptions, reviewing the DC-15 to ensure the appropriate confinement orders, official version/PSI and current criminal history are available, review of detainer status, separations and misconduct history and current legal disposition authority.

The preparation of escape circulars with descriptive information, making same available to police departments in a pre-determined radius of the institution; the entry of the initial NCIC/CLEAN notification of any escape and the provision of required information to the Pennsylvania State Police in order that subject can be entered into the system as a wanted person.

Certification by the Pennsylvania State Police to access the NCIC/CLEAN system, with recertification being obtained every two years.

As necessary, providing orientation and introduction regarding Records Office operations to institutional personnel and inmates.

Keep up to date on court decisions/rulings as they relate to the sentence computation, credit, etc.

The maintenance, storage and access of all inmate records, excluding the medical record jacket and the responsibility for the security of the inmate records jacket (DC-15) maintained on every inmate, both active and inactive.

Maintaining the operation of the I.D. Office such as photographing inmates, fingerprinting inmates as required, retrieving picture packets for van day, and processing I.D. Office mail.

The following routine responsibilities of Records Office staff.

Data entry into the IRS regarding population movements and accompanying inter-institutional reports.

Assembly of pertinent records necessary for inmates temporary/permanent transfer to another facility.

Deactivation of inactive files according to Records Retention Schedule.

Filing correspondence and reports received from outside agencies on a daily basis.

Dissemination of information regarding population movements via count and the end of the month report.

Prepare County Parole Applications, Commutation Summaries, Inmate Records Reviews and DC 13A reports.

Attend judicial hearings as directed by the Records Supervisor.

Compute daily count and make computer entries as required.

Assist staff with inquiries regarding inmate's records.

Initiate OVRTs upon reception of 2R, 1G screenings, Annual Review Lists, Parole Staffings, Recommitment of Parole Violators and new inmates received into this institution.

Give direction to Records Specialists I's at this institution within the framework of Department regulation and current policy. This will not include discipline of a Records Specialist, authorizing leave or work evaluations.

Assist Records Supervisor in assigned tasks to keep the Records Office in line with Department policy as well as institutional policy and procedure.

Perform all other duties as required.

---

**Decision Making:** *Describe the types of decisions made by the incumbent of this position and the types of decisions referred to others. Identify the problems or issues that can be resolved at the level of this position, versus those that must be referred to the supervisor. Example: In response to a customer inquiry, I research the status of an activity and prepare a formal response for my supervisor's signature.*

Responsible for decision making and maintenance of the DC 15.

**Requirements Profile:** *Identify any requirements, such as a licensure, registration, or certification, which may be necessary to perform the functions of the positions. Position-specific requirements should be consistent with a Necessary Special Requirement or other criteria identified in the classification specification covering this position. Example: Professional Engineer License*

1.  N/A

2.  N/A

3.  N/A

**Essential Functions**: Provide a list of essential functions for this position. Example: *Transports boxes weighing up to 60 pounds.*

1.  Communicate orally/writing.
2.  Compute sentence structures.
3.  Identify inmates from photographs.
4.  Operate typewriter and word processor.
5.  Operate mainframe computer.
6.  Operate fax and telephone equipment.
7.  Operate key locks.
8.  Read written documents.

9. Pull and file DC 15's.
10.

## CERTIFICATION

By entering my name below, I certify to the best of my knowledge all statements contained in this position description are correct.

| Employee's Acknowledgement | Job Title: | Date |
|---|---|---|
| DEBORAH K. HERBST | Rcrds Spcst 2 | 5/5/2009 2:47:10 PM |

| Supervisor's Acknowledgement | Job Title: | Date |
|---|---|---|
| Michelle Kodack | Rcrds Supv | 5/5/2009 2:41:11 PM |

| Reviewing Officer's Acknowledgement | Job Title: | Date |
|---|---|---|
| Linda Chismar | Corr Clsftn Prgm Mgr | 5/5/2009 2:59:13 PM |

**Michelle Kodack** l Records Supervisor
Department of Corrections | SCI Coal Township
1 Kelley Drive l Coal Township, PA 17866
570.644.7890 Ext. 2145 l Fax 570.644.3414

7/5/2012

FORM  DC-23B

# SENTENCE STATUS
# CHANGE REPORT

**COMMONWEALTH OF PENNSYLVANIA**

DEPARTMENT OF CORRECTIONS

| INSTITUTIONAL NUMBER | PBP NUMBER | COMMITMENT NAME | | INSTITUTION | DATE OF REPORT |
|---|---|---|---|---|---|
| | | | | | |

A SENTENCE STATUS CHANGE REPORT IS SUBMITTED ON THE ABOVE INMATE, AS INDICATED BY THE CHECKED SECTION (S)

☐ 1. THE SENTENCE WHICH THIS INMATE IS CURRENTLY UNDERGOING IS AS FOLLOWS:

| SENTENCE | EFFECTIVE DATE | EFFECTIVE DATE-PV | MINIMUM DATE | MAXIMUM DATE | BACKTIME IF PV | PV MAXIMUM DATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| OFFENSE (S) | | COURT — INDICTMENT NUMBER — TERM |
|---|---|---|

| COUNTY | REMARKS |
|---|---|

☐ 2. THE SENTENCE WHICH THIS INMATE IS CURRENTLY UNDERGOING IS CHANGED AS FOLLOWS:

| TYPE OF CHANGE | ☐ OVERLAPPING CONCURRENT SENT. | ☐ UNDERLAPPING CONCURRENT SENT. | ☐ RECONSIDERED SENTENCE | ☐ CORRECTED COMMITMENT | ☐ COMMUTED SENTENCE | ☐ RECOMPUTED SENTENCE |
|---|---|---|---|---|---|---|

| SENTENCE | EFFECTIVE DATE | EFFECTIVE DATE-PV | MINIMUM DATE | MAXIMUM DATE | BACKTIME IF PV | PV MAXIMUM DATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| PROSECUTING POLICE DEPARTMENT | JUDGE | | DATE OF SENTENCE | PLEA | ESCAPE TIME |
|---|---|---|---|---|---|

| OFFENSE (S) | | COURT — INDICTMENT NUMBER — TERM |
|---|---|---|

| COUNTY | REMARKS |
|---|---|

☐ 3. FOLLOWING COMPLETION OF THIS INMATE'S CURRENT SENTENCE, HE WILL BE REENTERED TO SERVE THE FOLLOWING:

| SENTENCE | JUDGE | DATE OF SENTENCE | PLEA | REENTER AT |
|---|---|---|---|---|
| | | | | |

| OFFENSE (S) | | COURT — INDICTMENT NUMBER — TERM |
|---|---|---|

| COUNTY | REMARKS |
|---|---|

☐ 4. A DETAINER HAS BEEN LODGED AGAINST THIS INMATE AS FOLLOWS: (PLEASE SEE OVER)

| FROM (INCLUDING ADDRESS) | CHARGING |
|---|---|

| DETAINER DATE | INDICTMENT-WARRANT NOS. | REMARKS |
|---|---|---|

☐ 5. A DETAINER PREVIOUSLY LODGED AGAINST THIS INMATE HAS BEEN DROPPED AS FOLLOWS:

| FROM (INCLUDING ADDRESS) | CHARGING |
|---|---|

| DETAINER DATE | INDICTMENT-WARRANT NOS. | METHOD OF DISPOSITION | REMARKS |
|---|---|---|---|

☐ 6. YOUR APPLICATION FOR COMMUTATION HAS BEEN REVIEWED BY THE BOARD OF PARDONS, AND IT WAS:

| ☐ GRANTED -- SEE SECTION #2 ABOVE | ☐ CONTINUED | ☐ REFUSED |
|---|---|---|
| ☐ HELD UNDER ADVISEMENT | ☐ WITHDRAWN | ☐ PASSED |

☐ 7

**EXHIBIT**
Herbst 2

**EXHIBIT**
Kolich

| RECORD OFFICER'S SIGNATURE | RECORD OFFICER'S NAME |
|---|---|
| | |

## Section 1 - Processing of Receptions

An inmate shall be received at the Diagnostic and Classification Center (DCC) or designated reception unit; however, a parole violator shall be received at the closest facility and transferred to the appropriate state correctional facility.

### A. Initial Receptions

1. When an inmate is delivered to the Department, the Records Office shall:

   a. ensure that the committing agents are representatives of the committing authority;

   b. collect appropriate documents relating to the reception, including, for an initial reception, the certified sentencing order *or* the **DC-300B, Court Commitment State or County Correctional Institution (Attachment 1-A)** or the county's commitment form;

   c. review the sentencing order and/or commitment form to ensure its authenticity;[1]

   d. review the confinement order to ensure that it meets the Department's jurisdictional threshold and designates the Department as the place of confinement;

      (1) Sentences of confinement for a period of less than two years must be served in a county prison *with the exception of 5-B transfers and for females only a proclamation county commitment*.

      (2) Sentences of confinement for a period of between two years and five years may be served in the Department if the sentencing order designates the Department as the place of confinement.

      (3) Sentences of confinement for a period in excess of five years must be served in the Department.

2. When an inmate whose sentence does not meet the jurisdictional threshold is received at a facility, the facility shall advise the Records *Administrator/Assistant Records Administrator* by telephone before declining the commitment. No improper commitment shall be accepted, except upon approval from the Records *Administrator/Assistant Records Administrator*. As soon as possible after accepting or refusing an improper commitment, the Records Office shall forward to the Central Office Records Coordinator a memorandum concerning the matter, including a copy of the commitment order.

3. The Records Office shall check for prior commitments to determine if the inmate was previously confined in the Department. If so, staff shall determine his/her previous Department number. Check the **Inmate Records System** to determine if the inmate's

EXHIBIT
Herbst - 3

1-1


EXHIBIT
Kolach - 2

CONFID-DEF-000001

Case 4:11-cv-00304-CCC  Document 46-5  Filed 09/24/12  Page 140 of 207

**11.5.1, Records Office Operations Procedures Manual**
**Section 1 - Processing of Receptions**                    *Revised November, 2008*

original maximum sentence date has expired. Listed below is necessary to determine whether the inmate's record needs to be cross-referenced:

a.  *SID numbers for both the old and new Department numbers must match for cross-referencing;*

b.  *the personal/ID data and names associated with the previous inmate number will be displayed when the new inmate number is entered;*

c.  *the inmate's new Department number should be entered as previous number and the inmate's previous department number entered as the new inmate number; and*

d.  *extreme caution must be used when cross-referencing files; data cannot be un cross-referenced.*

4.  Once the inmate is interviewed and the documents are reviewed and approved by the Records Office, a Department number shall be assigned to the inmate[2] and a **DC-151A, Body Receipt (Attachment 1-B)** issued to the delivering authority.

5.  The Records Office shall:

a.  conduct a reception interview to:

(1) obtain basic data (birthplace, date of birth, marital status, etc.) and initiate a **DC-2A, Reception Checklist (Attachment 1-C)**;[3]

(2) *complete a DC150B Reception Worksheet (Attachment 1-D);*

(3) obtain a **DC-155, Legal Dispositions Form (*Attachment 1-E*)** authorizing disposition of property and opening of mail.[4] The form must be fully explained to the inmate. No mail shall be allowed where the inmate refuses to sign this form. The mailroom must be notified in writing of any inmate who refuses to sign. Unless a **DC-155** is signed authorizing the Department to cash checks/ money orders on an inmate's behalf, the facility shall be unable to post money received from outside sources to an inmate's account. *In accordance with the DC-155, inmates will also be advised of their rights of communication and the grievance process.* The **DC-155** shall be signed using the inmate's name of commitment;

(4) *identify Guardian of property, including the relationship to the inmate, complete address and phone number on the DC-155 for Part 2, Designation of Guardian of Property;*

---

[2] 4-4285
[3] 4-4285

[4] 4-4285

CONFID-DEF-000002

(5) *determine if the inmate was a previously required to register under Megan's Law for a 10 year period;*

    a. *if a previously registered individual who was required to register for ten-years is returned to the custody of the Department, the running of the ten-year period will be tolled by the Pennsylvania State Police (PSP). The Department is required to notify the PSP of an individuals return to custody IAW Department policy 11.6.1 Sexually Violent Offender and Registration; and*

    b. *notification must be made via NCIC/CLEAN using the fixed screen TEXT PSP/INMINF*

(6) ask the inmate if he/she has any enemies at the facility or if there are persons at the facility whom the inmate believes are a danger to him/her. This information shall be forwarded to the counselor and Security Captain.

b. Obtain a set of fingerprints from the inmate.[5] Fingerprinting shall meet the requirements of the Records and Identification Division of the PSP. At a minimum, one set of fingerprints shall be placed in the **DC-15, Inmate Records Jacket**.

c. Place a **Dissemination of Information Form** in the DC-15 and obtain a criminal history report in accordance with Department policy **1.1.4, "NCIC/CLEAN."** A **WANTED INQUIRY** must be done for each inmate upon reception to ensure he/she is not wanted in another jurisdiction.

(1) Examples and instructions are contained within the CLEAN Operations Manual located with each CLEAN terminal.

(2) It shall be noted that Only personnel who have been trained and certified by the PSP are provided with the access codes needed to enter the system. Unauthorized use is a violation of Federal law.

(3) Questions regarding this procedure shall be referred to the facility's CLEAN Coordinator or to the Department's CLEAN Terminal Agency Coordinator in the Office of Professional Responsibility (OPR).

6. At the conclusion of the reception interview the Records Office shall make all required data entries in the Department's **Inmate Records System/DOCNET**.

7. *If any court order indicates the inmate has received a Recidivism Risk Reduction Incentive (RRRI) minimum sentence, the RRRI flag must be marked in the DCC sentence data screen.*

8. Within five working days of an inmate's reception, the Records Office shall:

---

[5] 4-4285

CONFID-DEF-000003

    a. organize the **DC-15** according to procedures outlined in **Section 3, Filing Procedures** of this procedures manual;

    b. notify the inmate's assigned counselor, that he/she is a registered sex offender, in accordance with Department policy 11.6.1, "Sexually Violent Offender Registration (Megan's Law); and

    c. review commitment papers to determine Boot Camp eligibility;

9. *All initial reception inmates' commitment orders will be sent to the Central Sentence Computation Unit (CSCU).*

    a. *CSCU will* use the commitment paper(s) to establish the sentence structure according to the **Sentence Computation Manual (Appendix A)**. Prepare a **16E, Sentence Status Summary (Attachment 1-*F*)** listing appropriate sentence structure and reflecting commitment name associated with the controlling sentence structure.

