# EXHIBIT E

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
   DAMON CHAPPELLE,                  :
 3                     Plaintiff
                                     :
 4
              vs.                    :
 5
                                     :
 6 DAVID VARANO, SUPERINTENDENT,
   SCI-COAL TOWNSHIP; MICHELLE  :  NO. 11-0304
 7 KODACK, RECORDS SUPERVISOR,
   SCI-COAL TOWNSHIP; DEBORAH   :
 8 HERBST, RECORDS SPECIALIST,
   SCI-COAL TOWNSHIP; MR. DUNN, :
 9 UNIT MANAGER, SCI-COAL
   TOWNSHIP; MS. FOULDS,        :
10 COUNSELOR, SCI-COAL TOWNSHIP,
                     Defendants:
11

12

13          Deposition of: RENEE FOULDS

14          Taken by      : Plaintiff

15
            Before        : Faith A. Culp
16                          Reporter-Notary Public

17          Beginning     : June 21, 2012; 2:16 p.m.

18          Place         : SCI-Coal Township
                            1 Kelley Drive
19                          Shamokin, Pennsylvania

20

21
   COUNSEL PRESENT:
22
       JENNIFER J. TOBIN, ESQUIRE
23     718 Arch Street, Suite 304 South
       Philadelphia, Pennsylvania  19106
24         For - Plaintiff

25
```

COPY

ERVIN BLANK ASSOCIATES, INC.

**RECEIVED**

JUL 0 9 2012

**Office of Attorney General
Litigation Section**

2

1   COUNSEL PRESENT (continued):

2       TIMOTHY P. KEATING, ESQUIRE
        Senior Deputy Attorney General
3       Pennsylvania Office of Attorney General
        Litigation Section
4       15th Floor, Strawberry Square
        Harrisburg, Pennsylvania  17120
5           For - Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

INDEX TO WITNESSES

| FOR - PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Renee Foulds | 4 | 49 | 53 | -- |


INDEX TO EXHIBITS

| FOR - PLAINTIFF | MARKED | ADMITTED |
|---|---|---|
| Foulds Exhibit No. 1 | 20 | -- |
| Foulds Exhibit No. 2 | 40 | -- |


ERVIN BLANK ASSOCIATES, INC.

4

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

*       *       *

RENEE FOULDS, called as a witness, having been duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MS. TOBIN:

Q    Good afternoon, Ms. Foulds.

A    Hello.

Q    As we met off the record I'm Jennifer Tobin. I'm the lawyer for the Plaintiff in this case, Damon Chappelle.  And you indicated earlier that you have not been deposed before.

A    Correct.

Q    I'm going to go over some ground rules. Before I do, I'd like you to just state and spell your full name for the record.

A    Renee Marie Foulds; R-e-n-e-e, M-a-r-i-e, F-o-u-l-d-s.

ERVIN BLANK ASSOCIATES, INC.

5

     Q    And just to give you a basic set of
guidelines on how this will go, a deposition is
essentially a question and answer session.   All of our
words are taken down by the court reporter.

          So one of the main rules of depositions is
that we have to take turns speaking.   So if you will
please wait until I'm done asking a question before
you start to answer and I will similarly try to wait
until you're done with your answer before I start with
another question.

     A    Okay.

     Q    Another deposition guideline is that if you
don't understand one of my questions, you need to tell
me so that I can rephrase it and I will do so.   And if
you are guessing about an answer or approximating, you
need to let me know.

          If you don't let me know that you don't
understand a question and I ask it and you answer, I'm
going to presume that you did understand it when I
asked it.   Does that sound fair?

     A    Okay.

     Q    Another thing is since Ms. Culp is taking
down all of our words and she can't take down a
gesture, if you could give vocal answers as opposed to
a nod of the head or a shake of the head.

6

1    A    All right.

2    Q    Okay.  Thanks.  Any questions for me about

3 how this will go?

4    A    No.

5    Q    Okay.

6         MR. KEATING:  If you want to stop at any time

7 and talk to me or stop and just take a break at any

8 time, I'm your attorney here.  You know that.  We can

9 do that.  No problem.

10        THE WITNESS:  Can we do that before we start

11 for a few minutes?

12        MR. KEATING:  Sure.  You want to go out and

13 talk?

14        (Whereupon, a recess was taken from 2:19 p.m.

15 until 2:22 p.m.)

16                  AFTER RECESS

17 BY MS. TOBIN:

18    Q    I'm not going to grill, I'm just going to

19 ask.  As Mr. Keating was saying if you need to take a

20 break, just let me know.  It's not a problem.

21    A    Okay.

22    Q    I don't anticipate this deposition will be

23 very long.  But you might need to take a break and if

24 you do, the only request I have is that you answer the

25 question that's pending before you take the break.

7

```
1        A    Okay.  Fine.

2        Q    So if you could, just give me a timeline of

3   your employment since high school.

4        A    Okay.  During high school, I worked --

5             MR. KEATING:  After high school.

6   BY MS. TOBIN:

7        Q    You can skip during high school.

8        A    Okay.  Does it have to be complete because I

9   may not recall everything?

10            MR. KEATING:  No.  Just your job history.

11   BY MS. TOBIN:

12       Q    What I'd like is I'm just trying to get a

13   sense of when you started here and any professional

14   jobs you held prior to starting here.

15       A    Okay.  That's fine.  In January of 1998, I

16   began employment with the Commonwealth of Pennsylvania

17   as a residential services aide trainee at Selinsgrove

18   Center.

19       Q    What is Selinsgrove Center?

20       A    It's a mental retardation facility under the

21   Department of Public Welfare.

22       Q    And what did you do as a residential services

23   aide trainee?

