# EXHIBIT F

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
     DAMON CHAPPELLE,                    :
3                        Plaintiff

                                         :                COPY
4
             vs.                         :
5
                                         :
6    DAVID VARANO, SUPERINTENDENT,
     SCI-COAL TOWNSHIP; MICHELLE    :    NO. 11-0304
7    KODACK, RECORDS SUPERVISOR,
     SCI-COAL TOWNSHIP; DEBORAH      :
8    HERBST, RECORDS SPECIALIST,
     SCI-COAL TOWNSHIP; MR. DUNN, :
9    UNIT MANAGER, SCI-COAL
     TOWNSHIP; MS. FOULDS,           :
10   COUNSELOR, SCI-COAL TOWNSHIP,
                        Defendants :
11

12

13

14           Deposition of: JOHN DUNN

15           Taken by      : Plaintiff

16           Before        : Faith A. Culp
                             Reporter-Notary Public
17           Beginning     : June 21, 2012; 9:23 a.m.

18           Place         : SCI-Coal Township
                             1 Kelley Drive
19                           Shamokin, Pennsylvania

20

21   COUNSEL PRESENT:

22       JENNIFER J. TOBIN, ESQUIRE
23       718 Arch Street, Suite 304 South
         Philadelphia, Pennsylvania  19106
24           For - Plaintiff

25

ERVIN BLANK ASSOCIATES, INC.

**RECEIVED**

JUL **0 9** 2012

**Office of Attorney General
Litigation Section**

2

1    COUNSEL PRESENT (continued):

2        TIMOTHY P. KEATING, ESQUIRE
         Senior Deputy Attorney General
3        Pennsylvania Office of Attorney General
         Litigation Section
4        15th Floor, Strawberry Square
         Harrisburg, Pennsylvania  17120
5            For - Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ERVIN BLANK ASSOCIATES, INC.

3

```
 1                    INDEX TO WITNESSES
 2   FOR - PLAINTIFF          DIRECT  CROSS  REDIRECT   RECROSS
 3   John Dunn                   4      64      --        --
 4
 5
 6
 7
 8
 9
10
11
12
13                    INDEX TO EXHIBITS
14   FOR - PLAINTIFF                      MARKED   ADMITTED
15   Dunn Exhibit No. 1                     20       --
16   Dunn Exhibit No. 2                     38       --
17   Dunn Exhibit No. 3                     48       --
18   Dunn Exhibit No. 4                     52       --
19   Dunn Exhibit No. 5                     55       --
20   Dunn Exhibit No. 6                     58       --
21   Dunn Exhibit No. 7                     60       --
22   Dunn Exhibit No. 8                     61       --
23
24
25
```

ERVIN BLANK ASSOCIATES, INC.

4

STIPULATION

1

2          It is hereby stipulated by and between

3     counsel for the respective parties that sealing,

4     certification and filing are hereby waived; and that

5     all objections except as to the form of the question

6     are reserved to the time of trial.

7

8                         *        *        *

9

10         JOHN DUNN, called as a witness, having been

11    duly sworn or affirmed, testified as follows:

12                    DIRECT EXAMINATION

13    BY MS. TOBIN:

14         Q    Good morning, Mr. Dunn.  As you know from

15    meeting me earlier my name's Jennifer Tobin, and I'm

16    the lawyer representing the Plaintiff in this case,

17    Damon Chappelle.  If you could just to start off with

18    state and spell your full name for the record.

19         A    John Paul Dunn, D-u-n-n.

20         Q    Okay.  And have you had a deposition before?

21         A    Yes.

22         Q    And when was that?

23         MR. KEATING:  Approximately.

24         THE WITNESS:  Approximately 1997.

25    BY MS. TOBIN:

ERVIN BLANK ASSOCIATES, INC.

5

1      Q    And was --

2      A    Six maybe.  Six, seven.

3      Q    Was that a civil case?  Was it --

4           MR. KEATING:  Yes.

5           THE WITNESS:  Yeah.

6  BY MS. TOBIN:

7      Q    Okay.

8      A    It was here.

9      Q    Okay.  Was it in connection with your job in

10  the DOC?

11      A    Yes.

12      Q    Do you remember the case name?

13      A    Reginald Whitman was the plaintiff.

14      Q    And were you one of the defendants in the

15  case?

16      A    Yes.

17      Q    Okay.  What was that case about?

18      A    Oh, boy.  It's been a while.

19           MR. KEATING:  The Camp Hill riots?

20           THE WITNESS:  No.  Actually, the one we had

21  here in '95.  August of '95 we had an incident here, a

22  small scale riot I guess or large scale, however you

23  want to say.

24           And we were locked down for a period of time

25  and this particular inmate was making verbal threats

ERVIN BLANK ASSOCIATES, INC.

6

1  towards staff members so we had to -- well, I had to

2  write a misconduct on him.  They ended up taking him

3  to the RHU.

4         And then sometime later he had accused myself

5  and several other I guess staff members of I believe

6  physically and verbally -- physically assaulting him I

7  guess.  So I had a deposition on that particular case

8  which was later dismissed.

9  BY MS. TOBIN:

10     Q    The case was dismissed?

11     A    Yeah.

12     Q    So all claims against you were dismissed?

13     A    Correct.

14     Q    Any other cases that you had depositions for?

15     A    Not that I can remember, no.  I believe that

16  was it.

17     Q    Any other cases that you haven't had

18  depositions for but that have been filed against you?

19     A    Yeah.  Gerald Funk was the inmate.

20     Q    Do you know when that was?

21     A    That's a recent one.  Is that still ongoing?

22  I don't know the particulars of that.  It had to do

23  with a cell move with smoking, nonsmoking.  Medical

24  was involved.  I honestly don't know.

25     Q    Were you a defendant or just a witness in

7

1  that case?

2      A    No.  I'm a defendant in that case, also.

3           MR. KEATING:  The one thing you have to do is

4  you really because we have a stenographer is you have

5  to wait for her to actually finish answering her

6  question before you -- asking the question before you

7  answer.

8           THE WITNESS:  I'm sorry.  My fault.

9  BY MS. TOBIN:

10     Q    Actually, I should get into that now.

11  Normally I'll give you just a brief rundown.  Even

12  though you've had a deposition before, I'll just give

13  you kind of the ground rules.

14           As Mr. Keating stated it's important to wait

15  until I'm done with my question before you start

16  answering because the court reporter's taking down

17  everything I say and then everything you say.  It's

18  kind of like a tennis match.  So I have to hit the

19  ball to you before you hit it back.  I'll try to do

20  the same thing.  So I'll try not to cut you off when

21  you're answering the question.

22           Depositions tend to spin into a

23  conversational like setting but it's not really a

24  conversation it's more a question and answer session.

25           The other really important thing about

8

1  depositions a ground rule is that if you don't

2  understand one of my questions, if there's a word or

3  phrase you don't understand or you just don't

4  understand it, tell me so that I can rephrase it and

5  hopefully make it understandable so that you can

6  answer it.

7       There's no score card at the end where I say

8  okay, he answered this many and give you a grade.

9  It's really the purpose is to get information.  So if

10 you answer a question that I ask you, I'm going to

11 presume that you understood it and I'm going to count

12 on you to tell me if you don't understand it.  Does

13 that make sense?

14      A    Yep.

15      Q    The other cardinal rule of depositions is

16 because the court reporter, Ms. Culp, can't take down

17 a nod of the head or a shake of the head or a shrug,

18 we're going to ask for vocal answers.  So I'll just

19 ask that instead of just indicating your answer with a

20 movement, that you give me a word.

21      A    Okay.

22      Q    You're doing great so far.  And those are the

23 basic ground rules.  If you do need to take a break at

24 any point, just let me know.  We can give you a break.

25 I don't anticipate this will last too long.

1     A     Okay.

2     Q     I do ask that if there's a question pending

3  and you have to take a break, that you answer the

4  question first and then take the break.   Any questions

5  so far?

6     A     No.

7     Q     Okay.  So I want to just start out with what

8  your current job is.   What is your current position at

9  Coal Township?

10     A     Unit manager.

11     Q     And how long have you had that job?

12     A     Six years.

13     Q     And have all of those six years been here at

14  Coal Township?

15     A     Yes.

16     Q     Did you have a job with the DOC prior to that

17  here at Coal Township?

18     A     Yes.

19     Q     And what was that?

20     A     Corrections counselor.

21     Q     And for how long did you have that job?

22     A     Twelve years.

23     Q     And were all of those years here at Coal

24  Township?

25     A     Yes.

10

1     Q    Prior to that, did you have any DOC
2  employment?
3     A    No.
4     Q    What was your employment prior to that?
5     A    The whole history or just --
6     Q    Going back to high school if you could.
7     A    Three years at Northumberland County Children
8  and Youth Services.
9     Q    What was your job there?
10    A    Caseworker.
11    Q    And what were your primary duties?
12    A    Basically handle -- take care of cases of
13  children that were involved in foster care.
14    Q    And you did that for three years?
15    A    Yes.  And then six months at Loysville Youth
16  Development Center.
17    Q    And what was your position there?
18    A    Youth development counselor.
19    Q    What is youth development?  What did you do
20  there?
21    A    Basically similar to a corrections counselor
22  here only the clientele are juveniles instead of
23  adults.
24    Q    Was it a lock-in facility?
25    A    Yes.

ERVIN BLANK ASSOCIATES, INC.

11

1      Q    And how old were the people, the children?

2      A    They ranged from 12 to 18 and on occasions 19

3   to 21 depending on their crime.

4      Q    And what were your primary duties there?

5      A    Basically to supervise the juveniles and

6   prepare their documents for court.

7      Q    So were they awaiting trial?

8      A    No.  They were all adjudicated.  Basically

9   our responsibilities were basically to report on their

10  behavior at the facility.

11     Q    Did you do counseling in the sense that that

12  term is generally known?  What was the counseling

13  component?

14     A    Yeah.  Well, we had one-on-one sessions with

15  them.  We had a caseload.  Each counselor had a

16  caseload and we were required to do one-on-one

17  sessions.

18     Q    And you said it was Louisville?

19     A    Loysville.

20     Q    How do you spell that?

21     A    It's L-o-y-s --

22          MR. KEATING:  L-o-y-s-v-i-l-l-e, Loysville.

23  It's in Perry County.

24  BY MS. TOBIN:

25     Q    And can you tell me where that is?

12

1     A    Perry County.

2     Q    Okay.  And you were just there for six

3 months?

4     A    Correct.

5     Q    And prior to that, what was your employment?

6     A    The Northumberland County Children and Youth

7 Services.

8     Q    Okay.  So the Loysville happened after

9 Northumberland County?

10    A    Correct.  Yeah.

11    Q    And then you came to Coal Township as a

12 corrections counselor and then you became a unit

13 manager?

14    A    Yes.

15    Q    Did you have employment prior to

16 Northumberland County?

17    A    Odds and end jobs.  I don't really -- worked

18 at a tree farm, Sunoco Station.  I pretty much got the

19 caseworker job right out of college.

20    Q    Okay.  Where did you go to college?

21    A    Three years at East Stroudsburg University

22 and two years I finished up at Bloomsburg University.

23    Q    And what was -- did you get a degree?

24    A    Yes.  A bachelor's degree in psychology.

25    Q    And do you have any further education apart

13

1   from that?

