# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

DAMON CHAPPELLE,          \*

    Plaintiff          \*   Case No.

    vs.          \*   11-0304

DAVID VARANO,          \*

JOHN DUNN, DEBORAH          \*

HERBST, MICHELLE          \*

KODACK and RENEE          \*

FOULDS,          \*

    Defendants          \*

\* \* \* \* \* \* \* \*

DEPOSITION OF

JENNIFER SHUROCK

August 16, 2012



Any reproduction of this transcript is
prohibited without authorization by the
certifying agency.

1                    DEPOSITION

2                        OF

3    JENNIFER SHUROCK, taken on behalf of the

4    Defendants herein, pursuant to the Rules of

5    Civil Procedure, taken before me, the

6    undersigned, Richard J. Lipuma, a Court Reporter

7    and Notary Public, in and for the Commonwealth

8    of Pennsylvania, at the offices of Pennsylvania

9    Department of Probation and Parole, 1101 South

10   Front Street, Harrisburg, Pennsylvania, on

11   Thursday, August 16, 2012 beginning at 9:03 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                    A P P E A R A N C E S

 2

 3    JENNIFER J. TOBIN, ESQUIRE

 4    Pennsylvania Institutional Law Project

 5    718 Arch Street

 6    Suite 304 South

 7    Philadelphia, PA  19106

 8         COUNSEL FOR PLAINTIFF

 9         (via telephone)

