# EXHIBIT I

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE MIDDLE DISTRICT

 3                      OF PENNSYLVANIA

 4                 *    *    *    *    *    *

 5   DAMON CHAPPELLE,              *

 6      Plaintiff                 * Case No.

 7             vs.                 * Civil Action-Law

 8   DAVID VARANO, SUPERINTENDENT,* 11-0304

 9   SCI-COAL TOWNSHIP; MICHELLE   *

10   KODACK, RECORDS SUPERVISOR,   *

11   SCI-COAL TOWNSHIP; DEBORAH    *

12   HERBST, RECORDS SPECIALIST,   *

13   SCI-COAL TOWNSHIP; MR. DUNN,  * DEPOSITION OF

14   UNIT MANAGER, SCI-COAL        * DAMON CHAPPELLE

15   TOWNSHIP; MS. FOULDS,         * July 24, 2012

16   COUNSELOR, SCI-COAL TOWNSHIP;*

17   JOHN DOE; JANE DOE 1; and,    *

18   JANE DOE 2, in their          *

19   individual and official       *

20   capacities,                   *

21      Defendants                *

22                 *    *    *    *    *    *

23     Any reproduction of this transcript is prohibited

24                  without authorization

25                by the certifying agency.
```

2

1                              DEPOSITION

2                                  OF

3      DAMON CHAPPELLE, taken on behalf of the Defendants

4      herein, pursuant to the Rules of Civil Procedure,

5      taken before me, the undersigned, Nicole Montagano,

6      a Court Reporter and Notary Public in and for the

7      Commonwealth of Pennsylvania, at the offices of

8      Pennsylvania Institute Law Project, 718 Arch Street,

9      Suite 304, South Philadelphia, Pennsylvania, on

10     Tuesday, July 24, 2012, at 10:04 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1              A P P E A R A N C E S

 2

 3    JENNIFER J. TOBIN  ESQUIRE

 4    Pennsylvania Institute Law Project

 5    718 Arch Street

 6    Suite 304 South

 7    Philadelphia, PA  19106

 8        COUNSEL FOR PLAINTIFF

 9

10    TIMOTHY P. KEATING  ESQUIRE

11    Office of Attorney General

12    Strawberry Square

13    15th Floor

14    Harrisburg, PA  17120

15        COUNSEL FOR DEFENDANTS

16                 .

17    ALSO PRESENT:  SHAWN CABINIAN, LAW STUDENT

18                   PAUL REMY, LAW STUDENT

19

20

21

22

23

24

25
```

4

1                    I N D E X

2

3    WITNESS: DAMON CHAPPELLE

4    EXAMINATION

5        By Attorney Keating              7 - 78

6    EXAMINATION

7        By Attorney Tobin               78 - 85

8    RE-EXAMINATION

9        By Attorney Keating            85 - 91

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                              EXHIBIT PAGE

2

3                                                      PAGE

4    NUMBER   DESCRIPTION                         IDENTIFIED

5    P-1      Order to Recommit                        52

6    P-2      5/23/09 Handwritten Appeal to

7             Facility Manager                          56

8    P-3      Complaint                                 70

9    P-4      Letter dated 4/22/09                      74

10   P-5      Inmate's Request to Staff

11            Member                                    76

12   P-6      Official Inmate Grievance

13            Initial Review Response                   77

14

15

16

17

18

19

20

21

22

23

24

25

6

1                     OBJECTION PAGE

2   ATTORNEY                                    PAGE

3   Tobin                    29, 39, 53, 55, 87, 87

4   Keating                              80, 83

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                    P R O C E E D I N G S

2    ----------------------------------------------------

3    DAMON CHAPPELLE, HAVING FIRST BEEN DULY SWORN,

4    TESTIFIED AS FOLLOWS:

5    ----------------------------------------------------

6                    COURT REPORTER:

7                    Usual stips?

8                    ATTORNEY TOBIN:

9                    Yeah, reserving the objections except

10   for form of the question until trial.

11                   ATTORNEY KEATING:

12                   And do you want to waive the read and

13   sign or do you want to read and sign?

14                   ATTORNEY TOBIN:

15                   We do want to read and sign.

16   EXAMINATION

17   BY ATTORNEY KEATING:

18   Q.   Mr. Chappelle, my name is Timothy Keating with

19   the Office of Attorney General.  I'm here to take

20   your deposition today in the case of Damon Chappelle

21   versus David Varano and various other members of the

22   Department of Corrections.  I represent most, but not

23   all, Defendants in this case, as you're well aware

24   of.  Are you?

25   A.   Yes.

8

1   Q.   Okay.   And before we start the deposition, we're

2   going to talk about the ground rules of the

3   deposition that we will follow.   Have you ever been

4   deposed before?

5   A.   No.

6   Q.   You're not sure?   Or you're pretty sure you were

7   not?   Okay.   First of all, you have to answer all

8   questions verbally because we have a stenographer and

9   a head shake one way or the other or an uh-huh, an

10  uh-uh or hand gesticulation will not come up on the

11  record.   So therefore, all your answers to all my

12  questions have to be verbal; is that fair?

13  A.   Fair.

14  Q.   Second of all, if I ask you a question and you

15  don't hear the question because I don't speak clearly

16  enough, just tell me to repeat the question.   I'll

17  repeat the question, make sure you hear it.   Okay?

18  A.   All right.

19  Q.   If I ask you a question and you don't understand

20  the question because the way I phrase it is difficult

21  to understand, tell me that.   I'll rephrase the

22  question in a way that you will understand it

23  hopefully, and you'll be able to answer it.

24  A.   Okay.

25  Q.   Square on that?

9

1   A.   Squared away.

2   Q.   So if I ask you a question and you answer the

3   question, I'm going to assume you heard the question

4   and understood the question and you're answering it

5   to the best of your ability to answer me.   Okay?

6   A.   All right.

7   Q.   Please don't try to guess an answer, you can

8   estimate if you want to.   And if you are going to

9   estimate, tell me.   I think it's around such and such

10   date or such and such time, but please don't try to

11   guess.   Is that fair?

12   A.   That's fair.

13   Q.   If you want to take a break at any time, you're

14   to do so.   If you don't want to answer a question

15   because you don't think it's fair, you think it's too

16   personal, for whatever reason, we'll talk about that.

17   You can take a break with your attorney and talk

18   about it.   Sometimes I have people who have security

19   concerns, they don't want to give out certain

20   information, and if that's the point, then we'll talk

21   about it and we'll see where we're at with that.   But

22   typically, we don't have a problem with that.   But if

23   that does happen, let us know.   Okay?

24   A.   Okay.

25   Q.   Do you have any questions about how the

10

1   deposition is going to work?

2   A.   No.

3   Q.   Did you talk to your Counsel about the

4   deposition and what all that involves?

5   A.   Yes.

6   Q.   After I'm done asking you questions, your

7   Counsel can ask you questions and put it on the

8   record in case that she believes that you misspoke or

9   something like that.  If at any time during the

10  deposition, you think back on a question and answer

11  that you gave and you want to change it, that's fine.

12  Okay?

13  A.   Okay.

14  Q.   If you say, oh, my goodness two minutes ago I

15  say X, Y and Z, it's really not the way it is, it's

16  A, B and C, you can do that.  Okay?

17  A.   All right.

18  Q.   Is there any reason why we can't take your

19  deposition today?

20  A.   No.

21  Q.   Are you on any drugs or medication that would

22  impair your ability to hear questions and understand

23  questions?

24  A.   No.

25  Q.   Are you under any drugs, alcohol or anything

1  that would impair your ability to answer questions

2  truthfully, honestly and to the best of your

3  knowledge?

4  A.  No.

5  Q.  Typically, what I do is I start out by asking a

6  lot of background questions about where you were

7  born, what your educational history is, and that sort

8  of thing.  Then I ask a series of questions about the

9  lawsuit that you have and the complaint and that sort

10  of thing.  Sometimes I may jump back and forth a

11  little bit because I'm a little scatterbrained.  But

12  don't worry about that, it'll get done quick and

13  easy.  Are we on the same page?

14  A.  Same page.

15  Q.  Okay.  What's your name?

16  A.  Damon Chappelle.

17  Q.  And when were you born?

18  A.  April 3rd, 1975.

19  Q.  And was your father --- or your mother Deborah?

20  A.  Yes.

21  Q.  And your father's name?

22  A.  Harold Fluellen.

23  BRIEF INTERRUPTION

24  A.  F-L-U-E-L-L-E-N.

25  BY ATTORNEY KEATING:

12

1   Q.   And where were you born, Mr. Chappelle?

2   A.   Philadelphia.

3   Q.   You also go by the name of Kevin Jessup; is that

4   true?

5   A.   Yes.

6                    ATTORNEY TOBIN:

7                    Is that currently?

8                    ATTORNEY KEATING:

9                    We'll just say at any time.

10  BY ATTORNEY KEATING:

11  Q.   Do you also go by the name Kevin Jessup?

12  A.   I've used that name before.

13  Q.   Okay.  So you have gone under the name of Kevin

14  Jessup.  Is that a correct statement?

15  A.   Yes.

16  Q.   Have you ever gone under any other names besides

17  Kevin Jessup and Damon Chappelle for any reason?

18  A.   Yes.

19  Q.   What other names had you gone under?

20  A.   Damon Jessup, Damon Morrison.

21  Q.   Can you tell me approximately when you started

22  to use the name Kevin Jessup?

23  A.   January 25, 1995.

24  Q.   And what was the purpose of using that name?

25  Excuse me, strike that.

13

1       Did you ever have your name --- you were born

2  Damon Chappelle; correct?

3  A.   Correct.

4  Q.   Okay.  Did you ever have your name legally

5  changed to another name?

6  A.   No.

7  Q.   And in January of '95, why did you start using

8  the name Kevin Jessup?

9  A.   I was arrested.

10  Q.   Okay.  Is there a Kevin Jessup out there that

11  you used that name from or how did you come up with

12  that name?

13  A.   That's my uncle.

14  Q.   Okay.  And you also used Damon Jessup at some

15  point?

16  A.   Prior to using Kevin Jessup.

17  Q.   And you also used Damon Morrison?

18  A.   Correct.

19  Q.   Are you currently --- what name are you

20  currently using?

21  A.   Damon Chappelle.

22  Q.   And where do you currently live?

23  A.   Excuse me?

24  Q.   Where do you live?

25  A.   South Philadelphia.

14

1   Q.   Okay.   Do you have an address?

2   A.   Excuse me?

3           ATTORNEY TOBIN:

4           He just moved and he just gave it to

5   me.   I can go ---.

6           ATTORNEY KEATING:

7           Well, that's okay.

8   BY ATTORNEY KEATING:

9   Q.   You're living in south Philly?

10  A.   Right.

11  Q.   Who are you living with?

12  A.   My sister.

13  Q.   Okay.   You have a daughter; correct?

14  A.   Correct.

15  Q.   Any other children except for the one?

16  A.   No.

17  Q.   How old is she, ---

18  A.   Eighteen (18).

19  Q.   --- approximately?   Okay.   And you have --- is

20  it three brothers and sisters or four?

21  A.   Four.

22  OFF RECORD DISCUSSION

23  BY ATTORNEY KEATING:

24  Q.   And you're currently working at where?

25  A.   I recently just stopped working.

15

1    Q.   And where did stop working?  Where were you

2    working?

3    A.   L.A. Fitness.

4    Q.   And how long had you worked there,

5    approximately?

6    A.   About three years.

7    Q.   Any particular reason why you're no longer

8    working there?  You can fudge it a little bit.  I

9    don't know what --- if I were your next employer

10   saying, why did you leave L.A. Fitness, what would

11   you tell me?

12   A.   I had issues there.

13   Q.   Okay.  You had issues with your employer.  We'll

14   leave that, is that okay?

15   A.   (Indicates yes.)

16   Q.   Okay.  Are you still on parole?

17   A.   Yes.

18   Q.   And do you know George Reid?

19   A.   Yes.

20   Q.   Is he your parole officer?

21   A.   Yes.

22   Q.   Are you about ready to get off?

23   A.   Yes.

24   Q.   When?

25   A.   July 30.

16

1   Q.   Okay.  Your birthday is coming early this year.

2   You're going to be done with all your parole on July

3   30, that's it?

4   A.   Done.

5   Q.   How's George treat you?

6   A.   He's all right.

7   Q.   Okay.  He speaks very highly of you.  You don't

8   have any restitution or fines you owe in either

9   federal or ---

10   A.   No.

11   Q.   --- state convictions or anything of that stuff?

12   Okay.

13              ATTORNEY TOBIN:

14              You need to wait until he's done with

15   the question before you answer.

16   BY ATTORNEY KEATING:

17   Q.   You'll know what the question is but for the

18   purposes of the stenographer, we sort of have to

19   wait.  How many times have you been arrested, Mr.

20   Chappelle?

21   A.   I'm not sure.

22   Q.   Can you approximate?  Can we say less than 30

23   and more than two?

24   A.   Less than 30 and more than two.

25   Q.   Can we narrow it down a little bit than that?

17

1   A.   Four.

2   Q.   Now, you spent time in state prison; correct?

3   A.   Correct.

4   Q.   And what was that conviction for?

5   A.   Robbery.

6   Q.   And what was your sentence by the sentencing

7   court?

8   A.   Six to 12 years.

9   Q.   And was that your first conviction as an adult?

10  A.   No.

11  Q.   Any prior convictions prior to that, other than

12  misdemeanors or did you have any prior felonies?

13  A.   No, they were misdemeanors.

14  Q.   Okay.  And did you plead or go to the jury on

15  that or how did that conviction come about?

16  A.   Trial.

17  Q.   And were you incarcerated pending trial or were

18  you out on bail?

19  A.   Pending trial.

20  Q.   So all the time you spent pending trial was

21  credited toward that state sentence?

22  A.   Correct.

23  Q.   And then after trial, a presentence

24  investigation report was done and you then went to

25  sentencing; correct?

