**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAMON CHAPPELLE, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | Civil No.: 11-0304 |
| DAVID VARANO, | ) | |
| SUPERINTENDENT, SCI-COAL | ) | (Judge Conner) |
| TOWNSHIP; | ) | |
| MICHELLE KODACK, | ) | |
| RECORDS SUPERVISOR, SCI- | ) | |
| COAL TOWNSHIP; DEBORAH | ) | |
| HERBST, RECORDS SPECIALIST, | ) | |
| SCI-COAL TOWNSHIP; | ) | |
| MR. DUNN, UNIT MANAGER, | ) | |
| SCI-COAL TOWNSHIP; | ) | |
| MS. FOULDS, COUNSELOR, | ) | |
| SCI-COAL TOWNSHIP, | ) | |
| | ) | |
| | ) | *Electronically Filed* |
| in their individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PRAECIPE TO FILE CORRECTED BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

AND NOW comes Plaintiff, by and through counsel, and requests that this

Court permit him to file a corrected brief in opposition to Defendants' motion for

summary judgment, attached hereto, as a replacement for Document # 50. The

corrected brief includes corrections to the page numbering on the Table of

Contents and corrects typographical errors on page 20 (adding "iii" after "Section" in footnote 3) and page 36 (deleting the word "not" before "to reject" and changing the word "amendment" to "imprisonment" in footnote 5).

Respectfully submitted,

s/ Jennifer J. Tobin

Date:  October 23, 2012        Jennifer J. Tobin
Attorney I.D. # PA 202047
PA Institutional Law Project
718 Arch Street, Ste. 304 South
Philadelphia, PA 19106
Tel:  215-925-2966; Fax:  215-925-5337
E:  jtobin@pailp.org

Attorney for Plaintiff Damon Chappelle

# CERTIFICATE OF SERVICE

I certify that on this date, a true and correct copy of the foregoing Praecipe to File Corrected Brief, along with all attachments, was electronically filed and is available for viewing and downloading from the Court's ECF system.  In addition, a copy was served via the Court's ECF notification system on the following:

Timothy P. Keating
Senior Deputy Attorney General
Pennsylvania Office of the Attorney General
15th Floor, Strawberry Square
Harrisburg, PA  17120

E:  tkeating@attorneygeneral.gov

Counsel for Defendants

Date:  October 23, 2012          /s/ Jennifer J. Tobin
                                 Jennifer J. Tobin
                                 Pennsylvania Institutional Law Project

## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAMON CHAPPELLE, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | Civil No.: 11-0304 |
| DAVID VARANO, | ) | |
| SUPERINTENDENT, SCI-COAL | ) | (Judge Conner) |
| TOWNSHIP; | ) | |
| MICHELLE KODACK, | ) | |
| RECORDS SUPERVISOR, SCI- | ) | |
| COAL TOWNSHIP; DEBORAH | ) | |
| HERBST, RECORDS SPECIALIST, | ) | |
| SCI-COAL TOWNSHIP; | ) | |
| MR. DUNN, UNIT MANAGER, | ) | |
| SCI-COAL TOWNSHIP; | ) | |
| MS. FOULDS, COUNSELOR, | ) | |
| SCI-COAL TOWNSHIP, | ) | |
| | ) | |
| | ) | *Electronically Filed* |
| in their individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF DAMON CHAPPELLE'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

AND NOW comes Plaintiff Damon Chappelle, by and through counsel, and submits this brief in opposition to Defendants' motion for summary judgment.

TABLE OF CONTENTS

Table of Authorities                                                      *iv*

I.      INTRODUCTION                                               1

II.     RELEVANT PROCEDURAL HISTORY                      1

III.    COUNTER STATEMENT OF THE CASE                  1

IV.     COUNTER STATEMENT OF FACTS                      2

V.      COUNTER STATEMENT OF QUESTIONS INVOLVED    3

VI.     ARGUMENT                                                  4

        a.   Standard for Summary Judgment                    4

        b.   Standard for Eighth Amendment Overdetention Claims    5

        c.   The Record Shows that Defendants Violated Plaintiff's
             Eighth Amendment Rights When They Failed to Respond
             Meaningfully to his Complaints That he was Being
             Overdetained                                         6

             i.   Defendants knew of the risk                     7

             ii.  Defendants took no action or took only ineffectual
                  action in responding to Plaintiff's complaints   8

                  Varano's response demonstrates deliberate indifference   9

                  Kodack's response demonstrates deliberate indifference   13

                  Herbst's response demonstrates deliberate indifference   20

                  Foulds' response demonstrates deliberate indifference   24

                  Dunn's response demonstrates deliberate indifference   26

The evidence supports a finding of deliberate indifference
By all Defendants                                                                28

   iii.   Defendants' attempt to shift attention away from their
actions should be rejected by this Court, because the
Parole Board's actions are not the focus of the claims
in this case.                                                                       30

   iv.   This Court should also reject Defendants'
liability-shifting argument because the evidence
supports a finding that it is the DOC, not the
Parole Board, that is responsible for calculating the
"max dates" for the inmates in its custody.                      32

   v.   July 14, 2009 is not Plaintiff's correct max date.           35

d. Defendants are not entitled to qualified immunity, because
The law governing this case was clearly established              36

e. Heck v. Humphrey does not bar Plaintiff's claims,
Because Plaintiff is not in custody and is not challenging
His conviction or sentence                                             38

VII.  CONCLUSION                                                              39

TABLE OF AUTHORITIES

**FEDERAL CASES**

Anderson v. Liberty Lobby, 477 U.S. 242 (1986)…………………………………….6

Boyle v. County of Allegheny, 139 F.3d 386 (3d Cir. 1998)………………….......6

Celotex v. Catrett, 477 U.S. 317 (1986)……………………………………………7

Fitzpatrick v. Algarin, 2008 U.S. Dist. LEXIS 59946 (E.D. Pa. 2008)…………..33

Harlow v. Fitzgerald, 457 U.S. 800 (1982)…………………………………………37

Heck v. Humphrey, 512 U.S. 477 (1994)……………………………………………38

Hutto v. Finney, 437 U.S. 678 (1978)……………………………………………...7

International Raw Materials, Ltd. v. Stauffer Chemical Co.,
        898 F.2d 946 (3d Cir. 1990)……………………………………………………6

Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002)…………………………………..39

Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993)…………………………………8, 22

Pearson v. Callahan, 555 U.S. 223 (2009)………………………………………...37

Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1989)……………………………*passim*

Schneyder v. Smith, 653 F.3d 313 (3d Cir. 2011)………………………………...37

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 56(c)………………………………………………………………..6

**STATE CASES**

Gillespie v. DOC, 527 A.2d 1061 (Pa. Commw. Ct. 1987)………………………33

Nickson v. Pa. Bd. of Probation and Parole,
     880 A.2d 21, 24 (Pa. Commw. Ct. 2005)…………………………………..33

## STATE STATUTES

42 Pa. C.S.A. § 9760…………………………………………………………...34

61 Pa. C.S.A, § 6138 (a)(2)…………………………………………………….34

## I.    INTRODUCTION

Plaintiff Damon Chappelle was kept in DOC custody by Defendants for nearly four months without legal authority.  Although he complained repeatedly and clearly to Defendants, seeking their help in addressing his problem, Defendants responded a superficial manner, if at all.  Because of Defendants' inaction, Plaintiff remained in prison unnecessarily.  He brings this case under 42 U.S.C. § 1983 asserting Eighth Amendment overdetention claims and state law false imprisonment claims against Defendants.  Defendants have moved for summary judgment, arguing that they took sufficient action in response to Plaintiff's claims or, alternatively, that they had no duty to investigate Plaintiff's claim because the Parole Board was responsible for his problem.  Plaintiff now submits his brief in opposition to Defendants' motion.