    NOTE: If a subsequent commitment order(s) is received which would become the controlling sentence and the commitment name is different, then a name change shall be completed to reflect the name associated with the new controlling sentence;

    b. *CSCU will provide e-mail notification to the records office, assigned counselor. When a 16E for an RRRI case has been completed the Office of the Victim Advocate (OVA) shall be notified.*

    c. *The original sentencing documents will be returned to the institutions and a copy will remain in the inmate's Central Folder.*

10. *Upon notification that the DC16E has been completed and receipt of the original orders, the institutions will prepare and distribute appropriate documents to necessary departments for the Classification process (to include DC-1, Classification Summary [Attachment 1-G], DC-16D/16E, etc.);*

11. The inmate is to be photographed as soon as possible and in accordance with Department policy **1.3.3, "Inmate Identification Cards."**[6]

12. Every inmate commitment shall be reviewed for applicability of Department policy **11.6.1, "Megan's Law" and 11.6.2, "Act *185* DNA Data and Testing"** as well as **Act 143 of 1998, 61 P.S. §331.21 (b.1).**

## B. Parole Violators (PVs)

The Pennsylvania Board of Probation and Parole (PBPP) District Office will contact the facility to notify staff that they will be returning a parole violator including, Community

---

6 4-4285

CONFID-DEF-000004

Parole Center Program (CPC["halfway back"]) and Out-of-State Parole Violators (OPV) cases.

1. The Records Office shall:

   a. collect the appropriate documents relating to the reception, including:

      (1) **PBPP 141, Warrant to Commit and Detain;**

      (2) **PBPP 257N, Notice of Charges and Hearing;**

      (3) **PBPP 257T, Technical Violation Arrest Report;**

      (4) **PBPP 257C, Criminal Arrest and Disposition Report; and/or**

      (5) **PBPP 227 Return of Parole Violator Report**

      (6) **PBPP 257H, Summary of Adjustment.** This is forwarded to the facility Record Office prior to the first level hearing (and within 14 calendar days of the PV return for cases detained for new criminal charges when the first level hearing is conducted at the Magisterial District Justice level). The original will be filed with the items a. (1) through (45) above, and a copy will be forwarded to the inmate's counselor for inclusion in the **DC-14, Counselor File.**

   b. review the confinement documents to verify their authenticity and that the inmate is properly being returned to the Department. If it appears that the parole violator is being returned to the Department improperly, the facility shall advise the Records Coordinator Administrator or Assistant Records Coordinator Administrator Central Office Records Supervisor by telephone before declining the commitment. Improper commitments shall not be accepted, except upon approval from the Records Coordinator Administrator or Assistant Records Coordinator Administrator Central Office Records Supervisor. After accepting or refusing an improper commitment, the Records Office shall forward to the Central Office Records Coordinator a memorandum concerning the matter, including a copy of the commitment documents;

   c. upon verifying the commitment documents, a DC-151A shall be issued to the delivering authority;

   d. conduct the reception interview as described in Subsection A.5.a. (1) - (**6**), above.

   e. obtain a letter from the PBPP to hold the inmate past his/her maximum date, if applicable; and

   f. complete and update all associated screens (personal, physical, cross-referencing, etc.) in accordance with Section 6, Inmate Records System/Movements Reports of this procedures manual;

CONFID-DEF-000005

**NOTE:** If the parole violator is being returned on a commuted sentence, a letter indicating this information shall be prepared and submitted to the Pardons Case Specialist in the BIS at Central Office.

g. if fingerprint cards for the inmate are not readily available at the facility, obtain a set of fingerprints. Fingerprinting shall meet the requirements of the Records and Identification Division of the PSP. One set of fingerprints shall be placed in the **DC-15**;

h. place a dissemination of information form in the **DC-15** if one is not contained therein and obtain a criminal history report in accordance with Department policy **1.1.4**. A Wanted Inquiry must be done for each inmate. Refer to **Section 1, A**. above for additional information; and

i. notify the Records Administrator/Assistant Records Administrator when an inmate is a PV who has a federal detainer/sentence.

2. If a parole violator is received from the PBPP at his/her paroling facility, then his/her **DC-15** shall be reactivated. If a parole violator is received at any other facility, a temporary file shall be created. At a minimum, the temporary file shall consist of the following: **PBPP 141, PBPP 257N, PBPP 257T, PBPP 257C, PBPP 257H**, fingerprints, **DC-2A, *four mug shots*, DC-151A, DC-155**, and any other compiled documentation. The decision whether to retain or transfer the parole violator shall be in accordance with Department policy **11.2.1, "Reception and Classification."** Procedures for transfers are outlined in **Section 2, Releases and Discharges** of this procedures manual. If the **DC-15** has been archived, then the facility that received the parole violator shall request the archived file *from technical records in BSS. Technical Records* shall forward the archived **DC-15** as requested to either the facility retaining the parole violator or to the facility to which the parole violator is transferred.

3. If the parole violator is being returned to the Department from another state, the inmate may arrive via a transportation service. The transportation schedule may require the inmate to arrive at a Department facility after hours or on a weekend. When that occurs, the Facility Parole Supervisor/Agent shall provide the Records Office with a copy of the Board's **PBPP-141**, Warrant to Commit and Detain or **PBPP-61**, Warrant for Arrest of Paroled Prisoner, prior to the arrival of the prisoner. This procedure will enable parole violators to be lodged in a Department facility by transporting personnel and negate the need for Records Office staff and PBPP staff to be physically present upon the inmate's arrival. If a parole violator is expected to be returned during other than normal business hours, a **DC-151A** or Automated Body Receipt shall be prepared and provided to appropriate receiving staff. The required Records Office functions shall be performed on the following business day.

C. **Out-of-State Parole Violators (OPV)**

*An OPV is a person who was serving a sentence in another state and has been granted parole. With prior agreement by the PBPP, the offender is permitted to move to Pennsylvania and is supervised by the PBPP. When the offender commits a*

*violation he/she is returned to the Pennsylvania DOC as opposed to the sending state or a county facility. The PA DOC will continue to house such persons until they are returned to the sending state or continued on parole. NOTE – upon release of an OPV, the same procedures outlined in Section 2 of this procedures manual apply. If an OPV has pending criminal charges in any County in Pennsylvania, the offender must remain in the county facility until the matter has been disposed of. All county prison time must be served prior to PBPP returning an OPV to the DOC.*

## D. Community Parole Center (CPC) Program

*Commonly referred to as "halfway back" is an alternative to confinement for offenders who are violating technical conditions of their supervision. Offenders will be received in the Department pending the PBPP arranging placement in the program. Reception procedures outlined in B.1- 3 will apply.*

*NOTE- the typical stay for "halfway back" inmates in an SCI is about one week. Upon reception of a known halfway back case, the records staff should begin to review the file for release using procedures outlined in Section 2 of this procedures manual.*

## E. County Prison Transfers

1. An inmate confined to a county jail may be transferred to a state correctional facility. Such transfers require Department approval. The county prison warden seeks approval for such a transfer by submitting a **DC-5B, Petition for Transfer: County Prisons (Attachment 1-H)**, along with form **DC-185, Transmittal of Data for County Prison Transfer (Attachment 1-I)**, to the Director of the BIS. He/She reviews the petition and designates a facility, if approved. The **DC-185** is sent to the receiving facility along with copies of all appropriate confinement orders and/or detainers.

2. When a county prisoner is delivered to the Department, the Records Office shall:

   a. collect the appropriate documents relating to the reception, including the unburst **DC-5B** and applicable **Act 84** documents as outlined in this procedures manual;

   b. review the **DC-5B** to verify its authenticity and that it has been approved by the Director, BIS. If it appears that the county prisoner is being transferred to the Department improperly, the facility shall advise the Records **Administrator/ Assistant Records Administrator** by telephone before declining the transfer. An improper transfer shall NOT be accepted, except upon approval from the Records **Administrator/Assistant Records Administrator**. As soon as possible after accepting or refusing an improper transfer, the Records Office shall forward to the Central Office Records **Administrator** a memorandum concerning the matter including a copy of the relevant documents;

   c. upon verifying the transfer documents, a Department inmate number shall be assigned and a **DC-151A** issued to the delivering authority.

   d. conduct the reception interview, as described in **Subsection A., 5-8**, above.

CONFID-DEF-000007

## F. Return from Authorized Temporary Absence (ATA)

1. The Records Office staff shall:

   a. prepare a **DC-151A** and meet the transporting authorities in the reception area to obtain their signatures. The **DC-151A** shall be signed and dated along with the time of arrival. The signed **DC-151A** is filed in the **DC-15** per the filing procedures outlined in **Section 3** of this procedures manual;

   b. closely review any court commitments or other documents delivered by the transporting authority to determine if the inmate's sentence structure must be changed or if his custody level should be reviewed. Any documents delivered by the transporting authority must be processed in accordance with procedures outlined in the **Sentence Computation Manual (Appendix A)** or **Section 5, Detainers** of this procedures manual;

   c. make all required entries in the Inmate Records System within two hours. After hours receptions must be done immediately on the next working day.;

   d. ask the inmate if he/she has any enemies at the facility or if there are persons at the facility whom the inmate believes are a danger to him/her. This information shall be forwarded to the respective counselor and Security Captain;

   e. if any of the inmate's responses to the questions or the inmate's actions indicate that the inmate is suffering from an active mental health issue, the inmate shall be referred to the Psychology Department.

2. Records Office Staff are responsible for monitoring the status of ATA inmates. If the inmate is not returned to the facility within three months, the Inmate Records Office shall contact the receiving authority to determine the status of the case. If the inmate has been released by the receiving authority or otherwise, the procedures outlined in **Section 2** of this procedures manual shall be followed.

   *NOTE: if the inmate was released in error by the receiving authorities immediately notify the Records Administrator/Assistant Records Administrator.*

3. Every inmate returning from ATA shall be reviewed for **new convictions** in accordance with **Department policy 11.6.1, 11.6.2**, as well as **Act 143 of 1998**.

## G. Inter-Facility Transfer

1. The Inmate Records Supervisor/designee is responsible to monitor the van schedule generated by the Automated Transfer Petition and Transportation systems weekly to determine whether an inmate is to be transferred to or from the facility.

2. When an inmate is transferred from one Department facility to another Department facility, upon reception, the transporting officers shall present a **DC-151A** for each inmate. (NOTE: Multiple inmates can be placed on one **DC-151A** if the destination is the

same for all). Photo(s) shall be attached *if not already on the DC151A.* The Reception Officer shall review/identify each inmate and process the DC-151A. The original shall be retained and forwarded to the Inmate Records Office. The Reception Officer shall also ensure that an Inmate Record has been received for each inmate.

3. Upon completion of the **DC-151A** processing, the Inmate Record Office of the facility receiving the inmate shall:[7]

   a. examine the **DC-151A** to identify each inmate received and acknowledge receipt of the inmate by signing the **DC-151A**;

   b. if a DC-15 is not received with the inmate, the Inmate Records Office shall contact the transferring facility, and arrange for the sending facility to send the record to the receiving facility;[8]

   c. b. distribute the inmate records to the appropriate departments as needed;

   d. upon completion of review by the Initial Reception Committee and the inmate's medical screening, verify that the inmate's photograph is in accordance with Department policy 1.3.3 and Subsection A. above;

   e. review the inmate's sentence structure for possible release processing;

   f. place a copy of the Transfer Petition and Routing Sheet in the **DC-15** in accordance with **Section 3** of this procedures manual; and

   g. determine if the inmate is subject to Department policy 11.6.1, 11.6.2, as well as Act 143 of 1998.

## H. Detentioners

1. A Detentioner is an inmate who is in the Department's custody in one of the following situations:

   a. the inmate has satisfied his/her state sentence and is being held on another jurisdiction's detainer pending transfer to the other jurisdiction;

   b. the inmate has been transferred from a county jail to a state correctional facility prior to the imposition of a sentence or the sentence was ordered to be served in the county jail;

   c. the inmate has been transferred to the Department for a psychiatric evaluation prior to the imposition of sentence as an aid in imposing sentence; or

---

[7] 2-CO-1E-04

[8] 4-4096

CONFID-DEF-000009

d. the inmate has been transferred from a county to the Forensic Treatment Center at SCI-Waymart as the result of a commitment under the Mental Health Procedures Act.

**e. The inmate has been referred to the DOC for evaluation for the SIP program.**

2. A **DC-5B** and a **DC-185** form must be completed for an inmate in categories **F. 1. b.,** above and a certified copy of the detainer or confinement order obtained. Only the Mental Health Procedures Act commitment is required for an inmate in category **F. 1. d.,** above.

3. Every procedure for **Initial Receptions (Subsection A. above)** shall be followed when a detentioner is transferred to the Department.

4. Refer to **Subsection M.4.** below for procedures to process an inmate being returned to Pennsylvania as a detentioner and not an added escape.

## I.   Interstate Corrections Compact (ICC) Receptions

1. An ICC case from another state shall be received at the DCC and processed as an initial reception EXCEPT:

   a. collecting the appropriate documents. The sending state shall provide acceptance letter and confinement orders;

   b. previewing for DNA criteria; and (any PA conviction will require DNA to be done)

   c.  establishing sentence structure.

2. Make all data entries in the Inmate Records System to include that a reception is reported as an ADD, OS as the population movement code. Use the standard alpha code to identify the state from which the inmate was received. Report OS as the Court on Line 5. OS shall be used to identify this inmate as an out of state ICC case. NOTE: A PA SID may not be available in these cases.

## J.  ICC Inmates from Other States

1. All documentation between Pennsylvania and the sending state must go through the Central Office Records Administrator.

2. All major incidents (i.e., death, attempted suicide, commission of a crime, misconduct, move to a MHU, SMU, or SNU, etc.) are to be reported immediately to the Central Office Records Administrator. If the Central Office Records Administrator is not available, it is to be reported to the Assistant Records Administrator. It is the responsibility of the Central Office Records Administrator to notify the Secretary/designee and the sending state of these types of occurrences.

CONFID-DEF-000010

3. The Central Office Records Administrator/designee shall complete a progress report every six months on every inmate sent to the Department from another state. The progress report shall be sent to the Records Administrator of the sending state, and a copy of the progress report shall be kept in the Central Office Records Division.

4. All requests for pre-release must go through the Central Office Records Administrator. The facility should forward the approved Pre-Release Packet to the Central Office Records Administrator who will in turn request approval from the sending state. Once approval from the sending state is received, the packet will be forwarded to the Secretary/designee for final approval unless the inmate is considered problematic. In problematic cases, the Central Office Records Administrator will forward the packet to the Regional Deputy Secretary for review who will then forward the packet to the Secretary/designee for final approval.

5. If important documents (i.e., release orders, etc.) are received at the facility without going through the Central Office Records Administrator, the Central Office Records Administrator must be notified immediately and the documents forwarded via fax

## K. Bail Returns

1. A bail return is the result of re-sentencing and may return directly to the releasing facility.

2. A bail return is processed the same as an initial reception except for the following:

   a. the appropriate record shall be restored in the **Inmate Records System** instead of assigning a new Department number; and

   b. all physical and personal data (marital status, next of kin, etc.) shall be reviewed and updated, if necessary.

3. Consider the need to update photos depending on length of time the inmate was on bail, if there has been a change to appearance, etc.