24       A    I cared for the individuals who lived within

25   that center.
```

8

1  Q Who had developmental disabilities?

2  A Yes.

3  Q How old were they?

4  A They were adults.

5  Q And that was in January of '98.  How long did
6 you do that?

7  A That was a limited term wage position.  So
8 for approximately six months.  I think it was July of
9 '98 that I was then laid off.  A group.  Everyone was
10 laid off.  And so I began my employment shortly
11 thereafter with the Department of Corrections in
12 September of 1998.

13  Q And what was your position at that time?

14  A Corrections officer trainee.

15  MR. KEATING:  COT?

16  THE WITNESS:  Yes, COT.

17 BY MS. TOBIN:

18  Q And how long were you a COT?  Was that one
19 year?

20  A One year.

21  Q And in September of '99, did you become a
22 CO1?

23  A Yes.  I was promoted.

24  Q Was that here at Coal Township?

25  A No.  That was at SCI Mahanoy.

ERVIN BLANK ASSOCIATES, INC.

9

1     Q    And when you became a CO1, were you also at
2  Mahanoy?
3     A    Yes.  I was at Mahanoy until February of 2004
4  as a CO1 during that whole time until I transferred
5  here to Coal Township.
6     Q    You said February of 2004?
7     A    Yes.
8     Q    And when you transferred to Coal Township,
9  was that still as a CO1?
10     A    Yes.
11     Q    How long did you keep that position here at
12  Coal Township?
13     A    I was promoted to counselor in 2006.  I think
14  like July of 2006.
15     Q    And was that counselor -- corrections
16  counselor one?
17     A    Corrections counselor one, yes.
18     Q    And how long did you stay in that position?
19     A    Approximately five months later I was
20  promoted to corrections counselor two.
21     Q    And that's the position you currently hold?
22     A    No.
23     Q    What is your current position?
24     A    I'm a corrections unit manager.
25     Q    Okay.  And when did that promotion happen?

10

1     A     December 2010.

2     Q     What unit are you currently the unit manager

3    for?

4     A     All of A unit and half of B unit.

5     Q     So in 2009 which is the general time frame of

6    when the events underlying this lawsuit happened, you

7    were a corrections counselor two?

8     A     Correct.

9     Q     Okay.  How many levels of corrections

10   counselors are there?

11    A     Two.

12    Q     Prior to starting in '98 at the residential

13   place for adults with developmental disabilities, what

14   was your educational background?

15    A     Prior to 1998, I had a high school diploma; I

16   had a cosmetology license; and I had completed I think

17   three semesters of college credits.

18    Q     And did you subsequently take additional

19   semesters of college?

20    A     Yes.  After my employment began with the

21   Department of Corrections, I returned to school.

22    Q     Okay.  Do you currently hold any degrees?

23    A     I hold an associate's degree in criminal

24   justice, associate in applied science, bachelor's

25   degree in criminal justice, and a master's degree in

1   criminal justice.

2       Q    Where did you get the master's degree in

3   criminal justice?

4       A    Kaplan University.

5       Q    Where is that?

6       A    I attended on-line school, but it's located

7   in Davenport, Iowa.

8       Q    And when did you get that degree?

9       A    I believe it was July 2010.

10      Q    Was that a requirement for becoming a unit

11   manager?

12      A    No.

13      Q    Can you describe for me back in 2009 when you

14   were a corrections counselor two what your major main

15   duties were?

16      A    My main duties were to at that time handle

17   the caseload on B2 housing unit.  And I also did some

18   treatment programs, but I can't recall if it was at

19   the same time that I was doing that or not.

20      Q    So when you say treatment programs, do you

21   mean that you provided programming for the inmates?

22      A    Yeah.  Yes.  As part of a corrections

23   counselor's position initially when I started being a

24   counselor, the counselors here within the institution

25   had dual roles where they handled a caseload on the

12

1    unit and they also provided treatment programs for

2    which they were trained to provide.

3          Since that time, and I don't remember when

4    that happened, they've divided the counselors to those

5    specifically case managers and specifically treatment

6    programs.  But initially for the first few years we

7    did both.

8          Q    You wore multiple hats?

9          A    Yes.

10         Q    Or two hats.  Are those people who do the

11   programming now called treatment specialists?

12         A    Yes.

13         Q    Okay.  And when you say you managed a

14   caseload, does that mean you had a certain number of

15   inmates you were responsible for?

16         A    That means all the inmates who lived on B2

17   housing unit at that time I was responsible for.  Now,

18   many times over the course of the time that I was

19   corrections counselor two, other housing units would

20   be also divided up among all of the counselors because

21   when there's not a counselor at each location, those

22   caseloads have to be shared.  So I may have had more

23   than just B2 housing unit, but it's hard to determine.

24         Q    And then on average -- and I know this is

25   difficult -- in 2009 on unit B2 when you were -- had a

13

1    caseload, how many people would be in that caseload?

2         A    That unit can house 130 inmates so I would

3    say on average somewhere between 115 to 125 inmates.

4    But there were a lot of times when I had both housing

5    units so I would have B2 and there was no counselor on

6    B1.  So sometimes I would have the entire housing unit

7    assigned to me which could be upwards of 250 inmates.

8         Q    Sounds like a lot of inmates?

9         A    Or it could be some on C housing unit and

10   then I had some in the RHU.  So there were many

11   inmates.

12        Q    And for those inmates what were your main

13   tasks in managing the caseload?

14        A    The main tasks were initially when they were

15   received here, I would review their file with them and

16   review their treatment recommendations and review some

17   initial information to help them plan for their

18   eventual release.

19        Review their classification information and

20   make sure all that was correct.  Essentially figure

21   out where they were when they got here, what things

22   had to be addressed for their eventual release, and

23   then plan for that.

24        Q    And so when you would have that meeting, how

25   soon after they got here would you have that?

14

1      A    Well, it's supposed to be within five days.

2  So I would keep as close to that as possible.  But,

3  you know, I can't really exactly say for each

4  particular inmate.  It would depend on when I received

5  their record on the unit to have that information.  So

6  it would be within five days of the time that I

7  received their record.

8      Q    And in terms of planning for their eventual

9  release, there's been earlier testimony about that the

10 people at the institution aren't the ones who

11 determine what the programs are that are required; is

12 that accurate?  You all don't decide which programs an

13 inmate gets?

14     A    Well, at one time the counselor here within

15 the institution was the one to make those program

16 recommendations.  And then I'm not sure when the

17 diagnostic center at Camp Hill changed it to that all

18 the programs will be recommended during classification

19 and not then at the institution.

20          So initially the counselors here did that.

21 But after time, that was a task that was centralized.

22     Q    So in 2009, that task had already been done

23 by the diagnostic and classification center?

24     A    Maybe.  I'm not really certain when that

25 change took place.

15

1    Q    Okay.  And in terms of planning for an

2  inmate's eventual release, did you -- how did you know

3  when to schedule that inmate for what programs?  How

4  did you do that scheduling?

5    A    Well, inmates would be scheduled for programs

6  based on their minimum dates.  And we had a matrix to

7  follow based on what certain assessment scores

8  revealed combined with the inmate's criminal history

9  and current crime.  There was a tool for us to use to

10  make those recommendations.  And they would be placed

11  on a waiting list that was prioritized by their

12  minimum date.

13    Q    And then did you also do planning -- so

14  basically before their first time they could apply for

15  both parole, you needed to get them ready for that

16  event?

17    A    Yeah.  Inmates who were not -- had not yet

18  reached a minimum date.  Inmates who were initial

19  receptions were the ones who were all this pretty much

20  that I'm talking about when they had their entire file

21  was gone over, all of their release planning, all of

22  that stuff would happen with initial receptions.

23        And there was different -- there was a

24  different much shorter version of initial reception

25  interview that would happen with parole violators

16

1    because we did not have a lot of information that we

2    needed at the time when parole violators would come

3    back.

4        Q    But they would still see you when they came

5    back?

6        A    Sure.  Yeah.  They would still see us, yes.

7        Q    So where did you get the information about

8    their minimum date?  Where did you access that

9    information?

10       A    When parole violators come back, they're kind

11   of on a hold as far as the counselor knowing what

12   their parole review date to see the parole board again

13   would be or any of that information because we have to

14   wait on two forms of information.

15          We have to wait on the records sentence

16   status summary that tells us exactly what the

17   disposition of that inmate is when they've been

18   recommitted formally as a convicted or technical

19   parole violator and then that would tell us what the

20   new sentence structure is.

21          And also we would have to wait for the green

22   sheet from parole that would tell us, also, that that

23   inmate now has formally been recommitted as a

24   technical or convicted parole violator and when their

25   next review date would be.

17

```
 1      Q    So the first document you referred to, that

 2   sentence status sheet, is that the DC-16E?

 3      A    It is.

 4      Q    And it used to be the DC-16D?

 5      A    Yes.

 6      Q    And then the green sheet, that's a parole

 7   board document?

 8      A    A parole board action, yes.

 9      Q    You would get -- who would you get that from?

10      A    They would be sent through the institutional

11   mail.  And I really don't know who drops them in the

12   mail.  I have to assume that it's from our parole

13   department.

14      Q    The institutional parole office?

15      A    I believe so, yes.

16      Q    So someone coming from fresh in initial

17   reception, is that what you call them?

18      A    Yes.

19      Q    When someone comes in fresh, where would you

20   get their information on their minimum date?