2        A    No.

3        Q    And I presume you got -- you went to college

4   after graduating high school?

5        A    Yes.

6        Q    Okay.  Can you tell me what your primary

7   duties were as a corrections counselor for the 12

8   years that you had that job?

9        A    Well, we had a caseload of approximately 120

10  to 125 inmates and basically responsible for the

11  maintenance of their case which would be their DC-14

12  file which included their criminal history, their

13  institutional adjustment, family background if

14  available.

15        And then we would prepare -- basically if

16  they would come up for parole or prerelease on their

17  min date or after, we would prepare a vote sheet that

18  would be circulated with pretty much a summary of the

19  information that's contained in the 14 file and the 15

20  file from records at that time.  Now a lot of the

21  stuff's computerized.

22        But anyhow, that would be circulated and the

23  superintendent would -- that would be passed along to

24  the deputies, and the superintendent would make the

25  decision on whether or not we were going to recommend

1   or not recommend the inmate for that particular

2   whatever we were staffing him for.  So that was one

3   thing.

4        And then we did an annual review on his

5   adjustment as far as programs and behavior.  Daily

6   questions that they may have, you know, regarding

7   things that happened on the housing unit or within

8   maybe other areas of the jail.

9        Q    How would you handle -- how would you handle

10  the questions?  Would you call them in for a

11  counseling session?

12       A    It varied.  We have a request slip system

13  here where if they want to speak to you and you're not

14  available on the unit, they put a request slip in the

15  box and there's a box that they put these request

16  slips in to speak with you.

17       So we get those every morning and we go

18  through them.  And if we have to set up an

19  appointment, we'll set up an appointment or if it can

20  just be answered by writing back on the -- there's a

21  spot on the request slip you can just answer if it's

22  something like that, something minor.

23       Q    Are the request slips do you then keep a copy

24  of the request slip with the response?

25       A    Not normally.  If it's something that is

15

1  maybe very important or something that we'll need to

2  refer to at a later date, we may.  But it's not

3  something that we normally do.

4        When I first started, going back almost 18

5  years, we probably kept more of the request slips than

6  we do now only because we weren't computerized and

7  stuff.  So a lot of things now we can just make a note

8  on the computer and there's a section that you can

9  just make a notation.

10     Q    And you mentioned that you prepare the vote

11  sheet for parole and prerelease, and that you include

12  some documents from the DC-14?

13     A    Yeah.

14     Q    I may have misinterpreted.  Do you include

15  those along with the vote sheet or do you use the vote

16  sheet to -- use those documents?

17     A    We put the vote sheet on top.  There's a

18  section in the file that you pull out and you put the

19  vote sheet on it.

20        MR. KEATING:  You're going to have to wait

21  for her to finish her question before you answer.  She

22  wasn't quite done.

23        THE WITNESS:  My fault.

24        MR. KEATING:  That's okay.

25  BY MS. TOBIN:

ERVIN BLANK ASSOCIATES, INC.

16

1      Q    So those documents are attached to the vote

2  sheet and then that vote sheet with the documents are

3  circulated?

4      A    Correct.

5      Q    You mentioned the DC-14.  Is that physically

6  kept in a separate file folder than the DC-15?

7      A    Yes.

8      Q    And who keeps that?  Is that the counselor?

9           MR. KEATING:  The 14 or the 15?

10 BY MS. TOBIN:

11     Q    The DC-14.

12     A    The DC-14 is on the housing unit, right.

13     Q    Who has access to that?

14     A    The corrections counselor, the unit manager,

15 and the clerk.

16     Q    Does each housing unit have one of those

17 three types of people?

18     A    Yes.

19     Q    And as a corrections counselor you are

20 responsible for maintaining that file, the DC-14?

21     A    Maintaining as far as?

22     Q    Putting documents in it, making sure that the

23 documents that needed to be in it were there?

24     A    Well, not necessarily.  We have -- I mean the

25 clerk is responsible for the filing part of it.

17

1      Q    And then when an inmate leaves the
2  institution, what happens to his DC-14?
3      A    We archive that, correct?
4           MR. KEATING:  Well, wait a minute.  First of
5  all --
6           THE WITNESS:  Don't look at her.
7           MR. KEATING:  Don't ask other people for
8  answers to the questions.
9           THE WITNESS:  I'm just looking.  I got you.
10          MR. KEATING:  Second of all, if you don't
11  know, that's the proper answer if you don't know.
12          THE WITNESS:  Okay.  Got you.
13          MR. KEATING:  Try not to guess but you can
14  say I believe this or I believe that.
15  BY MS. TOBIN:
16     Q    Yeah.  As I mentioned earlier, if I ask you a
17  question you don't understand, tell me that.  And
18  actually, Mr. Keating's right.  If you don't know the
19  answer to a question, you can say that.  If you are
20  able to -- if you are guessing, it's good to tell me
21  that.
22     A    Yeah.  I'm guessing.  But I believe we
23  archive that for a certain amount of years, but I'm
24  not sure what the time frame is on it.
25     Q    Okay.  Who would know the definitive answer

1  to the question where the DC-14 goes after the inmate

2  leaves?

3      A    I'm not sure.

4      Q    The inmate's criminal history information you

5  mentioned is included in the DC-14?

6      A    At times.  Sometimes.  It's not always

7  available but sometimes it is.

8      Q    What kind of information would be included in

9  the criminal history information?

10     A    Number of arrests, the dates, what the

11 disposition was on those.

12     Q    Would the sentences, the length of the

13 sentences be in there?

14     A    At times, yes.

15     Q    If you needed as a corrections counselor or

16 actually as a unit manager if you needed to find out

17 what someone's sentences were, active sentences or

18 even past sentences, how would you do that?

19     A    If it's not in the 14, then we would check

20 the 15 which usually has a little bit -- a little more

21 information in it.  If it's not in there, then

22 honestly we rarely do attempt to find that out because

23 you'd have to call probably the counties and stuff of

24 where the arrest occurred which would be very

25 time-consuming and we really don't have the time to do

1  that.

2      Q    Could you contact someone in the records

3  office at the institution?

4      A    You could try.  But there's no guarantee that

5  they're going to have the information either.

6      Q    Did you have access as a corrections

7  counselor to the DC-15?

8      A    Yes.

9      Q    And where was that physically kept?

10     A    The records office.

11     Q    Were you given training as a corrections

12  counselor on what the different sections and

13  components of the DC-15 are?

14     A    Yes.

15     Q    And as a unit manager were you given that

16  same training?

17     A    I didn't need it because I was a counselor.

18     Q    Does anyone ever get the unit manager job

19  without becoming a counselor first?

20     A    Yes.

21     Q    Would they have gotten the training, too?

22     A    I don't know.

23     Q    Okay.  When did you get that training on the

24  DC-15?

25     A    When I first started employment.

20

1              (Whereupon, a document was produced and

2      marked as Dunn Exhibit No. 1 for identification.)

3      BY MS. TOBIN:

4          Q    I'm going to show you what's been marked as

5      Dunn 1.  Can you tell me what -- if you could take a

6      look at that and let me know if you recognize that

7      document.

8          A    It looks like the unit manager job

9      description.

10         Q    Is that your job description?

11         A    Yes.

12         Q    It is.  I notice that -- well, you've had a

13     chance to read it.  At the top right there's a box

14     that says last change effective 7/18/2011.  And you've

15     been -- you've been a unit manager since approximately

16     2006; is that right?

17         A    Correct.

18         Q    Have there been any changes -- are there any

19     changes on this document that are different than your

20     job description in 2009?

21         A    I can't recall.

22         Q    Do you get an updated copy of the job

23     description when it changes?

24         A    Yes.

25         Q    And would the 2009 job description be in your

21

1  personnel file or would you have a copy?

2     A    I don't have a copy.  It could be.

3        MS. TOBIN:  I'm just going to ask counsel to

4  check to see if there's a 2009 version of the unit

5  manager job description so we can make sure that this

6  document is accurate and accurately reflects what his

7  duties were in 2009.

8        MR. KEATING:  I acknowledge your request.

9        MS. TOBIN:  Okay.  Thank you.

10  BY MS. TOBIN:

11     Q    So I'm just going to ask you some questions

12  about this.  So I'll ask you since we don't know that

13  this is identical, I'm just going to ask you about

14  certain items for it.

15        The first paragraph under definition says

16  that this is professional work in planning,

17  coordinating, and directing the security and treatment

18  programs within a designated housing unit.

19        What is a treatment program?  If you can

20  describe what that is.

21     A    Well, we have numerous treatment programs.

22  We have treatment programs for drug and alcohol, we

23  have treatment programs for sex offenders, we have for

24  anger control issues, domestic violence issues.

25     Q    And how -- you have to plan, direct, and

22

1  coordinate those.  How do you do that?

2      A    We have treatment specialists now that handle

3  all the groups pretty much.  Well, with the exception

4  of drug and alcohol and sex offenders.  But they

5  handle the other ones.

6          We basically just make sure that the inmates

7  are aware of the fact that they're going to be

8  recommended for these programs if it's something that

9  they need to take and we give them direction on who

10  they need to write to to get into the program.

11     Q    And who makes the decision whether the inmate

12  is recommended for a program?

13     A    There's a formula that's done and now I

14  believe they're done at the centralized services.

15     Q    Is that the diagnostic?

16     A    Diagnostic, yeah.  So the inmates coming in

17  already have designated programs that they're going to

18  need to take.

19     Q    So you can look on a computer and find the

20  list of programs that are assigned for somebody in

21  your caseload?

22     A    Yes.

23     Q    And then you make sure that that inmate knows

24  that he has to take those and you give him direction

25  on how?

23

1       A    Well, it's not necessarily the unit manager's

2    responsibility.   The correction counselor's

3    responsible to meet with them so many days after they

4    arrive at the institution and they'll go over the plan

5    with them.

6       Q    Do you keep track -- does the unit manager

7    keep track of what programs have been completed and

8    what's still on the list?

9       A    No.

10      Q    Does the corrections counselor keep track of

11   that?

12      A    Yes.

13      Q    And then is there a schedule that needs to be

14   followed so that the inmate gets all of his

15   programming in before he's released?

16      A    No.   Not technically, no.   I mean we make our

17   best effort to try to accomplish that but being the

18   number of inmates that are involved, you can only have

19   so many inmates in a class at one time.

20      Q    Who does the more hands-on -- it would be a

21   counselor who does the more hands-on scheduling for

22   the inmate to take a class?

23      A    Treatment specialist or -- well, the

24   individual that's in charge of running that particular

25   program whether it be a drug and alcohol specialist,

24

1  treatment specialist, psychologist.  They handle the

2  sex offender programs.  There's several people

3  involved.

4      Q    So they're the ones who actually give the

5  programming?

6      A    Correct.  And they schedule it, too.  They

7  also schedule it.

8      Q    Is there a way that you can look to see what

9  programs an inmate has already done?

10      A    Yes.

11      Q    And how do you do that?

12      A    We look on the correctional plan.

13      Q    And where is that?

14      A    We find that on the computer and normally

15  there's a hard copy in the DC-14 file.

16      Q    Does that show when the program was

17  completed?

18      A    Yes.

19      Q    And as a unit manager would you track or

20  follow-up on when the inmates had completed the

21  programs?