10

11    TIMOTHY P. KEATING, ESQUIRE

12    Office of Attorney General

13    15th Floor

14    Strawberry Square

15    Harrisburg, PA  17120

16         COUNSEL FOR OFFICE OF ATTORNEY GENERAL

17

18    JOHN J. TALABER, ESQUIRE

19    Pennsylvania Probation & Parole

20    1101 South Front Street

21    Suite 5100

22    Harrisburg, PA  17104

23         COUNSEL FOR PENNSYLVANIA PROBATION & PAROLE

24

25
```

4

1                        I N D E X

2

3    WITNESS: JENNIFER SHUROCK

4    EXAMINATION

5        By Attorney Keating              7 - 40

6    EXAMINATION

7        By Attorney Tobin              40 - 60

8    RE-EXAMINATION

9        By Attorney Keating           60 - 61

10   DISCUSSION AMONG PARTIES          61 - 63

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                           EXHIBIT PAGE

2

3                                                   PAGE

4     NUMBER    DESCRIPTION                      IDENTIFIED

5     One     Four Inmate Request Slips           48

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                          OBJECTION PAGE

2

3    ATTORNEY                                      PAGE

4                          NONE MADE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

P R O C E E D I N G S

----------------------------------------------------

JENNIFER SHUROCK, HAVING FIRST BEEN DULY SWORN,

TESTIFIED AS FOLLOWS:

----------------------------------------------------

EXAMINATION

BY ATTORNEY KEATING:

Q.   Jennifer, my name is Timothy Keating, here

with the Office of Attorney General, and I'm

representing the Department of Corrections

Defendants in the case of Damon Chappelle, also

known as Kevin Jessup, in a federal action

against them.  And we're here today to take your

deposition.  You're here with Counsel for the

Parole Board.  And if at any time you want to

take a break and speak with Counsel, feel free

to do so, and that's not a problem.  Is that

understood?

A.   Yes.

Q.   Okay.  Have you ever been deposed before?

A.   No.

Q.   Typically, the format of the deposition is

first I'm going to lay out some ground rules

about how to be deposed and how to answer and

that sort of thing.  And then I'm going to go a

8

1  little bit into your background, history, your

2  education, where you were born, that sort of

3  thing, and then talk to you about your role and

4  your job with the Pennsylvania Board of

5  Probation and Parole, and what that entails.

6  A.  Okay.

7  Q.  So for the instructions, first of all, we

8  have a court reporter here, which means that

9  every time you answer a question, it has to be

10  verbally.  You can't just shake your head yes or

11  no, shrug your shoulders, or say uh-huh (yes) or

12  uh-uh (no), because we're making a record; okay?

13  A.  Yes.

14  Q.  Okay.  Secondly, if I ask you a question and

15  you don't understand it because I don't speak

16  clearly enough, or slowly enough, tell me that

17  and I'll repeat the question so you understand

18  it.

19  A.  Okay.

20  Q.  Thirdly, you have to wait for me to finish

21  my question before you answer the question;

22  okay?

23  A.  Okay.

24  Q.  And I'll try to let you finish your answer

25  before I ask you another question.

9

1  A.   Okay.

2  Q.   Sometimes these things take on a

3  conversational type of dialog, but for the

4  record and the transcript, it's --- we try

5  to --- I mean sometimes you will know what my

6  question is going to be ---

7  A.   Okay.

8  Q.   --- and you'll want to answer it like that.

9  But we'll both try to --- I'll let you finish

10  your answer and you let me finish my question;

11  okay?

12  A.   Okay.

13  Q.   If I ask you a question that you don't

14  understand because the question itself is

15  confusing the way I ask it, let me know and I

16  will try to rephrase the question; okay?

17  A.   Okay.

18  Q.   That's fair?

19  A.   Yes.

20  Q.   Okay.  So if I ask you a question and you

21  answer a question, I'm going to assume that

22  you've heard the question, you understood the

23  question, and you're answering the question to

24  the best of your ability, belief, knowledge, and

25  understanding.

10

1    A.   Okay.

2    Q.   If you don't know the answer to a question,

3    I don't know is a legitimate answer, as long as

4    you don't know; okay?

5    A.   Okay.

6    Q.   If you want to estimate, that's fine, but

7    please try not to guess.

8    A.   All right.

9    Q.   Are you currently on any medication which

10   would impair your ability to understand

11   questions and to answer questions truthfully and

12   honestly?

13   A.   No.

14   Q.   If I ask you a question at any time that you

15   don't want to answer because it's too personal,

16   or you have concerns about it, let us know and

17   we'll take a break and we'll figure it out;

18   okay?

19   A.   Okay.

20   Q.   Is that fine?  I don't anticipate that, but

21   it happens once in a while.  Is there any reason

22   why we should not --- that you can think of that

23   we shouldn't or can't take your deposition

24   today?

25   A.   No.

11

1  Q.   The other thing is at the end of the

2  deposition --- well, one thing is we have

3  Attorney Tobin on the line.   Once I'm done

4  asking you questions, she'll ask you a series of

5  questions for you to answer.   Once we're done

6  with the deposition, we will get a transcript.

7  We will allow you to read the transcript to make

8  sure of its accuracy; okay?

9  A.   Okay.

10              ATTORNEY TOBIN:

11              Excuse me, Tim.

12              ATTORNEY KEATING:

13              Yes.

14              ATTORNEY TOBIN:

15              I'm having a hard time hearing Ms.

16  Shurock.   And I don't know if there's a way to

17  move the phone possibly closer to her.

18              ATTORNEY TALABER:

19              Just speak a little louder.

20  A.   I'll speak up.   I'll lean in.

21  BY ATTORNEY KEATING:

22  Q.   The other thing is you have to speak up so

23  Counsel --- all Counsel can hear you; is that

24  fair?

25  A.   Yes.

12

1    Q.   Okay.

2                    ATTORNEY TOBIN:

3                    Sounds good.

4    BY ATTORNEY KEATING:

5    Q.   Is that better?   Okay.   Good.   Your full

6    name?

7    A.   Jennifer A. Shurock, S-H-U-R-O-C-K.

8    Q.   And how old are you, Jennifer?

9    A.   Thirty-eight (38).

10   Q.   And where do you live?

11   A.   I live in Coal Township, Pennsylvania.

12   Q.   And how long have you lived in Coal

13   Township, Pennsylvania, approximately?

14   A.   About eight years.

15   Q.   And before Coal Township, Pennsylvania,

16   where did you live?

17   A.   Pine Grove, Pennsylvania.

18   Q.   Could you tell us a little bit about your

19   educational background?

20   A.   I graduated high school in 1992 and I

21   started with the Parole Board two weeks later.

22   I have no college.

23   Q.   When you started with the Parole Board in

24   1992, where was it?

25   A.   I started in the personnel division.

13

1   Q.   And physically where?

2   A.   Here in Harrisburg.

3   Q.   Here in Harrisburg?

4   A.   Yes.

5   Q.   And were you living in Harrisburg at the

6   time?

7   A.   No, I was still living in Pine Grove.

8   Q.   Did you move to Harrisburg?

9   A.   Nope, I never ---.

10   Q.   You drove from Pine Grove every day to

11   Harrisburg?

12   A.   Yes.

13   Q.   Okay.  And when you started with the Parole

14   Board in 1992, what position did you start with?

15   A.   I started in personnel as the personnel

16   director's secretary.

17   Q.   Who was the personnel director?

18   A.   At that time, it was Robert E. Yerger.

19   Q.   And as the personnel director's secretary,

20   did you say?

21   A.   Uh-huh (yes).

22   Q.   It wasn't an administrative assistant?

23   A.   Not at that point, no.

24   Q.   What were your duties, general duties and

25   responsibilities?

14

1    A.   General duties, scheduling meetings, doing

2    travel vouchers, typing memos, dictating, going

3    to meetings, dictating notes, that type of

4    thing.

5    Q.   Did you receive any specific training

6    relative to that position?

7    A.   Yes.

8    Q.   What kind of training did you receive?

9    A.   There was mandatory 16 hours of training

10   each year that we had to take.  They were just

11   various courses.

12   Q.   Now, I assume for the sake of discussion,

13   even back then, you had to take some sort of

14   EEOC training and diversity training?

15   A.   Correct.

16   Q.   Was that included in the 16 hours of

17   training or was that separate?

18   A.   I believe that would have been separate, but

19   it is a while ago.

20   Q.   Okay.

21   A.   But I mean the code of conduct was something

22   separate that we would have to sign, I believe

23   yearly.  You know, review and sign.

24   Q.   And how long did you work in that position,

25   approximately?

15

1   A.   I was in personnel approximately three

2   years, four years, before I transferred to the

3   Board Secretary's office.

4   Q.   So when you transferred to the Board

5   Secretary's office, would that have been about

6   '95 or '96?

7   A.   Approximately.

8   Q.   And why did you transfer to the Board

9   Secretary's office?

10  A.   I got an administrative assistant job there.