18

1    A.   Correct.

2    Q.   Do you know who a Joseph Tobin is ---

3    A.   No.

4    Q.   --- in the Presentence Investigation Division?

5    No?  Okay.  It's not a trick question.  That's okay.

6                    ATTORNEY TOBIN:

7                    I'd be curious to know who Joseph Tobin

8    is.

9                    ATTORNEY KEATING:

10                   He's in Presentence Investigation

11   Division that reviewed your case prior to being

12   sentenced.

13   BY ATTORNEY KEATING:

14   Q.   And where did start serving your state sentence

15   in the state institution?  Camp Hill?

16   A.   I think it was Graterford first, then Camp Hill.

17   Q.   Did they --- after you were convicted and/or

18   sentenced, were you transferred from county to

19   Graterford?

20   A.   Yes.

21   Q.   And you were held pending a transfer to Camp

22   Hill?

23   A.   Correct.

24   Q.   And then you went to Camp Hill and then you went

25   through processing and they decided which SCI they

19

1   want to send you to?

2   A.   Correct.

3   Q.   And can you tell me approximately when that was

4   that you were in Camp Hill?

5   A.   1996.

6   Q.   And where did they send you from Camp Hill?

7   What state correctional institution?

8   A.   SCI Coal Township.

9   Q.   Did you do all of your state time in Coal

10  Township after you left Camp Hill?

11  A.   What do you mean all?

12  Q.   The time that you did on your state sentence

13  after you left Camp Hill, did you do all of your

14  state time in Coal Township?

15  A.   Yes.

16  Q.   There may have been times they transferred you

17  to Graterford if you had a court hearing or something

18  like that, but you weren't permanently reassigned to

19  Huntingford (sic) or Smithfield or anything like

20  that; is that a correct statement?

21  A.   Correct.

22  Q.   And there was a point in time when you were

23  paroled from Coal Township; correct?

24  A.   Correct.

25  Q.   Let out on parole by the State --- the

1  Pennsylvania Board of Probation and Parole; correct?

2  A.   Correct.

3  Q.   And I assume for the sake of discussion, at the

4  time that you were paroled by Pennsylvania Board of

5  Probation and Parole from Coal Township, the

6  individuals at Coal Township approved or recommended

7  you for parole before the Parole Board?

8  A.   Correct.

9  Q.   Had you ever been denied --- excuse me, strike

10 that.

11     When was the first time you were paroled by the

12 Pennsylvania Board of Probation and Parole from SCI

13 Coal Township and let back out on the street, if you

14 know?  I have a copy of the Complaint, if you want

15 to review that if that would help you refresh your

16 recollection.

17 A.   Can you ask that question again?

18 Q.   You went from Camp Hill to SCI Coal Township,

19 and then you were released out on state parole at

20 some point.

21 A.   Right.

22 Q.   When?

23 A.   2001.

24 Q.   Had you ever been denied parole from the

25 Pennsylvania Board of Probation and Parole prior to

21

1   2001 when you were at SCI Coal Township?

2   A.   No.

3   Q.   Is that the first time you were up for parole?

4   A.   Yes.

5   Q.   In 2001, prior to being released on parole by

6   the Pennsylvania Board of Probation and Parole, do

7   you know what your maximum date was?  If you can give

8   me a year, that would be fine.

9   A.   2007.

10  Q.   And do you recall --- I'll read this from your

11  Complaint.  In April 2001, Mr. Chappelle was granted

12  parole.  So was it in April of 2001 when you were

13  granted parole?

14  A.   Yes.

15  Q.   All right.  Okay.

16              ATTORNEY TOBIN:

17              Can I add a clarifying question?

18              ATTORNEY KEATING:

19              Okay.

20              ATTORNEY TOBIN:

21              Were you granted parole then or were

22  you released on parole?

23  A.   I was released in 2000 --- April.

24  BY ATTORNEY KEATING:

25  Q.   Okay.  You were released on parole?

22

1   A.   Uh-huh (yes).

2   Q.   Okay.   What's the difference between being

3   released on parole and being granted parole?

4   A.   I was granted parole months before that.

5   Q.   Okay.   You can actually be on parole and still

6   be in prison; correct?

7   A.   Correct.

8   Q.   And it's not until you're released on parole is

9   when you go outside the physical confines of the

10  prison; correct?

11  A.   Correct.

12  Q.   There are a lot of people, inmates who are

13  waiting to be released to a CCC, who are on parole

14  but who are in an SCI; right?

15  A.   Right.

16  Q.   So you were released on parole in 2001, April

17  2001?

18  A.   Correct.

19  Q.   When were you granted parole?

20  A.   I believe in 2000 ---.

21  Q.   I can see here it says his, meaning your, his

22  minimum date, the date on which he was first eligible

23  for parole, was January 26, 2001?

24  A.   Right.

25  Q.   Okay.   Were you granted parole in January of

23

1  2001 and released in April?  Does that sound about

2  right?

3  A.   Right.

4  Q.   The records will show that, but overall that's

5  about correct?

6  A.   Correct.

7  Q.   Did you need a home plan to be released?

8  A.   Yes.

9  Q.   Did you have one in January?  Why did it take

10  from January to April to get released, do you know?

11  A.   I was awaiting for a bed date in a CCC.

12  Q.   And is that in Region One, Philadelphia?

13  A.   Yes.

14  Q.   Okay.  It's hard to get a bed date in

15  Philadelphia, isn't it?

16  A.   Yes.

17  Q.   Okay.  And were you released to the CCC in April

18  of 2001?

19  A.   Yes.

20  Q.   And how long did you stay in the CCC,

21  approximately?

22  A.   About three months.

23  Q.   From April --- or from excuse me, from January

24  to April of 2001, you were in SCI Coal Township

25  waiting to be released on parole; correct?

24

1   A.   Correct.

2   Q.   Did you have a parole agent at the time?

3   A.   I'm not sure.

4   Q.   Okay.  I'm not sure is a perfectly good answer

5   as long as you're not sure.  I don't know is a

6   perfectly good answer as long as you don't know.  Did

7   they have parole officers assigned to SCI Coal

8   Township?

9   A.   I'm not sure.

10   Q.   When you were at Coal Township, if you had

11   questions about parole, you don't know whether there

12   were individuals from parole assigned to SCI Coal

13   Township; is that a correct statement?

14   A.   No, I know they had --- I'm not sure if they

15   were parole officers, but there was somebody from the

16   parole that you would see.

17   Q.   So the parole --- the Pennsylvania Board of

18   Probation and Parole sort of had a mini office at the

19   prison?

20   A.   Correct.

21   Q.   You don't know whether you had an actual parole

22   agent assigned to you in January of 2001 when you

23   were granted parole?

24   A.   Oh, I had one.

25   Q.   Okay.  And who was that?

25

1    A.   I'm not sure.

2    Q.   Was that person located at Coal Township or were

3    they located in Philadelphia, where was that person

4    located?

5    A.   Well, I had --- it was someone you see in parole

6    when you're in an institution.  When I was released,

7    I had a parole officer while I was at the CCC.

8    Q.   Okay.

9    A.   Someone completely different.

10   Q.   Correct.  Were you assigned to somebody from the

11   Parole Board, I don't want to say a parole officer,

12   but were you assigned to someone from the Parole

13   Board at SCI Coal Township when you were granted

14   parole in January of 2001?

15   A.   Yes.

16   Q.   Was that person located at SCI Coal Township?

17   A.   Yes.

18   Q.   And then when you went to the CCC, you had a

19   parole agent or officer assigned to you or you --- at

20   the CCC?

21   A.   Correct.

22   Q.   And then once you left the CCC and went through

23   your home plan, you had another parole officer

24   assigned to you; correct?

25   A.   No.

26

1    Q.   Did you keep the same one you had in the CCC or

2    did you just --- were you unsupervised?

3    A.   Unsupervised.

4    Q.   You didn't have to report to anybody?

5              ATTORNEY TOBIN:

6              Do you understand the question?

7    A.   It's --- I don't really --- no, I don't really

8    understand.

9    BY ATTORNEY KEATING:

10   Q.   Okay.  When you were in the CCC, when you were

11   released in April of 2001, you had a parole officer;

12   correct?

13   A.   Correct.

14   Q.   You were allowed out of the CCC and could sign

15   back in; is that a correct statement?

16   A.   Yes, that's correct.

17   Q.   And you were accountable to one particular

18   parole person there inside the CCC; right?

19   A.   Correct.

20   Q.   And they would monitor your behavior and made

21   sure you went through all the rules and that sort of

22   thing?

23   A.   Correct.

24   Q.   And you had a home plan before you went to the

25   CCC because that was required by the parole board;

1  right?

2  A.   Correct.

3  Q.   And after you're done with the CCC, they

4  released you from the CCC and you went and lived

5  wherever it was that your home plan was; correct?

6                    ATTORNEY TOBIN:

7              So if I can ask a clarifying question

8  here?  Did you go to your home plan?

9  A.   No.

10 BY ATTORNEY KEATING:

11 Q.   Okay.  Where did go?

12 A.   Well, I didn't go to my assigned home plan.

13 Q.   Okay.  Did you get in trouble for that?

14 A.   Yes.

15 Q.   Did they yank your parole because of that?  Or

16 did they --- because of that, let's put it that way?

17 A.   It was considered abscond.

18 Q.   Okay.  Did you ever report back in or was the

19 next time that you had contact was when the feds

20 picked you up?  Do you understand the question?

21 A.   Yeah, I had contact with my parole officer about

22 a week after I was arrested.

23 Q.   And prior to that, you did not have contact with

24 anyone from parole from the time that you had left

25 the CCC; correct?

28

```
 1   A.   Correct.

 2   Q.   Okay.  And that's when you had federal charges

 3   brought against you for new offenses; correct?

 4   A.   Correct.

 5   Q.   And that was possession of a firearm, that was

 6   one of the charges?

 7   A.   Correct.

 8   Q.   And possession of illegal drugs was another?

 9   A.   Correct.

10   Q.   Are those the only two?

11   A.   Yes.

12   Q.   There might have been some other add-ons such as

13   conspiracy to possess, other things, but those are

14   the major two that you were looking at; correct?

15   A.   Right.

16   Q.   And were you aware that once the Pennsylvania

17   Board of Probation and Parole were contacted after

18   your arrest by the feds, did they put a detainer on

19   you?

20   A.   Can you repeat the question?

21   Q.   Were you aware that after you contacted the

22   Board of Probation and Parole after your arrest by

23   the feds, the Board of Probation and Parole put a

24   detainer on you?

25   A.   Yes.
```

29

1   Q.   Meaning, that once the feds were done with you,

2   dear feds, don't release this guy out to the street.

3   You have to send him back to us for us to decide what

4   to do with his tail end of what he owes us; is

5   that ---?

6                  ATTORNEY TOBIN:

7                  Objection, speculation.  He doesn't

8   know what the detainer meant.

9                  ATTORNEY KEATING:

10                  Well, how do we know?

11  BY ATTORNEY KEATING:

12  Q.   What does a detainer mean?

13  A.   That you're detained, you can't really go

14  anywhere.

15  Q.   The feds could not release you, you had to

16  answer back to the state before they could release

17  you?

18  A.   Well, it wasn't the --- the feds didn't

19  initially detain me.  It was initially the state.

20  The charges were initially with the Philadelphia

21  Police.

22  Q.   Okay.  And when were you arrested by the

23  Philadelphia Police?

24  A.   September 25th, 2001.

25  Q.   And when you were arrested at that time, which

30

1  name did you tell them --- what was your name that

2  you gave them?

3  A.   I don't remember giving them a name.

4  Q.   So ultimately, they ---.

5  A.   They fingerprinted me.

6  Q.   They fingerprinted you.  Is that how they came

7  up with your name or they came up with --- decided

8  who you were?

9  A.   Well, I was wanted for absconding from the

10 halfway house and I was on parole under Kevin Jessup.

11 So when I was re-arrested, they put me back under

12 Kevin Jessup.

13 Q.   And when you were arrested by the Philadelphia

14 Police, do you know who it was who notified the

15 Pennsylvania Board of Probation and Parole that they

16 had picked you up?

17 A.   No.

18 Q.   Do you know when they were notified?

19 A.   No.

20 Q.   And do you know approximately when it was that

21 it was decided the charges against you would be

22 federal charges and not state charges?

23 A.   You said when did I realize that?

24 Q.   When did you realize it or do you know when they

25 decided that, approximately?

31

1    A.    In February 2002.

2    Q.    And in February of 2002, where were you being

3    housed?

4    A.    SCI Coal Township.

5    Q.    When did you return to SCI Coal Township?

6    A.    I believe in 2001, around November or December.

7    Q.    So you were arrested end of September 2001, you

8    went back to SCI Coal Township in November or

9    December of 2001?

10   A.    That's about right.

11   Q.    Okay.  And in February of 2002 is that when you

12   first were notified that the charges were federal or

13   is that your belief as to when they, meaning the

14   authorities, decided the charges would be federal and

15   not state?

16   A.    Can you repeat the question again?

17   Q.    Yeah.  You indicated that in February of 2002,

18   you either learned the new charges were federal

19   charges or that the authorities decided they would be

20   federal and not state charges.  Is that --- February

21   of 2002, is that when you learned that they were

22   going to be federal charges or is that when you

23   believe they decided it was going to be federal

24   charges?

25   A.    Both.

32

1    Q.   Both.  Did someone come and tell you?

2    A.   I got a letter from my attorney.

3    Q.   Saying dear, Mr. Chappelle, I've received

4    information from the authorities indicating that

5    these offenses that you've been arrested for in

6    Philadelphia will be filed as federal charges and not

7    state charges, something to that effect?

8    A.   I received an indictment.

9    Q.   Okay.  From the feds?

10   A.   Yes.

11   Q.   You didn't like that, did you?

12   A.   No.

13   Q.   No.  Did you plead to the federal charges or did

14   you go to trial?