## II.    RELEVANT PROCEDURAL HISTORY

Plaintiff filed this action on February 11, 2011.  Defendants moved for summary judgment on September 24, 2012 and filed a supporting brief and statement of facts with their motion.  Plaintiff now files this brief in opposition to Defendants' motion, along with a response to Defendants' statement of facts and a counter statement of facts.

## III.    COUNTER STATEMENT OF THE CASE

Plaintiff was imprisoned without legal justification by Defendants at SCI Coal Township in 2009.  Plaintiff complained repeatedly to Defendants for help

1

and asked them to investigate why he was being held, review his records, and take steps to assist him. Despite their duty and ability to help him, given their positions and access to information about Plaintiff's predicament, and despite their awareness of the risk Plaintiff faced, Defendants failed to respond meaningfully, resulting in Plaintiff remaining incarcerated. Plaintiff was finally released from prison after he filed a mandamus petition in state court.

Defendants' primary defense is that it was not their responsibility to assist Plaintiff because they were not responsible for the calculations provided to them by the Parole Board. This defense ignores the fact that Defendants had custody of Plaintiff, they are charged with his care, custody and control. Defendants had access to all of the information and resources necessary to investigate Plaintiff's claims and attempt to resolve them. The focus of a deliberate indifference claim is not on whether the defendant has the power to ultimately resolve the inmate's problem; it is on whether the defendant's actions were reasonable in light of their knowledge and duties.

The evidence in this case supports a finding that Defendants were deliberately indifferent.

## IV.  COUNTER STATEMENT OF FACTS

Plaintiff is filing, contemporaneously with this brief, his Response to Defendants' Statement of Facts and Counter Statement of facts and will not

2

duplicate those here.  Plaintiff will make reference to relevant facts throughout the

brief.

## V.    COUNTER STATEMENT OF QUESTIONS INVOLVED

1.  Should Defendants' motion for summary judgment on
    Plaintiff's Eighth Amendment claims be denied because the
    evidence in the record demonstrates disputed material facts on
    material issues in this case and because a fact finder could find
    in favor of Plaintiff on his claims?

    Suggested Answer:  yes

2.  Should Defendants' be denied qualified immunity because the
    record contains sufficient evidence for a fact finder to conclude
    that Defendants violated Plaintiff's clearly established
    constitutional rights?

    Suggested Answer:  yes

3.  Should Defendants' argument for dismissal of Plaintiff's
    Section 1983 claims on the ground of <u>Heck v. Humphrey</u>'s
    favorable termination rule be rejected by this Court because
    <u>Heck</u>'s rule is inapplicable here?

    Suggested Answer:  yes

4.  Should Defendants' argument for dismissal of Plaintiff's false
    imprisonment rule be rejected by this Court because it is based
    on the false premise that Plaintiff's correct max date is July 14,
    2009?

    Suggested Answer: yes

## VI.   ARGUMENT

### a.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law identifies which facts are "material" for purposes of summary judgment. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. Pa. 1998) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986)).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. Anderson, 477 U.S. at 248.  At the summary judgment stage, a court may not weigh evidence or make credibility determinations; these tasks are left to the factfinder.  Boyle, 139 F.3d at 393 (citation omitted).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that

the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986).

### b. STANDARD FOR EIGHTH AMENDMENT OVERDETENTION CLAIMS.[1]

Incarceration without penological justification violates the Eighth Amendment. <u>Hutto v. Finney</u>, 437 U.S. 678 (1978). There can be no doubt that imprisonment beyond one's term constitutes punishment within the meaning of the Eighth Amendment. <u>Sample v. Diecks</u>, 885 F.2d 1099 (3d Cir. 1989). Holding a person beyond the term of imprisonment imposed by a court is quintessentially punitive. <u>Sample</u>, 885 F.2d at 1108.

In <u>Sample v. Diecks</u>, 885 F.2d 1099 (3d Cir. 1989), the Third Circuit established a three part test for determining whether a prison official is liable for keeping a person in prison beyond their maximum term. A Plaintiff must show that 1) the prison official had knowledge of the prisoner's problem and knowledge of the risk that unwarranted punishment was being or would be inflicted; 2) the prison official either failed to act or took only ineffectual action under the

---

[1] Plaintiff brings his constitutional claims through 42 U.S.C. § 1983, which requires that a defendant's actions be performed "under color of state law." There is no dispute that each Defendant was acting under color of state law during the relevant time frame in this case.

circumstances; and 3) a causal connection between the prison official's response and the unjustified detention. <u>Sample</u>, 885 F.2d at 1110.

A prison official's duties and the role he or she plays in the everyday life of the prison are relevant circumstances to consider when evaluating the official's response to the problem. <u>Sample</u>, 885 F.2d at 1110. If a prison official knows that, given his or her job description or role in the administration of the prison, a sentence calculation problem will not likely be resolved unless he or she addresses it or refers it to others, it is far more likely that deliberate indifference will be found. <u>Sample</u>, 885 F.2d at 1110.

In <u>Moore v. Tartler</u>, 986 F.2d 682 (3d Cir. 1993), the Third Circuit addressed the question whether there was evidence which indicated that the defendants' responses to the plaintiff's problem was the product of deliberate indifference. <u>Moore</u>, 986 F.2d at 686. The Third Circuit agreed with the District Court that because the defendants had begun an investigation which, although slow and incompetent, ultimately resulted in the plaintiff's release from prison, there was no deliberate indifference on the part of the defendants. <u>Moore</u>, 986 F.2d at 687. The Court "believed … that the undisputed facts show that the parole board officials were attempting to resolve the confusion over the sentencing order and were taking affirmative steps … toward that end." <u>Moore</u>, 986 F.2d at 687.

     c. THE RECORD SHOWS THAT DEFENDANTS VIOLATED PLAINTIFF'S EIGHTH AMENDMENT RIGHTS WHEN THEY

FAILED TO RESPOND MEANINGFULLY TO HIS COMPLAINTS
THAT HE WAS BEING OVERDETAINED.

Defendants assert that they did not know there was a risk that Plaintiff was being overdetained, they did not ignore Plaintiff's complaints, and that there was nothing they could do to help him.  <u>See</u> Def Br. at 27.  The record demonstrates that each of these contentions lacks merit and that a fact finder could find in Plaintiff's favor at trial.

i.  Defendants knew of the risk

There is no question that Defendants knew that Plaintiff faced a serious risk of overdetention.  Each Defendant was notified personally by Plaintiff of the risk, either in writing or through conversations.  In addition, Defendants had access to all of Plaintiff's DOC information and could verify the legitimacy of his complaint easily by looking at the computer or in his files.