4. Compute new sentence structure according to the Sentence Computation Manual.

## L. Return of Inmate Following Retrial or Re-sentence

1. A retried or re-sentenced case is not to be treated as a new commitment and *is* not entered under a new Department number. He/She is processed the same as an initial reception except for the following:

   a. the appropriate record shall be restored in the **Inmate Records System**;

   b. all physical and personal data (marital status, next of kin, etc.) shall be reviewed and updated, if necessary; and

CONFID-DEF-000011

    c.  such a case is to have his/her sentence recomputed *using DOCNET sentence computation program with the appropriate basis for computation listed.*

## M. Escape Returns

1.  Once the detaining authority contacts the state correctional facility from which the inmate escaped and indicates the date that the subject is available for pick up.

    a.  for every in-state and out-of-state return contact the Bureau of Standards, Practices, and Security; and

    b.  instructions regarding the Return of Apprehended Escapees as outlined in Department policy 6.3.1, Section 13 shall be followed.

2.  An escape return is processed the same as an initial reception except for the following:

    a.  the appropriate record shall be restored in the **Inmate Records System** instead of assigning a new Department number;

    b.  all physical and personal data (marital status, next of kin, etc.) shall be reviewed and updated, if necessary;

    c.  the inmate photos shall be updated depending on the length of time the inmate was *at large or absent*, if there has been a change to appearance, etc.;

    d.  calculate escape time according to the sentence computation section of this policy;

    e.  research and resolve issues relating to any detainers or open charges; and

    f.  a returned escapee is given notice that the Department is recalculating his/her sentence by using **(Attachment 1- J)** and he/she has 15 days from the date of the notice to challenge the recalculation. **Calculations are challenged by the inmate via PRC.**

3.  When an inmate escapes from a CCC, charges for the escape are filed by the District Attorney in the county where the CCC is located. When the inmate commits a new crime in another jurisdiction (Federal or other state) he/she is tried and sentenced to a prison in that other jurisdiction. The Pennsylvania District Attorney files a detainer for the new escape charges and the Department files a detainer for the inmate to return to Pennsylvania to complete his/her unsatisfied sentence. The inmate or the Pennsylvania District Attorney files under the Interstate Agreement on Detainers (IAD) to resolve the open charges (new escape charge). The Bureau of Standards and Practices will arrange for the transportation for the inmate to return to Pennsylvania.

4.  In the scenario listed above only, some District Attorneys will not prosecute for the new escape charge unless the Department pays the cost of transportation *of the inmate* to return to Pennsylvania and for the housing for the new charges. The Department has

CONFID-DEF-000012

agreed to do this. When this occurs and the Department has received the inmate, the following procedure will be used to process the inmate:

a.  the inmate is here as a detentioner, not as an added escapee;

b.  add the inmate as a detentioner with a new number and cross reference it with the old number;

c.  the inmate will remain in escape status on the old number and the escape time is still accumulating;

d.  when the inmate has completed the criminal proceedings on the new escape charges, he/she must be returned to the sending state to complete the sentence he/she is serving;

e.  the Bureau of Standards, Practices and Security must be contacted to arrange the return of the inmate to the sending state; and

f.  the delete move will be release detentioner.

5.  The escape time for the Pennsylvania sentence that the inmate escaped from does not stop until the inmate  has been permanently released from the other state (parole or maximum) and is available to be transported back to Pennsylvania to start serving the completion of his/her original sentence.

6.  *Escape Time Scenarios*

   a.  *Escape from DOC custody, no charges, escape time will be from date of escape to IC, In Custody date.*

   b.  *Escape from DOC custody, new escape charge only, escape time will be date of escape to return to DOC custody. The IC date to the date of return to DOC custody will be credit on the new escape charge IF ordered by the county. If not, the escape time must be corrected and recalculated as outlined in a. above.*

   c.  *Escape from DOC custody, new criminal charges; escape time is calculated as outlined in b. above.*

   d.  *Escape from DOC custody, new criminal charges out of state, the inmate is continued on escape status until completion of the other authority's sentence.*

## N. CCC Returns

1.  A CCC return results when an inmate with pre-release status (and who has been placed in a CCC) violates the conditions of the pre-release program and is returned to the Support Facility. The only exceptions to this are female resident's detained pending return to a female facility. An inmate may be returned directly from the CCC or via a

CONFID-DEF-000013

county prison. The Records Office staff issues a **DC-151A** upon arrival of the inmate and collects appropriate documents to include **DC-7X, Temporary Transfer Information (Attachment 1-K)**, detainer (if applicable), misconducts (if applicable), etc.

2. Consider the need to update photos.

3. Support Facility's Records Office staff shall research and resolve issues relating to any open charges or escapes.

4. It shall be the responsibility of appropriate staff at the Support Facility to determine if the individual remains at the facility or shall be permanently transferred back to the Parent Facility.

5. If the decision is to return the inmate to the Parent Facility, a computerized transfer petition shall be generated. When appropriate, the inmate shall be processed for transfer in accordance with Section 2 of this procedures manual.

6. If the CCC Return is due to escape, calculate escape time according to the Sentence Computation Manual.

O. *Proclamation Counties*

1. *The Department can accept female inmates to serve county sentences in the Department from Proclamation counties; based on former Governor Thornburgh's proclamation of April 8, 1986 permitting female prisoners sentenced in Allegheny, Armstrong, Beaver, Butler, Cameron, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Venango, Warren, Washington, and Westmoreland to be housed at SCI Muncy.*

2. The Department shall accept the inmate and process her for service of her sentence in accordance with the procedures outlined in **Subsection A.,** above. *Upon completion of processing at the DCC, an inmate may be transferred to* another facility if deemed appropriate. The Records Office Staff is responsible to maintain a suspense time file in order to ensure that the inmate is processed for county parole in accordance with the established minimum, and/or released at completion of the maximum sentence.

P. **Inmates Who Regularly Use Names Different from the Name on the Commitment Form**

1. An inmate, who has made a permanent legal change in his/her name, so that it differs from the commitment name, may submit a request to the Facility Manager for permission to use the new name for limited purposes. This request must include the reason(s) why the inmate wishes to use the new name.

2. The Facility Manager shall review and grant permission for limited use of the name if the name was changed for legitimate reasons. Legitimate reasons shall include changes

CONFID-DEF-000014

because of change in marital status, religious reasons, and ethnic identification. Only permanent changes will be approved. Multiple changes will not be honored.

3. The Facility Manager shall notify the inmate of his/her decision on the request to use the new name. If the request is approved, the Facility Manager shall inform the inmate in writing of the permitted uses of the new name. The Facility Manager shall advise the inmate that the approved new name may not be used to mislead or commit fraud and that abuse of the guidelines established for this procedure may result in withdrawal of approval to use the new name. If this request is disapproved, the Facility Manager shall explain the reasons for disapproval.

4. The facility is not required to permit an inmate to use a new name, which has not been approved by these procedures.

5. The new name shall be added to the inmate's records as an AKA (also known as). No Department records will be changed absent a court order specifically directing that the records be changed. If such an order is issued, it shall be referred to the Office of Chief Counsel for review. This type of change will not be handled pursuant to the procedures established here. A court order authorizing and ordering a change of name does not automatically mandate changes in existing records.

6. ***When an inmate changes his/her name, the Records Office shall notify the Office of Victim Advocate (OVA) and the Parole Supervisor at the facility.***

7. The inmate must continue to respond when addressed by his/her commitment name and to sign the commitment name for all purposes except those listed below:

   a. a visitor may identify the inmate he/she wishes to visit by using the approved new name;

   b. the inmate may execute a **DC-155, Section 1 Power of Attorney**, authorizing the receipt of mail and endorsement of checks in the approved new name. A notation shall be made on the second form indicating this form does not supersede the **DC-155** under the commitment name, but is only additional authorization;

   c. after the execution of the new power of attorney form the inmate may receive and send mail, packages, and publications using the approved new name. The inmate may also receive checks and money orders addressed in the approved new name;

   d. it is the inmate's responsibility to advise any person who wishes to use the approved new name for the purposes described above that he/she must, whenever using the new name, also provide other data; inmate number and commitment name, so that the facility can identify the inmate. A visitor, correspondence, and publication that does not present or contain data sufficient to identify the inmate may be disapproved; and

   e. it is the inmate's responsibility to change his/her name on his/her social security card. Form SS-5 (See Department policy **7.2.1, "Counseling Services,"** Section 2,

Attachment 2-B) is to be used for a name change. A new card will be issued with the inmate's original social security number. A new number is not issued for a name change. The inmate will have to send the original Court Order that grants the legal name change with the application for name change. Photocopies or notarized copies of documents are not accepted.

8. An inmate must be issued and charged for the replacement ID Card when there has been an authorized name change **in accordance with Department policy 1.3.3, "Inmate Identification Cards."**

9. The inmate shall be charged ten dollars ($10) for a new fingerprint card that is required for a name change.

10. Abuse by the inmate of any of these guidelines shall be treated as disobedience of a direct order, and may be grounds for revocation of permission to use the new name, and for disciplinary action.

An inmate may appeal a decision pursuant to these procedures to the Secretary. Exceptions to this procedure shall be made only with the approval of the Secretary.

CONFID-DEF-000016

DC-300B (PART IV) *For Use with Recidivism Risk Reduction Incentive (RRRI)
Rev. 5/08

COURT COMMITMENT
STATE OR COUNTY CORRECTIONAL INSTITUTION
Commonwealth of Pennsylvania
vs.

Type or Print Legibly

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
BOX 598 CAMP HILL, PA. 17001-0598
ATTN: CENTRAL OFFICE RECORDS

NOTE: Additional supply of this form available at above address

☐ DC-300B (PART V) for additional RRRI sentences attached

COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)

| SEX | Date of Birth | SID | OTN | COURT OF INITIAL JURISDICTION ☐ | COMMON PLEAS ☐ |
|---|---|---|---|---|---|
| ☐ F ☐ M | | | | | |

| COMMITTING COUNTY | COURT NUMBER | | DATE -TERM |
|---|---|---|---|

| MANDATORY SENTENCE | ☐ Yes | ☐ No | |
|---|---|---|---|
| BOOT CAMP RECOMMENDED | ☐ Yes | ☐ No | |
| RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes | ☐ No | COUNTY REFERENCE #: |
| RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes | ☐ No | |

The above defendant after    ☐ Pleading guilty    ☐ Nolo contendre    ☐ Alford    ☐ Being found guilty    ☐ GBMI

was on _____, _____, sentenced by Judge _____

to an **original** term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a **RRRI** term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or _____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____.

| Fine: Amount $ _____ Balance $ _____ | Cost: Amount $ _____ Balance $ _____ | Restitution: Amount $ _____ Balance $ _____ |
|---|---|---|

| CREDIT FOR TIME SERVED (EXPLANATION OF CREDIT COMPUTATION ON REVERSE SIDE) | EFFECTIVE DATE OF SENTENCE |
|---|---|

THIS SENTENCE IS CONCURRENT WITH:

THIS SENTENCE IS CONSECUTIVE TO:

| PROSECUTING ATTORNEY | DISPOSITION ON NON-INCARCERATION OFFENSE(S) |
|---|---|
| DEFENSE ATTORNEY | |
| COURT REPORTER | |
| | (THIS BLOCK NOT TO BE USED FOR INCARCERATION OFFENSE) |

| (SEAL) | In witness, whereof I have hereunto set my hand and seal of said court, this _____ day of _____, _____.  _____ AUTHORIZED SIGNATURE |
|---|---|

The sentence of this defendant was computed as follows:

| Date of Sentence | County or Magisterial Dist. | Court Number and Term | Type Sent. | Minimum | | | Maximum | | | Judge or District Justice | OTN (Include Alpha Suffix) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yrs. | Mos. | Days | Yrs. | Mos. | Days | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | Total Sent. | | | | | | | | |

**Credit for Time Served**

| Locked Up (Location) | Dates | | No. of Days |
|---|---|---|---|
| | From | To | |
| | | | |
| | | | |
| | | | |
| | | | Total |

| All Detainers Must Be Attached To This Form | | Total Number Of Detainers Attached | |
|---|---|---|---|
| Dated | Indict - Warrant Nos. | Remarks | |
| | | | |
| | | | |
| | | | |

**Recommendations of the Court**

| The Following Additional Reports are Attached | | | The Following Additional Reports will be Forthcoming | |
|---|---|---|---|---|
| ☐ Continuation Sheet (DC-300B, Part II, III, IV,V) | ☐ Arrest Report | ☐ FBI | ☐ Arrest Report | ☐ Presentence or Postsentence Investigation |
| ☐ Presentence or Postsentence Investigation | ☐ Behavior Clinic | ☐ PSP | | |

DC-300B (PART V) *For Use with Recidivism Risk Reduction Incentive (RRRI)
Rev. 5/08

**COURT COMMITMENT
CONTINUATION SHEET
STATE OR COUNTY CORRECTIONAL INSTITUTION**
Commonwealth of Pennsylvania

vs.

Type or Print Legibly

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
BOX 598 CAMP HILL, PA. 17001-0598
Attn: Central Office Records

**COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)**

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | COUNTY REFERENCE #: |
|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| MANDATORY SENTENCE: | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes | ☐ No |
| BOOT CAMP RECOMMENDED | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes | ☐ No |
| The above defendant after | ☐ Pleading guilty | ☐ Nolo contendre | ☐ Alford | ☐ Being found guilty | ☐ GBMI |

was on _____, _____, sentenced by Judge _____
to an **original** term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a RRRI term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or _____ for the offense of _____
_____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____

| Fine: | Cost: | Restitution: |
|---|---|---|
| Amount $ _____ | Amount $ _____ | Amount $ _____ |
| Balance $_____ | Balance $_____ | Balance $_____ |

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|

THIS SENTENCE IS CONCURRENT WITH:

THIS SENTENCE IS CONSECUTIVE TO:

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| MANDATORY SENTENCE: | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes | ☐ No |
| BOOT CAMP RECOMMENDED | ☐ Yes | ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes | ☐ No |
| The above defendant after | ☐ Pleading guilty | ☐ Nolo contendre | ☐ Alford | ☐ Being found guilty | ☐ GBMI |

was on _____, _____, sentenced by Judge _____
to an **original** term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a RRRI term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or _____ for the offense of _____
_____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at _____

| Fine: | Cost: | Restitution: |
|---|---|---|
| Amount $ _____ | Amount $ _____ | Amount $ _____ |
| Balance $_____ | Balance $_____ | Balance $_____ |

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|

THIS SENTENCE IS CONCURRENT WITH:

THIS SENTENCE IS CONSECUTIVE TO:

(SEAL)

In witness to the above sentence(s) for offense(s) as well as those found on the reverse side of this document, I hereunto set my hand and seal of said court, this _____ day of _____, _____.