21      A    That would already be in their DC-14 file

22   that would come from the records department up to the

23   unit.  So that's what I was referring to.  We would

24   have to wait until we get that file until we have a

25   clear picture of everything that needs addressed with
```

ERVIN BLANK ASSOCIATES, INC.

18

1    that inmate.  That's why, you know, it may be within

2    five days or it could be potentially longer.  I can't

3    see an inmate if I don't know anything about him.

4         Q    And so you have -- you get that file, you

5    review it, and you're planning for his minimum date,

6    his parole staffing, his first parole staffing; is

7    that correct?

8         A    Yes.  And the planning may just be having a

9    brief discussion about it if it's very far away, you

10   know.

11        Q    And then do you keep track of the programs

12   that the DSCC, the Diagnostic Classification Center,

13   do you keep track of the programs they have required

14   of this person and what the person's actually done?

15        A    Yes.  There's a sheet called a DC-43.  It

16   used to be called a PPP, Prescriptive Program Plan but

17   it's also called Correctional Plan is what it's

18   called.

19            And that form is -- a hard copy is placed

20   into their file that we can view but also when an

21   initial inmate comes to the unit, I will review in

22   their file and look at what's placed in the hard copy

23   versus what's actually on-line on DOCNet to see if

24   there have been any updates or changes, and then I

25   will print a new copy and give the inmate the updated

19

 1    information.

 2         Q    And then retrospectively -- or retroactively

 3    can you look on the computer or in the file to see

 4    what programs have been completed?

 5         A    That sheet will show what has been

 6    recommended, what is currently being administered, and

 7    what has been completed.

 8         Q    So you --

 9         A    It will show all three different sections.

10         Q    Okay.  And the DC-14 file that's something

11    that the counselor -- correctional counselor

12    maintains?

13         A    Yes.  It's the counselor's file.

14         Q    And how -- where is that maintained?

15         A    Well, at the time when I was a counselor, it

16    was maintained in a locked filing cabinet in my

17    office.

18         Q    And what is the procedure for either keeping

19    or discarding the DC-14 after an inmate leaves the

20    institution?

21         A    When an inmate leaves the institution --

22    well, at any time an inmate leaves my unit, I forward

23    that file either to the unit that he moved to or to

24    the records department if the inmate was leaving.

25         Q    So it would be -- would it be combined with

20

1   the DC-15 at that point in time?

2       A    I don't know.

3       Q    You just give it to the records?

4       A    I send it in a locked mail cart in the

5   records department bin or hand carry it if it needs to

6   be there quickly, and the records office takes it from

7   there.  I don't know what happens with it.

8       Q    So you don't purge any DC-14 files, you

9   yourself?

10      A    Never.  No.

11      Q    Do you know what the retention schedule or

12  the purging schedule is for the DC-14?

13      A    I believe they keep it on file for five years

14  here in the institution and then it's forwarded to

15  central records.  And I'm not sure how long they keep

16  it on file.

17      Q    Okay.

18           (Whereupon, a document was produced and

19  marked as Foulds Exhibit No. 1 for identification.)

20  BY MS. TOBIN:

21      Q    I'm showing you a document that I've marked

22  Foulds 1.  If you could please review that and when

23  you're done, let me know.

24      A    All right.

25      Q    Okay.  So what is this document?

21

1       A     It appears to be a job description.

2       Q     Is this the job description that was yours

3  when you were a corrections counselor two?

4       A     It doesn't have my signature so I can't be

5  sure.  Some of it looks familiar but as I'm reading

6  through it, some of it looks not familiar.

7       Q     Did you -- so you signed one.  You signed one

8  at one point?

9       A     Sure.  I had to sign one to acknowledge.

10  Every time that my supervisor would update my job

11  description, I would have to sign it.

12       Q     And do you know if those would be in your

13  personnel file or stored somewhere else?

14       A     I would say they should be, but I'm not

15  certain.

16       Q     Could you tell me what on this document looks

17  not familiar or what you think is not part of what you

18  signed?

19       A     Well, a lot of this section here where it

20  speaks to community corrections I don't believe any of

21  that part was involved with my specific job

22  description.  Also, it says that it's from 1998.  And

23  I should say that a lot of things could have changed

24  between 1998 and 2006.

25       Q     So I'd like to ask you some questions about

22

1  the general job and this is what we've got today so

2  I'm going to just ask you some things and if it's not

3  on your job description from 2009 is the period we're

4  looking at, then just let me know.

5      But I would like to get a copy of your job

6  description from that time period from your file just

7  in case there's any major differences.

8      So the definition on this talks about

9  advanced professional work in counseling and casework

10 services.  And then there's references to intensive

11 and extensive counseling.  Was that part of your job

12 when you had the job in 2009?

13 A    In 2009 I believe that my job description

14 read something closer to will provide group and

15 individual counseling rather than intensive and

16 extensive counseling.

17 Q    Okay.  What was group and individual

18 counseling?  Can you describe what that was?

19 A    Group counseling was essentially the

20 standardized treatment programs that I would

21 facilitate.

22 Q    So that was as a treatment -- when you were

23 wearing the hat as treatment specialist?

24 A    There was no such thing as a treatment

25 specialist at that time.  So every counselor

ERVIN BLANK ASSOCIATES, INC.

23

1   administered different treatment programs based on

2   which of the number of programs that we have that they

3   were specifically trained for.

4        Q    Okay.  And then individual counseling.  Can

5   you give examples of what that consisted of?

6        A    That may consist of discussing emotional

7   issues with inmates or family things that they want to

8   discuss, things of that nature.  More personal matters

9   that they would request to come and discuss with the

10  counselor.

11       Q    And did you have an office that was on the

12  unit?

13       A    Yes.

14       Q    And inmates could come to your office and did

15  they have to make an appointment?

16       A    Generally, I requested that inmates submit a

17  request slip.  That way on our request slip system it

18  usually says that they should be brief and clear in

19  what it is that they wanted to request to see a staff

20  member for.

21            I would have an idea of what their concern

22  was so that I could schedule an appropriate amount of

23  time.  So rather than them knock on my door, I

24  insisted on a request slip system.

25       Q    And would you respond to those request slips

24

1  in writing in the response section and send it back to

2  the inmate?

3      A    Sometimes.  If it was a very clear request

4  that could be answered in just one or two short

5  sentences with very basic information, I would respond

6  in writing.

7          If it was something that was more abstract or

8  would require a lot more time or that I had to get

9  information above and beyond what I would write, you

10  know, in a little paragraph, then I would just respond

11  in person because it may take longer.

12     Q    And so jumping into the underlying basis for

13  this case.  Do you remember an inmate that went by the

14  name of Kevin Jessup back in 2009?

15     A    I remember Jessup, yes.

16     Q    And what do you remember about him?

17     A    What I remember is that many times he had

18  complained that he was not supposed to be here.  That

19  he didn't believe that he was a parole violator.  He

20  thought he had served his time and he didn't think he

21  was here legally or however you want to say that.

22          So I do recall speaking to him on several

23  occasions.  And I didn't have a lot of information.

24  What he was telling me was really the only information

25  I had.

ERVIN BLANK ASSOCIATES, INC.

25

1        And the whole thing kind of I recall vague,

2   but I do remember that he was always very frustrated,

3   he was bringing it to my attention.

4        And I pretty much what I remember most was

5   that I kept telling him, you know, as far as the

6   information that I have, you know, we have to wait

7   until the paperwork comes through from the records

8   department and parole.  Really they would know the

9   answers to your questions if you're questioning if

10  something's not correct because I have to go by what

11  they send to me.  I don't know.  I don't bring you

12  back to jail.  I don't do any of those kind of things.

13  I have to go by the information that's given to me.

14       So it was kind of always a back and forth

15  thing.  And I would try and talk to him about well,