22      A    No.

23      Q    Would the correctional counselor do that?

24      A    Not necessarily, no.  It'll automatically

25  show up that -- the person running the group is

ERVIN BLANK ASSOCIATES, INC.

1    responsible for putting the completion date into the

2    system and then that'll automatically be updated on

3    their correctional plan.

4            So at the annual review when the correctional

5    plan is reviewed with them, if they completed any

6    programs within that year time, it'll show up on --

7    automatically show up on the correctional plan.

8        Q    Does the correctional counselor meet with the

9    inmate when he first arrives to talk about the

10   programs that are on his list?

11       A    Yes.

12       Q    And then what about for when the inmate comes

13   back after violating parole, does the correctional

14   counselor meet with him at that point to talk about

15   programs as well?

16       A    Yes.

17       Q    So that's an automatic review time?  Is it

18   considered a review?

19       A    Not really, no.  It's just it's more of an

20   orientation type of thing.  Less time is spent on the

21   parole violators because they were here before so

22   there's not -- they already know what to do.

23       Q    But there's a meeting?

24       A    There's a meeting, yes.

25       Q    And then does the unit manager attend -- do

26

1   you attend those meetings with either the newly

2   committed people or with the parole violators or with

3   both?

4        A    No.

5        Q    Just the corrections counselor?

6        A    Yes.

7        Q    Does the --

8        A    The unit manager can but it's not necessary.

9        Q    Was it your practice to attend them or not?

10       A    Occasionally.  It wasn't -- if I was

11  available, I would.

12       Q    Does the correctional counselor report to

13  you?

14       A    Yes.

15       Q    All right.  And you are their supervisor?

16       A    Correct.

17       Q    Another item on your -- on this job

18  description is about two-thirds of the way down.

19  Coordinates the provision of all centralized services

20  with appropriate departmental personnel.  What does

21  that mean?

22       A    I'm not sure how to answer that.

23       Q    What does centralized services mean to you?

24       A    That's pretty much everything that's

25  available to the inmate within the institution.

27

1    Q    So not just within the unit?

2    A    Correct.

3    Q    Can you describe how you carry out this duty?

4    A    No.

5    Q    Let me ask you this.  Do you assist the

6    inmate in gaining access to services that are

7    available outside the unit?

8    A    If they need assistance.  Our role as the

9    unit manager in that aspect would probably fall into

10   play if they didn't understand what the correctional

11   counselor was telling them at the initial meeting

12   because that's gonna occur at that initial meeting.

13       So if they would like more guidance, then

14   they would come to the unit manager and we would

15   probably most likely reiterate what the correctional

16   counselor already told them as far as the centralized

17   services and what's available.

18   Q    Did you have the option of making contact

19   with other staff at the institution if you needed help

20   answering a question?  If you also don't understand

21   what the correctional counselor said and you're trying

22   to resolve an issue for the inmate, can you contact

23   other staff?

24   A    We can.  I don't recall that ever happening.

25   Q    The next line, chairs unit meetings to

28

1   discuss and vote on an individual inmate's program

2   placement, release decisions, and custody level

3   changes.

4        Who attends those meetings, those unit

5   meetings?

6        A    Normally it's the unit manager, both

7   correction counselors.  There's normally there's two

8   on each unit so both correction counselors and if

9   available, the corrections officer or sergeant on the

10  unit.

11       Q    And discuss and vote on an individual

12  inmate's program placement.  What does that mean?

13       A    Well, we don't have a lot of that here so we

14  have --

15       MR. KEATING:  The question is do you know --

16  what does that mean?

17       THE WITNESS:  Yeah.  That means like, for

18  example, if he needed -- if we were voting on say to

19  put the inmate on the special needs unit, we would

20  have a vote on that.  We would do a vote sheet, have a

21  meeting, and decide whether or not that's appropriate.

22  We don't make the final decision but we would discuss

23  it.

24  BY MS. TOBIN:

25       Q    So that's different than the treatment

ERVIN BLANK ASSOCIATES, INC.

1    programs, this program placement?

2       A    Yeah.

3       Q    Not the treatment?

4       A    That's correct.

5       Q    In terms of discussing and voting on release

6    decisions, can you describe your role?

7       A    Our role is basically just to, like I said,

8    prepare the vote sheet, maybe organize the material

9    that's going to be included with the packet, and then

10   we make -- we'll interview the inmate and ask him

11   basically what his plans are and maybe what he has

12   done since he's been here and what he has done before

13   he got here.

14      Q    So that's release on parole?

15      A    Parole, prerelease.

16      Q    And how do you know that someone needs this

17   discussion and vote?  How do you know that --

18      A    It's standard.  It's done for everyone.

19      Q    How do you know at what point they need it?

20      A    Okay.  Well, for prerelease we have special

21   guidelines and it's up to the inmate to request it.

22   If they meet the criteria, then we will go ahead with

23   a discussion on it.

24      Q    What about for parole release?

25      A    For parole we get a list of individuals from

30

 1  the parole office that are scheduled to be seen.  And

 2  we go strictly on that.  We don't have access to -- we

 3  won't do a parole staffing on an inmate unless we're

 4  told to by the parole office.

 5      Q    So you're notified by the parole office.  Is

 6  that the institutional parole office or the main

 7  parole board?

 8      A    Institutional parole office.

 9      Q    And how often do you get those lists?

10      A    Once a month.

11      Q    And how far in advance of the person's

12  possible parole release do you get the list?

13      A    For guys coming up -- for guys that are being

14  seen on their min, minimum date, I believe and this is

15  a guess but I believe it's six months.  It's varied.

16  It's changed over the course of the last few years.

17           And then for parole reviews for individuals

18  that are past their min date, I believe it's three.  I

19  think it just changed from two to three months I

20  believe.

21      Q    Is this what you meant when you answered the

22  interrogatory that you do parole staffing?

23      A    Yes.

24      Q    Is that what a staffing is?

25      A    Correct.

ERVIN BLANK ASSOCIATES, INC.

31

1      Q    So is a staffing you mentioned that the

2  correctional counselor pulls together the vote sheet

3  and attaches documents to the vote sheet for

4  circulation?

5      A    Yes.

6      Q    What does the unit manager do?  What are your

7  roles for parole?

8      A    The unit manager chairs the particular

9  staffing on the unit.

10     Q    And who is on that meeting?  When you say

11 staffing, does that mean a meeting?

12     A    Yes.

13     Q    And who comes to that meeting?

14     A    It would be the unit manager, the correction

15 counselors on that housing unit which normally is two

16 at our facility; if available, an officer on the unit

17 or the sergeant and, of course, the inmate.

18     Q    So when you get the list from the parole

19 office of all the people coming up for parole

20 review^-- or excuse me, possible parole release in six

21 months, you have access to their minimum date.  Is

22 that listed on the documents when their minimum date

23 is?

24     A    The documents from parole?

25     Q    Yes.

32

1    A    No.

2    Q    What information do you get from parole?

3    A    What we get from parole is that they are

4  listed for review on this particular -- in this

5  particular month.  And then that's what we go by.

6  They don't circulate a minimum date or maximum date

7  with that document.

8    Q    So the DC-14 is what has that in it, has the

9  minimum and maximum?

10    A    Well, it's called a DC-16E that has that

11  sentence structure on it.  That's normally found in^--

12  there's usually a copy in the 14.  But you can pull

13  that off the computer now.  Most of the stuff is

14  computerized.

15    Q    Do you need to know that information to do a

16  parole staffing?

17    A    Yes.

18    Q    And so you look on the computer and find out

19  or look in the file to find out the minimum and

20  maximum dates?

21    A    Correct.

22    Q    Why did you choose to become a unit manager

23  rather than a correctional counselor?

24    A    More money.

25    Q    Are your job functions significantly

33

1   different?

2      A    I wouldn't say significantly different.

3   There's more responsibility as far as supervising and

4   having an overall responsibility of what occurs on the

5   unit.

6      Q    Do you have -- can you describe what your

7   daily contact is with inmates on the unit as a unit

8   manager?

9      A    I have contact pretty much all day with the

10  inmate population.

11     Q    Do you have an office where they come to

12  visit you?

13     A    No.  I mean I have an office that I can use

14  on the housing unit but it's not normally used for

15  inmates to come and visit.

16     Q    So --

17     A    I'll use it if I need to take an inmate in

18  private and talk to them.

19     Q    And so the contact that you have with inmates

20  where does that occur?

21     A    Just standing on the unit when they're

22  walking around.

23     Q    And so your unit has -- have you always had a

24  general population unit that you've been the manager

25  of?

34

1      A    I had -- yeah.  Yes.

2      Q    So no RHU?

3      A    No.

4      Q    If an inmate comes to you and has a question

5  about sentencing issues, sentencing credit, backtime,

6  what do you do?

7      A    Refer them to the records office.

8      Q    And can an inmate -- do you give him like a

9  hall pass to go to the records office?

10      A    No.  He has to write a request slip.

11      Q    And then where does that request slip go?

12      A    It goes to the records office.

13      Q    Do you deliver it to the records office?

14      A    No.  We have a mail system.

15      Q    So internal mail?

16      A    Yes.

17      Q    Do you do the same thing if the inmate has a

18  parole issue, how do you handle questions about

19  parole?

20      A    As far as what?

21      Q    If an inmate comes to you and says hey, I

22  have this issue about my parole, can you help me, what

23  is your response as unit manager?

24      A    I'll listen to the issue and if it's

25  something that I can't answer, I'll direct them to the

ERVIN BLANK ASSOCIATES, INC.

35

1  parole office.

2      Q    And same question.  Do they have to do a

3  request slip?

4      A    Yes.

5          MR. KEATING:  You have to let her finish the

6  question.

7          THE WITNESS:  My fault.

8          MR. KEATING:  Now, you mean request slips to

9  the parole office not a request slip to him?

10         MS. TOBIN:  Exactly.

11         THE WITNESS:  Yes.

12         MR. KEATING:  Okay.

13         THE WITNESS:  Sorry.

14         MR. KEATING:  That's all right.

15 BY MS. TOBIN:

16     Q    So my understanding is correct they don't

17 have a hall pass to go to the parole office?

18     A    Only if parole needs to see them.

19     Q    Where's the parole office, the institutional

20 parole office located in the institution?

21     A    Program services building.

22     Q    And where is that in relation to where the

23 housing units are?

24     A    The jail's divided pretty much into two

25 halves, and the program services building is in the

36

1    middle.

2         Q    So it's not -- there's no parole --

3    institutional parole office that's on a housing unit?

4         A    No.

5         Q    There's no parole people on the housing unit?

6         A    No.

7         Q    Have you had inmates approach you with

8    questions about their parole issues?

9         A    Yes.

10        Q    And you mentioned earlier that if you can't

11   answer the question, you'll direct them to the

12   institutional parole office?

13        A    Correct.

14        Q    What types of questions can you answer about

15   parole issues?

16        A    I can answer questions on the procedure as

17   far as, you know, our staffing and what happens after

18   we're done with the staffing and when the packet comes

19   back, you know, where does it go.

20        Q    What about questions about calculations of

21   backtime credit?

22        A    I have no education and/or direction on that.

23        Q    So if you got a question about that, you

24   would send them to the parole institution office via

25   request slip?

ERVIN BLANK ASSOCIATES, INC.