11  I had different promotions in personnel.  But

12  when I transferred to the Board Secretary, it

13  was as an administrative assistant.

14  Q.   And as an administrative assistant to the

15  Board Secretary, who did you report to?

16  A.   At that time, it was W. Conway Bushey.

17  Q.   Was W. Conway Bushey the Board Secretary?

18  A.   Yes, he was.

19  Q.   Do you recall how many people were on the

20  Board?

21  A.   At that time, I believe there may have been

22  four or five Board members.

23  Q.   You can't look to your attorney to help you

24  out.   That's okay.

25  A.   I believe there was four or five.   There

16

1   wasn't the current nine; I know that.

2   Q.   There's nine now?

3   A.   Yes.

4   Q.   And how long did you work as administrative

5   assistant for the Board Secretary,

6   approximately?

7   A.   I was only there approximately one year and

8   I got a promotion and transferred to our what

9   was then special projects section as a parole

10  staff technician.

11  Q.   Special projects ---?

12  A.   Section.

13  Q.   As a parole staff technician?

14  A.   Yes, sir.

15  Q.   Where was that located physically?

16  A.   Here in Harrisburg.

17  Q.   And what was the special projects section?

18  What did that entail?

19  A.   They encompassed, at that time, firearms was

20  under them, the Pardon Board investigations was

21  under them, declaring offenders delinquent,

22  absconders was under them.  Pretty much it was

23  like the field line to getting memos to the

24  Board, that kind of ---.

25  Q.   What was the actual role of the special

17

1  projects?  What exactly did they do?

2  A.   They did field audits.   They did firearms

3  training.

4  Q.   What is a field audit?  What does that

5  include?

6  A.   Back then, I believe they were parole staff

7  specialists.  We'd go out and review the field

8  logs of our agents, you know, review their case

9  notes, make sure everything was the way it was

10  supposed to be, in line with Board policy.

11  Q.   Do parole agents, on a regular basis, fill

12  out field logs?

13  A.   Correct.

14  Q.   And do they fill it out per parolee or per

15  date that they work?  Do you know what I'm

16  saying?

17  A.   That I am not sure how --- I'm not sure.

18  Q.   Do they currently still fill out field logs?

19  A.   I believe they do.

20  Q.   And what information is contained in a field

21  log?

22  A.   It would be their contacts with the

23  offender, collateral contacts with family

24  members, employers, police contact; anything

25  that would happen with that offender.

18

1  Q.   And how long did you work in that capacity?

2  A.   Well, I was a parole staff tech for about

3  five or six years in the special project

4  section.  I transferred to the interstate

5  services division also as a parole staff

6  technician.

7  Q.   And what did you do in that capacity?

8  A.   In that capacity, I reviewed incoming cases

9  from other states that they wanted us to

10  supervise for them if it was a dual supervision

11  case, made sure all of the paperwork, all of the

12  documentation was there, sent it to the field

13  for investigation, and then waited for the

14  field's reply to send back to the other

15  interstate office, whether or not the plan was

16  acceptable.

17  Q.   And approximately what year was that, if you

18  recall?

19  A.   Well, I was there up until 2003, I was in

20  that position.  I was a parole staff tech until

21  2003.

22  Q.   And when you say dual supervision, would

23  that be relegated only to those individuals who

24  were on parole for offenses that occurred in

25  other states and in Pennsylvania or ---?

19

1  A.   That was the case --- some of those did

2  happen like that.  Other times they lived here

3  and got arrested in the other state and were

4  just trying to get home.  But dual supervision,

5  yes, means they were on supervision, probation,

6  or parole in another state, and also here in

7  Pennsylvania, whether it be state or county.

8  Q.   Would you have instances where a parolee was

9  never convicted of a charge in Pennsylvania but

10 was doing parole for an offense in another state

11 and living in Pennsylvania?

12 A.   Correct.

13 Q.   Who would pay for that; Pennsylvania or the

14 other state?

15 A.   Well, the supervision fee ---.

16 Q.   Supervision?

17 A.   If an offender, he can't pay supervision

18 fees to two states.  So if his case was

19 transferred to Pennsylvania, he would pay the

20 supervision fees to Pennsylvania, not the other

21 state.  You can't have it being paid to both

22 states.

23 Q.   Okay.  If an offender from another state

24 doesn't have a conviction in Pennsylvania, the

25 supervision fee would be paid to Pennsylvania?

20

1    A.   It would be, if we accept the case for the

2    other state.

3    Q.   Okay.  And that was 2003?

4    A.   I was there up until 2003.

5    Q.   Where were you after 2003?

6    A.   2003, I got a promotion and went to SCI-Coal

7    Township as a parole agent.

8    Q.   Was it parole agent one?

9    A.   Yes, for six months, for the training

10   period.  It's a six-month training period.

11   Q.   And that was a promotion?

12   A.   That was a promotion.

13   Q.   So a parole agent one is pretty high up the

14   scale, relative to the positions?

15   A.   In our agency, yes.

16   Q.   And how was it that you applied for and got

17   the position as a parole agent at SCI-Coal

18   Township?  Would that have been on any

19   particular bulletin board ---?

20   A.   Right.  There was a job posting and I

21   applied.  I don't know of how many other

22   candidates.  Mileage-wise, it was actually

23   closer to my home than Harrisburg was.  At that

24   time, I was living in Pine Grove.

25   Q.   And did you have to go through any

21

1   training ---

2   A.   Yes.

3   Q.   --- after you got accepted to the position?

4   A.   Yes, I did.

5   Q.   What kind of training and how long did it

6   take?

7   A.   I believe at that time, I believe it was a

8   five or six-week basic training program at the

9   Department of Corrections Training Academy,

10   which was like --- every day there, it was a

11   40-hour week there going over Board policy, you

12   know, all the different divisions of the Parole

13   Board, who handled what, what was done in each

14   division.

15   Q.   Given your background, a lot of that you

16   already knew?

17   A.   Correct.  But everyone still has to go

18   through that.  As a parole agent, everyone still

19   must go through and successfully complete the

20   basic training academy in order to be certified,

21   in order to ---.

22   Q.   Did you have firearm training, too?

23   A.   I did not have to take firearms training

24   because I was an institutional agent.  The field

25   parole agents would have to do the firearms

22

1  qualification.  Inside, we don't carry.  I'm not

2  required to have firearms.

3  Q.   When you applied for the position, it was

4  for an institutional parole agent?

5  A.   Correct.

6  Q.   And can you explain just for the record the

7  difference between a --- I don't know, on the

8  street regular parole agent and an institutional

9  parole agent?

10 A.   Well, the institutional parole agent meets

11 with offenders before they're actually released

12 on parole.  We prepare their documents, gather

13 information, what they've done inside, whether

14 they have any misconducts.

15 Q.   Let's start with something very basic.

16 A.   Okay.

17 Q.   What institute are we talking about?

18 A.   We're at SCI-Coal Township.

19 Q.   Okay.  So a parole agent, who is an

20 institutional parole agent, is in a state

21 prison?

22 A.   Correct.

23 Q.   And that's where they work?

24 A.   Yes.

25 Q.   And a parole agent who is not an

23

1   institutional parole agent is not in a state

2   prison?

3   A.   Correct.

4   Q.   Do you know how many state prisons there

5   are?

6   A.   I don't.

7   Q.   Have you worked in any other state

8   institution other than SCI-Coal Township?

9   A.   Not in a fulltime capacity.  I've worked

10  overtime at other state institutions.  But I've

11  always been stationed at SCI-Coal Township.

12  Q.   And that's been since 2003; does that

13  sound ---?

14  A.   Correct.  Yes.

15  Q.   Okay.  Back in 2003, do you recall how many

16  institutional parole agents were there?

17  A.   At Coal Township?

18  Q.   Yes.

19  A.   We had three institutional parole agents.

20  Q.   What about today?

21  A.   Today, we have four.

22  Q.   Who else, other than the institutional

23  parole agents, worked for the probation ---

24  Pennsylvania Department of Probation and Parole

25  at Coal Township?  Do you understand what I

24

1   mean?

2   A.   Yes.   That would still be the same.   There

3   was a supervisor.

4   Q.   Okay.

5   A.   There were two institutional parole

6   assistants.   And then back then, there were

7   three parole agents.   And now, there's four

8   parole agents.

9   Q.   So now there's seven; there used to be six?

10   A.   Correct.

11   Q.   Do you have your own building in the

12   institution?

13   A.   No, we share a building.   We each have our

14   own offices, but we share a building with

15   Department of Corrections staff.

16   Q.   As an institutional parole agent, what were