15   A.   I went to trial.

16   Q.   On the Philadelphia arrest for the drug

17   possession and the gun possession?

18   A.   Yes.

19   Q.   Did they --- strike that.

20       Were the only charges you were facing from that

21   arrest federal charges and not state?  And here's

22   what I'm trying to find out about that.  Did they

23   file state charges and federal charges, and drop the

24   state charges or did they just file the federal

25   charges?

33

1    A.   To my belief, they filed state charges and they

2    were dropped, and the feds adopted the case.

3    Q.   The feds picked it up and made it federal

4    charges.   So it's not as if once you were done with

5    the federal charges, you had to go back and go

6    through the same charges through the state?

7    A.   Correct.

8    Q.   Okay.   And when did you go to trial on the

9    federal charges, approximately?

10   A.   It was around June, I believe, 2002.

11   Q.   And were you found guilty of all charges?

12   A.   Yes.

13   Q.   And what was the initial sentence that you

14   received by the court?

15   A.   162 months.

16   Q.   And when were you sentenced?

17   A.   September 2002.

18   Q.   And you were still in SCI Coal Township at the

19   time; is that a correct statement?   If you recall in

20   September of 2002 when you were --- let's step back.

21   When were you convicted of the federal charges?

22   A.   2002.

23   Q.   And when were you sentenced?

24   A.   September of 2002.

25   Q.   And how much time lapsed between when you were

34

1   found guilty and when you were sentenced,

2   approximately?

3   A.   About two months.

4   Q.   Did the feds also do a presentence investigation

5   report to the court?

6   A.   Correct.

7   Q.   And September of 2002 when you were sentenced,

8   you were still at SCI Coal Township; correct?

9   A.   No.

10  Q.   Okay.  When did you leave SCI Coal Township?

11  A.   I left Coal Township, I think, February 2002.

12  Yes, 2002.

13  Q.   Okay.  And where were you put?  Where were you

14  housed?

15  A.   FDC.

16  Q.   FDC where?

17  A.   Philadelphia.

18  Q.   And that was pending your federal trial?

19  A.   Correct.

20  Q.   And you spent the whole time from February of

21  2002 at FDC Philadelphia --- to September of 2002 at

22  FDC Philadelphia; correct, ---

23  A.   Correct.

24  Q.   --- until the time of your sentencing?  And

25  after you were sentenced, where did they send you to

35

1    do your federal time?

2    A.   They sent me back to SCI Coal Township.

3    Q.   So that was in September of 2002?

4    A.   Correct.

5    Q.   And how long were you in SCI Coal Township

6    before you were transferred out of SCI Coal Township

7    to start --- well, let's a stop right there.  How

8    long were you in SCI Coal Township until they

9    transferred you out of SCI Coal Township?

10   A.   I was in SCI Coal Township from 2002 to 2007.

11   Q.   And where did you go in 2007?

12   A.   I signed out of Coal Township.

13   Q.   Did you ever spend any more time in the federal

14   penitentiary for your federal sentence?

15   A.   No.  After I signed out of Coal Township?

16   Q.   After you were sentenced for your federal

17   charges?

18   A.   No, they sent me back to SCI Coal Township.

19   Q.   Were you ever in an FDC up in New York?

20   A.   No.

21                    ATTORNEY TOBIN:

22                    You didn't serve federal time after

23   signing out of Coal Township?

24   A.   After signing out of Coal Township, yeah, I did.

25   BY ATTORNEY KEATING:

36

1   Q.   Okay.   When did you sign out of Coal Township?

2   A.   July 2007.

3   Q.   So from September 2002 to July of 2007, you were

4   in Coal Township?

5   A.   Correct.

6   Q.   And that was after your conviction on the

7   federal charges?

8   A.   Correct.

9   Q.   And then July of 2007 when you left Coal

10  Township, where did go?

11  A.   I went to Lycoming County ---

12  Q.   Lycoming County Prison?

13  A.   --- for holdover.

14  Q.   And the holdover was just to hold you in that

15  facility until they can send you to the federal

16  facility?

17  A.   Correct.

18  Q.   And you may have gone to a couple different

19  holding facilities until you ultimately got to an FDC

20  to do time for your federal sentence; is that a

21  correct statement?

22  A.   Correct.

23  Q.   And where was that FDC at?

24  A.   USP Canaan.

25  Q.   And that's the one in New York?

37

1   A.   Waymart.

2   Q.   Waymart.  How long were you in Waymart,

3   approximately?

4   A.   About a year.

5   Q.   And then where did go?

6   A.   FCI Ray Brook, New York.

7   Q.   And then where did go?

8   A.   I signed out of Ray Brook and they took me back

9   into state custody.

10  Q.   Who did?

11  A.   Sheriffs.

12  Q.   Whose sheriffs, state or federal?

13  A.   State.

14  Q.   Pennsylvania State?

15  A.   Yes.

16  Q.   When you were in Ray Brook, were you doing

17  federal time there?

18  A.   Yes.

19  Q.   If you know, are there inmates doing federal

20  time in state prisons based on some agreement between

21  the federal government and the state government?

22  A.   I don't know.

23  Q.   Okay.  When you were in FCI Ray Brook, were you

24  serving state time or federal time?

25  A.   Federal.

38

1    Q.   And I'm sorry, when did you leave Ray Brook?

2    A.   I believe April 14th or 15th, 2009.

3    Q.   And where did go?

4    A.   They transported me to county jail somewhere in

5    New York and then back to SCI Coal Township.

6    Q.   And when did you go back to SCI Coal Township?

7    A.   April 16th, 2009.

8    Q.   Why were you being transported back to SCI Coal

9    Township?

10   A.   They said I had a detainer.

11   Q.   From who?

12   A.   At that time, I don't know.

13   Q.   Do you know now?

14   A.   Yes.

15   Q.   Who?

16   A.   It was a state detainer.

17   Q.   Probation and Parole?

18   A.   I never --- I'm not sure.

19   Q.   And was it your belief back in April 16th of

20   2009, that you had already done all of your state

21   time?

22   A.   Yes.

23   Q.   And who transported you back from Ray Brook,

24   were they state or federal marshals, do you know?

25   A.   I don't know.

39

1   Q.   And they told you when you were leaving Ray

2   Brook that they were taking you back to SCI Coal

3   Township; correct?

4   A.   Correct.

5   Q.   And did they tell you that you were going back

6   to Coal Township in order to do more state time?

7   A.   No.

8   Q.   When did you find out that you were going to do

9   state time at Coal Township in April of 2009?

10  A.   About two to three weeks after I was back at

11  Coal Township.

12  Q.   So two to three weeks after you get back from

13  Coal Township in April of 2009, you learn that you're

14  doing state time; correct?

15              ATTORNEY TOBIN:

16              Object to form.

17              ATTORNEY KEATING:

18              What's wrong with the form?

19              ATTORNEY TOBIN:

20              You said he learned, which implies that

21  he --- that that was a fact, he was told, he was

22  informed.

23              ATTORNEY KEATING:

24              Okay.

25  BY ATTORNEY KEATING:

40

1   Q.   For two or three weeks after you got back from

2   Coal Township, after April 16 of 2009, someone told

3   you or you found out that someone's belief was that

4   you were doing state time?

5   A.   Correct.

6   Q.   Up to that point what type of time did you think

7   you were doing?

8   A.   False time.

9   Q.   Well, did you think you were doing federal

10  sentence time?

11  A.   No.

12  Q.   Did you think you were doing state time?

13  A.   No.

14  Q.   When you first got back to Coal Township, did

15  they assign you a counselor?

16  A.   When I first got back?

17  Q.   In April of 2009, did they assign you a

18  counselor?

19  A.   Yes.

20  Q.   How soon after you got back after April 16th of

21  2009, did they assign you a counselor?

22  A.   About two weeks.

23  Q.   Was it your counselor who told you you were

24  doing state time?

25  A.   She didn't know at the time.

41

1   Q.   All right.   Who told you it was state time?

2   A.   They told me to wait until I received a green

3   sheet.

4   Q.   Who told you that?

5   A.   My counselor.

6   Q.   Who is your counselor?

7   A.   Renee Foulds.

8   Q.   And who is your unit manager?

9   A.   Dunn.

10  Q.   And you knew who your unit manager was pretty

11  much as soon as you got back because that's who was

12  on your block; right?

13  A.   I mean, that was my first time meeting him.

14  Q.   All right.   Well, when you get back to Coal

15  Township, do they put you in administrative custody

16  in the RHU first before they let you out on general

17  pop?

18  A.   Yes.

19  Q.   And how long do they keep you in the RHU?

20  A.   Well, they had me in POC.   I was there for about

21  a week.

22  Q.   Okay.   And that's observational custody;

23  correct?

24  A.   Correct.

25  Q.   Do you know why they put you in POC?

42

1  A.  No.

2  Q.  And who was the head of POC at the time?

3  A.  I do not know.

4  Q.  When you were in POC, did you file any

5  grievances about being held improperly at Coal

6  Township?

7  A.  Yes.

8  Q.  And who did you file them with?

9  A.  I can't really recall.

10 Q.  And then at some point, two or three weeks

11 later, are you on general population?  You're let out

12 of POC?

13 A.  Correct.

14 Q.  And your unit manager was Dunn?

15 A.  Right.

16 Q.  And you told Dunn that you were being held

17 improperly?  Or did you?

18 A.  Yes.

19 Q.  Okay.  Was that immediately when you get out and

20 got into general pop?

21 A.  Correct.

22 Q.  And what was his reaction or response to your

23 telling him that?

24 A.  Nothing.

25 Q.  He didn't say anything at all?

43

1   A.   No.

2   Q.   He turned and walked away?

3   A.   Just send me a request slip.

4   Q.   Sent you a request slip, okay.  And did you send

5   him a request slip?

6   A.   Yes.

7   Q.   And that was a written request to Dunn saying

8   I'm being held past my max, help me out or some words

9   to that effect?

10   A.   Correct.

11   Q.   And what was --- did you ever get a written

12   response to that?

13   A.   No.

14   Q.   Did he ever say anything to you about your

15   written request?

16   A.   No.

17   Q.   Did you ever ask for a parole hearing?

18   A.   No.

19   Q.   And Renee Foulds, how did you contact Renee

20   Foulds about your situation?  Did you send her a

21   written request also?

22   A.   Yes, she was on the block.

23   Q.   Okay.  And what was her position?  She was a

24   what?

25   A.   Counselor.

44

1   Q.   Counselor.   When you say she was on the block,

2   did she actually walk the block or did she have an

3   office inside the unit or how did that work?

4   A.   Office inside the unit.

5   Q.   And prior to returning in April of 2009, had you

6   known Renee Foulds ---

7   A.   Yes.

8   Q.   --- from SCI Coal Township?   Had she been your

9   counselor before?

10  A.   No.

11  Q.   But you knew her from being in Coal Township

12  before?

13  A.   Yes.

14  Q.   Okay.   And did you approach Renee and speak to

15  her about it or did you send her a request slip?   How

16  did you contact her concerning information?

17  A.   Both.

18  Q.   And did she ever give you a response or did she

19  just ignore you?

20  A.   She responded.

21  Q.   And what was her response?

22  A.   She doesn't know why.

23  Q.   That was her response, I don't know why you're

24  being held here?

25  A.   Correct.

45

1   Q.   Did she ever point you in the direction of where

2   you should focus on trying to get the answer or

3   anything?

4   A.   Yes.

5   Q.   What was that, what did she say?

6   A.   Contact the parole.

7   Q.   Did she ever give you a written response to your

8   recollection?

9   A.   No.

10  Q.   And excuse me, did Renee ever say anything to

11  you about contacting parole about your situation?

12  A.   Yes.

13  Q.   Was that in writing or verbally or both?

14  A.   I believe it was verbal.

15  Q.   And did you contact someone at the parole office

16  at SCI Coal Township?

17  A.   I'd written request slips.

18  Q.   To the parole office?

19  A.   Yes.

20  Q.   Okay.  And did you ever get a written answer?

21  A.   Yes.

22  Q.   Is that with an individual by the name of Pijar?

23  A.   Pijar (corrects pronunciation).

24  Q.   P-I-J-A-R?

25  A.   Correct.

46

1   Q.   Did you write specifically to her or did you

2   just write to the parole office?

3   A.   Specifically to her.

4   Q.   Was she assigned to you?

5   A.   Yes.

6   Q.   When was she assigned to you?

7   A.   I believe ---.

8   Q.   After you got out of POC?

9   A.   No.

10   Q.   Before you went into POC?

11   A.   She was assigned to me back in 2003.

12   Q.   So when you came back in 2009, you still had the

13   same parole officer in the institution, Pijar?

14   A.   I don't know if she was assigned to me or not,

15   but that's what --- that's who my previous parole

16   agent was before I was --- finished my sentence.

17   Q.   Okay.  And that's why you wrote to her because

18   you knew her from before?

19   A.   Correct.

20   Q.   Okay.  When you knew her back in 2003, how did

21   you get along with her?

22   A.   Okay.

23   Q.   Did you have any problems getting ahold of her

24   or speaking to her about any parole problems?

25   A.   Not at all.

47

1   Q.   And when you wrote to her after you came back,

2   did she respond to your inquiry?

3   A.   Yes.

4   Q.   And did she do it in writing or did she talk to

5   you about it?

6   A.   In writing.

7   Q.   And what did she indicate?

8   A.   She told me to address my issues with the Parole

9   Board.

10  Q.   When you wrote to her, did you outline in that

11  writing why it was you believed you were past your

12  maximum date?

13  A.   Yes.

14  Q.   And you put down the dates of when you were

15  incarcerated for your federal sentence, your state

16  sentence, and your computation and your calculation;

17  is that a correct statement?

18  A.   Correct.

19  Q.   Did she address your calculation or computation

20  in her response to your written inquiry?

21  A.   No.

22                ATTORNEY TOBIN:

23                And we're still talking about Pijar

24  here?