Varano understood Plaintiff's request slips and grievances to be complaining about being kept past his maximum date.  SMF 162, 165, 166.  Varano also knew about the risk to Plaintiff from the letter sent by Plaintiff's attorney, Burton Rose. SMF 191  In his response to Plaintiff's April 17, 2009 grievance, Varano acknowledges the seriousness of the issue when he writes "obviously we wouldn't be holding you past your max date."  (Plaintiff's Exhibit C, attached hereto)[2].

---

[2] Defendants take a different view of this response by Varano, asserting that it is evidence that Defendants were not, in fact, keeping Plaintiff beyond his max date.

Similarly, Kodack knew that Plaintiff was asserting a serious complaint that he was being kept in prison illegally.  SMF 208  Indeed, Kodack was familiar with inmates' complaints about max dates and had a standard procedure that she used for such questions.  SMF 222  Kodack also knew that the Parole Board can make mistakes.  SMF 210  Herbst interpreted Plaintiff's request slip to be about his "time calculation."  SMF 271  Foulds knew that Plaintiff was asserting that he had served all of his state time and should not be imprisoned at SCI Coal Township.  SMF 286  Plaintiff told Dunn immediately upon being placed in his housing unit that he was not supposed to be in prison.  SMF 308

In addition to the personal notification each Defendant received, all Defendants had access to Plaintiff's sentencing and custody information, through the DOC computer system (DOCnet) and through review of Plaintiff's inmate file (the "DC-15").  SMF 298, 299, 280-282, 243-248, 201-205.  In addition, the non-Records Office Defendants had access to Records Personnel and could inquire about the underlying basis of Plaintiff's complaint.  SMF 305, 285, 172-173

> ii. Defendants took no action or took only ineffectual action in responding to Plaintiff's complaints

The measure of Defendants' actions is whether, under the circumstances, the actions were meaningful.  Sample, 885 F.2d at 1110.  Plaintiff's timeline of

---

Def. Br. at 24.  This theory is intriguing, but ultimately the fact finder will need to determine liability, not a defendant's own self-professed innocence.

incarceration clearly shows that he had served his full twelve year state sentence before he went to the federal system to serve his federal sentence.  SMF 131-144; 160.  Defendants knew that Plaintiff had served his full twelve year sentence, not only because this information was in his records which Defendants maintained and had ready access to but also because Plaintiff had been assigned to Defendants' very same institution for the entire twelve year period.  (Moves report, Kodack Def. Ex. 28, Defendants' Exhibit C.)  The DOC has a duty to make sure all prisoners, including Plaintiff are there pursuant to legal authority.  SMF 154  Given the circumstances here, Defendants' actions not only lacked meaning; they were woefully deficient.

### *Varano's Response Demonstrates Deliberate Indifference.*

As Superintendent of SCI Coal Township, Defendant Varano is responsible for making sure the daily operations of the prison are carried out correctly.  SMF 167  He is ultimately responsible for the facility.  SMF 167  His usual practice is to meet with inmates who submit request slips to him, if the inmate can clearly indicate what the issue is or if the inmate asserts that staff was negligent.  SMF 168-169  If he cannot meet with the inmate he will usually refer the issue to the unit manager and have the inmate meet with the unit manager.  SMF  170  He would get involved if the issue was not resolved. SMF 171  Varano usually consults with the staff member who investigates inmate grievances at the first level

of the grievance system.  SMF 174 He handles the second level of the grievance

system and his practice is to make sure that the first level response was thorough.

SMF 176  He reads and responds to his own mail.  SMF 175

    None of these "usual practices" occurred in Plaintiff's case.  Plaintiff spoke

with Varano at "main line" meal time soon after he arrived at SCI Coal Township,

complaining that he should not be there and wanting to set up a meeting.  Varano

told Plaintiff to send him a request slip.  SMF 177 Plaintiff sent a request slip on

April 17, 2009, clearly identifying the problem and including all of relevant dates.

SMF 178 Plaintiff asked Varano to help him figure out "what is going on."

Plaintiff had not been assigned a Unit Manager or a Counselor because he was in a

POC cell.  SMF 179  At that point in time, Varano was the only one Plaintiff had

reached out to about his problem and was the only one who could help him.

Varano responded by telling Plaintiff to address his issues with the Records Office

and the Institutional Parole office.

    Varano did not call Kodack, the Records Supervisor and did not make an

appointment to talk with Plaintiff.  Varano only completed the response section

and returned the request slip to Plaintiff.  Although the request slip has a "cc:" line

at the bottom listing Kodack's name, Kodack does not remember getting a copy of

the request slip.  SMF 184  In fact, Kodack does not remember anyone from the

Superintendent's office, including Varano, speaking with her about Plaintiff's

complaint at all.  SMF 199.  Varano's actions at the point of the first request slip were critical, and, conversely, a lack of meaningful action at that point strongly suggests deliberate indifference.  See Sample, 885 F.2d at 1110 ("If a prison official knows that, given his or her job description or role in the administration of the prison, a sentence calculation problem will not likely be resolved unless he or she addresses it or refers it to others, it is far more likely that deliberate indifference will be found.")

Plaintiff sent a second request slip to Varano on April 22, 2009, reiterating his complaint of overdetention, providing the relevant timeline and notifying Varano that he had sought help from staff (he was now in general population) but they had not been helpful.  SMF 186, 187  Again, he asked Varano for a meeting so he can discuss the problem with him.  SMF 188  Varano did not schedule a meeting with Plaintiff, and did not contact the Records Department to follow up and find out whether the Records staff were working on Plaintiff's problem.  SMF 188, 189.  Instead, he repeated his instruction that Plaintiff should contact Records and the Institutional Parole Office.  SMF 190.

On April 22, 2009, Plaintiff's criminal defense attorney, Burton Rose, writes a letter to Varano, expressing his serious concern that his client is back in prison and asking Varano to look into the matter so that Plaintiff can be released.  SMF 191.  Attorney Rose states that he believes a legal error has occurred and that

11

Plaintiff should have completed his state sentence. SMF 91. Even after Varano received the letter from Attorney Rose asking him to look into this matter, the evidence suggests that Varano did not take any steps to investigate or even to respond to the letter. Varano testified at his deposition that he did not recall receiving the letter. SMF 193  To the extent this testimony is controverted by the date stamp and the letter's presence in Plaintiff's DOC file, this raises an issue of disputed fact. SMF 192

Plaintiff next filed a grievance, on May 5, 2009, raising the same complaint and explicitly stating that he had a question about how his sentence calculations were being handled. SMF 194  After Kodack denied the grievance on May 21, 2009, Plaintiff appealed to Varano. Varano "rubber stamped" Kodack's denial on May 26, 2009. Varano testified at his deposition that he spoke with Kodack about Plaintiff's complaint before he responded to the grievance. SMF 198  However, Kodack does not recall any such conversation. SMF 198 Varano testified that he did not take any other steps other than talking with Kodack. SMF 198  To the extent this testimony is controverted by Kodack's, this raises a disputed issue of material fact as to what Varano did to look into Plaintiff's complaint. Apart from that factual dispute, the record strongly supports a finding of deliberate indifference. Even if Varano did have this conversation with Kodack, it did not occur until some time between May 21st and May 26th – over one month from the

date on which Plaintiff first contacted him and approximately a month after

Attorney Rose wrote to Varano, urgently requesting assistance for Plaintiff.