Authorized Signature

CONFID-DEF-000019

*Attachment 1-A
Page 3 of 4*

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | COUNTY REFERENCE #: |
|---|---|---|

| MANDATORY SENTENCE: | ☐ Yes   ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes   ☐ No |
|---|---|---|---|
| BOOT CAMP RECOMMENDED | ☐ Yes   ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes   ☐ No |

The above defendant after   ☐ Pleading guilty   ☐ Nolo contendere   ☐ Alford   ☐ Being found guilty   ☐ GBMI

was on _____, ____, sentenced by Judge _____
to an *original* term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a RRRI term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or
_____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at

| Restitution:   Amount $ _____ <br> Balance $ _____ | Restitution:   Amount $ _____ <br> Balance $ _____ | Restitution:   Amount $ _____ <br> Balance $ _____ |
|---|---|---|

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|

THIS SENTENCE IS CONCURRENT WITH:

THIS SENTENCE IS CONSECUTIVE TO:

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | COUNTY REFERENCE #: |
|---|---|---|

| MANDATORY SENTENCE: | ☐ Yes   ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes   ☐ No |
|---|---|---|---|
| BOOT CAMP RECOMMENDED | ☐ Yes   ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes   ☐ No |

The above defendant after   ☐ Pleading guilty   ☐ Nolo contendere   ☐ Alford   ☐ Being found guilty   ☐ GBMI

was on _____, ____, sentenced by Judge _____
to an *original* term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a RRRI term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or
_____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at

| Restitution:   Amount $ _____ <br> Balance $ _____ | Restitution:   Amount $ _____ <br> Balance $ _____ | Restitution:   Amount $ _____ <br> Balance $ _____ |
|---|---|---|

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|

THIS SENTENCE IS CONCURRENT WITH:

THIS SENTENCE IS CONSECUTIVE TO:

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | COUNTY REFERENCE #: |
|---|---|---|

| MANDATORY SENTENCE: | ☐ Yes   ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) | ☐ Yes   ☐ No |
|---|---|---|---|
| BOOT CAMP RECOMMENDED | ☐ Yes   ☐ No | RECIDIVISM RISK REDUCTION INCENTIVE (RRRI) WAIVER GRANTED | ☐ Yes   ☐ No |

The above defendant after   ☐ Pleading guilty   ☐ Nolo contendere   ☐ Alford   ☐ Being found guilty   ☐ GBMI

was on _____, ____, sentenced by Judge _____
to an *original* term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, and a RRRI term of not less than _____ years, _____ months, _____ days nor more than _____ years, _____ months, _____ days, or
_____ for the offense of _____ (Section _____ of the Crimes Code) or (other statute) _____. It is further ordered that the said defendant be delivered by the proper authority to and treated as the law directs at the _____ facility located at

| Fine:   Amount $ _____ <br> Balance $ _____ | Cost:   Amount $ _____ <br> Balance $ _____ | Restitution:   Amount $ _____ <br> Balance $ _____ |
|---|---|---|

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|
| THIS SENTENCE IS CONCURRENT WITH: | THIS SENTENCE IS CONSECUTIVE TO: |

*Attachment 1-A* <br> Page 4 of 4 <br> CONFID-DEF-000020

# Department of Corrections

## BODY RECEIPT

| Receipt Date | Receipt Time | | Agency |
|---|---|---|---|
| | | | Dept of Correction |

| Received From | Title | | Institution | Authority |
|---|---|---|---|---|
| | | | Other ▼ | |

*(Select 'Other' from Institution to print any other Authority in adjacent box)*

### Enter up to 30 inmate numbers

Comments: *(Max 300 characters)*     300 characters left

⬜ To Detainer   ⬜ Confinement Papers     ⬜ RA     ⬜ Court Writ-ATA

⬜ 7X given To Sherriff   ⬜ Other (Specify)

| Received By | Title | | Agency |
|---|---|---|---|

Generate

DC-

**BODY RECEIPT**

**COMMONWEALTH OF PENNSYLVANIA**

| DATE | TIME | A.M. P.M. | INSTITUTION | | |
|---|---|---|---|---|---|
| RECEIVED FROM | | | TITLE | | AGENCY |

PRISONER(S)

| | | To Detain | Court Writ-ATA | DC-16D Photocopy Given to | OTHER (SPECIFY) |
|---|---|---|---|---|---|
| ☐ Confinement | ☐ | ☐ | ☐ | ☐ RA | |
| RECEIVED BY -SIGNATURE | | | TITLE | | AGENCY |

| DC-2A | DIAGNOSTIC-CLASSIFICATION REPORT RECEPTION CHECKLIST | | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | |
|---|---|---|---|---|---|
| DC Number | NAME | LOCATION | RECEIVED FROM | DATE | TIME |
| | | | | | |

### OBSERVATION AND COMMITMENT INFORMATION

| | Yes | No |
|---|---|---|
| 1. Obvious pain, bleeding? | | |
| 2. Wearing medical tags? | | |
| 3. Skin in poor condition (wounds, rash, vermin, swelling)? | | |
| 4. Wearing prostheses (artificial limb)? | | |
| 5. Carrying medication? | | |
| 6. Signs of illness (eyes glassy, bloodshot, pupils dilated or constricted)? | | |
| 7. Signs of possible mental disturbance (confused, anxious, disoriented, fearful, exagerated body movements-slow or rapid, rigidity, unusually tense or suspicious)? | | |
| 8. Signs of possible intoxication-alcohol or drugs (rapid, shallow breathing, staggering, dizziness, tremors, thick, slurred speech)? | | |
| 9. Signs of possible suicide (depression, fear, scars suggesting suicide attempts, history of suicide attempts/threats, expressed intent)? | | |
| 10. Signs of assaultiveness (verbally abusive, uncooperative, threatening, history of violence)? | | |
| 11. Escape history, including attempts or threats? | | |
| 12. Separations necessary? | | |
| 13. Any other problems? | | |

Prev. DC#s

| Observation concerning the inmate during reception processing? | KEEP INMATE SEPARATED FROM |
|---|---|
| | |

MEDICAL OFFICER: Perform medical screening. If not medically cleared, take appropriate action. If cleared for other housing, indicate restrictions by checking appropriate spaces below and list any special observations to be made by officers.

Preliminary Medical Screening Remarks

Indicate recommended housing for initial placement following medical clearance:

| | Receiving Officer | Medical Officer | |
|---|---|---|---|
| General DDC | | | |
| Administrative Custody | | | |
| Ground Floor (medical recommendation) | N/A | | Signature - Receiving Officer |
| Close Observation (Behavior/Medical) | | | |
| Protective Custody | | N/A | |
| Self-Confine | | N/A | Signature - Medical Officer |

If yes is answered to the following questions, make immediate referral as indicated:

| Question Numbers | Who |
|---|---|
| 1 through 8 | Medical Department |
| 7 through 11 | Psychiatrist/Psychologist |
| 12 | Counselor/Ranking Officer |
| 13 | Personnel Appropriate for Stated Problem |

Special Observation Instructions:

Immediate referral to

WHITE DC-15    CANARY Referral #1    PINK Referral #2    GOLDENROD Housing Unit

| DC-150B (revised 8/98) **RECEPTION WORKSHEET** | | | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | |
|---|---|---|---|---|---|
| DC NUMBER | PBPP NUMBER | Commitment  Name | | Institution SMI | Date |
| Aliases | | | | Race | Sex |
| Age | DOB | POB | | Religion | Martial Status |
| Height | Weight | Build | Color Eyes | Color Hair | Complexion |
| Legal Address | | | Arrest Address | | |
| Military  Service | Serial No. | | Dates of Service | Type of Discharge | |
| Social Security No. | USINS No. | | Selective Service No. | FBI No. | |
| Marks and Scars (ID Body Inspection) | | | | | |
| Method of Reception | Committing County | Plea | | Prosecuting Police Dept. | Quarters Assignment |

| Reception Steps | Date | Official's Signature |
|---|---|---|
| 1.    Deliverance of prisoners, examination of commitment papers, DC-151A  issued | | |
| 2.    Removal of valuables (DC-152 issued) | | |
| 3.    Removal of personal clothing | | |
| 4.    Photographing and fingerprinting | | |
| 5.    Reception interview (DC-155 issued) | | |
| 6.    Preliminary Medical Examination | | |
| A. Information to be received for a Reception from a County Facility | | |
| (1) Court Commitment Order | | |
| (2) Record of Institutional Adjustment (include misconduct and escape history) | | |
| (3) Written notice of current medical or psychological conditions regarding treatment (include suicide attempts) | | |
| (4) Written notice of current or previously ordered/administered medications | | |
| (5) A forty-eight (48) hour supply of medication(s). | | |
| B. Information to be received within twenty (20) days of reception | | |
| (1) PSI or official version of the crime or guilty pleas transcript or colloquy or preliminary hearing transcript or docket transcript form | | |
| (2) Criminal complaint or affidavit of probable cause accompanying The arrest warrant | | |
| (3) Police report summarizing the facts of crime, when available | | |
| (4) Guideline Sentence Form issued by the PA Sentencing Commission | | |
| (5) Record of any monies paid by the inmate and any balance remaining towards satisfaction of restitution or any other court ordered financial obligations. | | |
| C. Reception from PBPP | | |
| (1) Warrant to Commit and Detain (PBPP-141) | | |
| (2) Notice of charges of Hearing (PBPP) | | |
| (3) 257AR Report | | |

NOTIFY INCASE OF ILLNESS OR DEATH:
NAME:                                              RELATIONSHIP:
ADDRESS:                                         PHONE #

| DC-155<br>Rev. 1/05 | **LEGAL DISPOSITIONS**<br><br>_____<br>(Facility) | **COMMONWEALTH OF PENNSYLVANIA**<br>**Department of Corrections** |
|---|---|---|

## 1. POWER OF ATTORNEY

I, (print inmate's name and number) _____, do make, constitute, and appoint the Facility Manager/Director, or his/her authorized representative, of any facility or center within the Department of Corrections to which I am then confined my true and lawful attorney for me and in my name to sign my name as endorsement of all checks, money orders, or bank drafts for deposit to my credit in the Inmate General Welfare Fund Cash Account and to receive and document receipt of mail on my behalf. This power shall continue so long as I am an inmate of any facility or center within the Department of Corrections and shall not be affected by my subsequent disability or incapacity while confined therein unless sooner revoked. This power shall be for the doing of all lawful acts necessary to carry out the purposes set forth above. I hereby ratify, confirm, and intend to be bound by any and all acts, as described in the previous sentence, which these attorneys or substitutes shall commit pursuant to this power of attorney.

Witnessed by: _____

Inmate's
Signature: _____

Witnessed by: _____

## 2. DESIGNATION OF GUARDIAN OF PROPERTY

I, (print inmate's name and number) _____, hereby designate

(print guardian's name) _____ who lives at (print street address)

_____, (print city or town) _____,

(print county) _____ (print state) _____, (postal zip code) _____ ,telephone

(____)_____as the guardian of all property to which I hold lawful title at the time of my death which is either in my personal possession or in one of the facilities or an account of the Department of Corrections to hold until such property shall be disposed of according to law. This designation shall be null, void and of no further effect upon my release from the jurisdiction of the Department of Corrections.

_____         _____
Inmate's Signature                          Date

_____         _____
Witness                                           Date

_____         _____
Witness                                           Date

## 3. ADVISEMENT OF RIGHT OF COMMUNICATION

If any problem arises within the facility concerning your confinement, you may bring the matter to the attention of the appropriate staff members for assistance. The Inmate Grievance System may be used if applicable. In addition, you may address privileged communication at any time to the Facility Manager, the Regional Deputy Secretary of Corrections, the Secretary of Corrections, the Attorney General, the Governor, or any elected local official or any appointed or elected state or federal official. This is not to be construed as limiting your access to the courts in any way. I have read or have been read the following advisement and hereby acknowledge receipt thereof.

_____    _____    _____
**Inmate's Signature**                **Witness**                          **Date**

**COMMONWEALTH OF PENNSYLVANIA**
**DC16E – SENTENCE STATUS SUMMARY     DEPARTMENT OF CORRECTIONS**

Name:                                  Inmate #:

## 1.   REFERENCES AND IDENTIFICATION

| DOC # | Commitment Name | PBPP # | SID # | FBI # | Phila Photo # |
|-------|-----------------|--------|-------|-------|---------------|
| DOB   | Place of Birth  |        |       | Race  | Sex           |

## 2.   SENTENCE SUMMARY (RRRI)

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum | | | Maximum | | |
|-----------|----------------------|-------------|-----------|---|---|---|---|---|---|
|           |                      |             |           | Y | M | D | Y | M | D |
|           |                      |             |           |   |   |   |   |   |   |

| Plea: | | OTN: | Judge: | |
|-------|--|------|--------|--|
| Offense: | | | | RRRI |

| Reception Date | | Reentered from DOC # | |
|----------------|--|----------------------|--|
| Controlling Minimum Date | | New Maximum – PV | |
| Controlling Maximum Date | | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

Summary or Remarks on Sentence

| Remarks | |
|---------|--|

## 3.   SENTENCE STRUCTURE

| Commitment Credit |
|-------------------|

| Remarks | |
|---------|--|

Bail/Escape/Interruption Time Date

| None |
|------|

Name: _____      Inmate #: _____

### 3. SENTENCE STRUCTURE (Cont'd)

| Item | Computation 2 | | | |
|------|---------------|---|---|---|
| Indictments Included | | | | |
| Eff Date | | | | |
| Expiration of Minimum | | | | |
| Expiration of Maximum | | | | |
| Custody for Return – PV | | | | |
| Delinquent Time | | | | |
| Backtime Credit | | | | |
| Backtime Owned | | | | |
| New Maximum – PV | | | | |
| Sentence Computation Date | | | | |
| Basis for Computation | | | | |
| Total Sentence | | | | |
| Status | | | | |

Name: _____  Inmate #: _____

#### 4.   NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|-----------|---------------------|-------------|
| None | | |

Comments

#### 5.   DETAINERS

**Active Detainers**

| Detainer # | Date | Agency | Agency Identification | OTN | Type |
|-----------|------|--------|----------------------|-----|------|
| | | | | | |

Charges

**Deleted Detainers (For those deleted since last DC16)**

| Detainer # | Date Deleted | Agency | Agency Identification | OTN | Type |
|-----------|--------------|--------|----------------------|-----|------|
| None | | | | | |

Remarks

#### 6. PRIOR DOC NUMBERS

| None | | | | | | | | |
|------|---|---|---|---|---|---|---|---|
| | | | | | | | | |

#### 6.   ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---------------|-------------|--------|----------|
| | | | |

| PA Dept. of Corrections | DC1 Face Sheet | Date: 11/12/2008 |
|---|---|---|
| Time: | *Confidential* | Page: 1 |

| Initial ( ) | Parole Violator ( ) | Continuation ( ) | Update ( ) |
|---|---|---|---|

| DOC # | SID # | PBPP # | Name | Institution |
|---|---|---|---|---|

| Race | Sex | Date of Birth |
|---|---|---|
| Height | Weight | Eyes |
| Complexion | Build | Marital Status |
| SSN # | | Religion |
| Problematic Offenses | | |
| Custody Level | | Program Codes |

**Problem Area:**  V = Verified   NV = Not Verified
Assault: __   Alcohol:   Escape: __   Drugs:
Suicide:   Sexual: __   Psychiatric: __

Recomputed PV Max Date:
Factored Sentences   Expiration Date
Minimum:
Maximum:

**Priors:**   Detainers: Yes/No   More Sentences: Yes/No
**Legal Address:**   Notify Address:

**Scars, Marks, Tattoos:**

**Alias:**

**Assault Escape:**
Sex Offense ( )   Victim Killed ( )   Escape/Attempt ( )
Serious Assault ( )   Violated Probation/Parole/Bail ( )
**Separations: Yes/No**   **Misconducts: Yes/No**   **STG: Yes/No**

| DC-5B 5M-2-03 | **PETITION FOR TRANSFER: COUNTY PRISONS** | **COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS** Forward Petition unburst with DC-185 Form |

## 1. PETITIONING FACILITY

TO: Deputy Secretary – Specialized Facilities and Programs

| | Name of Official | Title | Prison or Jail |
|---|---|---|---|
| **FROM:** | | | |

| | | | |
|---|---|---|---|
| **RE:** | County Prison No. | Parole Board No. | Prisoner's Name |
| | Indictments, Term, and Court | Total Sentence | Effective Date |
| | If Not Sentenced or Tried, Reason for Confinement | If Not Sentenced, Date of Conviction | If Not Tried, Date of Confinement |

In accordance with the provisions of the Act of July 11, 1923, P.L. 1044, as amended 61 P.S. §72, I hereby petition for the transfer of the above inmate to such other facility authorized by law to receive him/her, the specific reason for this petition is as follows: (Check appropriate box.)