16  can you explain to me why do you think this?  And then

17  he would go on with an explanation of dates and

18  timelines and things that really I had no way to

19  verify or know, you know what I mean.

20       Q    Yeah.  You remember having -- you had the

21  individual sessions with him?

22       A    I remember speaking to him.  I don't remember

23  how many times.  But I do have an impression where I

24  remember having him in my office more than one time

25  and the conversation was that he was very upset

ERVIN BLANK ASSOCIATES, INC.

1   thinking that something was wrong with his commitment.

2   But there was little that I could do to remedy that at

3   the time.

4       Q    Can you describe his demeanor during those

5   visits?  You said he was upset.  But can you describe

6   how he was acting?

7       A    How do you mean?

8       Q    How would you -- would you be able to

9   describe -- did you have a sense of -- this is hard.

10  Can you describe how he looked when he was in your

11  office or any actions he was taking?

12      A    I don't know that I can.  My general

13  impression was that I mean he was polite, he was very

14  respectful, he was insistent.  And every time that I

15  would explain to him that, you know, I can do nothing

16  about changing his commitment.  I can do nothing about

17  his paperwork because I don't think I had it even

18  initially when we were talking about it because I know

19  that I had to get him to explain the entire thing to

20  me because I didn't understand why he thought that he

21  was here by mistake.

22           And I just my general impression was that he

23  was insistent.  He was respectful even when I told him

24  that there was nothing I could do, but he persisted.

25  I know I saw him more than once.

27

1   Q    And did you see him as the result of request

2   slips being submitted to you?

3   A    Probably.

4   Q    And after -- during the meeting, just

5   generally how did you -- did you take any steps to

6   look into his allegations?  And I know you said you

7   only had what he told you.  Did you take any steps to

8   look into that?

9   A    I think that I would have called the records

10  office just to question it, you know, and get a feel

11  for the information that he was telling me versus the

12  information that they have.

13       And that's my general impression, but I don't

14  recall exactly whether I did that and what the details

15  were or who I spoke to.  It's just my general

16  impression of a memory of it.

17  Q    Did you look in the computer system or after

18  you received the DC-14, look in his file to see if you

19  could find any information that would help you

20  understand his problem?

21  A    I don't recall when I received his file or if

22  I ever did.  And I would say, you know, if you ask me

23  this today, my initial first thing that I would do is

24  try and pull up whatever information on the computer

25  that I could.  Whether I did that then I really can't

ERVIN BLANK ASSOCIATES, INC.

28

1    exactly say.  I think that I would have, but I can't

2    really say.

3        Q    So just to be clear for the time periods,

4    what we're talking about now is when he was returned

5    to Coal Township in April of '09.

6        A    My general --

7             MR. KEATING:  Wait a minute.

8    BY MS. TOBIN:

9        Q    Let me ask you a question.

10       A    I'm sorry.

11       Q    So we're talking about that time period.  You

12   were a correctional -- you were his correctional

13   counselor at that point in time.  He was assigned to

14   your caseload in April of '09?

15       A    If he lived on B2 housing unit, he certainly

16   was.

17       Q    And he was coming back after serving a

18   federal sentence that he was paroled to in July of

19   2007.  Do you know if he was also in your caseload

20   before he left in July of 2007?

21       A    I don't know for sure, but I don't think so

22   because I don't believe that I had met him before

23   2009.

24       Q    Okay.

25       A    Or at least met him on my caseload.  I think

29

1    that I may have met him as a CO in the institution.

2    But I don't think he was ever on my caseload.

3         Q    So you may have met him when you were just

4    here not doing that job?

5         A    Probably, yeah.

6         Q    Did you have any interactions with him that

7    you can remember back then when you were a CO?

8         A    No.  I don't remember.  There's 2,000 inmates

9    or something here.  But I did work on every housing

10   unit, you know, and in every different post during the

11   time when I was a CO.  So I must have had some contact

12   with him beforehand.  But I don't recall exactly

13   because he was a familiar person.

14        Q    So before April of -- I guess if you weren't

15   his counselor prior to April of '09.  Did you

16   eventually get his DC-14?

17        A    I don't remember if I did or not.  Parole

18   violators sometimes we receive their DC-14 and

19   sometimes we never do.  And, you know, once it would

20   get to a point that we are told that they're going to

21   be on a parole docket and to prepare a staffing

22   packet, then we would have to go and try and gather as

23   much random information as we can to put together a

24   packet.

25             So anything that may be available in a DC-15

ERVIN BLANK ASSOCIATES, INC.

30

1   that the records department would have created, then

2   we would have to create one.  So there's no way for me

3   to remember whether or not I did receive it or didn't.

4        Q    And then if you didn't have it, you could

5   access the DC-15 through the records department,

6   right?

7        A    Yes.

8        Q    And you could also access some information

9   about him on the computer system?

10       A    Yes.  Like the DC-16E, the sentence status

11   summary sheet, I wouldn't have to go to the records

12   department for that because once one was available, a

13   hard copy would be mailed to me through the

14   institutional mail and also at the same time would be

15   available for viewing through the computer.

16       Q    Did you look on the computer to look at his

17   DC-16E forms at any point after you had these meetings

18   with him where he was complaining about over

19   detention?

20       A    Well, my impression of a memory from this is

21   when we were talking about it and I did not understand

22   what he was explaining to me, I think that I tried to

23   open that up and view it at the same time.  That would

24   be my -- that would be the only way for me to try and

25   follow what he was telling me.  Whether I absolutely

31

1   did and could access it, I can't remember.  But I

2   would have tried anyway to look at it.

3       Q    What was -- what was your understanding --

4   you mentioned before that he complained that he didn't

5   think he was a parole violator and that he shouldn't

6   be there.  What was your understanding of that

7   complaint?  What was his beef?

8       A    Well, I do remember that he told me that he

9   was paroled, then he got a federal case, did a federal

10  sentence, and that it was his understanding that he

11  was done after that.  And that parole was telling him

12  that he violated and he didn't think that was right.

13          So that's my general memory of it.  I really

14  don't know any more details than that.  I just know

15  that that was the gist of it.

16      Q    Okay.

17      A    Now, even if -- whether it were accurate or

18  were not accurate for him to have been recommitted,

19  initially when he's recommitted, there's this window

20  of time where he's a parole violator pending and until

21  a board action comes through and the records

22  department does another 16E, there's no way for me to

23  know if it's accurate or not.

24          The only way that I ever know as a counselor

25  is once I receive those two documents.  So I guess

32

1   essentially what I'm saying is, you know, I listened

2   to what he told me and I tried to feel out some detail

3   that would stand out to me of the story that he told

4   me of why could this be incorrect but there was really

5   no way for me to know because even for cases who are

6   absolutely, you know, supposed to be recommitted,

7   there's a window of time that you just don't know that

8   information as a counselor.

9        Q   So when he was a PVP and things were murky in

10  terms of what information you had, you didn't have the

11  documents to confirm or deny what he was saying?

12       A   Right.  There had to be a window of time that

13  I had neither of those documents because there is with

14  every parole violator a window of time that they

15  are -- when they're a parole violator pending, they're

16  really kind of just here without us having all the

17  information that we need to know what it is that took

18  place and what's the next step for them.  So they're

19  kind of on hold.

20       Q   What did you -- did you advise him to do

21  anything?  Did you -- or did you take any other steps?

22       A   Yeah.  I remember telling him that he needs

23  to bring his concerns to the records department and to

24  his parole agent because they're the ones who would

25  have the answers before I did, before those documents

ERVIN BLANK ASSOCIATES, INC.

33

1   came to me.

2       Q    Did you contact the records department or the

3   parole -- did you say the parole agent?