37

1    A    Correct.

2    Q    Do you ever -- have you ever picked up the

3 phone to call the institutional parole office to talk

4 about an inmate's question to try to help them?

5    A    I have.  I can't recall any particular cases.

6 But, yes, I have done that.

7    Q    And have you done the same thing with regard

8 to a question that could be directed to the records

9 office about sentence computation?

10    A    I may have.  That would be rare because we're

11 not educated on the sentence structure part, the

12 backtime and all that particular stuff.

13    Q    So if you get a question about that --

14    A    We pretty much direct the inmate to either

15 parole or records.

16    Q    If an inmate does come to you and asks one of

17 those questions, either about parole, backtime,

18 calculations, sentence computation, do you -- is there

19 a document that you fill out to just make a record

20 that you got that question and you took such and such

21 step?

22    A    No.

23    Q    How would you -- so you would just handle it

24 just on the spot?

25    A    Yes.

38

 1     Q    Are there any DOC procedures, manuals or
 2   policies that govern how you do your job as a unit
 3   manager?
 4     A    I'm confused by that.
 5     Q    Are there DOC policies that you have to
 6   consult?  For example, if there's an aspect of your
 7   job description that you need guidance on, is there a
 8   policy that you --
 9     A    We have policies.  We have policies, yes.
10     Q    On the unit manager job?
11     A    Not on the particular unit manager job.  But
12   there are policies on things that we do with the
13   inmate population as far as how to handle them.  But
14   not -- the only thing would be the unit manager job
15   description.
16     Q    Is the one document that outlines what your
17   job is?
18     A    Correct.  Yes.
19          (Whereupon, a document was produced and
20   marked as Dunn Exhibit No. 2 for identification.)
21   BY MS. TOBIN:
22     Q    Showing you what's been marked as Dunn 2.  Do
23   you recognize that document?
24     A    I recognize the format but this isn't a
25   document that I've ever seen as far as the particulars

39

1   of it.

2       Q    So what is this type of --

3       A    I'm not on here.

4       Q    What is this type of document?

5       A    This is a vote sheet.

6       Q    Is this what you were referring to earlier?

7       A    Yes.

8       Q    And so this is what the correctional

9   counselor prepares and attaches DC-14 documents to?

10      A    Correct.

11      Q    And after this is completed and signed, is it

12  kept in the DC-14?

13      A    Yes.  A copy is kept in the DC-14.

14      Q    Do you know if it's kept in the DC-15?

15      A    The original would be sent to the DC-15.

16      Q    So reviewing this document -- and I realize

17  your name is not on here.  But reviewing this if you

18  could take a moment to take a look at it and let me

19  know when you're done.

20      A    Okay.

21      Q    This is for Mr. Chappelle whose name was

22  Kevin Jessup when he was incarcerated here at Coal

23  Township.  Do you remember Mr. Chappelle?

24      A    No, I don't.

25           MR. KEATING:  Do you remember Mr. Jessup?

40

1          THE WITNESS:  No, I don't.

2     BY MS. TOBIN:

3          Q    So taking a look at this document, can you

4     summarize what the effect of this document is?  What

5     happened after this was completed?

6          MR. KEATING:  I'm going to object to that

7     question.

8     BY MS. TOBIN:

9          Q    Do you understand the question?

10         MR. KEATING:  He doesn't remember the guy.

11    His name is not --

12    BY MS. TOBIN:

13         Q    Can you tell me what happened to Mr.

14    Chappelle?  Do you know based on information on this

15    document what happened to Mr. Chappelle or Mr. Jessup

16    after this was signed off on?

17         A    No.

18         Q    Was he -- is it reasonable to say that he was

19    paroled to his federal detainer?

20         A    No.

21         MR. KEATING:  Wait a minute.  Wait a minute.

22    You mean no, it's not reasonable to say that he was

23    released on his federal detainer or do you mean no,

24    you don't know what happened to him?

25         THE WITNESS:  Both.  No, I don't know what

41

1   happened to him.  And no, it's not reasonable to say

2   that he was released to his federal detainer based on

3   this document.

4   BY MS. TOBIN:

5       Q    Okay.  Then following up on that last answer.

6   Why -- can you explain why it wouldn't be reasonable

7   to assume that he was paroled to his federal detainer

8   just based on your knowledge and experience?

9       A    Because this document is just a

10  recommendation.  The Department of Corrections doesn't

11  have the authority to release an inmate anywhere on

12  parole.

13      Q    And so that's the parole board's decision,

14  correct?

15          MR. KEATING:  What is the parole board's

16  decision?

17  BY MS. TOBIN:

18      Q    Whether or not somebody's going to be

19  released on parole is ultimately the parole board's^--

20      A    Excuse me.  That's for me.  Can I get that or

21  not?

22      Q    We can go off the record if you need to.

23          MR. KEATING:  We can take a break.

24          (Whereupon, a recess was taken from 10:12

25  a.m. until 10:14 a.m.)

42

AFTER RECESS

1
2    BY MS. TOBIN:

3        Q    So back to Dunn 2.  As a unit manager how

4    would you know if an inmate who was on your unit was

5    released on parole?  How would you get that

6    information?

7        A    We would normally get a notification from

8    parole and/or records saying that the gentleman was

9    going to be released on such and such a date.

10       Q    And that would go in the DC-14, also?

11       A    No.  Not necessarily.  It's just giving us^--

12   making us aware that he's going to be released.

13            MR. KEATING:  I believe her question was not

14   whether he was going to be released, the question was

15   whether he was released.  Is that a correct statement?

16            MS. TOBIN:  Actually, I'd like to know both.

17   BY MS. TOBIN:

18       Q    How would you know whether he was going to be

19   released?

20            MR. KEATING:  Well, he answered that one.

21   BY MS. TOBIN:

22       Q    If he was actually released?

23            MR. KEATING:  He wouldn't be in his cell.

24            THE WITNESS:  Right.  Exactly.  He wouldn't

25   be on the housing unit.  He would leave the housing

43

1   unit.  Honestly technically I really wouldn't know if

2   he was released.  All I know is that he left the

3   housing unit and he's not --

4   BY MS. TOBIN:

5       Q    You would just know that he wasn't in his

6   cell?

7       A    Right.  Correct.

8       Q    Are you familiar with a report called a moves

9   report?

10      A    No.

11      Q    Have you ever dealt with a moves report?

12      A    No.

13      Q    Do you have any ability to know if one of

14  your inmates in your unit's institutional history,

15  what institutions he's been at, where he was

16  transferred to, when, when he came in, when he left?

17  Can you get that information?

18      A    Yes.  In some cases.

19      Q    How would you get that?

20      A    On the computer system.  The DOCNet.

21      Q    Did that system have a different name prior

22  to DOCNet?

23      A    I don't know.

24      Q    And you said in some cases.  Which cases

25  would you be able to do that for?

44

1    A    Cases that are current with when the system

2  came in to effect because prior to that.  Inmates that

3  have been incarcerated prior to that system, I don't

4  normally have access to that.

5    Q    And do you know when that system came into

6  effect?

7    A    I do not.  Off the top of my head I do not

8  know the answer to that.

9    Q    And then apart from the computer system, you

10  had access to the DC-15 for the inmate?

11    A    Correct.

12    Q    In the records office?

13    A    Yes.

14    Q    What is the ICSA?

15    A    I'm trying to think what it stands for.

16  Inmate summary -- oh, no.  Institutional summary.  I

17  can't -- I don't know.

18         MR. KEATING:  Well, instead of saying what it

19  stands for, tell her what it is.

20  BY MS. TOBIN:

21    Q    Let me just rephrase the question.

22    A    I should know that.

23    Q    In the interrogatories I asked you to

24  identify the people you conferred with or consulted in

25  connection with Mr. Chappelle's complaint that he was

45

1   being incarcerated illegally.  And your response --

2        A    I don't recall that question.

3        Q    Let me just finish my question.

4             MR. KEATING:  She did not have a question in

5   front of you.  Okay.

6   BY MS. TOBIN:

7        Q    I'll just ask you the question.  Your

8   response -- or let me just read this and you can tell

9   me what it means.  All staff can have something

10  entered into the ICSA at SCI-Coal Township.

11       A    I said that?

12       Q    It was in your interrogatory response.

13       A    Okay.  Yeah.  All right.

14       Q    So is the ICSA a computer system?

15       A    Yes.

16       Q    Is that a system similar to the DOCNet?

17       A    DOCNet is where you go to -- DOCNet is a

18  Department of Corrections website and then on that

19  particular website you can access the ICSA which is

20  the inmate's individual record.

21       Q    And do you have access to that as a unit

22  manager?

23       A    Yes.

24       Q    Is there anyone who works on the unit manager

25  team who doesn't have access to that ICSA?  Would the

46

1    corrections counselor have that -- access to that

2    ICSA?

3         A    Yes.  Corrections counselor does.  But there

4    are -- and I don't know what the particulars are but

5    not everyone has access to the complete record.

6         Q    Did you have access to the DC-16 or the time

7    files for the inmate through DOCNet?

8         A    Not familiar with the time files.

9         Q    Did you have access to the DC-16 files, the

10   sentence status summary?

11        A    The sentence status summary it's not a file.

12   It's just a document that states his sentence and

13   gives his current min and max date.

14        Q    Is that accessible through the ICSA?

15        A    Yes.

16        Q    And did you have access to it?

17        A    Yes.

18        Q    And then is the ICSA or the system when you

19   said you can access the inmate's file or the inmate's

20   record I think you said, is that the same thing as

21   going to the records department and pulling the DC-15

22   paper file?  Do you know if they are the same -- if

23   they have the same information in them?

24        A    A lot of the information is the same, but I'm

25   not sure if all of the information is.  I'm sure

ERVIN BLANK ASSOCIATES, INC.

47

1   there's stuff in the 15 that's not on the computer

2   system, but I don't know the particulars of what.

3       Q    Okay.  Are you familiar with the allegations

4   in this lawsuit?

5       A    Yes.

6       Q    And have you read the complaint that started

7   the lawsuit?

8       A    Yes.

9       Q    You testified earlier you don't remember Mr.

10  Chappelle or Mr. Jessup as he was then known.  Do you

11  remember discussing any inmates -- if you don't

12  remember him by name, do you remember discussing with

13  anyone in records or any other DOC employee a question

14  of someone being held illegally or over detained past

15  their max back in '09?

16      A    No.

17      Q    Do you remember any of the -- have any

18  inmates ever come to you and complained that they were

19  being held past their max?

20      A    I can't recall any.

21      Q    Do you sometimes get phone calls from

22  inmates' families about the inmates?

23      A    Yes.

24      Q    Do you keep a record of those phone calls?

25      A    No.

48

```
 1        Q    And what do you do when you get such a phone
 2   call?
 3        A    If it's -- if they have a question that I can
 4   answer, I'll answer it for them.  If not, I'll try to
 5   direct them in a place where they can possibly get an
 6   answer.
 7        Q    And you don't make a note or a memo to the
 8   file for that inmate after you do that?
 9        A    Not necessarily.  It depends on the
10   importance of the phone call.  There are occasions
11   when we do make a note.
12             (Whereupon, a document was produced and
13   marked as Dunn Exhibit No. 3 for identification.)
14   BY MS. TOBIN:
15        Q    I'm going to show you what's been marked as
16   Dunn 3.  If you could review that and let me know when
17   you're done.
18             MR. KEATING:  And I would for the record
19   relative to Dunn 2 this is a vote sheet and they are
20   highly confidential records and I'm not sure how this
21   got released without the confidential attachment to
22   it.  So any and all vote sheets will fall into the
23   confidentiality agreement.
24             MS. TOBIN:  No problem.
25             MR. KEATING:  Thank you.  All right.  Go
```

49

1  ahead.