17   your duties --- what are your duties and

18   responsibilities?   You're still an institutional

19   parole agent; right?

20   A.   No, I am not.

21   Q.   Okay.

22   A.   I'm a parole supervisor.

23   Q.   When did you become a parole supervisor?

24   A.   January of 2010.

25   Q.   Would it be fair to say you are the parole

25

1  supervisor?

2  A.   I am, at Coal Township.

3  Q.   There's only one parole ---?

4  A.   There is only one.

5  Q.   What are the duties and --- have the duties

6  and responsibilities of the institutional parole

7  agents changed between 2003 and today?  Are they

8  still the same?

9  A.   Basically they're still the same.

10  Q.   And basically what are they?

11  A.   They are interviewing offenders that are

12  coming up to see the Parole Board for the hopes

13  of getting paroled, gathering material from the

14  Department of Corrections, as far as

15  programming, what they've done while inside,

16  preparing a report for the Board, helping

17  offenders obtain home plans, signing special

18  probation forms, going over conditions of

19  special probation with them, processing

20  hearings, violations hearings, that type of

21  thing.  They handle the hearing process.

22  Q.   You had indicated, I believe, that there are

23  two assistants also that work in the office?

24  A.   Yes.

25  Q.   They are ranked below parole agent, I guess?

26

1    A.   They are.

2    Q.   Do they have a special title; just assistant

3    parole ---?

4    A.   Institutional parole assistant.  They are

5    clerical people in the parole office, but their

6    title is institutional parole assistant.

7    Q.   Do they interact with inmates on a daily

8    basis?

9    A.   They do.

10   Q.   Do the institutional parole agents interact

11   with inmates on a daily basis?

12   A.   They do.

13   Q.   Does the parole supervisor interact with

14   inmates on a daily basis?

15   A.   I do.

16   Q.   Do you know presently what the approximate

17   inmate population is at Coal Township?

18   A.   Approximately, I would say 2,200 plus.

19   Q.   And out of that 2,200 plus, can you give me

20   an approximate percentage of how many of those

21   inmates are not under the auspices of the Board

22   of Probation and Parole?  Do you understand what

23   I mean?

24   A.   No.

25   Q.   Would it be correct to say that the parole

27

1   agents are assigned to inmates who are being ---

2   about to either receive parole or are being

3   returned from parole violations?

4   A.   That is correct.

5   Q.   So does every inmate have an assigned parole

6   agent, or should they?

7   A.   No.

8   Q.   Okay.  In what instances would they not?

9   A.   Guys that minimum dates are like way far

10  out, five, ten years, really have no --- lifers

11  have no interaction with parole, guys with far

12  out minimum dates have no interaction with

13  parole.

14  Q.   How soon does an inmate have to get towards

15  their minimum for the Probation and Parole to

16  start looking into the case and start helping

17  them in the file system, approximately?

18  A.   I believe it's about eight months before a

19  minimum that we have a parole education class

20  that we start putting guys coming up on their

21  minimum through a parole education class.

22  Q.   Okay.  And who keeps track of that?

23  A.   Our institutional parole assistants run a

24  query, per se, by minimum date.  And then those

25  offenders are put in a parole education class.

28

1   Q.  And once they receive that parole education

2   class, are they assigned an institutional parole

3   agent?

4   A.  At that point in time, yes.  It's documented

5   who their parole agent would be.  We go by last

6   number, last institution number.  That's how

7   inmates are assigned a parole agent caseload.

8   Q.  And do you coordinate with Department of

9   Corrections staff relative to scheduling

10  classes, or trying to get them ready for their

11  parole?

12  A.  No.  That's something we do on our own.

13  Q.  If you need information concerning an

14  inmate's minimum or maximum or sentence, how do

15  you --- what are the sources of information you

16  utilize?

17  A.  We would utilize Department of Corrections

18  sentence status summary sheet, which is

19  generated by the records' office.

20  Q.  Do you have access to the inmates'

21  Department of Corrections records if necessary?

22  A.  We do.

23  Q.  Do you know who Michelle Kodack is?

24  A.  I do.

25  Q.  Who is she?

29

1  A.   She is the records supervisor at SCI-Coal

2  Township.

3  Q.   And does the institutional parole officer

4  work with the records staff and the Department

5  of Corrections employees to coordinate

6  information sharing?

7  A.   We do.

8  Q.   Do you know approximately how many

9  inmates --- inmate cases, each institutional

10  parole agent receives?

11  A.   I would say our monthly dockets right now

12  are between 100 --- I mean there's 130 on a

13  docket this month, I believe.  We try to divide

14  them up.  So I'd say anywhere from 25 to 35

15  cases, you know, get written a month.  So if I

16  had to break it down monthly by parole agent,

17  they'd each have that many cases.  But more than

18  not, it is --- it wouldn't even be a ballpark

19  guess, how many inmates are assigned to each

20  agent at one time.

21  Q.   Because it depends on their institutional

22  parole number; right?

23  A.   Yes.

24  Q.   Besides getting inmates ready for release on

25  parole, do you offer other services to inmates

30

1   relative to getting them information on

2   questions they may have about their parole

3   eligibility and their sentencing and that sort

4   of thing?

5   A.   They write us request slips and we try to

6   answer their question.  If they ask us a

7   question that we know the answer to, we do

8   assist them.  We try to point them in the right

9   direction if it's something that we can answer,

10  you know, whether it be to get with your

11  counselor, or get with the records office, or

12  that kind of thing.  If it's something we can't

13  answer, we usually try to point them in the

14  right direction.

15  Q.   Do you ever go out on the units and speak

16  one on one with the inmates on a regular basis?

17  A.   No, we do not.

18  Q.   If an inmate sends you a written request, do

19  you ever schedule an appointment to bring them

20  in and interview them, and speak with them about

21  their request?

22  A.   If they write us a request slip that says I

23  need to see you, no, we do not.  We write back

24  and we tell them write your question on a

25  request slip and we'll --- you know, we'll

31

1    answer it.  If it's something disturbing, you

2    know, that the inmate is upset about something,

3    or if the counselor would call us and say the

4    inmate's upset, something happened to his ---

5    you know, that they need to speak to someone, we

6    may bring them over.

7        There are instances where we bring them

8    over, but that's on a case-by-case basis.  We

9    just don't --- you know, an inmate doesn't write

10   us and say I need to see you and we bring them

11   over.  That doesn't happen.  We want to know

12   what they're coming over about, what their

13   concern is, what their question is.

14   Q.   Would it be fair to say to be parole

15   eligible, inmates a lot of times are recommended

16   that they complete certain courses, anger

17   management courses and different things like

18   that?

19   A.   Yes.

20   Q.   Who typically, if anyone, decides what

21   courses they need or are required to be parole

22   eligible?

23   A.   Initially, the corrections counselors do

24   assessments and they recommend programming.

25   Q.   And the corrections counselors are

32

1   Department of Corrections employees?

2   A.   They are.

3   Q.   What role, if any, do the unit managers play

4   in recommending or helping or assisting

5   with ---?

6   A.   I'm not exactly sure how their chain of

7   command is, their system works as far as that.

8   Q.   Now, let's talk about inmates who have been

9   out on parole and have been returned because of

10  violations or new crimes.

11  A.   Okay.

12  Q.   If an inmate is out on parole and commits a

13  new crime or a technical violation, is sent back

14  to Coal Township, what does the institutional

15  parole officer do, and what information do they

16  have?  What do they do with that inmate?

17  A.   Initially, when an offender is brought back

18  as a parole violator, we notify the field agent

19  that this so and so has arrived at Coal

20  Township.  This agent will be assigned the case.

21  We pretty much wait for the field to give us the

22  information we need, because the violation is

23  still a part of the field's procedure, you know,

24  getting us the material, establishing the

25  violations, sending that in.  We will stand a

1  hearing for the field agent, but we're pretty

2  much just --- for lack of a better term, liaison

3  between the field agent and the hearing

4  examiner.  We're like the gap between the

5  paperwork flow.

6  Q.  Where is the field?

7  A.  The field would be the supervising agent out

8  on the street in one of our district or sub

9  offices.