25                ATTORNEY KEATING:

48

1          That is correct.

2    BY ATTORNEY KEATING:

3    Q.   She told you to take it up with the Parole

4    Board?

5    A.   Correct.

6    Q.   Did you ask to speak with her?

7    A.   Yes.

8    Q.   Set up an appointment, is what you asked for?

9    A.   Yes.

10   Q.   Was there any more information you could have

11   given her face-to-face during an appointment that you

12   did not give her in your written request?

13   A.   Yes.

14   Q.   What?

15   A.   I had documents that I wanted to present to her.

16   Q.   And did those documents reflect your calculation

17   and your position that you'd written down and

18   explained to her in your inquiry?

19   A.   No, they were documents that were handed to me

20   from the institution that stated my admission date,

21   my parole date and my expiration date.

22   Q.   So those documents substantiated those dates

23   concerning your admission, your parole date; correct?

24   A.   Correct.

25   Q.   In your written inquiry to her, did you tell her

49

1    what your admission date, your parole date and that

2    sort of --- did you write that down?

3    A.   Correct.

4    Q.   So these documents were just trying to prove

5    what you had already told her?

6    A.   Exactly.

7    Q.   Okay.  And did you send her a copy of the

8    documents?

9    A.   I'm not sure.

10   Q.   So you wrote to her, she said take that up with

11   the Board of Probation and Parole, you asked for a

12   face-to-face meeting with her.  And did she grant

13   that?

14   A.   Ms. Foulds told me she didn't want to see me.

15   Q.   Ms. Foulds told you that Ms. Pijar didn't want

16   to see you?

17   A.   Correct.

18   Q.   So did you write to Ms. Foulds and ask to see

19   Pijar or did you write to Ms. Pijar and ask to see

20   Ms. Foulds?

21   A.   I was in the office with Ms. Foulds.  She was on

22   the phone with Ms. Pijar.  I was relaying to Ms.

23   Foulds, can I talk to her and show her these

24   documents.  Ms. Foulds relayed the conversation to

25   Ms. Pijar, and told me she doesn't want to see me.

50

1   Q.   Okay.   So you were in the office with Ms. Foulds

2   and Ms. Foulds called Ms. Pijar about your situation

3   to see what Probation and Parole had to say about it,

4   and spoke with Ms. Pijar.   To your knowledge, you

5   don't know --- did you hear her on the other side of

6   the phone, Pijar's voice?

7   A.   No.

8   Q.   But you just assumed it was her talking, Pijar?

9   A.   Correct.

10  Q.   Did you hear her call a certain number and say

11  is Ms. Pijar there or something?   Were you actually

12  there when Foulds picked up the phone and called

13  Pijar?

14  A.   Yes.

15  Q.   Did you ask Foulds, hey, call Ms. Pijar and ask

16  her about it?

17  A.   No, I asked Ms. Foulds can she send me over

18  there, I have some documents I want to show her.   And

19  Ms. Foulds, I guess, she said she doesn't want to see

20  me.

21  Q.   All right.   So I just want to get this

22  chronology right and make sure.   So you wrote to Ms.

23  Pijar.   She said take it up with the Pennsylvania

24  Board of Probation and Parole.   You were speaking

25  with Ms. Foulds, who is your counselor; right?

51

1   A.   Correct.

2   Q.   And you said, look, I have these documents I

3   want to show to Ms. Pijar, and Foulds made a phone

4   call and told you Ms. Pijar doesn't want to see you?

5   A.   Correct.

6   Q.   Okay.  And you don't recall if you sent copies

7   of the documents to Ms. Pijar for review?

8   A.   I'm not sure.  I believe I did, I'm not sure.

9   Q.   Okay.  And you never had any problems with Ms.

10  Pijar like attitude wise or anything?

11  A.   No.

12  Q.   Had you met her in any way, in any form,

13  face-to-face after you returned to SCI Coal Township

14  in April of 2009?  We're talking about Ms. Pijar.

15  A.   No.

16  Q.   Did you need to put in a request slip to meet

17  with Ms. Foulds to discuss her --- with her anything

18  that you wanted to discuss?

19  A.   No.

20  Q.   She was open, you could just knock on her door

21  or whatever?

22  A.   Correct.

23  Q.   As long as she wasn't busy, as long as you

24  didn't have an attitude and polite, then that was not

25  a problem?

52

1    A.   Correct.

2    Q.   Okay.  And did you write to the Board of

3    Probation and Parole and ask them what was going on

4    with your maximum date?

5    A.   Yes.

6    Q.   And did they respond?

7    A.   No.

8    Q.   At all?

9    A.   No.

10   Q.   Did you ask them for a sentence recalculation,

11   if you recall?

12   A.   I believe so.

13   Q.   And did they ever respond to that?

14   A.   No.

15   Q.   I'm going to show you what is going to be marked

16   as Exhibit Number One?

17                  (Exhibit P-1 marked for

18                  identification.)

19   BY ATTORNEY KEATING:

20   Q.   This is a Pennsylvania Board of Probation and

21   Parole form 39 as you can see in the top left hand

22   corner.  As an inmate, would you ever get copies of

23   these documents?

24   A.   No.

25   Q.   Okay.  And it says last modified date and time,

53

1    bottom right-hand corner, April 17th, 2009.  It says

2    your new maximum date is September 6, 2014.  Do you

3    see where it says that?

4    A.   Yes.

5    Q.   You don't agree with that, do you?

6    A.   No.

7    Q.   Were you ever told at any point in time that

8    your new maximum date was calculated to be September

9    6, 2014 by the Pennsylvania Board of Probation and

10   Parole?

11   A.   Yes.

12   Q.   You weren't very happy with that, were you?

13   A.   No.

14   Q.   Okay.  But there is nothing you could do about

15   this piece of paper because you never saw it as an

16   inmate, did you?

17   A.   No.

18   Q.   When did you learn that the Pennsylvania Board

19   of Probatin and Parole recalculated your maximum date

20   to be September 6, 2014?

21            ATTORNEY TOBIN:

22            Object to form.

23            ATTORNEY KEATING:

24            What was wrong with it?

25            ATTORNEY TOBIN:

54

1              It assumes that the Pennsylvania Board

2    of Probation and Parole did calculate the new max

3    date.

4                   ATTORNEY KEATING:

5              Okay.

6    BY ATTORNEY KEATING:

7    Q.  When did you learn that Pennsylvania Probation

8    and Parole, if you did learn the Pennsylvania

9    Probation and Parole, decided that your new maximum

10   date was September 6, 2014?

11   A.  About a month and a half after I was returned.

12   Q.  This says --- dated April 17, 2009.  It's in the

13   very bottom right-hand corner.  Would it be around

14   that time?

15   A.  No.

16   Q.  Does that sound right?  Would it be May, June?

17   A.  I think around May.

18   Q.  Okay.  So probably around May of 2009, you heard

19   that your new max date was 2014; correct?

20   A.  It may have been before May or around May, I'm

21   not sure.  But it wasn't --- I don't think --- it

22   definitely wasn't on the 17th.

23   Q.  And who told you that or how did you learn that?

24   A.  I received the green sheet in the mail.

25   Q.  And the green sheet you received in the mail was

55

1   from the Pennsylvania Board of Probation and Parole;

2   correct?

3   A.   Correct.

4   Q.   And they send inmates a green sheet whenever

5   they recompute their sentence; correct?

6   A.   Correct.

7   Q.   And that tells them what their recomputed

8   sentence is; correct?

9   A.   Correct.

10                ATTORNEY TOBIN:

11                Objection as to form.

12                ATTORNEY KEATING:

13                Okay.   What ---?

14                ATTORNEY TOBIN:

15                You're asking him to testify about what

16   the Probation and Parole Board's practices are.

17                ATTORNEY KEATING:

18                No, I'm asking what the green sheet he

19   received from the Probation and Parole say on them,

20   and he knows what they say.

21                ATTORNEY TOBIN:

22                You asked him whether the Pennsylvania

23   Probation and Parole Board send inmates these

24   documents in order to do this.   My objection is that

25   he knows what happened to him.   He doesn't know

56

1 | necessarily ---.

2 |        ATTORNEY KEATING:

3 |        Okay.  Let's ask him what happened to

4 | him.

5 | BY ATTORNEY KEATING:

6 | Q.  You got green sheets on a periodic basis from

7 | the Pennsylvania Board of Probation and Parole;

8 | correct?

9 | A.  Correct.

10 | Q.  And did those green sheets tell you when your

11 | new parole eligibility date was?

12 | A.  Just the specific one.

13 | Q.  I'm just saying generally when you got green

14 | sheet from the Pennsylvania Probation and Parole, did

15 | it have information on there as to when your new

16 | minimum parole was going to be?

17 | A.  Some of them do.

18 | Q.  Okay.  And do some of them say when your new

19 | maximum is going to be?

20 | A.  Some have.

21 | Q.  And did you receive a green sheet from the

22 | Pennsylvania Board of Probation and Parole in 2009,

23 | April or May, or around that time period, that said

24 | that your new maximum parole --- maximum date was

25 | 2014?

57

1   A.   Correct.

2   Q.   Okay.  And you definitely didn't agree with

3   that, did you?

4   A.   Correct.

5   Q.   Did you get any other green sheet after April or

6   May of 2009 from the Pennsylvania Board of Probation

7   and Parole which indicated that your maximum date was

8   something other than 2014?

9   A.   No.

10  Q.   That's the last green sheet that you got from

11  them?

12  A.   Yes.

13                    ATTORNEY KEATING:

14              I would like this be marked as Exhibit

15  Number Two, please.

16              (Exhibit P-2 marked for

17              identification.)

18  BY ATTORNEY KEATING:

19  Q.   Do you recognize this document, Mr. Chappelle?

20  A.   Yes.

21  Q.   That is handwritten by you?

22  A.   Yes.

23  Q.   It's dated May 23rd, 2009?

24  A.   Correct.

25  Q.   And correct me if I'm wrong, it says the

58

1    Department of Corrections has the authority to credit

2    an inmate the correct time spent in custody to the

3    new sentence and/or the original sentence.  Is that a

4    correct statement?  It's about halfway down.

5    A.   Correct.

6    Q.   You knew that the Pennsylvania Board of

7    Probation and Parole on May 23rd, 2009 had calculated

8    your maximum sentence to a sentence which you did not

9    agree with; is that a correct statement?

10   A.   Correct.

11   Q.   And you wanted the Department of Corrections to

12   change that; correct?

13   A.   Correct.

14   Q.   You wanted Mr. Varano to change that?

15   A.   If possible.

16   Q.   You wanted Michelle Kodack to change that?

17   A.   If possible.

18   Q.   Possible or if ---

19   A.   Yes.

20   Q.   --- possible?

21   A.   Yes.

22   Q.   What about Deb Herbst?

23   A.   Yes.

24   Q.   You wanted her to change that?

25   A.   Yes.

59

1   Q.  All right.  What about Mr. Dunn, you wanted him

2   to change it?

3   A.  Yes.

4   Q.  Did you want Ms. Foulds to change that?

5   A.  Yes.

6   Q.  Other than just changing what your maximum date

7   was, as you believed it was, what else do you think

8   they could or should have done to help you out?

9   We'll start with Mr. Varano.  Other than changing

10  your maximum date to what you believe it was, is

11  there anything else you believe Mr. Varano should

12  have done to help you out?

13  A.  Yes.

14  Q.  What?

15  A.  Talk with me.

16  Q.  Talk with you?

17  A.  Yes.

18  Q.  Okay.  And what would you have told him that you

19  hadn't already told him in writing that you had sent

20  to him?

21  A.  I had documents.  I had papers, legal papers

22  from the courts and I had status summary sheets from

23  the institution.

24  Q.  And those documents reflected that what you

25  believe your calculation was correct, didn't they?

60

1   A.   They reflected what the jail stated they were

2   correct.

3   Q.   And those documents reflected that what you had

4   written to him was true and correct; correct?

5   A.   Correct.

6   Q.   And when you sent him a copy of those documents

7   and said, Mr. Varano, look at these documents, what

8   was his response?

9           ATTORNEY TOBIN:

10          We're on Varano, not Dunn?

11          ATTORNEY KEATING:

12          Yes, we're on Varano.

13          ATTORNEY TOBIN:

14          Okay.

15  A.   I'm not sure if I sent him copies of them.   I

16  asked him --- I mean, I sent him a request slip and I

17  put the dates and everything on the request slip and

18  asked to speak to ---

19  BY ATTORNEY KEATING:

20  Q.   To him?

21  A.   --- each and every person.

22  Q.   Well, let's start with Mr. Varano.   Let's just

23  talk about Mr. Varano.   Okay.   Did you ask in your

24  request slip to talk to Mr. Varano?

25  A.   Yes.

61

1   Q.  And the reason why you did that was because if

2   you were able to talk to him, you'd be able to show

3   him these documents that you had that supported what

4   you put down in writing?

5   A.  Correct.

6   Q.  And he didn't talk to you; correct?  He did not

7   have a one-to-one discussion with you concerning your

8   concerns; is that correct?

9   A.  We had one face-to-face at Mainline.  I spoke

10  with him and he said send me the request slip.

11  Q.  And you sent him the request slip?

12  A.  Yes.

13  Q.  And in that request slip is when you --- he

14  didn't just ignore you in Mainline, he spoke to you?

15  A.  Yes.

16  Q.  All right.  And at Mainline, you were trying to

17  tell him what your problem was?

18  A.  Correct.

19  Q.  And he said send me a request slip, I'll look at

20  it?

21  A.  Correct.

22  Q.  And in that request slip you put down what your

23  problem was and how you came up with your

24  calculations of your max date; correct?

25  A.  Correct.

62

1   Q.   You wrote it out; right?

2   A.   Yes.

3   Q.   And I believe you stated that if you had seen

4   him face-to-face, you would be able to give him

5   documents which would have supported what you had

6   written?