Given the factual disputes over what actions Varano took, Plaintiff's claims

against him are not appropriate for summary judgment.  In addition, Viewing the

evidence in the light most favorable to Plaintiff, a jury could find that Varano's

actions were either non-existent or ineffectual in response to Plaintiff's claim and

that he was deliberately indifferent towards Plaintiff.

### *Kodack's response demonstrates deliberate indifference.  (SMF 201-239)*

As the Records Supervisor, Kodack was required to maintain the inmates'

files and ensure that the information in those files was complete and accurate.

SMF 211 She oversaw both the reception and release processes from a Records

perspective, kept track of inmates' service of their sentences through various

reports, knew where each inmate was at any time, through the use of the "Moves"

report and other tools. SMF 202-206, 220, 228  She could access outside databases,

such as "J Net" to find out the dispositions of court cases.  SMF 207, 217

She was responsible for verifying the accuracy of information from both the

courts and the Parole Board, to the extent that information impacted inmates'

sentences.  SMF 213, 215, 219  She reviewed the work of the Records Specialists,

including that of Defendant Herbst.  SMF 216

Kodack was required by her job to interview inmates and explain her responses to their questions about Records office information if necessary. SMF 221  She testified that she can meet with an inmate if he has questions, including questions about sentence credit and if she needed more information from the inmate in order to look into his issue. SMF 221,223

Kodack is required to verify the information supplied by the Parole Board. SMF 215  She can contact the Parole Board to ask a question about a calculation and she can check DOC's records in connection with a question about a calculation. SMF 224

Kodack had access to DOC's legal office for questions surrounding claims of overdetention. SMF 218, 229  The DOC's Records Administrator in the Central Office was also available to her for questions on a particular inmate's case. SMF 226

In addition to the above specific job duties, Kodack was required to follow DOC policy with regard to ensure the validity of an inmate's confinement at SCI Coal Township, both initially and if the inmate returned as a Parole Violator. SMF 156  Part of this process is to make sure that a Parole Violator has been "properly returned" to the DOC by checking his confinement documents. SMF 156

Backtime is the amount of time an inmate has left to serve on his sentence at the time he is released on parole. Plaintiff was incarcerated at SCI Coal Township serving a 6 to 12 year sentence which began in 1995 when he was released on parole on April 9, 2001. His backtime, according to a Parole Board calculation, was 5 years, 9 months, and 17 days. On September 26, 2001, the day after he was arrested and taken into custody on the Parole Board's warrant, Plaintiff began to serve his "backtime." He continued to serve it until July 19, 2007, when he went to the federal BOP system to serve his federal sentence.

After serving his federal sentence, Plaintiff was brought back to state custody and was admitted to SCI Coal Township on April 15, 2009. He was angry, confused, and desperately seeking help from prison officials in figuring out why he was there and, more importantly, how to get released.

On May 1, 2009, Kodack approved "Version 5" of Plaintiff's DOC Sentence Status Summary (DC-16E) which had been created by Herbst, a Records Specialist. Creating a new DC-16E form was regular practice for Records staff when a parole violator was returned to DOC custody by the Parole Board. The Parole Board supplied DOC with a "backtime" number for Plaintiff of 1,971 days. Herbst typed this into the DOC computer, which generated a new maximum release date for Plaintiff of September 6, 2014. Kodack approved this form and September 6, 2014 became Plaintiff's new max date, even though he had already

served his full 12 year sentence.  Plaintiff's 12-year sentence was clearly reflected on the same DC-16E form, along with the effective date of the sentence, which was 1995.  Kodack did not check the accuracy of the Parole Board's "backtime" calculation.

Plaintiff received a copy of the new DC-16E on May 4th.  On May 5, 2009, Plaintiff filed a formal DOC grievance asking the Records Department to investigate his sentence credit and explain to him why he was not being given credit for nearly six years he had spent in DOC custody.  Plaintiff requested that this sentence credit be applied by the Records Department.  Plaintiff noted in the grievance that he had already contacted both Varano and Institutional Parole office staff and had provided them with notices and court documents.  Kodack responded to the grievance by telling Plaintiff that the Parole Board and the DOC are two separate entities and that he needed to talk with the Parole Board to get answers. Kodack did not address the timeline or dates in Plaintiff's grievance, and did not offer any explanation of why he did not get credit for his time spent in DOC custody.  Despite Plaintiff's clear statement that he was questioning the accuracy of his sentence calculation and why he had not been given credit for time spent in DOC custody, Kodack dismissed this as "parole violator" issue and refused to look into Plaintiff's complaints.

Kodack did not interview Plaintiff to try to better understand his complaint. She does not remember if she contacted Parole, but there is no document in Plaintiff's file to substantiate a claim that she did and Jennifer Shurock, the Institutional Parole Agent does not recall anyone from Records discussing Plaintiff's issues with her.  Other than referring Plaintiff to Parole, Kodack does not remember any other steps that she took when responding to this grievance.

One possible inference is that Kodack did not actually review any documents in Plaintiff's file.  Another possible inference is that she did review the file, including the two most recent DC-16E forms.  If she had done this, she would have seen the DC -16E dated 5/1/09 (which she had approved approximately a week earlier) which stated that 9/6/2014 was Plaintiff's max date.  She would also have seen that Plaintiff's total sentence of 6 to 12 years had not changed, and that the only two state convictions were the original convictions incurred in 1995.  See Bates # 895 – 897.  Seeing this information, and having access to all of the other information in the file, including the Moves report (Kodack Dep. Ex. 28) which showed that Plaintiff had been continuously in DOC custody from September 26, 2001 to July 19, 2007, she could have seen that plaintiff's claim had merit and that there was a serious risk that he was being held past his maximum sentence.  One possible inference is that despite seeing this, she chose to merely refer the plaintiff to the Parole Board, an action which she knew from past experience would result

17

in no investigation or help for plaintiff.   Another possible inference is that she did

not review the file or the DC 16E's and merely referred Plaintiff to the Parole

Board without conducting any investigation whatsoever.

Kodack's response was clearly inadequate, given what she knew and what

her duties were.  Kodack knew from the grievance, that Plaintiff had already tried

to get assistance from Parole, to no avail.  Kodack knew from past experience, that

Parole can make mistakes, and she knew (or should have known) from signing off

on the "Version 5" of the DC-16E that there was something wrong with Plaintiff's

back time number and the related max date.  Even a cursory review of Plaintiff's

DOC files, all of which she had access to, would have shown her that Plaintiff's

complaint had merit and needed to be looked into.  Moreover, the validity of

Plaintiff's return to SCI Coal Township needed to be looked into, since if what

Plaintiff was stating was true, he was not a "parole violator."