☐ Security Risk          ☐ Overcrowded Conditions          ☐ Medical Treatment          ☐ Psychiatric Evaluation

☐ Other: (specify)

_____
(Petitioning Official's Signature)                    (Date)

*In submitting this petition, the county authorities understand that approval is subject to extraordinary costs related to medical treatment, psychiatric treatment, transportation and overtime costs related to the provision of treatment or other extraordinary expenses related to the care, custody, and control of this inmate. County authorities are responsible for extraordinary costs associated with inmates transferred into the Department via the 5-B process. The submitting authority further understands that approval of this petition is subject to rescission by the Pennsylvania Department of Corrections for any reason deemed appropriate by the Department upon notice to the county.*

## 2. ORDER of TRANSFER

I hereby approve this transfer and authorize the following facility to receive this prisoner:

_____
(Facility)

_____
(Deputy Secretary – Specialized Facilities and Programs Signature/Date)

## 3. RECEIVING FACILITY TRANSMITTAL

DATE RECEIVED:                              SERIAL NUMBER ASSIGNED:

White – DC-15 IRJ Copy        Green – Dept. of Corrections        Yellow – Parole Board
        Pink – County Commissioners        Goldenrod – Transferring Facility

*11.5.1, Records Office Operations Procedures Manual*          **Attachment 1-H**
*Section 1 – Processing of Receptions*

CONFID-DEF-000030

Form **DC-185**

**TRANSMITTAL OF DATA FOR
COUNTY PRISON TRANSFER**

**COMMONWEALTH OF PENNSYLVANIA**

**Department of Corrections**

# INSTRUCTIONS

Complete this form, retaining yellow copy for your file. Forward it to the Deputy Secretary for Specialized Facilities and Programs, Department of Corrections, Box 598, Camp Hill, Pennsylvania 17001, ALONG WITH the **DC-5B** and copies of ALL appropriate commitment papers, confinement papers, and detainers. Section 1 in the DC-5B must be completed on all inmates you wish to transfer. Also, Section 2 in the DC-5B must be completed for any unsentenced or untried inmates you wish to transfer. Upon approval of the transfer, the Deputy Secretary for Specialized Facilities and Programs will forward the DC-185, along with necessary documents, to the facility he/she has approved for the transfer. The DC-5B will be returned to you intact. You will then obtain the Judge's approval, remove only the Goldenrod sheet for your records, and forward the remaining parts of the DC-5B UNBURSTED to the facility approved for this transfer with the delivering Sheriff and the inmate. No transfer will be approved between a county prison and a Department of Corrections facility UNLESS forms DC-185 and DC-5B are completed as outlined above.

| County Prison No. | Parole Board No. | Inmate's Name | County Prison | Date of Request |
|---|---|---|---|---|
| | | | | |

DETAILED REASON FOR REQUESTING THIS TRANSFER:

**THIS INMATE IS SERVING THE FOLLOWING SENTENCE:**

| DATE OF SENTENCE | EFFECTIVE DATE | COURT, INDICTMENT, NUMBER, TERM | MINIMUM | | | MAXIMUM | | | JUDGE | OFFENSE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Y | M | D | Y | M | D | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| SUMMARY OR REMARKS ON SENTENCE | TOTAL SENTNECE: | | COMMITMENT CREDIT |
|---|---|---|---|
| | | | |

**FOLLOWING THE ABOVE SENTENCE, THIS INMATE HAS THE FOLLOWING DETAINERS:**

| DATED | FROM (Include address) | CHARGING | INDICT-WARRANT NOS. | REMARKS |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**THIS INMATE IS NOT SENTENCED; NOTE THE FOLLOWING:**

| DATE OF CONFINEMENT | DATE OF CONVICTION | DATE OF TRIAL | INDICTMENT No., TERM | CHARGING |
|---|---|---|---|---|
| | | | | |

| SIGNATURE | TITLE |
|---|---|
| | |

DATE: _____

Subject:   Recomputation of Sentence

TO:

FROM:   Records Supervisor

This is to inform you that your sentence has been tentatively recomputed as follows:

ESCAPE:

ORIGINAL EFFECTIVE DATE:

NEW ADJUSTED MINIMUM:

NEW ADJUSTED MAXIMUM:

You are advised that you may make a written request for a hearing by the Program review committee for this recomputation of sentence within 15 days of your receipt of this memorandum. At that hearing you may question the Records Officer and present documentary evidence on your own behalf.

If you do not make a written request for a hearing within 15 days of receipt of this memorandum, the tentative recomputed sentence indicated above shall become effective, and you will receive written notice of the same.

RECEIVED: _____
                                        Inmate's Signature

DATE:          _____

WITNESS:    _____

cc:  DC-15
       inmate

| FORM **DC-7X**<br><br>**TEMPORARY TRANSFER INFORMATION**<br><br>(THIS FORM IS TO BE FORWARDED TO AUTHORITIES<br>ACCEPTING TEMPORARY CUSTODY OF INMATE) | **COMMONWEALTH OF PENNSYLVANIA**<br><br>**DEPARTMENT OF CORRECTIONS** |
|---|---|
| TO: | FROM:<br><br>(SEE INSTRUCTIONS BELOW) |

RE:  Name:                                                    Age:

      Home Address:

      Charge:

      Sentence:                                         Bill & Term No.

      Minimum Date:                                 Maximum Date:

      Detainer(s):

The above named inmate is being transferred on _____ for

the purpose of _____

To assist in supervising this inmate while in your custody, the following information is furnished:

      Custodial Classification:

      Special Problems:

      Medical Information:

      Recommendation:

| DATE: | SIGNATURE: | TITLE:<br><br>RECORD OFFICER |
|---|---|---|

**EXHIBIT**
Varano-5

**DC-16D.**

## SENTENCE STATUS SUMMARY

MMONWEALTH OF PENNSYLVAN
DEPARTMENT OF CORRECTIONS

### 1. SENTENCE SUMMARY

MR. MERROW CRS

| Class of Sentence | DEFINITE | ☒ INDEFINITE | GENERAL | LIFE | COMMUTED LIFE | EXECUT |
|---|---|---|---|---|---|---|

| Date | County | Number, Term Court, Indictment | Type Sent | Min Y | Min M | Min D | Max Y | Max M | Max D | Judge | Offense | On Tra Nu |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-25-96 | PHILADELPHIA | CP#0033;3/95 | | 5 | | | 10 | | | ALBERT DEFINO | ROBBERY | M611. |
| 1-25-96 | PHILADELPHIA | CP#0033;3/95 | CS | 1 | | | 2 | | | DEFINO | VUFA | M641 |

| Continued From DC# | Plea NOT GUILTY | Total Sentence: | 6 | | 12 | | Commitment Credit FROM 1-26-95. |
|---|---|---|---|---|---|---|---|

| Fines | Costs | Restitution |
|---|---|---|

Summary or Remarks on Sentence

### 2. DATES SECTION

| Item | Original | Change #1 | Change #2 | Change #3 | Change #4 | Chan |
|---|---|---|---|---|---|---|
| DATE OF RECEPTION | 1-29-96 | 10-22-2001 | | | | |
| EFFECTIVE DATE | 1-26-95 | 1-26-95 | | | | |
| EXPIRATION OF MINIMUM | 1-26-2001 | 1-26-2001 | | | | |
| EXPIRATION OF MAXIMUM | 1-26-2007 | 1-26-2007 | | | | |
| EFFECTIVE DATE - PV | XXXXX | PVP | | | | |
| DELINQUENT TIME | XXXXX | | | | | |
| BACKTIME | XXXXX | | | | | |
| NEW MAXIMUM - PV | XXXXX | | | | | |
| SENTENCE CHANGE | XXXXX | | | | | |
| BASIS FOR CHANGE | XXXXX | | | | | |
| NEW SENTENCE | XXXXX | | | | | |
| 1st Release: Method—Inst.—Date PAR.hCCC - COA. 49-01 | 2nd Release: Method—Inst.—Date | 3rd Release: Method—Inst.—Date | 4th Release: Method—Inst.—Date | | | |

### 3. REFERENCES AND IDENTIFICATION

| 1st Admission: Inst.—Date C/EDCC 1-29-96 | 2nd Admission: Inst.—Date T/CDCC 2-2-96 | 3rd Admission: Inst.—Date 4.2.96 SFCT | 4th Admission: Inst.—Date T/COA 1-22-02 |
|---|---|---|---|

| Prosecuting Police Department PHILA. PD | Place of Birth PHILADELPHIA, PA | Date of Birth 4-3-75 | Marital Status SINGLE | R-S B/M |
|---|---|---|---|---|

| DC Number CX-8799 | PBPP Number 496A5 | SID Number 21714127 | Name JESSUP, KEVIN |
|---|---|---|---|

(OVER)

**DEPOSITION EXHIBIT** Kadad 24

**EXHIBIT** Herbst 4

| 4. ACTIONS: PENNSYLVANIA BOARD OF PAROLE | | | | 5. ACTIONS: BOARD OF PARDONS | | |
|---|---|---|---|---|---|---|
| Date | Action | Date | Action | Date | Cal Page | Action |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## 6. DETAINERS

| Dated | From (Incl. Address) | Charging | Indict—Warrant Nos. | Remarks |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## 7. SELECTIVE SERVICE SYSTEM CONTROLS

| ☐ Registered At Time of Reception | ☐ Unregistered At Time of Reception | Remarks |
|---|---|---|

## 8. UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE CONTROLS

| USINS Number | ☐ USINS Notification of No Contemplated Action | ☐ USINS Proceedings Instituted and Pending | ☐ USINS Proceedings Completed Detainer; See Above |
|---|---|---|---|

## 9. NOTIFY IN EVENT OF ILLNESS OR DEATH

| Name   NADIRA MORRISON | Relationship   GIRLFRIEND |
|---|---|
| Address   1311 S. 53RD ST., PHILA., PA 19143 | Telephone   (215)727-2067 |

## 10. REMARKS - ATA - ETC.

| 1st Reception | |
|---|---|
| 2nd Reception | |
| 3rd Reception | |
| 4th Reception | |
| Previous DC# | |

DEF000979



| DC-16E | SENTENCE STATUS SUMMARY | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS |
|---|---|---|

## 1. REFERENCES AND IDENTIFICATION

| DOC Number | Commitment Name | PBPP No | SID No | FBI Number | Phila Photo # |
|---|---|---|---|---|---|
| CX8799 | KEVIN JESSUP | 496AS | 21714127 | 5111357A5 | 750487 |
| Date of Birth | Place of Birth | | | Race | Sex |
| 04/03/1975 | PHILADELPHIA  PA  USA | | | B | M |

## 2. SENTENCE SUMMARY

| Sent Date | County | Indictments | Sent Type | Minimum Y | M | D | Maximum Y | M | D |
|---|---|---|---|---|---|---|---|---|---|
| 01/25/1996 | PHILADELPHIA | CP#0033/9503 | | 5 | | | 10 | | |
| **Plea:** Found Guilty | | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** ROBBERY (GENERAL) | | | | | | | | | |
| 01/25/1996 | PHILADELPHIA | CP#0033/9503 | CS | 1 | | | 2 | | |
| **Plea:** Found Guilty | | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** VUFA | | | | | | | | | |

| Controlling Minimum Date | 01/26/2001 | | Reentered from Previous DOC#: |
|---|---|---|---|
| Controlling Maximum Date | 01/26/2007 | | New Maximum - PV |

**Non-Incarcerated Offenses**
01/25/1996, PHILADELPHIA, CP#0033/9503, DEFINO,ALBERT
VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY POW-NOT GUILTY THEFT,RSP,S/A-MERGES
Comments:

**Summary or Remarks on Sentence**
CONVERSION FROM 16D TO 16E TO MAKE INMATE PVP AND ADD FEDERAL DETAINER

DEF000883



## 3. SENTENCE STRUCTURE

### Commitment Credit
FROM 1-26-95 TO 1-25-96

| Item | Computation 1 | Computation 2 | — | |
|------|---------------|---------------|---|---|
| Indictments Included | CP#0033/9503 CP#0033/9503 | | | |
| Effective Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return – PV | | | | |
| Delinquent Time | | | | |
| Backtime Credit | | | | |
| Backtime Owed | | | | |
| New Maximum – PV | | | | |
| Sentence Computation Date | 02/12/1996 | | | |
| Basis for Computation | PVP | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Pending | | | |

DEF000884

Name: Kevin  Jessup                        Inmate #: CX8799        Closed Version No:3  Dated 6/27/2007 3:13:3

## 4.  NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| Description: | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| Comments | | |

## 5.  DETAINERS

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| 1 | 09/26/2002 | USMS EASTERN | CR# 02-32-01 | | Federal |
| Charges | ~ 162 M  To 162 M | | | | |

| Deleted Detainers (For those deleted since last DC16) | | | | | |
|---|---|---|---|---|---|
| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
| None | | | | | |
| Remarks | None | | | | |

## 6.  PRIOR DOC NUMBERS

| None | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

## 7.  ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---|---|---|---|
| None | | | |

Last Modified By: Kodack, Michelle L

Signed Off By: Fobia, Christina M                          Institution:  Coal Township



# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

| Name: Kevin Jessup | Inmate #: CX8799 | Closed Version 2 Dated 12/19/2003 3:06:06 PM |
|---|---|---|

## 1.   REFERENCES AND IDENTIFICATION

| DOC #<br>CX8799 | Commitment Name<br>KEVIN JESSUP | | PBPP #<br>496AS | SID #<br>21714127 | FBI #<br>511135TA5 | Phila Photo #<br>750487 |
|---|---|---|---|---|---|---|
| DOB<br>04/03/1975 | Place of Birth<br>PHILADELPHIA  PA USA | | | | Race<br>B | Sex<br>M |

## 2.   SENTENCE SUMMARY

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum Y | M | D | Maximum Y | M | D |
|---|---|---|---|---|---|---|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| **Plea:** Found Guilty | | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** CC3701 - ROBBERY (GENERAL) | | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| **Plea:** Found Guilty | | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | | |

| Reception Date | 10/22/2001 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | 02/16/2008 |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

**Summary or Remarks on Sentence**

| Remarks | Version 2 created due to inmate being recommited as a Technical Convicted Parole Violator (TCV).   Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003. |
|---|---|

## 3.   SENTENCE STRUCTURE

**Commitment Credit**

Computation 1       CP0033/9503 : 01/26/1995 to 01/25/1996

| Remarks | |
|---|---|

**Bail/Escape/Interruption Time Data**

| None |
|---|

DEF000886

Name: Kevin  Jessup                    Inmate #: CX8799      Closed Version No:2 Dated 12/19/2003 3:06:06 PM

### 3.  SENTENCE STRUCTURE (Cont'd)

| Item | Computation 1 | | | |
|------|---------------|---|---|---|
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | 09/23/2002 | | | |
| Delinquent Time | | | | |
| Backtime Credit | 4M24D | | | |
| Backtime Owed | 5Y4M23D | | | |
| New Maximum - PV | 02/16/2008 | | | |
| Sentence Computation Date | 12/19/2003 | | | |
| Basis for Computation | TCV | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Active | | | |

DEF000887

Name: Kevin Jessup                    Inmate #: CX8799        Closed Version No:2 Dated 12/19/2003 3:06:06 PI

### 4. NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| Description: | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |

| Comments | |
|---|---|

### 5. DETAINERS

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| 1 | 09/26/2002 | Usms Eastern | Cr# 02-32-01 | | Federal |
| Charges | - 162 M  To 162 M | | | | |

| Deleted Detainers (For those deleted since last DC16) | | | | | |
|---|---|---|---|---|---|
| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
| None | | | | | |
| Remarks | None | | | | |

### 6. PRIOR DOC NUMBERS

| None | | | | | | | |
|---|---|---|---|---|---|---|---|

### 7. ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---|---|---|---|
| None | | | |

**Last Modified By: Young, Don F**

**Signed Off By: Stahl, James N**                          **Institution: Frackville**

DEF000888



# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY    DEPARTMENT OF CORRECTIONS

Name: Kevin Jessup          Inmate #: CX8799          Closed Version 3 Dated 6/27/2007 3:13:38 PM

## 1. REFERENCES AND IDENTIFICATION

| DOC #<br>CX8799 | Commitment Name<br>KEVIN JESSUP | | PBPP #<br>496AS | SID #<br>21714127 | FBI #<br>511135TA5 | Phila Photo #<br>750487 |
|---|---|---|---|---|---|---|
| DOB<br>04/03/1975 | Place of Birth<br>PHILADELPHIA  PA USA | | | | Race<br>B | Sex<br>M |

## 2. SENTENCE SUMMARY

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum | | | Maximum | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Y | M | D | Y | M | D |
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| Plea: | Found Guilty | OTN: M6413794 | Judge: DEFINO,ALBERT | | | | | | |
| Offense: | CC3701 - ROBBERY (GENERAL) | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| Plea: | Found Guilty | OTN: M6413794 | Judge: DEFINO,ALBERT | | | | | | |
| Offense: | CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | |

| Reception Date | 10/22/2001 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

### Summary or Remarks on Sentence

| Remarks | Version 3 created due to board action dated 6/25/2007 to remove TCV status and reflect inmate is now serving as a PVP.  Inmate will return to the custody of the U.S. Marshals prior to serving PBPP backtime.<br><br>Version 2 created due to inmate being recommited as a Technical Convicted Parole Violator (TCV).   Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003. |
|---|---|

## 3. SENTENCE STRUCTURE

**Commitment Credit**

Computation 2          CP0033/9503 : 01/26/1995 to 01/25/1996

| Remarks | |
|---|---|
| | |

DEF000889



Name: Kevin Jessup          Inmate #: CX8799      Closed Version No.3 Dated 6/27/2007 3:13:38 PM

**Bail/Escape/Interruption Time Data**

| None | | | | |
|---|---|---|---|---|
| **Item** | **Computation 2** | | | |
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | | | | |
| Delinquent Time | | | | |
| Backtime Credit | | | | |
| Backtime Owed | | | | |
| New Maximum - PV | | | | |
| Sentence Computation Date | 06/27/2007 | | | |
| Basis for Computation | PVP | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Pending | | | |

DEF000890



Name: Kevin Jessup        Inmate #: CX8799    Closed Version No:3 Dated 6/27/2007 3:13:38

## 4. NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| Description: | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| Comments: | | |

## 5. DETAINERS

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| 1 | 09/26/2002 | USMS EASTERN | CR# 02-32-01 | | Federal |
| Charges | - 162 M  To 162 M | | | | |

### Deleted Detainers (For those deleted since last DC16)

| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| None | | | | | |
| Remarks | None | | | | |

## 6. PRIOR DOC NUMBERS

| None | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

## 7. ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---|---|---|---|
| None | | | |

**Last Modified By: Kodack, Michelle L**

**Signed Off By: Fobia, Christina M**                    **Institution:  Coal Township**

DEF000891



# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

Name: Kevin  Jessup                          Inmate #: CX8799          Closed Version 4  Dated 4/21/2009 10:05:54 AM

## 1.   REFERENCES AND IDENTIFICATION

| DOC #<br>CX8799 | Commitment Name<br>KEVIN  JESSUP | | PBPP #<br>496AS | SID #<br>21714127 | FBI #<br>511135TA5 | Phila Photo #<br>750487 |
|---|---|---|---|---|---|---|
| DOB<br>04/03/1975 | Place of Birth<br>PHILADELPHIA  PA USA | | | | Race<br>B | Sex<br>M |

## 2.   SENTENCE SUMMARY

| Sent<br>Date | County/State/Federal | Indictments | Sent<br>Type | Minimum | | | Maximum | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Y | M | D | Y | M | D |
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| **Plea:** | Found Guilty | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** | CC3701 - ROBBERY (GENERAL) | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| **Plea:** | Found Guilty | **OTN:** M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** | CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | |

| Reception Date | 04/15/2009 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

### Summary or Remarks on Sentence

**Remarks**   VERSION 4 CREATED TO SHOW PVP STATUS

Version 3 created due to board action dated 6/25/2007 to remove TCV status and reflect inmate is now serving as a PVP.  Inmate will return to the custody of the U.S. Marshals prior to serving PBPP backtime.

Version 2 created due to inmate being recommited as a Technical Convicted Parole Violator (TCV).   Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003.

## 3.   SENTENCE STRUCTURE

**Commitment Credit**

Computation 3          CP0033/9503 : 01/26/1995 to 01/25/1996

**Remarks**

DEF000892

Name: Kevin  Jessup                    Inmate #: CX8799    Closed Version No:4  Dated 4/21/2009 10:05:5

## Bail/Escape/Interruption Time Data

None

| Item | Computation 3 | | | |
|------|---------------|--|--|--|
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | | | | |
| Delinquent Time | | | | |
| Backtime Credit | | | | |
| Backtime Owed | | | | |
| New Maximum - PV | | | | |
| Sentence Computation Date | 04/16/2009 | | | |
| Basis for Computation | PVP | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Pending | | | |

DEF000893



Name: Kevin Jessup    Inmate #: CX8799    Closed Version No:4 Dated 4/21/2009 10:05:54 AM

### 4.   NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| Description: | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| Comments | | |

### 5.   DETAINERS

**Active Detainers**

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| Charges | None | | | | |

**Deleted Detainers (For those deleted since last DC16)**

| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| 1 | 7/19/2007 | USMS EASTERN | CR# 02-32-01 | | Federal |
| Remarks | INMATE RELEASED TO THIS DETAINER | | | | |

### 6.   PRIOR DOC NUMBERS

| None | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

### 7.   ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---|---|---|---|
| None | | | |

**Last Modified By: Herbst, Deborah K**

**Signed Off By: Kodack, Michelle L**    **Institution:  Coal Township**

DEF000894





# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY    DEPARTMENT OF CORRECTIONS

Name: Kevin  Jessup                    Inmate #: CX8799              Closed Version 5 Dated 5/1/2009 10:26:44 AM

## 1.   REFERENCES AND IDENTIFICATION

| DOC # CX8799 | Commitment Name KEVIN  JESSUP | PBPP # 496AS | SID # 21714127 | FBI # 511135TA5 | Phila Photo # 750487 |
|---|---|---|---|---|---|
| DOB 04/03/1975 | Place of Birth PHILADELPHIA  PA USA | | | Race B | Sex M |

## 2.   SENTENCE SUMMARY

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum Y | M | D | Maximum Y | M | D |
|---|---|---|---|---|---|---|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| **Plea:** | Found Guilty | OTN: M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** | CC3701 - ROBBERY (GENERAL) | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| **Plea:** | Found Guilty | OTN: M6413794 | **Judge:** DEFINO,ALBERT | | | | | | |
| **Offense:** | CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | |

| Reception Date | 04/15/2009 | Reentered from DOC # | |
|---|---|---|---|
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | 09/06/2014 |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | |
| RRRI Minimum Expiry Date | | | |

### Summary or Remarks on Sentence

| *Remarks* | VERSION 5 CREATED TO SHOW TCV STATUS ACCORDING TO PBPP VERSION 4 CREATED TO SHOW PVP STATUS Version 3 created due to board action dated 6/25/2007 to remove TCV status and reflect inmate is now serving as a PVP.  Inmate will return to the custody of the U.S. Marshals prior to serving PBPP backtime. Version 2 created due to inmate being recommited as a Technical Convicted Parole Violator (TCV).   Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003. |
|---|---|

## 3.   SENTENCE STRUCTURE

| Commitment Credit | |
|---|---|
| Computation 4 | CP0033/9503 : 01/26/1995 to 01/25/1996 |

| *Remarks* | |
|---|---|

DEF000895



Name: Kevin Jessup            Inmate #: CX8799      Closed Version No:5  Dated 5/1/2009 10:26:44 AM

## Bail/Escape/Interruption Time Data

None

| Item | Computation 4 | | | |
|---|---|---|---|---|
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | 04/14/2009 | | | |
| Delinquent Time | | | | |
| Backtime Credit | 147D | | | |
| Backtime Owed | 1971D | | | |
| New Maximum - PV | 09/06/2014 | | | |
| Sentence Computation Date | 04/28/2009 | | | |
| Basis for Computation | TCV | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Active | | | |

DEF000896



Name: Kevin Jessup          Inmate #: CX8799     Closed Version No:5   Dated 5/1/2009 10:26:4

## 4.   NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|-----------|----------------------|-------------|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| Description: | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| Comments | | |

## 5.   DETAINERS

**Active Detainers**

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|-----------|------|--------|-----------------------|-----|------|
| | | | | | |
| Charges | None | | | | |

**Deleted Detainers (For those deleted since last DC16)**

| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
|-----------|--------------|--------|-----------------------|-----|------|
| None | | | | | |
| Remarks | None | | | | |

## 6.   PRIOR DOC NUMBERS

| None | | | | | | | | |
|------|---|---|---|---|---|---|---|---|

## 7.   ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---------------|-------------|--------|----------|
| None | | | |

**Last Modified By:** Herbst, Deborah K

**Signed Off By:** Kodack, Michelle L

**Institution:  Coal Township**

DEF000897



# COMMONWEALTH OF PENNSYLVANIA
## DC16E - SENTENCE STATUS SUMMARY   DEPARTMENT OF CORRECTIONS

Name: Kevin Jessup                    Inmate #: CX8799        Closed Version 6  Dated 7/30/2009 2:36:10 PM

## 1. REFERENCES AND IDENTIFICATION

| DOC # CX8799 | Commitment Name KEVIN JESSUP | PBPP # 496AS | SID # 21714127 | FBI # 511135TA5 | Phila Photo # 750487 |
|---|---|---|---|---|---|
| DOB 04/03/1975 | Place of Birth PHILADELPHIA PA USA | | | Race B | Sex M |

## 2. SENTENCE SUMMARY

| Sent Date | County/State/Federal | Indictments | Sent Type | Minimum Y | M | D | Maximum Y | M | D |
|---|---|---|---|---|---|---|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 | | 5 | | | 10 | | |
| Plea: | Found Guilty | OTN: M6413794 | Judge: DEFINO, ALBERT | | | | | | |
| Offense: | CC3701 - ROBBERY (GENERAL) | | | | | | | | |
| 01/25/1996 | Philadelphia | CP0033/9503 | CS | 1 | | | 2 | | |
| Plea: | Found Guilty | OTN: M6413794 | Judge: DEFINO, ALBERT | | | | | | |
| Offense: | CC6108 - CARRY FIREARM IN PUBLIC-PHILADELPHIA | | | | | | | | |

| | | | | |
|---|---|---|---|---|
| Reception Date | 04/15/2009 | Reentered from DOC # | | |
| Controlling Minimum Date | 01/26/2001 | New Maximum - PV | 07/14/2009 | |
| Controlling Maximum Date | 01/26/2007 | True Minimum Expiry Date | | |
| RRRI Minimum Expiry Date | | | | |

### Summary or Remarks on Sentence

*Remarks*   Version 6 created to show modified TCV calculation per PBPP39.
VERSION 5 CREATED TO SHOW TCV STATUS ACCORDING TO PBPP
VERSION 4 CREATED TO SHOW PVP STATUS
Version 3 created due to board action dated 6/25/2007 to remove TCV status and reflect inmate is now serving as a PVP. Inmate will return to the custody of the U.S. Marshals prior to serving PBPP backtime.
Version 2 created due to inmate being recommited as a Technical Convicted Parole Violator (TCV). Sentence recomputed in accordance with PBPP Form 39 dated 12/02/2003.