4       A    The agent I told him to write to.  No, I did

5   not contact the parole agent to the best of my

6   knowledge.  And I may have called the records

7   department as I said before, but I'm not 100 percent

8   sure if I did or not.

9       Q    And was the first conversation that you had

10  with him about this issue, the over detention issue,

11  was that held during the initial meeting when he first

12  came back to the institution in April of 2009?

13      A    Most likely, yes.  That would be something

14  that we would discuss during that.  You know, I would

15  ask them straight out why are you back as a parole

16  violator?

17          Because many times their report to me is all

18  I have to go from until I have a copy of the parole

19  supervision report that might hint to what happened or

20  until I get the actual board action.

21      Q    So you asked him -- you may have asked him

22  that question?

23      A    I must have asked him.  That's one of the

24  normal questions I would ask, yes.

25      Q    And at that point were you able to look or

34

1  did you look on the computer to see what programs he

2  had taken before he had gone to serve his federal

3  sentence?

4      A    Probably if it was available, that would have

5  been one of the things I would have done during an

6  initial reception interview.  Whether I did that with

7  him I can't say because I don't recall.  But normally

8  I would do that, yes.

9      Q    Did he tell you that he had already served

10  from 1996 to 2001 at Coal Township?

11      A    He may have.

12      Q    And do you have any reason to -- I mean were

13  you able to confirm that on the computer?  Did you

14  take that step or did that even come up?

15      A    I don't think so, no.  There have been times,

16  many times where an inmate is a parole violator

17  pending who is already past their maximum date, so

18  it's not unusual for me to have the impression that I

19  have no idea what is going on with their case until I

20  get a board action because, you know, as I've said,

21  even sometimes inmates are parole violator pending who

22  are past their maximum date for the sentence for which

23  they, you know, supposedly violated parole.

24          So there's always this uncertainty about the

25  circumstances of why a parole violator is back.  Until

35

1   I receive those documents, I really don't know.

2       Q    Do you have someone that you can contact in

3   the institutional parole office to discuss these

4   issues?

5       A    Sometimes their agents have that information

6   and sometimes they don't because if their agents also

7   don't have a board action, maybe they may not know.

8   Because it may be the agent on the street who is the

9   one who has the documentation that would give the

10  answer to why the guy was sent back.  So, you know, I

11  could call the parole agent but they may not know

12  either.

13      Q    When you say the parole agent, do you mean

14  the institutional?

15      A    The institutional agent, um-hum.

16      Q    So during your time as a correctional

17  counselor either one or two, how many inmates had the

18  problem of being a PVP, parole violator pending, even

19  though their sentence was complete that you remember?

20      A    I don't know.

21      Q    If you can approximate.

22      MR. KEATING:  Yeah.  No.  I'm going to object

23  to that question, but you can go ahead and answer it.

24  BY MS. TOBIN:

25      Q    Well, you testified earlier that it was many.

36

1        MR. KEATING:  No.  That's not what she
2   testified to.  You're saying who completed their
3   sentence.  She said past their max date, and that's
4   two different things.
5        MS. TOBIN:  Okay.  Let me rephrase it then.
6        MR. KEATING:  Okay.
7   BY MS. TOBIN:
8    Q   So how many people, if you can estimate, fall
9   into that category, people who are past their max date
10  but are considered PVP?
11   A   I couldn't provide an exact number at all.
12  I'm speaking from, you know, general terms that I have
13  seen this happen enough times to know that there's no
14  definitive way to know the circumstances of a parole
15  violator's recommitment until the actual documents
16  arrive.
17       Because many times, you know, if that has
18  happened, the inmate will say, you know, I shouldn't
19  have been brought back.  I finished my sentence, blah,
20  blah, blah.
21       But what they fail to bring to light is the
22  fact that they were on parole at the time that they
23  committed the offense even though they were on the run
24  for six years and now it's been, you know, four years
25  since their max date.  They fail to bring that

1   information to light.

2        So it's never a certainty for me to

3   understand the circumstances of a parole violator's

4   commitment until I see the documentation.

5        Q    Do you recall whether you eventually did see

6   the documentation for Mr. Chappelle?

7        A    I do not recall whether I did or not.

8        Q    Did you later -- so he ultimately was

9   released on July 30th of 2009.  Do you recall whether

10  you did any follow-up with him from April to July

11  about the issue?

12       A    No, I don't.  Like I said, I know that I had

13  met with him more than one time.  I can't say how many

14  more times.  And I don't personally recall there ever

15  being any resolution to his concerns but, you know,

16  that information could have escaped me because I had a

17  lot of inmates on my caseload.

18       Q    So you weren't involved in his -- when he was

19  ultimately released, you weren't involved in that

20  process?

21       A    I don't even recall how he was released.  You

22  know, I would assume that he could have been, you

23  know, released one day without any advanced notice.

24  But I don't know how he was released, in what manner,

25  and I don't recall preparing anything for his release

38

1  paperwork.

2      Q   During that time period when he was back here

3  from April to July, did you have any meetings with him

4  that weren't about this issue?  Did you have any non

5  over detention related meetings with him?

6      A   I don't remember.  There's no way for me to

7  remember.

8      Q   Did you keep track -- was there a record or a

9  log of like your schedule?  Did you have an

10 appointment book where you had inmates, like a

11 doctor's appointment book, scheduled?

12     A   No, I didn't.  Essentially I handled my

13 caseload and whatever additional part of the caseload

14 that I had.  And for most of the time that I was

15 corrections counselor I had two to two and a half

16 times what everybody else's caseload was.

17          So pretty much I handled work as it came at

18 me.  Got as much possibly done in a day as I could and

19 I only kept records on things that were unusual or

20 extraordinary, you know, in terms of inmate's behavior

21 or things that I forwarded to somebody else or

22 whatever.

23          I would keep notes on specific inmates when

24 it was required I guess is what I meant to say.

25     Q   And the notes would be in the DC-14?

39

1      A    Or on the accumulative adjustment record

2  system of DOCNet which is the electronic version, yes.

3      Q    Is that the DC-17X?

4      A    No.   That's a different -- completely

5  different form.   It's called the ICAR, Accumulative

6  Adjustment Report.   It's the electronic equivalent of

7  what a DC-14 case note is hard copy.

8      Q    And are those -- those are on the computer so

9  you would go to a screen to review those?

10     A    Yeah.   You can enter comments or to view any

11 of the comments that had been entered.

12     Q    So any notes that you wrote about Mr. Jessup

13 would likely be in that form?

14     A    They would be there, yes.

15     Q    And is that something that would be

16 maintained even after the inmate leaves the

17 institution?

18     A    It's a permanent record, yes.

19     Q    Can it be called up now even though it's

20 three years after he left?

21     A    It may be able to be called up.   I never have

22 tried for an inmate who's not currently here.

23     Q    Would you be able to check to see if you made

24 any notes by doing that, by calling up?

25     A    I would.

40

1      Q    Could you do that?

2      A    Um-hum.  Yes.

3      Q    And if so, I'd like a copy of those.

4      A    Okay.

5      Q    Did you discuss programming needs with Mr.

6   Chappelle when he came back in April of 2009?

7      A    I don't know.  That's normally part of the

8   initial reception interview.  And for parole violators

9   for whose files I would have or have the information

10  that, you know, tells me why they were recommitted to

11  make an informed decision on programming, I may have.

12  But I can't be certain in his case whether I did or

13  not.

14     Q    You don't recall any discussions of you

15  telling him he needed to take a program and him saying

16  I already took that?

17     A    I don't recall that at all, no.

18          (Whereupon, a document was produced and

19  marked as Foulds Exhibit No. 2 for identification.)

20  BY MS. TOBIN:

21     Q    I'm showing you what I marked as Foulds 2.

22  Do you recognize that document?

23     A    Yes.  It's a classification.

24     Q    And can you tell me what the purpose is or

25  what is this?  What's the purpose of this document?

ERVIN BLANK ASSOCIATES, INC.

1      A    This document is to establish an inmate's

2   custody level, program codes, and other needs