2          THE WITNESS:  I'm having trouble reading the

3  inmate's version on this vote sheet -- or this request

4  slip.

5  BY MS. TOBIN:

6      Q    Okay.  The copy's not that clear.  Is this

7  type of document a request slip that you testified

8  earlier about?

9          MR. KEATING:  If an inmate has a request, is

10  this the type of request slip he fills out?

11          THE WITNESS:  Yes.

12  BY MS. TOBIN:

13      Q    Okay.  And in the top section of the

14  document, there's a spot for counselor's name and a

15  spot for unit manager's name.

16      A    Yes.

17      Q    And your name, Dunn, is in the unit manager's

18  name.  Is that because Mr. Jessup was assigned to your

19  unit on the date the request slip was filed?

20      A    I guess.  I don't know because I don't

21  remember the inmate.

22      Q    Why are the counselor's names and the unit

23  manager name why are those on this form?

24      A    I don't know.

25      Q    Do you get a copy of the request slips that

1  the inmates submit?

2      A     Only if it's directed to me.

3      Q     So only if the box labeled one is directed to

4  you, would you get that?

5      A     Correct.  Unless the individual that it's

6  directed to believes that I should receive a copy for

7  whatever reason, then I would possibly get a copy.

8      Q     Do you know whether you received a copy of

9  this request slip?

10     A     I'm going to say I did not receive a copy of

11 this request slip.

12     Q     If you did -- if you do receive copies of

13 request slips, do you have any procedure that you use

14 for filing them or keeping them?

15     A     No.

16     Q     Where do they go?

17     A     Well, I mean if it's something that's

18 important, then normally if it's directed to me, it's

19 because they need me to follow-up on it.  So I'll

20 follow-up and then make a note.

21          We don't necessarily keep all the request

22 slips.  But a copy will be -- normally if it's

23 something that they want put in the 14, it'll say 14

24 so it'll be put in the 14.

25     Q     Do you have a practice that you follow when

51

1    an inmate -- you testified earlier that if somebody

2    has a sentence calculation question or problem, you'll

3    refer them to the records office.  Is that what you do

4    in all cases?

5         A    All what cases?

6         Q    All cases where an inmate has a question

7    about sentence calculations or computations?

8         A    Yes.

9         Q    But there's no documentation to show?  You

10   would just do that verbally?

11        A    Yes.

12        Q    And you don't remember Mr. Jessup asking you

13   for help with his claim that he was being detained

14   past --

15        A    No.

16        Q    -- his max date?

17        A    No.

18             MR. KEATING:  You have to let her finish the

19   question.

20             THE WITNESS:  Sorry.  No.

21   BY MS. TOBIN:

22        Q    Did anyone from records ever contact you to

23   discuss Mr. -- do you have any way of knowing if

24   anyone from records ever contacted you to discuss Mr.

25   Jessup?  Would there be a note in the file if that had

52

1  happened?

2      A    It's possible.  But I don't recall it.  I

3  don't recall the inmate so I'm not going to be able to

4  recall that.

5      Q    If the superintendent had contacted you to

6  discuss an inmate including to discuss Mr. Jessup,

7  would you have made a note of that in the file?  Would

8  that be documented somewhere?

9      A    Not necessarily, no.  Not unless there was

10  something done on my part.

11          (Whereupon, a document was produced and

12  marked as Dunn Exhibit No. 4 for identification.)

13  BY MS. TOBIN:

14      Q    Looks like I do not have extra copies of

15  this, so I will just let both of you look.  I'm

16  showing you what's been marked as Dunn 4.  If you

17  could take a moment to read that and let me know when

18  you're finished.  Do you recognize or do you know what

19  that document is?

20      A    A request slip.

21      Q    And who is it directed to?

22      A    Ms. Kodack.

23      Q    And this request slip is dated May 18th of

24  '09.  Is this one -- this is one from Mr. Jessup.  Do

25  you agree?

1      MR. KEATING:  Well --

2  BY MS. TOBIN:

3      Q   Anyway, the document reflects --

4      A   I didn't see Mr. Jessup write it.

5      Q   Is this the type of -- do you recall

6  directing any inmate to write to records?

7      A   I'm not listed on here as anything.

8          MR. KEATING:  The question was do you

9  remember directing any inmate to --

10         MS. TOBIN:  Write to records on May 18th of

11  '09?

12         MR. KEATING:  May 18th.

13         THE WITNESS:  No, I don't recall.

14  BY MS. TOBIN:

15     Q   If you had directed Mr. Jessup to write to

16  records --

17         MR. KEATING:  I'm going to object to that

18  question.  Now you're asking him to speculate.  He

19  said he doesn't recall telling him that.  So now if

20  you had, you're speculating.

21  BY MS. TOBIN:

22     Q   Is the result of your process of directing

23  someone, if you get a records question, this is pretty

24  much all that could happen after you direct them to

25  write to records; is that accurate?

54

1          MR. KEATING:  I'm going to object to that

2    question because it's unclear.

3    BY MS. TOBIN:

4          Q    Do you understand the question?

5          A    No.

6          Q    Let me try to rephrase it.  If someone has a

7    records related question and you do your part and

8    refer them to records, based on your understanding, is

9    this inmate request to staff member form a likely next

10   step for the inmate?

11         A    I don't know.  It could vary.  I can't answer

12   for Mr. Jessup on what his next step would be.

13         Q    Fair enough.  Do you recall Ms. Foulds or Ms.

14   Kodack coming to you to talk about over detention

15   issues for any inmate on your unit?

16         MR. KEATING:  At any time at all?

17   BY MS. TOBIN:

18         Q    In 2009.

19         A    No.

20         Q    During your time as a correctional counselor

21   at Coal Township, were you aware of any inmates who

22   complained about being kept past their max date?

23         A    I can't recall.

24         Q    And what about during your time as a unit

25   manager?

55

1     A    Same thing.  I can't recall that.

2          (Whereupon, a document was produced and

3     marked as Dunn Exhibit No. 5 for identification.)

4     BY MS. TOBIN:

5     Q    I'm showing you what's been marked as Dunn 5.

6     If you could take a moment to read that and let me

7     know when you're finished.

8          MR. KEATING:  Are you done?

9          THE WITNESS:  Yeah.

10    BY MS. TOBIN:

11    Q    What is this document?

12    A    A reclassification summary.

13    Q    And is this something that you would have as

14    a unit manager?  Would you get this for an inmate as a

15    unit manager?

16         MR. KEATING:  Is it in the 14?  Are these

17    typically in the 14 or have you seen this before?

18         THE WITNESS:  Yeah, I've seen this before.

19    They can be in the 14, in the 15 or both.

20    BY MS. TOBIN:

21    Q    On the last page which is marked 974 at the

22    bottom.

23    A    Yes.

24    Q    There's a series of signatures, one of them

25    is a unit manager.  Obviously not you.  Robert Smith.

56

    1       A    Correct.

    2       Q    Do you know who Robert Smith is?

    3       A    Yes.

    4       Q    And were you a correctional counselor at the

    5   time he was a unit manager?

    6       A    I can't recall.  What's the date?

    7            MR. KEATING:  This is 2006.  July of 2006.

    8   Do you remember?

    9            THE WITNESS:  I don't remember.

   10   BY MS. TOBIN:

   11       Q    Let me ask you this.  As a unit manager when

   12   you -- have you -- I know Robert Smith signed this

   13   one.  But have you received and signed off on other

   14   inmate's reclassification summaries as a unit manager?

   15       A    I can't recall signing off on any of these as

   16   a unit manager.  This is an older document that we no

   17   longer use.

   18       Q    Is this now on the computer?

   19       A    There's a computer -- there's a format of

   20   this type of particular document on the computer, but

   21   the format's different.

   22       Q    What's the purpose of this form?

   23       A    It appears to be pretty much a summary of the

   24   inmate to include the superintendent's recommendation.

   25       Q    And this is the recommendation related to

1   whether the institution will support a parole

2   application?

3        A    Well, says parole summary.  Reparole summary

4   or other on it.  I guess it could be used for that.

5        Q    Is this something that would be involved in

6   the parole staffings?

7        A    No.  This is something that would be

8   completed after the parole staffing.

9        Q    Would it be completed based on what was

10  discussed at the parole staffing and the documents

11  that were circulated?

12       A    It'll be completed based on a combination of

13  those things and the superintendent's recommendation.

14       Q    And you had -- did you have or do you have as

15  a unit manager input into whether someone can be

16  released on parole -- or excuse me.  Input into

17  whether the institution will support a parole

18  application?

19       A    Input, yes.

20       Q    Is there anyone who has the final say?

21       A    The superintendent makes the final.  The

22  superintendent makes the final decision on the

23  institution's recommendation.  And that's what it is,

24  a recommendation.

25       Q    When an inmate is being released after

58

1 completing his sentence, what role do you play in that

2 process as a unit manager?  Are there forms you have

3 to fill out, other steps you have to take?

4     A    We have no role in that process.

5     Q    Who handles that process of an inmate being

6 released?

7     A    We're notified by the records department that

8 he's being released.  We have no role in that.

9     Q    So you're just given that information and you

10 don't have to sign off on anything?

11     A    Correct.

12     Q    And would the same answer -- would it be the

13 same for if he's being given prerelease or released to

14 parole in terms of his actual physical release,

15 someone's walking out the door tomorrow as a unit

16 manager?

17     A    We have no role in that.

18     Q    Does the counselor have a role in that, a

19 correctional counselor?

20     A    No.

21     Q    I'm going to show you what I'm marking as

22 Dunn 6.

23          (Whereupon, a document was produced and

24 marked as Dunn Exhibit No. 6 for identification.)

25 BY MS. TOBIN:

ERVIN BLANK ASSOCIATES, INC.

59

1     Q    If you could let me know if you recognize

2  that document.

3     A    Yes.

4     Q    What is this?

5     A    It says release worksheet on it.

6     Q    And what's your understanding or do you have

7  an understanding of what this is used for?

8     A    I'm not really sure why it's necessary.  And

9  to be honest with you I really don't know what it's

10 used for.  I know the inmate walks around to the

11 different departments and they sign it.  It really has

12 no bearing on anything as far as the release of the

13 inmate.

14          In other words, whether this is completed or

15 not has no bearing on whether the inmate's actually

16 going to physically leave the institution.

17    Q    What determines whether --

18    A    That I'm aware of.

19    Q    Do you know what determines whether he's

20 actually going to physically leave the institution?

21    A    No.

22    Q    There's a spot on this document in number 18

23 for the counselor.

24    A    Yes.

25    Q    When you were a correctional counselor, did

60

1  you have inmates come around to you with these forms?

2      A    I believe this form was generated after I was

3  promoted to unit manager.  So I don't recall.

4      Q    Okay.

5          (Whereupon, a document was produced and

6  marked as Dunn Exhibit No. 7 for identification.)