10 Q.  Now, when an inmate is released on parole,

11 are they required to have a home plan?

12 A.  When an inmate is released on parole, we

13 have to have somewhere --- we have to have it

14 documented where they're going.  It doesn't

15 necessarily need to be a home plan.  It could be

16 a community corrections center.

17 Q.  Okay.  And depending on where that is

18 depends on what field agent is assigned to them?

19 A.  Correct.

20 Q.  And who does the field agent --- what is

21 their chain of command?  Who do they report to?

22 A.  The chain of command would be the field

23 agent, parole supervisor in the field, a

24 district director, or --- excuse me, it could be

25 a deputy district director, a district director,

34

1   and then a regional director, and then into our

2   director of probation and parole services, which

3   that's not the correct title of that person

4   anymore.  It's executive director of something,

5   but I'm not sure what it is.

6   Q.  So how do you get this information from the

7   field?

8   A.  Well, the agent does the paperwork and the

9   field supervisor, and sometimes the district

10  director have to concur with it, but most of the

11  time, it's the field agent and the supervisor

12  get us the paperwork that establishes the

13  violations.

14  Q.  And what, if anything, does the

15  institutional parole office do with that

16  information?

17  A.  Well, at that time, we would present the

18  offender with his notice of hearing, the notice

19  establishing the violations.  Back then, our

20  procedures were that we would schedule a

21  preliminary hearing for --- I'm sorry.  Can I

22  get clarification?  Are we talking any

23  violation?  What kind of violation are we

24  talking, because there's different procedures?

25  Q.  What are the differences between violations?

35

1    I don't know what I'm asking for.

2    A.   Well, there's two separate violations.

3    There's technical parole violations.

4    Q.   Okay.

5    A.   Okay.  That would be a violation hearing.

6    And then there's hearings for new convictions,

7    which would be ---.

8    Q.   Okay.  So the technical violation is when

9    you may have not complied with one of the

10   conditions of parole and a decision has to be

11   made whether you violated that technical

12   condition; correct?

13   A.   Correct.

14   Q.   And a new conviction, you don't --- if it's

15   actually a conviction, you don't need to have

16   any hearing on any sort of violation, because

17   that is a per se violation, period?

18   A.   No.  If there is a conviction --- if there's

19   a new conviction, the procedure is a revocation

20   hearing.

21   Q.   Okay.  Let's assume someone is out on parole

22   and they violate and get convicted of a new

23   crime and do their time on the new conviction.

24   How do they actually get back to Coal Township

25   physically?  I mean what's the process?

36

1   A.   Well, it depends on where they're at.

2   Q.   Well, who decides where to send them?  Do

3   they go back to the prison where they were

4   before or does it just depend?

5   A.   That didn't used to be the case.  I mean it

6   doesn't --- they don't necessarily come out of

7   the jail that they paroled from.

8   Q.   When, as a general proposition, is a parolee

9   eligible for parole?

10   A.   When is he eligible for parole?

11   Q.   Correct.  Not a violator, just a

12   general ---?

13   A.   Just a general?  At his minimum date.

14   Q.   And how do you know what the minimum date

15   is?

16   A.   The sentence status summary established by

17   the Department of Corrections.

18   Q.   And how do you know the maximum date?

19   A.   The same instrument, the sentence status

20   summary.

21   Q.   From Department of Corrections?

22   A.   His initial max date, his original max date.

23   Q.   Does his max date ever change?

24   A.   It can.

25   Q.   Under what circumstances?

37

1   A.   If an offender is a parole violator who

2   absconds his supervision and was declared

3   delinquent, the maximum date could change, or if

4   the offender is a convicted parole violator and

5   loses his street time, the original maximum date

6   could change.

7   Q.   Who would determine what the new max date

8   would be?

9   A.   For parole violators?

10  Q.   Yes.

11  A.   The Board of Probation and Parole, we have a

12  unit here in our central office that calculates

13  the new max date.

14  Q.   Does any of the Department of Corrections

15  employees at the institution have the ability to

16  change the max date calculated by the

17  Pennsylvania Board of Probation and Parole?

18  A.   The parole violation max date?

19  Q.   Correct.

20  A.   No, they do not.

21  Q.   Why not?

22  A.   That lies with the Parole Board.

23  Q.   Well, if they know it's wrong, why can't

24  they just change it?

25  A.   That's not the procedure.  The Parole Board

38

1   establishes the new maximum date.  They have no

2   authority to go change the date.  They being the

3   Department of Corrections' record staff have no

4   authority to go change the max date that's been

5   recalculated.

6   Q.   Well, I'm not just talking about records.

7   I'm talking about anyone ---.  If the

8   Superintendent says no, if I tell you you're not

9   supposed to be here, Probation and Parole is

10  wrong, we'll just cut you loose, they can ---?

11  A.   No, they cannot do that.

12  Q.   Why not?

13  A.   Because it's the Board's jurisdiction to

14  establish the max date, the back time owed.

15  Q.   If an inmate, who is a parole violator, gets

16  a notice of a new calculated max date by the

17  Board of Probation and Parole, what mechanism,

18  if any, do they have to challenge that

19  calculation?

20  A.   On their Board action itself, their decision

21  that comes back with the new parole violation

22  max date, there is a paragraph I believe at the

23  bottom that states that if you wish to appeal

24  this decision, I think they have 30 days from

25  the date it was mailed out, and it's date

39

1   stamped at the bottom.  They have 30 days to
2   appeal from that date to the address at the top
3   of the Board action.
4   Q.   And when you talk about the Board action, is
5   that what is --- what color of paper is that on?
6   A.   Well, it was on green.
7   Q.   Okay.
8   A.   And now it's on white.
9   Q.   It's on white now?  Are they still called
10  green sheets?
11  A.   We try to not use that term anymore.
12  Q.   Okay.  Why?
13  A.   Because it was just confusing.  I mean it is
14  actually a Board action is what it is.  And the
15  lingo was changed to green sheet over the years
16  by the inmates because it came out on green
17  paper.
18  Q.   So if an inmate has a problem with a
19  calculated max, at SCI-Coal Township, they
20  contact you?
21  A.   Right.
22  Q.   What steps, if any, would you take to remedy
23  the situation or address their concerns?
24  A.   I would tell them that they need to write to
25  the address at the top of their Board action,

40

1  their green sheet, and you know, explain why

2  they think it's wrong or what their concern is

3  with that.

4  Q.  Do you have a personal recollection of Kevin

5  Jessup or Damon Chappelle?  They're both the

6  same person.

7  A.  I do not.

8          ATTORNEY KEATING:

9          I have no further questions.

10 Counselor?

11         ATTORNEY TOBIN:

12         I do have some questions.

13 EXAMINATION

14 BY ATTORNEY TOBIN:

15 Q.  Good morning, Ms. Shurock.

16 A.  Good morning.

17 Q.  My first one is just whether you went by the

18 name Pijar at any point.

19 A.  I did.  Pijar (corrects pronunciation),

20 P-I-J-A-R.

21 Q.  And when did your name change from Pijar to

22 Shurock?

23 A.  November of 2010.

24 Q.  When you were the institutional parole agent

25 one, did you receive inmates' green sheets when

41

1    they would be issued --- or excuse me, Board

2    actions?

3    A.   I would not necessarily receive them.  Our

4    institutional parole assistants would receive

5    them.  And then it depended --- the duties

6    changed several times.  Sometimes we would give

7    the offenders a Board decision, but sometimes

8    the institutional parole agents would give them

9    out, too.  We could all do that.

10   Q.   And if the inmate had a question about what

11   was on his Board action, or as he would probably

12   call it, his green sheet, would someone from the

13   Institutional Parole Office address that

14   question?

15   A.   It depends on what the question was.  How do

16   I want to ask this?  Are you getting

17   clarification on this specific offender or in

18   general because ---?

19   Q.   Just generally.  I just wanted to know --- I

20   understand your response about the request slip

21   question.

22   A.   Okay.

23   Q.   My question more specifically is was there a

24   procedure or something in place where when an

25   inmate got his green sheet or·his Board action,

42

1   there would be a sit-down conversation with him
2   about that?
3   A.   Well, okay, that's where I was going.
4   Again, there's two different procedures.
5   Offenders that have seen the Parole Board, at a
6   minimum, or a review, get a face-to-face.
7   Either they get a paroling action or they get