7   A.   Correct.

8   Q.   Okay.  But he did not grant you an interview, so

9   you did not give him those documents that supported

10  your written calculations in your grievance?

11           ATTORNEY TOBIN:

12           I think he testified that he wasn't

13  sure if he attached.

14           ATTORNEY KEATING:

15           Are you ---?

16           ATTORNEY TOBIN:

17           I'm sorry.

18           ATTORNEY KEATING:

19           Well, I don't believe he said he

20  attached it, but I believe he said ---

21  BY ATTORNEY KEATING:

22  Q.   --- and correct me if I'm wrong, that after you

23  had written the request for grievance that you asked

24  for an interview and the purpose of that was to show

25  him these documents which would support what you had

63

1    written; correct?

2    A.    Correct.

3    Q.    Did you ever send him a copy of the documents?

4    A.    I'm not sure.

5    Q.    Okay.  But even if you had, they still would

6    have substantiated or proven what you'd written down

7    as your calculations; right?

8    A.    Yes.

9    Q.    Okay.  And his response was talk to Michelle

10   Kodack or something in that respect.  What was his

11   response?

12   A.    He responded twice.  One was the issues can be

13   addressed through the record's office or the parole

14   office in the institution.

15   Q.    Okay.

16   A.    His second response was, obviously, we wouldn't

17   be keeping you past your max date.

18   Q.    Yes.  We don't want to keep you past your max

19   date, or obviously, we wouldn't be keeping you past

20   your max date; right?  Correct?

21   A.    That's what he said.

22   Q.    He actually handwrote that in part of his

23   response; right?

24   A.    Correct.

25   Q.    So he didn't just ignore your written grievances

64

1  or requests, he actually wrote back to you and said

2  either Michelle Kodack in records can take care of

3  this or parole can; correct?

4  A.   I asked him a question, I said I'm over my max

5  date, and I should be released.  And he said

6  obviously you're not over your max date, because we

7  wouldn't be keeping you past that.

8  Q.   And you wrote a request similar to that to

9  Michelle Kodack and told her about your problem, too?

10 A.   Correct.

11 Q.   And she told you it was something that parole

12 would have to take care of; right?

13 A.   Correct.

14 Q.   And you told her parole is not taking care of

15 it; right?

16 A.   Correct.

17 Q.   And other than just changing your max date to

18 the max date, which you thought it was supposed to

19 be, what else should have Michelle Kodack done to

20 help you?

21 A.   Well, she's in charge of records, like records.

22 Q.   Is there anything else other than actually

23 sitting down and changing the max date as to what

24 Probation and Parole had down for you to the max date

25 which you believe it was?  Anything else other than

1  that, what should Michelle Kodack have done if

2  anything?

3  A.   Can you repeat that again?

4  Q.   I believe you testified before that one of the

5  things you thought that Michelle Kodak should have

6  done as a records keeper was she should have changed

7  the max date by Probation and Parole that was in

8  error and changed to the max date that you calculated

9  it to be; correct?

10  A.   No.

11  Q.   Okay.   What did you want Michelle Kodack to do

12  to help you out?

13  A.   Investigate, look at it, like if she's in charge

14  of records, she has my record in front of her and my

15  record has my admittance date, my parole date and my

16  max date.   And I've been in the institution for 12

17  years.   My sentence was six to 12.

18  Q.   And she also had a max date given to her by

19  Probation and Parole; correct?

20  A.   I believe --- I don't know, I believe so.

21  Q.   Okay.   Did she inform you that she --- her

22  records show that Probation and Parole showed that

23  you didn't hit your max date yet?

24  A.   Yes.

25  Q.   And you believe that if that were true, that

66

1    Probation and Parole was wrong?

2    A.   Because I did the time.

3    Q.   So you believe that if that were true, that

4    Probation and Parole had a max date say 2014, that

5    was wrong, that Probation and Parole was wrong?

6    A.   That's over 12 years.

7    Q.   You believe that if Probation and Parole had a

8    max date of 2014, that that was a wrong date, didn't

9    you?  Did you believe that?

10   A.   Yes.

11   Q.   Okay.  So Probation and Parole had told Michelle

12   Kodack, in her records, that your max date was 2014

13   and you believe that that date --- and you believe

14   that Probation and Parole were wrong; right?

15   A.   They were.

16   Q.   Okay.  And assuming for the sake of discussion

17   that Michelle Kodack looked at your calculations and

18   agreed with your calculations and thought Probation

19   and Parole was wrong also, what did you want her to

20   do about it?

21   A.   Well, I was not getting a response from

22   Probation and Parole.  And if she was in contact with

23   Probation and Parole and she seen my documents and

24   had a discussion with me, she would have seen, all

25   right, the records reflect that my sentence was six

67

1   to 12.  I was incarcerated in '95.  I served over six

2   years my first time before I got paroled because I

3   had to wait for a CCC bed date.  I returned --- that

4   was in 2001.  I came right back to Coal Township in

5   2001, and I've been there since 2007.  And the

6   records have that I was in the institution and

7   nowhere else.  And that's what I wanted to show her.

8   Like I had commissary sheets, request slips,

9   certificates, programs I accomplished with the date

10  on them.  So I was in the institution.  I'm like I

11  didn't go anywhere.  I served the whole sentence.

12  I'm complete.  Like what they have is a

13  miscalculation.  Can you look at it and notify them,

14  and let them see that it's problem?

15  Q.  Okay.  So you wanted her to notify Probation and

16  Parole and tell Probation and Parole that they were

17  wrong and you were right; correct?

18  A.  Correct.

19  Q.  Okay.  But you had already notified Probation

20  and Parole and told them that they were wrong;

21  correct?

22  A.  Correct.

23  Q.  So the same information you gave to Probation

24  and Parole, you wanted Michelle Kodack to give to

25  Probation and Parole; correct?

68

1   A.   Not the same but similar.  I didn't get any

2   responses from Probation and Parole.  It was like

3   they were just mute.  Like I was sending them

4   numerous paperwork and like I would get no response,

5   anything.

6   Q.   So you asked them to recalculate your maximum

7   date because you thought they were wrong, Probation

8   and Parole; right?

9   A.   Correct.

10  Q.   And you got no response?

11  A.   Correct.

12  Q.   So you wanted Michelle Kodack to call up and see

13  if she could get them to change their mind and

14  correct this?

15  A.   Obviously, if I'm being held in the institution.

16  Q.   So that's what you wanted her to do?

17  A.   Correct.

18  Q.   Would the same be said about Deborah Herbst,

19  what did you want her to do to help out your

20  situation?

21  A.   Pretty much the same thing.

22  Q.   Mr. Dunn, same thing?

23  A.   Yes, I didn't even have a conversation --- like

24  I couldn't even --- I had one conversation with Dunn.

25  The first conversation was I'm here, my sentence is

69

1   done, I shouldn't be here.  And he said send a

2   request slip.  I sent him request slips.  And then

3   the last conversation I had with Dunn was July 30th

4   or 31st, I believe, when he came to my cell and told

5   me I had to get out of jail immediately.

6   Q.   Did you argue with him?

7   A.   No.

8   Q.   I don't want to make light of this, sir.  I

9   really don't.  And I apologize.  And I don't know if

10  you recall or not, now I want to focus --- you were

11  released on July 31st; is that a correct statement?

12  A.   Correct.

13  Q.   You celebrate that more than your birthday,

14  don't you?  Almost?

15  A.   Just about.

16  Q.   Okay.  I want to focus in on the time period

17  between July 14th and July 31st when you got out.

18  Okay?  Do you recall if during that time, you wrote

19  requests slips to any of the named Defendants in this

20  case, Varano, Kodack, Herbst or Dunn concerning your

21  situation?

22  A.   You say prior to?

23  Q.   Between July 14th and July 31st, when you were

24  released, if you know, if you recall?

25  A.   I don't remember.

70

1   Q.   Okay.   Foulds may not have ---.

2              ATTORNEY KEATING:

3              Who was the one who retired?

4              ATTORNEY TOBIN:

5              Herbst.

6              ATTORNEY KEATING:

7              Herbst may not have been there.   She

8   may have retired.

9   BY ATTORNEY KEATING:

10  Q.   What about Foulds, do you recall one way or the

11  other within the week or two before you were released

12  that you sent any request slips or grievances

13  concerning your situation to any of them?

14  A.   I'm not sure.

15  Q.   Now, prior to coming here today, did you review

16  any documents?

17  A.   No.

18  Q.   Do you recall the Complaint in this case, that

19  you filed a Complaint through your esteemed Counsel?

20              (Exhibit P-3 marked for

21              identification.)

22  BY ATTORNEY KEATING:

23  Q.   This was a Complaint that was filed by your

24  Counsel on your behalf.   There's a lot of legal stuff

25  in here that I don't expect you to know, but there is

71

1    a bunch of factual things in here that I want to talk

2    to you a little bit about.  Do you recall reading

3    this at any time?

4    A.   Yes.

5    Q.   Okay.  I want to point your attention to

6    paragraph 20.  And it says while in federal custody

7    Mr. Chappelle sought help from the Defendants in

8    getting his detainer lifted so that he could

9    participate in required programs and be eligible for

10   supervised release on or about February 11, 2009.

11   Did I read that correctly?

12   A.   Correct.

13   Q.   What Defendants did you seek help from in

14   getting the detainer lifted so you could participate

15   in required programs and be eligible for supervised

16   release on or about February 11, 2009?  Which

17   Defendants, all of them, or do you know?

18   A.   I'm not sure.

19   Q.   Okay.  Do you know if you sought help from David

20   Varano in getting the detainer lifted so you could

21   participate in required programs and be eligible for

22   supervised release on or about February 11, 2009?

23   A.   I don't think so.

24   Q.   What about Kodack?

25   A.   I'm not sure.

72

1   Q.   What about Herbst?

2   A.   I'm not sure.

3   Q.   What about Dunn?

4   A.   No.

5   Q.   What about Foulds?

6   A.   No.

7   Q.   Were you ever made aware of who filed that

8   detainer?

9   A.   At the time, no.

10   Q.   Okay.  But were you ever aware from then until

11   today, who filed that detainer?

12   A.   Yes.

13   Q.   Who was it?

14   A.   The Parole Board.

15   Q.   In paragraph 23, it says on April 14, 2009, Mr.

16   Chappelle was released from federal custody and taken

17   back to SCI Coal Township where he was

18   re-incarcerated despite having already served his

19   12-year maximum state sentence.  Do you see that?

20   A.   Right.

21   Q.   When you were being taken back into federal

22   custody, were you complaining to the feds that you

23   should not be returned to SCI Coal Township because

24   you'd done ---?

25   A.   Yes, I did.

73

1    Q.   And what did they say?

2    A.   Actually on the day when the transporting agency

3    came to get me, I was reluctant to go and they

4    basically like just ---.

5    Q.   You don't have a choice?

6    A.   Right.

7    Q.   You get in, you don't have a choice?

8    A.   Right.

9    Q.   You said you should be releasing me so I can

10   report to my federal parole officer and they were

11   like we don't have a choice, we got whatever orders,

12   you got to go?

13   A.   Correct.

14   Q.   And when you went back to SCI Coal Township, the

15   feds had a detainer on you for once you got released

16   in order for you to start your federal parole;

17   correct?

18   A.   Repeat that again.

19   Q.   When you were sent back to SCI Coal Township,

20   the feds put a detainer on you so that once you were

21   released from SCI Coal Township, you would start

22   doing your federal parole; is that a correct

23   statement?

24   A.   Correct.

25                    ATTORNEY KEATING:

74

1              Let's mark this as Exhibit --- we're

2    almost done.   Four, okay.

3              (Exhibit P-4 marked for

4              identification.)

5    BY ATTORNEY KEATING:

6    Q.   This is a letter of April 2009 from the U.S.

7    District Court, Eastern District of Pennsylvania,

8    Probation Officer --- Office in the Federal Office

9    Building to SCI Coal Township.   Have you ever seen

10   this paper before?   And look at it because --- look

11   at page two.   It seems to be apparent that you have,

12   but ---.

13   A.   Right.

14   Q.   Okay.   And that's your signature on page two?

15   A.   Correct.

16   Q.   And it says in the second paragraph, we confirm

17   that Mr. Jessup is presently incarcerated at your

18   facility with no set release date.   The purpose of

19   this letter is to request that our office be notified

20   when Mr. Jessup is scheduled to be released from

21   custody.   At that time, he will commence his

22   four-year supervised release term.   Did I read that

23   correctly?

24   A.   Right.

25   Q.   Therefore, Mr. Jessup will be required to report

75

1  to the U.S. Probation Office.  So at that time, would

2  it be fair to say that once you were released from

3  SCI Coal Township, you still had to do four years

4  worth of parole with the federal parole?

5  A.   Correct.

6  Q.   And when you were released in July --- what day

7  was that, the 31st?

8  A.   Correct.

9  Q.   July 31st, you did, within 72 hours, report to

10  the federal parole office; correct?

11  A.   I believe so.

12  Q.   Okay.  It might have been 74 or 71 or something

13  like that.  And if you didn't, I don't care, you're

14  about ready to get off; right?

15  A.   Right.

16  Q.   Are you even afraid to leave the house?  Are you

17  just going to sit around the house and not go

18  anywhere until Mr. Reid signs the papers?

19  A.   No, I'm all right.

20  Q.   You're all right, okay.  What are you doing job

21  wise?  Have you got anything in the hop?

22  A.   Searching.

23  Q.   Searching.  What did you do at L.A. Fitness?

24  A.   Sales counselor for about --- a couple of

25  months, then I became a personal trainer.

76

1   Q.   Okay.   Do you recall when you were picked up

2   from Ray Brook and sent to SCI Coal Township?   Would

3   it have been April 14th, 2009?

4   A.   That's about right.

5   Q.   Okay.

6                ATTORNEY KEATING:

7                I don't know if you want to make this

8   an exhibit or not.   I mean, if you agree with that,

9   that's fine, we don't have to make it an exhibit.