Kodack had access to numerous sources for additional information and

assistance and consultation.  She did not utilize any of them and made no contact

with the Records Administrator, DOC Chief Counsel's office.  Most significantly,

she made no contact with the Parole Board to ask about Plaintiff's backtime

calculation, which she had identified as the purported source of the problem.

Kodack knew how to check on the accuracy of data related to sentences; it is a

primary function of her job of computing sentence structures.  Kodack was very

careful to check the accuracy of information supplied by courts which impact

inmates' sentences.  These precautions are taken to make sure that the inmate's

sentence is correct and to make sure he does not get too much credit.  It would not

have taken much effort for Kodack to review Plaintiff's file and verify that he had,

indeed, been in DOC custody for a full twelve years.  It would not have taken

much effort to confirm that he only had one sentence with a maximum term of

twelve years.  Kodack had all of the necessary information and resources at her

disposal to take these actions. She also had access to any staff member at the

Parole Board and could have contacted them to alert them to the problem and work

on a resolution.  She did as much when handling potentially erroneous information

from the courts.  Instead of taking these steps, Kodack simply told Plaintiff to

contact the Parole Board.

By refusing to investigate Plaintiff's complaint, Kodack failed to carry out

her duty as a Records Supervisor to ensure that there is a legal basis for each

inmate incarcerated at SCI Coal Township and to ensure the accuracy of the

information in Plaintiff's file and the accuracy of sentence calculations.  Kodack

also failed to carry out her duty to verify information from the Parole Board.

Given her position, knowledge, and duties, and the seriousness of Plaintiff's

complaint, Kodack's cursory response with absolutely no investigation done or

affirmative steps to resolve Plaintiff's problem, demonstrates deliberate

indifference.  Cf., Moore, 986 F.2d at 687 (affirmative steps to investigate shows a lack of deliberate indifference).[3]  As a result of Kodack's inactions, Plaintiff spent time in prison with no justification.  A fact finder could find in Plaintiff's favor on his claim against Kodack.  Viewing the evidence in a light most favorable to Plaintiff, summary judgment should be denied Kodack.

There are disputed issues of material fact regarding what Kodack did which preclude summary judgment for Kodack.  Moreover, given the evidence in the record, a fact finder could find Kodack's response to Plaintiff deliberately indifferent.  Summary judgment should be denied.

### *Herbst's response demonstrates deliberate indifference*

As a Records Specialist Two in charge of Plaintiff's file, Herbst had access to all of Plaintiff's sentencing and custody information. SMF 240, 243  Herbst was responsible for ensuring that accurate information is maintained in the Inmate Records System computer. SMF 244  She also was responsible for carrying out "documentary investigative" duties in connection with the maintenance of inmates' files.  SMF 245 If Herbst needed to know where an inmate in her caseload had been imprisoned at any time in the past, she could pull that information up on the computer. SMF 246  Herbst was responsible for the computation and re-

---

[3] Plaintiff notes that throughout the litigation, Kodack and the other Defendants have offered a defense that it was not their responsibility to assist Plaintiff because it was the Parole Board which supplied the flawed calculation.  This argument is addressed below at Section iii.

computation of inmates' sentences to ensure that inmates were properly committed and confined. SMF 247  Herbst's duties included verifying the accuracy of information related to newly committed inmates and parole violators returning to the institution. SMF 250-251  Part of the process for handling a Parole Violator is for the Records specialist to complete a PVP-16E form.  SMF 253.  This is also called a "Sentence Status Sheet" and it contains information pertaining to an inmate's sentences, minimum and max dates, sentence structure (whether the sentences are to run concurrent or consecutive), among other information.  SMF 253  Herbst was required by her job to meet with inmates if necessary to explain issues related to sentence status changes.  SMF 257

Herbst completed two DC-16E forms for Plaintiff – one on April 16, 2009 ("Version 4") and one on April 28, 2009 ("Version 5").  SMF 264-265  "Version 4" was created merely to reflect that Plaintiff had been returned to SCI Coal Township as a Parole Violator.  SMF 264  "Version 5" had the effect of generating a maximum release date of September 6, 2014 for Plaintiff.  SMF 265  This occurred when Herbst input 1,971 days as "backtime owed" by Plaintiff – an amount supplied by the Parole Board.  SMF 265.

Plaintiff had no new state sentences and his DOC records reflected that he had spent 12 years incarcerated in SCI Coal Township.  (Kodack Dep. Ex. 28)

Herbst had access to all of those records.  Herbst did not double-check the accuracy or validity of the 1,971 days of backtime.  She did not conduct any check on this because she this is simply how she did her job; the Parole Board provided the backtime calculation and she input it into the computer.  SMF 267, 268  If the "backtime owed" amount generated a far distant max date for an inmate, then in Herbst's opinion, it was up to the inmate to contact the Parole Board to complain. SMF 267 By contrast, when Herbst input sentence information from court orders into the computer system, she regularly contacted court officials to ask about possible errors or discrepancies.  SMF 261-263

Herbst could contact Parole if she had any questions about an inmate's sentence.  SMF 258  She could have contacted the Parole Board or done some investigation into the basis for the calculation.  SMF 259  She could also have spoken with Kodack, her supervisor.  SMF 260  Herbst took none of these steps when inputting the 1,971 days of back time on April 28, 2009.

Likewise, Herbst did not make any effort to investigate Plaintiff's concern when he sent a request slip to Kodack on May 18, 2009.  SMF 269  Herbst answered the request slip because Plaintiff was in her caseload.  SMF 270 Plaintiff's request slip asked to meet with Kodack to discuss the "total time he had spent at the institution" and a possible sentence error.  SMF 269  Herbst did not conduct a review of Plaintiff's file before responding, she "just answered it."  SMF

271  Herbst's answer was that "If you need answers for time from your TCV you will need to talk to Parole. We have nothing to do with there [sic] calculations." (Herbst Dep. Ex. 14, Defendants' Exhibit D.)   Herbst added "As for your original sentence, it would've had to be right before you were paroled."  (Id.)  Herbst did not talk with Kodack or anyone about Plaintiff's issue.  SMF 276, 277  Herbst did not look at any parole information that she had received as of May 18, 2009, including the backtime calculation she had input into Plaintiff's file on April 28, 2009.  SMF 274  She did not call the parole office because it was up to Plaintiff to do that if he wanted it fixed.  SMF 275  Herbst did not schedule a meeting with Plaintiff even though he requested one.

Herbst's response shows a clear lack of concern.  Instead of responding to the issues raised in the request slip, Herbst shifts the focus to the Parole Board for "questions about his TCV."  However, Plaintiff did not write about his "TCV."  He wrote about a possible sentence error, which Herbst flatly refused to investigate, telling Plaintiff that it "would have had to be right" before he was paroled.  Thus, Herbst failed to carry out her most basic duty of ensuring the accuracy of information in the inmate's DC-15.  It was the inmate's problem if erroneous information resulted in a problem.  A fact finder could find that Herbst was deliberately indifferent, in light of her clear duties to investigate problems with Plaintiff's file and her equally clear refusal to do so.