## 3. SENTENCE STRUCTURE

**Commitment Credit**
Computation 5        CP0033/9503 : 01/26/1995 to 01/25/1996

*Remarks*

DEF000898



Name: Kevin  Jessup                  Inmate #: CX8799        Closed Version No:6  Dated 7/30/2009 2:36:10

### Bail/Escape/Interruption Time Data

| None |
|------|

| Item | Computation 5 | | | |
|------|---------------|---|---|---|
| Indictments Included | CP0033/9503 CP0033/9503 | | | |
| Eff Date | 01/26/1995 | | | |
| Expiration of Minimum | 01/26/2001 | | | |
| Expiration of Maximum | 01/26/2007 | | | |
| Custody for Return - PV | 04/14/2009 | | | |
| Delinquent Time | | | | |
| Backtime Credit | 2027D | | | |
| Backtime Owed | 91D | | | |
| New Maximum - PV | 07/14/2009 | | | |
| Sentence Computation Date | 07/30/2009 | | | |
| Basis for Computation | TCV | | | |
| Total Sentence | 6Y - 12Y | | | |
| Status | Active | | | |

DEF000899



Name: Kevin Jessup                    Inmate #: CX8799        Closed Version No:6 Dated 7/30/2009 2:36:10 PM

## 4.  NON-INCARCERATED OFFENSES

| Sent Date | County/State/Federal | Indictments |
|---|---|---|
| 01/25/1996 | Philadelphia | CP0033/9503 |
| **Description:** | VUFA(6106),PIC,T/T,REAP,C/CONSP.-GUILTY W/O FURTHER PENALTY  POW-NOT GUILTY THEFT,RSP,S/A-MERGES | |
| **Comments** | | |

## 5.  DETAINERS

### Active Detainers

| Detainer# | Date | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| | | | | | |
| **Charges** | None | | | | |

### Deleted Detainers (For those deleted since last DC16)

| Detainer# | Date Deleted | Agency | Agency Identification | OTN | Type |
|---|---|---|---|---|---|
| None | | | | | |
| **Remarks** | None | | | | |

## 6.  PRIOR DOC NUMBERS

| None | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

## 7.  ACTIONS: BOARD OF PARDONS

| Decision Date | File Number | Action | Comments |
|---|---|---|---|
| None | | | |

**Last Modified By: Kodack, Michelle L**

**Signed Off By: Kodack, Michelle L**                    **Institution:  Coal Township**

DEF000900

Sentence Computation Error Information Sheet

| | |
|---|---|
| Institution | |
| Inmate Number | |
| Inmate Name | |
| Sentence Calculation Error (Y/N)? | |
| What was the error? Include days calculated too long or too short. | |
| Month/Year Error was Detected | |
| Month/Year of Event | |
| Month/Year of Original Error | |
| Where (institution) was the error made? | |
| If possible, name of person who made the error. | |
| How was the error discovered? | |
| Explanation of error. | |
| Name of person compiling this form and date completed. | |
| Date | |



**DC-300B (PART 1)**
(Rev. 10-85)

(MC 95-01-3038)

COURT COMMITMENT
STATE OR COUNTY CORRECTIONAL INSTITUTION
Commonwealth of Pennsylvania

Type or Print Legibly

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

NOTE: Additional supply of this form available at above address.

☒ DC-300B (Part II) attached

COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)
_Jessup, Kevin_

vs.

| SEX | DATE OF BIRTH | SID | OTN | COURT OF INITIAL JURISDICTION | COMMON PLEAS |
|---|---|---|---|---|---|
| ☐ F  ☒ M | 4/13/76 | PP#750487 | M6413794 | | ☒ |

COMMITTING COUNTY/MAGISTERIAL DISTRICT: _Philadelphia_

COURT NUMBER: _10037_

DATE - TERM: _95-03_

The above defendant after ☐ pleading guilty ☐ nolo contendere ☒ being found guilty was on

_Jan 25_ 19 _96_ sentenced by Judge/District Justice _A.J. DeFino_ to a term of

not less than _5_ years _____ months _____ days nor more than _10_ years _____ months _____ days, or

for the offense of _Robbery_

(Section _3701_ of the Crimes Code) or (other statute)

It is further ordered that the said defendant be delivered by the proper authority to and treated as the law

directs at the _State_ facility located at _Graterford_

| FINE AMOUNT $ | COSTS AMOUNT $ 19.00 | RESTITUTION |
|---|---|---|
| To Be Paid To: | To Be Paid By: | / |
| ☐ COUNTY  ☐ COMMONWEALTH | ☐ COUNTY  ☒ DEFENDANT | |

CREDIT FOR TIME SERVED (EXPLANATION OF CREDIT COMPUTATION ON REVERSE SIDE) _1/24/95 – 1/25/96 IF NOT ALREADY CREDITED_

EFFECTIVE DATE OF SENTENCE _1/25/96_

This sentence shall be deemed to run concurrent to any existing sentences, effective the date of imposition unless otherwise stipulated below.

C.F.C.E.

PROSECUTING ATTORNEY _John Dobel_

DEFENSE ATTORNEY _John Cotter Esq._

COURT REPORTER _Jill Shilton_

DISPOSITION OF NON-INCARCERATION OFFENSE(S)
VUFA (6106), PIC, TT, REAP, %Consp. – Guilty w/5 yr penalty
Pow – not guilty
THEFT, RSP, S/A – Merges

(THIS BLOCK NOT TO BE USED FOR INCARCERATION OFFENSE)

In witness, whereof I have hereunto set my hand and seal of said

court, this _25th_ day of _January_ 19 _96_

_Elaine Ratliff_
AUTHORIZED SIGNATURE/DATE _001157_

(SEAL)

EXHIBIT
tabbies
Varano-6

DEPOSITION EXHIBIT
Kadode 9

EXHIBIT
tabbies
Herbst-6



# Computation
# Manual



## SENTENCE STRUCTURE DEFINITIONS



- **Aggregation** - The adding together of all of the minimum and maximum terms of incarceration of those sentences that are to run consecutive to each other, that can be aggregated as per law to form one total minimum and maximum sentence.
- **Backtime** - The amount of time determined by the paroling authority, which remains to be served on the inmate's sentence(s) when he/she is paroled or reparoled from the sentence(s).
- **Concurrent** - Running parallel, operating or occurring at the same time. Two or more sentences that are being served at the same time are concurrent.
- **Consecutive** - Following one after the other, in order, without gaps in time. If aggregation does not apply, a consecutive sentence starts when the previously imposed sentence ends.
- **Controlling Minimum** - The sentence with the minimum expiration date that is the predominate (or the longest) one.



EXHIBIT

ROOM 675 CITY HALL
PHILADELPHIA, PA 19107
(215) 686-4260 or 61 or 62

*CX 8799*

Nilas T. Joffes
Clerk of Quarter Sessions

Charles L. Williams
First Deputy

Ricardo P. Conway
Second Deputy

DATE: 1-27-96

TO THE SUPERINTENDENT
STATE CORRECTIONAL INSTITUTION

COMMONWEALTH
vs.

Jessup, Kevin

A/K/A

Robb.

RE: CREDIT TIME

C.P. # 95-03-0033

M.C. # 95-01-3038

P.P. # 750487

DEAR SUPERINTENDENT:

IN CHECKING THE RECORD OF THE ABOVE CAPTIONED DEFENDANT, HE/SHE IS TO BE CREDITED WITH TIME SERVED WHILE INCARCERATED IN THE PHILADELPHIA COUNTY PRISON SYSTEM AWAITING TRIAL, IF NOT ALREADY APPLIED ON ANOTHER MATTER.

FROM  1-26-95  TO  1-29-96

FROM _____  TO _____

FROM _____  TO _____

FROM _____  TO _____

THE ABOVE CREDIT TIME WAS CALCULATED BY C/O M Rybol OF THE PHILADELPHIA COUNTY PRISON. THIS LETTER SHALL BE CONSTRUED AS AN AMENDMENT TO THE ORIGINAL COMMITMENT, AND IS BEING SENT TO YOU UNDER THE SEAL OF THE COURT.

SINCERELY,

MYRTIS K. GORDON
COURT SERVICES MANAGER
CLERK OF QUARTER SESSIONS
ROOM 633 CITY HALL
(215) 686-6200 or 686-1896



EXHIBIT
Herbst - 8

EXHIBIT
Kodac 10

Varano - 7

DEF 001159

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
State Correctional Institute
at Coal Town
(570) 644-7890

** FOR INTERNAL RECORDS OFFICE USE ONLY **

DATE:        4.4.03

SUBJECT:     Disposition Unreported

TO:          File

FROM:        SCI Coal Township Records Staff

> This document is an original copy and should not be reproduced without the following criteria established in CHRIA. All reproduced copies of this document should be logged before dissemination. This CHRI is only that which is contained within the DOC files. A summary of statewide CHRI may be obtained by the PA State Police, Records and Identification Division.

Inmate Name: _Kevin Jessup_

Inmate Number: _C X 8799_

Arresting Agency: _Phila. P.D._
Arrest Date: _9-25-01_
Charges: _ ___  FA o/e X __ PA Public  P.C ___
OTN Number: _N 101/350_

Person Contacted: _JNET_
Agency/Office: _____

Information: _Nolle Prose_
_____
_____
_____
_____

Open Case/Detainer: Yes    (No)

Qualify for the Sexual Violent Offender Law: Yes    (No)

Information Verified By: _Delinah Shulon_

** FOR INTERNAL RECORDS OFFICE USE ONLY **

EXHIBIT
Herbst-9-A



# COMMONWEALTH OF PENNSYLVANIA
## Department of Corrections
### BODY RECEIPT

| Receipt Date | Receipt Time | Agency |
|---|---|---|
| 12/28/2006 | 11 40 | Dept of Corrections |

| Received From | Title | Institution |
|---|---|---|
| DAVID DIGUGLIELMO | Superintendent | Graterford |

| Inmate # | Inmate Name | Race | Sex | Sent Stat | Custody Lvl | Program Codes |
|---|---|---|---|---|---|---|
| **CX8799** | **JESSUP, Kevin** | Black | Male | AS | 3 | |

Inmate Number: **CX8799**

Name: **JESSUP, Kevin**

Photo Date: **1/17/2006**

ROUTE:031 VEH:B1

| |_| To Detainer | |_| Confinement Papers | |_| R|
|---|---|---|
| |_| Court WRIT-ATA | |_| 7X Given to Transporting Authority | |
| |X| Other ( Specify )   TT/RETURN | | |

| Received By | Title | Agency |
|---|---|---|
| Deborah Huht | RSI | SCI-COAL TOWNSHIP |



EXHIBIT
Hebt-9b

DEF001066



# Pennsylvania Department of Corrections
## Moves Report

mk

2/8/2012 12:41:18 PM

**Inmate Number:** CX8799

**Inmate Name:** JESSUP, Kev

| Time & Date | Inmate # | Move Code | Location | Sent. Status | Parole Status |
|---|---|---|---|---|---|
| 15:54 07/30/2009 | CX8799 | D | COA - Coal Township | Sentence Completed | Tech/convicted Pa |
| NA 04/28/2009 | CX8799 | SC | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 21:15 04/15/2009 | CX8799 | APV | COA - Coal Township | Actively Serving | Parole Violator Pe |
| 09:07 07/19/2007 | CX8799 | D | COA - Coal Township | Srv Prev Cnty/state/fed | Parole Violator Pe |
| 08:02 06/25/2007 | CX8799 | SC | COA - Coal Township | Actively Serving | Parole Violator Pe |
| 08:01 06/25/2007 | CX8799 | SC | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 08:00 06/25/2007 | CX8799 | SC | COA - Coal Township | Actively Serving | Parole Violator Pe |
| 11:39 12/28/2006 | CX8799 | RTT | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 10:34 12/28/2006 | CX8799 | RTT | BUS | Actively Serving | Tech/convicted Pa |
| 09:45 12/28/2006 | CX8799 | XPT | MAH - Mahanoy | Actively Serving | Tech/convicted Pa |
| 06:03 12/28/2006 | CX8799 | RTT | BUS | Actively Serving | Tech/convicted Pa |
| 14:25 11/29/2006 | CX8799 | SC | GRA - Graterford | Actively Serving | Tech/convicted Pa |
| 12:00 11/17/2006 | CX8799 | SC | FPH - Federal Auth-philadelphia | Writ/ata | Tech/convicted Pa |
| 18:03 11/14/2006 | CX8799 | STT | GRA - Graterford | Actively Serving | Tech/convicted Pa |
| 12:24 11/14/2006 | CX8799 | STT | BUS | Actively Serving | Tech/convicted Pa |
| 10:33 11/14/2006 | CX8799 | XPT | SMI - Smithfield | Actively Serving | Tech/convicted Pa |
| 07:55 11/14/2006 | CX8799 | STT | BUS | Actively Serving | Tech/convicted Pa |
| 11:24 09/07/2006 | CX8799 | RTT | COA - Coal Township | Actively Serving | Tech/convicted Pa |
| 10:20 09/07/2006 | CX8799 | RTT | BUS | Actively Serving | Tech/convicted Pa |
| 09:21 09/07/2006 | CX8799 | XPT | MAH - Mahanoy | Actively Serving | Tech/convicted Pa |
| 05:28 09/07/2006 | CX8799 | RTT | BUS | Actively Serving | Tech/convicted Pa |
| 12:40 08/25/2006 | CX8799 | SC | GRA - Graterford | Actively Serving | Tech/convicted Pa |
| 13:35 08/16/2006 | CX8799 | SC | FPH - Federal Auth-philadelphia | Writ/ata | Tech/convicted P |
| 20:46 08/08/2006 | CX8799 | STT | GRA - Graterford | Actively Serving | Tech/convicted Pa |
| 12:43 08/08/2006 | CX8799 | STT | BUS | Actively Serving | Tech/convicted Par |
| 10:26 08/08/2006 | CX8799 | XPT | SMI - Smithfield | Actively Serving | Tech/convicted Par |
| 07:42 08/08/2006 | CX8799 | STT | BUS | Actively Serving | Tech/convicted Par |
| 09:00 12/19/2003 | CX8799 | SC | COA - Coal Township | Actively Serving | Tech/convicted Par |
| 13:30 10/10/2002 | CX8799 | RTT | COA - Coal Township | Actively Serving | Parole Violator Pen |
| 11:27 10/10/2002 | CX8799 | RTT | BUS | Actively Serving | Parole Violator Pen |
| 10:45 10/10/2002 | CX8799 | XPT | MAH - Mahanoy | Actively Serving | Parole Violator Pen |
| 05:05 10/10/2002 | CX8799 | RTT | BUS | Actively Serving | Parole Violator Pen |
| 12:15 09/26/2002 | CX8799 | SC | GRA - Graterford | Actively Serving | Parole Violator Pen |
| 11:35 02/20/2002 | CX8799 | SC | FPH - Federal Auth-philadelphia | Writ/ata | Parole Violator Pen |
| 13:24 02/14/2002 | CX8799 | STT | GRA - Graterford | Actively Serving | Parole Violator Pen |
| 10:33 02/14/2002 | CX8799 | STT | BUS | Actively Serving | Parole Violator Pen |
| 09:14 02/14/2002 | CX8799 | XPT | MAH - Mahanoy | Actively Serving | Parole Violator Pen |
| 08:33 02/14/2002 | CX8799 | STT | BUS | Actively Serving | Parole Violator Pen |
| 16:12 01/22/2002 | CX8799 | TRN | COA - Coal Township | Actively Serving | Parole Violator Pen |
| 12:47 01/22/2002 | CX8799 | TRN | BUS | Actively Serving | Parole Violator Pen |
| 09:40 01/22/2002 | CX8799 | XPT | SMI - Smithfield | Actively Serving | Parole Violator Pen |
| 05:41 01/22/2002 | CX8799 | TRN | BUS | Actively Serving | Parole Violator Pen |
| 05:41 01/22/2002 | CX8799 | SC | GRA - Graterford | Actively Serving | Parole Violator Pen |
| 15:30 12/26/2001 | CX8799 | SC | GRA - Graterford | Diagnostic/classificatn | Parole Violator Pen |
| 07:47 12/26/2001 | CX8799 | SC | PHI - Philadelphia | Writ/ata | Parole Violator Pen |
| 13:46 10/22/2001 | CX8799 | APV | GRA - Graterford | Diagnostic/classificatn | Parole Violator Pen |
| 07:30 04/09/2001 | CX8799 | D | COA - Coal Township | Paroled | State Parole |
| 07:11 04/19/1996 | CX8799 | TRN | COA - Coal Township | Actively Serving | Not Applicable |
| 07:10 04/19/1996 | CX8799 | SC | CAM - Camp Hill | Actively Serving | Not Applicable |
| 05:35 02/02/1996 | CX8799 | TRN | CAM - Camp Hill | Diagnostic/classificatn | Not Applicable |
| 14:14 01/29/1996 | CX8799 | AC | GRA - Graterford | Diagnostic/classificatn | Not Applicable |