3   assessments.

4      Q    And is this something that you would input

5   data into the computer and it would generate this

6   document?

7      A    Yes.

8      Q    And is this how you would track the

9   programming needs that you talked about before?

10     A    No.   This is not the form that I would use to

11  track programming needs, no.   That's a completely

12  different form.

13     Q    What is the form to track programming needs?

14     A    It's a DC-43 correctional plan.

15     Q    And this is used to establish classification

16  of the inmate?

17     A    Yes.   Custody level, program code needs, and

18  pretty much all the whole classification umbrella is

19  what this is for to classify an inmate.

20     Q    And how would you use this information or how

21  did it --

22     A    This program is designed to come up with an

23  accurate custody level for an inmate based on the

24  information that's input.   And then if there are

25  program codes needed to go along with that inmate's

42

1    custody level, that would also be contained within

2    this program.

3        Q    And program codes meaning treatment programs

4    or other types of programs?

5        A    No.  Program codes meaning if the inmate had

6    other things associated with his security level, his

7    security custody level.  Like if he was an escape

8    risk, you would give him a certain program code.  If

9    he was on the mental health roster, you would give him

10   a certain program code.

11            So based on specific needs, there may be a

12   code that accompanies the custody level that would be

13   determined and input through this program as well.

14       Q    Okay.  And did you do this first -- did you

15   do the input for this first page that's identified as

16   920 in the bottom right corner?

17       A    Yes.

18       Q    And under the needs assessment, what is a

19   most recent and it looks like stability rating.  Is

20   that accurate?

21       A    Yes.  What a stability rating is is

22   determined by the psychology department through

23   psychological assessment.

24       Q    And on the next page which is marked 921 in

25   the bottom corner, remarks, other needs, comments.

43

1    Can you explain what those comments mean?

2        A    Yeah.   Those are comments that were input by

3    me.   What it means is the probation of -- or the

4    Pennsylvania Board of Probation and Parole 15 which is

5    essentially the board action form recorded on this

6    date, April 16th, 2009.

7           The essential part on that that tells me how

8    to deal with this inmate says referred to the board

9    action -- a previous board action from June 25th, 2007

10   to recommit to a state correctional institution as a

11   technical parole violator to serve 36 months backtime.

12          So I extracted that directly from the board

13   action.   That's what the parole department in their

14   board action tells me has been the decision of what to

15   do with this inmate.

16       Q    So that's the document you didn't have when

17   you first spoke with Mr. Chappelle?

18       A    Yeah.   I must not have had it at that time.

19       Q    So --

20       A    This doesn't say when I received it.   But I

21   would have received it by the time that I did the

22   classification.   It may have been pretty close to that

23   date, but I can't say when.

24       Q    Do you recall taking any -- doing any further

25   investigation about Mr. Chappelle's complaint after

44

1   you got the PBPP-15?

2      A    No.  Because I take that document to be

3   accurate.  I don't know how they come to make that

4   decision.  All I know is that once I've been told

5   that's been the decision, I take that as the

6   information to work from from the point I receive it.

7          I don't even know how they come to determine

8   a parole violator before, how they come to their

9   decision.  So there's nothing for me to investigate.

10  I don't work for the parole department so I can't

11  determine whether they were correct or not correct.

12     Q    And you didn't call them to find out what the

13  reason was for this parole board action?  Didn't call

14  the parole board?

15     A    I don't think I did.  Now, on the board

16  action they would list sometimes -- and it may not

17  have been this board action from April 2009.  It may

18  have been one from June 2007.  They would list

19  reasons.

20         So maybe -- I don't know if that's what you

21  meant to ask me did I call them and ask them why.

22  There would be reasons listed within that board action

23  of why he was recommitted.  It would spell that out

24  because this one sentence is not the entire board

25  action.  Is that what you meant to ask?

45

1         MR. KEATING:  No.  Just respond to the

2    questions.  I think the question was do you recall if

3    you called the board of probation and parole.  I think

4    you said you don't believe you did.

5         THE WITNESS:  Okay.

6    BY MS. TOBIN:

7      Q    My question -- another question is --

8         MR. KEATING:  We can give her questions to

9    ask but I'm sure she has enough of her own without us

10   giving her some more.  That's okay.  I understand.

11   You're trying to explain.

12        THE WITNESS:  Afterward I thought that what

13   your question meant to me was did I call them to ask

14   them what the reasons were.  The board action tells me

15   what the reasons are.  That's all.

16   BY MS. TOBIN:

17     Q    So Mr. Chappelle at this point in time on May

18   21st of '09, he's still here at Coal Township and

19   you're still his counselor.  And I don't have every

20   single date in front of me of when you had those

21   conversations but my basic question is he's still

22   complaining -- he complained essentially from April to

23   July of being here, that he shouldn't be here.  So my

24   question is --

25        MR. KEATING:  I'm going to object to that.

46

1   He complained from April to July.  You're putting

2   things in the record which are not.  There have been

3   some complaints that he has of record.  But the way

4   you characterize it is misleading.

5   BY MS. TOBIN:

6       Q    Okay.  I guess I'm fine with your answer.

7   You didn't call them.  That's fine.  Do you remember

8   getting any phone calls from his family members

9   after -- between April and July of 2009?

10      A    I don't remember that.

11      Q    Do you sometimes get calls from family

12  members?

13      A    Sometimes I do.

14      Q    And if you did, would those be recorded in

15  the DC-14?  Would a record of the fact of a call?

16      A    Sometimes, but not always.  Generally when

17  inmates' families call me, they ask for information

18  and many times because there's a release of

19  information policy, I'll tell them that what they're

20  asking me I will tell the inmate directly and they can

21  contact him.  He can give them their answer.  Most

22  often that's my response when families call me.

23      Q    At any time during that period, April to July

24  of '09, did Superintendent Varano contact you to

25  discuss Mr. Chappelle?

ERVIN BLANK ASSOCIATES, INC.

47

1      A     I don't recall.

2      Q     Did you have any meetings with the unit

3  manager at the time who was Mr. Dunn about Mr.

4  Chappelle?

5      A     I don't recall that either.

6      Q     And what about any meetings with anybody in

7  the records department?

8      A     I've never had a meeting with a records

9  department person.

10      Q     Did you make any phone calls to the records

11  department to try to help Mr. Chappelle straighten out

12  the sentence credit issue?

13      A     I've said before that I think that I did.  My

14  general impression is that I did call the records

15  department just to feel out the situation.  But I

16  can't definitively say that I did or who I spoke to.

17      Q     In 2009, did you use a form called the moves

18  report?  Did you have access to the move report?

19      A     I don't know what you mean by a move report.

20      Q     I'm showing you what's been previously marked

21  as Kodack 28.  Does that document look familiar to

22  you?

23      A     Yes.  That's something that I can access

24  through the computer system.

25      Q     And under what circumstances would you access

48

1   that?

2       A    If I had to determine where an inmate was

3   previous to being sent here.

4       Q    You could take a look at that?

5       A    I could look at it electronically.

6       Q    Do you know whether you accessed the moves

7   report in connection with Mr. Chappelle's complaints?

8       A    I do not.  I do not remember.

9       Q    Do you know if Mr. Chappelle did ever contact

10  the institutional parole office about his complaint?

11      A    I don't know if he did or not.

12      Q    Do you know if he ever contacted the records

13  department about his complaint?

14      A    No.  I don't know.

15      Q    Did Mr. Chappelle ever submit any inmate

16  request forms?  Do you remember if he ever submitted

17  any inmate request forms to you about this issue?

18      A    I don't remember whether he did or not.

19      Q    Okay.  Regardless of whether he did, you did

20  talk with him?

21      A    I did speak with him personally, yes.

22      Q    Just a couple more questions.  Do you have

23  any criminal convictions?

24      A    No.

25      Q    And do you have any military experience?