7  BY MS. TOBIN:

8      Q    I'm showing you Dunn 7.  Are you familiar

9  with this document?

10     A    No.

11     Q    Do you know whether there is another format,

12 a computerized document that contains this same

13 information?

14     A    No.

15     Q    When you go on to the computer to look at an

16 inmate's record if you need to, is there a form that

17 you look at?  What does the screen look like?

18     A    I've never seen this.

19         MR. KEATING:  That wasn't the question.

20 BY MS. TOBIN:

21     Q    When you look up an inmate's sentence

22 information, if you need to, does it have the start

23 date, the sentence date, the same information that's

24 on here?

25         MR. KEATING:  I'm going to object to that

61

1   question.  He's not familiar with this document.

2   BY MS. TOBIN:

3       Q    If you could take a moment to just see what

4   the information is on here.

5       A    There may be some things that are similar but

6   not many.  I'm not familiar with this form.

7       Q    So when you pull up an inmate's record, this

8   doesn't come up?

9       A    No.

10          MR. KEATING:  Wait a minute.  When you pull

11  up the record, where?

12          MS. TOBIN:  On the computer.

13          MR. KEATING:  On which computer?

14          MS. TOBIN:  The DOCNet.

15          MR. KEATING:  The DOCNet.

16          THE WITNESS:  This does not come up on the

17  DOCNet that I'm aware of.

18          (Whereupon, a document was produced and

19  marked as Dunn Exhibit No. 8 for identification.)

20  BY MS. TOBIN:

21      Q    Showing you Dunn 8.  If you would take a look

22  at that.  Are you familiar with this document?

23      A    I'm familiar with this format of the

24  document, but not this particular document.

25      Q    Okay.  What is this type of document?

62

1      A    It's just a document informing whoever it's

2   routed to that the individual will be leaving the

3   institution on that particular date.

4      Q    And there's a CC at the bottom that includes

5   unit manager.

6      A    Okay.

7      Q    As a unit manager where would these go?

8   Where would you put this?

9      A    The 14 file.

10      Q    Would you do anything with the information

11   after you would get this, not this particular one but

12   one of these types of memos, would you take any steps

13   or do anything after getting it?

14      A    Someone in the unit management team whether

15   the unit manager, counselor or clerk would inform the

16   officer on the housing unit.

17      Q    Just tell them this guy's leaving tomorrow?

18      A    Correct.

19      Q    Anything else that you would do?

20      A    No.

21      MR. KEATING:  Only if, in fact, he was going

22   to leave tomorrow.

23      THE WITNESS:  Scheduled to leave.  I'm sorry.

24   I should reiterate that.  Inform him that he is

25   scheduled to leave because it can be canceled at any

63

1   time.

2   BY MS. TOBIN:

3       Q    If it were canceled, how would you be

4   notified of that?

5       A    Same type of document.

6       Q    Would that also come from the records

7   department?

8       A    I'm not sure if this document can only come

9   from the records department or not.

10      Q    Are you familiar with body receipts?

11      A    I've heard of them, but I'm not sure I've

12  even ever saw one.  But I've heard the term used.

13      Q    As a unit manager do you have anything to do

14  with body receipts?

15      A    No.

16      Q    And what about as a correctional counselor?

17      A    No.

18      Q    You testified earlier that there's a current

19  lawsuit by an inmate named Gerald Funk and you're a

20  defendant.  What is that lawsuit about?  If you don't

21  know, you can say that.

22      A    I'm just -- is that something that's relevant

23  to disclose that or not?

24          MR. KEATING:  No.  You go ahead and answer

25  the question.

64

1      THE WITNESS:  I believe it has to do with^--

2      MR. KEATING:  Is it Gerald Funk or Steve?

3      THE WITNESS:  Gerald Funk it is, yes.  It has

4  to do with his cell assignment and --

5      MR. KEATING:  What's he claiming?

6      THE WITNESS:  He's claiming that he was put

7  in with a cellmate that smokes and that he doesn't

8  smoke.  However, all the units are nonsmoking.  So

9  that's pretty much the gist of the lawsuit.

10  BY MS. TOBIN:

11      Q   Are you as a unit manager involved in a cell

12  assignment procedure?

13      A   Yes.

14      MS. TOBIN:  I believe that's all my

15  questions.  Thank you very much.

16                  CROSS-EXAMINATION

17  BY MR. KEATING:

18      Q   Mr. Dunn, how many inmates are there on a

19  unit approximately?

20      A   Approximately 240 to 250 on a whole housing

21  unit.

22      Q   240 to 250?

23      A   They're broken down.  The unit's broken down

24  into halves.

25      Q   Okay.  So if I'm talking about one unit, you

65

1    are a unit manager, right?

2        A    Correct.

3        Q    For one unit?

4        A    Yes.

5        Q    How many people does that cover

6    approximately?

7        A    Approximately 240.

8        Q    And how many units are there at the

9    institution?

10       A    Including the restrictive housing unit?

11       Q    Correct.

12       A    Okay.  Ten.

13       Q    There's about 2,300 inmates currently?

14       A    Approximately, yes.

15       Q    Are you on the unit every day?

16       A    Yes.

17       Q    What unit are you assigned to?

18       A    Currently?

19       Q    Yes.

20       A    E housing unit.

21       Q    And do the inmates have access to you every

22   day?

23       A    Yes.

24       Q    Do you walk up and down and talk to them?

25       A    Yes.

66

1      Q     Are they free to come up and talk to you?

2      A     Yes.

3      Q     And can they talk to you about anything they

4   want to talk about essentially?  Can they come up and

5   ask you anything?

6      A     Yes.

7      Q     Now, if an inmate comes up to you and asks

8   you questions and he's not being disrespectful or

9   anything in any manner whether it's about his parole,

10  whether it's about his inmate account, his visitor

11  list, anything, do you ever just ignore him?

12     A     No.

13     Q     If an inmate comes up and talks to you and

14  has a problem about being out at yard say and has a

15  question about that and you discuss it with him, after

16  you're done discussing that with him, do you make a

17  note for your file and put that in your file about the

18  inmate in the inmate DC-14 about that?

19     A     No.  It's based on relevance.

20     Q     Okay.  So why don't you?

21     A     Because as you kind of alluded to there's

22  2,000 inmates here and they --

23     Q     You talk to them all the time?

24     A     They all have the opportunity.  Right.

25  Right.  The time just doesn't permit to do that.

67

1    Q   But you're open to speak with them about any

2  possible problem they may have whether it's the meals,

3  yard, their property account, commissary, laundry,

4  employment, cell status, anything of that nature at

5  all, correct?

6    A   Correct.

7    Q   So if an inmate does have a problem or a

8  concern with being held past their max, you don't just

9  ignore them, do you?

10    A   No.

11    Q   And absent them being belligerent or

12  disrespectful?

13    A   Well, in that case he still wouldn't be

14  ignored.  He would be given direction to follow, but

15  he wouldn't be ignored.

16        MR. KEATING:  Okay.  I have no other

17  questions.

18        MS. TOBIN:  I don't either.

19        MR. KEATING:  Okay.  You're done.

20        (Whereupon, the deposition was concluded at

21  10:53 a.m.)

22

23

24

25

68

```
 1   COUNTY OF UNION              :

 2   COMMONWEALTH OF PENNSYLVANIA:

 3        I, Faith A. Culp, the undersigned Notary

 4   Public, do hereby certify that personally appeared

 5   before me, JOHN DUNN; the witness, being by me first

 6   duly sworn to testify the truth, the whole truth and

 7   nothing but the truth, in answer to the oral questions

 8   propounded to him by the attorneys for the respective

 9   parties, testified as set forth in the foregoing

10   deposition.

11        I further certify that before the taking of

12   said deposition, the above witness was duly sworn,

13   that the questions and answers were taken down

14   stenographically by the said Faith A. Culp, Court

15   Reporter, Winfield, Pennsylvania, approved and agreed

16   to, and afterwards reduced to typewriting under the

17   direction of the said Reporter.

18        In testimony whereof, I have hereunto

19   subscribed my hand this 29th day of June, 2012.

20

21                    Faith A. Culp
                      Reporter-Notary Public
22                    My Commission Expires
                      August 23,2014
23

24

25
```

ERVIN BLANK ASSOCIATES, INC.

**- 0 -**

**09**    [3]
47:15;
52:24;
53:11

**- 1 -**

**1** [4]  1:18;
3:15;  20:2,
5
**10**    [3]
41:24,  25;
67:21
**11-0304** [1]
1:6
**12**    [3]
11:2;  13:7;
41:24
**120**    [1]
13:9
**125**    [1]
13:10
**14**    [12]
13:19;
16:9;
18:19;
32:12;
41:25;
50:23,  24;
55:16,  17,
19;  62:9
**15**    [5]
13:19;
16:9;
18:20;
47:1;
55:19
**15TH**    [1]
2:4
**17120**   [1]
2:4
**18**    [4]
11:2;  15:4;
20:14;
59:22

**18TH**    [3]
52:23;
53:10, 12
**19** [1]  11:2
**19106**   [1]
1:23
**1997**    [1]
4:24

**- 2 -**

**2** [5]  3:16;
38:20,  22;
42:3;
48:19
**2,300**    [1]
65:13
**2,000**    [1]
66:22
**20** [1]  3:15
**2006**    [3]
20:16;
56:7
**2009**    [5]
20:20,  25;
21:4,   7;
54:18
**2011**    [1]
20:14
**2012**    [2]
1:17;
68:20
**2014**    [1]
68:24
**21**    [2]
1:17;  11:3
**23**    [2]
1:17;
68:24
**240**    [3]
64:20,  22;
65:7
**250**    [2]
64:20, 22
**29TH**    [1]
68:20

**- 3 -**

**3** [3]  3:17;
48:13, 16
**304**    [1]
1:23
**38** [1]  3:16

**- 4 -**

**4** [4]   3:3,
18;  52:12,
16
**48** [1]  3:17

**- 5 -**

**5** [3]   3:19;
55:3, 5
**52** [1]  3:18
**53**    [1]
67:21
**55** [1]  3:19
**58** [1]  3:20

**- 6 -**

**6** [3]   3:20;
58:22, 24
**60** [1]  3:21
**61** [1]  3:22
**64** [1]  3:3

**- 7 -**

**7** [4]  3:21;
20:14;
60:6, 8
**718**    [1]
1:23

**- 8 -**

**8** [3]  3:22;
61:19, 21

**- 9 -**

**9** [1]  1:17
**95** [2]  5:21

**974**    [1]
55:21

**- A -**

**A.M.**    [4]
1:17;
41:25;
67:21
**ABILITY** [1]
43:13
**ABLE**    [3]
17:20;
43:25;
52:3
**ABOVE** [1]
68:13
**ABSENT** [1]
67:11
**ACCESS**
[17]  16:13;
19:6;  27:6;
30:2;
31:21;
44:4,   10;
45:19,   21,
25;   46:1,
5, 6, 9, 16,
19;  65:21
**ACCESSIBL**
**E** [1]  46:14
**ACCOMPLI**
**SH**    [1]
23:17
**ACCOUNT**
[2]   66:10;
67:3
**ACCURATE**
[2]   21:6;
53:25
**ACCURATE**
**LY**    [1]
21:6
**ACCUSED**
[1]  6:4
**ACKNOWLE**
**DGE**    [1]
21:8
**ACTIVE** [1]
18:17

| Job Code | Pay Scale Group | Pay Scale Type | Bargaining Unit | Civil Service or Non-Civil Service | Executive Board Change | Last Change Effective |
|---|---|---|---|---|---|---|
| 47470 | 05 | CM | H3 | C | 690-15 | 7/18/2011 |

Click on Job Code for current expanded information, on Pay Scale Type for current Pay Scale Type, on Civil Service or Non-Civil Service to obtain the Evaluation Guide (if available), on Executive Board Change to obtain the Executive Board amendment listed and on Last Change Effective to obtain history.