8   refused parole.  We hand those out personally to
9   the inmates.
10       Offenders that have violated, whether it be
11  a technical violation or a new conviction, those
12  Board actions are mailed directly to the
13  offenders because of what I stated earlier; they
14  have 30 days to appeal that decision from the
15  date it's mailed out.  So no, they are not met
16  with face-to-face; that decision is mailed
17  directly too them because of the timeliness
18  issue.
19  Q.   Okay.  And in terms of somebody who comes
20  back as a parole violator, and who wants to seek
21  re-parole, would they also get a Board Action or
22  a green sheet on their re-parole account?
23  A.   It would depend on what the Board Action
24  states.  If the Board Action stated to serve
25  their maximum sentence, they would have no ---

43

1   they would not be seeing the Parole Board again

2   for a re-parole.  However, if they were

3   recommitted and a review date set, then yes,

4   they would see the Parole Board again.

5   Q.   And so would those inmates get a

6   face-to-face on their re-parole application?

7   A.   Correct.  When it was time for them to see

8   the Board as a re-parole case, they would be met

9   with.

10  Q.   You mentioned that if they were told they

11  had to serve their full max, then, if I'm

12  understanding correctly, they wouldn't get a

13  re-parole date.  How is it determined that they

14  could have a re-parole hearing?

15  A.   They wouldn't be.  I mean if the Board

16  issued a decision to serve their max, that would

17  be their final decision, unless they filed an

18  appeal, like I stated, at the bottom of their

19  Board action.

20  Q.   But if the Board decided that they could

21  have re-parole, then they would just go

22  through --- or what would happen?  Would they be

23  seen every ---?

24  A.   It would depend on what they gave them; if

25  they gave them a six-month review date, or a

44

1  year review date.  Each time they would see him,

2  you know, they would see them, make a decision

3  based on that, and they could set another review

4  date, or they could re-parole them.

5  Q.   So is it similar to the initial parole

6  process then?

7  A.   Correct.  It's the same thing.  There is no

8  guarantee that they're getting re-paroled.

9  Q.   Okay.  When you were at Coal Township in

10  2009, were you still in the position of

11  institutional parole agent one?

12  A.   In 2009?  No.  I was a two.  I was only an

13  institutional parole agent one for six months.

14  I got promoted to a two after the six-month

15  training period was over.  In 2009, I was a

16  parole agent two.

17  Q.   And were your duties and responsibilities

18  any different from what you've already

19  described?

20  A.   No.

21  Q.   Okay.  Who was your supervisor in 2009?

22  A.   At that time, it was Brian Stout, S-T-O-U-T.

23  Q.   Did you prepare, either as a parole agent

24  one or two --- you mentioned part of your duties

25  were getting the inmates --- I think you

45

1    mentioned getting the inmates ready for the

2    parole reviews?

3    A.   Yes.   That would be part of the pre-parole

4    process.

5    Q.   And did you prepare paperwork, too, as part

6    of that process?

7    A.   I would have prepared a summary document of

8    the materials that I gathered from the

9    Department of Corrections, a summary document to

10   give to the Parole Board.

11   Q.   And you mentioned revocation hearings after

12   somebody has been convicted of a new crime.   Are

13   those also known as Gagnon I and II hearings?

14   A.   No, they are not.

15   Q.   What is a Gagnon hearing?

16   A.   A Gagnon hearing is before a Judge.   That's

17   a county violation.

18   Q.   And so the Parole Board had its own separate

19   revocation hearing process?

20   A.   Correct.

21   Q.   Was there any paperwork that was generated

22   for a revocation hearing?

23   A.   I'm not sure of the question.

24   Q.   As an institutional parole agent, did you

25   prepare any paperwork for an inmate who was

46

1   having a revocation hearing?

2   A.   No, we would not have.

3   Q.   Do you know if anyone at the DOC or in the

4   Parole Board's institutional office prepared

5   paperwork?

6   A.   We would not have.

7   Q.   Did you attend any revocation hearings for

8   the inmate who was being possibly revoked?

9   A.   It is possible.  We do stand revocation

10  hearings.  I don't personally remember doing

11  his.  I well could have, but I don't know.  But

12  we do stand revocation hearings.

13  Q.   Did you say stand?

14  A.   Yes.  Yeah, that's a term we use for we're

15  the one present doing the hearing.  The field

16  agent does not have to come in --- the field

17  agent that was supervising the offender does not

18  have to come in to do the hearing.  The

19  institutional agent can stand up the hearing for

20  the field agent.

21  Q.   I see.  So does the institutional agent

22  provide testimony at the hearing?

23  A.   The only testimony that we would be provided

24  for a revocation hearing would be the conviction

25  paperwork.

47

1   Q.   And after the revocation hearing happens and

2   a decision is made, is there paperwork generated

3   to document what that decision was?

4   A.   That would be the Board action, the green

5   sheet.

6   Q.   And would the inmate get a copy of that?

7   A.   Yes.  It would be mailed directly to him

8   from our central office.

9   Q.   Would that also be in his institutional

10  parole file?

11  A.   Yes, we would also get a copy.

12  Q.   You testified earlier that you --- I believe

13  you said that you would respond to inmate

14  request slips if you were able to within your

15  duties, and if not, you would point the inmate

16  in the right direction.  Did you ever assist an

17  inmate in sorting out his parole violator

18  calculation?

19  A.   No, I would never have done that.

20  Q.   That's something that's exclusively done by

21  the central office?

22  A.   That is correct.  I have never been trained

23  in that.  There's a specific unit that is

24  trained in time calculations.

25  Q.   Do you know the name of that unit?

48

1   A.   It's changed over the years.   I believe now
2   it's the case analysis division.
3   Q.   Okay.   If you wouldn't mind looking at ---
4   there's four sheets of paper that I e-mailed to
5   Mr. Keating yesterday.   If you could take a look
6   at those?
7                    ATTORNEY KEATING:
8                    Do you want them marked as Exhibit
9   Number One?
10                   ATTORNEY TOBIN:
11                   That would be great; yes.
12                   (Shurock Exhibit One marked for
13                   identification.)
14                   ATTORNEY KEATING:
15                   Okay.   We're going to mark the
16   whole pack as Exhibit Number One; okay,
17   Jennifer?
18                   ATTORNEY TOBIN:
19                   That sounds good.
20                   ATTORNEY KEATING:
21                   Okay.
22                   ATTORNEY TOBIN:
23                   And if you could make sure they're
24   in the order of the dates at the top right-hand
25   corner.

49

<u>ATTORNEY KEATING:</u>

They are.

<u>ATTORNEY TOBIN:</u>

Okay.

<u>BY ATTORNEY TOBIN:</u>

Q.   So Ms. Shurock, if you could take a look at those four sheets of paper and then just let me --- you don't have to read them all right now, but just let me know after you've had a chance to thumb through them.

WITNESS REVIEWS DOCUMENTS

A.   Yes.

<u>BY ATTORNEY TOBIN:</u>

Q.   Do you recognize these documents?

A.   I mean that is my writing.  That is my signature, yes.  Do I remember doing it, no.

Q.   Well, those were my two next questions.

A.   Okay.

Q.   These were request slips that you responded to from Mr. Jessup?

A.   Yes, ma'am.

Q.   Okay.  Do you recall sending him any other documents other than these four?

A.   I do not.  I don't know what else I would have sent him.

50

1   Q.   As an institutional parole officer, did you

2   ever respond to grievances made by inmates?

3   A.   No, I would not do that.

4   Q.   Did the Parole Board itself have a grievance

5   system or was it just the appeal procedure you

6   described earlier?

7   A.   It would just be the appeal procedure.  The

8   grievance procedure is through the Department of

9   Corrections.  The Parole Board does not have a

10  grievance procedure.

11  Q.   So just to clarify, the inmate who has a

12  question about parole violator calculation or

13  other calculation done by the Parole Board could

14  only use that appeal procedure?

15  A.   That is correct.

16  Q.   On the second page of this exhibit, in the

17  upper right-hand corner, it's dated 4/22/09.

18  A.   Okay.

19  Q.   In your response, it says Mr. Jessup, I have

20  copies of the paperwork your attorney sent.  Our

21  office here does not handle this.  You need to

22  go through the procedures on your Board Action

23  in regard to appeals.

24  A.   Okay.

25  Q.   Did I read that correctly?

51

1    A.    Yes.

2    Q.    What paperwork are you referring to in that

3    response; the paperwork that your attorney sent

4    you ---?

5    A.    I would believe that it would be what ---

6    the offender must have sent something to our

7    office.  I mean, I have copies ---.