10  BY ATTORNEY KEATING:

11  Q.   But is that --- does that look about right,

12  April 14th is when they took you from Ray Brook?

13  A.   Yes.

14  Q.   Okay.

15  OFF RECORD DISCUSSION

16               ATTORNEY KEATING:

17               I want this to be marked as an exhibit

18  also. I don't believe I have copies of that.

19               (Exhibit P-5 marked for

20               identification.)

21  SHORT BREAK TAKEN

22  BY ATTORNEY KEATING:

23  Q.   This is an inmate request and it was from you to

24  Mr. Varano and it's dated April 17th, 2009; correct?

25  A.   Correct.

77

1    Q.  And this is the one where he wrote back and

2    said, obviously, we would not be keeping you past

3    your max date; correct?

4    A.  Correct.

5    Q.  And that was --- he signed it April 22nd, 2009;

6    correct?

7    A.  Right.

8                    ATTORNEY KEATING:

9                    And then we'll mark this one.

10                   (Exhibit P-6 marked for

11                   identification.)

12   BY ATTORNEY KEATING:

13   Q.  This is a response to your concerns which was

14   sent to you by Michelle Kodack, and it says at the

15   top right, a grievance date of May 5th, 2009;

16   correct?

17   A.  Correct.

18   Q.  And at the bottom right-hand date it says May

19   21st, 2009; correct?

20   A.  Correct.

21   Q.  And it says a parole violation at that time is

22   calculated by the Parole Board and provided by them

23   to the records department for recording on your

24   sentence status summary; correct?

25   A.  Correct.

78

1   Q.   And it says any questions or problems with your

2   parole violation backtime calculation need to be

3   addressed to the Parole Board.   Is this after you

4   spoke to Ms. Pijar or before, do you recall?

5   A.   I never spoke to Ms. Pijar.

6   Q.   Is this after or before you had written a

7   request to Ms. Pijar, do you recall?   If you recall,

8   this is a long time ago?

9   A.   I'm not sure.

10  Q.   Okay.   That's fine.

11              ATTORNEY KEATING:

12              I don't have any further questions.   Do

13  you have any?

14              ATTORNEY TOBIN:

15              I do have some follow-ups.

16              ATTORNEY KEATING:

17              Okay.

18  EXAMINATION

19  BY ATTORNEY TOBIN:

20  Q.   At the beginning of the deposition you testified

21  --- I believe the question was, when did you start

22  using the name Kevin Jessup?   How many times did you

23  use the name Kevin Jessup?

24  A.   Once.

25  Q.   And was that in 1995?

79

1   A.   Yes.

2   Q.   While you were being --- going through your

3   sentencing proceedings in federal court --- and you

4   testified you were at FDC Philadelphia from about

5   February 2002 to September 2002; is that right?

6   A.   Correct.

7   Q.   Were you considered serving federal time then or

8   serving state time while you were at FDC?

9   A.   I was on writ, so I was still serving my state

10  time.

11  Q.   And what does writ mean?

12  A.   Temporary transfer.

13  Q.   And does that mean that even though you weren't

14  physically at Coal Township, you were still serving

15  your state sentence?

16  A.   Correct.

17  Q.   You testified earlier that you sent Unit Manager

18  Dunn a request slip and that you didn't get a written

19  response from him.  Did you send him more than one or

20  just one?

21  A.   More than one.

22  Q.   Do you know how many?

23  A.   I know it was more than one.  Probably about

24  four, five.

25  Q.   Did you get written responses to any of those?

80

1   A.   No.

2   Q.   Did you get verbal responses to any of those?

3   A.   No.

4   Q.   When you came back to Coal Township in April of

5   2009, and you got in touch with Ms. Pijar, is the

6   reason you got in touch with Ms. Pijar that you

7   specifically wanted to get in touch with her or ---?

8                    ATTORNEY KEATING:

9                    I'm going to object.  Could you be a

10  little bit more leading?

11  BY ATTORNEY TOBIN:

12  Q.   Why did you get in touch with Pijar in

13  particular?

14  A.   Because I knew she was my parole agent and she

15  had my record.

16  Q.   Okay.  When you were talking with Ms. Foulds in

17  her office, did you ask her to do anything specific

18  for you?

19  A.   Yes.

20  Q.   What'd you ask her to do?

21  A.   I asked her could she --- a couple of things.  I

22  asked her could she contact the Parole Board for me

23  since they wasn't responding, and I asked her could

24  she personally look and calculate my time since she

25  has it in front of her.

81

1   Q.   What do you mean since she has it in front of

2   her?

3   A.   She asked me when I was back --- when I was

4   there, she asked me, did I need to take a

5   prescriptive program that I've taken before.  I think

6   it was decision making, stress and anger class that I

7   completed before I was discharged from there in 2007.

8   When I came back in 2009, she said, well, you're

9   back, you got to take decision making, stress and

10  anger.  Like I completed those back in 2007.  I said

11  they should be on file.  And she went on the computer

12  and she said they are, you did complete them.  And I

13  said, so why do I need to take them again.  I'm

14  telling you like it's a mistake.  Like you just asked

15  me to take a program, an eight-month program that I

16  completed two years ago, you know, what I'm saying.

17  Do you see the problem?  And she didn't have an

18  answer for me.  She was like --- she said, I don't

19  know what's the problem.  I said you contact somebody

20  and let them know what's the problem.

21  Q.   And what was her response to that request?

22  A.   There's nothing she can do.

23  Q.   That was her response?

24  A.   Yes.

25  Q.   You had testified that you got green sheets that

82

1  had the new max date on it from parole.  Did you get

2  any other documents related to your max date?

3              ATTORNEY KEATING:

4              From parole?

5              ATTORNEY TOBIN:

6              From anyone?

7              ATTORNEY KEATING:

8              At what time?

9  BY ATTORNEY TOBIN:

10  Q.  When you were back, back at Coal Township in

11  April of 2009, after April of 2009?

12  A.  I'm not sure.  I don't think so.

13  Q.  Did you get a new sentence status sheet?

14  A.  Yes, I did.

15  Q.  Did that come from parole?

16  A.  No, it came from the institution.

17  Q.  And do you remember anyone discussing it with

18  you?

19  A.  No.

20  Q.  And do you remember how you got that?

21  A.  I got it in the mail.  Yes, I definitely got it

22  in the mail.

23  Q.  Did you think it was ---?

24              ATTORNEY KEATING:

25              Objection.

83

1          ATTORNEY TOBIN:

2              What's the objection?

3          ATTORNEY KEATING:

4              Did you think --- you're leading him

5    right in to this.  Why don't you just tell him what

6    the answer is?  I don't mind softballs, Counselor,

7    but once in awhile let's give it ---.

8          ATTORNEY TOBIN:

9              Hold on, I have another question.

10   BY ATTORNEY TOBIN:

11   Q.  Did you ask Varano to do anything specifically

12   for you?

13   A.  In the request slips, yes.  Yeah.

14   Q.  Do you know if Varano talked with the records

15   department?

16   A.  I don't know.

17   Q.  Did Varano ever send anything besides the

18   request slip responses to you in writing?

19   A.  No.

20   Q.  In addition to filing --- did you file a

21   grievance about this issue?

22   A.  Yes.

23   Q.  And you filed request slips?

24   A.  Yes.

25   Q.  Did you do anything else to try to get your

84

1   problem solved?

2   A.   Yes.

3   Q.   What did you do?

4   A.   I approached several staff, I filed a mandamus,

5   I contacted my attorney, family, asked them to make

6   phone calls for me.

7   Q.   And when you were released in July 31st, 2009,

8   do you know what caused you to be released?

9   A.   I believe my mandamus I filed.

10  Q.   What impact did the four months from April 15 or

11  16, 2009 to when you were released in July of 2009

12  have on you?

13  A.   A big impact.

14              ATTORNEY KEATING:

15              What?

16  A.   I big impact.

17  BY ATTORNEY TOBIN:

18  Q.   What impact did it have?

19  A.   Stress, depression, frustration, sleeplessness,

20  break-ups.

21              ATTORNEY KEATING:

22              What did you say?

23  A.   Break-ups.

24              ATTORNEY KEATING:

25              Okay.

85

1   A.   Relationship.  My grandmother passed away during

2   that time I was incarcerated, I wasn't able to

3   attend.   Just certain little things, my daughter's

4   16th birthday, like a lot of little issues that I was

5   looking forward to.

6   BY ATTORNEY TOBIN:

7   Q.   And on Exhibit P-6, if you'll read --- just read

8   Kodack's response to your grievance.  After you got

9   this response, did Ms. Kodack come and talk to you

10  about your issue?

11  A.   No.

12  Q.   Did you ever meet with her in person?

13  A.   No.

14  Q.   Did you ask her to meet with her in person?

15  A.   Yes.

16  Q.   Did you ever meet with Herbst in person?

17  A.   No.

18              ATTORNEY TOBIN:

19              I have no further questions.

20  RE-EXAMINATION

21  BY ATTORNEY KEATING:

22  Q.   Has anyone ever compensated you or given you

23  anything in return for your claim that you were spent

24  past your maximum date incarcerated?

25              ATTORNEY TOBIN:

86

1              I need to consult with him about that.

2              ATTORNEY KEATING:

3              No, you don't need to consult with him

4    about that.   He understands the question.

5              ATTORNEY TOBIN:

6              You can answer.

7    A.   Can you say the question again?

8    BY ATTORNEY KEATING:

9    Q.   Has anyone given you any compensation or paid

10   you anything to compensate you for the time that you

11   claim you spent past your maximum date incarcerated?

12   A.   Yes.

13   Q.   Who?   Who, and what compensation?

14             ATTORNEY TOBIN:

15             He can answer the first question.   The

16   second question is governed by a confidentiality

17   agreement.

18             ATTORNEY KEATING:

19             We'll see what the answer to the first

20   one is.

21   A.   What was the question?

22   BY ATTORNEY KEATING:

23   Q.   The question is, who was it that compensated you

24   for spending time past what you believe was your max

25   date?

87

1   A.   Who?

2   Q.   Yes, who.

3   A.   The Pennsylvania Parole Board.

4   Q.   So they paid you some money because of a mistake

5   they made?   Okay.   Let me rephrase that.   Did they

6   pay you money because of a mistake they made?

7               ATTORNEY TOBIN:

8               Object to form.

9               ATTORNEY KEATING:

10              Okay.

11              ATTORNEY TOBIN:

12              We don't know the reason they paid him

13  the money.

14  BY ATTORNEY KEATING:

15  Q.   So they paid you money --- they didn't pay you

16  money because they owed it to you for your inmate

17  account, did they?

18  A.   No.

19  Q.   They paid you because you told them you were

20  held past your max date and they paid you to

21  compensate you for that?

22              ATTORNEY TOBIN:

23              Object, and direct him not to answer.

24              ATTORNEY KEATING:

25              Why is that?

88

```
 1              ATTORNEY TOBIN:

 2              The agreement is covered by a

 3   confidentiality clause, and we can't do it.  I'm

 4   going to direct him not to answer unless I get an

 5   order from the Court.

 6              ATTORNEY KEATING:

 7              Okay.  Well, under the Freedom of

 8   Information Act, I have the right to know if any

 9   administrative agency pays, so we can find that out.

10   BY ATTORNEY KEATING:

11   Q.  But you were paid by Probation and Parole;

12   correct, for the mistake they made?

13   A.  Yes.

14   Q.  And were you aware of the fact that Probation

15   and Parole recalculated your maximum sentence to July

16   14th, 2009?

17   A.  No.

18   Q.  You never heard of that at all?

19   A.  No.

20   Q.  And you don't know how they came up with that

21   date?

22   A.  Nope.

23   Q.  Now, you said you had certain stress factors and

24   stuff from spending time in prison from April 2009 to

25   July 2009; correct?
```

89

1   A.   Correct.

2   Q.   Certain family members passed away?

3   A.   Yes.

4   Q.   And you had problems keeping your family

5   together and stuff during that time?

6   A.   Yes.

7   Q.   You also had those same problems prior to that

8   date when you were incarcerated both in federal and

9   state prison, didn't you?

10   A.   No, not --- I mean, it's --- can you say the

11   question again?

12   Q.   Prior to April 2009, you spent a substantial

13   amount of time in prison; correct?

14   A.   Right.

15   Q.   Both federal and state; correct?

16   A.   Right.

17   Q.   Years?

18   A.   Yes.

19   Q.   And during those years, you also had problems

20   with family and problems with people passing away and

21   not going to funerals, you were severely restricted,

22   weren't you?

23   A.   No.

24   Q.   You weren't severely restricted when you were

25   doing state time?

90

1    A.   No one passed away.

2    Q.   Your grandmother is the only one that passed

3    away between April and June of 2009?  During your

4    whole time you were in prison prior to 2009, ---

5    A.   No.

6    Q.   --- you didn't have any family that passed away?

7    A.   Yes, I did.

8    Q.   And were you allowed to go to their funerals?

9    A.   No.

10   Q.   And did you ask to be released from prison to

11   attend your grandmother's funeral?

12   A.   Yes.

13   Q.   And did you put in a written request?

14   A.   I believe it was verbal, was in --- this was in

15   --- it was verbal with my counselor.  She said I

16   could.

17   Q.   You were in FDC at the time?

18   A.   Yes.

19   Q.   You said something about you were considered

20   serving your state time --- you were asked --- strike

21   that.

22       Your attorney asked you about whether you were

23   considered serving your state time or your federal

24   time when you were incarcerated and you said you

25   were on a writ.  Do you remember saying that?

91

1   A.   Yes.

2   Q.   Where were you at the time, what institution?

3   A.   FDC Philadelphia.

4   Q.   And it's your position even though you were in a

5   federal prison, it's your understanding you were

6   serving state time?