### *Foulds' response demonstrates deliberate indifference.*

Foulds was Plaintiff's Counselor when he was returned to SCI Coal Township.  Because Plaintiff did not have any physical access to either the Parole Office or the Records Office, he relied on Foulds to bridge the gap between himself and the staff in those offices.   He needed her to be active in helping him solve the problem.  Foulds had access to his DC-15 file through the Records Department and could also review his DC-16E forms on the computer to see his sentence information. SMF 280  Foulds could access the Moves report on the computer.  SMF 282  Foulds could have requested a meeting with Records to discuss Plaintiff's problem. SMF 285  Foulds does not recall if she called Records to discuss Plaintiff's problem.  SMF 288 She does not remember if she looked in Plaintiff's file.  SMF 289

Plaintiff met with Foulds on several occasions in her office, desperately seeking her help in investigating the problem.  Plaintiff told Foulds when he met with her that he had served his state time and was not supposed to be back at SCI Coal Township.  Foulds contacted Ms. Pijar (Shurock) in the Institutional Parole Office once while Plaintiff was in her office and relayed information to Pijar as well as Plaintiff's requests for help.  SMF 293  While Foulds was on the phone with Pijar, Plaintiff asked if he could meet with Pijar and Foulds relayed that request.  Pijar told Foulds that she would not agree to meet with Plaintiff.  SMF

293  However, Foulds does not remember contacting Pijar.  SMF 291  Foulds also does not know whether Plaintiff contacted the parole office.

Foulds testified that she only had the information provided to her by Plaintiff about his claim that he was being held illegally.  However, this is not true.  She had access to all of the information she needed in order to verify what Plaintiff repeatedly told her.  She could check to see when and where he was in state custody through the Moves report.  (Kodack Dep. Ex. 28)  She could check his sentence information through the DC-16 E forms and verify that it was true that his sentence began in 1995 and was for a maximum term of 12 years.

She not only could, but did, check Plaintiff's program completion on the computer.  SMF 283  She did this soon after Plaintiff was assigned to her caseload.  She met with him and informed him that he would have to take certain programs in order to prepare for eventual release.  Plaintiff immediately told her that he had already taken those programs in 2007 and that she could check that on the computer.  Foulds did check the computer and saw that he was correct.  Plaintiff then asked her whether or not she understood his problem – that he should not be back in prison.  He also asked her for help in resolving the problem.  Foulds merely told him that there was nothing she could do.  SMF 295  By contrast, Foulds does not recall having a conversation with Plaintiff about his programming or Plaintiff informing her that he had already taken the programs.  SMF 296

Foulds did not contact Parole after finally receiving the April 16, 2009 Parole

Board Action which she had been waiting for when Plaintiff spoke with her.  SMF

292.

Disputed issues of fact exist about what actions Foulds took in response to

Plaintiff's complaint.  The fact finder will need to determine whether Foulds

verified that Plaintiff's complaint was valid by looking at his programs on the

computer.  The fact finder will also need to decide if Foulds did intercede on his

behalf with Pijar.  These fact issues preclude summary judgment for Foulds.

As Unit Manager, Dunn is required to plan, coordinate, and direct the

treatment programs for inmates on his unit. SMF 300  Dunn also chairs unit

meetings where issues concerning an inmate's programming, release and custody

levels are discussed and changes are recommended. SMF 301   A Unit Manager is

responsible for addressing inmates' needs, including asking other staff members to

help if necessary or making arrangements for the inmate to speak with whomever

he need to speak with to get the problem resolved.  SMF 302  The Unit Manager

can arrange a meeting between the inmate and the Records Supervisor to discuss

sentence structure or other time credit related issues and can arrange for an inmate

to get other staff assistance outside the unit.  SMF 303, 304 Unit Managers also

meet with inmates in response to request slips they submitted.  SMF 304

Dunn's usual practice when an inmate requested to see staff in Records or the Institutional Parole office was to direct the inmate to write out a request slip, which Dunn would put in the internal mail system; Dunn did not give out "hall passes" for inmates to visit these offices. SMF 307  Dunn has, however, called both the institutional parole office and the records office to ask a question to try to help an inmate.  SMF 305  Staff are also allowed to go to Records to review an inmate's file.  SMF 310

### *Dunn's response demonstrate deliberate indifference.*

Plaintiff told Dunn about his illegal detention as soon as Plaintiff arrived on Dunn's unit.  SMF 308  Dunn's only response was "send me a request slip".  SMF 309  Plaintiff sent Dunn more than one request slip but he never received a response from Dunn, either written or verbal.  SMF 309  DOC policy requires that staff respond to inmates' request slips within five business days.  SMF 159  Staff could come to Records and check the inmate's file to get information or ask Records Department staff questions.  SMF 310 Herbst does not recall any non-Records staff coming to Records to ask about Plaintiff.  SMF 311

Dunn testified in his deposition that he does not ignore inmates who ask him questions.  SMF 77  However, Plaintiff's testimony contradicts this.  Dunn was a gateway to staff who could help Plaintiff outside the unit.  He could have arranged for Plaintiff to meet with Records, he could have accessed Plaintiff's sentence and

27

custody information to verify Plaintiff's complaint.  Even though he is not trained in how to calculate backtime, Dunn could have facilitated Plaintiff's getting help from either Records or Parole.  The record indicates that he did none of this.  This dispute over what actions Dunn did take in response to Plaintiff's claims precludes summary judgment for Dunn, as a fact finder cannot conduct the analysis required by Sample v. Diecks without this information. A fact finder could find that Dunn's failure to respond in any way whatsoever constituted deliberate indifference.

### *The evidence supports a finding of deliberate indifference by all Defendants.*

Defendants argue that this is not a case where Defendants simply "refused to investigate" Plaintiff's claims.  See Def. Br. at 20.  To the contrary, Defendants' superficial and cursory responses to Plaintiff's urgent requests to them to help him are tantamount to a refusal to investigate.  Moreover, evidence in the record supports a finding that Defendants did no investigation whatsoever.

Plaintiff did everything in his power to make Defendants aware of his urgent problem.  He submitted request slips, had discussions, filed a grievance, enlisted the aide of his attorney.  Defendants had no reason to disbelieve Plaintiff's claim that he had served all twelve years of his 6 to 12 year sentence.  And, if they did disbelieve him at first glance, even a quick review of his DOC records would show that his claim was credible. Defendants knew that that the risk of overdetention

was serious and yet they failed to do anything more than "pass the buck."  A jury could find for Plaintiff on his Eighth Amendment claims against Defendants.

In contrast to <u>Moore</u>, in this case, Defendants took no affirmative steps to help Plaintiff with his problem.  Plaintiff repeatedly sought their help in investigating the reason he had been brought back to prison and remained there. Defendants responded in a cursory fashion, immediately and automatically referring Plaintiff to the Parole Board.  Defendants did not take the time to review his sentence and custody information, which was easily accessible in their own files, to verify his complaint.  Instead they referred Plaintiff to the Parole Board, despite knowing that he had already sought help from Parole unsuccessfully. Defendants played no affirmative role in Plaintiff's eventual release from prison. He was released, finally, after he filed a mandamus petition in state court which finally triggered some attention from DOC officials.  Had he not filed that petition, Plaintiff would likely still be in prison at SCI Coal Township – serving time until September 6, 2014 (his recalculated max date).  A jury could find, on the evidence in the record, that Defendants were deliberately indifferent and violated Plaintiff's Eighth Amendment rights.

iii. Defendants' attempt to shift attention away from their actions should be rejected by this Court, because the Parole Board's actions are not the focus of the claims in this case.