DEF000930

PBPP-39
Revised (02-04)

# ORDER TO RECOMMIT
## COMMONWEALTH OF PENNSYLVANIA BOARD OF PROBATION AND PAROLE

**Name:** KEVIN JESSUP     **Inst. No:** CX8799     **Parole No:** 496AS

**District:** CO - Central Office     **SID:** 21714127     **Date Paroled:** 04/09/2001

**Inst Parole From:** SCICT - SCI - Coal Township

**Recommit To:** SCICT - SCI - Coal Township     **Status:** ◉ TPV   ◉ CPV

The above-named individual who was conditionally released on parole by the Pennsylvania Board of Probation and Parole has been found by the Board to have violated the conditions of parole. Therefore, the Board, by virtue of the authority conferred on it by law, orders said individual recommitted for further imprisonment for the remainder of the unexpired maximum term, or until otherwise released or discharged according to law.

## County, Bill & Term and OTN

| County Name | OTN | Indictment Number | Minimum Date |
|---|---|---|---|
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |

## Parole Violation Date Calculation

| | |
|---|---|
| **Original Maximum Date:** | 01/26/2007 |
| **- Parole/Reparole/Delinquency/Board Warrant Date:** | 04/09/2001 |
| **+Constructive Parole Time Added:** | 0D |
| **- Confinement Time:** | 0D |
| **- Backtime Credit:** | 147D |
| **= Backtime Owed:** | 1971D |
| **+ Custody for Return:** | 04/14/2009 |
| **= Recomputed Maximum Date:** | **09/06/2014** |
| **+ Escape Time:** | 0D |
| **= New Maximum Date:** | **09/06/2014** |

**Backtime Dates:**

| From | To | Time Served |
|---|---|---|
| 09/26/2001 | 02/20/2002 | 147D |

**Time Lost Due to:**

| | |
|---|---|
| **Delinquency:** | 0D |
| **Service of Another Sentence:** | 0D |

## Conviction(s) Resulting in Recommitment

| | Sentence Date | Sentence County | Indictment | Period | Type | Place of Confinement |
|---|---|---|---|---|---|---|
| 2 | 11/24/2008 | FEDERA - FEDERAL COUNTY | 02CR00032-01 | 24 MONTHS | | FED - FEDERAL |

**Parole/Release/Max Date:** 04/14/2009     **Confined:** Y

**Comments:** ORIGINALLY SENTENCED ON 9/23/2002 TO 162 MONTHS. CONVICTION & SENTENCE VACATED ON 11/21/2006 AND RESENTENCED ON 11/21/2006 TO 95 MONTHS. RE-SENTENCED AGAIN ON 11/24/2008 TO 24 MONTHS

**EXHIBIT**
Herbt - 11

## Miscellaneous Notes

### Note Conviction

GIVEN under the hand of the Pennsylvania Board of Probation and Parole this  04/17/2009

By The Board

*Cynthia L. Dau*

Board Secretary

DEF001046

PBPP 141     (12/79)     *Original Puerto US Marshals*

AGENT JOSEPH RYAN
TELEPHONE 215-560-6750
SSAN 185566610
DOB 04/03/1975
SID 21714127
PICTUREID750487
JUDGE ALBERT DEFINO
BILL & TERM 950300033
ORIGINAL CHARGE ROBBERY: VUFA
MAX DATE 01/26/2007
NEW CHARGE  NEW CRIM CHAR CSA
           MANUF/DEL/ PWID

HEARING DATE   10/02/01
CONCURRENCE BY **AUDREY STARLING**
ON 09/27/2001

BAIL 10/4/01

COMMONWEALTH OF PENNSYLVANIA
BOARD OF PROBATION AND PAROLE

# WARRANT TO COMMIT AND DETAIN

### DATE  09/27/2001

To the Superintendent, Warden, or other authorized representative of any
   Detention Facility or State Correctional Institution in the Commonwealth
   of Pennsylvania :

By virtue of the authority delegated to me by the Pennsylvania Board of Probation
and Parole, you are hereby authorized and directed to commit and detain for
violation of parole/probation KEVIN JESSUP

Parole No. 496AS              , Paroled on 04/09/2001

from  SCI - Coal Township           , Institution No.  CX 8799

Subject to further order of the Board

PENNSYLVANIA BOARD OF PROBATION AND PAROLE

By:

*Willie E. Jones Jr.*

District Director

Warrant Number: 1C2-01-082



EXHIBIT
Herbst - 12

EXHIBIT
Kodak - 12

DEF001061

NOTICE OF BOARD DECISION
PBPP-15(6/96)

## COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

### DATE: 11/29/2000

| | | | |
|---|---|---|---|
| CLIENT NAME: | KEVIN JESSUP | PAROLE NO: | 496AS |
| INSTITUTION: | SCI - COAL TOWNSHIP | INSTITUTION NO: | CX8799 |

AS RECORDED ON 11/29/2000 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW AND REVIEW OF YOUR FILE, THE PENNSYLVANIA BOARD OF PROBATION AND PAROLE HAS DETERMINED THAT THE FAIR ADMINISTRATION OF JUSTICE MAY BE ACHIEVED THROUGH YOUR RELEASE ON PAROLE, AND SUBJECT TO YOUR COMPLIANCE WITH ALL OF THE TERMS AND CONDITIONS OF PAROLE SUPERVISION.  YOU ARE THEREFORE:

PAROLED ON OR AFTER 01-26-2001 TO A COMMUNITY CORRECTIONS CENTER ONLY FOR A MINIMUM OF 3 MONTHS. YOU SHALL ENTER INTO AND ACTIVELY PARTICIPATE IN THE COMMUNITY CORRECTIONS PROGRAM UNTIL SUCCESSFULLY DISCHARGED BY THE PAROLE SUPERVISION STAFF. YOU SHALL ABIDE BY ALL THE ESTABLISHED RULES AND REGULATIONS OF THE COMMUNITY CORRECTIONS PROGRAM.  ANY VIOLATION OF THE PROGRAM RULES OR REGULATIONS MAY CONSTITUTE A VIOLATION OF PAROLE AND RESULT IN YOUR ARREST.  YOU MUST HAVE AN APPROVED PLAN PRIOR TO RELEASE FROM THE CENTER.
BEFORE YOU CAN BE RELEASED, YOU SHALL PROVIDE PROOF OF PAYMENT OF AT LEAST $30.00 OF MANDATORY COURT COSTS (IN ACCORDANCE WITH 18 P.S. {11.1101}.

YOU MUST SUBMIT TO URINALYSIS TESTING-MANDATORY.
YOU SHALL NOT CONSUME OR POSSESS ALCOHOL UNDER ANY CONDITION OR FOR ANY REASON.
YOU SHALL NOT ENTER ESTABLISHMENTS THAT SELL OR DISPENSE ALCOHOL (EXCEPT AS APPROVED BY THE SUPERVISION STAFF).

(CONTINUE ON PAGE 2)

CC: DISTRICT ATTORNEY

*Region I*

INSTITUTION

*Kathleen Zwierzyna*

KATHLEEN ZWIERZYNA
BOARD SECRETARY

EXHIBIT
Herbst-13

DEF000548

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

*Z6*

Commonwealth of Pennsylvania
Department of Corrections

**INSTRUCTIONS**
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

*RecorDS*

1. To: (Name and Title of Officer)
   Ms. KodAck

2. Date: 5/18/09

3. By: (Print Inmate Name and Number)
   Kevin Jessup cx-8799

   _____
   Inmate Signature

4. Counselor's Name
   FouLDS

5. Unit Manager's Name
   DuNN

6. Work Assignment
   GLP

7. Housing Assignment
   B2  26

8. Subject: State your request completely but briefly. Give details.

Can you please schedule me talk to you or someone in RecorDS concerning my total time spent incarcerated at this institution I believe there is an error in my sentence calculation. Thanks
Kevin Jessup cx-8799

*(Response: This section for staff response only)*

IF YOU NEED ANSWERS FOR TIME FROM YOUR TCV YOU WILL NEED TO TALK TO PAROLE. WE HAVE NOTHING TO DO WITH THERE CALCULATIONS. AS FOR YOUR ORIGINAL SENTENCE IT WOULD'VE HAD TO BE RIGHT BEFORE YOU WERE PAROLED.

To DC-14 CAR only ☐              To DC-14 CAR and DC-15 IRS ☐

Staff Member Name D HERBST , DX Herbst    Date 5-19-09
                    Print              Sign

Revised July 2000


EXHIBIT
Herbst -14

Kodack -45


EXHIBIT
Dunn-4

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Commonwealth of Pennsylvania
Department of Corrections

**INSTRUCTIONS**

Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

Mr. VARANO

1. To: (Name and Title of Officer)
   Mr. VARANO  Superintendent

2. Date: 4/17/09

3. By: (Print Inmate Name and Number)
   Kevin Jessip   GX-8799

   *Kevin Jessip*
   Inmate Signature

4. Counselor's Name:

5. Unit Manager's Name:

6. Work Assignment

7. Housing Assignment
   D.O.C.

8. Subject: State your request completely but briefly. Give details.

I WAS RELEASED FROM FEDERAL custody on 4/14/09 and immediately detained to P.A. parole on violations. I arrived at S.C.I. coal on 4/15/09 and have not spoken to any one from parole about this matter. There has been an error I maxed out my sentence in 2007. Records will verify I was initially sentenced on 7-25-95 served 6 years on a 6½ to 13 year sentence paroled on 4-9-01. Re-arrested on 9-26-01 and returned to S.C.I. coal with 7-18-07 on 7-18-07 I maxed out of S.C.I. coal and was taken into state U.S. marshall custody for a federal detainer. I served 24 months and was discharged 7-14-09 now I'm back in S.C.I. coal and I should not be because my sentence is over maxed out. Can somebody tell me what's going on.

---

Your issues can be addressed with both parole and our Records office.

Obviously we would not be keeping you past your max date.

To DC-14 CAR only ☐          To DC-14 CAR and DC-15 IRS ☐

Staff Member Name   *D.A. Varano  Supt*
                     Print          Sign          Date  4-22-09

Revised July 2000

CC:  Ms Kodack
     Parole office
     File

EXHIBIT
Kodack-31

EXHIBIT
Herbst-15

Exhibit Varano-9

DEF000566



**COMMONWEALTH OF PENNSYLVANIA**
**BOARD OF PROBATION AND PAROLE**

Interstate Parole Services Division
1101 South Front Street, Suite 5800
Harrisburg, PA 17104-2538
(717) 787-6134

April 2, 2009

SCI-COAL TOWNSHIP

Re: KEVIN JESSUP
Inst. No. CX-8799
Parole No. 496-AS

Dear Superintendent:

On            , the above parole violator was lodged in your institution. Although his original maximum sentence was 1/26/2007, his maximum sentence is being extended due to:

☒ a new conviction
☒ a period of delinquency 06/15/2001

His new maximum sentence is:

☐ _____
☒   will be computed by the Board

Sincerely,
FOR THE BOARD

*Kay Longenberger*

Kay Longenberger
Director
Interstate Parole Services

By: Raquel A. Coughlin
Parole Manager

An Equal Employment Opportunity Employer
Accredited by the Commission on Accreditation for Corrections

**EXHIBIT**
Herbst - 16

**EXHIBIT**
Varano - 21

**EXHIBIT**
Kodach - 25

DEF001041



# BURTON A. ROSE
ATTORNEY AT LAW

1731 SPRING GARDEN STREET
PHILADELPHIA, PA 19130-3893
(215) 564-5550  FAX (215) 567-6809
EMAIL:barose@baroselaw.com

December 3, 2008

Catherine C. McVey, Chairman
Pennsylvania Board of Probation and Parole
1101 S. Front Street, Suite 5100
Harrisburg, PA 17104-2517

     RE:   Damon Chappelle, a.k.a. Kevin Jessup
             Parole No. 496-AS-DOC- CX-8799

Dear Ms. McVey:

     Enclosed herewith please find a true and correct copy of an Order dated November 24, 2008 from United States District Judge Timothy J. Savage in Criminal Action No. 02-32-01 which has modified the sentence of the District Court of July 18, 2007 to make the above named defendant's term of imprisonment 24 months effective as of July 18, 2007.

     Kindly advise if anything further is required. Thank you for your attention to these matters.

                           Very truly yours,

                           BURTON A. ROSE
                           Attorney for Damon Chappelle

BAR/cab
Enclosure
cc: Honorable Timothy J. Savage
    Michael L. Green, Board Member
    Mark S. Miller, Esquire, AUSA
    Damon Chappelle



DEF000903

DISSEMINATION SHEET INMATE (DC-15)

INMATE NAME _____

INMATE # ___CX1799___

| Date of Dissemination or Destruction | Identify Document | Name of Person Requesting Information (Last Name, First Name) | Job Title or Agency of Person Requesting Information | Reason for Dissemination of Information | Name of Person Disseminating or Destroying Information | I...E M...A...T...E... |
|---|---|---|---|---|---|---|
| 4-16-09 | | Herbt | 752 | DC15 | Herbt | X |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Attachment A    Page 1 of 2

4/16/ 2009

Herbst



EXHIBIT
Herbst- 18

1167