49

1        A    I do not.

2             MS. TOBIN:   Okay.  I don't have any more

3    questions for you right now.

4                      CROSS-EXAMINATION

5    BY MR. KEATING:

6        Q    I have a couple questions.  The parole board

7    recalculates and they change an inmate's maximum date

8    based on a board action; is that a correct statement?

9        A    The parole board -- can you please repeat

10   that?

11       Q    Can the parole board recalculate and change

12   an inmate's maximum date based on the board action?

13       A    I do not exactly know.  But I know that the

14   parole board gives information to the Department of

15   Corrections that tells the Department of Corrections

16   what changes should be made to an inmate's maximum

17   sentence.  Whether it's based on a board action or

18   based on the information that generates the board

19   action, I can't say.

20       Q    Okay.  And we were looking at this Foulds

21   Exhibit Number 2.  This one here.  And we were looking

22   at page two under remarks, other needs, comment.  And

23   I believe you were saying that there it said that

24   PBPP-15 of 04/16/09 which is April 16th of 2009.

25       A    Yes.

50

1    Q    You entered this and it says served 36-month

2    backtime, correct?

3    A    Correct.

4    Q    And was that based on a green sheet or

5    something you got from the board of probation and

6    parole?

7    A    Yes.  What this tells me essentially it's a

8    hyphenated version of what's on the green sheet.  So

9    it tells me that's the report I looked at on the date

10   4/16/09 and this remark here, refer to board action of

11   6/25/07 to recommit to a state correctional

12   institution as a technical parole violator serve

13   36-month backtime is nearly verbatim copied and pasted

14   directly from the wording on the green sheet.

15         Also, all of this is exactly extracted from

16   that board action.

17   Q    So that's saying that you were notified by

18   the board in April of 2009 he still had 36-month

19   backtime; is that a correct statement?

20   A    It's telling me April 16th, 2009 this board

21   action was recorded.  I can't say that I received it

22   on that date.  It could have been anytime thereafter.

23   Q    Okay.  That's not what I'm asking.  That's

24   not what I'm asking.

25   A    The board action tells me he has 36 months

51

1  backtime to serve.

2      Q    As of April 16th, 2009, the board is telling

3  you he has 36 months backtime?

4      A    Yes.  Now, I didn't list anything else.

5      Q    That's just what I'm asking.  Okay.  So after

6  the board told you that April of '09 he had 36 months

7  backtime yet, did you have any reason to try to

8  further investigate Mr. Jessup's claim that he was

9  being held past his max date?

10     A    No.  I take the board action as direction.

11     Q    Okay.  So I'm just asking.  I mean did you

12  have any reason to do any more investigation or call

13  up the parole board once you got that information from

14  the board?

15     A    I had no reason to do anything at all.  I

16  took the information and acted on it once I received

17  it.

18     Q    And was Mr. Jessup the first parole violator

19  who came back and told you they believed they were

20  being held beyond their sentence amount?  Is he the

21  first inmate that's come and ever told you --

22     A    Oh, never.  No.  They always, you know,

23  dispute.

24     Q    It's not unusual?

25     A    It's not unusual and very often they don't

52

1  tell you the circumstances that were the fact of the

2  matter.

3      Q    But did you ignore what Mr. Jessup told you

4  or did you actually look into it when he first told

5  you about what he thought his situation was?

6      A    I don't believe I ignored it at all.  I know

7  I had conversation with him, tried to get the story of

8  what happened, you know, through his report to me.

9  Tried to understand where he said there was a

10 discrepancy.  I never understood where the discrepancy

11 laid.  Then I received the board action and took that

12 to be accurate.

13     Q    And did you tell him about the board action

14 and say look, Mr. Jessup, the board's telling you you

15 got 36 more months.  Did you ever tell him that?

16     A    I can't say whether I did.  But if I

17 classified him, most likely I sat down with him to do

18 this because I may have had him sign a form or

19 something.

20     Q    Do you know what a green sheet is from the

21 board?

22     A    Yes.  The green sheet is a board action.

23     Q    And do they give them to the inmate that they

24 take the action against?

25     A    Absolutely, yeah.

ERVIN BLANK ASSOCIATES, INC.

53

1      Q    So did Jessup probably have -- well, that's

2   speculation.  I'm not going to ask.  Do you know

3   whether he had a copy of a green sheet from the board

4   saying he had a 36-month backtime hit or not?

5      A    I don't know if he had a copy.

6           MR. KEATING:  Okay.

7                    REDIRECT EXAMINATION

8   BY MS. TOBIN:

9      Q    Just one more.  What is your understanding of

10  what backtime is?

11     A    My understanding is backtime is time that the

12  inmate was on parole but now the parole board has

13  rescinded a portion of that time and said that that

14  inmate owes that time in incarceration because of a

15  violation.

16          So it was time that the inmate was in the

17  community and has been retracked and put back on to

18  them to owe that time to be spent either incarcerated

19  or at the end of the period of time that they have to

20  serve.

21     Q    So it's time that the inmate has to spend

22  incarcerated?

23     A    Or added on to their sentence at the end to

24  increase their maximum sentence.  So it may not --

25  they may come back.  Let's say hypothetically if they

54

1   were told they have six months backtime,

2   hypothetically, and they came back to jail and after

3   three months were reparoled, so then there would still

4   be three months of that time that were already

5   calculated in to their new parole violation max date.

6           So it's a portion of time where they were on

7   parole that has now been reintroduced into the rest of

8   the time of that sentence that's remaining whether

9   it's incarcerated or not.

10          MS. TOBIN:  Thank you.

11          MR. KEATING:  That's it.  Thank you very

12  much.

13          THE WITNESS:  Thank you.

14          (Whereupon, the deposition was concluded at

15  3:35 p.m.)

16

17

18

19

20

21

22

23

24

25

ERVIN BLANK ASSOCIATES, INC.

55

1   COUNTY OF UNION                :

2   COMMONWEALTH OF PENNSYLVANIA:

3          I, Faith A. Culp, the undersigned Notary

4   Public, do hereby certify that personally appeared

5   before me, RENEE FOULDS; the witness, being by me

6   first duly sworn to testify the truth, the whole truth

7   and nothing but the truth, in answer to the oral

8   questions propounded to her by the attorneys for the

9   respective parties, testified as set forth in the

10  foregoing deposition.

11         I further certify that before the taking of

12  said deposition, the above witness was duly sworn,

13  that the questions and answers were taken down

14  stenographically by the said Faith A. Culp, Court

15  Reporter, Winfield, Pennsylvania, approved and agreed

16  to, and afterwards reduced to typewriting under the

17  direction of the said Reporter.

18         In testimony whereof, I have hereunto

19  subscribed my hand this 29th day of June, 2012.

20                              *Faith A. Culp*

21                              Faith A. Culp
                                Reporter-Notary Public
22                              My Commission Expires
                                August 23, 2014
23

24

25

ERVIN BLANK ASSOCIATES, INC.

| Job Code | Pay Scale Group | Pay Scale Type | Bargaining Unit | Civil Service or Non-Civil Service | Executive Board Change | Last Change Effective |
|----------|-----------------|----------------|-----------------|-----------------------------------|-----------------------|-----------------------|
| 47540 | 07 | ST | F4 | C | 606-23 | 4/8/1998 |

Click on Job Code for current expanded information, on Pay Scale Type for current Pay Scale Type,
Civil Service or Non-Civil Service to obtain the Evaluation Guide (if available), on Executive Board Change
to obtain the Executive Board amendment listed and on Last Change Effective to obtain history.

04/08/1998                                    47540

CORRECTIONS COUNSELOR 2

DEFINITION:  This is advanced professional work in counseling and
providing casework services to inmates in a Commonwealth Correctional
Institution, Facility, or Community Corrections Center.

An employee in this class performs a variety of duties of more complex
nature utilizing casework, group and individual counseling methods and
techniques to help inmates to adjust to institutionalized living, to assist
them in solving social, economic, and emotional problems to the extent of
influencing changes in attitude and behavior, and to develop a sense of
dignity and responsibility.  An employee in an Institution, Regional Facility,
or Community Corrections Center is assigned cases identified with
unusually difficult behavior and adjustment problems which require
considerable independence in the selection of courses of action and for
which established guidelines, techniques, standards are not available or
non-existent.  An employee in a community based center assists the