07/18/2011                                    47470

CORRECTIONS UNIT MANAGER

DEFINITION:  This is professional work in planning, coordinating and directing the security and treatment programs within a designated housing unit(s) in a Commonwealth correctional institution or facility.

An employee in this job is responsible for planning, directing and coordinating unit security and treatment programs.  Work includes responsibility for supervising a multi-disciplinary unit management team for the purpose of ensuring continuity of security and treatment services on a 24 hour, seven (7) day a week basis.  Work includes responsibility for developing and implementing a unit plan, which includes casework and counseling services, psychological services and unit security; coordinating the provision of educational services, activity programs, job placement, religious services, medical services and other centralized services with the respective institutional departments; and chairing unit meetings where issues concerning an inmate's programming, release and custody level are discussed and changes are recommended.  An employee in this job is also responsible for arranging unit staff development and training through the institution training coordinator. Work is performed independently within the framework of departmental and institutional policies and procedures and is reviewed by a deputy superintendent through conferences and evaluations of unit operations.

EXAMPLES OF WORK:  Plans, directs and coordinates unit security and treatment programs on a 24 hour, seven (7) day a week basis.

Develops a unit plan for the provision of casework and counseling services, psychological services and security.

Coordinates with appropriate custody staff to ensure that unit security practices and procedures are consistent with the institution's overall security policies.

Coordinates the provision of all centralized services with appropriate departmental personnel.

Chairs unit meetings to discuss and vote on individual inmate's program placement, release decisions and custody level changes.

Coordinates staff development and training with the institution's training coordinator.

Schedules non-corrections officer staff and works collaboratively with the zone or area lieutenant to ensure adequate corrections officer coverage is available on the unit.

Directs the maintenance of inmate and unit records in accordance with institutional and departmental standards.

Performs the full range of supervisory duties.

An employee in this job may participate in the performance of subordinates' work consistent with operational or organizational requirements.



DEF000209

| DC-46<br>(Rev. 7/05) | **VOTE SHEET** | | **Commonwealth of Pennsylvania**<br>**Department of Corrections** | | |
|---|---|---|---|---|---|

| Facility<br>COA | Date<br>6-29-06 | Number<br>CX-8799 | Name<br>JESSUP, KEVIN | Custody Lev. & Code(s)<br>3 |
|---|---|---|---|---|

| Min<br>1-26-01 | Detainer | CWP/Esc Leave Offense | Problematic | DNA ☒Y ☐N | Explain Codes |
|---|---|---|---|---|---|
| Max<br>2-18-08 PV | ☒Y ☐N | Restriction ☒Y ☐N | ☒Y ☐N | Date Drawn: 6-2-03 | |

| Purpose 1  RE-PAROLE REVIEW | | | | Purpose 2 | | | Purpose 3 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Y | N | Comments | Y | N | Comments | Y | N | Comments |
| Counselor<br>Edward Klock | ☒ | ☐ | *Re detainer, Federal* | ☐ | ☐ | | ☐ | ☐ | |
| Work Supervisor | ☐ | ☐ | | ☐ | ☐ | | ☐ | ☐ | |
| Corrections Officer | ☐ | ☐ | | ☐ | ☐ | | ☐ | ☐ | |
| Psychologist | ☐ | ☐ | | ☐ | ☐ | | ☐ | ☐ | |
| Unit Manager<br>Robert Smith | ☒ | ☐ | *to detainer* | ☐ | ☐ | | ☐ | ☐ | |
| CCPM<br>Linda Chismar | ☐ | ☐ | | ☐ | ☐ | | ☐ | ☐ | |
| Major<br>Joseph Mushinski | ☒ | ☐ | *Parole to Fed detainer* | ☐ | ☐ | | ☐ | ☐ | |
| Other<br>Thomas Moser | ☐ | ☒ | *POOR Institutional Adjustment* | ☐ | ☐ | | ☐ | ☐ | |
| Other | ☐ | ☐ | | ☐ | ☐ | | ☐ | ☐ | |
| Other | ☐ | ☐ | | ☐ | ☐ | | ☐ | ☐ | |

| Reception Date<br>10-22-01 | Escape History<br>NONE KNOWN | Date of Last Misconduct<br>6-20-06 | LSI-R<br>21 | HIQ<br>N/A | CSSM<br>N/A | TCU<br>0 | TABE<br>10.2 |
|---|---|---|---|---|---|---|---|

Educational Requirements:
MEETS REQUIREMENTS.

Staff Recommendations: Mr. Jessup, age 31, is a Technical Convicted Violator returned to serve 18 months backtime. His original sentence is 6-12 years for Robbery (General) and CA/Firearm in Public-Philadelphia. The Pennsylvania Board of Probation and Parole Decision dated 9-23-05 has him listed as a September 2006 review. They recommended that he maintain a clear conduct record and complete his institution's Correctional Plan. Since his last review on 6-21-05, he incurred 2 Class I misconducts with the last one occurring on 6-15-06 for Refusing to obey an order and Destroying, Altering, Tampering with (Reduced, 30 days LOSS OF PRIVILEGES). He currently earns average housing unit reports and is GLP. In program areas, Mr. Jessup completed Citizenship 11-3-05 and is enrolled in AC/R. He is on the waiting list for CADD class. His Correctional Plan indicated that he is on the waiting list for Drug and Alcohol Education but the evaluation indicates than he completed CT. on 8-20-03 and no further program recommendations. The Unit Team is not staffing Mr. Jessup for 2R or 1G due to his Federal detainer to serve 162 months.

| Deputy-Centralized Services | *W. Harrell 7-13-06* | | Deputy-Facility Management | | *7-13-06* |
|---|---|---|---|---|---|
| Purpose 1 | ☐Y | ☐N | Purpose 1 | ☒Y | ☐N |
| Purpose 2 | ☐Y | ☐N | Purpose 2 | ☐Y | ☐N |
| Purpose 3 | ☐Y | ☐N | Purpose 3 | ☐Y | ☐N |
| Comments | *Parole to detainer-fed* | | Comments | *Back to Fed. det.* | |

| Signature of Superintendent/Designee | *7-13-06* | Comments |
|---|---|---|
| Purpose 1 *Re-Parole* | ☒Y ☐N | *to detainer* |
| Purpose 2 | ☐Y ☐N | |

**7.2.1, Counseling Services Procedures Manual**
**Section 8 - Vote Sheet**

EXHIBIT
*Dunn-2*

Attachment 8-A

DEF000689

DC.,

| Form DC-135A<br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections |
|---|---|
| | **INSTRUCTIONS**<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |

| | |
|---|---|
| 1.  To: (Name and Title of Officer)<br>mr. VARANO | 2.  Date:<br>4/22/09 |
| 3.  By: (Print Inmate Name and Number)<br>Kevin Jessup cx 8799<br>_Kevin Jessup_<br>Inmate Signature | 4.  Counselor's Name<br>FOULDS |
| | 5.  Unit Manager's Name<br>DUNN |
| 6.  Work Assignment<br>NONE | 7.  Housing Assignment<br>P 2  cell 26 |

8.  Subject:  State your request completely but briefly.  Give details.

mr. VARANO,

I served 12 years in this institution from 1-26-95 + 4-9-01 returned for violations on 9-26-01 to 7-18-07 I am back here for parole violations but I maxed this sentence out + I have all my status sheets green sheets and documents etc. I've been back for a week and none of the staff or parole has been helpful, can you "please" schedule me an appointment for me to talk to you about this situation. I'm exhausted all remedies to try and resolve this matter.

Thank you in Advance.

9.  Response: (This Section for Staff Response Only)

This is an issue which can be directed to both Parole and the Institution Records office.

Both of the office Supervisors should be able to ASSIST you!

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name   _D. A. Varano  SupT_   Date   4-27-09
                        Print                    Sign

Revised July 2000          CC: file

**EXHIBIT**
Dunn-3

DEF000564

Kodeck - 32

**26**

Form DC-135A

## INMATE'S REQUEST TO STAFF MEMBER

Commonwealth of Pennsylvania
Department of Corrections

### INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

RecorDS

| 1. To: (Name and Title of Officer) | 2. Date: |
|---|---|
| Ms. KodAck | 5/18/09 |

| 3. By: (Print Inmate Name and Number) | 4. Counselor's Name |
|---|---|
| Kevin Jessup CX-8799 | FoulDS |

Inmate Signature

| | 5. Unit Manager's Name |
|---|---|
| | DuNN |

| 6. Work Assignment | 7. Housing Assignment |
|---|---|
| GLP | B2  26 |

8. Subject: State your request completely but briefly. Give details.

Can you please schedule me talk to you or someone in RecorDS concerning my total time spent incarcerated at this institution I believe there is an error in my sentence calculation. THANKS
Kevin Jessup CX-8799

9. Response: (This Section for Staff Response Only)

IF YOU NEED ANSWERS FOR TIME FROM YOUR TCV YOU WILL NEED TO
TALK TO PAROLE. WE HAVE NOTHING TO DO WITH THERE
CALCULATIONS. AS FOR YOUR ORIGINAL SENTENCE IT  WOULD'VE HAD
TO BE RIGHT BEFORE YOU WERE PAROLED.

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name D HERBST , D Hubst   Date 5-19-09
                       Print                Sign

Revised July 2000

Kodack-45


EXHIBIT
Dunn-4

| DC-13A | CONFIDENTIAL | |
|---|---|---|
| **RECLASSIFICATION SUMMARY** | **COMMONWEALTH OF PENNSYLVANIA**<br>**Department of Corrections** | |

| Unit Clerk | Check Topic<br>☐ Parole Summary (minimum sentence interview)<br>☐ Parole Summary (review interview)<br>☒ Re-Parole Summary<br>☐ Other | Prepared at: SCI-COAL TOWNSHIP<br><br>Date: 7-24-06 |
|---|---|---|

| Records Office | SID Number | DC Number | PBPP Number | Name PP | | Age |
|---|---|---|---|---|---|---|
| | 217-14-12-7 | CX-8799 | 496AS | Jessup, Kevin | | 31 |

| Assessment | LSI-R Score | TCU Score | HIQ Score | | CSS-M Score | |
|---|---|---|---|---|---|---|
| | | | Initial | Current | Initial | Current |
| | 21 | 0 | N/A | N/A | N/A | N/A |

**B.     Problem Areas:**

☐ Assaultive      ☐ Domestic Violence Protocol      ☐ Sexual

☒ Vocational      ☐ Educational      ☐ Psychiatric/ Psychological

☒ Drugs and/or Alcohol      ☐ Other Problems

**C.     Drug related crime (ACT 97):** ☐ 97-1      ☐ 97-2      ☒ 97-3

**D.     DNA Data and Testing:**

    1. ☐  Inmate subject to DNA requirements. DNA Sample has been drawn on *. Please see attached DNA Sample Collection Tracking Sheet submitted with DC 13 A packet.