8                    ATTORNEY KEATING:

9                    If you recall.

10   A.    Yeah, I don't know.  At this point, I don't

11   know what I said three years ago.

12   BY ATTORNEY TOBIN:

13   Q.    Sure.  Would that paperwork be in Mr.

14   Jessup's parole file?

15   A.    I don't know.  At this point in time, I

16   don't know.  They do purge the files once

17   offenders leave.  I don't know.

18   Q.    Okay.  Do you recall whether you responded

19   to any letters from attorneys?

20   A.    I would not have.

21   Q.    And why not?

22   A.    Because we don't do that.  Usually, if an

23   attorney would call our office, we refer them to

24   our Office of Chief Counsel.  We kind of shy

25   away from talking to attorneys.

52

Q.   I don't blame you.   Okay.   And so then the
next question is kind of similar, just take a
look at the next document; 4/28/09 is the date.
Would your answer be the same there, that the
letters sent by the attorney, you wouldn't have
responded to those letters?

A.   That is correct.

Q.   So it's just reading through these four
request slips, it looks like your response to
Mr. Jessup's complaint was that he needed to
contact the Parole Board in Harrisburg?

A.   That is correct.

Q.   Do you recall taking any other steps or
doing anything else besides issuing these
responses?

A.   No, I would not have done anything else.

Q.   Not called the Parole Board in Harrisburg to
try to find out what was going on?

A.   Nope.   I would not have.

Q.   I know you said that you had nothing to do
with calculating parole violator max dates.   Is
that also the case for calculating back time?

A.   That is correct.

Q.   And you mentioned earlier that you got some
information about the inmate's sentence from the

53

1   sentence status sheet that was generated by the

2   Department of Corrections.  Is that also known

3   as the DC-16E?

4   A.   It is.

5   Q.   And did you have access to that on the DOC's

6   computer system?

7   A.   Yes, I would have access to it.

8   Q.   If you had questions about anything on that,

9   were you able to talk with records about your

10  questions?

11  A.   Yes.

12  Q.   Do you recall ever discussing an inmate's

13  sentence structure with records?

14  A.   I have discussed sentence structures with

15  records; yes.

16  Q.   And in this case, I'm guessing the answer is

17  no, but do you remember whether you discussed

18  sentence issues with records for Mr. Jessup?

19  A.   I don't recall.  I don't know.

20  Q.   Did you ever meet with Mr. Jessup face to

21  face about the issues in these request slips?

22  A.   I don't recall.

23  Q.   If you had done --- had a face-to-face

24  meeting, would you have put a note in his file?

25  A.   Probably.  I don't know.  It depends on what

54

1   it was.  If it was general questions, no.

2   Q.   You stated earlier that the Department of

3   Corrections doesn't have the authority to change

4   any calculations provided by the Parole Board.

5   And I think that you testified that it was ---

6   that was because that's not the procedure in

7   place.  Is there a Parole Board regulation that

8   provides that the DOC cannot change Parole Board

9   calculations?

10  A.   I don't know.

11  Q.   I guess what I'm trying to understand is

12  where you came by that understanding, that the

13  DOC cannot change the calculations.  What is the

14  basis for that belief?

15  A.   I mean, I've worked for the Parole Board 20

16  years.  And our unit here in central office is

17  the one who calculates back time.  And we give

18  that information to the Department of

19  Corrections.  It's always been that way.

20  Q.   Okay.  Did you have a liaison or a point

21  person at the Harrisburg central office to talk

22  with about an inmate's parole issues, if the

23  inmate was in your caseload?

24  A.   Could I have made a phone call to Harrisburg

25  to someone to ask a question?

55

1  Q.  Well, I guess that's a separate question,

2  but go ahead and answer that one.

3  A.  I mean we have access to anyone in our

4  central office.  Yes, I can make a phone call.

5  Q.  Did you have a specific person who was

6  associated with reviewing the parole cases in

7  your caseload, apart from your supervisor at

8  Coal Township?

9  A.  No.  There is no one assigned --- there is

10  no one particular person assigned to be a

11  contact person.

12  Q.  Okay.  So you could call somebody in the

13  case analysis division?

14  A.  If I needed to.

15  Q.  For a returning parole violator, you

16  mentioned that there --- that you have to get

17  from the field agent some paperwork that

18  establishes the violation.  What is that

19  paperwork?

20  A.  It would be our arrest report series.

21  Q.  I'm sorry, did you say series?

22  A.  Yeah, arrest report series.

23  Q.  And what does that consist of?

24  A.  It would consist of a notice of charges and

25  hearings.  It would consist of notice of

56

1    technical violations and/or notice of new

2    charges, and a supervision history report.

3    Q.   And are all of those documents required when

4    someone is returned as a parole violator?

5    A.   They're required if we go to a hearing; yes.

6    Q.   Under what circumstances would you not go to

7    a hearing?

8    A.   If the offender would waive his right to a

9    hearing.

10   Q.   Okay.  And is there a form that the offender

11   would have to sign to waive his right to a

12   hearing?

13   A.   There is.

14   Q.   It's just called a waiver?

15   A.   Yeah, I believe it's like waiver --- now

16   wait --- waiver of hearing and admission form.

17   There's a title to it and there's a number

18   assigned to it.

19   Q.   So there would either be these documents

20   that establish the violation or a waiver when

21   somebody is returned as a parole violator?

22   A.   Yes.  Yes.  Not initially when they're

23   brought in the door, but yes, before the

24   hearing.

25   Q.   And if the inmate had a question about any

57

1   aspect of the paperwork or the revocation

2   hearing, I know you said you would stand for the

3   hearings.  Would you also assist the inmate in

4   figuring out his problem at that point?

5   A.   If we could.  It's usually at the hearing is

6   when he gets all of that paper, he or his

7   attorney who is there with him.  He or his

8   attorney could raise a question on it during the

9   hearing process.

10  Q.   And where are those hearings held?

11  A.   They're held in SCI --- they're held in the

12  prisons.

13  Q.   In a conference room or something?

14  A.   Yes.

15  Q.   Do you know in Mr. Jessup's case what the

16  basis was for any of his parole violator max

17  dates?

18  A.   I do not.

19  Q.   When you were trained the five or six weeks

20  of basic training that you had at the DOC

21  Training Academy, ---

22  A.   Yes.

23  Q.   --- was that training only related to Parole

24  Board functions or did you also have some

25  training on DOC functions?

58

1   A.   It was strictly Parole Board functions.

2   Q.   So you just used their building?

3   A.   Correct.

4   Q.   Did you subsequently have any training on

5   DOC functions, in particular, records office

6   operations?

7   A.   No.

8                ATTORNEY KEATING:

9                They have enough training as it is

10  without getting cross trained with DOC, I think,

11  Jennifer, if you would ask her that.

12  A.   Yes.

13               ATTORNEY KEATING:

14               But they have training here today

15  and we're flooded with trainees.

16               ATTORNEY TOBIN:

17               Lots of trainees.

18               ATTORNEY KEATING:

19               Yes.

20  BY ATTORNEY TOBIN:

21  Q.   All right.  I just have a few more.  Have

22  you ever been a party, either a plaintiff or a

23  defendant in a civil lawsuit?

24  A.   No.

25  Q.   Have you ever been a witness in a civil

59

1   lawsuit?

2   A.   No, ma'am.

3   Q.   I'm sorry, my air conditioning didn't allow

4   me to hear your answer.

5   A.   I hear.  No, ma'am, I did not.  I was not.

6   Q.   Okay.  Before the deposition started today,

7   did you review any documents?

8   A.   I did not.

9   Q.   And other than your counsel, who is with you

10  at the deposition, Mr. Talaber, did you talk to

11  anyone about the deposition before today?

12  A.   I did not.

13                  ATTORNEY KEATING:

14                  Well, you spoke to ---.

15  A.   Well, Mr. Keating, just about the general

16  procedure but ---.

17                  ATTORNEY TALABER:

18                  Mr. Robinson?

19  A.   Oh ---.

20  BY ATTORNEY TOBIN:

21  Q.   Did you talk about the substance of the

22  deposition with Mr. Keating?

23  A.   I mean just basically what would happen, you

24  know, that he would ask me questions, you would

25  ask me questions.

60

1  Q.   Okay.  Just what would happen at the

2  deposition?

3  A.   Right, what would go on at the hearing.

4  Q.   Have you ever been charged with a crime?

5  A.   No.

6              ATTORNEY TOBIN:

7              I have no further questions.

8              ATTORNEY KEATING:

9              I have a couple of follow-up

10  questions.

11  REEXAMINATION

12  BY ATTORNEY KEATING:

13  Q.   Does the Department of Corrections have the

14  authority to add additional parole conditions on