7   A.   Correct.

8           ATTORNEY KEATING.

9           No further questions.

10          ATTORNEY TOBIN:

11          I have nothing further.

12          *  *  *  *  *  *  *  *

13       DEPOSITION CONCLUDED AT 12:00 P.M.

14          *  *  *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

92

1  COMMONWEALTH OF PENNSYLVANIA)

2

3                    CERTIFICATE

4      I, Nicole Montagano, a Notary Public in and for

5  the Commonwealth of Pennsylvania, do hereby certify:

6      That the witness whose testimony appears in the

7  foregoing deposition, was duly sworn by me on said

8  date and that the transcribed deposition of said

9  witness is a true record of the testimony given by

10  said witness;

11      That the proceeding is herein recorded fully and

12  accurately;

13      That I am neither attorney nor counsel for, nor

14  related to any of the parties to the action in which

15  these depositions were taken, and further that I am

16  not a relative of any attorney or counsel employed

17  by the parties hereto, or financially interested in

18  this action.

19

20                         *Nicole Montagano*

22

23

24

25

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

PBPP-39
Revised (02-04)

# ORDER TO RECOMMIT
## COMMONWEALTH OF PENNSYLVANIA BOARD OF PROBATION AND PAROLE

**Name:** KEVIN JESSUP     **Inst. No:** CX8799     **Parole No:** 496AS

**District:** CO - Central Office     **SID:** 21714127     **Date Paroled:** 04/09/2001

**Inst Parole From:** SCICT - SCI - Coal Township

**Recommit To:** SCICT - SCI - Coal Township     **Status:** ◉ TPV   ◉ CPV

The above-named individual who was conditionally released on parole by the Pennsylvania Board of Probation and Parole has been found by the Board to have violated the conditions of parole. Therefore, the Board, by virtue of the authority conferred on it by law, orders said individual recommitted for further imprisonment for the remainder of the unexpired maximum term, or until otherwise released or discharged according to law.

### County, Bill & Term and OTN

| County Name | OTN | Indictment Number | Minimum Date |
|---|---|---|---|
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |
| PHILAD | M6413794 | CP 950300033 | 01/26/2001 |

### Parole Violation Date Calculation

| | |
|---|---|
| **Original Maximum Date:** | 01/26/2007 |
| **- Parole/Reparole/Delinquency/Board Warrant Date:** | 04/09/2001 |
| **+Constructive Parole Time Added:** | 0D |
| **- Confinement Time:** | 0D |
| **- Backtime Credit:** | 147D |
| **= Backtime Owed:** | 1971D |
| **+ Custody for Return:** | 04/14/2009 |
| **= Recomputed Maximum Date:** | 09/06/2014 |
| **+ Escape Time:** | 0D |
| **= New Maximum Date:** | 09/06/2014 |

**Backtime Dates:**

| From | To | Time Elapsed |
|---|---|---|
| 09/26/2001 | 02/20/2002 | 147D |

**Time Lost Due to:**

| | |
|---|---|
| **Delinquency:** | 0D |
| **Service of Another Sentence:** | 0D |

### Conviction(s) Resulting in Recommitment

| | Sentence Date | Sentence County | Indictment | Period | Type | Place of Confinement |
|---|---|---|---|---|---|---|
| 2 | 11/24/2008 | FEDERA - FEDERAL COUNTY | 02CR00032-01 | 24 MONTHS | | FED - FEDERAL |

**Parole/Release/Max Date:** 04/14/2009     **Confined:** Y

**Comments:** ORIGINALLY SENTENCED ON 9/23/2002 TO 162 MONTHS. CONVICTION & SENTENCE VACATED ON 11/21/2006 AND RESENTENCED ON 11/21/2006 TO 95 MONTHS. RE-SENTENCED AGAIN ON 11/24/2008 TO 24 MONTHS



Herbst #11

EXHIBIT
P 1
7-24-12 AM

GRIEVANCE No. 271957

## Appeal To Facility Manager

FROM INMATE: Jessup, Kevin, CX8799.
Facility: SCI-Coal Township
Housing Location: BB-Block

RE: Appeal From Initial Review Response.

Inmate Jessup, respectfully appeals the denial of his Initial Grievance No, 271957. Inmate Jessup does understand that the Parole Board and the Department of Corrections are two separate entities, but Inmate Jessup is not requesting the Department of Corrections to use any authority over the Parole Board. Under 42 Pa.C.S.A. § 9760, the Department of Corrections has authority to credit Inmates for Time spend in custody. If there is a mistake either, made by the Courts and/or the Bureau in giving an Inmate credit for time spend in Custody, the Department of Corrections has the authority to credit an Inmate the Correction time spend in custody to the New sentence and/or the original sentence. As such the grievance clearly states that Inmate Jessup is owed a Total of 5 years 10 months and counting, that need to be credited towards his original sentence. For that reason Inmate Jessup respectfully Requests that the Facility Manager grant Inmate Jessup this Appeal and have the 5 years 10 months plus credit towards his current sentence.

Respectfully Submitted



Kevin Jessup

DATE: 5/23/09

cc File

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAMON CHAPPELLE, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | Civil No.:_____ |
| DAVID VARANO, | ) | |
| SUPERINTENDENT, SCI-COAL | ) | |
| TOWNSHIP; | ) | |
| MICHELLE KODACK, | ) | |
| RECORDS SUPERVISOR, SCI- | ) | |
| COAL TOWNSHIP; DEBORAH | ) | |
| HERBST, RECORDS SPECIALIST, | ) | |
| SCI-COAL TOWNSHIP; | ) | Jury Trial Demanded |
| MR. DUNN, UNIT MANAGER, | ) | |
| SCI-COAL TOWNSHIP; | ) | |
| MS. FOULDS, COUNSELOR, | ) | |
| SCI-COAL TOWNSHIP; | ) | |
| JOHN DOE; JANE DOE 1; and, | ) | |
| JANE DOE 2 | ) | |
| | ) | *Electronically Filed* |
| in their individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

1



## I. INTRODUCTION

1. Plaintiff, Damon Chappelle, by and through his attorney, brings this
   civil rights action for damages under 42 U.S.C. § 1983, asserting an
   overdetention claim under the Eighth Amendment to the United States
   Constitution and a false imprisonment claim under Pennsylvania law.

2. This is an action to recover for the unlawful incarceration of Damon
   Chappelle by employees of the Pennsylvania Department of
   Corrections (DOC). Mr. Chappelle was wrongfully imprisoned in a
   federal facility from February 11, 2009 to April 14, 2009 by virtue of
   an illegal state detainer, which Defendants failed to lift. After that,
   Mr. Chappelle was illegally imprisoned by Defendants from April 14,
   2009 until July 31, 2009 at SCI-Coal Township in Northumberland
   County, Pennsylvania. During that time, Mr. Chappelle repeatedly
   told Defendants that he was being illegally incarcerated and asked for
   their assistance, but they refused to help him. Mr. Chappelle now
   seeks compensation for this wrongful detention.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over the constitutional claims pursuant to
   28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction to issue
   declaratory relief under 28 U.S.C. §§ 2201(a) and 2202. The Court

has supplemental jurisdiction over the state law claims pursuant to 28

U.S.C. § 1367(a).

4. Venue is proper under 28 U.S.C. § 1391(b), as the causes of action

upon which the complaint is based arose in Northumberland County,

Pennsylvania, which is in the Middle District of Pennsylvania.

### III. PARTIES

5. Plaintiff, Damon Chappelle, is a citizen of the United States of

America currently residing in Philadelphia, Pennsylvania.

6. Defendants Superintendent David Varano, Records Supervisor

Michelle Kodack, Records Specialist Deborah Herbst, Unit Manager

Dunn, and Counselor Foulds were at all times relevant hereto DOC

employees at SCI-Coal Township, located in Northumberland County,

Pennsylvania, and were acting under color of state law.

7. Defendants John Doe, Jane Doe 1, and Jane Doe 2 also worked at

SCI-Coal Township and were acting under color of state law.

8. All defendants are sued in their individual and official capacities.

### IV. FACTS

9. In 1996, Mr. Chappelle was convicted (under the alias of "Kevin

Jessup") in the Court of Common Pleas for the First Judicial District

of Pennsylvania of state criminal charges and was sentenced to a total term of imprisonment of 6 to 12 years.

10. Mr. Chappelle's sentence began on January 26, 1995. His minimum date (the date on which he was first eligible for parole) was January 26, 2001, and his maximum release date was January 26, 2007.

11. In April 2001, Mr. Chappelle was granted parole by the Pennsylvania Department of Probation and Parole, after serving 6 years and 72 days of his sentence. This left 5 years and 293 days on his sentence.

12. In September 2001, while on parole, Mr. Chappelle was arrested. He was originally charged with offenses under Pennsylvania law. However, the Commonwealth soon withdrew the state charges and the federal government adopted the case and charged Mr. Chappelle with federal offenses.

13. Mr. Chappelle was not prosecuted by the Commonwealth of Pennsylvania in connection with the September 2001 arrest. The only new criminal case generated by the September 2001 arrest was a federal case.

14. Mr. Chappelle was re-incarcerated by the DOC as a "Technical Parole Violator" due to his arrest and violation of the parole conditions imposed on him in his 1996 state case.

4

15. At the time of the September 2001 arrest, Mr. Chappelle had been "on the street" and not incarcerated for approximately 170 days. Under Pennsylvania law, this "street time" was added to Mr. Chappelle's original maximum date of January 26, 2007. Therefore, Mr. Chappelle's new maximum date on his state sentence was on or about July 15, 2007.

16. Mr. Chappelle served the entire remainder of his 12-year state sentence in DOC custody at SCI-Coal Township from the time of his re-arrest in 2001 until July 18, 2007.

17. On July 18, 2007, upon completion of his state sentence, Mr. Chappelle was released from SCI-Coal Township and was transferred to federal custody to serve his federal sentence arising from the September 2001 charges, which had by that point, become convictions.

18. Mr. Chappelle's federal judge had recommended that he participate in certain programs while serving his federal sentence, as part of a Release Preparation Program which would release him to a halfway house on or about February 11, 2009.

19. While in federal custody, however, a state detainer prevented Mr. Chappelle's participation in the Release Preparation Program and

caused him to remain in federal prison beyond February 11, 2009.
Because Mr. Chappelle had previously served the entirety of his state
sentence, this detainer was imposed in error.

20. While in federal custody, Mr. Chappelle sought help from Defendants
in getting the detainer lifted so that he could participate in the required
programs and be eligible for supervised release on or about February
11, 2009.

21. Despite their knowledge of the risk that the detainer had no legal
basis, Defendants did not assist Mr. Chappelle or investigate whether
the detainer was lawfully imposed.

22. Defendants' failure to assist Mr. Chappelle with the illegal detainer
caused him to remain imprisoned in federal custody illegally from
February 11, 2009 to April 14, 2009.

23. On April 14, 2009, Mr. Chappelle was released from federal custody
and taken back to SCI-Coal Township where he was re-incarcerated,
despite having already served his 12-year maximum state sentence.

24. Upon Mr. Chappelle's return to SCI-Coal Township, he immediately
began filing Request to Staff Member forms and using the grievance
process to alert DOC staff members that he was being illegally
detained.

6

25. Upon Mr. Chappelle's arrival at SCI-Coal Township, DOC records staff, including Defendants Records Supervisor Kodack and Records Specialist Herbst, issued him a Sentence Status form indicating a total sentence of 6 to 12 years and a controlling maximum date of January 26, 2007.

26. This form accurately reflected that Mr. Chappelle's maximum sentence was 12 years.

27. Approximately ten days later, DOC records staff, including Records Supervisor Kodack and Records Specialist Herbst, informed Mr. Chappelle that the DOC had extended his maximum date to 2014.

28. On or about May 18, 2009, Mr. Chappelle filed a Request to Staff Member form to Defendant Kodack requesting to speak with her regarding his total time incarcerated at SCI-Coal Township.  Mr. Chappelle stated that an error had been made in his sentence calculation.

29. Records Specialist Deborah Herbst summarily responded to Mr. Chappelle's request, merely telling him that he needed to contact the Parole Board for answers.

30. Records Supervisor Kodack responded to Mr. Chappelle's grievance regarding the incorrect calculation of his sentence and his illegal

7

detention by stating that the Parole Board was responsible for
sentence calculations and that the issues raised in his grievance
needed to be addressed to the Parole Board.

31. Mr. Chappelle was not being held in the custody of Parole Board; he
was imprisoned by the DOC.

32. Nonetheless, Mr. Chappelle also sought help from the Parole Board to
address his illegal detention, yet he received no assistance.

33. Thus, Mr. Chappelle was entirely dependent on Defendants at SCI-
Coal Township, to investigate and resolve this urgent problem.

34. Mr. Chappelle appealed his initial grievance denial and
Superintendent Varano responded to this appeal by rubber-stamping
Defendant Kodack's initial response that any sentence calculation
issues are handled by the Parole Board.

35. As DOC records personnel, Defendants Kodack and Herbst had a duty
to ensure the accuracy of inmate sentence information for inmates
held in DOC custody at SCI-Coal Township.

36. This duty required that Defendants Kodack and Herbst investigate and
resolve sentence calculation problems and other records-related
problems that could negatively impact inmates and that could result in
overdetention.

8

37. Defendants Kodack and Herbst knew about Mr. Chappelle's concerns regarding an error in his sentence and maximum release date and about his complaint that he was being illegally detained, because Mr. Chappelle brought these problems to their attention repeatedly.

38. Defendants Kodack and Herbst were aware that Mr. Chappelle had not incurred any new state convictions or sentences and that he had already served the full 12 years on his 6 to 12 year state sentence. Yet neither Kodack nor Herbst took any actions to investigate whether the 2014 maximum release date was in error or whether Mr. Chappelle was being imprisoned without legal basis.

39. Defendants Kodack and Herbst were aware that Mr. Chappelle's maximum release date was more than two years old, creating a real risk that he was being illegally held in DOC custody.