The focus for "deliberate indifference" analysis is on the actions Defendants took to investigate or resolve Plaintiff's problem when he complained to them about being over detained. Defendants' attempt to frame the debate around the actions of the Parole Board ignores the fact that whatever triggered the overdetention is not the focus of the claims. It is the Defendants' *response* to the problem which is the focus.

Sample offers some guidance in addressing this issue. In Sample, as here, the defendant prison official argued that the decision whether or not to grant sentence credit which would result in the release of the plaintiff was not his to make. Sample, 885 F.2d at 1099, 1111-1112. The defendant also blamed the confusing nature of the sentencing orders involved. See id. The Third Circuit rejected these arguments, observing that the focus for the deliberate indifference question was whether the defendant had a duty to investigate and unravel sentencing problems, not necessarily whether the defendant had the sole ability to resolve the problem. See Sample, 885 F.2d at 1112 (observing that "[w]hether Diecks was the proper person to grant credit is not the point.") The Court emphasized that because the defendant had access to all of the relevant records and the training to decipher them, he was "in the best position to either solve the

30

problem or know who could."  See id.  Consequently, the defendant's failure to

take meaningful steps to resolve the problem demonstrated deliberate indifference.

See id.

Defendants should not be permitted to shift attention away from their action

and inaction in response to Plaintiff's problem by claiming they did not have the

unilateral ability to resolve it.  As in Sample, the record evidence here indicates

deliberate indifference based on the failure to take meaningful action.  Plaintiff was

in Defendants' custody.  He was under lock and key in their prison.  They were

responsible for his care, custody and control.  Defendants had access to all of the

information necessary to "unravel the problem."  The Parole Board does not

imprison people.  Although the Parole Board does have the authority to calculate a

parole violator's "back time" and the authority to "recommit" a parole violator to

serve that remainder of the sentence, the Parole Board does not track service of

sentences and it does not have the power to impose a new sentence.

Defendants' own policies and procedures clearly reflect that DOC was

responsible for ensuring the accuracy of information used in sentence calculations.

SMF 154-156.  These policies also require that DOC ensure that Parole Violators

are being returned properly by the Parole Board. (Id.)  The Defendants' oversight

of the Parole Board's decisions as to the actual physical custody of prisoners

reflects the division of power between the two agencies.  Defendants' responses to

Plaintiff's complaints must not be conflated with the ultimate source of the problem in the deliberate indifference analyis.

   iv.   This Court should also reject Defendants' liability-shifting argument because the evidence supports a finding that it is the DOC, not the Parole Board, that is responsible for calculating the "max dates" for the inmates in its custody.

The Parole Board has the authority to recommit a parole violator who is convicted of a new crime for the "remainder of [his] original sentence."  <u>See</u> 61 Pa. C.S. § 6138 (a)(2).  The Parole Board is responsible for calculating this amount of time.  <u>Id.</u>; SMF 27.  This amount of time is also referred to as "backtime."  SMF 242

Although related, backtime is not the same thing as an inmate's "max date."  Backtime is calculated by subtracting the date an inmate was released on parole from the original maximum date established by the DOC.  SMF 28.  Backtime is a static figure and does not change.  (Janis Dep. at 95:22 – 96:5, Defendants' Exhibit H.) The backtime information is sent to the DOC by the Parole Board, and a "max date" is calculated when the DOC inputs the information into its computer.  SMF 28. The new "max date" is generated by the DOC computer and is reflected on the inmate's DC-16 E Form.  SMF 28  A backtime calculation cannot cause an inmate to serve more time than the original sentence from the court called for.  SMF 161.

Both Pennsylvania and federal courts in the Third Circuit acknowledge that the DOC, not the Parole Board, is responsible for calculating the maximum

sentences for inmates in their custody.  See, e.g., Nickson v. Pa. Bd. of Probation and Parole, 880 A.2d 21, 24 (Pa. Commw. Ct. 2005)(holding that "it is the Department of Corrections that is 'responsible for calculating the minimum and maximum terms of prisoners committed to its jurisdiction."); Gillespie v. DOC, 527 A.2d 1061, 1065 (Pa. Commw. Ct. 1987) (this responsibility is exclusive to the Department of Corrections); Fitzpatrick v. Algarin, 2008 U.S. Dist. LEXIS 59946 (E.D. Pa. 2008) (extending logic of Nickson to county prisoners' sentences).

At the time he was arrested on September 25, 2001, the Parole Board calculated that Plaintiff owed 5 years, 9 months and 17 days on his state sentence. SMF 160.  This amount of time did not change.  Plaintiff was taken into custody on September 25, 2001 and remained in DOC custody serving time on his state sentence from September 25, 2001 until July 19, 2007 when he went to serve his federal sentence.  SMF 138  This amounts to five years (9/25/01 to 9/25/06), nine months (9/26/06 to 6/26/07), and 22 days (6/27/07 to 7/19/07).  Therefore, when he left SCI Coal Township on July 19, 2007 to serve his federal sentence, Plaintiff had served all the time he owed on his state sentence.

Regardless of by whom the "max date" was calculated, under state law, Plaintiff was entitled to credit on his state sentence for all of the time spent in custody, under 42 Pa. C.S.A. § 9760, which provides:

> credit against the maximum term and any minimum term shall be
> given to the defendant for all time spent in custody as a result of the

criminal charge for which a prison sentence is imposed or as a result
of the conduct on which such a charge is based.  Credit shall include
credit for time spent in custody prior to trial, during trial, pending
sentence, and pending the resolution of an appeal.

42 Pa. C.S.A. § 9760.

Defendants had access to all of Plaintiff's sentencing information and all of

his custody information.  SMF 140, 204, 240.  They knew that his maximum

sentence was twelve years and they knew that he had spent twelve years serving

that sentence from 1995 to 2007.  SMF 139  Defendants, not the Parole Board, had

physical custody of Plaintiff.  Defendants were the ones who finally released him

from custody on July 31, 2009 after he filed a petition for mandamus in the

Pennsylvania Commonwealth Court.  SMF 147-149

The fact that Plaintiff was only released after he filed a mandamus petition

against the DOC also supports the notion that it is the DOC, not the Parole Board,

that is responsible for establishing max dates and releasing prisoners.  The

mandamus petition only named the DOC as a respondent, as DOC is the legal

entity responsible for keeping custody of prisoners.  SMF 148.  The DOC's

"suggestion of mootness," in that action, which stated that Plaintiff was "released

after his maximum date was recalculated by the Department in conjunction with a

revised order of the Pennsylvania Board of Probation and Parole," also supports

this argument.  SMF 148-152  The Parole Board supplies a component of the

recalculation to the DOC; it does not do the recalculation itself.  Defendants cannot

be permitted to use a "hear no evil, see no evil" strategy and blame the Parole Board for Plaintiff's overdetention.

v.  July 14, 2009 is not Plaintiff's correct max date.