director in the administration of an individualized treatment program,
including involvement in individual and group counseling and assisting
inmates to adjust to pressure, problems and rules of conduct of society
during transition from a structured supervised institution environment to a
less structured community based setting.  Supervisor is received from a
professional or administrative superior and is reviewed for effectiveness
through observation, conferences, and evaluation of results.

EXAMPLES OF WORK:  Provides intensive and extensive counseling
services to inmates identified with unusually difficult behavior and
adjustment problems; provides inmates with individual and group
counseling services during reception and through entire institutional,
facility, or center assignment.

Administers and analyzes aptitude and interest tests, compiles
socio-demographic histories, and develops case records which include
initial medical, psychological, and psychiatric evaluations, tests and
measurements, and final clinical evaluation.

Resolves problems relating to the implementation of individualized
treatment plans through the support team, including housing, academic
and vocational training, job placement, and social, economic, and
behavioral adjustments.

Coordinates inmate treatment objectives with other institution activities
and services to obtain cooperation and for the effective utilization of
personnel and material resources.

Participates in parole planning and makes recommendations regarding
furloughs, special privileges, treatment plan changes, and release to
community based center.

Assists inmates through individual counseling and group therapy in the
transition from a structured supervised institutional environment to a less
structured community based center.

Assists the director of the community based center in the administration of
an individualized treatment program; promotes community understanding
and acceptance of the institution inmate treatment program and the



DEF000199

resident and non-resident community based program through speaking
engagements personal contact with business and community leaders, and
conducting institutional tours.

Develops employment opportunities, instructs inmates on procedures for
application and requirements for job retention, and provides
vocational and academic guidance.

Provides assistance in resolving personal and family problems, utilization
of leisure time in recreation and entertainment, and on matters relating to
financial management.

Enforces house rules for eligibility and continued assignment in a
community based service program.

Provides information regarding availability of medical and social services
through community and other state agency sources.

Attends scheduled in-service training programs designed to improve
counseling methods and techniques and for the development of
management skills.

Performs related work as required.

REQUIRED KNOWLEDGES, SKILLS, AND ABILITIES:  Knowledge of
counseling and casework methods and techniques.

Knowledge of individual and group behavior of the under privileged,
minorities, and persons with criminal and delinquent backgrounds.

Knowledge of medical and social services, academic and vocational
training, and recreation available in an institution and the community.

Knowledge of correctional institution or facility, or community based
center operation and management.

Skills in applying the counseling techniques needed in dealing with
inmates with unusually difficult behavior and adjustment problems.

Ability to review medical, socio-demographic histories, psychological and
psychiatric evaluations, vocational and educational data and make
recommendations for individualized treatment plans for inmates with
unusually difficult behavior and adjustment problems.

Ability to establish and maintain effective working relationships with
associates.

Ability to counsel inmates with unusually difficult behavior and adjustment
problems.

Ability to communicate effectively orally and in writing.

Ability to prepare and maintain reports.

MINIMUM EXPERIENCE AND TRAINING: One year as a Corrections
Counselor 1;

                    or

Two years of professional experience providing casework or counseling
services to adult clients or inmates in a social service setting, and a
bachelor's degree in sociology, psychology, counseling, social work,
corrections and law enforcement, or a related field;

                    or

One year of professional experience providing casework or counseling

DEF000200

services to adult clients or adult inmates in a social service setting, and a master's degree in sociology, psychology, counseling, social work, corrections and law enforcement, or a related field;

or

two years of professional educational experience in a correctional facility and a bachelor's degree in sociology, psychology, counseling, social work, corrections and law enforcement, education, or a related field which includes 18 college credits in the behavioral sciences, corrections, law enforcement, or a closely related area.

or

Any equivalent combination of experience and training which includes either two years of professional counseling experience in a correctional facility or 18 college credits in the behavioral sciences, corrections, law enforcement, or a closely related area.

# Pennsylvania Department of Corrections

mkodack 2/8/2012 1:36:17 PM    Inmate Query - Classification HistoryInitial

| Inmate Apps | Inmate Inquiry | Reports | Photos | JNET |

| | | | |
|---|---|---|---|
| **Inmate #:** CX8799 | **INACTIVE** **Name:** JESSUP, Kevin | **Cust Lvl:** | **Prog Cd:** | **Last Perm Loc:** Coal Townsh |
| **Race:** Black | **DOB:** 04/03/1975 | | **Housing Unit:** | **Temp Loc:** |
| **SID:** 217-14-12-7 | **FBI #:** 511135TA5 | **PBPP #:** 496AS | **Counselor:** Foulds, Renee M | **Detainers:** NO |

**Total Score:** N/A
**Custody Level:** 4
**Override Custody Level:** None
**Program Codes:**

**\*\*\* Initial Classification Information \*\*\***

**Staff Name:** Foulds, R
**Title:** CC
**Classification Date:** 05/21/2009
**Re-Classify In:** 08 Months
**Reason for Re-Class:** Next Routine Reclassification
**Severity of Current Off:** TCV - Technical And Convicted Parole Violator
**Severity of Criminal History:** CC3701 - Robbery (general)
XX0815 - Vufa
CC6106 - Firearm Not To Be Carried W/o License
**Escape History:** None
**Institutional Adjustment:** Poor
**Number of Prior Commitments:** 02
**Time to Expected Release:** 30 Months
**Age:** 34 Years
**Marital Status:** Single
**Employed During Prior 6 Months:** Unknown/No

**\*\*\* Needs Assessment \*\*\***

**Emotional Needs:** No Identified Mh/mr Needs
**Date Most Recent Stablty Rating:** 05/21/2009

**Drug/Alcohol Needs:** No AOD service
**D/A Score:**
**Type of Problem:** None
**How Found:** Other
**Comments:** Has Not Yet Been Assessed Since Recommitment.

**Educational Needs:** High School Graduate
**How Found:** Self Report
**Comments:**

**Vocational Needs:** Unskilled
**How Found:** Self Report
**Comments:**

EXHIBIT
Foulds-2

**Sexual Problems Related to:**
    **Severity Of Problem:**  None Known

**Remarks/Other Needs Comments:**  Pbpp-15 Of 04/16/09: Refer To Ba Of 06/25/07 To Recommit To An Sci As A Tcv To
Serve 36m Backtime. Participate In Aod Counseling. Review In/after Nov. 2011.

**\*\*\* Override Information \*\*\***

**\*\*No override data on file for this inmate\*\***

Return To History

DEF000921


cr3prodweb03

# Pennsylvania Department of Corrections

Return to DocNe

mkodack 2/8/2012 1:36:25 PM

Inmate Query - Classification History ReClassification

Productio

DOC In

**Inmate Apps** \ **Inmate Inquiry** \ **Reports** \ **Photos** \ **JNET**

| | | | | | |
|---|---|---|---|---|---|
| **Inmate #:** CX8799 | **INACTIVE** | **Name:** JESSUP, Kevin | **Cust Lvl:** | **Prog Cd:** | **Last Perm Loc:** Coal Townsh |
| **Race:** Black | | **DOB:** 04/03/1975 | | **Housing Unit:** | **Temp Loc:** |
| **SID:** 217-14-12-7 | **FBI #:** 511135TA5 | **PBPP #:** 496AS | **Counselor:** Foulds, Renee M | **Detainers:** NO | |

**Total Score:** 9
**Custody Level:** 3
**Override Custody Level:** None
**Program Codes:**



JNet Inmate

### *** Re-Classification Information ***

**Staff Name:** Maresca, G
**Title:** CC
**Re-Class Date:** 02/21/2007
**Re-Classify In:** 12 Months
**Reason for Re-Class:** Next Routine Reclassification
**Severity of Current Off:** TCV - Technical And Convicted Parole Violator
**Severity of Criminal History:** CC3701 - Robbery (general)
XX0815 - Vufa
CC6106 - Firearm Not To Be Carried W/o License
**Institutional Violence:** No Weapon/injury More Than 10 Years Or None
**Disciplinary Reports:** Two Or More During Last 6 Months
**Most Severe Rpt/18 Months:** Class I Offense, Category B
**Age:** 31 Years
**Escape History:** None
**Program Compliance:** Partial Compliance
**Work Performance:** Average
**Housing Performance:** Average

New Search

**Identificatio**
(Inmate #/SID/
Phil. Photo #/SS

Ge

### *** Needs Assessment ***

**Emotional Needs:** No Identified Mh/mr Needs
**Date Most Recent Stablty Rating:** 02/21/2007

**Drug/Alcohol Needs:** No AOD service
**D/A Score:** 00
**Type of Problem:** None
**How Found:** Self Report
D/A Tool
**Comments:**

**Educational Needs:** High School Graduate
**How Found:** Self Report
**Comments:**

**Vocational Needs:** Semi Skilled

DEF000922



**How Found:** Self Report
**Comments:**

**Sexual Problems Related to:**
**Severity Of Problem:** None Known

**Remarks/Other Needs Comments:** Needs To Remain Free Of Misconducts.

**\*\*\* Override Information \*\*\***

**\*\*No override data on file for this inmate\*\***

Return To History