    2. ☒  Inmate is not subject to DNA requirements at this time.

**E.     Megan's Law Registration:**

    1. ☐ Inmate is subject to Megan's Law Registration requirements.

    2. ☒ Inmate does not meet Megan's Law Registration requirements.

**F.     Crime Victims Compensation:**   ☒  **Yes**      ☐  **No**

EXHIBIT
Dunn-5

G.   **PA 143 Victim Aware. ,s Education:**

    1.  Inmate Jessup is not subject to Act 143 Victim Awareness Education as mandated under Act 143 of 1998.

H.   **Sex Offender Treatment:** Mr. Jessup requires no Sex Offender programming at this time.

I.   **Current Sentence:** Mr. Jessup is serving a total sentence of 6 to 12 years for Robbery and Carrying a Firearm in Public-Philadelphia. He was sentenced on 1-25-1996 by Judge Albert Defino of Philadelphia County. He was found guilty on both offenses. His controlling minimum date is 1-25-01 and his parole violator maximum date is 2-16-08.

J.   **Detainers:**   Available records indicate that Mr. Jessup has one detainer dated 9-26-02 for USMS Eastern to serve a flat 162 months.

K.   **Supervision History:**   To be completed by Institution Parole staff.

L.   **Offender Version:** On January 26, 1995 I was gambling with dice with three other people. I lost and got upset and robbed two of the people.

M.   **Last Board Action:**   Last board action dated 7-23-05 refused parole based on recommendation made by the Department of Corrections, his Institution behavior (including reported misconducts or CCC failures). He will be reviewed in or after September 2006. At his next interview the Board will review his file and consider whether he has received a favorable recommendation for parole from the Department of Corrections and whether he has received a clear conduct record and completed the Department of Corrections prescriptive programs.

N.   **Social History Update:**   The offender did not report any updates or changes.

O.   **Institutional Adjustment:**   Since his last review on 6-21-05, Mr. Jessup incurred two Class 1 misconducts with the last one occurring 6-15-06 for Refusing to Obey an Order and Destroying, Altering, Tampering with Property (30 days Loss of Privileges).

P.   **Counselor Evaluation:**

Mr. Jessup's total score on the LSI-R fell into the low range for this tool, indicating a risk of re-offending that is below average.

Due to Mr. Jessup being incarcerated on 10-22-01; he was not tested on the CSSM or HIQ. There are no scores to report.

Mr. Jessup's score of 0 on the TCU indicates that he does not meet the criteria for substance dependence and would not benefit from intensive alcohol and other drug program placement.

Mr. Jessup, age 31, is a Technical Convicted Violator returned to serve 18 months backtime. His original sentence is 6-12 years for Robbery (General) and CA/Firearm in Public-Philadelphia. The Pennsylvania Board of Probation and Parole Decision dated 9-23-05 has him listed as a September 2006 review. They recommended that he maintain a clear conduct record and complete his institution's Correctional Plan. Since his last review on 6-21-05, he incurred 2 Class I misconducts with the last one occurring on 6-15-06 for Refusing to obey an order and Destroying, Altering, Tampering with (Reduced, 30 days LOSS OF PRIVILEGES). He currently earns average housing unit reports and is GLP. In program areas, Mr. Jessup completed Citizenship 11-3-05 and is enrolled in AC/R. He is on the waiting list for CADD class. His Correctional Plan indicated that he is on the waiting list for Drug and Alcohol Education but the evaluation indicates that he completed CT on 8-20-03 and no further program recommendations. The Unit Team is not staffing Mr. Jessup for 2R or 1G due to his Federal detainer to serve 162 months.

**Q.**   **Pre-Release Programming:**      Mr. Jessup has had no pre-release programming due to his Federal detainer.

**R.**   **Superintendent's Recommendation and Rationale:** The SCI-Coal Township staff has reviewed Mr. Jessup's case and finds it can recommend parole to his Federal detainer. This recommendation is based on Mr. Jessup's completion of programs.

Edward Klock
Corrections Counselor II

Robert Smith, Unit Manager

Approved By:

Joseph J. Piazza, Superintendent

7-25-06
Date

EK/RS

DEF000974

DC-158                                                                PE

# RELEASE WORKSHEET

COMMONWEALTH OF PENNSLYVANIA
DEPARTMENT OF CORRECTIONS

| Institutional Number<br>CX8799 | Name<br>Jessup, Kevin | | County<br>Philadelphia | Race<br>B | Date of Release<br>07/19/07 |
|---|---|---|---|---|---|
| Method of Release<br>Release to US<br>Marshals | Eff Date Sen. | Time Served Y-M-D | Remarks<br>Leaving via US Marshals | | |

| RELEASE STATIONS | Date | Signature |
|---|---|---|
| 1.  Records Office   ID ( yes ) | 07/18/07 | |
| 2.  Release Photos | 07/18/07 | |
| 3.  Property Office | 07/18/07 | |
| 4.  Medical Office | 07/18/07 | |
| 5.  Dental Office | 07/18/07 | |
| 6.  Work Supervisor | 07/18/07 | |
| 7.  Chaplain | 07/18/07 | |
| 8.  Employment Office | 07/18/07 | |
| 9.  Education Office | 07/18/07 | |
| 10.  Library | 07/18/07 | |
| 11.  Barber Shop | 07/18/07 | |
| 12.  Drug & Alcohol | 07/18/07 | |
| 13.  Parole Office   (per callout) | 07/18/07 | |
| 14.  Commissary | 07/18/07 | |
| 15.  Laundry | 07/18/07 | |
| 16.  Business Office   (Intake 3 P.M.) | 07/18/07 | |
| 17.  Block Officer | 07/18/07 | |
| 18.  Counselor | 07/18/07 | |
| 19.  Control Desk | 07/19/07 | |
| 20. | | |

Inmate is leaving by:   ☐ Train   ☐ Automobile   ☐ Plane   ☐ Other (Specify)

| Inmate is leaving with | | Reason | | |
|---|---|---|---|---|
| Time leaving | Name(s) of Escorting Officer(s) | Placed on | Location | Time |

\* AREAS HIGHLIGHTED IN YELLOW INDICATES THAT THE INMATE MUST PERSONALLY GO TO THOSE STATIONS.

DNA _____          Megan's Law _____          Problematic _____

*7.2.1, Counseling Services Procedures Manual, Section 2, Case Contacts*          **Attachment 2-C**

EXHIBIT

DEF001055

```
PA DEPT. OF CORRECTIONS         INMATE RECORDS SYSTE         RUN:   YR1
BUREAU OF DATA PROCESSING            JACKET REPORT           DATE:  02/
REMOTE PRINT TIME 10:06         SENTENCE INFORMATION         PAGE:   2.
==================================================================
INMATE NUMBER: CX8799  NAME: JESSUP KEVIN   .

CONTINUED FROM INMATE NUMBER:           ADDITIONAL SENTENCE(S)/DETAINER(S)

SENTENCE STATUS: DIAGNOSTIC/CLASSIFICATION         STATUS DATE: 01/29/19
  PAROLE STATUS: NOT APPLICABLE                    STATUS DATE: 01/29/19

MINIMUM OFFENSE: CC3701   ROBBERY (GENERAL)
MAXIMUM OFFENSE: CC3701   ROBBERY (GENERAL)

                        CONTROLLING MINIMUM          CONTROLLING MAXIMUM
                        -------------------          -------------------
        CLASS OF SENTENCE: INDETERMINATE             INDETERMINATE
        SENTENCING COUNTY: PHILADELPHIA              PHILADELPHIA
        INDICTMENT NUMBER: 0033                      0033
           TERM OF COURT: 0395                       0395
          TYPE OF SENTENCE: STATE                    STATE
STATE (TRANSFER TO/FROM):
                   JUDGE: DEFINO A                   DEFINO A
 OFFENSE TRACKING NUMBER: M6413794                   M6413794
GUILTY BUT MENTALLY ILL:
           SENTENCE DATE: 01/25/1996                 01/25/1996
     SENTENCE START DATE: 01/25/1996                 01/25/1996
        COMMITMENT CREDIT:   0 YRS   0 MOS  364 DAYS    0 YRS   0 MOS  364
          EFFECTIVE DATE: 01/26/1995                 01/26/1995
          COURT SENTENCE:   6 YRS   0 MOS   0 DAYS    12 YRS   0 MOS   0

       FACTORED SENTENCE:   6 YRS   0 MOS   0 DAYS    12 YRS   0 MOS   0 :
         APPLY EARN TIME: NO                         NOT APPLICABLE
        MAXIMUM EARN TIME:                   0 DAYS  NOT APPLICABLE
        REVOKED EARN TIME:                   0 DAYS  NOT APPLICABLE
              BAIL TIME:   0 YRS   0 MOS   0 DAYS    0 YRS   0 MOS   0 I
             ESCAPE TIME:   0 YRS   0 MOS   0 DAYS    0 YRS   0 MOS   0 I
 SENT. INTERRUPTION TIME:   0 YRS   0 MOS   0 DAYS    0 YRS   0 MOS   0 I
          EXPIRATION DATE: 01/26/2001                 01/26/2007
 PV RECOMPUTED MAX DATE:                             NOT AVAILABLE

REMARKS:                                     COMPUTER CALCULATED:




SENTENCE CHANGE TYPE:            CHANGE DATE:
SENTENCE CHANGE BASIS:
```



DEF001154

```
PA DEPT. OF CORRECTIONS        INMATE RECORDS SYSTE         RUN:    YR101
BUREAU OF DATA PROCESSING          JACKET REPORT           DATE:   02/12,
REMOTE PRINT TIME 10:06            TIME PERIODS            PAGE:    2.01.
==================================================================================
INMATE NUMBER: CX8799  NAME: JESSUP KEVIN

        TYPE OF                                          APPLY TO:  MISCONDU
     TIME PERIOD        FROM         TO       YRS MOS DAYS  MIN MAX   NUMBER
------------------   ----------  ----------   --- --- ----  --- ---  -------
COMMIT. CREDIT       01/26/1995  01/25/1996 OR         364  YES YES
                                 ***  END OF DATA  ***
```

DEF001155

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**State Correctional Institution**
**at Coal Township**
(570) 644-7890
July 18, 2007

**SUBJECT:**   Inmate transferring to US Marshals

**TO:**   Central Control

**FROM:**   Kristi Macaluso  KSM
Records Specialist 1

The following inmate will be transferred to US Marshals to serve his federal sentence. He will return to SCI Coal Township upon completion of that sentence.

# July 19 , 2007:

| Inmate # | Inmate Name | Race |
|---|---|---|
| CX-8799 | Jessup, Kevin | Black |

This inmate will be removed from both Physical and Committed counts until his return to this institution.

KSM

cc:   Superintendent
Security Services
Unit Manager ( EA Block)
Maintenance
Inmate Reception
Medical
Mail Room
Inmate Accounts

Lobby
Counselor
Employment
Sally Port
Education
Commissary
Laundry
Kitchen
Correctional Industries



EXHIBIT
Dunn -8

DEF001058