15  a parolee who is out on parole?

16  A.   Excuse me.  Does a parole agent have ---?

17  Q.   Does the Department of Corrections have the

18  authority to add additional parole conditions

19  for a parolee who is out on the street on

20  parole?

21  A.   No, they do not.

22  Q.   Is there a Parole Board rule or regulation

23  that says the Department of Corrections does not

24  have such an authority?

25  A.   I don't know, honestly.

61

1   Q.  Does the Board of Probation and Parole, are

2   they allowed to grant a parolee a Presidential

3   pardon and erase the original conviction of a

4   parolee?

5   A.  The Parole Board?

6   Q.  Yes.

7   A.  No, sir.

8   Q.  Is there a rule or policy within the Parole

9   Board that says that you can't do that?

10   A.  Well, there's the Board of Pardons, but no.

11   Q.  Okay.  Is the current name of the section in

12   Probation and Parole which calculates the

13   maximum dates of parole violations, is that the

14   case analysis division, if you know?

15   A.  I believe that's the title of the division.

16   Q.  Okay.  Is that John Janis?

17   A.  It would be his unit.  It would be under

18   him, yes.  That unit is under John Janis.

19   Q.  Okay.  So whatever unit he is with, that's

20   the unit you were making reference to?

21   A.  Yes, sir.

22             ATTORNEY KEATING:

23             Okay.  I have no further questions.

24   Jennifer?

25             ATTORNEY TOBIN:

62

1              I do not.

2              ATTORNEY KEATING:

3              Okay.  Good.  We're done.

4              ATTORNEY TALABER:

5              Wait.  Okay.  One more

6    clarification, because I think Jennifer, you

7    stepped on her response.  Did you talk to

8    anybody else?

9    A.   Mr. Talaber that is sitting here with me,

10   the attorney, before him, Alan Robinson, the

11   other Parole Board attorney was handling the

12   case, and I spoke with him this morning, before

13   we came in here.  And he had to step away for a

14   meeting, and that is why Mr. Talaber is here.

15             ATTORNEY TOBIN:

16             Okay.  And he is also a Parole

17   Board attorney?

18   A.   Correct.  Assistant Counsel.

19             ATTORNEY KEATING:

20             Okay.  Good.  Are we done,

21   Jennifer?

22             ATTORNEY TOBIN:

23             I don't have any more questions.

24             ATTORNEY KEATING:

25             Good.  Thank you very much.

63

1              * * * * * * * *

2        HEARING CONCLUDED AT 10:09 A.M.

3              * * * * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64

1   COMMONWEALTH OF PENNSYLVANIA   )

2   COUNTY OF CAMBRIA                )

3

4                   CERTIFICATE

5        I, Richard J. Lipuma, a Notary Public

6   in and for the Commonwealth of Pennsylvania, do

7   hereby certify:

8        That the foregoing proceedings,

9   deposition of Jennifer Shurock, was reported by

10  me on 08/16/2012 and that I Richard J. Lipuma

11  read this transcript and that I attest that

12  this transcript is a true and accurate record

13  of the proceeding.

14       That the witness was first duly sworn

15  to testify to the truth, the whole truth, and

16  nothing but the truth and that the foregoing

17  deposition was taken at the time and place

18  stated herein.

19       I further certify that I am not a

20  relative, employee or attorney of any of the

21  parties, nor a relative or employee of counsel,

22  and that I am in no way interested directly or

23  in[                    ]     action.

24

25

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
RICHARD J. LIPUMA, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Apr. 8, 2016

**Court Reporter**

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

SCI-COAL

09 APR 22

**Commonwealth of Pennsylvania**
**Department of Corrections**

**INSTRUCTIONS**

Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

*26*

**1. To: (Name and Title of Officer)** Ms Dyas parole
PA. BOARD OF PROB. & PAROLE

**2. Date:** 4/21/09

**3. By: (Print Inmate Name and Number)** Kevin Jessup CX 8799

Inmate Signature

**4. Counselor's Name** Foulds

**5. Unit Manager's Name** Dunn

**6. Work Assignment** None

**7. Housing Assignment** B2 26 cell

**8. Subject: State your request completely but briefly. Give details.**

A mistake or error has been made, I need to talk to you immediately or someone in parole in regards to why I am still here. My original max date was 1-26-07 I've been in coal township from 9-26-01 until 7-18-07 & now I'm back again. my federal sentence was 24 months and it began 7-18-07 I was released from federal custody on 4-14-09 please explain where did the time spent in coal township get credited to because I have been incarcerated since 9-26-01 thru 7-18-07 and now I'm back here again when I should not be.

**Response: (This Section For Staff Response Only)**

You will be receiving a final Board Action in the mail — You could not begin serving your backtime until you were done w/ your Federal Sentence — The Board Action will show your review date + your PV max date — If you wish to appeal it, the instructions will be listed at the bottom

To DC-14 CAR only ☐     To DC-14 CAR and DC-15 IRS ☐

**Staff Member Name** _____ / Dyas
Print          Sign

**Date** 4-22-09

Revised July 2000



EXHIBIT
Shatock
1
PENGAD 800-631-6989

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections |
|---|---|
| | **INSTRUCTIONS**<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |

1. To: (Name and Title of Officer)   _Ms. Pijar Parole_
2. Date:  _4/22/09_
3. By: (Print Inmate Name and Number)   _Kevin Jessup CX 8799_

   _Kev_ (Inmate Signature)
4. Counselor's Name   _Follos_
5. Unit Manager's Name   _Dunn_
6. Work Assignment   _NONE_
7. Housing Assignment   _B2   cell 26_

*(stamp, right margin: PA. BOARD OF PROBATION & PAROLE   09 APR 23   PM 2: 18   SCI-COAL TOWNSHIP)*

8. Subject: State your request completely but briefly. Give details.

   Ms. Pijar,
   I recieved your response but I have NEW court documents you need to review also. I recieve a totally new federal sentence on Nov. 24, 2008 can you "please" schedule an appointment for me to see you so I present these documents to you and you need possibly answer a few questions.

   Thanks in advance

(Response: This Section for Staff Response Only)

   Mr. Jessup - I have copies of the paperwork your attorney sent
   Our office here does not handle this -
   You need to go through the procedures on your board action in regard to appeals!

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name _____ / _Pijar_ (Sign)   Date _4/28/09_
                              Print

Revised July 2000

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER** TOWNSHIP

SCI COAL TOWNSHIP

09 APR 29 AM 9:23

PA BOARD OF PROBATION & PAROLE

Commonwealth of Pennsylvania
Department of Corrections

**INSTRUCTIONS**
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer)  Ms. Pilar  Parole
2. Date: 4/28/09
3. By: (Print Inmate Name and Number) Kevin Jessup GK 8799
   _Inmate Signature_
4. Counselor's Name  Folds
5. Unit Manager's Name  Dunn
6. Work Assignment  NONE
7. Housing Assignment  B-2 26

8. Subject: State your request completely but briefly. Give details.

Ms. Pilar, I have to talk to you personally. I just recieved my green sheet. Can you call me over so you can explain somethings to me, also I have a new sentence that accured when I was in federal courts I will show you the court order and the new sentence I recieved.

9. Response: (This Section for Staff Response Only)

Please see previous responses — I cannot answer your questions — they can be addressed by our office in Harrisburg — I see your attorney sent letters on your case — You need to appeal your Board action if you have issues!

To DC-14 CAR only ☐          To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____ Print _____ Sign _____   Date 4/29/09

Revised July 2000

| Form DC-135A | Commonwealth of Pennsylvania |
|---|---|
| **INMATE'S REQUEST TO STAFF MEMBER** | Department of Corrections |

SCI-COAL TOWNSHIP

09 MAY 19  AM 10: 26

PA. BOARD of PROBATION
& PAROLE

**INSTRUCTIONS**
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer)  Ms. Pyar  Parole
2. Date: 5/18/09
3. By: (Print Inmate Name and Number)  Kevin Jessup  GX 8799
   Inmate Signature
4. Counselor's Name  Folds
5. Unit Manager's Name  Dunn
6. Work Assignment  GLP
7. Housing Assignment  B2  26

8. Subject: State your request completely but briefly. Give details.

Ms. Pyar This is my 3rd & final attempt to discuss this matter with you. For some apparent reason you refuse to see me. I recieved my correctstreet his mail and I dont understand it. From Jan. 28, 1995 to Apr. 9, 2001 I was incarcerated at SCI coal. From Sept 26, 2001 to July 18, 2007 I was incarcerated at Coal SCI. my new Federal sentence was 24 months, & I served that Sentence in a Federal jail. Theres a serious error in my sentence calculation that nobodys acknowledging. Can you please schedule me to see you or somebody from Parole on this matter.

**9. Response:**

Please see my attached 4/28/09 response to your prinar requests.

I have also attached a copy of the board Decision if you wish to appeal the decision, follow the instructions

To DC-14 CAR only ☐      To DC-14 CAR and DC-15 IRS ☐

Staff Member Name ___/ Pyar (Sign)  Date 5/26/09
Print

Revised July 2000