40. Despite this knowledge of the risk that Mr. Chappelle was being held illegally, neither Defendant Kodack nor Defendant Herbst took any meaningful steps to investigate Mr. Chappelle's complaints. Rather, they chose merely to refer Mr. Chappelle to the Parole Board, a referral that was useless, as the Parole Board offered him no assistance.

41. By their failure to investigate Mr. Chappelle's complaint and take steps to assist him in resolving it, Defendants Kodack and Herbst caused Mr. Chappelle to be illegally detained.

42. After being taken back to SCI-Coal Township in April 2009, Mr. Chappelle sent Request to Staff Member forms to Defendant Superintendent David Varano, alerting him that he had previously served his entire state sentence and was currently being held illegally.

43. Defendant Varano responded that Mr. Chappelle could direct his issue to SCI-Coal Township's records office (where Kodack and Herbst worked), and that a supervisor would be able to assist him.

44. As described above, Mr. Chappelle had already done that, and continued to do that, resulting in no help whatsoever.

45. On April 22, 2009, Mr. Chappelle's federal criminal attorney wrote to Defendant Varano informing him that a legal error had been made in calculating Mr. Chappelle's sentence and asking Varano to order a review of Mr. Chappelle's records so that a determination could be made that he was eligible for release from custody.

46. Despite these requests for assistance from both Mr. Chappelle and his lawyer, Defendant Varano did not take any steps to investigate or

10

resolve the problem.  This failure to act resulted in Mr. Chappelle's

continued illegal detention at SCI-Coal Township.

47. As the Superintendent, Defendant Varano had a duty to ensure that all

inmates in DOC custody at SCI-Coal Township were lawfully

imprisoned there.

48. To carry out this duty, when an individual's liberty is at stake,

Defendant Varano had a responsibility to actively take steps to ensure

the accuracy of all inmate records at SCI-Coal Township and, if the

records were not accurate, to correct them.

49. By his failure to investigate Mr. Chappelle's complaint and take steps

to assist him in resolving it, Defendant Varano caused Mr. Chappelle

to be illegally detained.

50. Between April 14, 2009 and July 31, 2009, Mr. Chappelle frequently

asked Defendants Unit Manager Dunn and Counselor Foulds for help

regarding his illegal detention and regarding the universal refusal of

other DOC employees to help him.

51. Despite their knowledge of the risk that Mr. Chappelle was being held

illegally, neither Defendant Dunn nor Defendant Foulds took any

meaningful action to investigate or resolve Mr. Chappelle's concern.

11

52. Defendants Dunn and Foulds' failure to investigate Mr. Chappelle's complaint and assist him in resolving it resulted in Mr. Chappelle's illegal detention at SCI-Coal Township.

53. After his return to SCI-Coal Township, Mr. Chappelle also filed Request to Staff Member forms to Defendant John Doe, informing him that he had previously served his entire state sentence, and asking Defendant John Doe to investigate his continuing illegal detention at SCI-Coal Township.

54. Defendant John Doe refused to respond to Mr. Chappelle's requests or take any actions to investigate the matter.

55. Defendant John Doe's failure to act resulted in Mr. Chappelle's continued illegal detention at SCI-Coal Township.

56. Mr. Chappelle also filed Request to Staff Member forms to Defendant Jane Doe 1 stating that the DOC was illegally detaining him by failing to give him credit for nearly six years he previously served in state custody.

57. Mr. Chappelle further stated that he had court documents that Defendant Jane Doe 1 needed to review regarding this issue, and requested a meeting to speak with her in person.

58. Mr. Chappelle filed a subsequent request to Defendant Jane Doe 1 stating again that there was a serious error in his sentence calculation and that he wished to speak with Jane Doe 1 in person to discuss his sentence.

59. In each instance, Jane Doe 1 simply told Mr. Chappelle to appeal his Parole Board action, and did not take any other steps to investigate whether Mr. Chappelle was being illegally detained.

60. Jane Doe 1's failure to investigate or take any other steps to resolve Mr. Chappelle's problem resulted in his continued illegal detention at SCI-Coal Township.

61. In May 2009, Mr. Chappelle filed a Request to Staff Member form to Defendant Jane Doe 2 asking to speak with her about his sentence.

62. Mr. Chappelle informed Jane Doe 2 that he had supporting documents to show her which would prove that he was being held illegally.

63. Jane Doe 2 did not even respond to Mr. Chappelle's request and did not take any steps to investigate or resolve Mr. Chappelle's illegal detention problem, resulting in Mr. Chappelle's continued illegal detention at SCI-Coal Township.

64. Defendants' failure to investigate and resolve Mr. Chappelle's illegal detention at SCI-Coal Township caused Mr. Chappelle severe mental

13

and emotional anguish, as it resulted in his continued imprisonment

for no legal reason.

65. Mr. Chappelle wrote to the SCI-Coal Township Psychology

Department, complaining of stress, mental frustration, and inability to

sleep.

66. The Psychology Department provided Mr. Chappelle with mental

health medications but discounted the underlying cause of his distress

– the fact that he was being held illegally - simply telling him to

resolve the matter with his attorney.

67. On or about July 20, 2009, Mr. Chappelle filed a <u>pro se</u> mandamus

petition in the Commonwealth Court of Pennsylvania seeking release

from DOC custody, asserting that the DOC was illegally imprisoning

him at SCI-Coal Township.

68. The DOC never filed a response to Mr. Chappelle's mandamus

petition.

69. Instead, on July 31, 2009, the DOC released Mr. Chappelle from SCI-

Coal Township without any explanation.

70. Mr. Chappelle's release did not follow standard inmate release

procedures, as Unit Manager Dunn hurried Mr. Chappelle out of SCI-

14

Coal Township and onto a bus without allowing Mr. Chappelle to

arrange for his own ride.

71. After releasing Mr. Chappelle from SCI-Coal Township, the DOC

filed an "application for relief suggesting mootness" in the

Commonwealth Court mandamus action.

72. Defendants' conduct, as alleged above, resulted in the unjustified loss

of Mr. Chappelle's liberty for over five months and caused Mr.

Chappelle severe mental and emotional suffering, including stress,

anxiety, depression and sleeplessness.

## V. CAUSES OF ACTION

### Count I - Overdetention

### Against All Defendants

73. Mr. Chappelle realleges and incorporates by reference all preceding

allegations.

74. As set forth above, the failure of Defendants Varano, Kodack, Herbst,

Dunn, Foulds, John Doe, Jane Doe 1, and Jane Doe 2 to take

meaningful steps to investigate and resolve Mr. Chappelle's

complaints about his illegal detention, despite their knowledge of the

risk that Mr. Chappelle was being held illegally, constitutes deliberate

15

indifference in violation of Mr. Chappelle's Eighth Amendment

rights.

75. As a direct and proximate cause of the actions and omissions of the

Defendants, Mr. Chappelle was illegally incarcerated from February

11, 2009 until July 31, 2009 and thereby suffered harm to his person,

liberty, dignity, and to his rights under the Eighth Amendment to the

United States Constitution, as described above.

## Count II – false imprisonment

### Against All Defendants

76. Mr. Chappelle realleges and incorporates by reference all preceding

allegations.

77. Mr. Chappelle was unlawfully incarcerated, against his will, from

February 11, 2009 until July 31, 2009, by Defendants, as described

above.

78. As a direct and proximate result of the actions and omissions of the

Defendants, in falsely imprisoning him, Mr. Chappelle suffered harm

to his person, liberty, and dignity, as described above.

## VI. RELIEF

**WHEREFORE,** Mr. Chappelle requests that this Court:

1. Issue a declaratory judgment that the Defendants violated his

   constitutional rights;

2. Award compensatory damages to Mr. Chappelle against

   Defendants;

3. Award punitive damages to Mr. Chappelle against Defendants;

4. Award the costs of this action to Mr. Chappelle;

5. Award reasonable attorneys' fees to Mr. Chappelle; and

6. Award such other and further relief as this Court may deem
   appropriate.

Respectfully submitted,

s/ Jennifer J. Tobin

Date: February 11, 2011      Jennifer J. Tobin
                             Attorney I.D. # PA 202047
                             PA Institutional Law Project
                             718 Arch Street, Ste. 304 South
                             Philadelphia, PA 19106
                             Tel:  215-925-2966
                             Fax:  215-925-5337
                             E:  jtobin@pailp.org

Attorney for Plaintiff Damon Chappelle

17



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA
### PROBATION OFFICE

DANIEL W. BLAHUSCH
CHIEF U.S. PROBATION OFFICER

FEDERAL OFFICE BUILDING
600 ARCH STREET, SUITE 2400
PHILADELPHIA, PA  19106-1679
215-597-7950
FAX # 215-597-8856

April 22, 2009

SCI Coal Township
1 Kelley Drive
Coal Township, PA 17866-1020

Attn:  Record Room

RE:  JESSUP, Kevin
AKA Damon Chappelle
DOB - 4/3/75
Inmate No. CX 8799

Dear Sir:

On September 23, 2002, Mr. Jessup appeared before the Honorable Jay Waldman in the Eastern District of Pennsylvania under docket 02-CR-032-01 and was sentenced to 162 months custody to be followed by six years supervised release. On November 21, 2006, this sentence was vacated and Mr. Jessup was re-sentenced by the Honorable Timothy Savage to 95 months custody to be followed by four years supervised release. His sentence was subsequently reduced to 24 months custody on November 24, 2008. On April 14, 2009, Mr. Jessup completed his federal custodial sentence and was released to a detainer located by the Pennsylvania Board of Probation and Parole.

We confirmed that Mr. Jessup is presently incarcerated at your facility with no set release date. The purpose of this letter is to request that our office be notified when Mr. Jessup is scheduled to be released from custody. At that time, he will commence his four year supervised release term. Therefore, Mr. Jessup will be required to report to the **U.S. Probation Office at the William J. Green Federal Building, 600 Arch Street, Suite 2400, Philadelphia, PA 19106** within 72 hours of release from custody or to the Probation Office in the state of his residence.

Please have Mr. Jessup sign this letter to verify his understanding of his federal supervision status. A copy of this letter should be mailed to this office at the above address. Please keep a signed copy of this letter in Mr. Jessup's institution file and provide him with a copy.





**RE:   JESSUP, Kevin**
**AKA Damon Chappelle**
**Inmate No. CX 8799**
**Page Two**

Your assistance rendered in this matter will be greatly appreciated.  If you have any questions, please feel free to contact me at 267-299-4595.

Sincerely,

Daniel W. Blahusch, Chief
U.S. Probation Officer

Alice Colloton
Supervising U.S. Probation Clerk

/ac
cc:    Kevin Jessup/Damon Chappelle

_____          _____
Kevin Jessup/Damon Chappelle               Date

_____          _____
Witness                                    Date

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Mr. VARANO

Commonwealth of Pennsylvania
Department of Corrections

**INSTRUCTIONS**

Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer)
Mr. VARANO ~~Superintendent~~

2. Date: 4/17/09

3. By: (Print Inmate Name and Number)
Kevin Jessup CX-8799

*Kevin Jessup*

Inmate Signature

4. Counselor's Name
?
APR 20 2009

5. Unit Manager's Name

6. Work Assignment

7. Housing Assignment
R.O.C.

8. Subject: State your request completely but briefly. Give details.

I WAS RELEASED FROM FEDERAL custody on 4/14/09 and immeditatly DETAINED to P.A. parole on violations. I ARRIVED AT S.C.I coal on 4/15/09 AND HAS NOT SPOKEN to ANY one FROM parole about this matter. THERE HAS been AN ERROR I maxed out my remainder of sentence in 2007. Records will verify I was intially arrested on 1-25-95 served 6 years on a 6 to 12 yr sentence. paroled on 4-9-01, Re-arrested on 9-26-01 AND REMAINED in S.C.I coal until 7-18-07. On 7-18-57 I signed out of S.C.I coal AND was taken into the U.S. MARshall custody FOR a FEDERAL DETAINER. I SERVED 24 months AND was DISCHARGE 4-14-09 NOW I back IN S.C.I coal AND I SHOULD not be because my sentence is over maxed out. CAN somebody Tell me whats GOING on.

Response: (This Section For Staff Response Only)

your issues can be addressed with both parole and our Records office.

Obviously we would not be keeping you past your max date.

To DC-14 CAR only ☐

To DC-14 CAR and DC-15 IRS ☐

Staff Member Name *D.A. Varano Supt*
                        Print          Sign

Date 4-22-09

Revised July 2000

CC: Ms Kodack
Parole office
File

EXHIBIT
P-5
7-24-12 AM

DC-ADM 804, Inmate Grievance  ʃ  .n                                    **Attachment B**



DC-804
Part 2
                           **COMMONWEALTH OF PENNSYLVANIA**
                           **DEPARTMENT OF CORRECTIONS**
                                   **P.O. BOX 598**
                              **CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

                                                    **GRIEVANCE NO.**        271957

| TO: (Inmate Name & DC No.) | FACILITY | HOUSING LOCATION | GRIEVANCE DATE |
|---|---|---|---|
| JESSUP, Kevin CX-8799 | SCI-COA | B-B | 5/5/2009 |

The following is a summary of my findings regarding your grievance:

This is in response to Grievance Number:  271957

Mr. Jessup:

The Parole Board and the Department of Corrections are two separate entities.   As such, the Department of Corrections has no authority over the Parole Board.  The issues that you address in this grievance need to be addressed to the Parole Board.

Additionally, your parole violation backtime is calculated by the Parole Board and provided by them to the institutions Records Department for recording on your sentence status summary.  Any questions or problems with your parole violation backtime calculation needs to be addressed to the Parole Board.   We have no authority to change their calculation.

Taking all information into consideration your grievance is denied.

**EXHIBIT**
*P-6*
7-24-2012

cc:  Ms. Dascani
     DC-15 Inmate Records
     DC-14
     File

| Print Name and Title of Grievance Officer | SIGNATURE OF GRIEVANCE OFFICER | DATE |
|---|---|---|
| Michelle Kodack, Records Supervisor | *Michelle Kodack* | May 21, 2009 |