Defendants assert throughout their brief that July 14, 2009 is the correct max date for Plaintiff.  Defendants are wrong.  This date fails to take into account that Plaintiff served his full 12-year sentence in state custody from 1995 to 2007.

The July 14, 2009 max date is also wrong because it is based on the Parole Board's designation of the two-year period from 2/20/02 to 2/20/04 as the time that Plaintiff spent serving his federal sentence, even though Plaintiff was in DOC custody at the time, serving his state sentence.  (Janis Dep. 142:8-13; SMF 133.) This designation is also factually wrong because Plaintiff served his federal sentence beginning on July 19, 2007 and ending on April 15, 2009.  Further, the federal system (BOP) did not give Plaintiff permission to have his time served in state custody count towards his federal sentence.  SMF 142

It is unclear why the Parole Board made this decision to designate 2/20/02 to 2/20/04 as the time for Plaintiff's federal sentence and therefore refuse to give him "backtime credit" for that time period.  The record does not provide any logical reason for this decision, which has no basis in reality.[4]  It is equally unclear why

---

[4] The timing of this decision by the Parole Board may be telling.  The Parole Board did not arrive at this new calculation until July 29, 2009, nine days after Plaintiff

Defendants accepted this decision despite knowing that:  Plaintiff had spent this time period in DOC custody; Plaintiff was not getting credit by the federal authorities on his federal sentence for time spent in state custody; and they had sent Plaintiff to serve his federal sentence directly from SCI Coal Township on 7/19/2007.  Finally, as Defendants have insisted throughout their depositions that they do not know how the Parole Board arrives at its calculations and that they never check on the accuracy or validity of the Parole Board's calculations, their insistence on the validity of this date is circumspect.  Defendants apparently expect the Court to accept this new proposed max date for Plaintiff with blind faith.  For the reasons outlined above, Plaintiff urges the Court to reject this invitation.[5]

> d.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE LAW GOVERNING THIS CASE WAS CLEARLY ESTABLISHED.

---

filed his mandamus petition in the Commonwealth Court.  Just before this, Plaintiff's "backtime owed" amount had been 1,971 days and his "new" max date had been September 6, 2014.  (Janis Dep. at 142-143, Defendants' Exhibit H; Herbst Dep. Ex. 4 at Bates # 895 – 900.)

[5] As Defendants ground their dismissal argument for the false imprisonment claims on the validity of the July 14, 2009 max date, Plaintiff urges the Court to deny this portion of Defendants motion for the same reasons discussed.  Plaintiff submits that the same record evidence supporting his Eighth Amendment claims similarly supports his false imprisonment claims against Defendants, as it clearly shows unlawful incarceration against Plaintiff's will.

Defendants argue that they are entitled to qualified immunity from suit. See Def. Br. at 24-25. A review of the record in this case and the relevant legal standards reveals this assertion to have no traction.

A public official is entitled to qualified immunity if the conduct he is charged with "does not violate clearly established constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining if a defendant is entitled to qualified immunity, "[t]here are two related but distinct inquiries." Schneyder v. Smith, 653 F.3d 313, 318 (3d Cir. 2011). The court must consider "whether the defendant's conduct violated the plaintiff's civil rights." Id. It must also determine "whether the right in question was clearly established at the time of the violation." Id. It is within the court's discretion to "decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Defendants base their qualified immunity argument on their assertion that there was "nothing they could have done" to help Plaintiff and therefore, they are immune. Def. Br. at 25. As discussed above, the question for an overdetention claim is not whether a defendant has the final or only solution to the inmate's problem; it is whether he or she responded in a meaningful way to the inmate's complaint. The evidence strongly suggests that Defendants did not respond

meaningfully to Plaintiff's complaint. Defendants' assertion that "this is not a case where the Defendants knew that Plaintiff's sentence had expired and had refused to release him." Def. Br. at 26. To the contrary, each Defendant knew both from Plaintiff and from multiple sources of information that Plaintiff had served his full 12-year sentence. Despite this knowledge, Defendants failed to help Plaintiff in a meaningful way.

Finally, Defendants' assertion that Defendants did not "act in knowing violation of any law or regulation," misstates the qualified immunity standard which provides that a prison official's conduct does not "violate clearly established constitutional rights of which a *reasonable person* would have known." Harlow, 457 U.S. at 818. The standard is objective, not subjective. Given the state of overdetention law in the Third Circuit in 2009, it is clear that Defendants' actions in failing to take meaningful steps to help Plaintiff violated clearly established law.

   e. <u>HECK V. HUMPHREY</u> DOES NOT BAR PLAINTIFF'S CLAIMS
      BECAUSE PLAINTIFF IS NOT IN CUSTODY AND IS NOT
      CHALLENGING HIS CONVICTION OR SENTENCE.

In their last argument for dismissal of the Eighth Amendment claims, Defendants misapply the favorable termination rule set forth in <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994). The <u>Heck</u> rule provides: "where success in a 1983 action would implicitly call into question the validity of conviction or duration of sentence, the plaintiff must first achieve favorable termination of his available state

or federal habeas remedies to challenge the underlying conviction or sentence."

Heck, 512 U.S. at 486-87.  In Leamer v. Fauver, 288 F.3d 532, 542 (3d Cir. 2002),

the Third Circuit explained that the Heck rule applies:

> whenever the challenge ultimately attacks the 'core of habeas' -- the validity of the continued conviction or the fact or length of the sentence -- a challenge, however denominated and regardless of the relief sought, must be brought by way of a habeas corpus petition. Conversely, *when the challenge is to a condition of confinement such that a finding in plaintiff's favor would not alter his sentence or undo his conviction, an action under § 1983 is appropriate.*

Leamer v. Fauver, 288 F.3d 532, 542 (3d Cir. 2002) (emphasis added).

In this case, unlike the cases cited by Defendants, Plaintiff is not in custody. Moreover, success on Plaintiff's claims will not "necessarily imply the invalidity of his sentence or conviction."  Indeed, the very basis for this lawsuit is the fact that Defendants kept him imprisoned *in violation of* the sentencing order imposed by Judge DeFino.  If anything serves to imply the invalidity of Plaintiff's sentence it was the actions of the Defendants in this case, whose actions resulted in a *de facto* additional sentence being imposed on Plaintiff.

## VII.  CONCLUSION

For the foregoing reasons, Plaintiff Chappelle respectfully requests that this Court deny Defendants' motion for summary judgment.

Respectfully submitted,

s/ Jennifer J. Tobin

Date: October 22, 2012            Jennifer J. Tobin
Attorney I.D. # PA 202047
PA Institutional Law Project
718 Arch Street, Ste. 304 South
Philadelphia, PA 19106
Tel: 215-925-2966; Fax: 215-925-5337
E: jtobin@pailp.org
Attorney for Plaintiff Damon Chappelle